EXHIBIT - A

Cuantía: $1,500,000,000.00

2019-P0079

*Execution Version*

(1) NFENERGÍA LLC

AS SELLER

AND

(2) PUERTO RICO ELECTRIC POWER AUTHORITY

AS BUYER

## FUEL SALE AND PURCHASE AGREEMENT

## TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND INTERPRETATION ................................................................. 2

ARTICLE II SALE AND PURCHASE ................................................................................... 13

ARTICLE III DURATION AND CONDITIONS ....................................................................... 13

ARTICLE IV QUALITY .................................................................................................... 17

ARTICLE V SUPPLY PERIOD .......................................................................................... 19

ARTICLE VI NG QUANTITIES ........................................................................................ 20

ARTICLE VII SCHEDULING ............................................................................................ 21

ARTICLE VIII SHUTDOWN; COMMITTEES ....................................................................... 25

ARTICLE IX SELLER'S SHORTFALL ................................................................................ 26

ARTICLE X MEASUREMENT AND TESTING ...................................................................... 27

ARTICLE XI RISK AND INDEMNITY ............................................................................... 31

ARTICLE XII NATURAL GAS MANUFACTURING SURCHARGE ............................................ 34

ARTICLE XIII INVOICING AND PAYMENT ....................................................................... 35

ARTICLE XIV DUTIES, TAXES AND CHARGES .................................................................. 38

ARTICLE XV FORCE MAJEURE ...................................................................................... 39

ARTICLE XVI REPRESENTATIONS, WARRANTIES AND LIABILITIES ................................... 42

ARTICLE XVII ASSIGNMENT ......................................................................................... 44

ARTICLE XVIII SUBCONTRACTORS ................................................................................ 45

ARTICLE XIX TERMINATION ......................................................................................... 46

ARTICLE XX NOVATION ............................................................................................... 48

ARTICLE XXI CHANGE IN LAW ..................................................................................... 48

ARTICLE XXII APPLICABLE LAW .................................................................................. 49

ARTICLE XXIII RESERVED ............................................................................................ 49

ARTICLE XXIV SETTLEMENT OF DISPUTES .................................................................... 49

ARTICLE XXV NON-WAIVER ......................................................................................... 51

ARTICLE XXVI CONFIDENTIALITY ................................................................................. 51

ARTICLE XXVII NOTICES .............................................................................................. 53

ARTICLE XXVIII CONTINGENT FEES .............................................................................. 53

ARTICLE XXIX ADDRESSES .......................................................................................... 53

ARTICLE XXX BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES
ACT ........................................................................................................................... 54

ARTICLE XXXI TRANSFER OF FUNDS ............................................................................ 55

ARTICLE XXXII CONFLICT OF INTEREST ........................................................................ 55

i

ARTICLE XXXIII UNFAIR LABOR PRACTICE ................................................................. 56

ARTICLE XXXIV DISCRIMINATION ............................................................................. 56

ARTICLE XXXV COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS ................................................................. 56

ARTICLE XXXVI INSURANCE ...................................................................................... 61

ARTICLE XXXVII GENERAL ......................................................................................... 64

## ANNEXES

Annex A – Terms and Conditions for Works

Annex B – Delivery Point

Annex C – Seller's and Buyer's Site Diagrams; Each Party's Property

Annex D – Operations Committee and Construction Committee

Annex E – Annual Contract Quantity

## EXHIBITS

Exhibit A – Buyer's and Seller's Obligations

Exhibit B – Specifications

Exhibit C – Fuel Price

Exhibit D – Natural Gas Manufacturing Surcharge Amount and Discounted Surcharge Amount

Exhibit E – Monthly Invoice

Exhibit F – Performance Guarantees and Required Testing

Exhibit G – Back-Up Fuel Quantity

Exhibit H – Scope of Work

Exhibit I – Form of Parent Payment Guarantee

**THIS AGREEMENT** is made this 5th Day of March, 2019 (the "**Effective Date**").

**BETWEEN:**

(1)    **NFENERGÍA LLC**, a Puerto Rico limited liability company (hereinafter called the "Seller"), and

(2)    **PUERTO RICO ELECTRIC POWER AUTHORITY** (PREPA), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at P.O. Box 363928, San Juan, Puerto Rico 00936-3928 (hereinafter called the "**Buyer**").

Seller and Buyer shall each be a "**Party**" and, together, the "**Parties.**"

## WITNESSETH

**WHEREAS:**

(A)    Buyer would benefit from and desires to (i) make power generation units 5 and 6 (collectively, the "**SJ 5&6 Units**," and "**SJ 5**" and "**SJ 6**," respectively) of the San Juan Combined Cycle Power Plant (the "**San Juan Power Plant**") capable of using natural gas as their primary fuel, generating significant potential fuel savings versus diesel, and (ii) procure natural gas for the SJ 5&6 Units;

(B)    Buyer, by virtue of its enabling act (Act 83), has the authority to engage those professional, technical and consulting services necessary and convenient to the activities, programmes, and operations of Buyer;

(C)    Pursuant to Section 205 (2)(f) of Act No. 83 and to encourage greater competition, reduce the risk of collusion and promote the best possible terms and conditions in benefit of greater savings and reduction of costs and expenses of Buyer, Buyer carried out a competitive request for proposal (RFP) process for the (i) design, engineering, construction, supply, installation, commissioning and testing works required to make the SJ 5&6 Units capable of utilizing natural gas for power generation and (ii) supply of Natural Gas to such units, in each case as described herein;

(D)    Seller desires to provide natural gas to multiple on-island industrial users and is in the process of building a landed micro-fuel handling facility with multiple truck loading bays and other associated infrastructure, located in San Juan, Puerto Rico, adjacent to the SJ 5&6 Units, which affords Seller the opportunity to undertake the conversion of the SJ 5&6 Units and make Natural Gas available to Buyer, without requiring Buyer to make costly, new investments in additional fuel handling infrastructure;

(E)    Buyer may nominate up to 25 TBtu each year of the contract term taking into account the market price of diesel;

1

(F)   The Parties are committed to work together under the terms of this Agreement to ensure that the supply and utilization of natural gas for the SJ 5&6 Units shall start no later than the last quarter of natural year 2019;

(G)   The transactions contemplated under this Agreement are reasonable and necessary expenses related to the maintenance, repair and operation of the SJ 5&6 Units, and are consistent with standard practices for public utility systems and with Buyer's standard business operations of maintaining and operating its system; and

(H)   Buyer's expected cost and time savings from switching from diesel to Natural Gas to fuel SJ 5&6 Units in accordance with this Agreement will further its strategy of lowering electricity costs, and accelerating grid modernization; the displacement of diesel with Natural Gas will significantly reduce air emissions from the SJ 5&6 Units including for pollutants like $SO_2$.

**NOW, THEREFORE, SELLER AND BUYER HEREBY AGREE as follows:**

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1   Definitions

In this Agreement, except where the context otherwise requires, each of the following expressions have the following meaning:

"**Affiliate**" means, in relation to a Party, any company, corporation, partnership or other legal entity (in this definition referred to as a "Person") that (a) is directly or indirectly Controlled by such Party; (b) directly or indirectly Controls such Party; or (c) is directly or indirectly Controlled by a Person that also, directly or indirectly, Controls such Party; *provided, however,* that unless and until Buyer undergoes a Change of Control permitted by this Agreement, Buyer's only Affiliates are (x) the Puerto Rico Fiscal Agency and Financial Advisory Authority and (y) the Commonwealth of Puerto Rico.

"**Agreement**" means this Agreement and its Annexes and Exhibits, as may be amended, modified, varied or supplemented from time to time.

"**Annual Contract Quantity**" or "**ACQ**" shall have the meaning given to it in Clause 7.4(a)(i).

"**Annual Delivery Programme**" or "**ADP**" shall have the meaning given to it in Clause 7.4(a).

"**Anticipated Commencement Notice**" shall have the meaning given to it in Clause 7.4(a)(i)(B).

"**Applicable Law**" means, in relation to any legal person, property, transaction or event, all applicable provisions of laws, treaties, conventions, statutes, rules, regulations, permits, official directives and orders of, and the terms of all judgments, orders, awards, and decrees issued by, any Governmental Authority by which such legal Person is bound or having application to the property,

2

transaction or event in question, including the Electric Power Authority Revitalization Act and PROMESA.

"**Back-up Fuel Cover Amount**" shall have the meaning set forth in Clause 9.1(b).

"**Back-Up Fuel Quantity**" shall have the meaning set forth in Clause 9.1(a).

"**Back-Up Fuel Quantity Index Price**" means the lower of (a) the average of ULSD fuel from New York/Boston and US Gulf Coast as published in Platt's Oilgram Report, plus $6.70 and (b) the price actually paid in respect of the Back-Up Fuel Quantity procured by Buyer pursuant to Clause 9.1(a)(ii).

"**Base Cost**" shall have the meaning set forth in Exhibit C.

"**Binding Monthly Schedule**" shall have the meaning given to it in Clause 7.4(a)(iv).

"**BOP Contractor**" means any contractor of Seller, other than MHPSA, engaged to perform any activities within the fence-line of the San Juan Power Plant.

"**Btu**" means a British thermal unit, being that amount of heat that is equal to 1,055.056 Joules or 0.000293071 kWh.

"**Business Day**" means a Day, other than a Saturday, Sunday or a public holiday in San Juan (Puerto Rico) or New York (United States).

"**Buyer**" shall have the meaning given to it in the preamble to this Agreement.

"**Buyer Check Meter**" shall have the meaning given to it in Clause 10.2(b).

"**Buyer Firm Supply Conditions**" shall have the meaning given to it in Clause 3.2(f).

"**Buyer Group**" means Buyer, its Affiliates, and its and their respective directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Buyer Metering Station**" shall have the meaning given in Clause 10.1(b).

"**Buyer Permit Condition**" shall have the meaning given in Clause 3.2(a).

"**Buyer Property**" means the San Juan Power Plant, the improvements to the SJ 5&6 Units created by the Works, and the Interconnection Facility, in each case as modified from time to time, including as depicted in Annex C.

"**Carryover Credit**" shall have the meaning given in Clause 7.5(d).

"**Challenge Action**" means (a) any action, contested matter or proceeding commenced by (i) a Significant Party before the Title III Court or (ii) any other party-in-interest before the Title III Court, or (b) any order entered by the Title III Court or other Governmental Authority, which,

3

in the case of either (a) or (b), seeks to or has the effect to avoid, enjoin, rescind, set aside, stay, subordinate, or otherwise alter or impair, this Agreement or any of the transactions contemplated hereby in any way, including the payment or timing of payment of, any amounts paid or payable to Seller hereunder.

"**Change of Control**" means (a) in the case of Buyer, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, a Puerto Rican Governmental Authority would no longer Control Buyer, and (b) in case of Seller, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, Atlantic Energy Holdings LLC would cease to Control Seller.

"**Change of Law**" means the amendment, repeal or change of an existing Applicable Law, or a new Applicable Law, in either case that takes effect after the Effective Date.

"**Claims**" means all claims, demands, notices of violation or noncompliance, governmental requests for information, legal proceedings, liens, encumbrances, causes of action and other actions, of any kind or nature (including actions in rem or in personam and actions of Governmental Authorities). "**Claim**" means any of the foregoing.

"**Commissioning Start Date**" has the meaning given to it in Clause 5.4.

"**Confidential Information**" shall have the meaning given to it in Clause 26.1.

"**Construction Committee**" shall have the meaning give to it in Clause 8.4.

"**Contract Quarter**" means each calendar quarter (beginning each of January, April, July and October) during the Contract Year, provided that the first Contract Quarter shall begin as of the first Day of the Firm Supply Period and end on the last Day of such calendar quarter and the last Contract Quarter shall end on the last Day of the Firm Supply Period.

"**Contract Term**" shall have the meaning given to it in Clause 3.1(a).

"**Contract Year**" means any calendar year during the Firm Supply Period, except for the first Contract Year, which shall commence on the first Day of the Firm Supply Period, and the last Contract Year, which shall end on the last Day of the Firm Supply Period.

"**Contracting Officer**" means the Chief Executive Officer of Buyer, acting directly or through his properly authorized representatives as notified in writing to Seller.

"**Contractor**" refers to MHPSA and any BOP Contractor.

"**Control**" means the beneficial ownership, either directly or indirectly, of fifty percent (50%) or more of the voting rights in a Person, or (whether alone or acting in concert with others, and whether by the ownership of share capital, the possession of voting power, contract or otherwise) the right to appoint fifty percent (50%) or more of the board of directors or equivalent management body of such Person. "**Controlled**" shall have the correlative meaning.

4

"**Corporate Tax**" means any and all Taxes based on income, revenues, profits, or net worth and all state and local franchise, license, occupation and similar Taxes required for the maintenance of corporate existence or to maintain good standing that are assessed against a Party.

"**Daily Contract Quantity**" or "**DCQ**" shall have the meaning given to it in Clause 6.5.

"**Day**" means a period of twenty-four (24) consecutive hours beginning at 00:00 hours local time in Puerto Rico.

"**Defaulting Party**" shall have the meaning given to it in Clause 19.1(b).

"**Delay LDs**" shall have the meaning given to it in Clause 5.5.

"**Delivery Confirmation Request**" shall have the meaning given to it in Clause 4.2(c).

"**Delivery Point**" means the point of interconnection between Seller's MFH Facility and Buyer's Interconnection Facility, as identified on the schematic attached as Annex B (unless otherwise agreed in writing by the Parties).

"**Disclosing Party**" shall have the meaning given to it in Clause 26.1.

"**Discounted Surcharge Amount**" shall have the meaning given to it in Clause 12.3.

"**Dispatch**" shall have the meaning given to it in Clause 7.4(a)(i)(A).

"**Dispute**" shall have the meaning given to it in Clause 24.1(a).

"**Effective Date**" shall have the meaning given to it in the preamble to this Agreement.

"**Environmental Compliance Officer**" means an employee of Buyer in the role of manager of environmental compliance who is designated to be in charge of project inspections and environmental regulations compliance.

"**environmental violation**" means any violation of Applicable Law by a Contractor or its subcontractors in connection with the handling of any Hazardous Materials brought to or generated on the Site by a Contractor or its subcontractors in connection with the performance or non-performance of its obligations under this Agreement or its agreement with Seller.

"**Excess Nomination**" shall have the meaning given to it in Clause 7.5.

"**Excluded Losses**" shall have the meaning given to it in Clause 11.5.

"**Expert**" means a Person of appropriate industry expertise and experience to whom a Dispute, disagreement or another matter of interpretation is or is to be referred to pursuant to Clause 24.2.

"**Extension Notice**" shall have the meaning given to it in Clause 3.1(b).

"**Extension Term**" shall have the meaning given to it in Clause 3.1(b).

5

"**Final Completion**" shall have the meaning given to it in Clause 10.2 of Annex A.

"**Financing Entities**" means any and all lenders, security, note or bond holders, lien holders, investors, equity providers and other Persons providing any construction, interim or long-term equity or debt financing, refinancing, or recapitalization to Buyer, its Affiliate, and its or their heirs, successors and assigns, and any trustees or agents acting on their behalf.

"**Firm Supply Conditions**" shall have the meaning given to it in Clause 3.2.

"**Firm Supply Conditions Date**" shall have the meaning given to it in Clause 3.4.

"**Firm Supply Period**" shall have the meaning given to it in Clause 5.3.

"**Firm Supply Solvency Conditions**" means the Firm Supply Conditions set forth in Clause 3.2(f).

"**Fiscal Budget**" means the then-applicable annual fiscal budget approved and certified by the Oversight Board for PREPA in accordance with PROMESA.

"**Force Majeure**" shall have the meaning given to it in Clause 15.1.

"**Forced Shutdown**" means a shutdown condition of either of the SJ 5&6 Units, which makes one or both of them unavailable to produce power due to an unexpected or imminent breakdown, including as caused by equipment failures, disruption of the fuel supply and operator error.

"**Fuel Price**" shall have the meaning given to it in Exhibit C.

"**Full Surcharge Amount**" shall have the meaning given to it in Clause 12.3.

"**Governmental Authority**" means the government of the United States of America, any state thereof, the Commonwealth of Puerto Rico, or any local jurisdiction, or any political subdivision of any of the foregoing including, but not limited to courts, administrative bodies, departments, commissions, boards, bureaus, agencies, municipalities or other instrumentalities.

"**Guaranteed First Gas Date**" means June 1st, 2019, as may be extended in accordance with this Agreement.

"**Guaranteed First Gas Long-Stop Date**" means December 31st, 2019, as may be extended in accordance with this Agreement.

"**Guaranteed Item**" shall have the meaning given to it in Exhibit F.

"**Guaranteed Result**" shall have the meaning given to it in Exhibit F.

"**Guaranteed Substantial Completion Date**" means June 30th, 2020, as may be extended in accordance with this Agreement.

6

"Hazardous Materials" means any substance that is either defined or regulated as hazardous or toxic by, or as to which liability including for damages or remediation may be imposed under Applicable Law, including (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing polychlorinated biphenyls and processes and certain cooling systems that use chlorofluorocarbons; (b) any chemicals, materials or substances which as of the applicable Effective Date are, or hereafter become, defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," or any words of similar import pursuant to Applicable Law; or (c) any other chemical, material, substance or waste, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental Authority, or which may be the subject of liability under any Applicable Law for damages, costs or remediation.

"Heating Value" (also known as High Heating Value (HHV)) means the gross heating value on a dry basis, which is the number of Btus produced by the complete combustion at constant pressure of the amount of dry gas that would occupy a volume of one Standard Cubic Foot at a constant pressure of 14.73 psia and a temperature of 60° F with combustion air at the same temperature and pressure as the gas, the products of combustion being cooled to the initial temperature of the gas and air and the water formed by combustion condensed to the liquid state.

"Incremental Tax Adjustment" shall have the meaning given to it in Clause 12.3.

"Initial Contract Term" shall have the meaning given to it in Clause 3.1(a)(i).

"Interconnection Facility" means the facility connecting Seller's MFH Facility to the SJ 5&6 Units, as depicted in Annex C.

"Joule" means a unit of energy defined in the International System of Units.

"kWh" shall mean kilowatt per hour.

"LNG" means Natural Gas in a liquid state at or below its boiling point and at or near atmospheric pressure.

"LNG Delivery Plan" shall have the meaning given to it in Clause 15.1(a).

"Losses" means all liabilities, damages, losses, costs and expenses (including those on account of loss of or damage to property, bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium (parental or spousal), loss of support, death, and wrongful termination of employment, and all litigation and arbitration costs and expenses and reasonable attorneys' fees) that accrue at any time, whether created by or based upon law (including statute), contract, tort, voluntary settlement or otherwise, or under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties. "Loss" means any of the foregoing.

"Maximum Annual Contract Quantity" shall have the meaning given to it in Clause 6.1.

7

"**Maximum DCQ**" shall have the meaning given to it in Clause 6.5.

"**Maximum Hourly Rate**" shall have the meaning given to it in Clause 6.6(a).

"**Metering Equipment**" shall have the meaning given to it in Clause 10.2(a).

"**MFH Facility**" shall have the meaning given to it in Annex A.

"**MHPSA**" means Mitsubishi Hitachi Power Systems America, Inc.

"**Minimum DCQ**" shall have the meaning given to it in Clause 6.5.

"**Minimum Hourly Rate**" shall have the meaning given to it in Clause 6.6.

"**Mitigation Sale**" shall have the meaning given to it in Clause 7.5(c).

"**MMBtu**" means 1,000,000 Btu.

"**Monthly Invoice**" shall have the meaning given to it in Clause 13.2.

"**Natural Gas**" or "**NG**" means any saturated hydrocarbon or mixture of saturated hydrocarbons consisting essentially of methane and other combustible and non-combustible gases in a gaseous state.

"**Natural Gas Deficiency**" shall have the meaning set forth in Clause 9.1.

"**Natural Gas Manufacturing Discounted Payment**" shall have the meaning given to it in Clause 12.3.

"**Natural Gas Manufacturing Surcharge**" shall have the meaning given to it in Clause 12.1.

"**Ninety Day Schedule**" or "**NDS**" shall have the meaning given to it in Clause 7.4(a)(iv).

"**Off-Spec Natural Gas**" is any Natural Gas that does not conform to the Specifications set forth in Clause 4.1.

"**Operations Committee**" shall have the meaning given to it in Clause 8.3.

"**Oversight Board**" shall mean the Financial Oversight and Management Board for Puerto Rico.

"**Party**" and "**Parties**" shall have the meanings given to them in the preamble to this Agreement.

"**Permit**" means, in respect of either Party, any permit, license, consent, clearance, certificate, approval, authorization or similar document or authority (including for export or import) which any Applicable Laws requires such Party (or, in the case of Seller, any member of

8

the Seller Group) to hold or obtain in order for any of its obligations under this Agreement to be performed, including visas and permits for personnel to work and reside in any location.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a joint stock company, a trust, any unincorporated organization, or any Governmental Authority.

"**Planned Buyer Shutdown**" shall have the meaning given to it in Clause 8.2.

"**Planned Seller Shutdown**" shall have the meaning given to it in Clause 8.2.

"**Postpetition Financing Budget**" shall mean the initial thirteen (13) week cash flow budget filed as Exhibit 1 to Docket No. 722 in Buyer's Title III Case and any subsequent thirteen (13) week cash flow budget submitted by Buyer to the Commonwealth of Puerto Rico, in its capacity as "Lender" under the Credit Agreement (defined in the Postpetition Financing Order) and approved by the Lender and the Oversight Board, as set forth in the Postpetition Financing Order.

"**Postpetition Financing Order**" shall mean that certain *Order (A) Authorizing Debtor Puerto Rico Electric Power Authority to Obtain Postpetition Financing, (B) Providing Superpriority Administrative Expense Claims, and (C) Granting Related Relief* entered at Docket No. 744 in the Title III Case.

"**Prime Rate**" means the prime lending rate, as reported by The Wall Street Journal's bank survey.

"**Project**" means the Works required to effect the conversion of the fuel delivery and combustion components of SJ 5&6 Units so that those units may be fueled primarily by Natural Gas, as well as the related design, construction and commissioning of the Interconnection Facility to deliver Natural Gas from the MFH Facility to the SJ 5&6 Units, as more particularly described in the Scope of Work.

"**PROMESA**" means the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241, as may be amended or modified.

"**Puerto Rican Governmental Authority**" means a Governmental Authority of the Commonwealth of Puerto Rico, and excludes, for the avoidance of doubt, any Governmental Authority of the federal government of the United States of America or any state therein.

"**Punch List**" means the list of non-conforming or incomplete work items that are agreed by Buyer and Seller (each acting reasonably) as being unnecessary for commencement of the Firm Supply Period, but required for the Final Completion of the Work.

"**Reasonable and Prudent Operator**" means a Person seeking in good faith to perform its contractual obligations and comply with Applicable Law, and in so doing, and in the general conduct of its undertaking, exercising that degree of skill, diligence, prudence and foresight which would reasonably and ordinarily be expected from a skilled and experienced international operator engaged in the same type of undertaking under the same or similar circumstances and conditions.

9

"**Receiving Party**" shall have the meaning given to it in Clause 26.1.

"**Required Consents**" shall have the meaning given to it in Clause 16.1(c).

"**Required Testing**" means the tests set forth in the agreement between Seller and MHPSA regarding the Works.

"**Resident Engineer**" means the manager of Seller's field office whose duties include, the administrative issues, quality control, and technical aspects of the Project. This person shall be a professional engineer registered in Puerto Rico and an active member of the Puerto Rico College of Engineers and Land Surveyors. The Resident Engineer shall be present at all times on site for Seller to be able to perform any task relating to the Project.

"**Safety Officer**" means an employee of Buyer in the role of manager of the HSSE programmes, whose duties include the prevention of accidents and the implementation of the safety and health programme and the site-specific work plan.

"**San Juan Power Plant**" shall have the meaning given to it in the Recitals.

"**Scheduled Maintenance**" means the maintenance periods scheduled to be performed on SJ 5&6 Units, the Interconnection Facility and/or the MFH Facility in accordance with Article VIII.

"**Scope of Work**" shall mean all works and other requirements set forth in Exhibit H.

"**Seller**" shall have the meaning given to it in the preamble to this Agreement.

"**Seller Group**" means Seller, its Affiliates, and its or their directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Seller's Financing Sources**" shall have the meaning given to it in Clause 37.5.

"**Seller Metering Station**" shall have the meaning given in Clause 10.2(a).

"**Seller Property**" means the MFH Facility and all other property developed by Seller adjacent to or in the vicinity of the San Juan Power Plant (other than Buyer Property created by the Works), including as depicted in Annex C.

"**Seller's Parent**" means Atlantic Energy Holdings LLC, a Delaware limited liability company.

"**Significant Party**" shall mean (i) U.S. Bank National Association, as successor Trustee pursuant to that certain Trust Agreement, dated as of January 1, 1974, as amended and supplemented, between Buyer and U.S. Bank National Association as successor Trustee, (ii) any holder of or insurer of bonds issued under the Trust Agreement in an aggregate principal amount exceeding $200 million, (iii) the Oversight Board, (iv) the Buyer, or (v) the Puerto Rico Fiscal Agency and Financial Advisory Authority.

10

"SJ 5" shall have the meaning given to it in the Recitals to this Agreement.

"SJ 5&6 Units" shall have the meaning given to it in the Recitals to this Agreement.

"SJ 6" shall have the meaning given to it in the Recitals to this Agreement.

"SJ 6 First Gas Requirements" shall have the meaning given to it in Clause 5.4.

"Specifications" shall have the meaning given to it in Clause 4.1.

"Standard Cubic Foot" or "scf" means Natural Gas at a base temperature of 60° F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law.

"Substantial Completion" means, with respect to either of the SJ 5&6 Units, the date when (i) the Works have been completed in respect of such Unit (other than Punch List items), (ii) the Interconnection Facility is able to deliver Seller's Natural Gas to the Delivery Point, (iii) Required Testing of the relevant Unit has been completed, and (iv) Seller has delivered written notice to Buyer that the relevant Unit has passed all Required Testing for such Unit in accordance with Exhibit F.

"Supply Period" shall have the meaning given to it in Clause 5.1.

"Taxes" shall have the meaning given to it in Article XIV.

"TBtu" means 1,000,000,000,000 Btu.

"Termination Event" shall have the meaning given to it in Clause 19.1(b).

"Terms of Works" means the requirements, Clauses, and processes for the Works included as Annex A.



"Third Party" means any Person not a Party to this Agreement; *provided, however,* that for the purpose of Article XI, "Third Party" means any person who is not a member of Seller Group or Buyer Group.

"Title III Case" shall mean the case under Title III of PROMESA styled *In re The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority (PREPA)* and numbered No. 17 BK 4780-LTS, which was instituted on July 2, 2017 by the Oversight Board by the filing of a voluntary petition for relief for Buyer.

"Title III Court" shall mean the United States District Court for the District of Puerto Rico, or any appellate court, presiding over the pending Title III Case of PREPA.

"Transitional Supply Period" shall have the meaning given to it in Clause 5.2.

"Trust Agreement" shall mean that certain Trust Agreement, dated as of January 1, 1974, between Buyer and U.S. Bank, National Association, as Successor Trustee, as amended, restated, or otherwise modified from time to time.

11

"**Unit**" means SJ 5 or SJ 6, as applicable.

"**Unplanned Shutdown**" shall have the meaning given to it in Clause 8.1.

"**US**" means the United States of America.

"**US Dollars**" or "**US$**" means the lawful currency of the United States of America.

"**Weekly Programme**" shall have the meaning given to it in Clause 7.4(a)(v).

"**Works**" means the design, engineering, construction, supply, installation, commissioning and testing works within the fence line of the San Juan Power Plant required to make Natural Gas available to SJ 5&6 Units at the Delivery Point and to convert such units to Natural Gas burning power generation, all as further described in the Scope of Work.

1.2    Interpretation

In this Agreement, unless the context requires otherwise:



(a)    References to Clauses, Annexes, and Exhibits are to Clauses, Annexes, and Exhibits of this Agreement. The Annexes and Exhibits hereto are incorporated herein as an integral part of this Agreement.

(b)    References to a Person include that Person's successors and permitted assigns.

(c)    Headings of Clauses, Annexes, and Exhibits are for convenience only and shall not affect the construction or interpretation of this Agreement.

(d)    Where the context requires, words denoting the singular or masculine or neuter only shall include the plural, feminine, body politic or corporate and vice versa.

(e)    References to "include" and "including" shall be construed as "including without limitation."

(f)    The words "agree," "agrees," and "agreed" refer to a written agreement, executed and delivered by the Parties.

(g)    Wherever either Party's consent or agreement is expressed to "not be unreasonably withheld," it is acknowledged that such obligation shall include, but not be limited to, the obligation of the Party not unreasonably to delay giving the relevant consent or agreement, and in the foregoing case as well as wherever either Party undertakes "efforts" or "endeavors" to do something, or refrain from doing something, it is acknowledged that such Party shall not be in breach of its obligations to the other Party to the extent that such Party's actions are limited by such Party's need to comply with its contractual obligations to any Person, provided that such Party has used its reasonable efforts to obtain any necessary waiver(s) of

12

such relevant obligations and that such Party has not assumed such obligations subsequent to entering into this Agreement.

(h)    Any law, statute or statutory provision shall be construed as a reference to the same as it may be amended, modified or re-enacted, from time to time, and shall include any subordinate legislation made from time to time under that provision.

(i)    If at any time during the Supply Period, the Prime Rate becomes unavailable or inappropriate then the Parties shall meet as soon as possible thereafter and in good faith discuss and attempt to agree in writing upon a suitable alternative replacement. If the Parties are unable to so agree upon a suitable alternative replacement, then either Party may refer the matter to an Expert for determination in accordance with Clause 24.2.

## ARTICLE II
## SALE AND PURCHASE

Seller agrees to sell and make available to Buyer at the Delivery Point, and Buyer agrees to purchase from Seller, Natural Gas in compliance with Article IV "Quality," for use by Buyer solely as fuel for the SJ 5&6 Units. The quantity of Natural Gas to be made available by Seller at the Delivery Point shall be the amount required to operate the SJ 5&6 Units primarily on Natural Gas, as scheduled in accordance with Article VII. The price for such quantities shall be determined in accordance with Article XIII. Pursuant to Clause 7.4(a)(i), Buyer shall have the right, on or before June 1st of each year, to nominate zero (0) as the Annual Contract Quantity for the following Contract Year, and (at Buyer's option) procure diesel from Third Parties during such Contract Year instead.

## ARTICLE III
## DURATION AND CONDITIONS

3.1    Contract Term

(a)    This Agreement shall enter into full force and effect on the Effective Date and shall, subject to the terms hereof, continue in force and effect until and including the later of:

(i)    the fifth (5th) anniversary of the first Day of the Firm Supply Period (the "Initial Contract Term"), and

(ii)    the expiration of any Extension Term agreed to pursuant to Clause 3.1(b),

(such period, the "Contract Term"), unless this Agreement is terminated earlier in accordance with its terms.

(b)    Subject to the provisions of this Clause 3.1(b), Buyer may elect to extend the Contract Term for three (3) separate five (5) year periods (each, an "Extension Term"). Buyer must notify Seller in writing of its intent to exercise its right to

13

extend (an "Extension Notice") by no later than June 1st of the Contract Year preceding the final Contract Year of the Initial Contract Term or Extension Term, as applicable. Upon Seller's receipt of an Extension Notice, the Parties shall have ninety (90) Days to agree in writing on the terms and conditions regarding price and volume applicable to such Extension Term. If, within such ninety (90) Day period, Buyer and Seller are unable to agree upon the volume of Natural Gas and price of Natural Gas delivered to the SJ 5&6 Units that will apply during the relevant Extension Term, then this Agreement shall terminate at the end of the Initial Contract Term or the then-current Extension Term, as applicable.

(c)     In no event shall Buyer be permitted to use Natural Gas purchased from Seller pursuant to this Agreement in any power generation unit other than the SJ 5&6 Units.

(d)     From and after the Effective Date, the Parties shall comply with the terms and conditions of Annex A, and Seller shall be responsible for the scope of work and associated costs required for the Works. Title to all Buyer Property created by the Works shall transfer from Seller at Substantial Completion free and clear of all liens and encumbrances. **NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, SELLER SHALL RETAIN EXCLUSIVE TITLE TO (AND BUYER SHALL HAVE NO ACTUAL OR BENEFICIAL RIGHT, TITLE, RIGHT TO USE, OR OTHER INTEREST, IN OR TO) THE SELLER PROPERTY AND ALL FIXTURES, APPURTENANCES AND OTHER ELEMENTS THERETO AND THEREOF.**

(e)     During the Contract Term, Seller shall be the exclusive supplier of Natural Gas to Buyer for use as fuel at the SJ 5&6 Units. To the extent that a Seller failure to make available to Buyer a binding quantity of Natural Gas exceeding fifty percent (50%) of the nominations in the Binding Monthly Schedules over three (3) consecutive months, for the remaining duration of such failure, Buyer shall be entitled to procure from Third Parties the volume of Natural Gas that Seller fails to deliver during such remaining duration; *provided, however*, that Seller's facilities shall not be used to deliver any such Natural Gas without Seller's written consent signed by an authorized executive officer of Seller.

3.2     Each of the following will be "Firm Supply Conditions":

(a)     Buyer shall have obtained and maintained from the relevant Governmental Authorities all Permits necessary for the execution of its obligations under this Agreement, including the Permits set out in the column captioned "Buyer Permits" of the table set forth in Exhibit A (the "Buyer Permit Condition");

(b)     Seller shall have (i) given written notice to Buyer that (a) Seller has achieved Substantial Completion of one of the SJ 5&6 Units; and (b) Seller is able to supply Natural Gas on a fully operational basis to such Unit at the Delivery Point, and (ii) obtained from the relevant Governmental Authorities all Permits necessary

14

for the execution of its obligations under this Agreement, including the Permits set out in the column captioned "Seller Permits" of the table set forth in Exhibit A (the "Seller Firm Supply Condition");

(c)     Buyer shall (i) have obtained the Required Consents with respect to funding for all amounts payable to Seller in connection with the Binding Monthly Schedule included in the then-operative Fiscal Budget and the then-operative Postpetition Financing Budget, to the extent that the Postpetition Financing Budget remains applicable, and, to the extent the Postpetition Financing Budget is no longer applicable, included only in the then-operative Fiscal Budget, (ii) have complied with all applicable terms of the Trust Agreement relating to Buyer's performance under this Agreement, except to the extent such terms of the Trust Agreement are modified, stayed, or otherwise excused by PROMESA and the pendency of the Title III Case, and (iii) be current on amounts due and payable to Seller under this Agreement pursuant to Clause 13.7 in excess of One Million Dollars ($1,000,000.00);

(d)     (i) no Challenge Action commenced by any Significant Party shall be pending, (ii) no Challenge Action commenced by any other party-in-interest shall be pending for which there is a reasonable likelihood such action could materially impair the ability of Buyer to perform under this Agreement, and (iii) no order relating to a Challenge Action by any party shall have been entered by the Title III Court or other Governmental Authority that impairs this Agreement or the transactions provided for or contemplated by this Agreement including any amounts paid or payable to Seller under this Agreement;

(e)     both (i) no Significant Party shall have challenged the treatment of any amounts paid or payable to Seller under this Agreement as being considered for all purposes, including for purposes of the Trust Agreement, as "Current Expenses" as defined in the Trust Agreement, and (ii) neither Buyer or Seller has, due to any notice or action by a Person (other than the Parties) or a Governmental Authority, a reasonable basis for concluding that any or all amounts paid or payable to Seller under this Agreement would not be considered for all purposes, including for purposes of the Trust Agreement, "Current Expenses" as defined in the Trust Agreement, and to the extent either Party receives at any time any oral or written notice of any challenge by any Significant Party, Person, or Governmental Authority to the treatment of any amounts paid or payable to Seller under this Agreement as "Current Expenses," such Party shall immediately provide such notice to the other Party; and

(f)     no order has been entered by the Title III Court or any other Governmental Authority expressly providing for the appointment of a receiver, custodian, or similar fiduciary for Buyer or any material portion of its property; provided that any order entered by the Title III Court modifying the automatic stay (other than an order of the Title III Court modifying the automatic stay to permit a party to seek the appointment of a receiver, custodian, or similar fiduciary for the Buyer or any material portion of its property in any forum other than the Title III Court) shall not

15

impair or affect this Agreement (clause (c), clause (d), clause (e) and clause (f), collectively, the "Firm Supply Solvency Conditions," and, together with the Buyer Permit Condition, the "Buyer Firm Supply Conditions").

3.3    The Parties shall keep each other duly informed of the fulfillment of each of their respective Firm Supply Conditions. Seller shall notify Buyer and Buyer shall notify Seller in writing of the date on which it anticipates that the Seller Firm Supply Condition or the Buyer Firm Supply Conditions, respectively, will be satisfied no less than thirty (30) Days prior to such anticipated date. As soon as the Seller Firm Supply Condition or a Buyer Firm Supply Condition is satisfied, Seller or Buyer, respectively, shall confirm in writing the fulfillment of such Firm Supply Condition.

3.4    The Firm Supply Period will commence as provided in Clause 5.3. The "Firm Supply Conditions Date" shall be the date on which Seller Firm Supply Condition and the Buyer Firm Supply Conditions have been satisfied or expressly waived in accordance with Clause 3.7, provided that the Firm Supply Conditions Date will not occur until the latest date specified in a notice properly delivered under Clause 3.3.

3.5    Each Party shall use commercially reasonable efforts to cooperate and assist the other to obtain and maintain their respective Permits. Buyer shall not act or fail to act in any manner that delays, interferes with, impedes, or otherwise negatively impacts, Seller's ability to satisfy the Firm Supply Conditions or thereafter to deliver Natural Gas hereunder. Seller shall not act or fail to act in any manner that delays, interferes with, impedes, or otherwise negatively impacts, Buyer's ability to satisfy the Firm Supply Conditions or thereafter to receive Natural Gas hereunder. In agreeing to the Seller's Firm Supply Conditions, the Guaranteed First Gas Date, the Guaranteed First Gas Long-Stop Date and the Guaranteed Substantial Completion Date, Seller has relied on the assumption that no other Puerto Rican Governmental Authority will act or fail to act in any manner that delays, interferes with, impedes, or otherwise negatively impacts, the Parties' respective abilities to satisfy the Firm Supply Conditions or thereafter to deliver and receive Natural Gas hereunder, even though it is acknowledged that Buyer has no authority to, and is not required hereunder, to compel any such conduct (or abstention therefrom). Buyer's obligations under this Clause 3.5 and the Seller assumptions regarding other Puerto Rican Governmental Authorities include (i) that Buyer will use commercially reasonable efforts to ensure that its Permits that are required in order to satisfy the Firm Supply Conditions are applied for, processed, granted and obtained in a timely manner, and are thereafter maintained for the duration of the Contract Term (provided that the foregoing does not require Buyer to compel action by any other Puerto Rican Governmental Authority), (ii) that Buyer will use commercially reasonable efforts to cooperate and assist Seller with obtaining and maintaining the Seller Permits, (iii) non-interference with Seller's ability to deliver, or Buyer's ability to accept, the quantity of Natural Gas contemplated hereby, (iv) completion of each action specified for Buyer in Exhibit A by the corresponding date specified therein, and (v) from the Effective Date until the Works are finally complete, unrestricted access (to the extent reasonably necessary to complete the Works) to and use of all areas on or adjacent to the San Juan Power Plant that are necessary for the execution of the Works, twenty-four (24) hours per Day, seven (7) Days per week, for Seller, its contractors, subcontractors, vendors and consultants, and their respective officers,

16

employees and representatives, in each case with prior notice (which may be included in a work plan agreed by the Parties). As Seller's sole and exclusive remedy in connection with Buyer's failure to comply with this Clause 3.5 and any variance from or inaccuracy of any of the assumptions made with respect to any Puerto Rican Governmental Authority or to any other party (A) the Guaranteed First Gas Date and the Guaranteed First Gas Long-Stop Date shall be automatically extended by the number of days by which such failure, variance or inaccuracy directly or indirectly delay the Commissioning Start Date beyond such date, (B) the Guaranteed Substantial Completion Date shall be automatically extended by the number of days by which such failure, variance or inaccuracy directly or indirectly delay achievement of Substantial Completion beyond such date, and (C) in accordance with Article 9 of Annex A, Seller shall be entitled to an equitable adjustment to the compensation payable hereunder.

3.6    Each Party shall furnish the other Party upon request by such other Party with such other reasonable assistance and other information in its possession (and not subject to applicable confidentiality restrictions) as the other Party may request in connection with its fulfillment of each Firm Supply Condition for which that other Party is the responsible Party.

3.7    Each Party shall be entitled, in its sole discretion, to waive the other Party's obligation to comply with such other Party's Firm Supply Conditions.

### ARTICLE IV
### QUALITY

4.1    The Natural Gas delivered by Seller to or for the account of Buyer at the Delivery Point shall comply with the Natural Gas quality specifications set forth in Exhibit B (the "Specifications"). The standard test methods ASTM D1945, Standard Test Method for Analysis of Natural Gas by Gas Chromatography, then in effect, shall be used to determine compliance with the Specifications.

4.2    Failure of Natural Gas to Conform to Specifications

(a)    Seller shall notify Buyer as soon as reasonably practicable after becoming aware of any existing or anticipated failure of the NG available for delivery to the Delivery Point to conform to the Specifications, giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration, including the delivery time of such Off-Spec Natural Gas.

(b)    If at any time, the NG offered for delivery by Seller is or is reasonably expected by Seller to be Off-Spec Natural Gas, Buyer may reject in whole or in part the delivery of such Off-Spec Natural Gas.

(c)    If at any time, Seller is unable to deliver NG conforming to the Specifications but is able to deliver Off-Spec Natural Gas, Seller shall withhold deliveries until such time as it is able to deliver NG conforming to the Specifications; *provided, however*, that in such event Buyer shall be entitled to (i)

17

procure Back-up Fuel Quantity from Third Parties, or (ii) request delivery of such Off-Spec Natural Gas (a "**Delivery Confirmation Request**"), unless such delivery, in Seller's opinion acting as a Reasonable and Prudent Operator, would have a detrimental effect on the MFH Facility or other related Seller Property.

(d)     Unless both (i) Buyer is notified of the full extent to which Off-Spec Natural Gas actually fails to meet the Specifications, and (ii) Buyer makes a Delivery Confirmation Request pursuant to Clause 4.2(c) (which shall constitute a waiver in writing of its right to reject such Off-Spec Natural Gas), Seller shall, subject to Clause 11.5, be liable for all cost and expense directly incurred by Buyer as a result of the delivery of Off-Spec Natural Gas, including all the reasonable out-of-pocket, actual costs and expenses incurred (over and above those normally incurred in accepting conforming Natural Gas) in receiving and treating Off-Spec Natural Gas by such means as are appropriate; *provided, however*, that Buyer shall exercise commercially reasonable practices to minimize the costs and expenses which may occur.

(e)     If (i) Buyer is notified of the full extent to which Off-Spec Natural Gas actually fails to meet the Specifications, and (ii) Buyer procures a Back-up Fuel Quantity from Third Parties pursuant to Clause 4.2(c) as a replacement for such Off-Spec Natural Gas, Seller shall be liable to Buyer for the Back-up Fuel Cover Amount for such Back-up Fuel Quantity, as determined pursuant to Clause 9.1(b).



(f)     If (i) Buyer is notified of the full extent to which Off-Spec Natural Gas actually fails to meet the Specifications, and (ii) Buyer waives in writing its right to reject such Off-Spec Natural Gas, (A) such Off-Spec Natural Gas shall be deemed to have been delivered in accordance with this Agreement and (B) Seller shall not be liable for any damages to Buyer for the acceptance of such Off-Spec Natural Gas.

(g)     When NG is not taken by Buyer due to it being Off-Spec Natural Gas or when Seller withholds NG pursuant to Clause 4.2(c), Buyer shall not be obliged to pay for such NG not taken, and such NG not taken shall be deemed not to have been made available and shall be considered a "Natural Gas Deficiency."

(h)     The price for all Off-Spec Natural Gas delivered to the Delivery Point, whether pursuant to paragraph (f) above or otherwise, shall equal eighty-five percent (85%) of the Fuel Price.

(i)     Buyer shall have no right or remedy with respect to the Off-Spec Natural Gas other than those stated or referred to in this Clause 4.2 and Article XIX.

4.3     Any Dispute between the Parties concerning the measurement and/or testing of NG for the purposes of determining the quality thereof at the Delivery Point, shall be settled in accordance with the provisions of Clause 24.2 of this Agreement.

18

**ARTICLE V**
**SUPPLY PERIOD**

5.1    The supply period for NG shall begin on the Commissioning Start Date and shall continue in force until and including the last Day of the Contract Term (the "Supply Period").

5.2    The phase of the Supply Period from, and including, the Commissioning Start Date to, and including, the final Day of the calendar month in which the Firm Supply Conditions Date occurs shall be considered to be a transitional supply period (the "**Transitional Supply Period**").

5.3    The phase of the Supply Period from and including the first Day of the first calendar month that commences after the Firm Supply Conditions Date to and including the last Day of the Contract Term shall be the "**Firm Supply Period**."

5.4    Seller shall use commercially reasonable efforts to complete those elements of the Works that are necessary to make the Interconnection Facility and SJ 6 capable of receiving and using Natural Gas (the "**SJ 6 First Gas Requirements**") for commissioning on a Day (the "**Commissioning Start Date**") that occurs on or before the Guaranteed First Gas Date (as it may be extended pursuant to this Clause 5.4). Seller shall deliver written notice to Buyer promptly upon achievement of the SJ 6 First Gas Requirements and the Commissioning Start Date. If, due to events or circumstances not attributable to Seller (including (i) any event of Force Majeure, (ii) any material breach of this Agreement by Buyer (including of Clause 3.5), (iii) any variance from the assumptions specified in Clause 3.5 with respect to Puerto Rican Governmental Authorities, (iv) any act or omission of MHPSA, including failure to perform any part of the Works fully in accordance with the terms of the agreement between MHPSA and Seller, or any delay in performing such work, (v) any act or omission of Buyer, including Buyer's inability, for any reason, to satisfy the Buyer Firm Supply Condition, and (vi) any Change of Law), satisfaction of the SJ 6 First Gas Requirements is delayed, the Guaranteed First Gas Date shall be automatically extended by the number of days by which such events or circumstances directly or indirectly delay satisfaction of the SJ 6 First Gas Requirements.

5.5    If the Commissioning Start Date fails to occur within seven (7) calendar Days after the Guaranteed First Gas Date, Seller shall be liable to Buyer for delay liquidated damages of Three Hundred Thirty-Three Thousand Three Hundred Thirty Three Dollars and 33/100 Cents ($333,333.33) per Day that elapses between the Day that is the eighth (8th) day after the Guaranteed First Gas Date and the Commissioning Start Date (the "Delay LDs"), up to an aggregate maximum of Ten Million Dollars ($10,000,000.00). The Parties acknowledge and agree that the Delay LDs are a reasonable calculation of the loss that Buyer will suffer as a result of such a delay, are assessed in light of the difficulty of calculating such loss, and do not constitute a penalty. The Delay LDs shall be Buyer's sole and exclusive remedy, and Seller's sole and exclusive liability, with respect to any delay in satisfaction of the SJ 6 First Gas Requirements or commencement of Natural Gas supply (save with respect to the applicable Termination Events in Clause 19.1(b)(ii) and Clause 19.1(b)(v)).

19

## ARTICLE VI
## NG QUANTITIES

6.1    The "**Maximum Annual Contract Quantity**" for each Contract Year shall be twenty-five (25) TBTU unless otherwise agreed in writing by the Parties.

6.2    The Maximum Annual Contract Quantity shall be prorated downward ratably for each Contract Year of less than three hundred sixty-five (365) Days. Without prejudice to the provisions of Clause 6.5 and taking into account Seller's commercial and technical restrictions and subject to the Parties obtaining any relevant Permits, during the Transitional Supply Period (a) Seller shall sell and deliver NG to Buyer at the Delivery Point and (b) Buyer shall purchase and take delivery from Seller, at the Delivery Point, such quantities of Natural Gas as the Parties agree are necessary for Seller to start-up, commission, test and complete, the Works, and Buyer shall make such quantities of Natural Gas available to the Seller for such purposes.

6.3    All the terms and conditions of this Agreement governing the delivery, receipt, metering and testing of, and payment for, Natural Gas, shall apply *mutatis mutandis* during the Transitional Supply Period, provided that:



(a)    Seller shall make available the necessary agreed quantities of NG in accordance with Clause 6.2 and Buyer shall pay for such quantities of NG, in each case in accordance with this Agreement, provided that the quantities of NG to be delivered shall not, without prior written agreement between the Parties, exceed:

(i)    the maximum amount of NG that Seller can supply technically, legally and commercially; and

(ii)    The maximum amount of NG that Buyer can consume at SJ 5&6 Units.

(b)    The Fuel Price applicable to the NG quantities consumed during the Transitional Supply Period up to a maximum quantity of one million two hundred thousand (1,200,000) MMBtu in aggregate for both SJ 5&6 Units shall be the Fuel Price calculated in accordance with Exhibit C, and Seller shall be solely responsible for the cost of NG in excess of such quantity, except to the extent that such excess quantities are used to generate power sold to the grid by Buyer.

6.4    The Parties shall be in contact on a regular basis to define the quantities of Natural Gas to deliver, and to agree upon a delivery programme, in accordance with Clauses 7.4(a)(iii), 7.4(a)(iv) and 7.5, and to start the supply as soon as practicable during the Transitional Supply Period.

6.5    In respect of each Day of every Contract Year, the contracted quantity for such Day (the "**Daily Contract Quantity**" or "**DCQ**") shall be the daily nomination for such Day of the Binding Monthly Schedule or as otherwise agreed in writing. The maximum quantity that Buyer may nominate for any Day (the "**Maximum DCQ**") shall be eighty-six thousand

20

one hundred sixty (86,160) MMbtu per Day; *provided, however*, that Seller shall use reasonable efforts to comply with Buyer's request to deliver a quantity on a Day in excess of the applicable Maximum DCQ. If Buyer nominates a quantity of Natural Gas for a given Day above zero (0), then the minimum quantity that Buyer may nominate for such Day (the "Minimum DCQ") shall be eleven thousand four hundred (11,400) MMbtu per Day; *provided, however*, that Seller shall use commercially reasonable efforts to comply with Buyer's request to deliver a quantity on a Day that is less than the applicable Minimum DCQ.

6.6    Hourly Rates

(a)    Seller shall not be obliged, notwithstanding any other provision of this Agreement, to deliver the DCQ at an hourly rate over three thousand five hundred ninety 3590 MMbtu per hour ("Maximum Hourly Rate") or, if a DCQ above zero (0) has been nominated, under nine hundred fifty (950) MMbtu per hour ("Minimum Hourly Rate"); *provided, however*, that (i) Seller shall make commercially reasonable efforts to accommodate a lower send-out during start-up and shutdown of a Unit; and (ii) Seller shall use commercially reasonable efforts to comply with Buyer's requests to exceed the Maximum Hourly Rate or to deliver at a rate that is less than the Minimum Hourly Rate, to the extent necessary for Buyer's demand, subject to the operation of the SJ 5&6 Units.

(b)    Buyer shall not be obliged, notwithstanding any other provision of this Agreement, to receive the DCQ at an hourly rate over the Maximum Hourly Rate or under the Minimum Hourly Rate; *provided, however*, that Buyer shall use commercially reasonable efforts to comply with Seller's exceptional requests to exceed such Maximum Hourly Rate or, if a DCQ above zero (0) has been nominated, fall below such Minimum Hourly Rate to the extent necessary for the performance of this Agreement.

## ARTICLE VII
## SCHEDULING

7.1    Transitional Supply Period

In accordance with Clause 6.4, the Parties shall agree to a delivery programme for the Transitional Supply Period.

During the Transitional Supply Period, Clauses 7.4(a)(iii), 7.4(a)(iv) and 7.5 shall apply *mutatis mutandis* to the binding NG quantities agreed between the Parties in accordance with Clause 6.4.

7.2    Firm Supply Period –first Contract Year

The first Contract Year shall begin on the first Day of the Firm Supply Period and end on December 31st following the start of the Firm Supply Period.

21

7.3    Firm Supply Period –except for first Contract Year and the last Contract Year:

Each Contract Year shall begin on January 1st, of the Contact Year at 00:00 local time and end on December 31st, of the Contract Year at 24:00 local time.

7.4    With respect to each Contract Year during the Firm Supply Period, the following provisions shall apply:

(a)    The "Annual Delivery Programme" ("ADP"), Ninety Day Schedule ("NDS") and Weekly Programme for such Contract Year shall be established according to the following conditions:

(i)    Except for the first Contract Year, on or before June 1st, Buyer shall nominate, on a non-binding basis, the "Annual Contract Quantity" or "ACQ" for the upcoming Contract Year, which ACQ may be zero (0), but if it is more than zero (0), then it must be at least four (4) TBTU and shall not exceed the Maximum Annual Contract Quantity for such Contract Year. In establishing each ACQ, Buyer shall have the right to nominate a quantity of Natural Gas equal to zero (0) and, at Buyer's election, to procure diesel from Third Parties during the relevant period. If Buyer nominates zero (0) or less than four (4) TBTU (which shall be deemed a nomination of zero (0)), such nomination shall be final and binding and Seller has no obligation to deliver for that Contract Year. In addition to the ACQ, Buyer shall provide on or before June 1st:

(A)    an estimate of its Natural Gas consumption and projected electricity dispatch from SJ 5&6 Units ("Dispatch") on a quarterly basis; and

(B)    its non-binding estimate of the dates of any Scheduled Maintenance expected to occur during such Contract Year.

Regarding the first Contract Year, an estimation of the ACQ and the information required in this Clause 7.4(a)(i) are attached hereto as Annex E. Seller shall provide written notice to Buyer at least ninety (90) Days in advance of what it anticipates will be the Firm Supply Condition Date (the "Anticipated Commencement Notice"). Buyer shall confirm no later than ten (10) Days after receiving the Anticipated Commencement Notice, the final ACQ for the first Contract Year.

(ii)    Except for the first Contract Year, on or before October 1st of each year thereafter, Buyer shall provide to Seller an ADP for the ACQ informed by Buyer in accordance with Clause 7.4(a)(i), for the following Contract Year showing Natural Gas consumption and Dispatch quantities on a monthly basis the sum of such quantities for the three (3) months of each calendar quarter (the "Quarterly Quantity"), in each case on a non-binding

22

basis. This ADP shall include the final dates of any Scheduled Maintenance to occur during such Contract Year.

(iii)     Regarding the first Contract Year, Buyer shall provide Seller an estimated ADP no later than thirty (30) Days after the Effective Date. Once the Anticipated Commencement Notice is delivered to Buyer, Buyer shall confirm no later than ten (10) Days after such event, the final ADP for the first Contract Year.

(iv)     On or before the fifth (5th) Day of each calendar month M-1 Buyer shall provide to Seller its NG requirements and planned Dispatch for the three (3) months following M-1 (the "NDS" and such three months, in chronological order, months "M," "M+1" and "M+2"). The NDS shall be final and binding for month M (the "Binding Monthly Schedule"), subject to Clause 7.6. The NDS shall be non-binding for months M+1 and M+2. Such NDS shall include the monthly quantities of Natural Gas to be delivered in and planned Dispatch for each of the next three (3) months, as well as the daily Natural Gas requirements and planned Dispatch for month M. Buyer may request additional Natural Gas from Seller for month M after the deadline for submission of the NDS. Upon receipt of such a request, Seller shall inform Buyer within one (1) Day whether Seller can deliver all or a portion of such quantities and the applicable price, and Buyer shall have two (2) Days to accept or decline Seller's offer. If Buyer accepts Seller's offer, such quantities shall become firm and binding; *provided, however,* that such quantities shall not be treated as quantities of Natural Gas to which the Binding Monthly Schedule, the NDS, any Quarterly Quantity or the ACQ apply. Further, Buyer shall use commercially reasonable efforts to include in each NDS estimated, non-binding daily requirements for months M+1 and M+2; and

(v)     On or before 00.00 hours Puerto Rico Time of each Wednesday of each week, or, if such Day is not a Business Day, on the Business Day immediately preceding such Day, Buyer shall provide to Seller a daily estimate of its NG requirements and planned Dispatch for the coming week, to be provided on a daily basis with hourly detail. This weekly programme ("Weekly Programme") shall be reasonably adjusted to the original NDS for the applicable month. For the purpose of this Clause 7.4 each Weekly Programme shall contain consumption details beginning 00:00 hours Sunday until 23:59 hours the following Saturday.

(b)     The Parties shall cooperate in the scheduling to ensure that the supply of Natural Gas to the SJ 5&6 Units is as regular and as even as practicable (subject to Buyer's Scheduled Maintenances) in a manner that is consistent with Seller's projected deliveries and use of LNG, as such projected deliveries or requirements may be adjusted or exist from time to time. Under no circumstance shall Buyer, without the prior written agreement of Seller pursuant to Clause 7.4(a)(iv), be entitled to nominate any quantity of Natural Gas that would increase the daily,

23

weekly, monthly, quarterly or annual (as applicable) quantity of Natural Gas that Seller is required to deliver hereunder to exceed the quantity of Natural Gas nominated with respect to the relevant period pursuant to any earlier nomination under Clause 7.4(a).

(c)    Buyer designates the Operational Manager as specified in Article XXIII to make all the notifications required under this Clause 7.4.

(d)    Buyer will use commercially reasonable efforts to provide written notice to Seller as soon as practicable after information becomes available to Buyer or any event occurs that causes a discrepancy between the quantities of Natural Gas nominated by Buyer pursuant to this Clause 7.4 (including the ACQ, ADP, NDS, Quarterly Quantity, Binding Monthly Schedule and the Weekly Programme) and the quantities that Buyer is able to receive, regardless of whether such nomination is binding or non-binding. Such notice shall specify the cause of such discrepancy and the amount of such discrepancy. Unless and until Seller receives any such notice from Buyer, Seller shall be considered as acting reasonably in relying on the nominations provided by Buyer pursuant to this Clause 7.4.

7.5    If, during any month, Buyer determines that it no longer requires, or if Buyer is unable to receive, some or all of the quantity of Natural Gas set forth in the Binding Monthly Schedule for such month (such quantity, the "Excess Nomination"), then:

(a)    Buyer shall promptly provide written notice to Seller of the quantities not needed or unable to be received;

(b)    Buyer shall remain obligated to pay the Fuel Price for the originally nominated Binding Monthly Quantity (subject to Buyer's right to receive Carryover Credits pursuant to Clause 7.5(d));

(c)    Seller shall use commercially reasonable efforts to sell the Excess Nomination, whether as Natural Gas or as LNG, at a reasonable price. If Seller is able to sell all or a portion of such Excess Nomination (such sale, a "Mitigation Sale"), Seller shall credit to Buyer the proceeds of such Mitigation Sale, less the reasonable, incremental out-of-pocket costs incurred by Seller in storing and transporting the Natural Gas or LNG sold, and marketing, making and performing such sale, in each case above what Seller would have incurred in making such gas available at the Delivery Point. Seller shall furnish the details of such Mitigation Sale in writing to Buyer within thirty (30) days of the date of such sale.  Any sale of LNG or Natural Gas by Seller to any Third Party that Seller was already obligated to make (as of the date Seller becomes aware of the Excess Nomination) is not a Mitigation Sale.  If Seller is unable to sell all or a portion of such Excess Nomination (such inability to be documented in a writing describing the market conditions that precluded such sale or made such sale commercially impracticable), Seller shall retain such quantities and credit Buyer with an amount equal to fifteen percent (15%) of the Fuel Price multiplied by the quantity not sold on the Day it would have otherwise been made available to Buyer; and

24

(d)    To the extent that an Excess Nomination is caused by Force Majeure or a Forced Shutdown and Buyer pays for such Excess Nomination pursuant to Clause 7.5(b) (the "Credit Quantity"), Buyer shall be entitled to a credit determined by multiplying the Credit Quantity by the Fuel Price for the relevant month (a "Carryover Credit"), which may be applied to Buyer's payment obligations in the immediately subsequent three (3) months, on a first-in first-out basis. To the extent any Carryover Credit is not applied to Buyer's payment obligations in the three (3) months immediately following its accrual, such Carryover Credit shall expire.

7.6    Notwithstanding anything in this Agreement to the contrary, Buyer shall have no obligation to pay for any portion of a Binding Monthly Schedule to the extent not made available or not taken at the Delivery Point due to (a) an event of Force Majeure claimed by Seller or (b) any other reasons attributable to Seller (including any Unplanned Shutdowns affecting the MFH Facility, any Planned Seller Shutdown or other Scheduled Maintenance on the MFH Facility, or rejected or withheld Off-Spec Gas).

7.7    Notwithstanding any Binding Monthly Schedule delivered pursuant to this Article VII, and without limiting Buyer's obligations and liabilities hereunder or under Applicable Law with respect to such binding nominations, until such time as the Title III Case is finally resolved (and is no longer subject to appeal), and unless (and then only to the extent that) the terms set forth in this Clause 7.7 are expressly waived by Seller by written notice expressly referring to this Clause 7.7:

(a)    Seller shall not be obligated to deliver any quantity of Natural Gas set forth in a binding nomination unless the Firm Supply Solvency Conditions were satisfied at the time of each relevant nomination and remain satisfied at the time that the relevant quantity of Natural Gas is scheduled for delivery;

(b)    if any Firm Supply Solvency Condition is not satisfied at any time, Seller's obligations under this Agreement shall be immediately suspended for the duration of the Supply Period (without notice by or action of the Seller); and

(c)    Seller is excused from performing under this Agreement, unless and until such Firm Supply Solvency Condition is satisfied in full, at which time the suspension of the Supply Period shall cease, and the Parties shall resume performance under the Agreement.

From and after the final resolution of the Title III Case, the terms and conditions of this Clause 7.7 shall be null and void and of no further force and effect.

## ARTICLE VIII
## SHUTDOWN; COMMITTEES

8.1    In the case of any unplanned outage, trip, curtailment or temporary discontinuance in the operation of the SJ 5&6 Units, the Interconnection Facility or the MFH Facility (including any unplanned outage, trip, curtailment or temporary discontinuance necessary to address any emergency or an imminent threat to the health and safety of people or

25

property) (an "**Unplanned Shutdown**"), the affected Party shall provide written notice thereof to the other Party as soon as reasonably possible, and in no event more than ninety (90) minutes after the start of such Unplanned Shutdown. During the period of any Unplanned Shutdown, the affected Party shall, from time to time, update the unaffected Party on the expected progress towards completing the maintenance or modification, whichever is applicable. Seller shall use commercially reasonable efforts to sell to third parties all quantities of Natural Gas for which Buyer is unable to take delivery during an Unplanned Shutdown affecting Buyer.

8.2    Buyer shall (a) within thirty (30) days of its receipt of the Anticipated Commencement Notice, provide a written notice to Seller indicating the periods of time during the first year of the Supply Period, and (b) by October 1 of each year during the Supply Period, a written notice to Seller indicating the periods of time during the next Contract Year, in each case, when Buyer has planned Scheduled Maintenance (each, a "**Planned Buyer Shutdown**"). Seller shall provide written notice to Buyer six (6) months prior to the dates during the next year when the MFH Facility will be shut down for maintenance or refurbishment (each, a "**Planned Seller Shutdown**"); *provided, however*, that in each Contract Year such Planned Seller Shutdowns and Unplanned Shutdowns of the MFH Facility will, in aggregate, last no longer than twenty-one (21) Days. Seller shall use commercially reasonable efforts to cause its Planned Seller Shutdowns to coincide with Planned Buyer Shutdowns. Each Party's obligations under this Agreement to deliver and receive Natural Gas shall be suspended and excused during Unplanned Shutdowns affecting the other Party, Unplanned Shutdowns caused by Force Majeure, and Planned Buyer Shutdowns and Planned Seller Shutdowns.

8.3    The Parties shall establish a committee comprised of three (3) representatives of each Party (as set forth in <u>Annex D</u>) for the purpose of reviewing and discussing the operations of the Parties at the MFH Facility, the Interconnection Facility and the SJ 5&6 Units (such committee, the "**Operations Committee**"). The Operations Committee shall meet monthly from and after the Effective Date. Each Party shall have the right to change its representatives on the Operations Committee at its sole discretion by providing written notice thereof to the other Party.

8.4    The Parties shall establish a committee comprised of three (3) representatives of each Party (as set forth in <u>Annex D</u>) for the purpose of reviewing and discussing the progress and commissioning of the Works (such committee, the "**Construction Committee**"). The Construction Committee shall meet every week from and after the Effective Date until Final Completion is achieved, and thereafter, the Construction Committee shall meet monthly. Each Party shall have the right to change its representatives on the Construction Committee at its sole discretion by providing written notice thereof to the other Party.

## ARTICLE IX
## SELLER'S SHORTFALL

9.1    If, for any reason other than the occurrence of (a) an event of Force Majeure, (b) a Planned Seller Shutdown, (c) Excess Nominations, (d) the failure of any Firm Supply

26

Solvency Condition to be satisfied at any time (subject to Clause 7.7) or (e) reasons attributable to Buyer (including any Unplanned Shutdowns affecting the SJ 5&6 Units, any Scheduled Maintenance affecting SJ 5&6 Units or any suspension pursuant to Clause 13.9(b)), Seller fails to deliver to Buyer the scheduled quantity of Natural Gas in the Binding Monthly Schedule for the applicable month of any Contract Quarter (the "Natural Gas Deficiency"), then, as Buyer's sole and exclusive remedy, and Seller's sole and exclusive liability, with respect to such Natural Gas Deficiency (subject only to Buyer's termination right pursuant to Clause 19.1(b)(ii)(B)):

(a)     At Seller's sole option, Seller shall either (i) make available to Buyer, at the SJ 5&6 Units, the equivalent quantity of diesel (the "Back-up Fuel Quantity") required to make up for the energy content of the Natural Gas Deficiency, as calculated in accordance with Exhibit G or (ii) pay the Back-up Fuel Cover Amount so that Buyer may procure the Back-up Fuel Quantity from Third Parties.

(b)     In case of Clause 9.1(a)(ii), if on the date of purchase of such Back-up Fuel Quantity by Buyer, the Back-Up Fuel Quantity Index Price exceeds the Fuel Price that would have been payable hereunder for an equivalent quantity of Natural Gas (based on energy content), Seller shall reimburse Buyer for the lower of (i) such difference multiplied by the Back-up Fuel Quantity Index Price applicable if Seller had delivered Natural Gas and (ii) the actual incremental cost to Buyer of sourcing and delivering the Back-up Fuel Quantity, relative to the Fuel Price that would have been paid to Seller for equivalent Natural Gas (the "Back-up Fuel Cover Amount").

9.2     Any Back-Up Fuel Cover Amounts shall be due and payable by Seller to Buyer in accordance with Article XIII.

9.3     Seller agrees that Buyer's damages associated with Seller's failure to deliver NG hereunder would be difficult to estimate, and that Clause 9.1 represents a reasonable estimate of such damages.

## ARTICLE X
## MEASUREMENT AND TESTING

10.1    Unit of Measurement

The following guidelines shall be followed with regard to the units of measurement to be used by either Party to comply, as appropriate, with the provisions of this Agreement:

(a)     The unit for the purpose of measuring volume shall be one cubic foot of Natural Gas at a base temperature of sixty degrees (60°) F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law. Computation of volumes, including any deviation from Boyle's Law, shall comply with applicable rules, regulations, and orders promulgated by the appropriate regulatory authorities having jurisdiction. For payment purposes, the volume of Natural Gas delivered hereunder will be determined at the pressure reported by the Metering Equipment

27

or based on fifteen (15) Day average flowing pressure corrected, if necessary, in the event that the Metering Equipment is inoperable or not measuring accurately, as applicable, and will be multiplied by the Btu content per cubic foot to obtain the total Btu contained within such volume of Natural Gas.

(b)    For purposes of measurement and meter calibration, the atmospheric pressure shall be assumed to be 14.73 psia, irrespective of actual elevation or location of the Delivery Point or any Metering Equipment above sea level, or variations in such atmospheric pressure from time to time.

(c)    The static pressure of the Natural Gas passing through the Metering Equipment shall be determined by the use of electronic measurement equipment or by the use of another pressure recording device reasonably acceptable to both Parties. The instantaneous static pressure measurements from the electronic measurement equipment or the arithmetic average of the temperature recorded each Day shall be used in computing Natural Gas volumes.

(d)    If Metering Equipment requiring the use of specific gravity is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined by a method according to accepted industry practice. If a recording gravitometer is used, then the arithmetic average of the specific gravity of the Natural Gas flowing through the meters shall be used in computing Natural Gas volumes. If a spot test method is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined as often as found necessary in practice. Any such test shall determine the specific gravity to be used in computation of volumes values effective the first Day of the following month and shall continue to be used until changed in a like manner by a subsequent test.



(e)    The temperature of the Natural Gas shall be determined by a recording thermometer installed so that it will record the temperature of the Natural Gas flowing through the meters, and such flowing temperature shall be corrected to Fahrenheit.

(f)    Heating Value and energy content will be measured by Seller as described in "Appendix F – Heating Value Calculation of API MPMS, Chapter 14.3." The determination of Natural Gas composition shall be in accordance with the GPA Standard 226 "Analysis for Natural Gas Chromatography" and GPA Standard 2172 "Calculation of Gross Heating Value relative density and compressibility factor for Natural Gas Mixtures from compositional analysis". The composition of the NG shall be continuously measured by on-line chromatographs installed and maintained (or caused to be installed and maintained) by Seller at Seller's sole expense. The Heating Value of the NG shall be calculated using results from the on-line chromatograph. In the event of failure of the on-line NG chromatograph, chromatograph analysis of samples collected proportional to the flow through the meters shall be Used. All electronic metering shall comply with the API Manual of Petroleum Standards, Chapter 21, Flow Measurement Using Electronic Metering

28

Systems, First Edition, dated September 1993, and any subsequent modification and amendment thereof.

(g)    The energy content of all NG delivered hereunder shall be in Btu and shall equal the Standard Cubic Feet of such NG multiplied by the Heating Value of such NG.

10.2    Metering Equipment

(a)    Prior to the start of the Supply Period, Seller shall install or cause to be installed, at Seller's expense, a main and a back-up ultrasonic meter as necessary to measure the flow, volume and Heating Value of Natural Gas delivered hereunder for revenue purposes (the "Metering Equipment"). The Metering Equipment will be installed at the point identified as "Seller Metering Station" on the schematic attached as Annex C. The Metering Equipment shall be designed and installed in accordance with the current recommendations of the American Gas Association. If the Metering Equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(i)    by using the registration of the Buyer Check Meter;

(ii)    by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(iii)    by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

(b)    Buyer has a meter equipment necessary to measure the volume of Natural Gas delivered hereunder (the "Buyer Check Meter"). The Buyer Check Meter is installed at the point identified as "Buyer Metering Station" on the schematic attached as Annex C. The Buyer Check Meter is designed and installed in accordance with the current recommendations of the American Gas Association. In the event that Buyer notifies Seller of a discrepancy greater than plus or minus one percent (1%) between the quantity of Natural Gas delivered at the Delivery Point by Seller according to the Buyer Check Meter, and the quantity of Natural Gas measured by the Metering Equipment, the Parties will resolve and correct such discrepancy (including with respect to adjustments for prior Natural Gas deliveries).

(c)    For the avoidance of doubt, it is the intent of the Parties that Natural Gas will only be considered delivered when it reaches the Delivery Point, and that any Natural Gas measured at the Metering Equipment that is not actually delivered to the Delivery Point will not be considered delivered and will not be charged to Buyer. In this regard, Buyer will not be charged for line fill or any losses or fuel used on the pipeline between the Metering Equipment and the Delivery Point. Also,

29

if Seller informs Seller about its intention to consume, due to any operational event, any quantity of Natural Gas stored in the pipeline that was not delivered to Buyer at the Delivery Point and, consequently, that was already measured by the Metering Equipment at the Seller Metering Station, Seller shall notify in writing Buyer of such circumstance. The Parties will resolve any material discrepancies resulting from Seller's consumption of Natural Gas under this Clause 10.2(c) in accordance with Clause 10.2(b).

10.3    Verification

The following guidelines shall be followed with regard to the verification of the Metering Equipment to be used in accordance with this Agreement:

(a)    At least once each month, and from time to time upon at least two weeks prior written notice by either Party to the other, Seller shall verify or cause to be verified the accuracy of the Metering Equipment. When as a result of such test the Metering Equipment is found to be out of calibration by no more than one percent (1%) when compared to the manufacturer's specifications for such equipment, no adjustment shall be made in the amount paid by Buyer to Seller.

(b)    If the testing of the Metering Equipment demonstrates that a meter is out of calibration by more than one percent (1%) when compared to the manufacturer's specifications for such equipment, the applicable Metering Equipment reading for the actual period during which out of calibration measurements were made shall be adjusted based on the methods stated in Clause 10.2 above.

(c)    If the actual period that such equipment has been out of calibration cannot be determined to the mutual satisfaction of Seller and Buyer, the adjustment shall be for a period equal to one-half of the time elapsed since the most recent test. The previous payments made by Buyer to Seller for this period shall be subtracted from the amount of payments that are calculated to have been owed under this Agreement. The difference in US Dollars (which may be a positive or negative amount) shall be added to the next Monthly Invoice pursuant to Article XIII.

(d)    The cost of the monthly testing and calibration of the Metering Equipment described in this Clause 10.3 shall be the responsibility of Seller. The cost of any testing and calibration of the Metering Equipment beyond the monthly test permitted in this Clause 10.3 shall also be the responsibility of Seller, unless the request to test any of the Metering Equipment is made by Buyer and the results of such test requested by Buyer demonstrate that the Metering Equipment is less than one percent (1%) out of calibration, in which case the cost of such testing and calibration shall be for Buyer's account.

(e)    Each Party shall comply with any reasonable request of the other concerning the sealing of the Metering Equipment, the presence of a representative of Buyer when the seals are broken and tests are conducted, and other matters affecting the accuracy, testing and calibration of the Metering Equipment.

30

(f)     If either Seller or Buyer believes that there has been a failure or stoppage of any of the Metering Equipment, it shall immediately notify the other Party.

10.4    Availability of Readings

At the end of each Month, Seller shall make available to Buyer all readings of the metering equipment as referenced in Clause 10.2(a).

10.5    Preservation of Records

Seller shall preserve or cause to be preserved for a period of at least three (3) years following the expiration of this Agreement all test data, charts, and other similar records regarding the measurement of Natural Gas delivered in accordance with this Agreement.

## ARTICLE XI
## RISK AND INDEMNITY

11.1    Conversion Works.

(a)     Subject to the provisions of Clause 11.2(b), Seller shall protect, defend, indemnify and hold harmless, the Buyer Group from and against any and all Claims and Losses by reason of damage to Third Party physical property, or for personal or bodily injury, or both, arising out of the performance of the Works or the Terms of Works to the extent such damage or injury is attributable to the negligence of Seller.

(b)     Subject to the provisions of Clause 11.2(a), Buyer shall protect, defend, indemnify and hold harmless, the Seller Parties from and against any and all Claims and Losses by reason of damage to Third Party physical property, or for personal or bodily injury, or both, arising out of the performance of the Works or the Terms of Works to the extent such damage or injury is attributable to the negligence of Buyer.

11.2    Knock-for-Knock Release and Indemnities.

(a)     **SELLER HEREBY WAIVES AND RELEASES, AND SELLER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS, THE BUYER GROUP** from and against any and all Claims and Losses by or of any Seller Group directly or indirectly arising out of, incident to, or in connection with (i) any bodily injury, illness or death of any member of Seller Group or (ii) the loss or destruction of any property owned by or in the possession of any member of Seller Group, arising out of or incident to the Works or activities contemplated by the Terms of Works.

(b)     **BUYER HEREBY WAIVES AND RELEASES, AND BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS, THE SELLER GROUP** from and against any and all Claims and Losses by or of any Buyer Group directly or indirectly arising out of, incident to, or in connection with

31

(i) any bodily injury, illness or death of any member of Buyer Group or (ii) the loss or destruction of any property owned by or in the possession of any member of Buyer Group, arising out of or incident to the Works or activities contemplated by the Terms of Works.

(c)    **THE OBLIGATIONS OF, AND THE WAIVER GIVEN BY, EACH PARTY PURSUANT TO THIS CLAUSE 11.2 (INCLUDING THE DEFINED TERMS "CLAIM" AND "LOSS") ARE INTENDED TO BE GIVEN FULL AND LITERAL EFFECT AND SHALL APPLY REGARDLESS OF THE CAUSE OF THE RELEVANT EVENT, CIRCUMSTANCE, CLAIM OR LOSS, EVEN THOUGH CAUSED IN WHOLE OR IN PART BY (i) A PRE-EXISTING CONDITION, RELEASE, EXPLOSION OR FIRE, (ii) THE SOLE, JOINT, CONCURRENT, ACTIVE OR PASSIVE NEGLIGENCE, GROSS NEGLIGENCE, BREACH OF DUTY (STATUTORY OR OTHERWISE), STRICT LIABILITY, OR OTHER LEGAL FAULT OF ANY PERSON, OR (iii) THE DEFECTIVE CONDITION OF VEHICLES, PREMISES OR OTHER PROPERTY OWNED, SUPPLIED, HIRED, CHARTERED OR BORROWED BY ANY PERSON, IN EACH CASE WHETHER PRECEDING OR DURING THE EXECUTION OF THIS AGREEMENT.**

11.3    <u>Supply Period</u>. The following indemnities shall apply during the Supply Period to the fullest extent permitted under Applicable Law:

(a)    <u>Third Party Claims</u>.



(i)    **SELLER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE BUYER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas), in each case directly or indirectly arising out of, incident to, or in connection with, Seller's operation of the MFH Facility, **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF SELLER.**

(ii)    **BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE SELLER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas), in each case directly or indirectly arising out of, incident to, or in connection with, Buyer's operation of the San Juan Power Plant (including the Interconnection Facility and the SJ 5&6 Units), **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF BUYER.**

(b)    <u>Natural Gas</u>.

32

(i)      The Natural Gas to be sold by Seller and purchased by Buyer in accordance with this Agreement shall be delivered to Buyer at the Delivery Point. Title in Natural Gas, and the risk of loss or contamination of Natural Gas, shall pass from Seller to Buyer at the Delivery Point.

(ii)     **SELLER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE BUYER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said Natural Gas or other charges thereon which attach before title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the Natural Gas before the Delivery Point (excluding, for the avoidance of doubt, any Claims or Losses for which Buyer is responsible pursuant to Clause 11.2).

(iii)    **BUYER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE SELLER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said Natural Gas or other charges thereon which attach after title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the Natural Gas from and after the Delivery Point (excluding, for the avoidance of doubt, any Claims or Losses for which Seller is responsible pursuant to Clause 11.2).

11.4    Notice and Defense. Any Person indemnified hereunder will, as soon as practicable after receiving notice of any suit brought against it within this indemnity, furnish to the indemnifying Party the full particulars within its knowledge thereof and will render all reasonable assistance requested by the indemnifying Party in the defense of any Claims. Each indemnified party will have the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and/or settlement thereof without relieving the indemnifying Party of any obligations hereunder; *provided, however,* that an indemnifying Party that has acknowledged its indemnity obligations with respect to any Claim will have control over the defense and settlement of such Claim, as long as the settlement does not impose any obligations on the indemnified parties.

11.5    Excluded Losses. Notwithstanding any other provision of this Agreement, (1) in no event shall either Party be liable to the other Party for (a) any indirect, special, incidental or consequential losses, damages, liabilities or expenses, (b) loss of profits or revenue; loss of use; loss of power; cost of replacement power; loss by way of shutdowns; costs of substitute facilities, goods or services; loss of opportunity or loss of goodwill, whether or not constituting losses, damages, liabilities or expenses contemplated by Clause 11.5(a), or (c) claims of upstream or downstream customers or service providers to either Party for any of the aforementioned categories of damages (collectively, "Excluded Losses") howsoever arising, (2) Seller waives and shall indemnify Buyer Group from and against Claims by members of Seller Group for Excluded Losses, and (3) Buyer waives and shall indemnify Seller Group from and against Claims by members of Buyer Group or by any of its Financing Entities

for Excluded Losses, in each case, except to the extent that Seller's express remedies pursuant to Article VII or Buyer's express remedies pursuant to Article IX (including but not limited to any Back-up Fuel Cover Amounts) or Delay LDs as provided in Clause 5.5 may be construed as constituting or compensating for Excluded Losses.

11.6    Third Party Beneficiaries. The provisions of this Agreement are intended for the sole benefit of Buyer and Seller and there are no third-party beneficiaries hereof, other than indemnitees pursuant to this Article XI and Article 21 of Annex A, each of whom is hereby made a third party beneficiary to this Agreement, with direct enforcement rights against the relevant indemnitor, solely for the purpose of enforcing (or relying upon as a defense) the indemnification provisions under which it is a member of the indemnified group.

## ARTICLE XII
## NATURAL GAS MANUFACTURING SURCHARGE

12.1    In addition to any other amounts that may become due from Buyer to Seller under this Agreement, Buyer shall pay to Seller, on a monthly basis during the Initial Contract Term, a manufacturing surcharge payment of $833,333.34 (or $416,666.67 per Unit) per calendar month (the "Natural Gas Manufacturing Surcharge"), for each of the sixty (60) calendar months of the Initial Contract Term, subject to Buyer's rights and obligations to pay the Discounted Surcharge Amount or Full Surcharge Amount, as the case may be, pursuant to Clause 12.3, Clause 17.4(b) and Clause 19.5.  Buyer shall not have any obligation to pay the Natural Gas Manufacturing Surcharge in respect of a Unit unless and until Seller has achieved Substantial Completion of such Unit pursuant to Annex A and the other Firm Supply Conditions have been satisfied or waived by the Party(ies) entitled to so waive them. The Natural Gas Manufacturing Surcharge shall be payable by Buyer to Seller regardless of the quantity of Natural Gas that is delivered (or not delivered) by Seller during each calendar month of the Initial Contract Term (or the reasons therefor). The Natural Gas Manufacturing Surcharge will not apply to any Extension Terms.

12.2    The Natural Gas Manufacturing Surcharge is a reasonable and necessary current expense of making Natural Gas available.

12.3    At any time during the Initial Contract Term, Buyer may elect to pay the remaining Natural Gas Manufacturing Surcharge amounts due to Seller under this Agreement by providing ninety (90) Days' written notice of such election, which notice shall set forth the reasons underlying Buyer's election to repay the remaining Natural Gas Manufacturing Surcharge payments and Buyer's sources of funds with respect to the same regardless whether such funds are Buyer's own revenue from profit or operations, provided by any Governmental Authority (including the Federal Emergency Management Agency) or received from a Third Party in connection with an acquisition or private financing. If Buyer's funds to be used to repay the remaining Natural Gas Manufacturing Surcharge payments derive from Buyer's own revenue and profit from operations or funding provided by any Governmental Authority (including the Federal Emergency Management Agency), Buyer shall pay to Seller the amount specified in Exhibit D (the "Discounted Surcharge Amount") corresponding to the month in which Buyer makes such election. If the funds to be used by Buyer to prepay the remaining Natural Gas Manufacturing Surcharge

34

payments derive from any source other than Buyer's own revenue and profit from operations or funding provided by any Governmental Authority (including the Federal Emergency Management Agency), Buyer will be required to pay the full amount of all remaining payments of the Natural Gas Manufacturing Surcharge for each Unit that has achieved Substantial Completion, without applying any discount factor (including any Incremental Tax Adjustment, the "**Full Surcharge Amount**," and together with the Discounted Surcharge Amount, the "**Natural Gas Manufacturing Discounted Payment**"). Buyer shall be responsible for the amount of additional Taxes for which Seller becomes liable as a result of its receipt of the one-time lump sum Natural Gas Manufacturing Discounted Payment instead of monthly payments of the Natural Gas Manufacturing Surcharge. The amount of the difference (if any) in the Taxes Seller will pay upon receipt of the Natural Gas Manufacturing Discounted Payment as compared to the aggregate amount of Taxes that Seller would have paid (assuming then current rates of taxation) if all remaining payments of the Natural Gas Manufacturing Surcharge had been paid as and when due shall be added to the Natural Gas Manufacturing Discounted Payment (the "**Incremental Tax Adjustment**"). Upon Buyer paying the applicable Natural Gas Manufacturing Discounted Payment (including any Incremental Tax Adjustment) to Seller in full, Buyer shall have no further obligation to pay the Natural Gas Manufacturing Surcharge during the remainder of the Contract Term.

**ARTICLE XIII**
**INVOICING AND PAYMENT**

13.1    Every month Seller shall invoice Buyer for the quantities in the Binding Monthly Schedule (as may be adjusted by Clause 7.6) for the previous calendar month plus any additional quantities Seller agreed to deliver pursuant to Clause 7.4(a)(iv), and whatsoever other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time. Buyer certifies that the funds for the payments of Services rendered under this Agreement come from budgetary allocations. All payments made under this Agreement will be charged to Buyer's budget account number 1-2321-23215-000-000.



13.2    Seller shall prepare and shall give to Buyer by the tenth (10th) Day of each calendar month an invoice substantially in the form set forth in Exhibit E (the "Monthly Invoice"), which shall show in respect of the preceding calendar month the following information:

   (a)    The Fuel Price *multiplied by* the quantities in the Binding Monthly Schedule for such month;

   (b)    Any additional quantities Seller agreed to deliver pursuant to Clause 7.4(a)(iv) *multiplied by* the price applicable to such quantities;

   (c)    The amount of the Natural Gas Manufacturing Surcharge for such month;

   (d)    Any applicable Taxes due for payment by Buyer;

35

(e)    The proceeds from any Mitigation Sale or other sale of (or credit from) any Excess Nomination;

(f)    The amount of any Carryover Credit that, pursuant to Clause 7.5(d), Buyer is entitled to apply to the applicable Monthly Invoice; and

(g)    The net amount payable by Buyer to Seller, which shall be (a) *plus* (b) *plus* (c) *plus* (d) *minus* (e) *minus* (f).

Buyer shall provide written notice to Seller of any irregularity in a Monthly Invoice submitted by Seller within five (5) working Days of Buyer's receipt thereof, failing which such Monthly Invoice will be deemed to have been properly prepared and submitted.

13.3    If, at the time Seller issues a Monthly Invoice, Buyer is not current on amounts due and payable to Seller under this Agreement pursuant to Clause 13.7 in excess of One Million Dollars ($1,000,000.00), the Fuel Price for the preceding calendar month set forth in such Monthly Invoice shall be calculated based on a Unit Cost that is equal to the Base Cost.

13.4    Subject to Clause 13.10, Buyer shall pay the amount to Seller due in accordance with such Monthly Invoice.

13.5    If Seller incurs a liability to Buyer for failing to deliver NG pursuant to Article IX, then Buyer shall send to Seller (following the end of the applicable month) an invoice and reasonable supporting documentation showing the amount payable by Seller in accordance with Article IX.

13.6    If any sums are due from one Party to the other Party, except for reasons addressed in Clauses 13.1 and 13.5, then the Party to which such sums are owed shall furnish to the other an invoice describing in reasonable detail the basis for the invoice and providing relevant supporting documentation.

13.7    In respect of any invoice issued pursuant to this Article XIII, Buyer or Seller, as the case might be, shall pay the amount due within thirty (30) Days after physical receipt of a properly submitted invoice.

13.8    Payment of amounts due to one Party from the other Party shall be made by wire transfer in immediately available funds into the bank account nominated from time to time by the Party to which the funds are owed. Each payment of any amount owing hereunder shall be for the full amount due, without reduction, withholding or offset for any reason (including any exchange charges, bank transfer charges or other fees or Taxes). Until further notice, the bank account for each Party is as follows:

**SELLER**:    **Bank Name: Scotiabank de Puerto Rico**

**Bank Account #: 071006094388**

36

**BUYER:**    **Intermediary Bank Name: Citibank, NY**

**Receiving Bank Name: Citibank, PR**

**Bank Account #: 10-99-1506**

**Beneficiary Bank Name: Citibank, PR**

**For Further Credit to: Puerto Rico Electric Power Authority**

**Bank Account #: 0-400015-015**

Notwithstanding the foregoing, Seller shall request from Buyer wire instructions prior to transferring any funds to Buyer and shall provide Buyer bank confirmation upon completion of each such transfer.

13.9    If any Party fails to pay the other Party the full amount of any invoice due by the due date (a) such Party shall also pay interest thereon to the other Party for the period commencing from and including the due date until and including the Day when payment is made. Interest shall be calculated at the rate of the Prime Rate *plus* 200 basis points percentage rate per annum, but no greater than the maximum amount allowable by law, and (b) where Buyer is the defaulting Party, Seller may suspend Natural Gas deliveries until the relevant amount is paid in full.

13.10   If a Party disagrees in good faith with any invoice, such Party shall pay the full amount invoiced or so stated by the due date thereof and shall immediately notify the other Party of the reasons for its disagreement. An invoice may be contested by the Party that received it, or modified by the Party that sent it, by written notice delivered to the other Party within a period of one hundred eighty (180) Days after such receipt or sending, as the case may be. If no such notice is served within such period of one hundred eighty (180) Days, such invoice shall be deemed correct and accepted by both Parties. Promptly after resolution of any Dispute as to an invoice, the amount of any overpayment or underpayment shall be paid by Seller or Buyer, as the case may be, to the other Party, together with interest thereon at the rate provided in Clause 13.10 from the date payment was due to the date of payment.

13.11   On or before the Commissioning Start Date, Seller shall procure the delivery to Buyer of a payment guarantee, which shall in no event exceed Thirty Million Dollars ($30,000,000.00) issued by Seller's Parent to Buyer, in the form set forth in Exhibit I.

13.12   Invoices under this Agreement shall be delivered to the following addresses and deemed received on the date (a) personally delivered to the respective party or (ii) receipt is evidenced by certified or registered mail:

**SELLER:**    NFEnergía LLC
c/o New Fortress Energy

37

700 NW 1ˢᵗ Avenue, Suite 700
Miami, FL 33030

Attention:    Accounts Payable
Email:        accountspayable@newfortressenergy.com

**BUYER**:    Autoridad de Energía Elétrica de Puerto Rico
              Apartado 363928
              San Juan, Puerto Rico 00936-3928

              and

              Autoridad de Energía Elétrica de Puerto Rico
              Ave. Ponce de León # 110 Pda. 17 ½
              Edificio NEOS, Piso 8, Ofic. 802
              Santurce, Puerto Rico 00907-3802

Attention:    Edwin Barbosa, Fuel Office Administrator
E-mail:       Edwin.barbosa@aeepr.com

## ARTICLE XIV
## DUTIES, TAXES AND CHARGES

Each of Seller and Buyer shall be responsible for the payment of all taxes, fees, levies, royalties, duties, penalties, licenses, and other charges imposed by any Governmental Authority ("Taxes") which it incurs and for which it is legally responsible for as a result of complying with this Agreement and which correspond to such Party under all applicable tax regulations and laws in force at the Effective Date and throughout the Contract Term in each of the jurisdictions relevant to this Agreement connected to the Parties. If a Party is required to remit or pay Taxes that are the other Party's responsibility hereunder, the Party responsible for such Taxes shall promptly reimburse the other Party for such Taxes. Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof. Buyer shall cooperate and use commercially reasonable efforts to provide to Seller such information and execute and deliver such documents reasonably requested, to the extent not otherwise detrimental to Buyer, in connection with Seller's efforts to obtain any available tax exemptions and/or incentives under applicable tax regulations and laws in force at the Effective Date and throughout the Contract Term.

14.1    For the avoidance of doubt and notwithstanding the above:

(a)    Seller represents and warrants that it is the importer of record for all Natural Gas delivered hereunder, and shall be responsible for entry and entry summary filings as well as the payment of associated duties, Taxes and fees, if any, and all applicable record keeping requirements.

38

(b)     Buyer shall pay or cause to be paid all Taxes imposed by any Governmental Authority after the Delivery Point on the sale, use, or purchase of Natural Gas delivered to Buyer under this Agreement (and on any LNG from which such Natural Gas is derived) and its transportation within the territory of Puerto Rico after the Delivery Point; provided that at all times Seller shall be responsible for the payment of all and any Corporate Tax payable in Puerto Rico in connection with this Agreement; and

(c)     Seller shall pay or cause to be paid all Taxes imposed by any Governmental Authority on or with respect to Natural Gas delivered to Buyer under this Agreement (and on any LNG from which such Natural Gas is derived) prior to the Delivery Point and all Taxes at the Delivery Point.

## ARTICLE XV
## FORCE MAJEURE

15.1    Neither Seller nor Buyer shall be liable for any failure to perform or for omission or delay in the performance of any of its obligations under this Agreement, other than the obligation to make payments of money when due, if and to the extent that the affected Party's performance is prevented, delayed or interfered with by an act, event or circumstance, or combinations of events or circumstances, whether of the kind described herein or otherwise, that is not reasonably within its control, such Party having acted as a Reasonable and Prudent Operator and which effects could not be prevented or overcome by the exercise of due diligence ("Force Majeure").



For the avoidance of doubt, provided that the requirements set out in the preceding paragraph are met, events of Force Majeure shall include but not be limited to the following:

(a)     loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the relevant loading terminal or upstream facilities affecting an LNG cargo and source indicated in the LNG Delivery Plan. The "LNG Delivery Plan" shall mean the indicative LNG cargo scheduling programme submitted by Seller to Buyer, solely for the purposes of this Clause 15.1(a), not later than 30 Days prior to the commencement of each Contract Year and which shall include for each LNG cargo the expected source. Seller shall inform Buyer of any modifications to the sources indicated in the LNG Delivery Plan, provided that Seller shall not at any time nominate any source that is affected by Force Majeure or that is affected by any event that could reasonably lead to a claim of Force Majeure relief under this Agreement.

(b)     loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of an LNG Ship requiring her removal from service, which removal prevents Seller from delivering LNG to the MFH Facility;

(c)     loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the MFH Facility;

39

(d)    loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the SJ 5&6 Units; provided that if an event of Force Majeure affects only one of SJ 5&6 Units, but not both, the affected Party shall only be released from its obligations under this Agreement with regard to the unit affected by the event of Force Majeure;

(e)    without prejudice to the obligations of Seller set forth in Clause 3.5 (which shall not be relieved in the event of a Force Majeure event of the type described in this Clause 15.1(e)), any act or omission of a Governmental Authority of the United States of America (including any Puerto Rican Governmental Authority), including refusal or failure to issue, delay in issuing, or amendment, revocation or suspension of, any Permit; and

(f)    any act of God, lightning, storm, typhoon, hurricane, tornado, earthquake, fires, floods, tsunami, landslide, soil erosion, subsidence, washout, shipwreck, navigational and maritime perils, acts of any Governmental Authority or compliance with such acts; explosions, acts of the public enemy, wars (whether declared or undeclared), terrorism or threat thereof, civil war, piracy, civil and military disturbances, strikes, blockades, insurrections, riots, epidemics and quarantine restrictions; strike, lockout or other industrial disturbances involving an enterprise other than a Party, its transporter or its agents or sub-contractors in connection with its performance of this Agreement; radioactive contamination or ionising radiation; or breakdown or unavailability of port facilities or port services (including the channel, tugs or pilots).

15.2    Notwithstanding the foregoing provisions of Clause 15.1, the following shall not be events of Force Majeure:

(a)    events arising out of market decline, market failure, industry economic conditions, or general economic conditions;

(b)    where Buyer is the affected Party, any delay in achieving the Buyer Firm Supply Condition, unless such delay is caused by an event of Force Majeure;

(c)    where Seller is the affected Party, any delay in achieving the Seller Firm Supply Condition, unless such delay is caused by an event of Force Majeure;

(d)    the failure by a Party to obtain or the withdrawal of any authorization, approval, permit or permission of any Governmental Authority, because the Party claiming Force Majeure failed to act as a Reasonable and Prudent Operator in connection with its efforts to obtain or maintain such authorization, approval, permit, or permission;

*provided, however*, that the failure to obtain any authorization, approval, permit or permission of any Governmental Authority that is required in order to satisfy the Firm Supply Conditions shall under no circumstances be considered Force Majeure.

40

15.3    In the event of any failure or delay of a Party's performance due to the occurrence of a Force Majeure event, the affected Party shall use commercially reasonable efforts (acting as a Reasonable and Prudent Operator) to resume as soon as possible full performance of its obligations under this Agreement, provided that the settlement of strikes or boycotts, lockouts or other industrial disputes, or obstructive action by organizations or local inhabitants, shall be entirely within the discretion of the Party concerned.

15.4    A Party intending to seek relief under this Article XV shall as soon as reasonably practicable after it becomes aware of the occurrence of a Force Majeure event:

(a)    notify the other Party of the occurrence of an event that it considers may subsequently lead it to claim Force Majeure relief under this Agreement, describing such event, in as much detail as is then reasonably available, and the obligations, the performance of which has been or could be delayed, hindered or prevented thereby, and the estimated period during which such performance may be suspended or reduced, including (to the extent known or ascertainable) the estimated extent of such suspension or reduction in performance; the obligations which could or have been actually delayed or prevented in performance and the estimated period during which such performance may be suspended or reduced, including (to the extent know or ascertainable) the estimated extent of such suspension or reduction in performance;

(b)    give a bona-fide good faith estimate of when it shall be able to resume full performance of its obligations; and

(c)    give the particulars of the programme to be implemented, if any, to resume full performance hereunder subject to any Third Party confidentiality obligations.

Such notices shall thereafter be supplemented and updated at reasonable intervals during the period of such Force Majeure, specifying the actions being taken to remedy the circumstances causing such Force Majeure and the date on which such Force Majeure is expected to terminate.



15.5    If any Party claims relief under this Article XV, it shall allow reasonable access to the other Party, upon such other Party's written request, to examine the scene of such event or circumstance which gave rise to the Force Majeure claim, provided that the Party not claiming relief under this Article XV shall bear the cost, expense and risk of examining such site.

15.6    Where an act, event or circumstance prevents, impedes or delays a Party's performance hereunder, even if such act, event or circumstance primarily affects a Third Party or Third Parties, it shall constitute Force Majeure hereunder as to Seller or Buyer, as appropriate, if and to the extent that it is of a kind or character that, if it had happened to a Party, would have come within the definition of Force Majeure under this Article XV.

15.7    Force Majeure takes effect at the moment a Force Majeure event occurs, not upon giving notice. A Party whose performance is excused by Force Majeure shall not be

41

required, during the period in which the circumstances of the Force Majeure event are continuing, to incur uneconomic cost, make additional investments in new facilities, or bring into production existing or potential reserves not already flowing in support of this Agreement.

15.8    If Seller is rendered wholly or partially unable to deliver NG under this Agreement as a result of a Force Majeure event claimed only by Buyer, Seller shall have the right to enter into binding contracts with Third Parties to sell and deliver LNG that is not reasonably expected to be needed by Seller to meet its obligations to Buyer hereunder based on the expected extent and duration of such Force Majeure as notified by Buyer.

15.9    If the Force Majeure event lasts for a period such that the affected Party shall be prevented from or delayed in performing its obligations hereunder for a period of three hundred and sixty five (365) consecutive Days (or, where the affected Party is not using commercially reasonable efforts to overcome the relevant Force Majeure (which the affected Party must show by providing a weekly report to the non-affected Party describing its efforts to overcome such Force Majeure), one hundred and eighty (180) consecutive Days) or more from the date on which the Force Majeure event first occurred, the Party not claiming Force Majeure shall have the right to terminate this Agreement without liability to either Party by giving written notice to the either Party.

## ARTICLE XVI
### REPRESENTATIONS, WARRANTIES AND LIABILITIES



16.1    Each Party hereby represents and warrants to the other Party that, as of the Effective Date:

(a)    With regard to Seller it is a corporation or limited liability company duly formed, validly existing and in good standing under the laws of the state and/or country of its incorporation or organization, and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(b)    With regard to Buyer it is a Puerto Rico public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(c)    With regard to Buyer, all necessary consents and approvals required by Applicable Law (including PROMESA) from any relevant Governmental Authority (including, as an example, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority, and Buyer's Governing Board) (the "Required Consents") to all of the terms and conditions of this Agreement have been obtained prior to the Effective Date.

42

(d)      With regard to Buyer, all amounts payable to Seller under this Agreement are "Current Expenses" as defined in the Trust Agreement and are reasonable and necessary expenses related to the maintenance, repair and operation of the SJ 5&6 Units, and are consistent with standard practices for public utility systems and with Buyer's standard business operations performed in maintaining and operating its system.

(e)      Such Party has all requisite power and authority to conduct its business, to own or lease and operate its properties, and to execute, deliver, and perform its obligations under this Agreement.

(f)      The execution, delivery and performance by such Party of this Agreement has been duly authorized by all necessary corporate action on the part of such Party and do not (i) require any consent or approval of any Governmental Authority, such Party's governing body or any other Person, other than those that have been obtained, or the failure to obtain, of which would not have, or could not reasonably be expected to have, a material adverse effect on such Party's ability to perform its obligations hereunder, (ii) violate any provision of such Party's Articles of incorporation or by-laws, or other organizational documents, or any Applicable Law in effect, or (iii) result in a breach of or constitute a default under such Party's organizational documents or other material indentures, contracts or agreements to which it is a part or by which it or its properties may be bound.

(g)      This Agreement is a legal, valid, and binding obligation of such Party enforceable against such Party, as appropriate, in accordance with its terms.

16.2   Seller warrants that it has good title to or good right to, all NG delivered hereunder and that all NG delivered to Buyer at the Delivery Point shall be free and clear of all liens, security interests, charges, assessments encumbrances and adverse claims whatsoever. Seller makes no representation or warranty, written or oral, express or implied that the NG will be fit for a particular purpose, or will be of merchantable quality, and all such representations and warranties are expressly excluded to the fullest extent permitted by law, but nothing in this Clause 16.2 affects the requirement that all NG delivered to Buyer under this Agreement will meet the Specifications of Article IV.

16.3   Seller shall take, or cause to be taken, all necessary actions to start NG deliveries from the first Day of any Transitional Supply Period and the first Day of the Firm Supply Period including the design and construction of any facility or its elements situated upstream of the Delivery Point.

16.4   Buyer shall take, or cause to be taken, all necessary actions to commence taking delivery of NG from the first Day of any Transitional Supply Period and the first Day of the Firm Supply Period including the design and construction of any facility or its elements situated downstream of the Delivery Point other than the Works.

16.5   Seller's sole and exclusive liability, and Buyer's sole and exclusive remedy, for failure by Seller to deliver Natural Gas in accordance with this Agreement will be limited

43

to the payment of the amounts detailed in Article IX, subject only to the additional remedies available to Buyer in the circumstances described in Clause 5.5 and Clause 19.1(b)(ii).

### ARTICLE XVII
### ASSIGNMENT

17.1    Except as provided in Clauses 17.2, 17.3, 17.4 and 17.5, neither Party may assign any of its rights or delegate any of its obligations under this Agreement to a Third Party without the prior written consent of the other Party. Any purported assignment of a Party's rights or obligations hereunder in contravention of this Article XVII shall be null and void and shall have no force or effect.

17.2    Notwithstanding the foregoing, Seller shall be entitled to assign, or as appropriate, delegate, all, but not part, of its rights and obligations under this Agreement to an Affiliate by providing notice to Buyer, provided that subsequent to any assignment or delegation made pursuant to this Clause 17.2, Seller and each subsequent assignee or delegate, having itself assigned or delegated to an Affiliate, shall be fully liable under this Agreement in the event of non-fulfilment of its obligations under this Agreement by an assignee or delegate.

17.3    Notwithstanding the foregoing provisions of this Article XVII, and without the prior written consent of Buyer but subject to Seller's written notification to Buyer, Seller may assign (a) its rights to payment under this Agreement to a trust, trustee, bank, paying agent, financial entity or other Person or company for the purposes of any bona fide financing or in order to facilitate the making of any such payment, and (b) any of Seller's rights under this Agreement to any lender or lender's agent as security for its obligations to any such lender under any such financing.

17.4    Buyer shall not effect a Change of Control of Buyer or transfer ownership of all or any part of the SJ 5&6 Units, other than in compliance with the terms of this Clause 17.4:

(a)    Buyer shall give Seller at least sixty (60) Days' prior written notice of any proposed transfer of the SJ 5&6 Units or Change of Control of Buyer, which notice shall set forth the proposed transferee, the transaction or transactions giving rise to the transfer or Change of Control, and any performance assurance or credit support that such transferee proposes to provide in connection with the obligations under this Agreement.

(b)    Notwithstanding anything in this Clause 17.4 to the contrary, without the prior written consent of Seller, Buyer shall not (i) assign this Agreement to any Person who does not have direct and exclusive ownership of, or the obligation to operate and maintain, the SJ 5&6 Units or (ii) assign this Agreement or effect a Change of Control to any Person whose creditworthiness is worse than the expected creditworthiness of Buyer at the time of such assignment (giving effect to the transaction contemplated at the time of such assignment). Whether or not Seller's consent to an assignment by Buyer or Change of Control affecting Buyer is required, it is a condition precedent to the effectiveness of any proposed assignment

44

by Buyer of this Agreement or proposed Change of Control affecting Buyer that Buyer has first paid to Seller (x) all amounts properly invoiced by Seller to Buyer hereunder prior to the proposed date of such assignment or Change of Control (other than any amounts (except any amounts constituting the Full Surcharge Amount) that are the subject of an ongoing dispute validly asserted by Buyer pursuant to Clause 13.10 prior to the date Buyer was notified of such assignment or Change of Control), regardless of whether the due date for payment of such invoices has occurred and (y) the Full Surcharge Amount. Any purported assignment made in the absence of such payments having been made shall be void *ab initio*.

17.5    Seller shall not effect a Change of Control of Seller or transfer direct ownership of the MFH Facility, other than in compliance with the terms of this Clause 17.5:

(a)    Seller shall give Buyer at least sixty (60) Days' prior written notice of such transfer of the MFH Facility, which notice shall set forth the proposed transferee, the transaction or transactions giving rise to the transfer or Change of Control, and any performance assurance or credit support that such transferee proposes to provide in connection with the obligations under this Agreement.

(b)    Notwithstanding anything in this Clause 17.5 to the contrary, but except to the extent otherwise permitted pursuant to Clause 17.2 or Clause 17.3, without the prior written consent of Buyer, Seller shall not assign this Agreement or effect a Change of Control to any Person whose creditworthiness is worse than the expected creditworthiness of Seller at the time of such assignment (giving effect to the transaction contemplated at the time of such assignment). Whether or not Buyer's consent to an assignment by Seller or Change of Control affecting Seller is required, it is a condition precedent to the effectiveness of any proposed assignment by Seller of this Agreement or proposed Change of Control affecting Seller that Seller has first paid to Buyer (x) all amounts invoiced by Buyer hereunder prior to the proposed date of such assignment or Change of Control (other than any amounts that are the subject of an ongoing dispute validly asserted by Seller pursuant to Clause 13.10 prior to the date Seller was notified of such assignment or Change of Control), regardless of whether the due date for payment of such invoices has occurred.

## ARTICLE XVIII
## SUBCONTRACTORS

Seller shall not subcontract its rights and obligations under this Agreement, except in the event Buyer gives written authorization for such actions; provided that no subcontract shall be considered for Buyer's approval, except when the following requirements are met: (1) Seller delivers Buyer a copy of the subcontract, not less than thirty (30) days prior to the effective date of the proposed subcontract; (2) the subcontract includes, as a condition for its legal validity and enforceability, a provision whereby Buyer has the right to substitute, subrogate or assume Seller's rights under the subcontract, in the event that Buyer declares Seller in breach or default of any of the Agreement terms and conditions; and (3) the subcontract includes, as a condition for its validity

45

and enforceability, a provision establishing for the subcontractor the obligation to comply unconditionally and entirely with all Seller's obligations under the Agreement (mirror image rule), except for such obligations, terms and conditions which exclusively related with works or services not included under the subcontract.

### ARTICLE XIX
### TERMINATION

19.1    This Agreement may be terminated if any of the following circumstances occur:

(a)    the mutual agreement of the Parties;

(b)    if a Termination Event on the part of either Party (the "Defaulting Party") has occurred, the other Party (and in the case of paragraph (ii) below, Buyer only) may at any time after which such Termination Event has occurred or during which such Termination Event is otherwise continuing, terminate this Agreement by giving written notice of termination to the Defaulting Party in accordance with this Article XIX, with such termination to take effect as from and including the date of such notice. The following shall each constitute a termination event (a "Termination Event"):

(i)    if any undisputed amount in excess of One Million Dollars ($1,000,000.00) payable by the Defaulting Party under this Agreement has not been paid in full by the due date for the payment of the relevant invoice and the other Party has (after such due date) given notice to the Defaulting Party requiring payment of such amount and the amount has not been paid in full within ten (10) Business Days after the date of such notice;

(ii)    in the case of Seller as the Defaulting Party:

(A)    Seller abandons performance of all of its obligations under the Agreement and does not take material steps to recommence such performance within seven (7) days of written notice from Buyer that it believes Seller has so abandoned;

(B)    the Commissioning Start Date does not occur by the Guaranteed First Gas Long-Stop Date; or

(C)    Substantial Completion does not occur by the Guaranteed Substantial Completion Date; *provided, however,* that if, prior to the Guaranteed Substantial Completion Date, Substantial Completion occurs for one Unit but not the other Unit, the Agreement may only be terminated with respect to the Unit for which Substantial Completion has not occurred and shall remain in full force and effect with respect to the Unit that achieved Substantial Completion (it being agreed that in such circumstances the Natural Gas volume

46

requirements under this Agreement shall be reduced by fifty percent (50%) on account of such termination).

(iii)    if the Defaulting Party is unable to pay, suspends payment of, or agrees to a moratorium (or threatens any of the foregoing with respect to all or a material part of its debts), makes a general assignment or any composition or compromise with or for the benefit of its creditors except to the extent otherwise permitted by this Agreement, takes any proceedings with view to a readjustment, rescheduling or deferral of all or a substantial part of its indebtedness (other than in the case of a refinancing, but the commencement and pendency of the Title III Case shall not be considered a Termination Event, except that if any order has been entered by the Title III Court or any other Governmental Authority providing for the appointment of a receiver, custodian, or similar fiduciary for Buyer or any material portion of its property, the entry of any such order shall be considered a Termination Event);

(iv)    if any order is made, or a petition is presented and not withdrawn within a period of twenty-one (21) Days, for the winding-up, liquidation, dissolution, custodianship or administration (or any equivalent proceedings) of the Defaulting Party; or

(v)    if (A) Seller has not satisfied the SJ 6 First Gas Requirements by December 31, 2019, (B) from and after such date, Buyer is purchasing Back up Fuel Quantities and (C) Seller is not current pursuant to Clause 13.7 on payments to Buyer of Back-up Fuel Cover Amounts due and payable, the Buyer may terminate this Agreement by providing thirty (30) Days' prior written notice;

*provided, however*, that if the circumstances of such Termination Event are cured by the Defaulting Party within the notice period (if any) provided for such Termination Event, such termination notice shall be deemed withdrawn and this Agreement shall not terminate.

19.2    On and at any time after the occurrence of a Termination Event, any Party not subject to such Termination Event may, while such Termination Event subsists, by giving five (5) Days written notice of its intentions to the Defaulting Party, suspend performance of its obligations under this Agreement. Where the Defaulting Party is Buyer, any such suspension by Seller shall not constitute a failure by Seller to make quantities of NG available for sale and delivery pursuant to the terms of this Agreement during such period of suspension, and Buyer shall have no rights in respect of such suspended deliveries during such period of suspension. Where the Defaulting Party is Seller, any such suspension by Buyer shall not constitute a failure by Buyer to take delivery of quantities of NG pursuant to the terms of this Agreement during such period of suspension, and Seller shall have no rights in respect of such suspended deliveries during such period of suspension. If such Termination Event is remedied thereafter (including, with respect to any late payments, payment in full of any such outstanding amounts together with interest thereon), prior to

47

the exercise of rights under Clause 19.3 the notice of suspension served under this Clause 19.2 shall be deemed to be revoked automatically.

19.3    The termination of this Agreement under this Article XIX for any reason shall be without prejudice to the rights and remedies of the terminating Party accrued prior to such termination under this Agreement, including in respect of any antecedent breach (whether or not a repudiatory breach) giving rise to such termination. For the avoidance of doubt, neither Party will be liable to pay any termination payment upon termination of this Agreement other than in respect of liabilities accrued prior to the date of termination.

19.4    **To the fullest extent permitted under Applicable Law, each Party hereby irrevocably waives any right it might otherwise have, for any reason, to equitable rescission of this Agreement.**

19.5    Notwithstanding any other provision of this Agreement to the contrary, upon (a) termination of this Agreement by either Party (including pursuant to this Article XVIII, Clause 15.9, Article XXXII(c) and including where Seller is the Defaulting Party) or by order of any Governmental Authority or (b) rejection of this Agreement pursuant to PROMESA in the Title III Case, (i) the Full Surcharge Amount (including any Incremental Tax Adjustment) and (ii) all other amounts that are owed pursuant to this Agreement with respect to obligations performed prior to the date of such termination, in each case, shall automatically become a debt due and payable by Buyer to Seller (and capable of being set off by Seller against any amount owed by Seller to Buyer under this Agreement, including in connection with the termination); *provided, however,* that if the Agreement is terminated pursuant to Clause 19.1(b)(ii)(A), Seller shall not be entitled to payment of the Full Surcharge Amount.

### ARTICLE XX
### NOVATION

Buyer and Seller expressly agree that no amendment or change order which could be made to this Agreement, during its term, shall be understood as a contractual novation, unless both Parties agree to the contrary, specifically and in writing. The previous provision shall be equally applicable in such other cases where Buyer gives Seller a time extension for the compliance with any of its obligations under this Agreement or where Buyer dispenses the claim or demand of any of its credits or rights under the Agreement.

### ARTICLE XXI
### CHANGE IN LAW

During the term of this Agreement, any change in law, including, but not limited to changes in applicable tax law, which causes an increase in Seller's costs when supplying the products or services to be acquired by Buyer, shall be Seller's responsibility and Buyer shall not be obliged to make additional payments nor to pay additional sums to the price or canon originally agreed for those products or services.

48

### ARTICLE XXII
### APPLICABLE LAW

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America, excluding any choice-of-law provisions that would require application of the laws of a different jurisdiction. The United Nations Convention on Contracts for the International Sale of Goods (the Vienna Sales Convention 1980) and the Convention on the Limitation Period in the International Sale of Goods shall not apply to this Agreement or to the performance thereof or to any aspect of any Dispute arising therefrom.

### ARTICLE XXIII
### RESERVED

### ARTICLE XXIV
### SETTLEMENT OF DISPUTES

24.1    Exclusive Jurisdiction

(a)    Any claim, dispute, disagreement or controversy (each, a "Dispute") that arises between the Parties under this Agreement or that is otherwise related to the subject matter of this Agreement, except for those Disputes to be resolved through Expert determination pursuant to Clause 24.2 below, shall be resolved exclusively in the Federal District Court for the District of Puerto Rico.

(b)    In the event of such Dispute, each Party shall continue performing its obligations hereunder except to the extent such obligations have been properly suspended pursuant to the terms hereof. For the avoidance of doubt, Buyer shall continue paying undisputed amounts due under Article XIII.

24.2    Expert Determination

Any Dispute that arises between the Parties with respect to (i) the determination of quality under Article IV, or (ii) Article X may be referred by either Party to an Expert for such Expert's determination of such Dispute, disagreement or other matter of interpretation in accordance with the following guidelines:

(a)    The Parties hereby agree that such determination shall be conducted expeditiously by an Expert selected unanimously by the Parties.

(b)    The Expert shall not be deemed to be acting in an arbitral capacity.

(c)    The Party requesting that any matter arising under Article IV or Article X of this Agreement be referred to an Expert shall give the other Party notice of such request. If the Parties are unable to agree on the identity of an Expert within ten (10) Days after receipt of the notice of request for an Expert determination, then, upon the request of any of the Parties, the International Centre for Expertise of the

49

International Chamber of Commerce shall appoint such Expert and shall administer such Expert determination through the ICC's Rules for Expertise.

(d)    The Expert shall be and remain at all times wholly impartial as between the Parties, and, once appointed, the Expert shall have no *ex parte* communications with either of the Parties concerning the Expert determination or the underlying Dispute.

(e)    The Expert procedure shall take place in San Juan, Puerto Rico in English.

(f)    Both Parties agree to cooperate fully in the expeditious conduct of such Expert determination and to provide the Expert with access to all facilities, books, records, documents, information and personnel necessary to make a fully informed decision in an expeditious manner.

(g)    Before issuing a final decision, the Expert shall issue a draft report and allow the Parties to comment on it.

(h)    The Expert shall endeavor to resolve the Dispute within thirty (30) Days (but no later than sixty (60) Days) after his appointment, taking into account the circumstances requiring an expeditious resolution of the Dispute.

(i)    The Expert's decision shall be final and binding on the Parties.



24.3    Qualification of Experts

(a)    No Person, without the prior written agreement of the Parties, shall be appointed as an Expert pursuant to Clause 24.2 if such Person:

(i)    is (or has been at any time within ten years preceding notice of the Dispute) an employee of a Party or of an Affiliate of a Party;

(ii)    is (or has been at any time within five years preceding notice of the Dispute) a consultant or contractor of a Party or of an Affiliate of a Party;

(iii)    holds any significant financial interest in a Party; or

(iv)    does not have at least ten years' experience advising or working in the North American NG industry with respect to the subject matters subject to the Expert's determination under Clause 24.2

(b)    The Parties shall, within two months after the Effective Date, agree on a list of possible Experts for purposes of Clause 24.2; *provided, however*, that in the event that the Parties are unable to agree on a list of acceptable Experts, then in the event of a Dispute subject to Expert determination pursuant to Clause 24.2 the Expert shall be appointed by the International Centre for Expertise of the International Chamber of Commerce in accordance with Clause 24.2.

50

### ARTICLE XXV
### NON-WAIVER

Delay or failure to exercise any right, power or remedy accruing to any Party as the result of any breach or default hereunder shall not impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or Default.

### ARTICLE XXVI
### CONFIDENTIALITY

26.1    Any information directly or indirectly disclosed or furnished, whether orally, in writing or in electronic, digital or any other form, by either Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Disclosing Party**") to the other Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Receiving Party**") in connection with this Agreement (or in connection with the terms and conditions or the negotiation of any other agreement or document related to this Agreement or to is subject matter either between the Parties or otherwise) which is not:

(a)    already known to the Receiving Party; or

(b)    already in the public domain (other than in violation of the terms of this Clause 26.1),



such information being "**Confidential Information,**" shall, unless otherwise agreed in writing by the Parties, be kept confidential and shall not be sold, traded, published or otherwise disclosed to any Third Party in any manner whatsoever (except as provided in Clause 26.2) by the Receiving Party. For the avoidance of doubt, the terms of this Agreement may be made public pursuant to Applicable Law.

26.2    The Receiving Party may disclose Confidential Information to the following Persons without the consent of the Disclosing Party:

(a)    To the Receiving Party's and its Affiliates' directors, agents and employees;

(b)    to the Receiving Party's lenders and prospective lenders for the sole purpose of obtaining finance based on this Agreement;

(c)    to the Receiving Party's advisors and consultants, including legal counsel, accountants and other agents of the Receiving Party for purposes connected with this Agreement;

(d)    to Third Parties on an aggregated basis to the extent such information is delivered to such Third Party for the sole purpose of calculating a published index;

(e)    to Experts and any court in connection with the resolution of a Dispute;

(f)    to co-shareholders and partners in upstream and downstream projects, any operator of Seller's facilities and any other relevant Third Parties, in all cases

51

limited (i) only to operational information; and (ii) to the extent strictly necessary to implement this Agreement;

(g)    to any insurer in connection with a policy of insurance required pursuant to this Agreement;

(h)    to any lender or potential lender and to any employee, representative or advisor of such Person;

(i)    to those contractor(s) that Seller retains or proposes to retain to perform any of Seller's obligations hereunder; or

(j)    to any Governmental Authority or financial markets to the extent required or advisable in connection with any future financing activity related to Seller.

26.3    The Receiving Party disclosing Confidential Information pursuant to Clause 26.2 to a Person identified in Clause 26.2(b) to 26.2(f) shall ensure that such Person undertakes to hold such Confidential Information subject to confidentiality obligations equivalent to those set out in Clause 26.1 (excluding legal counsel). Each Party understands that the Receiving Party, and Persons, listed in Clause 26.2(a), (b) or (c) may now or in the future work on similar projects, and the Parties agree that, without prejudice to the other provisions in this Article XXVI, such Persons shall not be precluded from working on such other projects because they have reviewed any Confidential Information.

26.4    In the event that disclosure is required by any Governmental Authority or Applicable Law and such disclosure is not of the kind permitted pursuant to Clause 26.2(j), the Receiving Party subject to such requirement may disclose the Confidential Information to the extent so required, but shall promptly notify the Disclosing Party of such disclosure prior to so doing, and shall cooperate (consistent with the Receiving Party's legal obligations) with the Disclosing Party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the Disclosing Party. Notwithstanding the foregoing, Seller acknowledges that Clauses 26.4 and 26.5 shall not apply to any requirements applicable to Buyer to disclose any Confidential information that Buyer is required to disclose as a public entity under Applicable Law.

26.5    No press release or public statement concerning the existence, execution of, or other matters directly related to, this Agreement, or the transactions contemplated hereby, shall be issued by the representatives, directors, officers, agents or employees of either Party or its Affiliates unless otherwise agreed by the Parties in writing. In the case of any such press release or public statement, the Parties shall first consult and agree to the specific contents and the manner or timing of presentation or publication thereof. The foregoing shall not apply to any announcement by a Party required in order to comply with any Applicable Law, provided that in this case the relevant Party making such announcement notifies the other Party of the details of such announcement, the relevant Applicable Law to be complied with and, where applicable, the addressee of such announcement.

52

26.6     The Parties shall be entitled to all remedies available at law or in equity to enforce or seek relief in connection with the breach of the confidentiality obligation set out in this Article XXVI.

## ARTICLE XXVII
## NOTICES

All notices to be given under this Agreement by one Party to the other shall be in writing, sent to the address and marked to the attention of the Person specified in Article XXIX and, unless otherwise agreed, in English.

## ARTICLE XXVIII
## CONTINGENT FEES

Seller guarantees that it has not employed any person to solicit or secure this Agreement upon any agreement for a commission percentage, brokerage or contingent fee. Breach of this guarantee shall give Buyer the right to annul the Agreement or, at its discretion to deduct from the consideration payable hereunder the amount of such commission, percentage, brokerage or contingent fees. This warranty shall not apply to commissions payable by Contractors upon Contract or sales secured or made through bona fide established commercial or selling agencies maintained by Seller for the purpose of securing business.

## ARTICLE XXIX
## ADDRESSES

**SELLER:**     NFEnergía LLC
c/o New Fortress Energy
111 W 19th St., 8th Fl.
New York, NY 10011

Attention:     General Counsel
Telephone:     516-268-7400
Email:          legal@newfortressenergy.com

Copy to:       Vinson & Elkins LLP
1001 Fannin St., Ste. 2500
Houston, TX 77002

Attention:     Mark Brasher
Telephone:     713-758-3352
Email:          mbrasher@velaw.com

**BUYER:**      Puerto Rico Electric Power Authority
PO Box 364267
San Juan, Puerto Rico 00936-4267

Attention:     José F. Ortiz Vázquez
Title:          Chief Executive Officer

53

|  |  |
|---|---|
| Copy to: | King & Spalding LLP |
|  | 1700 Pennsylvania Avenue NW |
|  | Ste. 200 |
|  | Washington, D.C. 20006 |

|  |  |
|---|---|
| Attention: | James F. Bowe, Jr. |
| Telephone: | 202-626-9601 |
| E-mail: | jbowe@kslaw.com |

Either Party may change its address details by giving not less than five (5) Days written notice to the other Party.

## ARTICLE XXX
## BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT

30.1    Each Party agrees that in connection with its activities conducted pursuant to this Agreement, neither it nor any of its directors, officers, employees, or Affiliates shall (a) take any action, or omit to take any action that would violate any Applicable Law applicable to that Party, (b) make, promise to make, or authorize, the making of any payment, gift or transfer of anything of value, directly or indirectly, to any official or employee of any government or instrumentality of any government or to any political party or official thereof or any candidate of any political party for the purpose of influencing the action or inaction of such official, employee, political party or candidate, or (c) otherwise take any action, or omit to take any action that would cause the other Party to be in violation of any Applicable Law related to the business practices of such other Party, including the United States Foreign Corrupt Practices Act.

30.2    Each Party agrees and undertakes, on behalf of itself, its directors, officers, employees, or Affiliates, not to pay any fees, commissions or rebates to any employee, officer or agent of the other Party, or its Affiliates or shareholders nor provide or cause to be provided to any of them any gifts or entertainment of significant cost or value in connection with their activities conducted pursuant to this Agreement or in order to influence or induce any actions or inactions in connection with the commercial activities of the Parties under this Agreement.

30.3    Without prejudice to Article XXVIII, neither Party shall use any broker, agent, or other intermediary in connection with soliciting, obtaining, negotiating, structuring or performing this Agreement or in connection with the subject matter to which it applies.

30.4    Each Party shall indemnify and hold the other Party harmless from and against any and all losses, damages, liabilities, costs, expenses and claims which arise out of, are incident to, or result from any breach by such Party of this Article XXX.

30.5    Each Party shall use commercially reasonable efforts to cause its contractors and agents to agree to terms concerning business practices and the Foreign Corrupt Practices Act that are substantially similar to those set forth in this Article XXX.

54

## ARTICLE XXXI
## TRANSFER OF FUNDS

If Seller decides to assign or transfer any right to payment of an amount, due or payable, to which he is entitled for services rendered or goods provided during the term of this Agreement, Seller shall notify Buyer of such transfer of funds, in accordance with the provisions of Act 21-2012. Said notice shall clearly indicate the rights granted, including a copy of the contract under which the assignment or transfer of the right to payment is made, the exact amount of funds to be assigned or transferred, and specific identification information regarding the assignee (full name of the person or company), address and any other contact information.

## ARTICLE XXXII
## CONFLICT OF INTEREST

Seller certifies that none of its representatives under this Agreement receive payment or compensation of any nature, for services rendered regularly through an appointment to a governmental agency, body, public corporation or municipality of Puerto Rico. Seller also certifies that it may have consulting services contracts with other governmental agencies or bodies, but such condition does not constitute a conflict of interest for Seller.

Seller acknowledges that in executing the services pursuant to this Agreement it has a duty of complete loyalty towards Buyer which includes not having adverse interests to those of Buyer related to the services. Those adverse interests include representation of clients which have or may have opposed interests to those of Buyer in relation to the services. Also, Seller shall have the continuous obligation to disclose to Buyer all information and circumstances of its relations with clients and third persons and any interest which could reasonably influence Buyer when executing this Agreement or during its term.

The Parties certify that no officer, employee or agent of Buyer, or of the Government of the Commonwealth of Puerto Rico or Municipal Governments, shall be admitted to any share or part of this Agreement or to any benefit that may arise therefrom, but this provision shall not be construed to extend to this Agreement if made with a corporation for its general benefit.

In addition to the restrictions and limitations established under the provisions of Act 1-2012, as amended, retired or former officers or employees of Buyer, whose work was in any way related to the award or management of contracts, shall in no way benefit from any contract with Buyer for a period of two (2) years after leaving employment with or ceasing services to Buyer.

> (a)    Seller represents conflicting interests when on behalf of a client it must contend for that which it is his duty to oppose to comply with its obligations with another previous, present or potential client. Also, Seller represents conflicting interests when its conduct is described as such in the canons of ethics applicable to Seller and its personnel or in the laws or regulations of the Commonwealth of Puerto Rico.

55

(b)     In the event that any of the partners, directors or employees of Seller should incur in the conduct described herein, said conduct shall constitute a violation to the prohibitions provided herein. Seller shall avoid even the appearance of the existence of conflicting interests.

(c)     Seller acknowledges that Buyer's Contracting Officer shall have the power to intervene the acts of Seller and/or its agents, employees, and subcontractors regarding the enforcement of the prohibitions contained herein. In the event that Buyer should discover the existence of adverse interests with Seller, the Contracting Officer shall inform Seller, in writing, of Buyer's intention to terminate this Agreement within a thirty (30) Day period. During said period, Seller may request a meeting with the Contracting Officer to present his arguments regarding the alleged conflict of interests, which meeting shall be granted by Buyer in every case of alleged conflict of interests. In the event that Seller does not request such a meeting during the specified thirty (30) Day period or the controversy is not satisfactorily settled during the meeting, this Agreement shall be cancelled.

(d)     Seller certifies that, at the time of award of this Agreement, it does not have any other contractual relation that can enter in a conflict of interest with this Agreement. Seller also certifies that no public employee has any personal or economical interest in this Agreement.

### ARTICLE XXXIII
### UNFAIR LABOR PRACTICE

In the event that Seller or any of its subcontractors or agents do not comply with an order issued by the Puerto Rico Labor Relations Board and/or the National Labor Relations Board upon their finding that Seller or any of its subcontractors or agents have committed an unfair labor practice, no further payments shall be made by Buyer to Seller after the date of the said order, until such non-compliance is corrected. Any declaration by the Puerto Rico Labor Relations Board and/or by the National Labor Relation Board that the contractors or agents have not complied with an order issued by the Board relating to any unfair labor practice shall be binding, final, and conclusive unless such order is reversed or set aside by a Court of competent jurisdiction.

### ARTICLE XXXIV
### DISCRIMINATION

Seller certifies that it is an employer with equal opportunity employment, and does not discriminate by reason of race, color, religion, political ideas, sex, nationality, age or mental or physical condition.

### ARTICLE XXXV
### COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING
### REQUIREMENTS

Seller undertakes to comply with all applicable State Law, Regulations or Executive Orders that regulate the contracting process and requirements of the Commonwealth of Puerto Rico.

56

35.1    Executive Order Num. OE-1991-24 of June 18, 1991 to require certification of compliance with the Internal Revenue Services of the Commonwealth of Puerto Rico: Pursuant to Executive Order Number OE-1991-24 of June 18, 1991, Seller shall certify and guarantee that it has filed all the necessary and required income tax returns to the Government of Puerto Rico for the last five (5) years. Seller further will certify that it has complied and is current with the payment of any and all income taxes that are, or were due, to the Government of Puerto Rico. Seller shall provide, to the satisfaction of Buyer, and whenever requested by Buyer during the term of this Agreement, the necessary documentation to support its compliance with this Clause 35.1. Seller will be given a specific amount of time to produce said documents. During the term of this Agreement, Seller agrees to pay and/or to remain current with any repayment plan agreed to by Seller with the Government of Puerto Rico.

35.2    Executive Order Num. OE-1992-52 of August 28, 1992 to require certification of compliance with the Department of Labor of the Commonwealth of Puerto Rico. Pursuant to Executive Order Number 1992-52, dated August 28, 1992 amending OE-1991-24, Seller shall certify and warrant that it has made all payments required for unemployment benefits, workmen's compensation and social security for chauffeurs, whichever is applicable, or that in lieu thereof, has subscribed a payment plan in connection with any such unpaid items and is in full compliance with the terms thereof. Seller accepts and acknowledges its responsibility for requiring and obtaining a similar warranty and certification from each and every Contractor and Subcontractor whose service Seller has secured in connection with the services to be rendered under this Agreement and shall forward evidence to Buyer as to its compliance with this requirement.

35.3    Government of Puerto Rico Municipal Tax Collection Center: Seller shall certify and guarantee that it does not have any current debt with regards to property taxes that may be registered with the Government of Puerto Rico's Municipal Tax Collection Center (known in Spanish as Centro de Recaudación de Ingresos Municipales (CRIM)). Seller further will certify to be current with the payment of any and all property taxes that are or were due to the Government of Puerto Rico. Seller shall provide, to the satisfaction of Buyer and whenever requested by Buyer during the term of this Agreement, Certification issued by the Municipal Revenues Collection Center ("MRCC"), assuring that Seller does not owe any tax accruing to such governmental agency. To request such Certification, Seller will use the form issued by the MRCC (called "CRIM-Certificados, Radicación, Estado de Cuenta y Todos los Conceptos" in the MRCC website). Seller shall deliver upon request any documentation requested by Buyer. During the Term of this Agreement, Seller agrees to pay and/or to remain current with any repayment plan agreed to by Seller with the Government of Puerto Rico with regards to its property taxes.

Seller shall provide a Personal Property Tax Filing Certification, issued by the MRCC which indicates that Seller has filed its Personal Property Tax Return for the last five (5) contributory terms or Negative Debt certification issued by the MRCC with respect to real and property taxes and a sworn statement executed by Seller indicating that (i) its revenues are derived from the rendering of professional services, (ii) during the last five (5) years (or the time in which it has been providing professional services) it has had no taxable business or personal property on the 1st of January of each year, (iii) that for such reasons

57

it has not been required to file personal property tax returns, as required under Article 6.03 of Act 83-1991, as amended and (iv) that for such reason it does not have an electronic tax file in the MRCC's electronic system.

35.4    Seller shall furnish a Certification issued by the Treasury Department of Puerto Rico which indicates that Seller does not owe Puerto Rico Sales and Use taxes to the Commonwealth of Puerto Rico; or is paying such taxes by an installment plan and is in full compliance with its terms.

35.5    The Seller shall provide a Puerto Rico Sales and Use Tax Filing Certificate, issued by the Treasury Department of Puerto Rico assuring that Seller has filed his Puerto Rico Sales and Use Tax for the last sixty (60) tax periods.

35.6    The Seller shall provide a copy of its Certificate of Merchant's Registration issued by the Treasury Department of Puerto Rico.

35.7    Puerto Rico Child Support Administration (ASUME): Seller shall present, to the satisfaction of Buyer, the necessary documentation certifying that neither Seller nor any of its owners, affiliates of subsidiaries, if applicable, have any debt, outstanding debt, or legal procedures to collect child support payments that may be registered with the Puerto Rico Child Support Administration (known in Spanish as the Administración Para El Sustento de Menores (ASUME)). Seller will be given a specific amount of time to deliver said documents. 3 L.P.R.A. § 8611 et seq.;



35.8    Seller shall provide a Good Standing Certificate issued by the Department of State of Puerto Rico.

35.9    Seller shall provide a Certification of Incorporation, or Certificate of Authorization to do business in Puerto Rico issued by the Department of State of Puerto Rico.

35.10    Social Security and Income Tax Withholdings: In compliance with Executive Order 1991 OE- Article XXIII; and 20 C.F.R. Part 404 et. seq., the Seller will be responsible for filing and depositing the Federal Social Security and Income Tax withholding obligations, as applicable, for any amounts paid in connection with this Contract.

35.11    Compliance with Act No. 1 of Governmental Ethics: Seller shall certify compliance with Act No. 1 of January 3, 2012, as amended, known as the Ethics Act of the Government of Puerto Rico, which stipulates that no employee or executive of Buyer nor any member of his/her immediate family (spouse, dependent children or other members of his/her household or any individual whose financial affairs are under the control of the employee) shall have any direct or indirect pecuniary interest in the services to be rendered under this Agreement, except as may be expressly authorized by the Governor of Puerto Rico in consultation with the Secretary of Treasury and the Secretary of Justice of the Government. 3 L.P.R.A. § 8611 et seq.

35.12    Law 168-2000: Law for the Strengthening of the Family Support and Livelihood of Elderly People: Seller shall certify that if there is any Judicial or Administrative Order

58

demanding payment or any economic support regarding Act No. 168-2000, as amended, the same is current and in all aspects in compliance. Act No. 168-2000 **"Law for the Strengthening of the Family Support and Livelihood of Elderly People"** in Spanish: **"Ley para el Fortalecimiento del Apoyo Familiar y Sustento de Personas de Edad Avanzada"**, 3 L.P.R.A. §8611 et seq.

35.13  Law Num. 127, May 31, 2004: Contract Registration in the Comptroller's Office of Puerto Rico Act: Payment for services the object of this Agreement shall not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

35.14  Prohibition with respect to execution by public officers: (3 L.P.R.A. 8615(c)):

No public officer or employee authorized to contract on behalf of the executive agency for which he/she works may execute a contract between the agency for which he/she works and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

35.15  Prohibition with respect to contracting with officers or employees: (3 L.P.R.A. 8615(d)):



No executive agency may execute a contract in which any of its officers or employees or any member of their family units has or has had direct or indirect economic interest during the last four (4) years prior to their holding office, unless the Governor gives authorization thereto with the previous recommendation of the Secretary of the Treasury and the Secretary of Justice.

35.16  Prohibition with respect to contracts with officers and employees of other Government entities: (3 L.P.R.A. 8615(e)):

No public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

35.17  Prohibition with respect to evaluation and approval by public officers: (3 L.P.R.A. 8615(f)):

No public officer or employee who has the power to approve or authorize contracts shall evaluate, consider, approve or authorize any contract between an executive agency and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

35.18  Prohibition with respect to execution by public officers contracts with former public officers: (3 L.P.R.A. 8615(h)):

59

No executive agency shall execute contracts with or for the benefit of persons who have been public officers or employees of said executive agency until after two (2) years have elapsed from the time said person has ceased working as such.

35.19  Both Parties acknowledge and agree that the contracted services herein may be provided to another entity of the Executive Branch which enters into an interagency contract with Buyer or by direct disposition of the Chief of Staff. These services will be performed under the same terms and conditions in terms of hours of work and compensation set forth in this Agreement. For the purpose of this Clause 35.19, the term "entity of the Executive Branch" includes all agencies of the Government of Puerto Rico, as well as all instrumentalities and public corporations.

35.20  [Reserved]

35.21  Seller shall provide Workmen's Compensation Insurance as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico. Seller shall also be responsible for compliance with said Workmen's Compensation Act by all its subcontractors, agents, and invitees, if any.

35.22  Invoices must include a written and signed certification stating that no officer or employee of Buyer, and their respective subsidiaries or affiliates, will personally derive or obtain any benefit or profit of any kind from this Agreement, with the acknowledgment that invoices that do not include this certification will not be paid. This certification must read as follows:

"We certify under penalty of nullity that no public servant of Buyer will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the Services provided is the agreed-upon price that has been negotiated with an authorized representative of Buyer. The total amount shown on this invoice is true and correct. The Services have been rendered, and no payment has been received."

35.23  Anti-Corruption Code for a New Puerto Rico. Seller agrees to comply with the provisions of Act No. 2-2018, as the same may be amended from time to time, which establishes the Anti-Corruption Code for a New Puerto Rico. Seller hereby certifies that it does not represent particular interests in cases or matters that imply a conflict of interest, or of public policy, between the executive agency and the particular interests it represents.

Seller shall furnish a sworn statement to the effect that neither Seller nor any president, vice president, executive director or any member of a board of officials or board of directors, or any person performing equivalent functions for Seller has been convicted of or has pled guilty to any of the crimes listed in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico or any of the crimes included in Act 2-2018.

60

Seller hereby certifies that it has not been convicted in Puerto Rico or United States Federal court under Articles 4.2, 4.3 or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

Buyer shall have the right to terminate this Agreement in the event Seller is convicted in Puerto Rico or United States Federal court for under Articles 4.2, 4.3 or 5.7 of Act 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico.

If any of the previously required Certifications shows a debt, and Seller has requested a review or adjustment of this debt, Seller will certify that it has made such request at the time of the Agreement execution. If the requested review or adjustment is denied and such determination is final, Seller will provide, immediately, to Buyer a proof of payment of this debt; otherwise, Seller accepts that the owed amount be offset by Buyer and retained at the origin, deducted from the corresponding payments.

35.24   Consequences of Non-Compliance: Seller expressly agrees that the conditions outlined throughout this Article XXXV are essential requirements of this Agreement.

## ARTICLE XXXVI
### INSURANCE

36.1   INSURANCE AND BONDS:

Seller shall secure and maintain in full force and effect during the life of this Agreement as provided herein, policies of insurance covering all operations engaged in by the Agreement as follows:

(a)   Commonwealth of Puerto Rico Workmen's Compensation Insurance:

Seller shall provide Workmen's Compensation Insurance as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico. Seller shall also be responsible for compliance with said Workmen's Compensation Act by all its subcontractors, agents, and invitees, if any.

61

Seller shall furnish a certificate from the Puerto Rico's State Insurance Fund showing that all personnel employed in the work are covered by the Workmen's Compensation Insurance, in accordance with this Contract.

(b)    Employer's Liability Insurance:

Seller shall provide Employer's Liability Insurance with minimum bodily injury limits of $1,000,000 for each employee and $1,000,000 for each accident covering against the liability imposed by Law upon Seller as result of bodily injury, by accident or disease, including death arising out of and in the course of employment, and outside of and distinct from any claim under the Workmen's Compensation Act of the Commonwealth of Puerto Rico.

(c)    Commercial General Liability Insurance:

Seller shall provide a Commercial General Liability Insurance with limits of $2,000,000 per occurrence and $2,000,000 aggregate, and including coverage for explosion, collapse, and underground (XCU) hazard.

The Commercial General Liability Insurance or its equivalent must include coverage for bodily injuries and property damages caused during the operation of a watercraft.

(d)    Excess Liability Insurance:



Seller shall provide an Excess Liability Insurance in excess of the Commercial General Liability Insurance limits. This Excess Liability Insurance will have limits of $10,000,000 per occurrence and $10,000,000 aggregate.

(e)    Commercial Automobile Liability Insurance:

Seller shall provide a Commercial Automobile Liability Insurance with limits of $1,000,000 combined single limit covering all owned, non-owned, and hired automobiles.

(f)    Pollution Liability Insurance:

Seller shall provide a Pollution Liability Insurance with limits of $1,000,000 per claim and $1,000,000 per aggregate.

36.2    Requirements Under the Policies:

The Commercial General Liability or its equivalent and the Commercial Automobile Liability Insurance required under this Contract shall be endorsed to include:

(a)    As Additional Insured:

> Puerto Rico Electric Power Authority (Buyer)
> Risk Management Office
> PO Box 364267
> San Juan, PR 00936-4267

(b)    A thirty (30) Day cancellation or nonrenewable notice to be sent to the above address.

(c)    An endorsement including this Agreement under contractual liability coverage and identifying it by number, date and parties to the contract.

(d)    Waiver of Subrogation in favor of Puerto Rico Electric Power Authority (Buyer).

(e)    Breach of Warranties or Conditions:

> "The Breach of any of the Warranties or Conditions in this policy by the Insured shall not prejudice Buyer's rights under this policy."

36.3    Bonds:

Seller shall require each BOP Contractor to furnish at the time of the execution of an agreement to perform any part of the Works:

(a)    A Performance Bond in the amount of twenty-five percent (25%) of the relevant contract price, with good and sufficient surety reasonably acceptable to Buyer guaranteeing to Buyer that such BOP Contractor will well and faithfully perform its obligations under such agreement.

(b)    A Payment Bond in the amount of twenty-five percent (25%) of the relevant contract price, with good and sufficient surety reasonably acceptable to Buyer to guarantee to Buyer the prompt payment of all labor, supervision, equipment and materials required in the performance of the work.

(c)    All bonds shall be issued in a form reasonably acceptable to Buyer.

36.4    Furnishing of Policies:

All required policies of insurance shall be in a form acceptable to Buyer and shall be issued only by insurance companies authorized to do business in Puerto Rico.

Seller shall furnish a certificate of insurance in original signed by an authorized representative of the insurer in Puerto Rico, describing the coverage afforded.

63

## ARTICLE XXXVII
## GENERAL

37.1    If any inconsistency appears between the provisions contained in the body of this Agreement and any Annex or Exhibit to this Agreement, then the provisions of the body of this Agreement shall prevail.

37.2    If any one or more of the provisions, obligations, or terms herein or part thereof shall be determined by a court of competent jurisdiction to be wholly or partially invalid, void, illegal or unenforceable in any respect by operation of Applicable Law or otherwise, the validity, legality, or enforceability of the remaining provisions, obligations, or terms or part thereof in any other jurisdiction shall not in any way whatsoever be affected or impaired thereby and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the validity and enforceability hereof to the extent that the essential purposes of this Agreement can be determined and effectuated.

37.3    The Parties do not intend any term of this Agreement to be enforceable by any Third Party.

37.4    Nothing in this Agreement shall be deemed to create a partnership, joint venture or association, establish a principal and agent relationship or any other relationship of a similar nature, including employment, between the Parties or create any joint and several liabilities. Neither Party shall have any right, power or authority to enter into any agreement or undertaking for, to act on behalf of, to act as or be an agent or representative of, or to otherwise bind, the other Party.



37.5    From and after the Effective Date and for the remainder of the Contract Term, Buyer shall use commercially reasonable efforts to cooperate with any financing efforts of Seller (including any refinancing thereof) with respect to the development and construction of the MFH Facility and Works, including providing information regarding the MFH Facility, the Interconnection Facility and SJ 5&6 Units reasonably available to Buyer and responding to any reasonable questions asked or imposed by any of Seller's potential debt and equity financing sources ("Seller's Financing Sources"). Buyer consents to the collateral assignment of this Agreement to Seller's Financing Sources. In connection with such cooperation, Buyer agrees that it shall execute and deliver such further instruments and documents (if any) as are reasonably requested by Seller's Financing Sources in connection with such financing efforts on terms that are customary for the relevant type of financing in connection with a project similar to that described in the first sentence of this Clause 37.5, which instruments and documents may include notices, collateral assignments or direct agreements (containing customary lender cure rights and remedies provisions), acknowledgements, consents, certifications and representations and opinions of counsel.

37.6    The Parties acknowledge that this Agreement has been negotiated and prepared by the Parties with the advice of legal counsel to the extent deemed necessary by each Party. The Parties have agreed to the wording of this Agreement and none of the provisions of this Agreement shall be construed against one Party on the ground that such Party is the author of this Agreement or any part of this Agreement.

37.7    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations and communications relative hereto, oral or written, and there are no other understandings or representations between the Parties hereto. This Agreement may not be amended except by an instrument in writing signed by a duly authorized representative of each Party.

[Signature Page Follows]

65

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their respective duly authorized representative as of the day and year first above written.

For and on behalf of

SELLER:

NFENERGÍA LLC

Name: _____

Title: CFo / Authorized Signatory

S.S.

For and on behalf of

BUYER:

PUERTO RICO ELECTRIC POWER AUTHORITY

Name: _____

Title: Chief Executive Officer

S.S.

JULIANA STEFANOV
NOTARY PUBLIC-STATE OF NEW YORK
No. 01ST6281316
Qualified in New York County
My Commission Expires 05-14-2020

3.5.2019

66

## ANNEX A
## TERMS AND CONDITIONS FOR WORKS

### ARTICLE 1.  Scope of Work

Seller shall furnish all labor, materials, design, supervision, equipment, tools, services, engineering, fabrication, procurement, construction, tests, startup, and other necessary services for completion of the Works in strict accordance with the Scope of Work, provisions of this Annex A and the Agreement, including reference drawings, all of which are hereby made a part hereof. On or before 60 days after the Commissioning Start Date, as part of its obligations herein stated, Seller shall deliver to Buyer a true and exact copy of all diagrams, plans, sketches, maps, and other documents used in the performance of contracted works and for which a third-party copyright or patent right would not be an impediment for such delivery. Seller shall be responsible for the scope of work and associated capital cost required for the Works, in each case, as specified herein.

The terms and conditions included on this Annex A will apply only to the Works. If there is any discrepancy between this document and the Agreement, the latter will prevail. The provisions of the Agreement shall also apply to the Works.

### ARTICLE 2.  Definitions

Whenever the words defined in this Article or pronouns used instead are mentioned in this Annex A, they shall have the meanings here given. If not defined in this Annex A, then the definitions provided in the Agreement will apply:

2.1   "Construction Manager" means the professional assigned by Seller to provide the construction management services in connection with the execution of the Work. This professional shall be a professional engineer registered in Puerto Rico and an active member of the Puerto Rico College of Engineers and Land Surveyors.

2.2   "Delay" means an event that extends (affects) the completion date of the Work, by affecting tasks on the critical path. The project schedule shall clearly display that Seller has used, in full, all the float time available for the work involved with this request (such float belonging exclusively to Seller).

2.3   "Engineer" means Buyer's Director of Generation, acting directly or through his properly authorized representatives.

2.4   "MFH Facility" shall have the meaning given to it in Annex C.

2.5   "Notice to Proceed" means a written order sent to Seller by the Contracting Officer, or his designated representative, notifying Seller of the date upon which Seller is given authority to begin the work.

2.6   "Subcontractors" shall have the meaning given to it in Article 18.

2.7   "Warranty Period" shall have the meaning given in Article 18.1.

A-1

## ARTICLE 3.  Commencement and Completion of Work

Seller, within ten (10) days after its receipt of the Notice to Proceed, shall file with the Engineer a schedule of proposed progress of the Works and the proposed detailed method of carrying on the Works including a full statement of equipment and equipment layout for the job. This progress chart and statement of operations shall show the dates of commencement and completion of each item of the Works. This schedule shall also include the milestones for the submittals and material ordering, the critical path of the Work, and the man-hours per item if said progress chart and/or statement of operations are not satisfactory to the Engineer, they shall be revised by Seller to provide for the use of adequate and sufficient equipment and force and a method of operations, which will assure the completion of the Works within the schedule set forth in the Scope of Work. This information shall become a part of this Agreement after the Engineer has approved it in writing. The schedule shall be actualized monthly by Seller and submitted to Buyer for approval.

## ARTICLE 4.  Suspension of Work

The Contracting Officer or the Engineer may, at any time, suspend the whole or any portion of the work under this Agreement, for the period of time that the Contracting Officer or the Engineer determines appropriate to Buyer, but this right to suspend the work shall not be construed as denying Seller actual reasonable, and necessary expenses due to delays caused by such suspension (such amounts to be paid as they accrue), it being understood that expenses will not be allowed for such suspension when ordered by the Contracting Officer or the Engineer on account of a Force Majeure event or due to Seller's failure to comply with the Agreement[1]. The cause of such suspension shall be put in writing by the Contracting Officer, the Engineer or the designated representative within two (2) working Days after the suspension or as soon as practicable.

## ARTICLE 5.  Other Work at the Site

Buyer reserves the right to perform other work outside of the scope of the Works or to enter into other contracts in connection with the SJ 5&6 Units. Seller shall afford Buyer and its other contractors a reasonable opportunity for the introduction and storage of their materials and the execution of their work and shall properly connect and coordinate Seller's work with the work performed by Buyer and its other contractors. If any part of Seller's work depends for proper execution or results upon the work of Buyer or of any other contractor, Seller shall inspect and promptly report to Buyer any defects in such work or any conflicts between such work and that of Seller, Buyer to decide, if necessary, the course to be followed by each party.

Wherever work being done by Buyer's own forces or by other contractors is contiguous to work covered by this Agreement, Buyer will secure the completion of the various portions of the work so as not to interfere with the Work. Whenever, in the opinion of Buyer, the orderly progress of the entire Project requires the use by Buyer's own forces or by other contractors, of construction equipment installed and operated by Seller for his own use, Buyer will arrange with Seller for such use, at times, and in locations which will not interfere with the work being done under this

---

[1] Dependent upon Mitsubishi agreeing to the same.

A-2

Agreement, and will reimburse Seller for any incremental costs incurred by Seller as a result of any such use.

ARTICLE 6.  Submittals

The Engineer shall be allowed five (5) working Days to evaluate and to review submittals and mark them as disapproved, approved as corrected or approved it becomes necessary. Seller is responsible to submit digital submittals. All submittals not approved shall be corrected as required and resubmitted for Buyer's evaluation.

Any review or approval by the Engineer or Buyer of such submittals under this Article 6, or specification or drawings under Article 9, shall not relieve Seller from its obligation to comply with the Agreement and the Scope of Work, unless otherwise agreed in writing by the Parties.

Before commencement of any work or task required in this Agreement, Seller shall submit for Buyer's approval the Occupational Safety and Health Programme.

ARTICLE 7.  Specifications and Drawings

Buyer reserves the right to review and approve all drawings, specifications, methods, and data which Seller generates, from its responsibilities, obligations or liabilities under this Agreement. Seller shall obtain such reviews or approval in writing from Buyer. Seller shall keep at the working area a copy of the Agreement, its supplementary documents, specifications and drawings, and shall, at all times, give the Engineer access thereto. Anything called for in the specifications and not shown on the drawings or shown on the drawings and not mentioned in the specifications shall be of like effect as if called for or shown on both. In case of discrepancy in the specifications and drawings, the matter shall be immediately submitted to the Engineer, without whose decision said discrepancy shall not be adjusted by Seller, and Seller shall not proceed with the work so affected until it has received written order from the Engineer.

ARTICLE 8.  Strict Accordance with Technical Requirements

All construction work called for in the Scope of Work and/or shown on the drawings to be performed by Seller shall be performed in strict accordance with the technical requirements of the contract documents.

ARTICLE 9.  Changes and/or Extra Work

Seller shall be entitled to be reimbursed the actual direct incremental cost to Seller (including amounts paid to its contractors, vendors, consultants and Subcontractors) on account of any of the following events (each, a "Change Event"):

9.1    If Buyer, at any·time, makes changes or orders extra work additional to the Scope of Work contracted, subject to previous written approval of Buyer's Contracting Officer, which changes may include, but not limited to, changes:

   (a)    in the specifications including drawings and design;

A-3

(b)      in the method or manner of performance of the work;

(c)      in Buyer's furnished facilities, equipment, materials, services, or site; and/or,

(d)      acceleration in the performance of the work.

9.2      Within ten (10) working days after receipt of Buyer's written order of a change in the work (or such shorter or longer period of time as may be reasonably required as agreed by Buyer and Seller) or the occurrence of a Change Event, Seller shall promptly notify Buyer of the cost, schedule and other impact(s) Seller anticipate as a result of the Change Event. If Buyer agrees with Seller's statement as to the impact of the Change Event, the parties shall proceed promptly to enter into a written change order in connection with such change to equitably adjust Seller's cost (increase or decrease), schedule (lengthen or shorten), or other obligations under this Agreement in connection with such Change Event, including by modifying the Natural Gas Manufacturing Surcharge to include allowance for the relevant costs. If Buyer disagrees with Seller's statement as to the final impact of the Change Event, Buyer shall promptly advise Seller in writing of the basis for the disagreement and Buyer and Seller shall negotiate in good faith to resolve any issues in order to, when applicable, enter into a written change order to equitably adjust Seller's cost (increase or decrease), schedule (lengthen or shorten), or other obligations under the Agreement in connection with such change. Acceptance of the change order and an adjustment in the Agreement price and/or Agreement time shall not be unreasonably withheld. Once a written consent has been executed by Buyer's Contracting Officer, Seller shall proceed with the change. Except as herein provided, and within the time frames stated, no order, statement, or conduct of Buyer that does not constitute a Change Event shall be treated as a change under this Clause 9.2 or entitle Seller to an equitable adjustment hereunder.



If agreement on the prices for the extra work cannot be reached between Buyer and Seller, Buyer may order in writing Seller to perform the required work on a force account basis and Seller shall then execute the order and be paid on a reimbursable basis as its expenses accrue. Buyer may also elect to have such work performed by its own forces or by separate contract.

In order to facilitate review of quotations for extras or credits, all proposals submitted by Seller in connection with a change in the work by Buyer, except those so minor that their propriety can be seen by inspections, shall be accomplished by a complete itemization of the costs including labor, materials, equipment, and subcontracts. When subcontractors perform major cost items, they shall also be itemized.

ARTICLE 10. Inspection

10.1    Periodic Inspection

All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Buyer's inspectors, at agreed times. During the Warranty Period, at the time of any such inspection, Buyer shall have the right to reject defective material, equipment or workmanship or require its correction. Rejected workmanship shall be satisfactorily corrected and rejected material and equipment furnished by Seller shall be satisfactorily replaced with proper material and equipment,

A-4

without charge to Buyer. Seller shall furnish all facilities, labor, materials, and equipment reasonably necessary for any inspection and Required Testing to be performed in a safe manner that will not unnecessarily delay the work.

10.2    Final Inspection

Whenever all the materials have been furnished and all of the Works have been performed, including final cleaning-up as contemplated in Article 21, all in accordance with the drawings and Scope of Work, Seller shall notify the Engineer in writing that said work is completed and ready for final inspection. Final inspection shall occur within a ten (10) working Days period after the Engineer has received notice from Seller of Substantial Completion. After receipt of notice Buyer will notify Seller of the exact date and time of the final inspection and Seller shall accommodate Buyer's specific time. If all Works are found completed in accordance with the Scope of Work, this inspection shall constitute the final inspection and the date of receipt of the notice of Seller that the Works were completed and ready for final inspection shall be established as "Final Completion." If, however, upon inspection by the Engineer it is found that any Work, in whole or in part, is unsatisfactory, the Engineer shall give Seller the necessary instructions as to replacement of material and performance of work necessary to achieve Final Completion and acceptance and Seller shall immediately comply with and execute such instructions. Upon satisfactory replacement and performance of such Work, Seller shall notify the Engineer, and another inspection shall be made which will constitute the final inspection if the Required Testing demonstrates Substantial Completion. In such event, the date of receipt of this last notice of Seller will be established as Final Completion of the Works or any separable part thereof under the Agreement. Final Completion, thus established, shall be used in calculating the actual time of performance of the work.

10.3    Substantial Completion Prior to Final Completion

When Seller believes that it has achieved Substantial Completion for SJ 5 or SJ 6, Seller shall submit a written notice to Buyer of its determination that the Works in respect of such Unit satisfy the requirements for Substantial Completion.

Following receipt of a Seller determination pursuant to Clause 10.3, Buyer (acting reasonably and in good faith) shall, within three (3) Days, either issue a certificate confirming that Substantial Completion has occurred for such unit or provide written notice to Seller (in a proposed Punch List) of the Works that remain to be completed in order for Substantial Completion of such unit to occur. Notwithstanding the achievement of Substantial Completion, Seller shall finish the items included in the Punch List and all other pending tasks or requirements of the contract documents, as required in the Substantial Completion certificate.

## ARTICLE 11. Superintendence by Seller

Before commencement of the Works, Seller shall designate a competent Construction Manager, reasonably satisfactory to the Engineer, with the expertise and resources necessary to provide construction management services. Seller shall also have a competent Resident Engineer,

A-5

reasonably satisfactory to the Engineer, on the work site, at all times during progress of the work, with authority to act for the Engineer. The Resident Engineer shall only be assigned to the Work. The Construction Manager and Resident Engineer shall represent Seller in his absence and all directions given to the Construction Manager and Resident Engineer by the Engineer shall be as binding as if given to Seller. Seller shall, at all times, enforce strict discipline and good order among its employees and shall not employ on the work any unsuitable or unskilled person in the work assigned to Seller. In addition, Seller shall be fully responsible for the negligent or wrongful acts or omissions of subcontractors or of persons both directly or indirectly employed by Seller and shall be liable to Buyer and/or any affected third parties for such acts or omissions.

## ARTICLE 12. Sanitary Facilities

Seller shall furnish and maintain satisfactory, sanitary facilities for the use of the workmen engaged in the construction, as required by law or regulations.

## ARTICLE 13. Access to Work

13.1    Buyer shall provide reasonable access to all Persons appointed or authorized by Seller to visit and inspect the Work, or any part thereof, at all reasonable times, and places during the progress of it.

13.2    Buyer shall provide Seller and its contractors, consultants, vendors, and Subcontractors, and each of their respective employees, agents, representatives and other personnel clear access to all areas of the site at all times necessary for the timely completion of the Works and Seller's other obligations hereunder.

## ARTICLE 14. Independent Contractor

Seller shall be considered an independent contractor, for all purposes under this Agreement, and all persons engaged or contracted by Seller for the performance of its obligations herein, shall be considered either as its employees or agents or those of its subcontractors, and not as employees or agents of Buyer. In consequence, Seller is not entitled to any fringe benefits, such as, but not limited to vacations, sick leave, and other.

## ARTICLE 15. Insurance, Bonds, and Indemnities

Seller shall cause MHPSA to secure and maintain in full force and effect until Final Acceptance, policies of insurance covering the Works as follows:

15.1    Commonwealth of Puerto Rico Workmen's Compensation Insurance:

Seller shall provide Workmen's Compensation Insurance as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico. Seller shall also be responsible for compliance with said Workmen's Compensation Act by all its subcontractors, agents, and invitees, if any.

A-6

Seller shall furnish a certificate from the Puerto Rico's State Insurance Fund showing that all personnel employed in the work are covered by the Workmen's Compensation Insurance, in accordance with this Contract.

15.2    Employer's Liability Insurance:

Seller shall provide Employer's Liability Insurance with minimum bodily injury limits of $1,000,000 for each employee and $1,000,000 for each accident covering against the liability imposed by Law upon Seller as result of bodily injury, by accident or disease, including death arising out of and in the course of employment, and outside of and distinct from any claim under the Workmen's Compensation Act of the Commonwealth of Puerto Rico.

15.3    Commercial General Liability Insurance:

Seller shall provide a Commercial General Liability Insurance or its equivalent with limits of $2,000,000 per occurrence and $2,000,000 aggregate, and including coverage for explosion, collapse, and underground (XCU) hazard.

15.4    Excess Liability Insurance:

Seller shall provide an Excess Liability Insurance in excess of the Commercial General Liability Insurance limits. This Excess Liability Insurance will have limits of $10,000,000 per occurrence and $10,000,000 aggregate.

15.5    Commercial Automobile Liability Insurance:

Seller shall provide a Commercial Automobile Liability Insurance with limits of $1,000,000 combined single limit covering all owned, non-owned, and hired automobiles.

15.6    Pollution Liability Insurance:

Seller shall provide a Pollution Liability Insurance with limits of $1,000,000 per claim and $1,000,000 per aggregate.

15.7    Professional Liability Insurance:

Seller shall provide a Professional Liability Insurance with limits of $1,000,000 per claim and $1,000,000 per aggregate.

15.8    Requirements Under the Policies:

The Commercial General Liability or its equivalent and the Commercial Automobile Liability Insurance required under this Contract shall be endorsed to include:

(a)    As Additional Insured:

A-7

Puerto Rico Electric Power Authority (PREPA)
Risk Management Office
PO Box 364267
San Juan, PR 00936-4267

(b)     A thirty (30)-Day cancellation or nonrenewable notice to be sent to the above address.

(c)     An endorsement including this Contract under contractual liability coverage and identifying it by number, date and parties to the contract.

(d)     Waiver of Subrogation in favor of Puerto Rico Electric Power Authority (PREPA).

(e)     Breach of Warranties or Conditions:

"The Breach of any of the Warranties or Conditions in this policy by the Insured shall not prejudice Buyer's rights under this policy."

15.9    Bonds:

Seller shall require MHPSA to furnish, at the time of the execution of its agreement with Seller for the Works:

(a)     A Performance Bond in the amount of one hundred percent (100%) of the contract price thereunder, with good and sufficient surety reasonably acceptable to Buyer, guaranteeing to Buyer and Seller that MHPSA will well and faithfully perform the Works.

(b)     A Payment Bond in the amount of one hundred percent (100%) of the contract price thereunder, with good and sufficient surety reasonably acceptable to Buyer, to guarantee to Buyer and Seller the prompt payment by MHPSA of all labor, supervision, equipment and materials required in the performance of the Works.

(c)     All bonds shall be issued in the official form of Buyer.

15.10   Furnishing of Policies:

All required policies of insurance shall be in a form acceptable to Buyer and shall be issued only by insurance companies authorized to do business in Puerto Rico.

Seller shall furnish a certificate of insurance in original signed by an authorized representative of the insurer in Puerto Rico, describing the coverage afforded.

## ARTICLE 16. Other Contracts

Buyer may award other contracts for additional work, and Seller shall fully cooperate with such other contractors, in accordance with Article 5, in their performance of other work at the San Juan Power Plant, and Seller shall coordinate its performance of the Works insofar as possible with that

A-8

performed under other contracts as may be directed by the Contracting Officer. Seller shall not commit or permit any acts which interfere with the performance of work by any other contractor.

ARTICLE 17. Correction of Work After Final Acceptance

Neither the final certificate for payment nor any provision in the Contract documents shall relieve MHPSA or any BOP Contractor of responsibility for faulty materials or workmanship and, unless otherwise specified, Seller shall require MHPSA and each BOP Contractor to remedy any defects due thereto and pay for any damage to other work resulting therefrom, on the terms set forth in Article 18 of this Annex A.

ARTICLE 18. Warranty and Performance Testing

Seller shall use commercially reasonable efforts to obtain from MHPSA and each BOP Contractor ("Subcontractors") warranties of goods, equipment and materials on the following terms:

18.1    During the Required Testing completed by MHPSA prior to Substantial Completion, each Unit will satisfy the performance guarantees set forth in Exhibit F.

18.2    That all materials, parts or equipment used, and work performed for the Works comply in all respect with the terms and conditions of the Agreement; that they are free from any and all latent and patent defects in design, materials, and workmanship; that they are suitable and adequate for the purposes if any, specified in the Agreement, and that the services provided under this Agreement will conform with the standards of care and practice appropriate to a Reasonable and Prudent Operator. The warranty period will begin the date on Substantial Completion and will continue for a period of one (1) year or for whatever period MHPSA will provide (the "Warranty Period"). The Subcontractor will, upon written notice by Buyer, fully remedy, free of expense to Buyer, such defects as may develop on said services, materials, parts or equipment, provided that (i) they have been properly stored, installed and maintained, and operated within the specified parameters (including any such parameters provided by Seller's contractors) and (ii) Buyer notifies the Subcontractor during the Warranty Period. The Performance Bond furnished by the relevant Subcontractor shall cover and serve as guarantee for this warranty.

18.3    For those materials, parts, equipment, which proves defective or deficient during the Warranty Period, the Subcontractor shall, at his own expense, repair or replace, transport-in, from Subcontractor's facilities to Buyer's site, and transport-out, from Buyer's site to Subcontractor's facilities, such materials, parts, and/or equipment. The Performance Bond furnished by the relevant subcontractor shall cover and serve as guarantee for the Subcontractor's failure, in whole or in part, to properly perform his obligations under this Agreement.

18.4    For parts and equipment to be procured by Seller from other suppliers, and which will be furnished by Seller to Buyer under this Agreement, a written warranty shall be obtained by Seller from each supplier on the above terms and legally tended to Buyer prior to the commencement of work. Seller shall assign all agreements with Subcontractors to Buyer upon Final Completion, at which point Seller shall be released from any future liability

A-9

with respect to the Works, whether under this Article 18, or pursuant to any other theory of law, including contract, tort, statute or equity.

18.5    The warranties shall not apply to the extent any defect is proven to be as a result of any of the following occurring after the date on which Buyer finally accepts the service and/or installation of the contracted product: (1) materials, parts, and equipment being repaired or modified by a third party without Subcontractor's or other supplier's authorization, as applicable, or being subjected to modification, misuse, improper maintenance or accident by a third party, (2) materials, parts, and equipment having their serial number or any part thereof altered, defaced or removed by a third party, or (3) materials, parts, and equipment being stored, installed, operated and maintained by a third party not in accordance with manuals, instruction books, or reasonable recommendations provided in writing by Subcontractor or other supplier, as applicable, to Buyer prior to such activity.

18.6    Save for its obligations under this Article 18, Seller shall not be liable for, and Buyer hereby waives, and releases Seller Group from, any Claims pertaining to the quality of the services performed hereunder and pertaining to any goods, equipment and materials supplied hereunder, including for breach of any warranty by a Subcontractor. SELLER MAKES NO WARRANTY (INCLUDING OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), EXPRESS OR IMPLIED, IN FACT OR BY LAW, AS TO THE QUALITY OF THE SERVICES, GOODS, EQUIPMENT OR MATERIALS FURNISHED PURSUANT TO THIS AGREEMENT.

## ARTICLE 19. Correlation of Documents

The contract documents are complementary and what is required by one shall be as binding as if required by all. Seller shall keep at the work site a copy of the Contract documents relating to the Works and any supplementary documents, specifications and drawings relating thereto and shall give Buyer access thereto during all normal working hours.

In case of discrepancy or in the event of conflict among the different Contract documents such as the Fuel Sale and Purchase Agreement, Terms of Works (Annex A), the Scope of Work, technical specifications, drawings, and the offeror's proposal, these shall take precedence in the order given.

The terms and conditions contained in the Contract shall prevail over any conflicting terms and conditions contained in the Seller's Bidding Proposal.

## ARTICLE 20. Notice

Any required notice to be given hereunder, related to the Works, shall be in writing and will be sufficiently served when delivered in person or properly mailed to the following addresses:

To PREPA:    Puerto Rico Electric Power Authority
PO Box 364267
San Juan, Puerto Rico 00936-4267

A-10

Attention:    Eng. Daniel Hernández Morales
              Acting Generation Director

To Seller:    NFEnergía LLC
              c/o New Fortress Energy
              111 W 19th St., 8th Fl.
              New York, NY 10011

Attention:    General Counsel
              516-268-7400
              legal@newfortressenergy.com

ARTICLE 21. Cleaning-Up

Except as provided herein, Seller shall, from time to time, as directed by the Engineer, remove from Buyer's property and from all public and private property all temporary structures no longer required for construction, rubbish, and waste materials resulting from his construction operations.

Upon completion of the Work, Seller shall remove from the vicinity of the San Juan Power Plant all remaining rubbish, unused materials, and other like material, belonging to him or used under his direction during the installation of the equipment, and in the event of his failure to do so the same may be removed by Buyer at Seller's expense, and his surety or sureties shall be liable therefor. Notwithstanding the foregoing (a) under no circumstances shall Seller have any responsibility for any Hazardous Materials or other materials at the site prior to the time when the Works begin, (b) should Seller encounter any such pre-existing materials during the course of the Works, it shall identify the same to Buyer and allow Buyer to address and remove the same, and (c) Buyer shall indemnify Seller Group from and against any and all claims, damages, losses, causes of action, demands, judgments and expenses arising out of or relating to any Hazardous Materials that are (i) present on the Site prior to the commencement of the Work or brought onto the Site by a member of Buyer Group, or (ii) improperly handled or disposed of by Buyer (including Hazardous Materials brought onto the Site or produced thereon by a Contractor). At the written request of Buyer and at Buyer's sole expense, Seller may agree to remove and remediate on behalf of Buyer any such Hazardous Materials or other materials to the extent located on the site with the understanding that Buyer will execute any and all documents, submittals or regulatory filings associated with the discovery of these materials, the work or the transportation and disposal of the materials.

ARTICLE 22. Safety Provisions. Seller shall require MHPSA and the BOP Contractors to:

22.1    Comply with all applicable laws, ordinances, rules, regulations and OSHA standards for the safety of personnel, equipment, property and to protect them from damage, injury or loss; erect and maintain, as required by existing conditions and progress of the work, all reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities.

A-11

22.2    Submit a Site-specific Work Plan including: the scope of work, description of the activities to be done, special safety and health considerations to be addressed before commencement of the project, safety procedures to be applied and used during the project including but not limited to excavations, work zone protection, scaffolding, crane operations and emergency procedures for fire and chemical spill among others.

22.3    Before commencement of work, take part in a coordination meeting with Buyer's Safety Officer and Project Manager. During this meeting the areas to be worked on will be toured, the site-specific work plan will be reviewed and the protocols for Safety inspections and work permit system shall be discussed.

22.4    Designate one or more employees as their safety officer for the Project. The duties of the safety officer may be in addition to his/her normal duties. The safety officer shall be in charge of the prevention of accidents and the implementation of the Site-specific Plan in coordination with Buyer's Safety Officer, Project Manager and Resident Engineer, and shall have the opportunity to be present at all times on site while Seller is performing any task relating to the Project. The safety officer shall have a basic training of thirty (30) hours in Occupational Safety and Health Standards for Construction Industry from an approved OSHA Training Center. Evidence of the training shall be submitted if requested by Buyer.

22.5    Required welding operations shall comply with the requirements of OSHA, ANSI and NFPA.

22.6    Require all chemical products to be used to be classified as Approved or Conditionally Approved by Buyer's Hazard Communication Section.

22.7    Be responsible for maintaining good housekeeping and sanitary conditions in the work, rest, lunch and toilet areas. If the project involves the handling of non-asbestos insulation or other dust-generating materials, like gypsum board, steps shall be taken to prevent the release of dust to adjacent areas.

22.8    Have an incident investigation procedure and notify to Buyer in writing any incident or accident on Buyer's facility.

22.9    Have available and up to date all licenses, trainings, medical surveillance and related certificates for specialized personnel required by OSHA, EQB and DOT according to the scope of work to be performed.

22.10   Adhere to a one hundred percent (100%) drug /alcohol free work zone. At minimum, pre-project and post-accident testing is required. A positive post-accident test or positive pre-project test will result in worker dismissal from the project. Testing will be performed following closely the NIDA standards.

22.11   Services and activities inside buildings occupied by working personnel that could create a hazard to their safety or health will not be performed after Buyer's Working Hours, except to the extent that Seller puts in place such precautions as may be necessary to protect Buyer's employees and the public from any possible hazard caused by the work. Seller will

A-12

take all steps necessary to assure the area will be free of nuisance odors or vapors before Buyer's personnel are permitted to resume their occupation of the area. All such activities will be undertaking in coordination with the local supervisor of Buyer.

22.12    Assure that all wastes generated by Seller as a part of the Works are removed and properly disposed of, in accordance with all applicable laws and regulations, at the end of every work shift and after the completion of the Project, except to the extent that it is agreed with Buyer that members of Seller Group or a Contractor may deposit waste in Buyer-provided waste containers for disposal by Buyer.

22.13    Obtain and maintain, during the duration of the Project, the proper permits from all federal, state and local regulatory authorities with respect to discharge, disposal, use, storage, handling and transportation of Hazardous Materials used in connection with the Works. For all Works that require or include the handling of asbestos, lead, or spilled Hazardous Materials, Seller will require MHPSA and the BOP Contractor to provide any notifications required by Environmental Laws or any Permit to EPA or the EQB, but in coordination with the Safety Officer and the Environmental Advisor.

ARTICLE 23. Laws to be Observed

Seller shall use its commercially reasonable efforts to require MHPSA and the BOP Contractors to observe and comply with any and all federal, state and municipal Laws, by-laws, ordinances, and regulations in any manner affecting the Work, those employed on the Work, or the conduct of the Work, and with all such orders and decrees as exist at present or may be enacted prior to the completion of the work by bodies or courts having any jurisdiction or authority over the work. Seller shall use its commercially reasonable efforts to require MHPSA and the BOP Contractors to save and hold harmless and to indemnify Buyer and its representative's officers, agents, and servants against any claim or liability arising from or based on the violation of any such law, by-law, ordinance, regulation, order or decree, whether by MHPSA or the relevant BOP Contractor (as applicable) or their respective employees.

ARTICLE 24. Environmental Liabilities. Seller shall use its commercially reasonable efforts to require MHPSA and the BOP Contractors to:

24.1    Indemnify Buyer Group from any and all claims, damages, losses, causes of action, demands, judgments and expenses of any nature arising out of or relating to any claim due to an environmental violation, caused by such Contractor or such Contractor's agents, employees, subcontractors or any personnel assigned during the performance or non-performance of its obligations under this Agreement.

24.2    Have available, and near to the working area, the necessary equipment to control and recover any spills that may occur during the performance of Seller's obligations under this Agreement. This equipment should include all the necessary materials for waste disposal.

24.3    Ensure that all equipment to be used in the performance of Seller's obligations under this Agreement should be free of oil, transmission fluid or hydraulic fluid leakages. If the equipment develops a leakage during Seller's performance of its obligations hereunder, it

A-13

should be repaired or replaced immediately. While the leaking equipment is removed or repaired, it shall be MHPSA's or the relevant BOP Contractor's responsibility to use and replace the absorbent materials and drip pans.

24.4    Inform and coordinate with the Environmental Compliance Officer of Buyer's Environmental Protection and Quality Assurance Division (EPQAD) regarding any work to be done to avoid any environmental violation. In case of any incident, MHPSA or the relevant BOP Contractor shall immediately notify Buyer's on-site Supervisor, who will notify the EPQAD.

24.5    Before starting the work, submit the work plan to Buyer's EPQAD for evaluation.

24.6    Cause all chemical analysis to be performed by a Buyer-approved laboratory that is included in Buyer's Material Management Division Supplier Registry as a company that is qualified and evaluated to perform this type of work.

24.7    Agree that Buyer's personnel will audit the sampling and the disposal of waste material.

24.8    Ensure that the disposal of non-hazardous and hazardous waste material shall be done in a Puerto Rico Environmental Quality Board (PREQB) approved landfill.

24.9    Comply with 49 CFR 72 Sub. Part II (DOT requirements).

24.10   Cause all remedial actions and environmental work to be performed by a company previously approved by Buyer.

24.11   Cause all Work for which they are responsible to follow the Control Erosion and Sedimentation Plan (CES Plan). The temporary measures needed to control erosion and water pollution shall include, but not be limited to, berms, dikes, dams, sediment basins, fiber mats, netting, gravel, mulches, grasses, slope drains, and other erosion control devices or methods. These temporary measures shall be installed at the locations where there is a need to control erosion and water pollution during the construction of the project, and as directed by the engineer, and as shown on the drawings. The CES Plan presented in the drawings serves as a minimum for the requirements of erosion control during construction. MHPSA or the relevant BOP Contractor (as applicable) has the ultimate responsibility for providing adequate erosion control and water quality throughout the duration of the project. Therefore, if the provided plan is not working sufficiently to protect the project areas, then MHPSA or the relevant BOP Contractor (as applicable) shall provide additional measures as required to obtain the required protection.

24.12   Chemical products cannot reach any internal or external sewer at the construction site in order to prevent contamination and comply with all federal and local regulations related to the Clean Water Act.

24.13   Obtain and submit to Buyer's EPQAD any other type of permit required for their operation including: fuel or wastewater storage tanks, storage of remain material of excavations or any landfill required for the project, use and storage of chemicals. Furthermore, will take immediate response or mitigate any environmental concern and deficiencies found by

A-14

Buyer personnel or regulatory agencies. MHPSA or the relevant BOP Contractor (as applicable) will be responsible to notify Buyer immediately for any findings or environmental violations due to inspections by regulatory agencies.

24.14  Provide and maintain environmental protection measures during the commencement, construction and completion of the project, as defined under this contract. Environmental protection measures must be provided by MHPSA or the relevant BOP Contractor (as applicable) to correct conditions that may emerge or develop during the construction, as well as, the recondition of all environmental measures or controls employed at the project which do not fulfill their purpose.

24.15  The construction process shall be performed in such a manner that any adverse environmental impacts, where applicable, are reduced to a minimum and acceptable level.

24.16  It is intended that the natural resources within the Project boundaries and outside the limits of the permanent work performed, be preserved in their existing condition or be restored to an equivalent or improved condition, upon completion of the work. MHPSA or the relevant BOP Contractor (as applicable) shall confine his construction activities to areas defined by the work schedule, plans and specifications.

24.17  MHPSA or the relevant BOP Contractor (as applicable) and its engineer will establish, at least on a monthly basis, an orientation programme for the residents and business people to clarify details and the working schedule of the Project, and to attend to their needs or complaints.

24.18  All equipment to be used in the Works area shall be in new condition and shall be maintained in accordance with a good maintenance programme. A monthly record of maintenance shall be filed by MHPSA or the relevant BOP Contractor (as applicable) and submitted to Buyer's EPQAD. If required, Seller must perform and submit a monitoring study of gas emission or noise reduction on determined areas to comply with regulations. Seller shall be responsible to maintain the Works area in a clean and organized state.

24.19  The use of liners to cover up carrying trucks is compulsory.

24.20  Dispose of all waste generated by the components of the Works for which MHPSA or the relevant BOP Contractor (as applicable) is responsible, except to the extent that it is agreed with Buyer that members of Seller Group or a Contractor may deposit waste in Buyer-provided waste containers for disposal by Buyer. The waste shall be picked up and placed in containers which must be emptied on a regular schedule. The construction areas shall be clean and must be restored to their pre-existing condition upon completion. The use of Buyer's waste disposal equipment by MHPSA or the relevant BOP Contractor (as applicable) is not permitted.

24.21  Buyer's personnel will audit the sampling and the disposal of waste material.

24.22  A company previously approved by Buyer will perform all remedial actions and environmental work (if it is necessary).

A-15

24.23   All work shall be performed according to the Storm Water Pollution Prevention Plan (SWPPP), which is part of Buyer's NPDES Permit.

24.24   All work at Docks A, B and C shall be performed in accordance with best management practices to avoid any impact to NPDES Outfalls 002 and 003 and Intake 001 of the San Juan Power Plant.

24.25   All work will be performed in compliance with Consent Decree stipulations Civil Action No. 93-2527 CCC.

ARTICLE 25. Quality Assurance

MHPSA and each BOP Contractor shall submit for evaluation and approval by Buyer a quality control programme and establish a quality assurance programme, also to be evaluated and approved by Buyer, to satisfy all applicable regulations and requirements specified in the procurement documents. Such programmes shall contain all those measures necessary to assure that all basic technical requisites set forth in the drawings, codes, tests, and inspections for design, fabrication, cleaning, installation, packing, handling, shipping, long-term storage, when necessary, and test equipment are fulfilled. Buyer reserves the right to conduct audits and inspections to the facilities, activities, and/or documents when estimated and without previous notification necessary in order to assure that the quality control programme is adequate and is being properly implemented.

MHPSA and each BOP Contractor shall allow Buyer access to its facilities and documents, so that Buyer, through audits and inspections, can verify the quality of the labor, equipment, products, services, and any other related items provided by MHPSA or the relevant BOP Contractor (as applicable). In every case in which the materials or services to be furnished to Buyer are subcontracted partially or totally by MHPSA or the relevant BOP Contractor (as applicable), MHPSA or the relevant BOP Contractor (as applicable) shall request the subcontractor to accept and comply with all the requirements of this Quality Assurance Article.

ARTICLE 26. Export Control.   Buyer shall not re-export any products created by the Works by members of Seller Group or a Contractor.

A-16

**Annex B**

**Delivery Point**



**ANNEX C**
**SELLER'S AND BUYER'S SITE DIAGRAMS; EACH PARTY'S PROPERTY**

C-1



Annex C







SAN   JUAN   BAY





Interconnection Facility and gas supply pipe routing and equipment location as agreed by Seller and Buyer 19 December 2018.

## ANNEX D
## OPERATIONS COMMITTEE AND CONSTRUCTION COMMITTEE

Operations Committee

| SELLER | BUYER |
|---|---|
| Brannen McElmurray | Radamés Alvarado |
| Simon Duncan | Javier Soto Suárez |
| Carlos A. Faris Ambert | Gary Germeroth |

Construction Committee

| SELLER | BUYER |
|---|---|
| Brannen McElmurray | José Molina |
| Sam Abdalla | Jorge Sánchez |
| Winnie Irizarry | Jaime Umpierre |



D-1

### Annex E
### Annual Contract Quantity

| Month | Estimated Nomination (TBTU) | Dispatch | Scheduled Maintenance |
|---|---|---|---|
| June 2019 | 1.12 | Baseload | Commissioning - SJ 6 |
| July 2019 | 2.22 | Baseload | - |
| August 2019 | 2.21 | Baseload | - |
| September 2019 | 2.09 | Baseload | - |
| October 2019 | 2.22 | Baseload | - |
| November 2019 | 2.11 | Baseload | - |
| December 2019 | 1.12 | Baseload | Environmental Compliance |
| January 2020 | 1.13 | Baseload | Environmental Compliance |
| February 2020 | 2.10 | Baseload | - |
| March 2020 | 2.16 | Baseload | - |
| April 2020 | 1.12 | Baseload | Combustion Inspection - SJ 5 |
| May 2020 | 2.13 | Baseload | - |
| Estimated ACQ | 21.73 | | |





*Exhibit Version*

## EXHIBIT A

### PERMITS AND OBLIGATIONS

#### Buyer's Obligations Prior to Seller Beginning Works

| Obligation | Date |
| --- | --- |
| EQB Construction Air Permit (SJ Units 5&6) | April 5, 2019 |
| Buyer provides Seller with limited notice to proceed (LNTP) to begin demolition, rehabilitation of existing pipe supports, site-clearing, grading, and on-site storage of equipment and materials. | March 15, 2019 |
| Buyer Provides Seller with full notice to proceed (FNTP) | April 15, 2019 |

#### Buyer's Obligations

| Obligation | Date |
| --- | --- |
| LNTP Issued, and NFE granted site access to begin Preparatory Works | March 15, 2019 |
| FNTP Issued and MHPSA granted site access with all Buyer Permits in hand | April 15, 2019 |
| MHPSA granted access to open / shut down Unit 6 | May 1, 2019 |
| MHPSA granted access to open / shut down Unit 5 | June 1, 2019 (subject to Substantial Completion of Unit 6) |

#### Seller's Obligations Before Starting Construction

| Obligation |
| --- |
| Seller to perform a land survey and deliver results to Buyer |

#### Buyer Permits

| Permit Name |
| --- |
| EQB Construction Air Permit (SJ Units 5&6) |

*Exhibit Version*

Seller Permits

| Permit Name |
| --- |
| Permit Authorization under NPDES General Permit for Discharges from Construction Activities |
| Consolidated General Permit (MFH Facility) |
| EQB Construction Air Permit (MFH Facility) |
| EQB Air Emissions Operation Permit (MFH Facility) |
| Use Permit (MFH Facility) |

*Exhibit Version*

## EXHIBIT B
## SPECIFICATIONS

Natural Gas delivered by Seller shall satisfy the following conditions at the Delivery Point:

    a.  Sulfur content less than 1 gr/100 scf

    b.  Pressure Range between 400 and 660 psig at gas turbine inlet; fluctuation range restricted to +/- 21 psi

    c.  Temperature at gas turbine inlet higher than 41°F

    d.  Compliance with "Gas Fuel Specification - Natural Gas for Diffusion Combustor Application – MHPS PROPRIETARY INFORMATION STANDARD DOCUMENT IBSTD-10011 R3.0"

Assuming the above conditions have been satisfied, and Buyer's equipment configuration is Mitsubishi 501F Class gas turbines, below is a sample gas chromatograph reading with illustrative data that would be available to Buyer at the Seller metering skid:

## EXHIBIT C
## FUEL PRICE

**"Fuel Price"** (per MMBtu) shall be equal to the Unit Cost *plus* Unit Fuel Cost, *where*:

(a)     <u>Unit Cost</u>:

Except as otherwise provided in <u>Clause 13.3:</u>

During the Transitional Supply Period and months 1-12 of the Initial Contract Term, $8.50/MMBtu (the **"Base Cost"**)

During months 13-24 of the Initial Contract Term, $7.50/MMBtu

During months 25 until the end of Initial Contract Term, $6.50/MMBtu

During any Extension Term, an amount per MMBtu to be agreed

(b)     <u>Unit Fuel Cost</u>:

Gas Index Price multiplied by one hundred fifteen percent (115%).

**"Gas Index Price"** with respect to any Day, means the final settlement price (in USD per MMBtu) for the New York Mercantile Exchange's Henry Hub natural gas futures contract for the month in which the Day occurs.

In addition to the Fuel Price per MMBtu calculated in accordance with the formula set forth above, Buyer shall pay each month during the Initial Contract Term the applicable monthly instalment of the Natural Gas Manufacturing Surcharge described in <u>Article XII</u>, in accordance with the provisions of <u>Article XIII</u>.

## EXHIBIT D
## NATURAL GAS MANUFACTURING SURCHARGE AMOUNT AND DISCOUNTED SURCHARGE AMOUNT

See tables, attached, subject to Article XII.

D-1

# Exhibit D

*For Information Purposes Only*

| Discount Rate | 6.00% | | | |
|---|---|---|---|---|
| Period | Beginning of Period | Scheduled Natural Gas Manufacturing Surcharge | Natural Gas Manufacturing Surcharge Amount | Discounted Surcharge Amount |
| 1 | $50,000,000.00 | $833,333.33 | $49,166,666.67 | $42,699,257.91 |
| 2 | $49,166,666.67 | $833,333.33 | $48,333,333.34 | $42,075,254.04 |
| 3 | $48,333,333.34 | $833,333.33 | $47,500,000.01 | $41,448,130.31 |
| 4 | $47,500,000.01 | $833,333.33 | $46,666,666.68 | $40,817,870.96 |
| 5 | $46,666,666.68 | $833,333.33 | $45,833,333.35 | $40,184,460.32 |
| 6 | $45,833,333.35 | $833,333.33 | $45,000,000.02 | $39,547,882.63 |
| 7 | $45,000,000.02 | $833,333.33 | $44,166,666.69 | $38,908,122.04 |
| 8 | $44,166,666.69 | $833,333.33 | $43,333,333.36 | $38,265,162.66 |
| 9 | $43,333,333.36 | $833,333.33 | $42,500,000.03 | $37,618,988.47 |
| 10 | $42,500,000.03 | $833,333.33 | $41,666,666.70 | $36,969,583.42 |
| 11 | $41,666,666.70 | $833,333.33 | $40,833,333.37 | $36,316,931.34 |
| 12 | $40,833,333.37 | $833,333.33 | $40,000,000.04 | $35,661,016.00 |
| 13 | $40,000,000.04 | $833,333.33 | $39,166,666.71 | $35,001,821.08 |
| 14 | $39,166,666.71 | $833,333.33 | $38,333,333.38 | $34,339,330.19 |
| 15 | $38,333,333.38 | $833,333.33 | $37,500,000.05 | $33,673,526.85 |
| 16 | $37,500,000.05 | $833,333.33 | $36,666,666.72 | $33,004,394.48 |
| 17 | $36,666,666.72 | $833,333.33 | $35,833,333.39 | $32,331,916.46 |
| 18 | $35,833,333.39 | $833,333.33 | $35,000,000.06 | $31,656,076.05 |
| 19 | $35,000,000.06 | $833,333.33 | $34,166,666.73 | $30,976,856.43 |
| 20 | $34,166,666.73 | $833,333.33 | $33,333,333.40 | $30,294,240.71 |
| 21 | $33,333,333.40 | $833,333.33 | $32,500,000.07 | $29,608,211.92 |
| 22 | $32,500,000.07 | $833,333.33 | $31,666,666.74 | $28,918,752.98 |
| 23 | $31,666,666.74 | $833,333.33 | $30,833,333.41 | $28,225,846.75 |
| 24 | $30,833,333.41 | $833,333.33 | $30,000,000.08 | $27,529,475.99 |
| 25 | $30,000,000.08 | $833,333.33 | $29,166,666.75 | $26,829,623.37 |
| 26 | $29,166,666.75 | $833,333.33 | $28,333,333.42 | $26,126,271.49 |
| 27 | $28,333,333.42 | $833,333.33 | $27,500,000.09 | $25,419,402.85 |
| 28 | $27,500,000.09 | $833,333.33 | $26,666,666.76 | $24,708,999.87 |
| 29 | $26,666,666.76 | $833,333.33 | $25,833,333.43 | $23,995,044.87 |
| 30 | $25,833,333.43 | $833,333.33 | $25,000,000.10 | $23,277,520.10 |
| 31 | $25,000,000.10 | $833,333.33 | $24,166,666.77 | $22,556,407.71 |
| 32 | $24,166,666.77 | $833,333.33 | $23,333,333.44 | $21,831,689.75 |
| 33 | $23,333,333.44 | $833,333.33 | $22,500,000.11 | $21,103,348.20 |
| 34 | $22,500,000.11 | $833,333.33 | $21,666,666.78 | $20,371,364.94 |
| 35 | $21,666,666.78 | $833,333.33 | $20,833,333.45 | $19,635,721.77 |
| 36 | $20,833,333.45 | $833,333.33 | $20,000,000.12 | $18,896,400.39 |
| 37 | $20,000,000.12 | $833,333.33 | $19,166,666.79 | $18,153,382.39 |
| 38 | $19,166,666.79 | $833,333.33 | $18,333,333.46 | $17,406,649.31 |
| 39 | $18,333,333.46 | $833,333.33 | $17,500,000.13 | $16,656,182.56 |
| 40 | $17,500,000.13 | $833,333.33 | $16,666,666.80 | $15,901,963.47 |
| 41 | $16,666,666.80 | $833,333.33 | $15,833,333.47 | $15,143,973.29 |
| 42 | $15,833,333.47 | $833,333.33 | $15,000,000.14 | $14,382,193.16 |
| 43 | $15,000,000.14 | $833,333.33 | $14,166,666.81 | $13,616,604.13 |
| 44 | $14,166,666.81 | $833,333.33 | $13,333,333.48 | $12,847,187.16 |
| 45 | $13,333,333.48 | $833,333.33 | $12,500,000.15 | $12,073,923.09 |
| 46 | $12,500,000.15 | $833,333.33 | $11,666,666.82 | $11,296,792.71 |
| 47 | $11,666,666.82 | $833,333.33 | $10,833,333.49 | $10,515,776.68 |
| 48 | $10,833,333.49 | $833,333.33 | $10,000,000.16 | $9,730,855.57 |
| 49 | $10,000,000.16 | $833,333.33 | $9,166,666.83 | $8,942,009.85 |
| 50 | $9,166,666.83 | $833,333.33 | $8,333,333.50 | $8,149,219.90 |
| 51 | $8,333,333.50 | $833,333.33 | $7,500,000.17 | $7,352,466.00 |
| 52 | $7,500,000.17 | $833,333.33 | $6,666,666.84 | $6,551,728.34 |
| 53 | $6,666,666.84 | $833,333.33 | $5,833,333.51 | $5,746,986.98 |
| 54 | $5,833,333.51 | $833,333.33 | $5,000,000.18 | $4,938,221.92 |
| 55 | $5,000,000.18 | $833,333.33 | $4,166,666.85 | $4,125,413.03 |
| 56 | $4,166,666.85 | $833,333.33 | $3,333,333.52 | $3,308,540.10 |
| 57 | $3,333,333.52 | $833,333.33 | $2,500,000.19 | $2,487,582.81 |
| 58 | $2,500,000.19 | $833,333.33 | $1,666,666.86 | $1,662,520.72 |
| 59 | $1,666,666.86 | $833,333.33 | $833,333.53 | $833,333.33 |
| 60 | $833,333.53 | $833,333.33 | $0.20 | $0.00 |



# Exhibit E - Monthly Invoice

*For Information Purposes Only*

> **Example**

## Invoicing and Payment

Illustrative Schedule for one pay period:

- Seller flows Gas
- Seller tenders invoice to Buyer on the 10th day of the following month; invoice may include the Fuel Price, Manufacturing Surcharge, applicable taxes due for payment by the Buyer, other charges owed, less a Mitigation Sale or other sale of any excess nomination, less any Carryover Credit
- Buyer pays invoice 30 days after receiving such invoice

### Generic June

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | | | | | |

### Generic July

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

### Generic August

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |



## Exhibit E – Monthly Invoice (Continued)

*For Information Purposes Only*

**Example**

### Invoicing and Payment: Section 13.2

Illustrative Pricing Example for a pay period in Year 1:

| | | |
|---|---|---|
| Gas Index Price[1] | $/MMBtu | $3.021 |
| (x) Factor | % | 115.00% |
| Unit Fuel Cost | $/MMBtu | $3.474 |
| (+) Unit Cost[2] | $/MMBtu | $8.500 |
| Fuel Price | $/MMBtu | $11.974 |
| (x) Monthly Nominated Quantity[3] | MMBtu | 2,083,333 |
| [a] Gas Cost | $ | $24,946,145.83 |

(1) "Gas Index Price" with respect to any Day means the final settlement price (in USD per MMBtu) for the New York Mercantile Exchange's Henry Hub natural gas futures contract for the Month in which the Day occurs.

(2) As defined in the Fuel Supply Agreement, the Unit Cost is subject to change per Section 13.3.

(3) Buyer may request additional quantities, but the price of such quantity will be determined pursuant to Section 7.4(a)(iv).

| | | |
|---|---|---|
| Price | $/MMBtu | $0.000 |
| (x) Additional Quantity | MMBtu | 0 |
| [b] Plus: Additional Gas Cost | $ | $0.00 |
| [c] Plus: Natural Gas Manufacturing Surcharge | $ | $833,333.34 |
| [d] Plus: Applicable Taxes Due for Payment by the Buyer | $ | $0.00 |
| [e] Less: Mitigation Sale or Other Sale of Any Excess Nomination | $ | $0.00 |
| [f] Less: Carryover Credit | $ | $0.00 |
| Total Invoice | $ | $25,779,479.17 |




## Exhibit E - Monthly Invoice (Continued)

*For Information Purposes Only*

 NFEnergía PUERTO RICO

**Example**

NFEnergia LLC
111 W 19th Street, 8th Floor
New York, NY 10011
United States of America

| Bill To | Invoice Date | Due Date | Invoice |
|---|---|---|---|
| Puerto Rico Power Authority | 7/10/2019 | 8/9/2019 | PREPA00001A |

Puerto Rico Power Authority
P.O. Box 363928
San Juan
Puerto Rico
00936-3928

| Billing Period No. | Start date | End date | Contract Number |
|---|---|---|---|
| 1 | 6/1/2019 | 6/30/2019 | |

| Products & Other Charges | Quantity (MMBtu) | Price | Amount (US$) |
|---|---|---|---|
| **Description:** | | | |
| Manufactured Natural Gas made available, pursuant to the Fuel Sale and Purchase Agreement, to Units 5 and 6. | | | |
| **Quantities:** | | | |
| Monthly Nominated Quantity | 2,083,333 | | |
| Additional Quantity | 0 | | |
| **Gas Cost:** | | | |
| Gas Index Price | | $3.021 | |
| (x) Factor | | 115.00% | |
| Unit Fuel Cost | | $3.474 | |
| (+) Unit Cost | | $8.500 | |
| Gas Cost | 2,083,333 | $11.974 | $24,946,145.83 |
| **Additional Quantities:** | | | |
| Additional Gas Cost | 0 | $0.000 | $0.00 |
| **Natural Gas Manufacturing Surcharge:** | | | |
| Monthly Amount | | | $833,333.34 |
| **Other:** | | | |
| Applicable Taxes Due for Payment by the Buyer | | | $0.00 |
| **Other:** | | | |
| Credit for Mitigation Sale or Other Sale of Any Excess Nomination | | | $0.00 |
| **Other:** | | | |
| Credit for Force Majeure or Forced Outage ("Carryover Credit") | | | $0.00 |
| **Total Invoice** | | | **$25,779,479.17** |

| Cash Wire Instructions - USD | New Fortress Energy Contact |
|---|---|
| Bank Name: JP Morgan Chase Bank, NA | Jack Finlay |
| Bank Routing Number: 021000021 | Chief Financial Officer |
| Beneficiary Account Name: Scotiabank de Puerto Rico | (441) 296 9954 |
| Beneficiary Account Number: 001058975 | |
| For Further Credit Account Name: NFEnergia LLC | |
| For Further Credit Account Number: 071006094388 | |

**Certification**

*We certify under penalty of nullity that no public servant of Buyer will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the Services provided is the agreed-upon price that has been negotiated with an authorized representative of Buyer. The total amount shown on this invoice is true and correct. The Services have been rendered, and no payment has been received.*

Authorized Signatory

## Exhibit E - Monthly Invoice (Continued)

*For Information Purposes Only*

**Example**

"Gas Index Price" with respect to any Day means the final settlement price (in USD per MMBtu) for the New York Mercantile Exchange's Henry Hub natural gas futures contract for the Month in which the Day occurs. See Platt's Gas Daily cut-out below which illustrates October pricing. Additionally, the following website can be used to see pricing: https://business.directenergy.com/market-insights/nymex-settlement-history



---

GASDAILY | THURSDAY, SEPTEMBER 27, 2018

### NATURAL GAS FUTURES

### NYMEX October gas futures contract drops 6.1 cents, expires at $3.021/MMBtu

The NYMEX October gas futures contract expired at $3.021/MMBtu Wednesday, down 6.1 cents day on day as production hit a new high in the week thus far.

The front-month contract traded between $2.981/MMBtu and $3.088/MMBtu.

The November contract settled at $2.98/MMBtu Wednesday, down 7.8 cents, a day before it rolls as the front-month.

US dry gas production hit a record high of 84.4 Bcf Tuesday, largely driven by a production rise in the Northeast, according to S&P Global Platts Analytics. Production averaged 83.6 Bcf/d in the past seven days, and with these historically high production levels, the market seems to have shrugged off concerns about the storage deficit.

Platts Analytics estimates output will drop 1.6 Bcf on day to 82.8 Bcf Wednesday. In September to date, production has averaged 83.3 Bcf/d, up 9.7 Bcf from year-ago levels.

Total US demand is estimated to remain relatively flat, averaging 78.4 Bcf/d in the week to date. Platts Analytics estimates demand to average 76 Bcf/d over the next two weeks, with the National Weather Service calling for a likelihood of moderate temperatures across much of the country over the next eight to 14 days.

Power demand is estimated to fall nearly 1 Bcf to 30.8 Bcf Wednesday. Gas-fired power burn is estimated to average 29.5 Bcf/d over the next seven days, down from 33.2 Bcf/d in the past week.

With production showing no signs of slowing down and seasonal demand flattening during the shoulder season, storage may see some strong injections before the winter demand hits and offset some of the production increases.

However, a consensus of analysts surveyed by S&P Global Platts expects a 61-Bcf injection for the week that ended September 21, about 25 Bcf below the storage build seen for the previous week. Current national gas stocks sit at 2.722 Tcf, at a 17.7% deficit to the five-year average of 3.308 Tcf for the same time period.

— Mark Dravedaury

### MONTH-AHEAD TEMPERATURE FORECAST MAP
October departure from average

### NYMEX HENRY HUB GAS FUTURES CONTRACT, SEP 26

| | Settlement | High | Low | +/- | Volume |
|---|---|---|---|---|---|
| Oct 2018 | 3.021 | 3.088 | 2.981 | -0.061 | 8135 |
| Nov 2018 | 2.980 | 3.062 | 2.950 | -0.078 | 135314 |
| Dec 2018 | 3.068 | 3.134 | 3.050 | -0.067 | 19826 |
| Jan 2019 | 3.145 | 3.215 | 3.138 | -0.064 | 15421 |
| Feb 2019 | 3.068 | 3.145 | 3.077 | -0.067 | 8253 |
| Mar 2019 | 2.927 | 2.964 | 2.888 | -0.033 | 8743 |
| Apr 2019 | 2.841 | 2.849 | 2.514 | -0.001 | 8728 |
| May 2019 | 2.800 | 2.514 | 2.581 | 0.001 | 1421 |
| Jun 2019 | 2.839 | 2.843 | 2.810 | 0.003 | 438 |
| Jul 2019 | 2.870 | 2.873 | 2.643 | 0.004 | 765 |
| Aug 2019 | 2.971 | 2.973 | 2.844 | 0.004 | 1514 |
| Sep 2019 | 2.953 | 2.955 | 2.525 | 0.005 | 1328 |
| Oct 2019 | 2.87 | 2.973 | 2.843 | 0.005 | 1951 |
| Nov 2019 | 2.717 | 2.720 | 2.689 | 0.005 | 871 |
| Dec 2019 | 2.840 | 2.842 | 2.814 | 0.008 | 341 |
| Jan 2020 | 3.033 | 2.938 | 2.905 | 0.007 | 355 |
| Feb 2020 | 2.866 | 2.888 | 2.870 | -0.008 | 71 |
| Mar 2020 | 2.767 | 2.787 | 2.744 | -0.007 | 252 |
| Apr 2020 | 2.580 | 2.621 | 2.502 | 0.005 | 117 |
| May 2020 | 2.482 | 2.483 | 2.475 | 0.007 | 33 |
| Jun 2020 | 2.520 | 2.520 | 2.513 | 0.008 | 1 |
| Jul 2020 | 2.553 | 2.550 | 2.543 | 0.008 | 4 |
| Aug 2020 | 2.556 | 2.556 | 2.555 | 0.008 | 8 |
| Sep 2020 | 2.533 | 2.533 | 2.539 | 0.008 | 0 |
| Oct 2020 | 2.555 | 2.556 | 2.547 | 0.009 | 8 |
| Nov 2020 | 2.800 | 2.808 | 2.808 | 0.008 | 8 |
| Dec 2020 | 2.734 | 2.734 | 2.734 | 0.008 | 8 |
| Jan 2021 | 2.837 | 2.848 | 2.837 | 0.009 | 1 |
| Feb 2021 | 2.788 | 2.799 | 2.789 | 0.008 | 0 |
| Mar 2021 | 2.715 | 2.715 | 2.715 | -0.009 | 0 |
| Apr 2021 | 2.475 | 2.475 | 2.475 | 0.012 | 0 |
| May 2021 | 2.445 | 2.445 | 2.445 | 0.012 | 0 |
| Jun 2021 | 2.475 | 2.476 | 2.476 | 0.011 | 0 |
| Jul 2021 | 2.508 | 2.508 | 2.509 | 0.011 | 0 |
| Aug 2021 | 2.522 | 2.715 | 2.715 | 0.008 | 0 |
| Sep 2021 | 2.514 | 2.514 | 2.514 | 0.009 | 0 |

Contract data for Tuesday
Volume of contracts traded: 560,755
Front-month open interest:
Oct 8,971; Nov 232,211; Dec 195,953
Total open interest: 1,621,483
Data is provided by a third-party vendor and is accurate as of 5:30 pm Eastern time.

### NYMEX PROMPT MONTH FUTURES CONTINUATION



Note: The entire stick of the candlestick depicts the high and low daily front-month Henry Hub futures price range. The body of the candlestick depicts the price range between the open and close, with a red candlestick indicating a close on the downside and a green candlestick indicating a close on the upside.
Source: S&P Global Platts

### US GAS STORAGE SURPLUS vs ROLLING 5-YEAR AVERAGE



© 2018 S&P Global Platts, a division of S&P Global Inc. All rights reserved. | 10

*Exhibit Version*

## EXHIBIT F
### PERFORMANCE GUARANTEES AND REQUIRED TESTING

Seller shall require MHPSA to guarantee that, as of Substantial Completion of a Unit, for each item set out in the column captioned "Guaranteed Item (Full Load)" (the "**Guaranteed Item**"), such Unit complies with the criteria set out in the column captioned "Guaranteed Result" (the "**Guaranteed Result**"), based on the fuel and timing condition set out in the column captioned "Timing/Fuel", in each case as set forth in the table below.

| PERFORMANCE BASIS | | | |
|---|---|---|---|
| **Guaranteed Item (Full Load)** | **Timing/Fuel** | **Guaranteed Result** | **Contractor Remedy** |
| Change in GT Output | Oil fuel before and after conversion | No worse | LDs |
| Change in GT Heat Rate | Oil fuel before and after conversion | No worse | LDs |
| Change in GT Output | Gas fuel vs. oil fuel following conversion | +1% | Remedial Action |
| Change in GT Heat Rate | Gas fuel vs. oil fuel following conversion | 0 | LDs |
| Change in GT Exhaust Flow | Gas fuel vs. oil fuel following conversion | -0.75% | LDs |
| Change in GT Exhaust Temp | Gas fuel vs. oil fuel following conversion | No change | LDs |
| NOx Emissions (base load) | Gas fuel after conversion | < 25 | Remedial Action |
| CO Emissions (base load) | Gas fuel after conversion | < 10 | Remedial Action |

To establish satisfaction of each Guaranteed Result prior to Substantial Completion of a Unit, Seller shall require MHPSA, in cooperation with PREPA, to conduct the Required Tests (i) before and after performance of the Works on such Unit, and (ii) in accordance with American Society of Mechanical Engineers Performance Test Code 22. A Unit undergoing a Required Test shall have a clean air inlet filter housing, air inlet duct, inlet filters and compressor. The Required Test results shall be corrected back to the following conditions:

*Exhibit Version*

1.    Ambient temperature of 85 degrees Fahrenheit

2.    Relative humidity of 70%

3.    Barometric pressure of 14.696 psi

4.    Power factor of 1.0

Seller shall exercise commercially reasonable efforts to ensure that MHPSA has, and causes its contractors and agents to agree to, terms concerning its guarantees and Required Testing in accordance with this Exhibit F. Seller shall not amend, vary, supplement, replace or waive the testing and commissioning provisions it has agreed with MHPSA without the prior written consent of Buyer (which Buyer will not unreasonably withhold or delay). Seller shall enforce all of its rights under any agreement with MHPSA in respect of a Unit's inability to meet a Guaranteed Result or MHPSA's performance in accordance with the Scope of Work, and shall fully pass through to Buyer all liquidated damages that Seller recovers from MHPSA in respect of any Guaranteed Items identified as having "LDs" in the column captioned "Contractor Remedy" of the table above.

Additionally, Seller shall use commercially reasonable efforts to (i) make PREPA an express third party beneficiary to the guarantees in this Exhibit F that are given by MHPSA pursuant to its agreement with Seller and (ii) ensure that all Seller's rights pursuant to the guarantee provisions of its agreement with MHPSA are freely assignable to PREPA, such that PREPA may have direct recourse against MHPSA for any failure by MHPSA to satisfy the performance guarantees set forth in this Exhibit F.

## EXHIBIT G

## BACK-UP FUEL QUANTITY

The Back-up Fuel Quantity in barrels (BBLs) of diesel shall be calculated by dividing:

(a) the Daily Contracted Quantity in MMBtu

by

(b) the number of MMBtu per BBL from the sample test report from the diesel supply cargo.

*Exhibit Version*

## EXHIBIT H
## SCOPE OF WORK

This Exhibit H covers the project description, scope of work and supply, and specifications included under this Agreement. The equipment, materials, and installation covered by this Exhibit H will be incorporated into the SJ 5&6 Units. The plant consists of two (2) one-on-one combined cycle units that currently operate on #2 diesel fuel and are being modified by Seller's contractors, subcontractors and agents to also operate on natural gas.

**Scope of Work**

The Works under these specifications shall include the procurement, construction, construction management, commissioning, testing, and startup of the systems and components. Seller's contractors, subcontractors and agents shall provide or cause to be provided materials and tools, labor, construction fuels, construction chemicals, administration and other services and items required to complete the Works. Seller's contractors, subcontractors and agents shall be responsible for receiving, unloading, storing, installing, commissioning, and testing of all equipment and components in accordance with original equipment manufacturer (OEM) requirements and these specifications. The Works shall include the following:



1. Furnishing all materials, labor, incidentals, equipment, and accessories as required to complete the scope of work described herein.

2. Receive at site; inspect; inventory; unload, place in, maintain, and remove from storage; protect from weather and damage; clean; dry; transport into place; and install all materials and equipment.

3. Furnish and erect all temporary structural steel and lifting lugs required for structural steel, piping, and equipment erection.

4. Pressure test all piping installed under this Agreement per ASME B31.1 – Power Piping.

5. Plan, coordinate, and execute startup and commissioning activities for the equipment and systems installed under this Agreement.

6. Maintain complete set of as-built drawings and turn over to Buyer upon completion of Works in accordance with the Agreement.

### Civil/Structural Scope

1. Restore site grading and surfacing disturbed by Seller's contractors, subcontractors and agents to preexisting conditions.
2. Furnish and install concrete foundations, anchors, embedments, shims, and grout as required to level and support equipment and structures.
3. Furnish and install steel structures and accessories.

1

4.    Furnish and install all coatings and touch-up coatings as required by these specifications.

Mechanical Scope

1.    Furnish and install components associated with the fuel gas supply system as indicated on P&ID 199399-CFGA-M2381A and B from the LNG interface terminal point (TP-1) to the combustion turbine interface point at the fuel gas control valve skid located inside each CTG enclosure.

2.    Furnish and install control air from existing control air header(s) to the new air-actuated valves indicated on the fuel gas supply system P&ID.

3.    Furnish and install catalytic systems on one unit to control emissions of nitrogen oxides and carbon monoxide. The catalytic systems will be comprised of Selective Catalytic Reduction (SCR) and oxidation catalyst (OxCat), and shall be designed to allow the operators of San Juan Units 5 & 6 to comply with applicable environmental regulations (including annual operating limits). The catalytic systems shall employ commercially proven technologies designed for the combustion of natural gas and distillate fuel oil. The SCR system shall be designed to use an aqueous solution of ammonia as a reagent at a concentration that does not trigger requirements of Section 112(r) of the Clean Air Act. The system shall not be designed for anhydrous ammonia.

Instrumentation Scope

Furnish, install, and wire instrumentation shown on the fuel gas supply system P&ID 199399-CFGA-M2381A and B.

Electrical Scope

1.    Furnish and install cable, raceway, motor starters, and circuit breakers, as required, to provide power to two (2) new CTG hydraulic pump skids (one new skid per CTG) from the existing CTG electrical enclosures.

2.    Furnish and install necessary components to bond new skids and components to the existing plant ground grid.

Combustion Turbine Gas Conversion Modifications

Refer to MHPSA proposal included after page 8 of this Exhibit H.

**Codes and Standards**

The codes and industry standards used for design, fabrication, and construction are listed below and will be the editions, including all addenda, in effect as of the date of this Agreement. Other recognized standards may also be used by Seller's contractors, subcontractors and agents as design, fabrication, and construction guidelines when not in conflict with the listed standards.

*   American Concrete Institute (ACI)

2

*Exhibit Version*

- American Institute of Steel Construction (AISC)
- American Iron and Steel Institute (AISI)
- American National Standards Institute (ANSI)
- American Society of Mechanical Engineers (ASME)
- American Society for Testing and Materials (ASTM)
- American Welding Society (AWS)
- Concrete Reinforcing Steel Institute (CRSI)
- Institute of Electrical and Electronics Engineers (IEEE)
- Instrument Society of America (ISA)
- Insulated Cable Engineers Association (ICEA)
- National Electrical Safety Code (NESC) or National Electric Code (NEC)
- National Fire Protection Association (NFPA)
- Occupational Safety and Health Administration (OSHA)
- 2018 Puerto Rico Building Code
- American Gas Association (AGA)
- American Petroleum Institute (API)
- National Association of Corrosion Engineers (NACE)

**Site Meteorological and Seismic Data**

Works shall be designed according to the following building code and site conditions:

| General Design Data: | |
|---|---|
| Building Code | 2018 Puerto Rico Building Code (Based on the 2018 International Building Code with amendments. References ASCE 7-05) |
| Occupancy Category | III |
| Site Elevation (Mean Sea Level), ft (m) | +7 feet (MSL) |
| **Wind Design Data:** | |
| Basic Wind Speed, V, Nominal 3 second gust wind speed at 33 ft (10 m) above ground for Exposure C category, mph (m/s) | As specified in 2018 Puerto Rico Building Code |
| Exposure Category | As specified in 2018 Puerto Rico Building Code |
| Topographic Factor, $K_{zt}$ | As specified in 2018 Puerto Rico Building Code |
| Importance Factor (Wind Loads), I | As specified in 2018 Puerto Rico Building Code |
| **Seismic Design Data:** | |
| Short Period Mapped Spectral Acceleration, $S_s$ | As specified in 2018 Puerto Rico Building Code |
| One Second Period Mapped Spectral Acceleration, $S_1$ | As specified in 2018 Puerto Rico Building Code |

3

| Site Class | As specified in 2018 Puerto Rico Building Code |
|---|---|
| Seismic Design Category | As specified in 2018 Puerto Rico Building Code |
| Importance Factor (Seismic Loads), $I_e$ | As specified in 2018 Puerto Rico Building Code |

**Scope of Supply**

The following is not meant to limit the Scope of Work, nor is it an exhaustive discussion or list of the scope of supply. The intention of the following is to clarify the intent and key provisions of the scope of supply, which is further described in Section 4 of the MHPS Scope of Work Document, included with this Agreement.

Seller will deliver vaporized LNG through one 10" carbon steel pipe to the Delivery Point in Buyer's property, as identified in ANNEX B. The Delivery Point is the point at which the financial custody of the gas transfers to Buyer. For this purpose, MHSPA or a BOP Contractor will design and construct a metering station (shall be four-path gas ultrasonic flow meter, Daniel SeniorSonic 3414 model ) located at the front of the condensate tank 7-8. The readings of this metering station will be compared to the metering station on Seller's side. This metering station shall include a flow computer that will communicate to the Buyer's Ovation control system through fiber optic cable. Seller's gas chromatograph installed in Seller's metering station shall also communicate to the Buyer's Ovation control system through fiber optic cable. The gas will be delivered to the SJ 5&6 Units through two six inches pipes from Buyer's metering station. Piping will be stainless steel downstream of the gas absolute separators, as shown on the fuel gas supply system P&ID 199399-CFGA-M2381B.

Seller has selected floating storage units sized to meet the 7-day storage requirement. Vaporizers will be installed at Seller's side to provide the required fuel gas flow. Piping connections and fire protection system upgrades will be included for the expansion of the facility's vaporization and delivery capacity.

Seller is responsible in procuring new balance-of-plant systems necessary to support the project and combustion turbine modifications, including the fuel gas supply system. Such related systems are to transfer the natural gas from the LNG facility at wharfs A and B to the combustion turbines supplied by MHPSA. The new balance-of-plant systems will be designed, constructed, and tested in accordance appropriate codes and standards referenced above.

The fuel gas supply system will be designed to deliver natural gas to each combustion turbine. The system will be constructed of seamless, carbon and stainless steel piping, all welded construction with flanged isolation valves including an emergency, air-actuated isolation valve. The system will be designed to operate at nominal conditions of 525 psig and 48 degrees F. A gas absolute separator for each six inches stainless steel pipe line will be provided upstream of the gas supply interface connection with combustion turbines, between the financial custody metering station and gas turbines.

Seller is also responsible for procuring the mechanical conversions of the SJ 5&6 Units, including the fire protection system inside turbine enclosure of each unit. The conversion is going to be

4

designed, installed and commissioned by MHPSA, the original equipment manufacturer, as more fully described later in this document. The conversion modifications include new dual fuel nozzles DF42 (provided by PREPA), fuel gas metering (Coriolis type), integration to existing control system (DCS Ovation) expansion to accommodate monitoring, control, and operation of the dual fuel systems; modifications to existing liquid fuel systems including liquid fuel metering system, fuel oil injection pump skid, purge air system, sweep air/sweep gas systems, and hydraulic control oil skid.

The MFH Facility will be designed to accommodate safe start up, shut down and load ramp rates for the SJ 5&6 Units. During the plant start up, natural gas will be supplied at the required pressure to the gas turbines by controls designed to maintain vaporization in line with the demand. The plant DCS Ovation control system will be integrated with the MFH Facility, metering stations, gas turbines' fuel flow meters, and fire protection systems. Similarly, when the power plant trips, the DCS control system integration will ensure that the gas pressure in the piping and equipment will remain within the design limits for a safe shutdown. During the ramp up and ramp down of gas turbines, the LNG vaporizer system is designed to maintain the system pressure in a steady state mode. The system is designed with double redundancy for high reliability and availability of the power plant.

Provide catalytic systems on one unit to control emissions of nitrogen oxides and carbon monoxide. The system(s) shall be installed with all necessary infrastructure and integrated with the human machine interface (HMI). Any improvements and modifications to the heat recovery steam generator (HRSG) required to accommodate the catalytic systems shall be furnished by the Seller.

Seller is responsible for procuring the system integration with the plant's DCS control system. The integration shall be in coordination with MHPSA and Emerson-Ovation.

The following provides a summary of the scope of supply.

1.  Financial custody fuel gas metering station (Buyer Property)
    a.    One four-path gas ultrasonic flow meter, Daniel SeniorSonic 3414 model
    b.    Flow computer with redundant processors, with communication to DCS control system
    c.    Isolation valves
    d.    Operation, maintenance and calibration procedures
    e.    Gas leak sensors
    f.    Audible and visible emergency alarms
    g.    One set of non-sparking maintenance tools
    h.    Roof, Light Fixtures (LED)
    i.    Integration for two ways communications to Plant's DCS control system through fiber optic cable
    j.    Ladder logic
    k.    Calibration Certified by Independent Laboratory
2.  Metering station fenced with gate for control access (TWIC compliance)

3.    Three hand held gas leak sensors
4.    Communication to Gas Chromatograph (located at Seller's side) through fiber optic cable connection to DCS control system
5.    Fuel gas absolute separators
6.    Furnish and install catalytic systems on on unit to control emissions of nitrogen oxides and carbon monoxide.  The system shall be integrated with the turbine control system.
7.    TFA support from MHPSA for construction, commissioning and field services (PREPA boundary)
8.    Digital control system integration two ways communication: TFA support from emerson – ovation system (within PREPA and Seller Boundaries)
9.    Gas Pipeline Purging, Validation and Commissioning Procedures
10.    Welding procedures, welder's procedure qualifications records, quality inspections reports
11.    Deliverables (2 cd's and two hard copies 24x36)
   a.    Civil and structural drawings
   b.    Electrical drawings
   c.    One line diagrams
   d.    Mechanical drawings
   e.    P&ID's
   f.    As built drawings
   g.    Technical specifications
   h.    Vendors list of equipment
   i.    Warranties of equipment
   j.    Operations, maintenance, and part list manual of all equipment and parts within PREPA boundary
   k.    NDT reports
   l.    Commissioning reports for all systems



## General Coating Requirements

| Coating Selection - Atmospheric Service Category | | | | |
|---|---|---|---|---|
| Section | Description | Design Temp °F (°C)[1] | Coating System Number | Codes[2] |
| 1.0 | **Structural Steel** | | | |
| 1.1 | Outdoor columns, beams, girders, trusses, channels, and other structural members | ≤200 (≤93) | 1719 | EPZ/EPS/EPS/URA |
| 2.0 | **Pipe and Welded Lugs** | | | |
| 2.1 | **Carbon Steels and Low Alloy (≤9% Cr) Steels** | | | |
| 2.1.1 | Uninsulated | ≤200 (≤93) | 1720 | EPS/EPS/URA |

*Exhibit Version*

| Coating Selection - Atmospheric Service Category | | | | |
|---|---|---|---|---|
| **Section** | **Description** | **Design Temp °F (°C)**[1] | **Coating System Number** | **Codes**[2] |
| 2.1.2 | | >200    (>93) ≤1,000 (≤538) | 1613 | IZ/SLA |
| 2.1.3 | Insulated | >25    (>-4) <350 (<175) | No coating | |
| 2.1.4 | | >350 (>175) | No coating | |
| 2.1.5 | Underground Pipe | ≤200 (≤93) | 3301 | EPB |
| 2.1.6 | Underground Fittings and Field Girth Welds | ≤200 (≤93) | 3011 | SPC/SPC |
| 2.2 | **Stainless Steels and High Nickel Alloys** | | | |
| 2.2.1 | Uninsulated | All | No coating | |
| 2.2.2 | Insulated | >120    (>50) <350 (<175) | No coating | |
| 2.2.3 | | >350    (>175) <120 (<50) | No coating | |
| 2.2.4 | Underground Pipe | ≤200 (≤93) | 3301 | EPB |
| 2.2.5 | Underground Fittings and Field Girth Welds | ≤200 (≤93) | 3011 | SPC/SPC |
| 3.0 | **Bulk    Valves, Fittings,    Pumps, Compressors, Rotating Equipment,    and Other   Mechanical Equipment    Not Specified Otherwise** | All | Manufacturer's Standard Coating | |

7

*Exhibit Version*

| Coating Selection - Atmospheric Service Category | | | | |
|---|---|---|---|---|
| Section | Description | Design Temp °F (°C)[1] | Coating System Number | Codes[2] |
| 4.0 | Civil/Structural/ Architectural Surfaces and Equipment Not Specified Otherwise | All | Manufacturer's Standard Coating | |
| 5.0 | Electric Motors and Equipment Not Specified Otherwise | All | Manufacturer's Standard Coating | |
| 6.0 | Instrumentation and Control Panels Not Specified Otherwise | All | Manufacturer's Standard Coating | |

1. Based on continuous operating temperature.

2. EPB - Epoxy, fusion bonded
   EPS - Epoxy
   EPZ - Epoxy zinc
   IZ - Inorganic zinc
   SLA - Silicone acrylic
   SPC - Special
   URA - Polyurethane

| Coating System Data Sheets | | |
|---|---|---|
| Drawing Number | Rev. | Title/Description |
| 81113-DM-0691_1613 | 2 | Coating System Data Sheets - System 1613 – Inorganic Zinc (IZ)/ Silicone Acrylic (SLA) |
| 81113-DM-0703_1719 | 0 | Coating System Data Sheets - System 1719 – Epoxy Zinc (EPZ)/Epoxy (EPS)/Epoxy (EPS)/Polyurethane (URA) |
| 81113-DM-0704_1720 | 0 | Coating System Data Sheets - System 1720 – Epoxy (EPS)/Epoxy (EPS)/Polyurethane (URA) |

8

*Exhibit Version*

| Coating System Data Sheets | | |
|---|---|---|
| **Drawing Number** | **Rev.** | **Title/Description** |
| 81113-DM-0662_3011 | 3 | Coating System Data Sheets - System 3011 – Adhesive Primer (SPC)/Cold Applied Tape (SPC) |
| 81113-DM-0664_3301 | 4 | Coating System Data Sheets - System 3301 – Epoxy, Fusion Bonded (EPB) |



*Exhibit Version*

| **BLACK & VEATCH**<br>Building a world of difference. | Inorganic Zinc (IZ)/Silicone Acrylic (SLA) | **Coating System<br>1613** |
|---|---|---|

| **Project** | Energy-Std-2-03880-01420 |
|---|---|
| **Description** | Inorganic zinc primer with ambient temperature cured high temperature finish |
| **Surfaces** | Carbon steel |

|  | **First Coat** | **Touchup** | **Second Coat** | **Third Coat** |
|---|---|---|---|---|
| **VOC Limits** | 4.17 lb/gal (500 g/L) | 4.17 lb/gal (500 g/L) | 3.5 lb/gal (420 g/L) | 3.5 lb/gal (420 g/L) |

| **Approved Products** | Coating manufacturers and products other than those listed herein are subject to Engineer's review/approval. | | | |
|---|---|---|---|---|
| **Manufacturer** | **First Coat** | **Touchup** | **Second Coat** | **Third Coat** |
| Carboline | Carbozinc 11 Series | Carbozinc 11 Series | Thermaline 4000 AL | N/A |
| International | Interzinc 22 | Interzinc 22 | Intertherm 50 | Intertherm 50 |
| PPG | Dimetcote 9 | Dimetcote 9 | Hi-Temp 1000 V | N/A |

| **Surface Preparation** | SSPC-SP10/NACE No. 2 Near-White Metal Blast Cleaning<br>Profile depth 1 mil (25 μm) to 2 mils (50 μm) |
|---|---|
| **Remarks** | Profile to be verified by Contractor using ASTM D4417 Method C.<br>Welds to be prepared in accordance with NACE RP0178, Appendix C, Designation "E." |



| **Dry Film Thickness (DFT)** | | | | | |
|---|---|---|---|---|---|
|  | **Generic Coating Type** | **Minimum DFT** | **Maximum DFT** | **Shop (S) or Field (F) Applied** | **Remarks** |
| **First Coat** | IZ | 2 mils (50 μm) | 3 mils (75 μm) | S | |
| **Touchup** | IZ | 2 mils (50 μm) | 3 mils (75 μm) | S, F | SSPC-SP11 Power Tool Cleaning to Bare Metal (bare metal or rusted areas). |
| **Second Coat** | SLA | Per manufacturer's recommendation | Per manufacturer's recommendation | S, F | |
| **Third Coat** | SLA | 1 mil (25 μm) | 1.2 mils (30 μm) | S, F | International paint only. |
| **Completed System** | IZ/SLA | Per manufacturer's recommendation | Per manufacturer's recommendation | | Dry film thickness to be verified in accordance with SSPC-PA2. |

|  |  |  |  |  | **2** | 02/10/16 | General Revision | RJT | BPL |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | **1** | 06/19/15 | General Revision | GMA | RHW |
|  |  |  |  |  | **0** | 03/29/13 | Initial Issue | GMA | RHW |
| REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP | REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP |

| **BLACK & VEATCH** | **COATING SYSTEM DATA SHEETS - SYSTEM 1613** | Drawing No.<br>81113-DM-0691 | Rev 2 |
|---|---|---|---|

*Exhibit Version*

| **BLACK & VEATCH** | Epoxy Zinc (EPZ)/Epoxy (EPS)/Epoxy (EPS) Polyurethane (URA) | Coating System 1719 |
|---|---|---|

| Project | Coating System and Blast Media Selection Procedure |
|---|---|
| Description | Epoxy zinc-rich primer/epoxy intermediate/epoxy intermediate/polyurethane finish; ISO 12944 C5-M (marine), M (medium) durability compliant |
| Surfaces | Carbon steel |
| Regulatory Compliance | Products must comply with all regulations regarding volatile organic compound (VOC) content and any restricted solvents for the point of application and, as required, for the site location. |

| Approved Products | Coating manufacturers and products other than those listed herein are subject to Engineer's review/approval. | | | |
|---|---|---|---|---|
| Manufacturer | First Coat | Second Coat | Third Coat | Fourth Coat |
| Carboline | Carbozinc 859 | Carboguard 60 | Carboguard 60 | Carbothane 134 HG |
| International | Interzinc 315 | Intergard 475HS | Intergard 475HS | Interthane 990 |
| Jotun | Barrier Plus | Jotamastic 87 | Jotamastic 87 | Hardtop XP |
| PPG | Amercoat 68HS | Amercoat 410 | Amercoat 410 | Sigmacover 550H |

| Surface Preparation | SSPC-SP 10/NACE No. 2, Near-White Metal Blast Cleaning; ISO 8501-1 Sa 2-1/2 Very Thorough Blast Cleaning<br>Profile depth 2 to 3 mils (50 μm to 75 μm); sharp, angular profile |
|---|---|
| Remarks | Profile depth to be verified by Contractor using ASTM D4417, Method C; ISO 8503-1 Medium (G).<br><br>Welds to be prepared in accordance with NACE SP0178, Appendix C, Designation "E."<br><br>Dust and abrasives to be removed in accordance with ISO 8502-3, Rating 2 Maximum.<br><br>Soluble salts to be removed in accordance with ISO 8502-6. Conductivity measured in accordance with ISO 8502-9 shall not exceed 100 mg/m² NaCl.<br><br>Coating repairs and coating of welds shall be in accordance with manufacturer's published recommendations. |

| Dry Film Thickness (DFT) | | | | | |
|---|---|---|---|---|---|
| | Generic Coating Type | Minimum DFT | Maximum DFT | Shop (S) or Field (F) Applied | Remarks |
| First Coat | EPZ | 3 mils (75 μm) | 4 mils (100 μm) | S | Slip factor 0.50 minimum. |
| Second Coat | EPS | 4 mils (100 μm) | 6 mils (150 μm) | S, F | Do not coat faying surface. |
| Third Coat | EPS | 4 mils (100 μm) | 6 mils (150 μm) | S, F | Do not coat faying surface. |
| Fourth Coat | URA | 2 mils (50 μm) | 3 mils (75 μm) | S, F | Do not coat faying surface. |
| Completed System | | 13 mils (325 μm) | 19 mils (475 μm) | | Dry film thickness to be verified in accordance with SSPC-PA 2 or ISO 19840. |

| | | | | | | 0 | 12/29/17 | Initial Issue | | RJT | FY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP | REV | DATE | | REVISIONS AND RECORD OF ISSUE | | BY | APP |
| BLACK & VEATCH | | COATING SYSTEM DATA SHEETS - SYSTEM 1719 | | | | | | Drawing No. 81113-DM-0703 | | | Rev 0 |

11

*Exhibit Version*

| **BLACK & VEATCH** | Epoxy (EPS)/Epoxy (EPS)/Polyurethane (URA) | **Coating System 1720** |
|---|---|---|

| **Project** | Coating System and Blast Media Selection Procedure |
|---|---|
| **Description** | Epoxy primer, epoxy intermediate, and polyurethane finish; ISO 12944 C5-M (marine), M (medium) durability compliant |
| **Surfaces** | Carbon steel |

| **Regulatory Compliance** | Products must comply with all regulations regarding volatile organic compound (VOC) content and any restricted solvents for the point of application and, as required, for the site location. |
|---|---|

| **Approved Products** | Coating manufacturers and products other than those listed herein are subject to Engineer's review/approval. | | |
|---|---|---|---|
| **Manufacturer** | **First Coat** | **Second Coat** | **Third Coat** |
| Carboline | Carboguard 893 SG | Carboguard 893 SG | Carbothane 133 LH |
| International | Intergard 475HS | Intergard 475HS | Interthane 870 |
| Jotun | Jotamastic 87 | Jotamastic 87 | Hardtop XP |
| PPG | Amerlock 2/400 | Amerlock 2/400 | Sigmacover 550 H |

| **Surface Preparation** | SSPC-SP 10/NACE No. 2 Near-White Metal Blast Cleaning; ISO 8501-1 Very Thorough Blast Cleaning in accordance with Sa 2-1/2 |
|---|---|
| | Profile depth 2 to 3.4 mils (50 μm to 85 μm); sharp, angular profile meeting |
| **Remarks** | Profile to be verified by Contractor using ASTM D4417, Method C. |
| | Welds to be prepared in accordance with NACE SP0178, Appendix C, Designation "E." |
| | Dust and abrasives must be removed such that particle quantity and particle size do not exceed a rating of 2 in accordance with ISO 8502-3. |
| | Soluble salts to be removed in accordance with ISO 8502-6. Conductivity measured in accordance with ISO 8502-9 shall not exceed 100 mg/m² NaCl. |

**Dry Film Thickness (DFT)**

| | Generic Coating Type | Minimum DFT | Maximum DFT | Shop (S) or Field (F) Applied | Remarks |
|---|---|---|---|---|---|
| **First Coat** | EPS | 5 mils (125 μm) | 7 mils (175 μm) | S, F | |
| **Second Coat** | EPS | 5 mils (125 μm) | 7 mils (175 μm) | S, F | Stripe edges and welds before applying a full second coat. |
| **Third Coat** | URA | 3 mils (75 μm) | 4 mils (100 μm) | S, F | |
| **Completed System** | | 13 mils (325 μm) | 18 mils (450 μm) | | Each coat must provide a significant color change under all light sources. Dry film thickness to be verified in accordance with SSPC-PA 2 or ISO 19840. |

| | | | | | | 0 | 12/29/17 | Initial Issue | | RJT | FY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP | REV | DATE | | REVISIONS AND RECORD OF ISSUE | BY | APP |
| **BLACK & VEATCH** | | **COATING SYSTEM DATA SHEETS - SYSTEM 1720** | | | | | | **Drawing No.** 81113-DM-0704 | | **Rev 0** |

*Exhibit Version*

| ⚡ BLACK & VEATCH | Adhesive Primer (SPC)/Cold Applied Tape (SPC) | Coating System 3011 |
|---|---|---|

| Project | Coating System and Blast Media Selection Procedure |
|---|---|
| Description | Adhesive primer with AWWA C209 Type II cold applied tape finish (≤ 120° F; ≤ 49° C) |
| Surfaces | Carbon steel or stainless steel |

| Regulatory Compliance | Products must comply with all regulations regarding volatile organic compound (VOC) content and any restricted solvents for the point of application and, as required, for the site location. |
|---|---|

| Approved Products | Coating manufacturers and products other than those listed herein are subject to Engineer's review/approval. | | |
|---|---|---|---|
| Manufacturer | First Coat | Touchup | Second Coat |
| Berry Plastics | Polyken 1033a | | Polyken 930-35 |
| Denso | Denso Butyl Primer | | Denso Butyl 35 Tape |
| Tapecoat | TC Omni-prime | | 1135 Gray |

| Surface Preparation | SSPC-SP3 Power Tool Cleaning |
|---|---|
| Remarks | Welds to be prepared in accordance with NACE RP0178, Appendix C, Designation "E." |

| Dry Film Thickness (DFT) | | | | | |
|---|---|---|---|---|---|
| | Generic Coating Type | Minimum DFT | Maximum DFT | Shop (S) or Field (F) Applied | Remarks |
| First Coat | SPC | 1 mil (25 µm) | 2 mils (50 µm) | S, F | |
| Touchup | | N/A | N/A | | |
| Second Coat | SPC | 56 mils (1,400 µm) | 70 mils (1,750 µm) | S, F | Add moldable sealant to fill voids. 50 percent overlap. |
| Completed System | | 57 mils (1,425 µm) | 72 mils (1,800 µm) | | |

| | | | | | | 2 | 07/12/13 | Expanded to Stainless | | GMA | RHW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 1 | 08/31/11 | General Revision | | GMA | RHW |
| 3 | 02/29/16 | Biennial Review | GMA | BPL | | 0 | 06/01/08 | Initial Issue | | BPL | RHW |
| REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP | | REV | DATE | REVISIONS AND RECORD OF ISSUE | | BY | APP |
| BLACK & VEATCH | | COATING SYSTEM DATA SHEETS - SYSTEM 3011 | | | | | | Drawing No. 81113-DM-0662 | | | Rev 3 |

13

*Exhibit Version*

| R, BLACK & VEATCH | Epoxy, Fusion Bonded (EPB) | Coating System 3301 |
|---|---|---|

| Project | Coating System and Blast Media Selection Procedure |
|---|---|
| Description | Fusion bonded epoxy |
| Surfaces | Carbon steel or stainless steel |

| Regulatory Compliance | Products must comply with all regulations regarding volatile organic compound (VOC) content and any restricted solvents for the point of application and, as required, for the site location. |
|---|---|

| Approved Products | Coating manufacturers and products other than those listed herein are subject to Engineer's review/approval. | |
|---|---|---|
| Manufacturer | First Coat | Touchup |
| 3M | Scotchkote 6233 | Scotchkote 323 |
| Valspar | Pipeclad 2000 | Pipeclad 970G |

| Surface Preparation | SSPC-SP 10/NACE No. 2 Near-White Blast Cleaning; ISO 8501-1 Sa 2-1/2 Very Thorough Blast Cleaning (Carbon Steel) SSPC-SP 16 Brush-Off Blast Cleaning of Non-Ferrous Metals (Stainless Steel) Profile depth 2 to 4 mils (50 μm to 100 μm) |
|---|---|
| Remarks | Profile depth to be verified by Contractor using ASTM D4417 Method C. Welds to be prepared in accordance with NACE SP0178, Appendix C, Designation "E." |

**Dry Film Thickness (DFT)**

| | Generic Coating Type | Minimum DFT | Maximum DFT | Shop (S) or Field (F) Applied | Remarks |
|---|---|---|---|---|---|
| First Coat | EPB | 14 mils (350 μm) | 20 mils (500 μm) | S | |
| Touchup | EPS | 25 mils (625 μm) | 28 mils (700 μm) | S, F | SSPC-SP 11 Bare Metal Power Tool Cleaning. |
| Completed System | | 14 mils (350 μm) | 20 mils (500 μm) | | Dry film thickness to be verified in accordance with NACE SP0394. Holiday testing required in accordance with NACE SP0490. |

| | | | | | 2 | 07/12/13 | Expanded to Stainless | GMA | RHW |
|---|---|---|---|---|---|---|---|---|---|
| 4 | 09/27/17 | Updated and Added Valspar | RJT | BPL | 1 | 06/30/09 | Product Update | GRL | RHW |
| 3 | 02/29/16 | Biennial Review | GMA | BPL | 0 | 06/01/08 | Initial Issue | BPL | RHW |
| REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP | REV | DATE | REVISIONS AND RECORD OF ISSUE | BY | APP |
| BLACK & VEATCH | | COATING SYSTEM DATA SHEETS - SYSTEM 3301 | | | | | Drawing No. 81113-DM-0664 | | Rev 4 |

14



Exhibit Version

Exhibit Version



NOT TO BE USED
FOR CONSTRUCTION

NEW FORTRESS ENERGY
P199399-CFGA-M2381B

*Exhibit Version*

## EXHIBIT I

## PARENT LIMITED PAYMENT GUARANTEE

KNOW ALL MEN BY THESE PRESENTS, that we, NFENERGÍA LLC ("Principal"), and ATLANTIC ENERGY HOLDINGS LLC ("Surety"), are held and firmly bound unto PUERTO RICO ELECTRIC POWER AUTHORITY ("Obligee"), in the penal sum of up to, but not greater than, Thirty Million Dollars ($30,000,000), lawful money of the United States (as such sum may be reduced pursuant to Section 2 or Section 5, the "Penal Sum"), to the payment of which well and truly to be made we hereby bind ourselves and our heirs, administrators, successors, and assigns, jointly and severally, firmly by these presents. This limited payment guarantee is made effective as of the Commissioning Start Date as defined in the Contract (the "Effective Date").

WHEREAS the above bound Principal has entered into that certain Fuel Sale and Purchase Agreement for the SJ 5&6 Units (the "Contract") with the above named Obligee, effective the [     ] day of [          ], 2019, which Contract is hereby referred to and made a part hereof as fully and to the same extent as if copies at length were attached herein.

WHEREAS, in the event of a Natural Gas Deficiency (as defined in the Contract), Principal has agreed to pay Obligee certain amounts in accordance with the terms and conditions of Article IX of the Contract.

NOW THEREFORE, the condition of the obligations is such that if Principal and/or Surety has paid to Obligee all amounts that are due and owing to Obligee by Principal under Article IX of the Contract over the Contract Term (as defined in the Contract), then this limited payment guarantee shall be null and void, otherwise to be in full force and effect.

This limited payment guarantee is executed by Surety and accepted by Obligee subject to the following expressed conditions. Capitalized terms used herein and not defined herein shall have the meaning set forth in the Contract.



1. Obligee shall provide notice of Principal's failure to pay any undisputed amount due and owing under Article IX of the Contract ("Default") to both Principal and Surety, providing ten (10) business days for Principal to cure the Default. If Principal has not cured the Default within such period of time, then Obligee may make a Demand on this limited payment guarantee pursuant to Sections 2 and 3 below, in an amount not to exceed the Penal Sum. Any Demand for an amount that exceeds the Penal Sum shall be invalid to the extent that it exceeds the Penal Sum.

2. Subject to satisfaction of the requirements of Section 1, within fifteen (15) business days of Surety's receipt of a valid demand for payment under this limited payment guarantee ("Demand"), accompanied by the documentation referred to in Section 3 below, Surety shall pay to Obligee via wire transfer the amount stated in the Demand. Payment of a Demand by Surety shall constitute full satisfaction of all Claims against Principal in respect of which the Demand was made. Any Demand paid by Surety to Obligee in any Contract Year shall reduce the Penal Sum of this limited payment guarantee during such Contract Year.

3. Documentation to be provided to Surety in support of a Demand under this Guarantee shall be the following:

    a. A photocopy of this limited payment guarantee.

    b. A certificate, executed by a duly authorized representative of Obligee, that specifies the amount of the relevant Default.

    c. All documentation (including invoices and records of nominations and natural gas or diesel quantities, quality and price) reasonably necessary to establish that the relevant amount is due and owing by Seller to Obligee under Article IX of the Contract.

4. The term of this limited payment guarantee is initially from the Effective Date to the conclusion of the Initial Contract Term. This limited payment guarantee will automatically renew for successive one (1) calendar year

terms following expiration of the previous term, unless cancelled by Surety by providing Principal and Obligee no less than sixty (60) calendar days written notice of cancellation. This limited payment guarantee shall terminate automatically upon termination of the Contract for any reason. Any notice of cancellation or termination of the limited payment guarantee pursuant to this Section 4 will not nullify or void any liability or indebtedness incurred or accrued by Principal and Surety named herein prior to said date of cancellation or termination.

5. The Penal Sum shall be automatically adjusted at the beginning of each Contract Year to the amount determined pursuant to the following formula:

$$\text{Penal Sum} = (\$30,000,000 \times (ACQ/MCQ)) - P$$

*Where*

ACQ = The Annual Contract Quantity (as defined in the Contract) for the relevant Contract Year

MCQ = 25 TBtu

P = The aggregate of all amounts paid by Surety to Obligee hereunder during previous Contract Years

6. Surety's liability under this limited payment guarantee (a) shall in no event exceed the Penal Sum and (b) is strictly limited to payment of Default amounts in accordance with Section 2 hereof; it being agreed that Surety shall not be obligated to perform (and shall not be liable for any performance or failure to perform by Principal of) any other obligations of Principal pursuant to the Contract.

7. This limited payment guarantee is governed by the laws of New York (with exclusion of its choice of law rules). Any dispute arising from or in connection to this limited payment guarantee shall be finally settled by binding arbitration in accordance with the International Chamber of Commerce Rules then in force (ICC Rules). The seat of the arbitration shall be New York and the arbitration shall be conducted in the English language.

Signed, sealed and dated this _____ day of _____, _____.

ATTEST _____    BY _____
                                                            Principal

ATTEST _____    BY _____
                                                            Surety



**GOVERNMENT OF PUERTO RICO**
PUERTO RICO ELECTRIC POWER AUTHORITY

Annex

May 15, 2024

The contract stipulates both an effective date, and an "Initial Contract Term" which should run through the fifth anniversary of the **Firm Supply Period.** In turn, the Firm Supply Period was not to begin until all condition precedents were met by Seller and Buyer, **including the execution of the Substantial Completion Certificate** (See attached} by both parties ("Firm Supply Conditions Date" as per Clause 3.4). Such certificate was issued on July 23, 2021 (see first page). As per Clause 5.3, the Firm Supply Period was to **begin on the first day of the first calendar Month after the Firm Supply Condition Date.**

Therefore, the Initial Contract Term was deemed to commence on August 1, 2021, and will end on August 1, 2026.

Lionel E. Santa Crispín
Legal Affairs Director



PO Box 364267 San Juan, Puerto Rico 00936-4267

"We are an equal opportunity employer and do not discriminate on the basis of race, color, gender, age, national or social origin, social status, political ideas or affiliation, religion; for being or perceived to be a victim of domestic violence, sexual aggression or harassment, regardless of marital status, sexual orientation, gender identity or immigration status, for physical or mental disability, for veteran status or genetic information



# *Certificate*
# *Of*
# *Substantial Completion*

## *Project Name*
**Fuel Sale and Purchase Agreement - Dual Fuel Conversion-SJ5&SJ6 units**
**SAN JUAN POWER STATION**

## *Substantial Completion Date*
**July 23, 2021**

**Contract #:**     2191300079
**Issue Date:**     Tuesday, March 5, 2019
**Contractor:**     NFEnergia LLC

·The Work Performed Under the Following Contract Documents or Specified Parts Thereof have been Inspected and Accepted by PREPA and Contractor and are Declared to be Substantially Completed·

**All Contract Documents**

Contractor's Responsibilities for Security, Operation, Safety, Maintenance, Utilities, Warranties and Guarantees Associated with the Work After Substantial Completion Shall be in Accordance with the Requirements of the Contract. This Certificate Shall Not Act as a Release of Contractor's Obligations nor Shall it Constitute Acceptance of Work that has not been Performed in Accordance with the Requirements of the Contract.

The Parties Hereby Accept and Confirm the Issuance of this Certificate of Substantial Completion Subject to the Terms and Conditions of the Agreement and as Described Herein:

Puerto Rico Electric Power Authority                     NFEnergia

Rafael Rodriguez Torres
Head Engineering and Technical Services Division          Chief Financial Officer

EXHIBIT - B



 

# Natural Gas Sale and Purchase Agreement

## Natural Gas Supply (Palo Seco, San Juan and Other Generation Units Around the Island)

Issued by 3PPO

*KDF*

(1)     **NFENERGÍA LLC**

**AS SELLER**

**AND**

(2)     **PUERTO RICO ELECTRIC POWER AUTHORITY**

**AS BUYER**

---

**NATURAL GAS SALE AND PURCHASE AGREEMENT**

---

*KDF*



# TABLE OF CONTENTS

RFP 3PPO-0118-04-FA.................................................................................................1

ARTICLE I DEFINITIONS AND INTERPRETATION .................................................6

ARTICLE II SALE AND PURCHASE...........................................................................14

ARTICLE III TERM AND CONDITIONS.....................................................................15

ARTICLE IV QUALITY ................................................................................................15

ARTICLE V SCHEDULING..........................................................................................17

ARTICLE VI SELLER'S SHORTFALL........................................................................21

ARTICLE VII MEASUREMENT AND TESTING AND OPERATIONS .....................21

ARTICLE VIII RISK AND INDEMNITY .....................................................................25

ARTICLE IX INVOICING AND PAYMENT ................................................................27

ARTICLE X DUTIES, TAXES AND CHARGES .........................................................32

ARTICLE XI FORCE MAJEURE ..................................................................................33

ARTICLE XII REPRESENTATIONS, WARRANTIES AND LIABILITIES ................35

ARTICLE XIII ASSIGNMENT......................................................................................36

ARTICLE XIV SUBCONTRACTORS ..........................................................................37

ARTICLE XV TERMINATION......................................................................................37

ARTICLE XVI NOVATION ...........................................................................................39

ARTICLE XVII CHANGE IN LAW ..............................................................................39

ARTICLE XVIII APPLICABLE LAW ..........................................................................40

ARTICLE XIX CODE OF ETHICS ...............................................................................40

ARTICLE XX SETTLEMENT OF DISPUTES .............................................................40

ARTICLE XXI NON-WAIVER ......................................................................................42

ARTICLE XXII CONFIDENTIALITY ..........................................................................42

ARTICLE XXIII NOTICES.............................................................................................44

*KDf*

*CA*

ARTICLE XXIV CONTINGENT FEES .................................................................................. 45

ARTICLE XXV ADDRESSES FOR NOTICES ...................................................................... 45

ARTICLE XXVI ............................................................................................................... 45

BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT .................................... 45

ARTICLE XXVII TRANSFER OF FUNDS .......................................................................... 46

ARTICLE XXVIII CONFLICT OF INTEREST ...................................................................... 46

ARTICLE XXIX UNFAIR LABOR PRACTICE ..................................................................... 47

ARTICLE XXX DISCRIMINATION .................................................................................... 48

ARTICLE XXXI COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO
CONTRACTING REQUIREMENTS ..................................................................................... 48

ARTICLE XXXII PUBLIC OFFICERS OR EMPLOYEES ....................................................... 48

ARTICLE XXXIII DISPENSATION .................................................................................... 49

ARTICLE XXXIV RULES OF PROFESSIONAL ETHICS ........................................................ 49

ARTICLE XXXV ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO ............................ 50

ARTICLE XXXVI CONTRACT REVIEW POLICY ................................................................ 50

ARTICLE XXXVII INSURANCE ........................................................................................ 50

ARTICLE XXXVIII GENERAL ......................................................................................... 52

EXHIBIT A SPECIFICATIONS ........................................................................................... 55

EXHIBIT B DELIVERY POINTS ........................................................................................ 56

EXHIBIT C FORM OF PARENT GUARANTEE .................................................................... 57

EXHIBIT D FORM OF BOND ........................................................................................... 64

EXHIBIT E GOVERNMENT CONTRACTING REQUIREMENTS ............................................. 66

EXHIBIT F TAX BREAKDOWN ........................................................................................ 72

*KD7*



DocuSign Envelope ID: 4F0D6585-842D-4729-ABC0-D9D933F20F6F

**THIS NATURAL GAS SALE AND PURCHASE AGREEMENT** is made this 15th

Day of March 2024 (**"Effective Date"**), BETWEEN:

(1) **NFENERGÍA LLC**, a Limited Liability Company with offices in 111 W 19th St. 8th Fl. New York, N.Y., represented in this act by Christopher Guinta, of legal age, married and authorized signatory of NFENERGÍA LLC, limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the ("**Seller**").

(2) **PUERTO RICO ELECTRIC POWER AUTHORITY** ("PREPA"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at P.O. Box 363928, San Juan, Puerto Rico 00936-3928, represented in this act by Genera PR LLC ("**Genera**") exclusively as agent on behalf of and for the account of PREPA, represented by Kevin D. Futch, of legal age, married and authorized signatory of Genera PR LLC, a limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the "**Buyer**").

Seller and Buyer shall each be a "**Party**" and, together, the "**Parties**."

## WITNESSETH

(A) WHEREAS, on January 24, 2023, the P3A (as defined below), PREPA and Genera entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "**Generation O&M Agreement**"), whereby Genera became the operator of the Legacy Generation Assets (as defined therein) as an agent of PREPA;

(B) WHEREAS PREPA, by virtue of Act No. 83 of May 2, 1941, as amended ("**Act 83**"), has the authority to engage services necessary and convenient to pursue the activities, programs, and operations of PREPA;

(C) WHEREAS, pursuant to the Generation O&M Agreement, PREPA designated and appointed Genera as its agent;

(D) The Third-Party Procurement Office (3PPO) is established under the Puerto Rico Public-Private Partnerships Authority (P3A), as mandated by the Puerto Rico Electric System Transformation Act (Act 120-2018) and the Public-Private Partnerships Act (Act 29-2009). The 3PPO is designated as the primary entity authorized to manage and oversee procurement activities pertaining to the Public-Private Partnerships, specifically in relation to the Puerto Rico Electric Power Authority (PREPA);

(E) WHEREAS, in accordance with the Generation O&M Agreement and Genera's Procurement Manual, this Agreement constitutes a Facility Contract and Genera is hereby acting solely as agent to PREPA and not for itself or on its own behalf;

(F) WHEREAS, the U.S. Army Corps of Engineers, Omaha Division, as tasked by the Federal Emergency Management Agency, issued multiple task orders to Weston Solutions, Inc. under the Rapid Disaster Infrastructure contract to supply and operate modular, mobile power generation facilities totaling approximately (i) 180 MW on the site of the existing Palo Seco

*KDF*

5



Power Plant ("**Palo Seco Units**") and (ii) 250 MW on the site of the existing San Juan Power Plant ("**San Juan Units**" and, together with the Palo Seco Units, the "**Mobile Units**"), in each case along with vaporization facilities to deliver regasified LNG to the Mobile Units.

(G)     WHEREAS, the condition of the generation fleet and reserve power margin in Puerto Rico requires ongoing operation of the Palo Seco Units, the San Juan Units and other power generation units located at Delivery Points (as defined below) around the island (the "**Generation Units**");

(H)     WHEREAS, PREPA requires a secure supply of Natural Gas to use as fuel for the Generation Units; and

(I)     WHEREAS, to address such requirement, the 3PPO issued the Request for Proposals **3PPO-0118-04-FA** on **February 17, 2024** in which it seeks bids to deliver LNG to the sites of the Generation Units, provide for the vaporization of such LNG, and deliver Natural Gas to the Generation Units and Seller was selected to supply such Natural Gas pursuant to the **3PPO-0118-04-FA**,

**NOW, THEREFORE**, Seller and Buyer hereby agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

I.1     Definitions

In this Agreement, except where the context otherwise requires, each of the following expressions have the following meaning:

"**3PPO**" means the Third Party Procurement Office.

"**Adjusted Nominated Quantity**" shall have the meaning given to it in Article IX.2.

"**Affiliate**" means, in relation to a Party, any company, corporation, partnership or other legal entity (in this definition referred to as a "**Person**") that (a) is directly or indirectly Controlled by such Party; (b) directly or indirectly Controls such Party; or (c) is directly or indirectly Controlled by a Person that also, directly or indirectly, Controls such Party; *provided, however,* that unless and until Buyer undergoes a Change of Control permitted by this Agreement, Buyer's only Affiliates are (x) the Puerto Rico Fiscal Agency and Financial Advisory Authority and (y) the Commonwealth of Puerto Rico.

"**Agreement**" means this Agreement and its Exhibits, as may be amended, modified, varied or supplemented from time to time.

"**Annual Quantity Taken**" shall have the meaning given to it in Article IX.7.

"**Anti-Corruption Controls**" shall have the meaning given to it in Article XIX.1.

*KDf*

*CH*

"**Applicable Law**" means, in relation to any legal person, property, transaction or event, all applicable provisions of laws, treaties, conventions, statutes, rules, regulations, permits, official directives and orders of, and the terms of all judgments, orders, awards, and decrees issued by, any Governmental Authority by which such legal Person is bound or having application to the property, transaction or event in question, including the Electric Power Authority Revitalization Act and PROMESA.

"**Btu**" means a British thermal unit, being that amount of heat that is equal to 1,055.056 Joules or 0.000293071 kWh.

"**Business Day**" means a Day, other than a Saturday, Sunday or a public holiday in San Juan (Puerto Rico) or New York (United States).

"**Buyer**" shall have the meaning given to it in the preamble to this Agreement.

"**Buyer Group**" means Buyer, its Affiliates, and its and their respective directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Carryover Credit**" shall have the meaning given in Article V.4(d).

"**Change of Control**" means (a) in the case of Buyer, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, a Puerto Rican Governmental Authority would no longer Control Buyer, and (b) in case of Seller, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, New Fortress Energy Inc. would cease to Control Seller.

"**Change of Law**" means the amendment, repeal or change of an existing Applicable Law, or a new Applicable Law, in either case that takes effect after the Effective Date.

"**Claims**" means all claims, demands, notices of violation or noncompliance, governmental requests for information, legal proceedings, liens, encumbrances, causes of action and other actions, of any kind or nature (including actions *in rem* or *in personam* and actions of Governmental Authorities). "**Claim**" means any of the foregoing.

"**Confidential Information**" shall have the meaning given to it in Article XXII.1.

"**Contract Ceiling**" shall have the meaning given to it in Article IX.6.

"**Contract Year**" shall have the meaning given to it in Article Article III(b).

"**Control**" means the beneficial ownership, either directly or indirectly, of fifty percent (50%) or more of the voting rights in a Person, or (whether alone or acting in concert with others, and whether by the ownership of share capital, the possession of voting power, contract or otherwise) the right to appoint fifty percent (50%) or more of the board of directors or equivalent management body of such Person. "**Controlled**" shall have the correlative meaning.

*KD7*

7

*CH*

"**Corporate Tax**" means any and all Taxes based on income, revenues, profits, or net worth and all state and local franchise, license, occupation and similar Taxes required for the maintenance of corporate existence or to maintain good standing that are assessed against a Party.

"**Day**" means a period of twenty-four (24) consecutive hours beginning at 00:00 hours local time in Puerto Rico.

"**Defaulting Party**" shall have the meaning given to it in Article XV.1(c).

"**Delivery Confirmation Request**" shall have the meaning given to it in Article IV.2(c).

"**Delivery Point**" means (i) with respect to any Generation Units with Metering Equipment, the outlet of the Natural Gas metering facilities between the relevant Regas Equipment and the Generation Units, and (ii) with respect to all other Generation Units, the point at which the relevant Regas Equipment interconnects with the applicable Generation Units, or such other points as may be agreed in writing by the Parties.

"**Diesel Contract Price**" with respect to a given month means the arithmetic mean of the prices for deliveries of ultra-low sulfur diesel (converted to cents per gallon and rounded to four decimal places) on each Day of that month as set forth in (i) the Diesel Fuel Purchase Contract dated October 27, 2023, Contract Number 101333, while such contract remains in full force and effect, and (ii) subsequently, in Buyer's then-effective fuel supply agreement for deliveries of ultra-low sulfur diesel to one or more of San Juan, Palo Seco, Aguirre, Mayagüez, Cambalache, and various generating stations around the island of Puerto Rico, or another reasonably similar agreement.

"**Diesel Price**" shall have the meaning given to it in Article IX.

"**Disclosing Party**" shall have the meaning given to it in Article XXII.1.

"**Dispute**" shall have the meaning given to it in Article XX.1(a).

"**Effective Date**" shall have the meaning given to it in the preamble to this Agreement.

"**Excess Nomination**" shall have the meaning given to it in Article V.4.

"**Excluded Losses**" shall have the meaning given to it in Article VIII.4.

"**Expert**" means a Person of appropriate industry expertise and experience to whom a Dispute, disagreement or another matter of interpretation is or is to be referred to pursuant to Article XX.2.

"**Extension Term**" shall have the meaning given to it in Article III(a).

"**Force Majeure**" shall have the meaning given to it in Article XI.1.

"**Forced Shutdown**" means a shutdown or dispatch condition of any of the Generation Units located at the same site as a Delivery Point nominated to receive a delivery in a Monthly Schedule or Weekly Programme, which results in a derating or otherwise makes such Generation Units

*KD7*

*C4*

unavailable to produce power, including as a result of an unexpected or imminent breakdown, equipment failures, disruption of the fuel supply, operator error, grid operator instruction, government action and similar occurrences.

"**Fuel Price**" shall have the meaning given to it in Article IX.1.

"**Governmental Authority**" means the government of the United States of America, any state thereof, the Commonwealth of Puerto Rico, or any local jurisdiction, or any political subdivision of any of the foregoing including, but not limited to courts, administrative bodies, departments, commissions, boards, bureaus, agencies, municipalities or other instrumentalities.

"**Genera**" shall have the meaning given to it in the Preamble to this Agreement.

"**Generation O&M Agreement**" shall have the meaning given to it in the Recitals.

"**Generation Units**" shall have the meaning given to it in the Recitals.

"**Hazardous Materials**" means any substance that is either defined or regulated as hazardous or toxic by, or as to which liability including for damages or remediation may be imposed under Applicable Law, including (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing polychlorinated biphenyls and processes and certain cooling systems that use chlorofluorocarbons; (b) any chemicals, materials or substances which as of the applicable Effective Date are, or hereafter become, defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," or any words of similar import pursuant to Applicable Law; or (c) any other chemical, material, substance or waste, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental Authority, or which may be the subject of liability under any Applicable Law for damages, costs or remediation.

"**Heating Value**" (also known as High Heating Value (HHV)) means the gross heating value on a dry basis, which is the number of Btus produced by the complete combustion at constant pressure of the amount of dry gas that would occupy a volume of one Standard Cubic Foot at a constant pressure of 14.73 psia and a temperature of 60° F with combustion air at the same temperature and pressure as the gas, the products of combustion being cooled to the initial temperature of the gas and air and the water formed by combustion condensed to the liquid state.

"**Initial Term**" shall have the meaning given to it in Article III.I.

"**ISO Container**" means (i) an intermodal container designed for the transportation and storage of LNG in a cryogenic state that is manufactured according to the specifications for such containers prescribed by the International Organization for Standardization or (ii) subject to Buyer's consent, such consent not to be unreasonably withheld, a truck-mounted trailer designed for the transportation and storage of LNG in a cryogenic state.

"**Joule**" means a unit of energy defined in the International System of Units.

"**kWh**" shall mean kilowatt hour.

9

*KD7*

*C4*

"**Loading Certificate**" means the loading certificate or similar document that sets forth the mass, composition, heating value per unit of mass, and quality of LNG loaded into an ISO Container.

"**Logistics Factor**" means the rate of $0 (Zero US Dollars) per MMBtu per mile for deliveries to each Delivery Point.

"**Logistics Surcharge**" means, for each Delivery Point to which Seller delivers Natural Gas in a month, a surcharge in US Dollars for such deliveries, calculated as the Logistics Factor multiplied by the quantity (in MMBtu) of such deliveries multiplied by the distance in miles to such Delivery Point as set forth in Exhibit B.

"**LNG**" means Natural Gas in a liquid state at or below its boiling point and at or near atmospheric pressure.

"**Losses**" means all liabilities, damages, losses, costs and expenses (including those on account of loss of or damage to property, bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium (parental or spousal), loss of support, death, and wrongful termination of employment, and all litigation and arbitration costs and expenses and reasonable attorneys' fees) that accrue at any time, whether created by or based upon law (including statute), contract, tort, voluntary settlement or otherwise, or under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties. "Loss" means any of the foregoing.

"**Maximum Annual Contract Quantity**" shall have the meaning given to it in Article V.1.

"**Maximum Monthly Quantity**" shall have the meaning given to it in Article V.3(a)(i).

"**Maximum Weekly Quantity**" shall have the meaning given to it in Article V.3(a)(i).

"**Metering Equipment**" shall have the meaning given to it in Article VII.3.

"**Minimum DCQ**" shall have the meaning given to it in Article V.2.

"**Minimum Volume Commitment**" means 0% (Zero Percent) of the Maximum Annual Contract Quantity.

"**Mitigation Sale**" shall have the meaning given to it in Article V.4(c).

"**MMBtu**" means 1,000,000 Btu.

"**Mobile Units**" shall have the meaning given to it in the Recitals.

"**Monthly Invoice**" shall have the meaning given to it in Article IX.3.

"**Monthly Schedule**" shall have the meaning given to it in Article V.3(a)(ii).

"**Natural Gas**" or "**NG**" means any saturated hydrocarbon or mixture of saturated hydrocarbons consisting essentially of methane and other combustible and non-combustible gases in a gaseous state.

KDf

10



"**NG Deficiency**" shall have the meaning set forth in Article VI.1.

"**Ninety Day Schedule**" or "**NDS**" shall have the meaning given to it in Article V.3(a).

"**Off-Spec NG**" is any LNG or Natural Gas that does not conform to the Specifications set forth in Exhibit B.

"**Oversight Board**" shall mean the Financial Oversight and Management Board for Puerto Rico.

"**P3A**" the Puerto Rico Public-Private Partnerships Authority, a public corporation of the Commonwealth of Puerto Rico.

"**Palo Seco Units**" shall have the meaning given to it in the Recitals.

"**Party**" and "**Parties**" shall have the meanings given to them in the preamble to this Agreement.

"**Permit**" means, in respect of either Party, any permit, license, consent, clearance, certificate, approval, authorization or similar document or authority (including for export or import) which any Applicable Laws requires such Party (or, in the case of Seller, any member of the Seller Group) to hold or obtain in order for any of its obligations under this Agreement to be performed, including visas and permits for personnel to work and reside in any location.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a joint stock company, a trust, any unincorporated organization, or any Governmental Authority.

"**PREPA**" shall have the meaning given to it in the preamble to this Agreement.

"**Prime Rate**" means the prime lending rate, as reported by The Wall Street Journal's bank survey.

"**PROMESA**" means the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241, as may be amended or modified.

"**Puerto Rican Governmental Authority**" means a Governmental Authority of the Commonwealth of Puerto Rico, and excludes, for the avoidance of doubt, any Governmental Authority of the federal government of the United States of America or any state therein.

"**Qualifying Bank**" means a national bank, national association, commercial bank or other financial institution organized under the laws of the United States or a political subdivision thereof or validly existing in the country of its organization and registered to do business in the United States, having a branch located within Puerto Rico or the contiguous United States, in each case that has a long-term issuer rating of at least (i) if headquartered within Puerto Rico, then "B+" by Standard & Poor's Ratings Services, "B1" by Moody's Investors Services Inc., or "B+" by Fitch Ratings Inc. or (ii) if headquartered outside of Puerto Rico, then "A-" by Standard & Poor's Ratings Services, "A3" by Moody's Investors Services Inc., or "A-" by Fitch Ratings Inc., or in each case if the relevant

11

KDf

CA

rating agencies cease to engage in business or rate the obligations in question, then an equivalent rating from another internationally recognized rating agency selected by Seller with the written consent of Buyer; provided that, if such financial institution's ratings satisfy such minimum ratings, no other credit rating agency shall have placed such financial institution on credit watch with negative implications.

"**Reasonable and Prudent Operator**" means a Person seeking in good faith to perform its contractual obligations and comply with Applicable Law, and in so doing, and in the general conduct of its undertaking, exercising that degree of skill, diligence, prudence and foresight which would reasonably and ordinarily be expected from a skilled and experienced international operator engaged in the same type of undertaking under the same or similar circumstances and conditions.

"**Receiving Party**" shall have the meaning given to it in Article XXII.1.

"**Regas Equipment**" means facilities located at and around a Delivery Point for the vaporization of LNG held in ISO Containers and delivery and metering, to the extent available, of the resulting Natural Gas to the Delivery Point.

"**San Juan Units**" shall have the meaning given to it in the Recitals.

"**Seller**" shall have the meaning given to it in the preamble to this Agreement.

"**Seller Group**" means Seller, its Affiliates, and its and their respective directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Seller Shortfall Payment**" shall have the meaning set forth in Article VI.1.

"**Specifications**" shall have the meaning given to it in Article IV.1.

"**Standard Cubic Foot**" or "**scf**" means Natural Gas at a base temperature of 60° F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law.

"**Supply Period**" shall have the meaning given to it in Article III.2.

"**Taxes**" shall have the meaning given to it in Article X.

"**TBtu**" means 1,000,000,000,000 Btu.

"**Term**" shall have the meaning given to it in Article Article III.1.

"**Termination Event**" shall have the meaning given to it in Article XV.1(c).

"**Termination for Convenience**" shall have the meaning given to it in Article XV.1(b).

"**Third Party**" means any Person not a Party to this Agreement; *provided, however,* that for the purpose of Article XI, "**Third Party**" means any person who is not a member of Seller Group or Buyer Group.

*KDf*

12

*CA*

"**Title III Case**" shall mean the case under Title III of PROMESA styled *In re The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority (PREPA)* and numbered No. 17 BK 4780-LTS, which was instituted on July 2, 2017 by the Oversight Board by the filing of a voluntary petition for relief for Buyer.

"**Title III Court**" shall mean the United States District Court for the District of Puerto Rico, or any appellate court, presiding over the pending Title III Case of PREPA.

"**Trust Agreement**" shall mean that certain Trust Agreement, dated as of January 1, 1974, between Buyer and U.S. Bank, National Association, as Successor Trustee, as amended, restated, or otherwise modified from time to time.

"**US**" means the United States of America.

"**US Dollars**" or "**US$**" means the lawful currency of the United States of America.

"**Weekly Programme**" shall have the meaning given to it in Article V.3(a)(iii).

I.2    Interpretation

In this Agreement, unless the context requires otherwise:

(a)    References to Articles and Exhibits are to Articles and Exhibits of this Agreement. The Exhibits hereto are incorporated herein as an integral part of this Agreement.

(b)    References to a Person include that Person's successors and permitted assigns.

(c)    Headings of Articles and Exhibits are for convenience only and shall not affect the construction or interpretation of this Agreement.

(d)    Where the context requires, words denoting the singular or masculine or neuter only shall include the plural, feminine, body politic or corporate and vice versa.

(e)    References to "include" and "including" shall be construed as "including without limitation."

(f)    The words "agree," "agrees," and "agreed" refer to a written agreement, executed and delivered by the Parties.

(g)    Wherever either Party's consent or agreement is expressed to "not be unreasonably withheld," it is acknowledged that such obligation shall include, but not be limited to, the obligation of the Party not unreasonably to delay giving the relevant consent or agreement, and in the foregoing case as well as wherever either Party undertakes "efforts" or "endeavors" to do something, or refrain from doing something, it is acknowledged that such Party shall not be in breach of its obligations to the other Party to the extent that such Party's actions are limited by such Party's need to comply with its contractual obligations to any Person,

13

*KDP*

provided that such Party has used its reasonable efforts to obtain any necessary waiver(s) of such relevant obligations and that such Party has not assumed such obligations subsequent to entering into this Agreement.

(h)     Any law, statute or statutory provision shall be construed as a reference to the same as it may be amended, modified or re-enacted, from time to time, and shall include any subordinate legislation made from time to time under that provision.

(i)     If at any time during the Supply Period, the Prime Rate becomes unavailable or inappropriate then the Parties shall meet as soon as possible thereafter and in good faith discuss and attempt to agree in writing upon a suitable alternative replacement. If the Parties are unable to so agree upon a suitable alternative replacement, then either Party may refer the matter to an Expert for determination in accordance with Article XX.2.

I.3     Seller acknowledges and agrees that as long as the Generation O&M Agreement is in effect (a) all provisions hereunder relating to Buyer as beneficiary of the terms and conditions of the Agreement or otherwise referencing Buyer taking any action, receiving any notice or disclosure, making any determination (including the termination of the Agreement) shall be understood to refer to Genera acting on Buyer's behalf; (b) all references to "Genera" shall be understood to mean Genera on its own behalf, as third party beneficiary of the Agreement; (c) Buyer is prohibited from taking any action or giving any consent hereunder directly and not through Genera as its agent; and (4) Genera shall have no liability hereunder for any actions it may take on Buyer's behalf, and all such liability shall be exclusively of Buyer.

I.4     Generation O&M Agreement. By executing this Contract, Seller acknowledges and agrees that it has reviewed the Generation O&M Agreement located at: https://www.p3.pr.gov/wp-content/uploads/2023/01/230124-LGA-OM-Agreement.pdf.

## ARTICLE II

## SALE AND PURCHASE

II.1     Seller agrees to sell and deliver to Buyer at the Delivery Points, and Buyer agrees to purchase from Seller, Natural Gas that conforms to the requirements in Article IV. The quantity of Natural Gas to be delivered by Seller and the Delivery Point(s) to which such Natural Gas is to be delivered shall be the amount(s) and location(s) scheduled in accordance with Article V. The price for such quantities of Natural Gas shall be determined in accordance with Article IX.

II.2     Seller shall deliver LNG in ISO Containers for inland sites by truck, or by alternative means as agreed by the Parties in writing, to the areas designated by Buyer for placement of ISO Containers, revaporize such LNG using the relevant Regas Equipment (owned or contracted for by Seller), and deliver Natural Gas to Buyer at the Delivery Points in the quantities nominated by Buyer and as directed by Buyer pursuant to Article V.

II.3     Within three (3) Business Days of notice from Buyer that ISO Containers are ready for retrieval, Seller shall remove empty ISO Containers from the designated Delivery Point(s).   All

*KD7*

14

*CH*

deliveries and retrieval of ISO Containers shall take place during the business hours for such Delivery Point as notified by Buyer to Seller from time to time.

II.4    If any new Delivery Point is agreed to by the Parties and such Delivery Point is capable of receiving Natural Gas by means other than ISO Container, or if any existing Delivery Point becomes capable of receiving Natural Gas by means other than ISO Container, the Parties may agree in writing to such terms and conditions as are necessary to provide for the additional means of delivery and receipt.

## ARTICLE III

## TERM AND CONDITIONS

III.1    This Agreement shall become effective once signed by Buyer and Seller, contingent upon the signing and execution of the Asset Purchase Agreement for the temporary generators by and between PREPA and NFE POWER PR LLC, if and when such signing and execution occur. This Agreement shall remain in effect for a period of one (1) year (the **"Initial Term"** and, as extended pursuant to this section, the "**Term**"), commencing on March 16, 2024, at 12:00:01 am, unless earlier terminated by either Party pursuant to Article XV.1.

(a)    Buyer may elect to extend the Term for up to three (3) additional one-year periods (each an "**Extension Term**") by delivering notice of such election to Seller no later than thirty (30) days prior to the end of the then-current Term, provided that Seller may reject such extension by delivering notice to Buyer no later than [three (3) days after receipt of Buyer's notice.

(b)    If Seller accepts Buyer's election to extend the Term or does not respond within the period set forth in Article III(a), then the Term shall be extended for one (1) year (the initial Term and each one year extension a "**Contract Year**"). If Seller delivers notice rejecting Buyer's extension notice within the period set forth in Article III(a), then the Term of this Agreement shall not be extended.

III.2    The "**Supply Period**" shall commence on the later of (a) March 16, 2024, and (b) the first Day after the termination or expiration date, without replacement, of any Task Order issued by the US Army Corps of Engineers, Omaha Division, for the operation and supply of Natural Gas to any Generation Units.

## ARTICLE IV

## QUALITY

IV.1    The Natural Gas delivered by Seller to or for the account of Buyer at any Delivery Point shall comply with the Natural Gas quality specifications set forth in Exhibit B (the "**Specifications**"). The standard test method ASTM D1945, Standard Test Method for Analysis of Natural Gas by Gas Chromatography, then in effect, shall be used to determine compliance with the Specifications. Prior to delivery, the Seller shall provide the Buyer with a Quality Compliance Certification. This certification shall affirm that the Natural Gas to be dispatched adheres to the specified quality standards outlined in Exhibit B.

15

*KD7*

*CH*

IV.2    Failure of LNG or Natural Gas to Conform to Specifications

(a)    Seller shall notify Buyer as soon as reasonably practicable after becoming aware of any existing or anticipated failure of the Natural Gas available for delivery to the Delivery Point to conform to the Specifications, giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration, including the delivery time of such Off-Spec NG.

(b)    If at any time, the Natural Gas offered for delivery by Seller is or is reasonably expected by Seller to be Off-Spec NG, Buyer may reject in whole or in part the delivery of such Off-Spec NG.

(c)    If at any time, Seller is unable to deliver Natural Gas conforming to the Specifications but is able to deliver Off-Spec NG, Seller shall withhold deliveries until such time as it is able to deliver Natural Gas conforming to the Specifications; *provided, however*, that in such event Buyer shall be entitled to (i) procure Natural Gas, LNG, or other fuel from Third Parties, (ii) utilize the relevant Regas Equipment and/or (iii) request delivery of such Off-Spec NG (a "**Delivery Confirmation Request**").

(d)    Unless both (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer makes a Delivery Confirmation Request pursuant to Article IV.2(c) (which shall constitute a waiver in writing of its right to reject such Off-Spec NG), Seller shall, subject to Article VIII.4, be liable for all cost and expense directly incurred by Buyer as a result of the delivery of Off-Spec NG, including all the out-of-pocket, actual costs and expenses incurred (over and above those normally incurred in accepting conforming Natural Gas or LNG) in receiving and treating Off-Spec NG by such means as are appropriate and available to Buyer; *provided, however*, that Buyer shall exercise commercially reasonable practices to minimize the costs and expenses which may occur.

(e)    If (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer elects not to take such Off-Spec NG, Seller shall be liable to Buyer for Seller Shortfall Payment as determined pursuant to Article VI.1.

(f)    If (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer waives in writing its right to reject such Off-Spec NG, (A) such Off-Spec NG shall be deemed to have been delivered in accordance with this Agreement and (B) Seller shall not be liable for any damages to Buyer for the acceptance of such Off-Spec NG.

(g)    When Natural Gas is not taken by Buyer due to it being Off-Spec NG or when Seller withholds Natural Gas pursuant to Article IV.2(c), Buyer shall not be obliged to pay for such Natural Gas not taken, and such Natural Gas not taken



16



shall be deemed not to have been made available and shall be considered an NG Deficiency and Article VI shall apply.

(h)    The price for all Off-Spec NG delivered to the Delivery Point, whether pursuant to paragraph (f) above or otherwise, shall equal eighty-five percent (85%) of the Fuel Price.

(i)    Buyer shall have no right or remedy with respect to the Off-Spec NG other than those stated or referred to in this Article IV.2 and Article XV.

IV.3    Any Dispute between the Parties concerning the measurement and/or testing of Natural Gas or LNG for the purposes of determining the quality thereof at the DELIVERY POINT shall be settled in accordance with the provisions of Article XX.2 of this Agreement.

## ARTICLE V

## SCHEDULING

V.1    The "**Maximum Annual Contract Quantity**" for each Contract Year shall be 80 TBtu.

V.2    In respect of each Day of every Contract Year, the contracted quantity for such Day shall be the daily nomination for such Day of the Weekly Programme or as otherwise agreed in writing.

V.3    With respect to each Contract Year during the Supply Period, the following provisions shall apply:

(a)    The Ninety Day Schedule ("**NDS**") and Weekly Programme for such Contract Year shall be established according to the following conditions:

(i)    The Maximum Annual Contract Quantity shall be divided equally (A) among the twelve months of each Contract Year, with partial months for the period from March 16-March 31 at the start of the Contract Year and for March 1-March 15 at the end of the Contract Year ("**Maximum Monthly Quantity**"); and (B) by fifty-two (52) weeks with partial weeks starting on March 16 at the beginning of each Contract Year and ending on March 15 at the end of each Contract Year ("**Maximum Weekly Quantity**").

(ii)    Except as set forth in Article V.3(a)(v) below, on or before the fifth (5th) Day of each calendar month M-1 Buyer shall provide to Seller its Natural Gas requirements for the three (3) months following M-1 (the "**NDS**" and such three months, in chronological order, months "**M**," "**M+1**" and "**M+2**"). The NDS shall be final and binding for month M (the "**Monthly Schedule**"), and non-final and non-binding for months M+1 and M+2. Such NDS shall include the monthly quantities of Natural Gas to be delivered in each of the next three (3) months, which monthly quantities of Natural Gas shall not exceed the Maximum Monthly Quantity, as well as the estimated daily Natural Gas requirements

*KD7*

17

*CA*

for month M and Buyer's expected Delivery Point(s) for such quantities. Buyer may request additional Natural Gas from Seller for month M after the deadline for submission of the NDS. Upon receipt of such a request, Seller shall inform Buyer within one (1) Day whether Seller can deliver all or a portion of such quantities and the applicable price, and Buyer shall have two (2) Days to accept or decline Seller's offer. If Buyer accepts Seller's offer, such quantities shall become firm and binding; *provided, however,* that such quantities shall not be treated as quantities of Natural Gas to which the Monthly Schedule or the NDS apply. Further, Buyer shall use commercially reasonable efforts to include in each NDS estimated, non-binding daily requirements for months M+1 and M+2; and

(iii)    On or before 00.00 hours Puerto Rico Time of each Wednesday of each week, or, if such Day is not a Business Day, on the Business Day immediately preceding such Day, Buyer shall provide to Seller a daily nomination of its Natural Gas requirements for the coming week, the Delivery Point(s) to which such Natural Gas shall be delivered, and the quantities to be delivered to each Delivery Point on each Day ("**Weekly Programme**"), provided that the quantities to be delivered during such week shall not, without the consent of Seller, exceed the Maximum Weekly Quantity, and provided further that if no Wednesday will occur between the establishment of the first NDS and Monthly Schedule pursuant to Article V.3(a)(v) and the first Day of the Supply Period, Buyer shall provide the information for the first Weekly Programme to Seller at the same time as the information for the first NDS and Monthly Schedule.

(iv)    On or before 12.00 hours Puerto Rico Time each Business Day, Buyer may direct Seller to deliver the quantity of Natural Gas remaining in the Weekly Programme in different quantities to each Delivery Point or to different Delivery Points than those originally nominated and the Weekly Programme shall be revised accordingly, provided that Buyer may not increase or decrease the total quantity of Natural Gas to be delivered during such Weekly Programme.

(v)    With respect to the first NDS and Monthly Schedule of the Supply Period, Buyer shall provide to Seller its Natural Gas requirements for months M, M+1, and M+2, where month M shall be the period from the first Day of the Supply Period until the end of the calendar month in which such Day occurs, on or before the earlier of the third (3rd) Day following the Effective Date and the Day before the start of the Supply Period.

(b)    Under no circumstance shall Buyer, without the prior written agreement of Seller pursuant to Article V.3(a)(ii), be entitled to nominate any quantity of Natural Gas that would increase the quantity of Natural Gas that Seller is required

*KDF*

18

*CH*

to deliver hereunder in any month to exceed the quantity set forth in the Monthly Schedule.

(c)    Except with respect to adjustments to Natural Gas deliveries pursuant to Article V.5, Buyer will use commercially reasonable efforts to provide written notice to Seller as soon as practicable after information becomes available to Buyer or any event occurs that causes a discrepancy between the quantities of Natural Gas nominated by Buyer pursuant to this Article V.3 and the quantities that Buyer is able to receive, regardless of whether such nomination is binding or non-binding. Such notice shall specify the cause of such discrepancy and the amount of such discrepancy. Unless and until Seller receives any such notice from Buyer, Seller shall be considered as acting reasonably in relying on the nominations provided by Buyer pursuant to this Article V.3.

(d)    If, for a given month or week, Buyer fails to deliver to Seller a nomination for the NDS, Monthly Schedule or Weekly Programme, as applicable, by the relevant deadline for such nomination, then Buyer's nomination shall be as follows:

(i)    With respect to an NDS or Monthly Schedule, Buyer's nomination for months M and M+1 shall be the nomination for the same calendar month from the prior NDS and the nomination for month M+2 shall be the same as for what is then month M+1, adjusted for any difference in number of days in such month by eliminating the final day (in the case of a 28- or 30-day month) or adding an additional day that is the same as the final day (in the case of a 31-day month). For example, if Buyer fails to submit a nomination by June 5th for the months of July, August and September, the nominations for July and August shall be the same as the nominations for July and August from the prior NDS, and the nomination for September shall be the same as the nomination for August with the 31st day removed; and

(ii)    With respect to a Weekly Programme, Buyer's nomination shall be the quantities and Delivery Points for the relevant Days as set forth in the Monthly Schedule, adjusted to account for any Forced Outage, Force Majeure, or Excess Nomination applicable to such Days already communicated by Buyer to Seller.

V.4    If, during any month, Buyer determines that it no longer requires, or if Buyer is unable to receive, some or all of the quantity of Natural Gas set forth in the Monthly Schedule for such month (such quantity, the "**Excess Nomination**"), then:

(a)    Buyer shall promptly provide written notice to Seller of the quantities not needed or unable to be received;





(b)    Buyer's notice to Seller pursuant to Article V.4(a) shall not relieve Buyer of its obligation to pay for the quantities set forth in the Weekly Programme or for the Monthly Quantity pursuant to Article IX.2;

(c)    Seller shall use commercially reasonable efforts to sell the Excess Nomination, whether as Natural Gas or as LNG, at a reasonable price. If Seller is able to sell all or a portion of such Excess Nomination (such sale, a "**Mitigation Sale**"), Seller shall credit to Buyer the proceeds of such Mitigation Sale, less the reasonable, incremental out-of-pocket costs incurred by Seller in storing and transporting the Natural Gas or LNG sold, and marketing, making and performing such sale, in each case above what Seller would have incurred in making such Natural Gas available at the Delivery Point. Seller shall furnish the details of such Mitigation Sale in writing to Buyer within thirty (30) days of the date of such sale. Any sale of LNG or Natural Gas by Seller to any Third Party that Seller was already obligated to make (as of the date Seller becomes aware of the Excess Nomination) is not a Mitigation Sale. If Seller is unable to sell all or a portion of such Excess Nomination (such inability to be documented in a writing describing the market conditions that precluded such sale or made such sale commercially impracticable), Seller shall retain such quantities and credit Buyer with an amount equal to the Fuel Price for the month it would have otherwise been made available to Buyer *multiplied by* the quantity not sold; and

(d)    To the extent that an Excess Nomination is caused by a Forced Shutdown and Buyer pays for such Excess Nomination pursuant to Article V.4(b), Buyer shall be entitled to a credit (a "**Carryover Credit**") determined by multiplying the quantities in such Excess Nomination(s) caused by a Forced Shutdown by the Fuel Price for such month and then subtracting the proceeds of any applicable Mitigation Sale or credit pursuant to Article V.4(c), provided that such Mitigation Sale proceeds or credit shall be applied first to Excess Nominations not caused by a Forced Shutdown. Such Carryover Credit shall be applied to Buyer's payment obligations in the immediately subsequent six (6) months, on a first-in first-out basis.

V.5    Seller shall deliver Natural Gas to Buyer at each Delivery Point at such rates as directed by Buyer, including stopping the flow of Natural Gas, consistent with the dispatch of the applicable Generation Units. If requested by Buyer, Seller shall use reasonable efforts to deliver Natural Gas on a Day in excess of the nomination set forth in the Weekly Programme, provided that Seller shall not be liable to Buyer if, despite the use of reasonable efforts, it is unable to provide such excess Natural Gas, and provided further that the Maximum Monthly Quantity, Maximum Weekly Quantity, and Article V.3(a)(ii), and Article V.3(b) shall continue to apply.

V.6    Notwithstanding anything in this Agreement to the contrary, Buyer shall have no obligation to pay for any portion of a Monthly Schedule or Weekly Programme to the extent not made available at the proper Delivery Point.

*KD7*

20



# ARTICLE VI

## SELLER'S SHORTFALL

VI.1    If, for any reason other than the occurrence of (a) an event of Force Majeure, (b) Excess Nominations, or (c) reasons attributable to Buyer, Seller fails to deliver to Buyer on any Day the scheduled quantity of Natural Gas for such Day in the Weekly Programme in the proper quantities to each Delivery Point (such quantities not delivered or delivered to the wrong Delivery Point, the "**NG Deficiency**"), then, as Buyer's sole and exclusive remedy, and Seller's sole and exclusive liability, with respect to such NG Deficiency (subject only to Buyer's termination right pursuant to Article XV.1(c)(ii) Seller shall pay to Buyer an amount equal to (i) the NG Deficiency *multiplied by* (ii) the Diesel Contract Price for such month *minus* the Fuel Price for such month (the "**Seller Shortfall Payment**").

VI.2    Any Seller Shortfall Payment shall be due and payable by Seller to Buyer in accordance with Article XIII.

VI.3    Seller agrees that Buyer's damages associated with Seller's failure to deliver Natural Gas hereunder would be difficult to estimate, and that Article VI.1 represents a reasonable estimate of such damages.

# ARTICLE VII

## MEASUREMENT AND TESTING AND OPERATIONS

VII.1    Order of Preference for Measurement

For Delivery Points where Natural Gas metering facilities exist so as to allow for the measurement of Natural Gas pursuant to Articles VII.2 through VII.5, the methodology set forth in Articles VII.2 through VII.5 shall control for purposes of measuring the quantity and quality of Natural Gas delivered pursuant to this Agreement. For Delivery Points where Natural Gas metering facilities do not exist so as to allow for the measurement of delivered Natural Gas pursuant to Articles VII.2 through VII.5, the methodology set forth in Articles VII.6 through VII.8 shall control for purposes of measuring the quantity and quality of Natural Gas delivered pursuant to this Agreement.

VII.2    Unit of Measurement

The following guidelines shall be followed with regard to the units of measurement to be used by either Party to comply, as appropriate, with the provisions of this Agreement:

(a)    The unit for the purpose of measuring volume shall be one cubic foot of Natural Gas at a base temperature of sixty degrees (60°) F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law. Computation of volumes, including any deviation from Boyle's Law, shall comply with applicable rules, regulations, and orders promulgated by the appropriate regulatory authorities having jurisdiction. For payment purposes, the volume of Natural Gas delivered hereunder will be determined at the pressure reported by the Metering Equipment or based on fifteen (15) Day average flowing pressure corrected, if

*KDf*

21

*CH*

necessary, in the event that the Metering Equipment is inoperable or not measuring accurately, as applicable, and will be multiplied by the Btu content per cubic foot to obtain the total Btu contained within such volume of Natural Gas.

(b)   For purposes of measurement and meter calibration, the atmospheric pressure shall be assumed to be 14.73 psia, irrespective of actual elevation or location of the Delivery Point or any Metering Equipment above sea level, or variations in such atmospheric pressure from time to time.

(c)   The static pressure of the Natural Gas passing through the Metering Equipment shall be determined by the use of electronic measurement equipment or by the use of another pressure recording device reasonably acceptable to both Parties. The instantaneous static pressure measurements from the electronic measurement equipment or the arithmetic average of the temperature recorded each Day shall be used in computing Natural Gas volumes.

(d)   If Metering Equipment requiring the use of specific gravity is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined by a method according to accepted industry practice. If a recording gravitometer is used, then the arithmetic average of the specific gravity of the Natural Gas flowing through the meters shall be used in computing Natural Gas volumes. If a spot test method is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined as often as found necessary in practice. Any such test shall determine the specific gravity to be used in computation of volumes values effective the first Day of the following month and shall continue to be used until changed in a like manner by a subsequent test.

(e)   The temperature of the Natural Gas shall be determined by a recording thermometer installed so that it will record the temperature of the Natural Gas flowing through the meters, and such flowing temperature shall be corrected to Fahrenheit.

(f)   Heating Value and energy content will be measured by Seller as described in "Appendix F – Heating Value Calculation of API MPMS, Chapter 14.3." The determination of Natural Gas composition shall be in accordance with the GPA Standard 226 "Analysis for Natural Gas Chromatography" and GPA Standard 2172 "Calculation of Gross Heating Value relative density and compressibility factor for Natural Gas Mixtures from compositional analysis". The composition of the NG shall be continuously measured by on-line chromatographs installed and maintained (or caused to be installed and maintained) by Seller at Seller's sole expense. The Heating Value of the NG shall be calculated using results from the on-line chromatograph. In the event of failure of the on-line NG chromatograph, chromatograph analysis of samples collected proportional to the flow through the meters shall be Used. All electronic metering shall comply with the API Manual of Petroleum Standards, Chapter 21, Flow Measurement Using

*KDJ*

22



Electronic Metering Systems, First Edition, dated September 1993, and any subsequent modification and amendment thereof.

(g)    The energy content of all NG delivered hereunder shall be in Btu and shall equal the Standard Cubic Feet of such NG multiplied by the Heating Value of such NG.

### VII.3    Metering Equipment

Buyer plans to install ultrasonic meters at the Delivery Points for the Mobile Units, and Buyer may, at its option, install an ultrasonic meter at other Delivery Points, to measure the flow, volume and Heating Value of Natural Gas (such ultrasonic meters, the "**Metering Equipment**") in accordance with Article VII.2. Any new Metering Equipment installed by Buyer shall be designed and installed in accordance with the current recommendations of the American Gas Association. Seller shall be responsible for maintaining all Metering Equipment. If the Metering Equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(a)    by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(b)    by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

### VII.4    Verification of Metering Equipment

The following guidelines shall be followed with regard to the verification of the Metering Equipment to be used in accordance with this Agreement:

(a)    At least once each month, and from time to time upon at least two weeks prior written notice by either Party to the other, the Party responsible for maintaining such Metering Equipment shall verify or cause to be verified the accuracy of the Metering Equipment. When as a result of such test the Metering Equipment is found to be out of calibration by no more than one percent (1%) when compared to the manufacturer's specifications for such equipment, no adjustment shall be made in the amount paid by Buyer to Seller.

(b)    If the testing of the Metering Equipment demonstrates that a meter is out of calibration by more than one percent (1%) when compared to the manufacturer's specifications for such equipment, the applicable Metering Equipment reading for the actual period during which out of calibration measurements were made shall be adjusted based on the methods stated in Article VII.3 above.

(c)    If the actual period that such equipment has been out of calibration cannot be determined to the mutual satisfaction of Seller and Buyer, the adjustment shall be for a period equal to one-half of the time elapsed since the most recent test. The previous payments made by Buyer to Seller for this period shall be subtracted from the amount of payments that are calculated to have been owed

KDf

23



under this Agreement. The difference in US Dollars (which may be a positive or negative amount) shall be added to the next Monthly Invoice pursuant to Article IX.

(d)    The cost of the monthly testing and calibration of the Metering Equipment described in this Article VII.4 shall be the responsibility of the Party that maintains such Metering Equipment. The cost of any testing and calibration of the Metering Equipment beyond the monthly test permitted in this Article VII.4 shall also be the responsibility of the Party that maintains such Metering Equipment, unless the request to test any of the Metering Equipment is made by the other Party and the results of such test requested by such other Party demonstrate that the Metering Equipment is less than one percent (1%) out of calibration, in which case the cost of such testing and calibration shall be for the account of the Party that requested the test.

(e)    Each Party shall comply with any reasonable request of the other concerning the sealing of the Metering Equipment, the presence of a representative of the other Party when the seals are broken and tests are conducted, and other matters affecting the accuracy, testing and calibration of the Metering Equipment.

(f)    If either Seller or Buyer believes that there has been a failure or stoppage of any of the Metering Equipment, it shall immediately notify the other Party.

## VII.5    Availability of Readings

At the end of each Month, Seller shall make available to Buyer all readings of the Metering Equipment.

## VII.6    Measurement of LNG by Mass

(a)    The quantity of LNG delivered to any Delivery Point at which Natural Gas measurement equipment is not installed or is not functioning shall be determined using the mass of LNG loaded into each ISO Container used to deliver LNG multiplied by the heating value (in MMBtu) per unit of mass, in each case as set forth on the Loading Certificate provided by the Person loading such ISO Container, reduced to reflect Natural Gas used to vaporize LNG using the relevant Regas Equipment, as agreed by Buyer and Seller from time to time. To the extent the Parties cannot agree to such reduction, Article XX.2 shall apply.

(b)    Seller shall provide to Buyer a copy of the Loading Certificate for each ISO Container of LNG delivered pursuant to this Agreement.

(c)    If an ISO Container is determined to still contain LNG after retrieval by Seller, Seller shall credit to Buyer on the next Monthly Invoice an amount equal to the quantity of LNG remaining in such ISO Container (in MMBtu) *multiplied by* the Fuel Price applicable to the LNG delivered in such ISO Container and provide to Buyer documentation supporting such calculation.

24



VII.7    Determination of LNG Quality

The quality of LNG in any ISO Container and Natural Gas delivered from such ISO Container shall be as set forth in the Loading Certificate for the loading of such ISO Container.

VII.8    Periodic inspections and calibrations

Seller shall ensure that all contracts or terms and conditions pursuant to which LNG loading activities occur require such periodic inspections and calibrations of the equipment for determining mass and quality as would be performed by a Reasonable and Prudent Operator. If such equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of LNG or Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(a)    by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(b)    by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

Any corrections shall be reflected in the next Monthly Invoice.

VII.9    Preservation of Records

Seller or Buyer, as applicable, shall preserve or cause to be preserved for a period of at least three (3) years following the expiration of this Agreement all test data, charts, and other similar records regarding the measurement of LNG or Natural Gas delivered in accordance with this Agreement.

VII.10    ISO Containers

Seller shall ensure at all times that ISO Containers used in the performance of this Agreement are in compliance with all Applicable Laws, are compatible with the Regas Equipment, and are fit for the purpose of meeting Seller's obligations under this Agreement.

**ARTICLE VIII**

**RISK AND INDEMNITY**

VIII.1    Supply Period. The following indemnities shall apply during the Supply Period to the fullest extent permitted under Applicable Law:

(a)    **SELLER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE BUYER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas and LNG), in each case directly or indirectly arising out of, incident to, or in connection with, Seller's delivery of Natural Gas and LNG, operation and maintenance of the

25

*KDF*

*CH*

Regas Equipment, and retrieval of ISO Containers, **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF SELLER.**

(b)     **BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE SELLER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas and LNG), in each case directly or indirectly arising out of, incident to, or in connection with, Buyer's operation of any Generation Units, **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF BUYER.**

(c)     **SELLER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE BUYER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said Natural Gas or LNG or other charges thereon which attach before title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the Natural Gas or LNG before the Delivery Point.

(d)     **BUYER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE SELLER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said LNG or other charges thereon which attach after title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the LNG from and after the Delivery Point.

VIII.2   Title to Natural Gas. The Natural Gas to be sold by Seller and purchased by Buyer in accordance with this Agreement shall be transported to the site of each Delivery Point in ISO Containers, or such other means agreed by the Parties, and vaporized using the relevant Regas Equipment at the nominated Delivery Point(s). Title to Natural Gas, and the risk of loss or contamination of such Natural Gas, shall pass from Seller to Buyer upon the delivery of Natural Gas to the Delivery Point.

VIII.3   Notice and Defense. Any Person indemnified hereunder will, as soon as practicable after receiving notice of any suit brought against it within this indemnity, furnish to the indemnifying Party the full particulars within its knowledge thereof and will render all reasonable assistance requested by the indemnifying Party in the defense of any Claims. Each indemnified party will have the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and/or settlement thereof without relieving the indemnifying Party of any obligations hereunder; *provided, however*, that an indemnifying Party that has acknowledged its indemnity obligations with respect to

*KDF*

26

*CH*

any Claim will have control over the defense and settlement of such Claim, as long as the settlement does not impose any obligations on the indemnified parties.

VIII.4 <u>Excluded Losses.</u> Notwithstanding any other provision of this Agreement, (1) in no event shall either Party be liable to the other Party for (a) any indirect, special, incidental or consequential losses, damages, liabilities or expenses, (b) loss of profits or revenue; loss of use; loss of power; cost of replacement power; loss by way of shutdowns; costs of substitute facilities, goods or services; loss of opportunity or loss of goodwill, whether or not constituting losses, damages, liabilities or expenses contemplated by <u>Article VIII.4(a)</u>, or (c) claims of upstream or downstream customers or service providers to either Party for any of the aforementioned categories of damages (collectively, "Excluded Losses") howsoever arising, (2) Seller waives and shall indemnify Buyer Group from and against Claims by members of Seller Group for Excluded Losses, and (3) Buyer waives and shall indemnify Seller Group from and against Claims by members of Buyer Group or by any of its Financing Entities for Excluded Losses, in each case, except to the extent that Seller's express remedies pursuant to Article V or Buyer's express remedies pursuant to Article VI (including but not limited to any Seller Shortfall Payment) may be construed as constituting or compensating for Excluded Losses.

VIII.5 <u>Third Party Beneficiaries.</u> The provisions of this Agreement are intended for the sole benefit of Buyer and Seller and there are no third-party beneficiaries hereof, other than indemnitees pursuant to this Article VIII, each of whom is hereby made a third party beneficiary to this Agreement, with direct enforcement rights against the relevant indemnitor, solely for the purpose of enforcing (or relying upon as a defense) the indemnification provisions under which it is a member of the indemnified group.

## ARTICLE IX

## INVOICING AND PAYMENT

IX.1    The "**Fuel Price**" to be paid for each MMBtu of Natural Gas delivered in a month during the Supply Period shall be determined by the formula:

$$FP = ((1 - BD) \times DP) / 5.8$$

where:

FP = the Fuel Price in US$ per MMBtu;

BD = zero decimal two seven (0.27) and

DP, or "Diesel Price" = DCP / 100 x 42, where:

DCP = the Diesel Contract Price for vessel delivery for such month in cents per gallon.

IX.2    With respect to each month during the Supply Period, Seller shall invoice Buyer for

27

*KDf*

*CH*

(a)   The sum for each Day of the previous calendar month of (i)(A) the quantities of Natural Gas nominated for delivery on such Day in the Weekly Programme (in MMBtu) less (B)any NG Deficiency and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure (such amount, with respect to a month, the "**Adjusted Nominated Quantity**") *multiplied by* (ii) the Fuel Price for such month; *plus*

(b)   The sum, for each Delivery Point to which Seller delivered Natural Gas, of the Logistics Surcharges; *plus*

(c)   (i) Any additional quantities Seller agreed to deliver pursuant to Article V.3(a)(ii) less any such additional quantities Seller fails to deliver and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure *multiplied by* (ii) the agreed price for such quantities; *minus*

(d)   Any credit due pursuant to Article VII.6(c); *plus*

(e)   The result, if greater than zero, of (i) the Monthly Quantity *minus* sum of the quantities of Natural Gas scheduled for delivery on each Day of such month in the Weekly Programme, *multiplied by* (ii) the Fuel Price; *plus*

(f)   Whatsoever other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time. Buyer certifies that the funds for the payments of Services rendered under this Agreement come from budgetary allocations. All payments made under this Agreement will be charged to Buyer's budget account number 1-2321-23215-000-000.

IX.3   Seller shall prepare and shall give to Buyer by the tenth (10th) Day of each calendar month an invoice (the "**Monthly Invoice**"), which shall show in respect of the preceding calendar month (or, in the case of (e), with respect to any prior calendar month) the following information:

(a)   The Fuel Price for such month *multiplied by* the Adjusted Nominated Quantity;

(b)   The Logistics Surcharges for each Delivery Point to which Natural Gas was delivered (including, for each Delivery Point, a breakdown of the Logistics Factor, quantity delivered, and applicable miles set forth in Exhibit B);

(c)   Any additional quantities Seller agreed to deliver pursuant to Article V.3(a)(ii) less any such additional quantities Seller failed to deliver and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure *multiplied by* the price applicable to such quantities;

(d)   The proceeds from any Mitigation Sale or other sale of (or credit from) any Excess Nomination;





(e)     Any quantities of LNG remaining in an ISO Container where the mass of such ISO Container was used in the calculation of Natural Gas delivered *multiplied by* the Fuel Price for such month;

(f)     The amount of any Carryover Credit that, pursuant to Article V.4(d), Buyer is entitled to apply to the applicable Monthly Invoice;

(g)     The result, if greater than zero, of (i) the Monthly Quantity *minus* the sum of the quantities of Natural Gas scheduled for delivery on each Day of such month in the Weekly Programme *multiplied by* (ii) the Fuel Price;

(h)     Other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time;

(i)     The net amount payable by Buyer to Seller, which shall be (a) *plus* (b) *plus* (c) *minus* (d) *minus* (e) *minus* (f) *plus* (g) *plus* (h);

(j)     A breakdown of the amount of each tax listed on Exhibit F that is included in any of (a) through (j), the calculation of such amount, and supporting documentation; and

(k)     The following certification (adjusted for this Agreement):

*"We certify under penalty of nullity that no public servant of the Puerto Rico Electric Power Authority shall derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement by and among the Puerto Rico Electric Power Authority ("PREPA") and [Seller] dated [●] (the "Agreement"). The only consideration to be received for the supply of Natural Gas (as defined in the Agreement) are the agreed-upon Fuel Price that has been negotiated with PREPA as specified in the Agreement. The total amount shown on this invoice is true and correct. The Natural Gas was delivered, and no payment has been received.*

*Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Agreement.*

*By:*

*Name:*

*Title:"*

Buyer shall provide written notice to Seller of any irregularity in a Monthly Invoice submitted by Seller within twenty (20) Days of Buyer's receipt thereof, failing which such Monthly Invoice will be deemed to have been properly prepared and submitted.

*KDf*

29



IX.4    Subject to Article IX.6 and Article IX.13, Buyer shall pay the amount to Seller due in accordance with such Monthly Invoice.

IX.5    If Seller incurs a liability to Buyer for failing to deliver Natural Gas pursuant to Article VI, then Buyer shall send to Seller (following the end of the applicable month) an invoice and reasonable supporting documentation showing the amount payable by Seller in accordance with Article VI.

IX.6    The total amount to be paid by Buyer during the Initial Term or during an Extension Term in no event shall exceed one billion one hundred forty-seven million dollars ($1,147,000,000) (the "**Contract Ceiling**"). Seller shall not exceed the Contract Ceiling without prior written approval by Buyer, as evidenced by a written amendment to this Agreement. Notwithstanding any other provision of this Agreement, Buyer will not pay and shall have no obligation to pay amounts in excess of the Contract Ceiling, and Seller exceeds the Contract Ceiling at its own risk. Seller shall inform Buyer when accrued fees and expenses under this Agreement for the Initial Term or an Extension Term reach fifty percent (50%), seventy-five percent (75%), ninety percent (90%), and one hundred percent (100%) of the Contract Ceiling.

IX.7    Promptly following the end of each Contract Year, Seller shall deliver to Buyer an invoice comparing the sum of the Adjusted Nominated Quantity with respect to each Day of such Contract Year *plus* the sum of all NG Deficiencies for such Contract Year *plus* the sum of all Natural Gas quantities not delivered by Seller or not received by Buyer due to Force Majeure ("**Annual Quantity Taken**") to the Minimum Volume Commitment. If the Annual Quantity Taken is less than the Minimum Volume Commitment, Seller shall send to Buyer an invoice reflecting the quantity by which the Annual Quantity Taken is less than the Minimum Volume Commitment *multiplied by* the arithmetic mean of the Fuel Price for each month of such Contract Year and Buyer shall pay such amount to Seller, subject to Article IX.13 and *provided that* such amount shall be considered as occurring during the Contract Year to which the calculation of the Annual Quantity Taken applies for purposes of determining whether the Contract Ceiling has been exceeded and Article IX.6 shall continue to apply to such amount.

IX.8    If any sums are due from one Party to the other Party, except for reasons addressed in Articles IX.1 and IX.5, then the Party to which such sums are owed shall furnish to the other an invoice describing in reasonable detail the basis for the invoice and providing relevant supporting documentation.

IX.9    In respect of any invoice issued pursuant to this Article IX, Buyer or Seller, as the case might be, shall pay the amount due within thirty (30) Days after physical receipt of a properly submitted invoice.

IX.10   Buyer may, upon prior written notice to Seller, offset any amount due and payable from Seller to Buyer against any amount due and payable to Seller hereunder.

IX.11   Payment of amounts due to one Party from the other Party shall be made by wire transfer in immediately available funds into the bank account nominated from time to time by the Party to which the funds are owed. Each payment of any amount owing hereunder shall be for the full amount due,

*KDF*

30



DocuSign Envelope ID: 4F0D6585-842D-4729-ABC0-D9D933F20F6F

without reduction, withholding or offset for any reason (including any exchange charges, bank transfer charges or other fees or Taxes). Until further notice, the bank account for Seller is as follows:

<u>**SELLER**</u>:    **Bank Name: Bank of America**

**Bank Account #: 446026663797**

For payments to Buyer, Seller shall request from Buyer wire instructions prior to transferring any funds to Buyer and shall provide Buyer bank confirmation upon completion of each such transfer.

IX.12   If any Party fails to pay the other Party the full amount of any invoice due by the due date (a) such Party shall also pay interest thereon to the other Party for the period commencing from and including the due date until and including the Day when payment is made. Interest shall be calculated at the rate of the Prime Rate percentage rate per annum, but no greater than the maximum amount allowable by law, and (b) where Buyer is the defaulting Party, Seller may suspend Natural Gas deliveries five (5) Business Days after delivering written notice of such past due amounts until the relevant amount is paid in full.

IX.13   If a Party disagrees in good faith with any invoice, such Party shall pay the undisputed amount by the due date thereof and shall immediately notify the other Party of the reasons for its disagreement. An invoice may be contested by the Party that received it, or modified by the Party that sent it, by written notice delivered to the other Party within a period of one hundred eighty (180) Days after such receipt or sending, as the case may be. If no such notice is served within such period of one hundred eighty (180) Days, such invoice shall be deemed correct and accepted by both Parties. Promptly after resolution of any Dispute as to an invoice, the amount due shall be paid by Seller or Buyer, as the case may be, to the other Party, together with interest thereon at the rate provided in Article IX.12 from the date payment was due to the date of payment.

IX.14   No later than fifteen (15) Days after the Effective Date, Seller shall deliver or cause to be delivered to Buyer either (i) a parent guarantee issued by a Creditworthy Parent to Buyer in the form set forth in Exhibit C or (ii) a bond issued by a surety authorized to do business and issue surety bonds in Puerto Rico, naming Buyer as beneficiary, with a value of at least five percent (5%) of the Contract Ceiling in the form set forth in Exhibit D.

IX.15   Invoices under this Agreement shall be delivered to the following addresses and deemed received on the date (i) personally delivered to the respective party or (ii) receipt is evidenced by certified or registered mail:

<u>**SELLER**</u>:    NFEnergía LLC
c/o New Fortress Energy Inc.
111 W 19th St., 8th Fl.
New York, NY 10011
Attention: Accounts Payable
Email: accountspayable@newfortressenergy.com

31

KDf

CH

**BUYER**:      PREPA
                c/o Genera PR LLC, agent of PREPA
                Fuels Office
                250 Muñoz Rivera, Ave., Suite 1200 San Juan, Puerto Rico 00918

Attention:    Jose L. Carrasco, Fuels Manager
E-mail:       legal@genera-pr.com

IX.16   Law 127 - 2004: Contract Registration in the Comptroller's Office of Puerto Rico Act

Seller acknowledges that payment under this Agreement will not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

## ARTICLE X

## DUTIES, TAXES AND CHARGES

Each of Seller and Buyer shall be responsible for the payment of all taxes, fees, levies, royalties, duties, penalties, licenses, and other charges imposed by any Governmental Authority ("**Taxes**") which it incurs and for which it is legally responsible for as a result of complying with this Agreement and which correspond to such Party under all applicable tax regulations and laws in force at the Effective Date and throughout the Term in each of the jurisdictions relevant to this Agreement connected to the Parties. If Buyer is required to remit or pay Taxes that are Seller's responsibility hereunder, Seller shall promptly reimburse Buyer for such Taxes. Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof. Buyer shall cooperate and use commercially reasonable efforts to provide to Seller such information and execute and deliver such documents reasonably requested, to the extent not otherwise detrimental to Buyer, in connection with Seller's efforts to obtain any available tax exemptions and/or incentives under applicable tax regulations and laws in force at the Effective Date and throughout the Term.

X.1     For the avoidance of doubt and notwithstanding the above,

(a)     Seller represents and warrants that it is the importer of record for all Natural Gas and LNG delivered hereunder and shall be responsible for entry and entry summary filings as well as the payment of associated duties, Taxes and fees, if any, and all applicable record keeping requirements.

(b)     Seller represents and warrants that Exhibit F (in this agreement) includes a true and correct list of all Taxes and the applicable amount or tax rate that Seller has included in or intends to recover from the Fuel Price or otherwise in connection with this Agreement. Buyer shall have no obligation to pay to Seller any amounts for Taxes (including, but not limited to, excise taxes, sales taxes or any charge levied by a Government Authority on facilities used for the performance of this Agreement) not included in the Fuel Price. If any tax listed on Exhibit F

KD7

CH

(in this agreement) decreases or ceases to apply to the transactions under this Agreement at any time during the Term, such revised tax, tax amount, or tax rate shall automatically apply immediately upon becoming effective, *mutatis mutandis*.

## ARTICLE XI

## FORCE MAJEURE

XI.1    Neither Seller nor Buyer shall be liable for any failure to perform or for omission or delay in the performance of any of its obligations under this Agreement, other than the obligation to make payments of money when due, if and to the extent that the affected Party's performance is prevented, delayed or interfered with by an act, event or circumstance, or combinations of events or circumstances, whether of the kind described herein or otherwise, that is not reasonably within its control, such Party having acted as a Reasonable and Prudent Operator and which effects could not be prevented or overcome by the exercise of due diligence ("**Force Majeure**").

For the avoidance of doubt, provided that the requirements set out in the preceding paragraph are met, events of Force Majeure shall include but not be limited to the following:

(a)    loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the facility for receiving and/or loading LNG in Puerto Rico.

(b)    loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of any of the Generation Units;

(c)    any act or omission of a Governmental Authority of the United States of America (including any Puerto Rican Governmental Authority), including refusal or failure to issue, delay in issuing, or amendment, revocation, or suspension of, any Permit; and

(d)    any act of God, lightning, storm, typhoon, hurricane, tornado, earthquake, fires, floods, tsunami, landslide, soil erosion, subsidence, washout, shipwreck, navigational and maritime perils, acts of any Governmental Authority or compliance with such acts; explosions, acts of the public enemy, wars (whether declared or undeclared), terrorism or threat thereof, civil war, piracy, civil and military disturbances, strikes, blockades, insurrections, riots, epidemics and quarantine restrictions; strike, lockout or other industrial disturbances involving an enterprise other than a Party, its transporter or its agents or sub-contractors in connection with its performance of this Agreement; radioactive contamination or ionizing radiation; or breakdown or unavailability of port facilities or port services (including the channel, tugs or pilots).

XI.2    Notwithstanding the foregoing provisions of Article XI.1, the following shall not be events of Force Majeure:

(a)    events arising out of market decline, market failure, industry economic conditions, or general economic conditions;

*KD7*

33



(b)     the failure by a Party to obtain or the withdrawal of any authorization, approval, permit or permission of any Governmental Authority, because the Party claiming Force Majeure failed to act as a Reasonable and Prudent Operator in connection with its efforts to obtain or maintain such authorization, approval, permit, or permission.

XI.3    In the event of any failure or delay of a Party's performance due to the occurrence of a Force Majeure event, the affected Party shall use commercially reasonable efforts (acting as a Reasonable and Prudent Operator) to resume as soon as possible full performance of its obligations under this Agreement, provided that the settlement of strikes or boycotts, lockouts or other industrial disputes, or obstructive action by organizations or local inhabitants, shall be entirely within the discretion of the Party concerned.

XI.4    A Party intending to seek relief under this Article XI shall as soon as reasonably practicable after it becomes aware of the occurrence of a Force Majeure event:

(a)     notify the other Party of the occurrence of an event that it considers may subsequently lead it to claim Force Majeure relief under this Agreement, describing such event, in as much detail as is then reasonably available, and the obligations, the performance of which has been or could be delayed, hindered or prevented thereby, and the estimated period during which such performance may be suspended or reduced, including (to the extent known or ascertainable) the estimated extent of such suspension or reduction in performance; the obligations which could or have been actually delayed or prevented in performance and the estimated period during which such performance may be suspended or reduced, including (to the extent know or ascertainable) the estimated extent of such suspension or reduction in performance;

(b)     give a bona-fide good faith estimate of when it shall be able to resume full performance of its obligations; and

(c)     give the particulars of the programme to be implemented, if any, to resume full performance hereunder subject to any Third Party confidentiality obligations.

Such notices shall thereafter be supplemented and updated at reasonable intervals during the period of such Force Majeure, specifying the actions being taken to remedy the circumstances causing such Force Majeure and the date on which such Force Majeure is expected to terminate.

XI.5    If any Party claims relief under this Article XI, it shall allow reasonable access to the other Party, upon such other Party's written request, to examine the scene of such event or circumstance which gave rise to the Force Majeure claim, provided that the Party not claiming relief under this Article XI shall bear the cost, expense and risk of examining such site.

XI.6    Where an act, event or circumstance prevents, impedes or delays a Party's performance hereunder, even if such act, event or circumstance primarily affects a Third Party or Third Parties, it shall constitute Force Majeure hereunder as to Seller or Buyer, as appropriate, if and to the extent that it is of a kind or character that, if it had happened to a Party, would have come within the definition of Force Majeure under this Article XI.

KD7

34



XI.7    Force Majeure takes effect at the moment a Force Majeure event occurs, not upon giving notice. A Party whose performance is excused by Force Majeure shall not be required, during the period in which the circumstances of the Force Majeure event are continuing, to incur uneconomic cost, make additional investments in new facilities, or bring into production existing or potential reserves not already flowing in support of this Agreement.

XI.8    If the Force Majeure event lasts for a period such that Seller is prevented from or delayed in performing its obligations hereunder for a period of ninety (90) consecutive Days (or, where Seller is not using commercially reasonable efforts to overcome the relevant Force Majeure (which Seller must show by providing a weekly report to Buyer describing its efforts to overcome such Force Majeure), sixty (60) consecutive Days) or more from the date on which the Force Majeure event first occurred, Buyer shall have the right to terminate this Agreement without liability to Seller by giving written notice to Seller.

## ARTICLE XII

## REPRESENTATIONS, WARRANTIES AND LIABILITIES

XII.1    Each Party hereby represents and warrants to the other Party that, as of the Effective Date:

(a)    With regard to Seller, it is a corporation or limited liability company duly formed, validly existing and in good standing under the laws of the state and/or country of its incorporation or organization, and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(b)    With regard to Buyer, it is a Puerto Rico public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(c)    With regard to Buyer, all necessary consents and approvals required by Applicable Law (including PROMESA) from any relevant Governmental Authority (including, as an example, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority, and Buyer's Governing Board) to all of the terms and conditions of this Agreement have been obtained prior to the Effective Date.

(d)    With regard to Buyer, all amounts payable to Seller under this Agreement are "Current Expenses" as defined in the Trust Agreement and are reasonable and necessary expenses related to the maintenance, repair and operation of the Generation Units, and are consistent with standard practices for public utility systems and with Buyer's standard business operations performed in maintaining and operating its system.

*KDf*



(e)     Such Party has all requisite power and authority to conduct its business, to own or lease and operate its properties, and to execute, deliver, and perform its obligations under this Agreement.

(f)     The execution, delivery and performance by such Party of this Agreement has been duly authorized by all necessary corporate action on the part of such Party and do not (i) require any consent or approval of any Governmental Authority, such Party's governing body or any other Person, other than those that have been obtained, or the failure to obtain, of which would not have, or could not reasonably be expected to have, a material adverse effect on such Party's ability to perform its obligations hereunder, (ii) violate any provision of such Party's Articles of incorporation or by-laws, or other organizational documents, or any Applicable Law in effect, or (iii) result in a breach of or constitute a default under such Party's organizational documents or other material indentures, contracts or agreements to which it is a part or by which it or its properties may be bound.

(g)     This Agreement is a legal, valid, and binding obligation of such Party enforceable against such Party, as appropriate, in accordance with its terms.

XII.2    Seller warrants that it has good title to or good right to deliver, all Natural Gas delivered hereunder and that all Natural Gas delivered to Buyer at the Delivery Points shall be free and clear of all liens, security interests, charges, assessments encumbrances and adverse claims whatsoever. Seller makes no representation or warranty, written or oral, express or implied that the Natural Gas will be fit for a particular purpose, or will be of merchantable quality, and all such representations and warranties are expressly excluded to the fullest extent permitted by law, but nothing in this Article XII.2 affects the requirement that all Natural Gas delivered to Buyer under this Agreement will meet the Specifications.

XII.3    Seller shall take, or cause to be taken, all necessary actions to start Natural Gas deliveries from the first Day of the Supply Period including the execution of contracts for the use of any appropriate Regas Equipment and the design and construction of any facility or its elements situated upstream of the Delivery Point.

XII.4    Buyer shall take, or cause to be taken, all necessary actions to commence taking delivery of Natural Gas from the first Day of the Supply Period including the design and construction of any facility or its elements situated downstream of the Delivery Point.

XII.5    Seller's sole and exclusive liability, and Buyer's sole and exclusive remedy, for failure by Seller to deliver Natural Gas in accordance with this Agreement will be limited to the payment of the amounts detailed in Article VI, subject only to the additional remedies available to Buyer in the circumstances described Article XV.1(c)(ii).

## ARTICLE XIII

## ASSIGNMENT

This Agreement, as well as any rights, duties, liabilities, or obligations under it, may not be assigned, transferred, subcontracted, hypothecated, or otherwise disposed of by Seller without the

*KDf*

36



prior written consent of Buyer, except that Seller and its assigns may without such consent assign all or a portion of their rights and interests under this Agreement (including any collateral) in connection with any securitization or bank funding arrangement entered into by Seller or an assignee of Seller. Seller acknowledges that, other than assignments in connection with any securitization or bank funding arrangement entered into by Seller or an assignee of Seller, Buyer does not favor requests for assignment, transfer, subcontracting, hypothecation, or other types of disposal of this Agreement and/or duties or obligations under it, and will have reasonable grounds not to approve any request to that effect, unless, in the business judgment of Buyer, the particular circumstances of the request warrant its approval and the assignment, transfer, subcontracting, hypothecation, or disposal does not operate against Buyer's best interests.

## ARTICLE XIV

## SUBCONTRACTORS

No subcontract shall be considered for Buyer's approval, except when the following requirements are met: (i) Seller delivers Buyer a copy of the subcontract, not less than thirty (30) days prior to the effective date of the proposed subcontract; (ii) the subcontract includes, as a condition for its legal validity and enforceability, a provision whereby Buyer has the right to substitute, subrogate, or assume Seller's rights under the subcontract, in the event that Buyer declares Seller in breach or default of any of the Contract terms and conditions; (iii) the subcontract includes, as a condition for its validity and enforceability, a provision establishing for the subcontractor the obligation to comply with all Seller's obligations under this Agreement (a mirror image clause), except for such obligations, term, and conditions which exclusively relate to works or services not included under the subcontract. Consent to assignment or subcontracting under this Article shall not relieve Seller of its full responsibilities under this Agreement, nor be construed as an approval of the terms of said assignment or subcontract. Seller shall be responsible for all services performed by its subcontractors, employees, agents or assignees, whose performance Seller shall ensure complies with the provisions of this Agreement.

## ARTICLE XV

## TERMINATION

XV.1   This Agreement may be terminated if any of the following circumstances occur:

(a)     the mutual agreement of the Parties;

(b)     by Buyer, in its sole discretion, upon giving written notice to Seller, such termination to take effect on the date set forth in such notice, which shall be no less than ten (10) Days from the delivery of such notice ("**Termination for Convenience**"); or

(c)     if a Termination Event on the part of either Party (the "**Defaulting Party**") has occurred, the other Party (and in the case of paragraph (ii) below, Buyer only) may at any time after which such Termination Event has occurred or during which such Termination Event is otherwise continuing, terminate this

37

*KD7*

*CH*

Agreement by giving written notice of termination to the Defaulting Party in accordance with this Article XIX, with such termination to take effect as from and including the date of such notice. The following shall each constitute a termination event (a "**Termination Event**"):

(i)    if any undisputed amount in excess of One Million Dollars ($1,000,000.00) payable by the Defaulting Party under this Agreement has not been paid in full by the due date for the payment of the relevant invoice and the other Party has (after such due date) given notice to the Defaulting Party requiring payment of such amount and the amount has not been paid in full within ten (10) Business Days after the date of such notice;

(ii)   in the case of Seller as the Defaulting Party, Seller abandons performance of all of its obligations under the Agreement and does not take material steps to recommence such performance within three (3) days of written notice from Buyer that it believes Seller has so abandoned;

(iii)  if the Defaulting Party is unable to pay, suspends payment of, or agrees to a moratorium (or threatens any of the foregoing with respect to all or a material part of its debts), makes a general assignment or any composition or compromise with or for the benefit of its creditors except to the extent otherwise permitted by this Agreement, takes any proceedings with view to a readjustment, rescheduling or deferral of all or a substantial part of its indebtedness (other than in the case of a refinancing, but the commencement and pendency of the Title III Case shall not be considered a Termination Event, except that if any order has been entered by the Title III Court or any other Governmental Authority providing for the appointment of a receiver, custodian, or similar fiduciary for Buyer or any material portion of its property, the entry of any such order shall be considered a Termination Event);

(iv)   if any order is made, or a petition is presented and not withdrawn within a period of twenty-one (21) Days, for the winding-up, liquidation, dissolution, custodianship or administration (or any equivalent proceedings) of the Defaulting Party;

*provided, however*, that if the circumstances of such Termination Event are cured by the Defaulting Party within the notice period (if any) provided for such Termination Event, such termination notice shall be deemed withdrawn and this Agreement shall not terminate; or

(v)    in the case of Seller as Defaulting Party, Seller breaches the representations and certifications in Article XXVIII.1 or fails to comply with Article XXVIII.2.

38

*KD7*

*CLF*

XV.2  On and at any time after the occurrence of a Termination Event, any Party not subject to such Termination Event may, while such Termination Event subsists, by giving five (5) Days written notice of its intentions to the Defaulting Party, suspend performance of its obligations under this Agreement. Where the Defaulting Party is Buyer, any such suspension by Seller shall not constitute a failure by Seller to make quantities of Natural Gas available for sale and delivery pursuant to the terms of this Agreement during such period of suspension, and Buyer shall have no rights in respect of such suspended deliveries during such period of suspension. Where the Defaulting Party is Seller, any such suspension by Buyer shall not constitute a failure by Buyer to take delivery of quantities of Natural Gas pursuant to the terms of this Agreement during such period of suspension, and Seller shall have no rights in respect of such suspended deliveries during such period of suspension. If such Termination Event is remedied thereafter (including, with respect to any late payments, payment in full of any such outstanding amounts together with interest thereon), prior to the exercise of rights under Article XV.1 the notice of suspension served under this Article XV.2 shall be deemed to be revoked automatically.

XV.3  The termination of this Agreement under this Article XV for any reason shall be without prejudice to the rights and remedies of the terminating Party accrued prior to such termination under this Agreement, including in respect of any antecedent breach (whether or not a repudiatory breach) giving rise to such termination.

XV.4  In the event that this Agreement is terminated pursuant to a Termination for Convenience, Buyer shall pay to Seller US $zero ($0).

XV.5  **To the fullest extent permitted under Applicable Law, each Party hereby irrevocably waives any right it might otherwise have, for any reason, to equitable rescission of this Agreement.**

## ARTICLE XVI

## NOVATION

Buyer and Seller expressly agree that no amendment or change order which could be made to this Agreement, during its term, shall be understood as a contractual novation, unless both Parties agree to the contrary, specifically and in writing. The previous provision shall be equally applicable in such other cases where Buyer gives Seller a time extension for the compliance with any of its obligations under this Agreement or where Buyer dispenses the claim or demand of any of its credits or rights under the Agreement.

## ARTICLE XVII

## CHANGE IN LAW

During the term of this Agreement, any change in law, including, but not limited to changes in applicable tax law, which causes an increase in Seller's costs when supplying the products or services to be acquired by Buyer, shall be Seller's responsibility and Buyer shall not be obliged to make additional payments nor to pay additional sums to the price or canon originally agreed for those products or services.

*KD7*



# ARTICLE XVIII

## APPLICABLE LAW

This Agreement, the Confirmation(s) and any other document specifically incorporated into it shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Other than matters relating to the PREPA Bankruptcy, which shall be heard and determined in the United States District Court for the District of Puerto Rico, the Parties expressly agree that all actions and proceedings arising out of or relating to this Agreement shall be heard and determined in the courts of the Commonwealth of Puerto Rico, and the Parties hereby irrevocably submit to the jurisdiction of such court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The Parties hereby irrevocably waive all rights to trial by jury in any action, proceeding or counterclaim (whether based in contract, tort or otherwise) arising out of or relating to this Agreement or the actions of any Party or their respective representatives in the negotiation or performance hereof.

# ARTICLE XIX

## CODE OF ETHICS

Each Party represents and warrants that, in connection with this Agreement:

XIX.1 It has implemented adequate internal procedures designed to ensure that it shall not authorize the giving or offering of any financial or other advantage with the intention of inducing or rewarding any individual or entity to improperly perform an activity undertaken in the course of an individual's employment or connected to an entity's business activities (the "**Anti-Corruption Controls**"); and

XIX.2 It has not authorized and it will not authorize, in connection with the performance of this Agreement, any financial or any other advantage to or for the benefit of any public official, civil servant, political official, candidate for office, or any other public or private individual or entity where such authorization would violate the Anti-Corruption Controls.

# ARTICLE XX

## SETTLEMENT OF DISPUTES

XX.1    Exclusive Jurisdiction

(a)    Any claim, dispute, disagreement or controversy (each, a "**Dispute**") that arises between the Parties under this Agreement or that is otherwise related to the subject matter of this Agreement, except for those Disputes to be resolved through Expert determination pursuant to Article XX.2 below, shall be resolved exclusively in the Federal District Court for the District of Puerto Rico.

(b)    In the event of such Dispute, each Party shall continue performing its obligations hereunder except to the extent such obligations have been properly suspended

40

*KD7*



pursuant to the terms hereof. For the avoidance of doubt, Buyer shall continue paying undisputed amounts due under Article IX.

## XX.2    Expert Determination

Any Dispute that arises between the Parties with respect to (i) the determination of quality under Article IV, or (ii) Article VII may be referred by either Party to an Expert for such Expert's determination of such Dispute, disagreement or other matter of interpretation in accordance with the following guidelines:

(a)    The Parties hereby agree that such determination shall be conducted expeditiously by an Expert selected unanimously by the Parties.

(b)    The Expert shall not be deemed to be acting in an arbitral capacity.

(c)    The Party requesting that any matter arising under Article IV or Article VII of this Agreement be referred to an Expert shall give the other Party notice of such request. If the Parties are unable to agree on the identity of an Expert within ten (10) Days after receipt of the notice of request for an Expert determination, then, upon the request of any of the Parties, the International Centre for Expertise of the International Chamber of Commerce shall appoint such Expert and shall administer such Expert determination through the ICC's Rules for Expertise.

(d)    The Expert shall be and remain at all times wholly impartial as between the Parties, and, once appointed, the Expert shall have no *ex parte* communications with either of the Parties concerning the Expert determination or the underlying Dispute.

(e)    The Expert procedure shall take place in San Juan, Puerto Rico in English.

(f)    Both Parties agree to cooperate fully in the expeditious conduct of such Expert determination and to provide the Expert with access to all facilities, books, records, documents, information and personnel necessary to make a fully informed decision in an expeditious manner.

(g)    Before issuing a final decision, the Expert shall issue a draft report and allow the Parties to comment on it.

(h)    The Expert shall endeavor to resolve the Dispute within thirty (30) Days (but no later than sixty (60) Days) after his appointment, taking into account the circumstances requiring an expeditious resolution of the Dispute.

(i)    The Expert's decision shall be final and binding on the Parties.

*KDf*

41



XX.3  <u>Qualification of Experts</u>

(a)  No Person, without the prior written agreement of the Parties, shall be appointed as an Expert pursuant to <u>Article XX.2</u> if such Person:

(i)  is (or has been at any time within ten years preceding notice of the Dispute) an employee of a Party or of an Affiliate of a Party;

(ii)  is (or has been at any time within five years preceding notice of the Dispute) a consultant or contractor of a Party or of an Affiliate of a Party;

(iii)  holds any significant financial interest in a Party; or

(iv)  does not have at least ten years' experience advising or working in the North American NG industry with respect to the subject matters subject to the Expert's determination under <u>Article XX.2</u>.

(b)  The Parties shall, within two months after the Effective Date, agree on a list of possible Experts for purposes of <u>Article XX.2</u>; *provided, however,* that in the event that the Parties are unable to agree on a list of acceptable Experts, then in the event of a Dispute subject to Expert determination pursuant to <u>Article XX.2</u> the Expert shall be appointed by the International Centre for Expertise of the International Chamber of Commerce in accordance with <u>Article XX.2</u>.

## ARTICLE XXI

## NON-WAIVER

Delay or failure to exercise any right, power or remedy accruing to any Party as the result of any breach or default hereunder shall not impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or Default.

## ARTICLE XXII

## CONFIDENTIALITY

XXII.1 Any information directly or indirectly disclosed or furnished, whether orally, in writing or in electronic, digital or any other form, by either Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Disclosing Party**") to the other Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Receiving Party**") in connection with this Agreement (or in connection with the terms and conditions or the negotiation of any other agreement or document related to this Agreement or to is subject matter either between the Parties or otherwise) which is not:

(a)  already known to the Receiving Party; or

(b)  already in the public domain (other than in violation of the terms of this <u>Article XXII.1</u>), such information being "**Confidential Information**," shall,

*KDF*

42



unless otherwise agreed in writing by the Parties, be kept confidential and shall not be sold, traded, published or otherwise disclosed to any Third Party in any manner whatsoever (except as provided in Article XXII.2) by the Receiving Party. For the avoidance of doubt, the terms of this Agreement may be made public pursuant to Applicable Law.

XXII.2 The Receiving Party may disclose Confidential Information to the following Persons without the consent of the Disclosing Party:

(a)     To the Receiving Party's and its Affiliates' directors, agents and employees;

(b)     to the Receiving Party's lenders and prospective lenders for the sole purpose of obtaining finance based on this Agreement;

(c)     to the Receiving Party's advisors and consultants, including legal counsel, accountants and other agents of the Receiving Party for purposes connected with this Agreement;

(d)     to Third Parties on an aggregated basis to the extent such information is delivered to such Third Party for the sole purpose of calculating a published index;

(e)     to Experts and any court in connection with the resolution of a Dispute;

(f)     to co-shareholders and partners in upstream and downstream projects, any operator of Seller's facilities and any other relevant Third Parties, in all cases

(g)     limited (i) only to operational information; and (ii) to the extent strictly necessary to implement this Agreement;

(h)     to any insurer in connection with a policy of insurance required pursuant to this Agreement;

(i)     to any lender or potential lender and to any employee, representative or advisor of such Person;

(j)     to those contractor(s) that Seller retains or proposes to retain to perform any of Seller's obligations hereunder; or

(k)     to any Governmental Authority or financial markets to the extent required or advisable in connection with any future financing activity related to Seller.

XXII.3 The Receiving Party disclosing Confidential Information pursuant to Article XXII.2 to a Person identified in Article XXII.2(b) to XXII.2(f) shall ensure that such Person undertakes to hold such Confidential Information subject to confidentiality obligations equivalent to those set out in Article 26.1 (excluding legal counsel). Each Party understands that the Receiving Party, and Persons, listed in Article XXII.2(a), (b) or (c) may now or in the future work on similar projects, and the Parties agree

*KDf*



that, without prejudice to the other provisions in this Article XXII, such Persons shall not be precluded from working on such other projects because they have reviewed any Confidential Information.

XXII.4 In the event that disclosure is required by any Governmental Authority or Applicable Law and such disclosure is not of the kind permitted pursuant to Article XXII.2(j), the Receiving Party subject to such requirement may disclose the Confidential Information to the extent so required, but shall promptly notify the Disclosing Party of such disclosure prior to so doing, and shall cooperate (consistent with the Receiving Party's legal obligations) with the Disclosing Party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the Disclosing Party. Notwithstanding the foregoing, Seller acknowledges that Articles XXII.4 and XXII.5 shall not apply to any requirements applicable to Buyer to disclose any Confidential information that Buyer is required to disclose as a public entity under Applicable Law.

XXII.5 No press release or public statement concerning the existence, execution of, or other matters directly related to, this Agreement, or the transactions contemplated hereby, shall be issued by the representatives, directors, officers, agents or employees of either Party or its Affiliates unless otherwise agreed by the Parties in writing. In the case of any such press release or public statement, the Parties shall first consult and agree to the specific contents and the manner or timing of presentation or publication thereof. The foregoing shall not apply to any announcement by a Party required in order to comply with any Applicable Law, provided that in this case the relevant Party making such announcement notifies the other Party of the details of such announcement, the relevant Applicable Law to be complied with and, where applicable, the addressee of such announcement.

XXII.6 The Parties shall be entitled to all remedies available at law or in equity to enforce or seek relief in connection with the breach of the confidentiality obligation set out in this Article XXII.

XXII.7 If Seller connects to information systems managed by PREPA or Genera, Seller shall implement and maintain a cybersecurity system designed to prevent unauthorized access to such systems, as well as the system owned or managed by Seller. Buyer has the right to screen Seller's systems for compliance and security purposes at any time during the Term. Seller shall notify Buyer immediately if any information provided by or on behalf of Buyer has been, or is suspected of being, lost, stolen, or inappropriately disclosed. Seller shall protect the privacy of the personal information of PREPA's and Genera's employees, customers, and vendors against inadvertent or inappropriate disclosure.

## ARTICLE XXIII

### NOTICES

All notices to be given under this Agreement by one Party to the other shall be in writing, sent to the address and marked to the attention of the Person specified in Article XXV and, unless otherwise agreed, in English.

*KDf*

44



## ARTICLE XXIV

## CONTINGENT FEES

Seller guarantees that it has not employed any person to solicit or secure this Agreement upon any agreement for a commission percentage, brokerage or contingent fee. Breach of this guarantee shall give Buyer the right to annul the Agreement or, at its discretion to deduct from the consideration payable hereunder the amount of such commission, percentage, brokerage or contingent fees. This warranty shall not apply to commissions payable by contractors upon contract or sales secured or made through bona fide established commercial or selling agencies maintained by Seller for the purpose of securing business.

## ARTICLE XXV

## ADDRESSES FOR NOTICES

**SELLER**:    NFEnergía LLC
c/o New Fortress Energy Inc.
111 W 19th St., 8th Fl.
New York, NY 10011
Attention: General Counsel
Telephone: 516-268-7400
Email: legal@newfortressenergy.com

**BUYER**:    PREPA
c/o Genera PR LLC, agent of PREPA Fuels Office
250 Muñoz Rivera Ave., Suite 1200
San Juan, Puerto Rico 00918
Attention: Jose L. Carrasco, Fuels Manager
fuels@genera-pr.com
With a copy to legal@genera-pr.com

Either Party may change its address details by giving not less than five (5) Days written notice to the other Party.

## ARTICLE XXVI

## BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT

XXVI.1    Each Party agrees that in connection with its activities conducted pursuant to this Agreement, neither it nor any of its directors, officers, employees, or Affiliates shall (a) take any action, or omit to take any action that would violate any Applicable Law applicable to that Party, (b) make, promise to make, or authorize, the making of any payment, gift or transfer of anything of value,

*KDf*

45



directly or indirectly, to any official or employee of any government or instrumentality of any government or to any political party or official thereof or any candidate of any political party for the purpose of influencing the action or inaction of such official, employee, political party or candidate, or (c) otherwise take any action, or omit to take any action that would cause the other Party to be in violation of any Applicable Law related to the business practices of such other Party, including the United States Foreign Corrupt Practices Act.

XXVI.2    Each Party agrees and undertakes, on behalf of itself, its directors, officers, employees, or Affiliates, not to pay any fees, commissions or rebates to any employee, officer or agent of the other Party, or its Affiliates or shareholders nor provide or cause to be provided to any of them any gifts or entertainment of significant cost or value in connection with their activities conducted pursuant to this Agreement or in order to influence or induce any actions or inactions in connection with the commercial activities of the Parties under this Agreement.

XXVI.3    Without prejudice to Article XXIV, neither Party shall use any broker, agent, or other intermediary in connection with soliciting, obtaining, negotiating, structuring or performing this Agreement or in connection with the subject matter to which it applies.

XXVI.4    Each Party shall indemnify and hold the other Party harmless from and against any and all losses, damages, liabilities, costs, expenses and claims which arise out of, are incident to, or result from any breach by such Party of this Article XXVI.

XXVI.5    Each Party shall use commercially reasonable efforts to cause its contractors and agents to agree to terms concerning business practices and the Foreign Corrupt Practices Act that are substantially similar to those set forth in this Article XXVI.

## ARTICLE XXVII

### TRANSFER OF FUNDS

If Seller decides to assign or transfer any right to payment of an amount, due or payable, to which he is entitled for services rendered or goods provided during the term of this Agreement, Seller shall notify Buyer of such transfer of funds, in accordance with the provisions of Act 21- 2012. Said notice shall clearly indicate the rights granted, including a copy of the contract under which the assignment or transfer of the right to payment is made, the exact amount of funds to be assigned or transferred, and specific identification information regarding the assignee (full name of the person or company), address and any other contact information.

## ARTICLE XXVIII

### CONFLICT OF INTEREST

XXVIII.1    Seller represents and warrants that: (i) none of its representatives under this Agreement are employed by or receive payment or compensation for such employment from any governmental agency, body, public corporation or municipality of Puerto Rico; (ii) no employee of the Puerto Rico government, Buyer, or Genera and the 3PPO has any personal or economic interest in this Agreement; (iii) it may have service contracts with other governmental agencies, bodies, public corporations or municipalities of Puerto Rico, but such contracts do not constitute a conflict of interest

KDf

46



for Seller, Buyer, or Genera, or otherwise bias Seller's judgement, in its performance of the Agreement; (iv) at the time of execution of this Agreement, it does not have any other contractual relationship that could be deemed to constitute a conflict of interest for Seller, or otherwise bias Seller's judgement, in its performance of the Agreement; (v) at the time of execution of this Agreement, it does not have any claims or existing litigation with Buyer, Genera, the 3PPO or any instrumentality of the government of Puerto Rico; (vi) it did not, prior to submitting a proposal with respect to this Agreement, have access to another competitor's proprietary information that was obtained from a Puerto Rico government official, Buyer, Genera and/or the 3PPO without proper authorization; and (vii) it did not, prior to submitting a proposal with respect to this Agreement, have access to source selection information (i.e., information prepared for use by Buyer, Genera and/or the 3PPO for the purpose of evaluating bids or proposals to enter into a contract, if that information was not previously made available to the public or disclosed publicly) that is relevant to this Agreement but was not available to all competitors.

XXVIII.2    Conflicting Interest.

(a)    Seller acknowledges that it has a duty of ethical behavior towards Buyer, Genera and the 3PPO. Such duty includes that Seller shall not have interests that conflict with Buyer or Genera's interests in this Agreement, including (i) the representation of clients which have, or may have, interests opposed to those of Buyer or Genera and/or the 3PPO in relation to this Agreement; (ii) when Seller's conduct is described as such in the canons of ethics that may be applicable to Seller and its personnel or in the laws or regulations applicable to Seller and its personnel assigned to this Agreement; (iii) when Seller, its Affiliates, or their employees, directors, or officers directly or indirectly, for themselves or any other third party, obtain, request or give to Buyer or Genera and/or the 3PPO or an employee, officer, director or agent of Buyer or Genera and/or the 3PPO, any profit, utility, advantage or gain by way of improper acts or exercise of undue influence.

(b)    Seller agrees to avoid even the appearance of a conflict of interest.

(c)    Seller shall have the continuous obligation to promptly disclose to Buyer if any relationship with third parties could represent a conflict of interest with Buyer or Genera and/or the 3PPO in connection with this Agreement.

## ARTICLE XXIX

## UNFAIR LABOR PRACTICE

In the event that Seller or any of its subcontractors or agents do not comply with an order issued by the Puerto Rico Labor Relations Board and/or the National Labor Relations Board upon their finding that Seller or any of its subcontractors or agents have committed an unfair labor practice, no further payments shall be made by Buyer to Seller after the date of the said order, until such non-compliance is corrected. Any declaration by the Puerto Rico Labor Relations Board and/or by the National Labor Relation Board that the contractors or agents have not complied with an order issued by the Board relating to any unfair labor practice shall be binding, final, and conclusive unless such order is reversed or set aside by a Court of competent jurisdiction.

*KD7*

47



## ARTICLE XXX

## DISCRIMINATION

Seller certifies that it is an employer with equal opportunity employment, and does not discriminate by reason of race, color, religion, political ideas, sex, nationality, age or mental or physical condition.

## ARTICLE XXXI

## COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS

XXXI.1    Seller shall comply with all applicable laws, including local and federal regulations and Executive Orders that regulate the environmental matters and contracting processes and requirements in the Commonwealth of Puerto Rico. Seller has complied or will comply with all government contracting requirements pursuant to Exhibit E.

XXXI.2    Resolution of Debt

If any of the certifications required in Exhibit E shows a debt, and Seller has requested a review or adjustment of this debt, Seller hereby certifies that it has made such request at the time of Contract execution. If the requested review or adjustment is denied and such determination is final, Seller will provide, immediately, to Buyer a proof of payment of this debt; otherwise, Seller accepts that the owed amount be offset by Buyer and retained at the origin, deducted from the corresponding payments. Seller accepts and acknowledges its responsibility for requiring and obtaining a similar warranty and certification from each and every contractor and subcontractor whose service Seller has secured in connection with the services to be rendered under this Agreement and shall forward evidence to Buyer as to its compliance with this requirement.

## ARTICLE XXXII

## PUBLIC OFFICERS OR EMPLOYEES

XXXII.1    Prohibition with respect to execution by public officers: (3 L.P.R.A. 8615(c))

Seller acknowledges that no public officer or employee authorized to contract on behalf of the executive agency for which he/she works may execute a contract between the agency for which he/she works and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

XXXII.2    Prohibition with respect to contracting with officers or employees: (3 L.P.R.A. 8615(d))

Seller acknowledges that no executive agency may execute a contract in which any of its officers or employees or any member of their family units has or has had direct or indirect economic interest during the last four (4) years prior to their holding office unless the Governor gives

*KDf*

48



authorization thereto with the previous recommendation of the Secretary of the Treasury and the Secretary of Justice.

XXXII.3    Prohibition with respect to contracts with officers and employees of other Government entities: (3 L.P.R.A. 8615(e))

Seller acknowledges that no public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

XXXII.4    Prohibition with respect to evaluation and approval by public officers: (3 L.P.R.A. 8615(f))

Seller acknowledges that no public officer or employee who has the power to approve or authorize contracts shall evaluate, consider, approve, or authorize any contract between an executive agency and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

XXXII.5    Prohibition with respect to execution by public officers contracts with former public officers: (3 L.P.R.A. 8615(h))

Seller acknowledges that no executive agency shall execute contracts with or for the benefit of persons who have been public officers or employees of said executive agency until after two (2) years have elapsed from the time said person has ceased working as such.

## ARTICLE XXXIII

## DISPENSATION

Any and all necessary dispensations have been obtained from any government entity and that said dispensations shall become part of the contracting record.

## ARTICLE XXXIV

## RULES OF PROFESSIONAL ETHICS

Seller acknowledges and accepts that it is knowledgeable of the rules of ethics of his or her profession and assumes responsibility for his or her own actions.

*KDF*

49

*CA*

## ARTICLE XXXV

## ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO

XXXV.1    Seller agrees to comply with the provisions of Act 2-2018, as the same may be amended from time to time, which establishes the Anti-Corruption Code for a New Puerto Rico.

XXXV.2    Seller hereby certifies that it does not represent particular interests in cases or matters that imply a conflict of interest, or of public policy, between the executive agency and the particular interests it represents.

XXXV.3    Provisions Required under Act 14-2004

Seller agrees that articles extracted, produced, assembled, packaged, or distributed in Puerto Rico by enterprises with operations in Puerto Rico, or distributed by agents established in Puerto Rico, shall be used when the service is rendered, provided that they are available.

## ARTICLE XXXVI

## CONTRACT REVIEW POLICY

XXXVI.1    The Parties acknowledge that Seller has submitted the certification titled "Contractor Certification Requirement" in accordance with Exhibit E.

XXXVI.2    For this Agreement, the transfer of skills and technical knowledge required by the Certified Fiscal Plan is inapplicable given the non-recurring or specialized nature of the contracted services.

## ARTICLE XXXVII

## INSURANCE

XXXVII.1    Insurance and Bonds:

Seller shall secure and maintain in full force and effect during the life of this Agreement as provided herein, policies of insurance covering all operations engaged in by the Agreement as follows:

(a)    Commonwealth of Puerto Rico Workmen's Compensation Insurance:

Seller shall provide Workmen's Compensation Insurance as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico. Seller shall also be responsible for compliance with said Workmen's Compensation Act by all its subcontractors, agents, and invitees, if any.

Seller shall furnish a certificate from the Puerto Rico's State Insurance Fund showing that all personnel employed in the work are covered by the Workmen's Compensation Insurance, in accordance with this Contract.

*KDf*

50



(b)    Employer's Liability Insurance:

  Seller shall provide Employer's Liability Insurance with minimum bodily injury limits of $1,000,000 for each employee and $1,000,000 for each accident covering against the liability imposed by Law upon Seller as result of bodily injury, by accident or disease, including death arising out of and in the course of employment, and outside of and distinct from any claim under the Workmen's Compensation Act of the Commonwealth of Puerto Rico.

(c)    Commercial General Liability Insurance:

  Seller shall provide a Commercial General Liability Insurance with limits of $2,000,000 per occurrence and $2,000,000 aggregate, and including coverage for explosion, collapse, and underground (XCU) hazard.

  The Commercial General Liability Insurance or its equivalent must include coverage for bodily injuries and property damages caused during the operation of a watercraft.

(d)    Excess Liability Insurance:

  Seller shall provide an Excess Liability Insurance in excess of the Commercial General Liability Insurance limits. This Excess Liability Insurance will have limits of $10,000,000 per occurrence and $10,000,000 aggregate.

(e)    Commercial Automobile Liability Insurance:

  Seller shall provide a Commercial Automobile Liability Insurance with limits of $1,000,000 combined single limit covering all owned, non-owned, and hired automobiles.

(f)    Pollution Liability Insurance:

  Seller shall provide a Pollution Liability Insurance with limits of $1,000,000 per claim and $1,000,000 per aggregate.

XXXVII.2    Requirements Under the Policies:

The Commercial General Liability or its equivalent and the Commercial Automobile Liability Insurance required under this Contract shall be endorsed to include:

(a)    As Additional Insured:

Puerto Rico Electric Power Authority (Buyer)
Risk Management Office
PO Box 364267
San Juan, PR 00936-4267

*KDF*



(b)     A thirty (30) Day cancellation or nonrenewable notice to be sent to the above address.

(c)     An endorsement including this Agreement under contractual liability coverage and identifying it by number, date and parties to the contract.

(d)     Waiver of Subrogation in favor of Puerto Rico Electric Power Authority (Buyer).

(e)     Breach of Warranties or Conditions:

> "The Breach of any of the Warranties or Conditions in this policy by the Insured shall not prejudice Buyer's rights under this policy."

XXXVII.3    Furnishing of Policies:

(a)     All required policies of insurance shall be in a form acceptable to Buyer and shall be issued only by insurance companies authorized to do business in Puerto Rico.

(b)     Seller shall furnish a certificate of insurance in original signed by an authorized representative of the insurer in Puerto Rico, describing the coverage afforded.

## ARTICLE XXXVIII

### GENERAL

XXXVIII.1    If any inconsistency appears between the provisions contained in the body of this Agreement and any Exhibit to this Agreement, then the provisions of the body of this Agreement shall prevail.

XXXVIII.2    If any one or more of the provisions, obligations, or terms herein or part thereof shall be determined by a court of competent jurisdiction to be wholly or partially invalid, void, illegal or unenforceable in any respect by operation of Applicable Law or otherwise, the validity, legality, or enforceability of the remaining provisions, obligations, or terms or part thereof in any other jurisdiction shall not in any way whatsoever be affected or impaired thereby and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the validity and enforceability hereof to the extent that the essential purposes of this Agreement can be determined and effectuated.

XXXVIII.3    The Parties do not intend any term of this Agreement to be enforceable by any Third Party.

XXXVIII.4    Nothing in this Agreement shall be deemed to create a partnership, joint venture or association, establish a principal and agent relationship or any other relationship of a similar nature, including employment, between the Parties or create any joint and several liabilities. Neither Party shall

*KDJ*



have any right, power or authority to enter into any agreement or undertaking for, to act on behalf of, to act as or be an agent or representative of, or to otherwise bind, the other Party.

XXXVIII.5    The Parties acknowledge that this Agreement has been negotiated and prepared by the Parties with the advice of legal counsel to the extent deemed necessary by each Party. The Parties have agreed to the wording of this Agreement and none of the provisions of this Agreement shall be construed against one Party on the ground that such Party is the author of this Agreement or any part of this Agreement.

XXXVIII.6    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations and communications relative hereto, oral or written, and there are no other understandings or representations between the Parties hereto. This Agreement may not be amended except by an instrument in writing signed by a duly authorized representative of each Party.

[Signature Page Follows]



53



IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their respective duly authorized representative as of the day and year first above written.

| For and on behalf of | For and on behalf of |
|---|---|
| **SELLER:** | **BUYER:** |
| **NFENERGÍA LLC** | |
| EIN: 66-0889369 | **PUERTO RICO ELECTRIC POWER AUTHORITY, represented by its agent, Genera PR LLC** |

Name: _____

Christopher Guinta

Title:   Chief Financial Officer

Name: _____

Kevin D. Futch

Title:    General Counsel

Authorized Signatory for Genera PR LLC, exclusively as agent on behalf of and for the account of PREPA

KDF

54

CW

## EXHIBIT A
## SPECIFICATIONS

Natural Gas delivered by Seller shall satisfy the following conditions:

| Parameter | Min | Max | Units |
|---|---|---|---|
| Sand, dust, gums, crude oil, impurities, or other objectionable substances | No traces allowed | | |
| Sulfur | -- | 1 | grain/100 scf |
| Hydrogen Sulfide | -- | 0.3 | grains/100 scf |
| Mercaptan Sulfur | -- | 0.25 | grains/100 scf |
| Carbon Dioxide ($CO_2$) | -- | 2 | Percent by volume of carbon dioxide |
| Water Vapour | -- | 7 | lb/MMscf |
| Oxygen | -- | 0.4 | Percent by volume of oxygen |
| Heating Value (Natural Gas) | 1,000 | -- | Btu/scf |
| Heating Value (LNG) | 21,350 | -- | Btu/lb |

Note: These quality parameters shall be measured by methods in accordance with accepted industry practices.

*KDf*



## EXHIBIT B
## DELIVERY POINTS

| Delivery Point | Distance from Palo Seco (in miles) |
|---|---|
| Palo Seco Power Plant | 0 |
| Palo Seco MobilePacs | 0 |
| San Juan Power Plant | 0 |
| Mayaguez Power Plant | 96 |
| Aguirre Power Plant | 40 |
| Costa Sur Power Plant | 79 |
| Cambalache Power Plant | 46 |
| Vega Baja Power Plant | 22 |
| Daguao Power Plant | 39 |
| Yabucoa Power Plant | 29 |
| Jobos Power Plant | 41 |

KD7



**EXHIBIT C**
**FORM OF PARENT GUARANTEE**

This GUARANTEE (this "*Guarantee*"), dated as of March 15th, 2024, is made by NEW FORTRESS ENERGY INC, a Delaware corporation ("*Guarantor*"), in favor of the PUERTO RICO ELECTRIC POWER AUTHORITY, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act of May 2nd 1941, No. 83, as amended ("*Buyer*," and, together with Guarantor, each a "*Party*" and, collectively, the "*Parties*").

**RECITALS**

**WHEREAS,** Buyer has agreed to enter into the Fuel Sale and Purchase Agreement for the Palo Seco and San Juan Temporary Generation Facilities, dated as of March 15th, 2024, with NFENERGÍA LLC ("*Seller*"), a subsidiary of Guarantor (the "*Agreement*"), which is hereby incorporated by reference in this Guarantee and made a part hereof; and

**WHEREAS,** it is a condition to Buyer and Seller entering into the Agreement that Guarantor execute and deliver this Guarantee.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Guarantee**.

   1.1  On the terms and subject to the conditions contained herein, Guarantor hereby absolutely, unconditionally and irrevocably guarantees, to and for the benefit of Buyer, the full and punctual performance and payment, as and when each such payment or performance becomes due (whether at the stated due date, by acceleration or otherwise), by or on behalf of Seller of any and all obligations or amounts owed by Seller to Buyer in connection with and to the extent provided for in the Agreement (the "*Guaranteed Obligations*"). The Guaranteed Obligations of Guarantor hereunder are direct and primary obligations.

   1.2  This Guarantee is an absolute, unconditional, present, and continuing guarantee of performance and payment, and not of collection, is in no way conditioned or contingent upon any attempt to collect from or enforce performance or payment by Seller or upon any other event, contingency or circumstance whatsoever, and shall remain in full force and effect and be binding upon and against Guarantor and its successors and permitted assigns (and shall inure to the benefit of Buyer and its agents, successors, endorsees, transferees, and permitted assigns) without regard to the validity or enforceability of the Agreement. If, for any reason, Seller shall fail to punctually, and fully perform or pay, as and when such performance or payment is due, any of the Guaranteed Obligations, Guarantor shall promptly perform or pay, or cause to be performed or paid, such Guaranteed Obligations.

   1.3  Guarantor agrees that any judgment between Seller and Buyer under the Agreement (whether in contested litigation or arbitration, by default or otherwise) shall be conclusive and binding on the Parties for the purposes of determining Guarantor's

57

obligations under this Guarantee but no such judgment shall be required to enforce the Guarantor's obligations under this Guarantee.

1.4    Guarantor further agrees to pay to Buyer all costs, expenses (including, without limitation, all reasonable fees and disbursements of counsel), and damages which may be paid or incurred by Buyer in enforcing any rights with respect to this Guarantee, including, without limitation, collecting against Guarantor under this Guarantee.

## 2.    <u>Obligations Absolute and Unconditional, Continuing; Etc.</u>

2.1    Guarantor agrees that the obligations of Guarantor set forth in this Guarantee shall be direct obligations of Guarantor, and such obligations shall be absolute, irrevocable and unconditional, shall not be subject to any counterclaim, set-off, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense (other than full and strict compliance with its obligations hereunder) based upon any claim Guarantor or any other Person may have against Buyer or any other Person and shall remain in full force and effect without regard to and shall not be released, discharged or in any way affected or impaired by, any circumstance or condition whatsoever (other than full and strict compliance by Guarantor with its obligations hereunder) (whether or not Guarantor shall have any knowledge or notice thereof), including, without limitation: (i) the existence, validity, enforceability, perfection, release, or impairment of value of any collateral for such Guaranteed Obligations; (ii) any amendment or modification of or supplement to or other change in the Agreement or any other document, including, without limitation, any change order, renewal, extension, acceleration or other changes to time, manner, place or terms of payment thereunder; (iii) any failure, omission or delay on the part of Buyer or any other Person to confirm or comply with any term of the Agreement or any other document; (iv) any waiver, consent, extension, indulgence, compromise, release or other action or inaction under or in respect of the Agreement or any other document or any obligation or liability of Buyer or any other Person, or any exercise or non-exercise of any right, remedy, power, or privilege under or in respect of any such instrument or agreement or any such obligation or liability; (v) any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, or similar proceeding with respect to Buyer, Seller, or any other Person or any of their respective properties, or any action taken by any trustee or receiver or by any court in any such proceeding; (vi) any discharge, termination, cancellation, frustration, irregularity, invalidity or unenforceability, in whole or in part, of the Agreement or any other document or any term or provision thereof; (vii) any merger or consolidation of Guarantor, Seller or any other Person into or with any other Person or any sale, lease or transfer of all or any of the assets of Guarantor, Seller or any other Person; (viii) any change in the ownership of Guarantor, Seller or any other Person; (ix) any winding up or dissolution of Guarantor, Seller or any other Person; (x) any assignment of, or the creation of any mortgage, pledge, charge or other encumbrance over, or in respect of, this Guarantee, the Agreement or any of Buyer's rights, benefits, or obligations under or pursuant to this Guarantee or the Agreement; or (xi) to the fullest extent permitted under Applicable Law, any other occurrence or circumstance whatsoever, whether similar or dissimilar to the foregoing, which might otherwise constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which might otherwise limit recourse against    *KDf*
Guarantor.

58



2.2 The Guaranteed Obligations constitute the full recourse obligations of Guarantor enforceable against it to the full extent of all its assets and properties. Without limiting the generality of the foregoing, Guarantor agrees that repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, Seller shall fail to perform obligations or pay amounts owed by Seller under the Agreement and that notwithstanding the recovery hereunder for or in respect of any given failure to so comply by Seller under the Agreement, this Guarantee shall remain in full force and effect and shall apply to each and every subsequent such failure.

3. **Reinstatement.** Guarantor agrees that this Guarantee shall be automatically reinstated with respect to any payment made by or on behalf of Seller pursuant to the Agreement if and to the extent that such payment is rescinded or must be otherwise restored, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

4. **Waiver of Demands, Notices; Etc.** Guarantor hereby unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of any of the matters referred to in Section 2.1 hereof; (ii) all notices which may be required by Applicable Law, or otherwise, now or hereafter in effect, to preserve any rights against Guarantor hereunder, including, without limitation, any demand, proof, or notice of non-payment or non-performance of any Guaranteed Obligation; (iii) any right to the enforcement, assertion, or exercise of any right, remedy, power, or privilege under or in respect of the Agreement; (iv) notice of acceptance of this Guarantee, demand, protest, presentment, notice of failure of performance or payment, and any requirement of diligence; (v) any requirement to exhaust any remedies resulting from failure of performance or payment by Seller under the Agreement or by any other Person under the terms of the Agreement; and (vi) any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge, release, or defense of a guarantor or surety, or which might otherwise limit recourse against Guarantor.

5. **No Subrogation.** Notwithstanding any performance, payment or payments made by Guarantor hereunder (or any set-off or application of funds of Guarantor by Buyer), Guarantor shall not be entitled to be subrogated to any of the rights of Seller (or of any rights of Buyer hereunder), or any collateral, security, or guarantee or right of set-off held by Buyer, for the performance or payment of the obligations guaranteed hereunder, nor shall Guarantor seek or be entitled to assert or enforce any right of contribution, reimbursement, indemnity or any other right to payment from Seller as a result of Guarantor's performance of its obligations pursuant to this Guarantee until all Guaranteed Obligations are performed or paid in full. If any amount shall be paid to Guarantor on account of such subrogation, contribution, reimbursement or indemnity rights at any time when all of the Guaranteed Obligations and all amounts owing hereunder shall not have been performed and paid in full, such amount shall be held by Guarantor in trust for Buyer, segregated from other funds of Guarantor, and shall, forthwith upon receipt by Guarantor, be turned over to Buyer in the exact form received by Guarantor (duly endorsed by Guarantor to Buyer, if required), to be applied against the Guaranteed Obligations, whether or not matured, in such order as Buyer may determine.

6. **Representations and Warranties.** Guarantor represents and warrants that:

6.1 it is a corporation duly organized, validly existing and is in good standing under the laws of the state of Delaware, and has the corporate power and authority to execute, deliver and carry out the terms and provisions of this Guarantee; the execution,

*KDf*

59

*CH*

delivery and performance of this Guarantee will not violate or conflict with its charter or by-laws (or comparable constituent documents), any law, regulation or order of any governmental authority or any court or other agency of government applicable to it or the terms of any agreement to which it is a party;

6.2 no authorization, approval, consent or order of, or registration or filing with, any court or other governmental entity having jurisdiction over Guarantor is required on the part of Guarantor for the execution, delivery, or performance of this Guarantee;

6.3 the execution, delivery and performance of this Guarantee have been and remain duly authorized by all necessary corporate action and do not contravene the Guarantor's constitutional documents or any contractual restriction binding on the Guarantor or its assets;

6.4 this Guarantee, when executed and delivered, will constitute a valid and legally binding agreement of Guarantor, enforceable against Guarantor in accordance with its terms, except as the enforceability of this Guarantee may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity as they apply to the Guarantor; and

6.5 Guarantor is financially solvent, able to pay all debt as they mature, and possesses sufficient working capital to perform its obligations under this Guarantee.

7. **Conveyance or Transfer.** Guarantor shall not convey, sell, lease or transfer its properties or assets to any Person to the extent that such conveyance, sale, lease or transfer could have a material adverse effect on Guarantor's ability to fulfill its obligations under this Guarantee (a "*Material Transaction*") without Buyer's written consent (not to be unreasonably withheld). For the avoidance of doubt, a sale of property or assets for market value shall not be considered a Material Transaction as long as Guarantor receives all of the proceeds from such sale and does not subsequently transfer such proceeds to another Person. If Guarantor proposes a Material Transaction, Guarantor shall (i) provide Buyer with reasonable advance notice of such proposed Material Transaction, (ii) meet with Buyer, and (iii) pursuant to a written confidentiality agreement, provide to Buyer all necessary information, reasonably requested by Buyer, regarding the proposed Material Transaction for the purpose of receiving Buyer's written consent to such Material Transaction (not to be unreasonably withheld). For the avoidance of doubt, such restriction on conveyances, sales, leases and transfers shall include conveyances, sales, leases or transfers to Guarantor's Affiliates.

8. **Dispute Resolution.**

8.1 The Parties agree that any claim, dispute, controversy, difference, disagreement, or grievance (of any kind or type, whether based on contract, tort, statute, regulation or otherwise) arising out of, connected with or relating in any way to this Guarantee (including the construction, validity, interpretation, termination, enforceability or breach of this Guarantee) ("*Dispute*") shall be decided by litigation pursuant to this Section 8.

8.2 Litigation of any Dispute shall be brought exclusively in the Commonwealth Court of First Instance, San Juan, Puerto Rico or federal court having jurisdiction over San

*KDf*

60

*CA*

Juan, Puerto Rico. Each Party hereby consents to personal jurisdiction in any legal action, suit, or proceeding brought in any state court in San Juan, Puerto Rico, or federal court having jurisdiction over San Juan, Puerto Rico having subject matter jurisdiction, and irrevocably waive, to the fullest extent permitted by Applicable Law and the law of the internal laws of the Commonwealth, any claim or any objection it may now or hereafter have, that venue or personal jurisdiction is not proper with respect to any such legal action, suit, or proceeding brought in such a court in or having jurisdiction over San Juan, Puerto Rico, including any claim that such legal action, suit, or proceeding brought in such court has been brought in an inconvenient forum. Each Party further consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at its address specified herein for the giving of notices, or by such other notice given in accordance with the rules and procedures of such courts. Each Party hereby waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceeding brought under this Guarantee.

## 9. **Miscellaneous.**

9.1     This Guarantee shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns. Guarantor may not assign or transfer this Guarantee or any rights or obligations hereunder without Buyer's prior written consent, which consent may be withheld in Buyer's sole and absolute discretion. Buyer may, without Guarantor's consent: assign this Guarantee, in whole or part, to any Person who is a permitted successor or assignee of Buyer under the Agreement. Except as otherwise provided in this Section 9.1, nothing herein, express or implied, is intended or shall be construed to confer upon or to give to any Person other than the Parties hereto any rights, remedies, or other benefits.

9.2     This Guarantee shall be governed by, interpreted and construed in accordance with the laws of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than New York.

9.3     No modification or amendment of this Guarantee shall be of any force or effect unless made in writing, signed by the Parties hereto, and specifying with particularity the nature and extent of such modification or amendment. This Guarantee constitutes the entire and only understanding and agreement among the Parties hereto with respect to the subject matter hereof and cancels and supersedes any prior negotiations, proposals, representations, understandings, commitments, communications, or agreements, whether oral or written, with respect to the subject matter hereof.

9.4     All notices, demands, offers, requests and other written instruments required or permitted to be given pursuant to this Guarantee shall be in writing signed by the Party giving such notice and shall be hand delivered or sent by overnight courier, messenger, facsimile or certified mail, return receipt requested, to the other Parties at the address set forth below.

*KDF*



| **If to Buyer** | | **If to Guarantor** | |
|---|---|---|---|
| Name | General Counsel | Name: | General Counsel |
| Title: | | Title: | |
| Address: | 250 Ave. Muñoz Rivera | Address: | 111 W, 19th St. 8th Fl. |
| | Suite 1200 San Juan P.R. 00918 | | New York, N.Y. 10011 |
| Phone Number: | | Phone Number: | (516)268-7400 |
| Email: | legal@genera-pr.com | Email: | legal@newfortressenergy.com |

Each Party shall have the right to change the place to which such notices shall be sent or delivered by sending a similar notice to the other Parties in like manner. Notices, demands, offers, requests or other written instruments shall be deemed to have been duly given on the date actually received by the intended recipient, provided that if the day of receipt is not a Business Day then it shall be deemed to have been received on the next succeeding Business Day.

9.5     The headings of the several provisions of this Guarantee are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guarantee.

9.6     No forbearance or delay by Buyer in asserting rights against Seller shall affect or impair in any way Guarantor's obligations hereunder or the rights of Buyer hereunder.

9.7     Capitalized terms used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Agreement. The term "Person" shall mean any individual, company, joint venture, corporation, partnership, association, joint stock company, limited liability company, trust, estate, unincorporated organization, governmental entity or other entity having legal capacity.

9.8     If any provision of this Guarantee is ultimately determined by a court of competent jurisdiction to be invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Guarantee except to the extent necessary to give effect to the construction of such invalidity, and any such invalid portion shall be deemed severed without affecting the validity of the remaining portions of this Guarantee.

*KD7*

62



9.9    This Guarantee may be executed in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

[*Signature page follows.*]

**IN WITNESS WHEREOF**, the undersigned have duly executed this Guarantee as of the date first above written.

NEW FORTRESS ENERGY INC

By: _____

Name: Christopher Guinta

Title:   Chief Financial Officer

63

*KDT*

*CG*

## EXHIBIT D
## FORM OF BOND

KNOW ALL MEN BY THESE PRESENTS, that we, [_____] ("**Principal**"), and [_____] ("**Surety**"), are held and firmly bound unto PUERTO RICO ELECTRIC POWER AUTHORITY ("**Obligee**"), in the penal sum of up to, but not greater than, [5% of the Contract Ceiling] lawful money of the United States (the "**Penal Sum**"), to the payment of which well and truly to be made we hereby bind ourselves and our heirs, administrators, successors, and assigns, jointly and severally, firmly by these presents. This limited payment guarantee is made effective as of the day it is delivered to Obligee (the "**Effective Date**").

WHEREAS the above bound Principal has entered into that certain Fuel Sale and Purchase Agreement for the Palo Seco and San Juan Temporary Generation Facilities (the "**Contract**") with the above named Obligee, effective the [___] day of [_____], 2024, which Contract is hereby referred to and made a part hereof as fully and to the same extent as if copies at length were attached herein.

WHEREAS, in the event of an NG Deficiency (as defined in the Contract), Principal has agreed to pay Obligee certain amounts in accordance with the terms and conditions of Article VI of the Contract.

NOW THEREFORE, the condition of the obligations is such that if Principal and/or Surety has paid to Obligee all amounts that are due and owing to Obligee by Principal under Article VI of the Contract over the Term (as defined in the Contract), then this limited payment guarantee shall be null and void, otherwise to be in full force and effect.

This limited payment guarantee is executed by Surety and accepted by Obligee subject to the following expressed conditions. Capitalized terms used herein and not defined herein shall have the meaning set forth in the Contract.

1. Obligee shall provide notice of Principal's failure to pay any undisputed amount due and owing under Article VI of the Contract ("**Default**") to both Principal and Surety, providing ten (10) business days for Principal to cure the Default. If Principal has not cured the Default within such period of time, then Obligee may make a Demand on this limited payment guarantee pursuant to Sections 2 and 3 below, in an amount not to exceed the Penal Sum. Any Demand for an amount that exceeds the Penal Sum shall be invalid to the extent that it exceeds the Penal Sum.

2. Subject to satisfaction of the requirements of Section 1, within fifteen (15) business days of Surety's receipt of a valid demand for payment under this limited payment guarantee ("**Demand**"), accompanied by the documentation referred to in Section 3 below, Surety shall pay to Obligee via wire transfer the amount stated in the Demand. Payment of a Demand by Surety shall constitute full satisfaction of all Claims against Principal in respect of which the Demand was made. Any Demand paid by Surety to Obligee in any Contract Year shall reduce the Penal Sum of this limited payment guarantee during such Contract Year.

3. Documentation to be provided to Surety in support of a Demand under this Guarantee shall be the following:

   a. A photocopy of this limited payment guarantee.

*KD7*

64



b.   A certificate, executed by a duly authorized representative of Obligee, that specifies the amount of the relevant Default.

c.   All documentation (including invoices and records of nominations and Natural Gas and LNG [or diesel] quantities, quality and price) reasonably necessary to establish that the relevant amount is due and owing by Seller to Obligee under Article VI of the Contract.

4.   The term of this limited payment guarantee is initially from the Effective Date to the conclusion of the Initial Term. This limited payment guarantee will automatically renew for successive one (1) calendar year terms following expiration of the previous term, unless cancelled by Surety by providing Principal and Obligee no less than sixty (60) calendar days written notice of cancellation. This limited payment guarantee shall terminate automatically upon termination of the Contract for any reason. Any notice of cancellation or termination of the limited payment guarantee pursuant to this Section 4 will not nullify or void any liability or indebtedness incurred or accrued by Principal and Surety named herein prior to said date of cancellation or termination.

5.   Surety's liability under this limited payment guarantee (a) shall in no event exceed the Penal Sum and (b) is strictly limited to payment of Default amounts in accordance with Section 2 hereof; it being agreed that Surety shall not be obligated to perform (and shall not be liable for any performance or failure to perform by Principal of) any other obligations of Principal pursuant to the Contract.

6.   This limited payment guarantee is governed by the laws of New York (with exclusion of its choice of law rules). Any dispute arising from or in connection to this limited payment guarantee shall be finally settled by binding arbitration in accordance with the International Chamber of Commerce Rules then in force (ICC Rules). The seat of the arbitration shall be New York and the arbitration shall be conducted in the English language.

Signed, sealed and dated this _____ day of _____, _____.

ATTEST_____    BY _____
                                                    Principal

ATTEST_____    BY _____

*KD7*

65

*CK*

**EXHIBIT E**

**GOVERNMENT CONTRACTING REQUIREMENTS**

1.    **SELLER ACKNOWLEDGMENTS**

1.1    Seller, for itself and its members or partners (if Seller is a partnership under the Puerto Rico Internal Revenue Code of 2011, as amended), represents and warrants that as of the Effective Date (a) neither it nor its members or partners, as applicable, has any outstanding debts for unemployment insurance, temporary disability, or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, workman's compensation with the State Insurance Fund, income taxes or sales and use taxes with the Department of Treasury of the Commonwealth, or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (b) it or its members or partners, as applicable, have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

1.2    Seller shall have delivered to PREPA prior to, or shall deliver to PREPA on, the Effective Date:

1.2.1    a copy of its current Certificate of Incorporation, Certificate of Organization or Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable; and

1.2.2    evidence (in each case dated no earlier than sixty (60) days prior to the Effective Date) of either:

(a)    the Seller's current RUL or RUP registration; or

(b)    in lieu of the RUL or RUP registration required in Section 1.2.2(a), each of the following:

(i)    a copy of Seller's Merchant's Registration Certificate.

(ii)    a copy of Seller's Merchant's Registration Certificate;

(iii)    a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iv)    a certification issued by the Puerto Rico Treasury Department indicating that Seller and its members and partners, if applicable, do not owe Puerto Rico sales and use taxes to the Commonwealth of Puerto Rico;

(v)    a Puerto Rico Sales and Use Tax Filing Certificate issued by the Puerto Rico Treasury Department reflecting that Seller has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods;

*KDF*

(vi)    a certification issued by the Puerto Rico Treasury Department indicating that Seller and its members and partners, if applicable, do not owe Puerto Rico income taxes to the Commonwealth;

(vii)    a Puerto Rico Income Tax Filing Certificate issued by the Puerto Rico Treasury Department reflecting that Seller has filed its Puerto Rico Income Tax returns for the last five (5) tax years;

(viii)    a certification issued by the Puerto Rico Child Support Administration (ASUME) reflecting that Seller is in compliance with the withholdings required to be made by employers under Applicable Laws;

(ix)    a sworn statement under Act 2-2018, signed before a notary public, in the form attached hereto as Attachment 1.

(x)    an all concepts debt certification issued by CRIM reflecting that Seller does not owe any taxes to CRIM with respect to real or personal property; and

(xi)    a certification issued by the Puerto Rico Labor Department reflecting that Seller is in compliance with the withholdings required to be made by employers with respect to Unemployment and Disability Insurance.

1.3    In providing the services, Seller, covenants, represents and warrants to PREPA as follows:

1.3.1    Neither Seller, its subsidiaries or affiliates, nor, when acting on behalf of Seller or its subsidiaries or affiliates, any director or officer or employee of Seller or its subsidiaries or its affiliates (together "**Seller Group Members**" and each a "**Seller Group Member**") has violated as of the Effective Date, or shall violate, conspire to violate, or aid and abet the violation of, any Anti-Corruption Laws. No funds transferred by PREPA to Seller shall be transferred by Seller or any Seller Group Member, directly or indirectly, in violation of any Anti-Corruption Laws.

1.3.2    Neither Seller nor any Seller Group Member are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Seller nor any Seller Group Member shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by PREPA to Seller shall be transferred by Seller or any Seller Group Member, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions;

1.3.3    Seller and Seller Group Members maintain and implement as of the Effective Date, and shall maintain and implement, policies, procedures and controls



reasonably designed to ensure compliance by Seller with the Anti-Corruption Laws and Sanctions;

1.3.4    Seller shall promptly notify PREPA in writing if, to Seller's knowledge, Seller, or any Seller Group Member, in connection with this Agreement or the Services, becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions;

1.3.5    Seller shall at all times comply with all Applicable Law regarding non-discrimination;

1.3.6    neither Seller nor Seller Group Members, nor any of their representatives, directly or indirectly, to the best of Seller's knowledge, has entered into or offered to enter into, or in the case of Seller shall enter into, any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement; and Seller attests, subject to the penalties for perjury, that the foregoing representation is true;

1.3.7    Seller shall inform PREPA and Genera and/or the 3PPO if, at any time during the Term, there are any material Tax disputes with any Governmental Body of the Commonwealth;

1.3.8    Seller shall inform PREPA if, at any time during the Term, it or any of its Seller Group Members becomes aware that any of them are subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property;

1.3.9    Pursuant to Section 5(f) of Act 120 and subject to the provisions of the Generation O&M Agreement, Seller shall at all times comply with the public policy and regulatory framework applicable it with respect to the PREPA generation assets; and

1.3.10  In delivering the goods or services, Seller shall:

(a)     to the extent that the goods or services are subject to rules of ethics of a profession, comply with any such applicable rules;

(b)     to the extent that the goods or services involve performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988, as amended ("Act 173"), comply with Act No. 173; and

(c)     as required by Article 11 of Act No. 14-2004, use commercially reasonable efforts to use, to the extent available and applicable to the goods or services, and to the extent permitted by law and the Federal Funding Requirements, goods extracted, produced, assembled, packaged, bottled or distributed in the

*KDF*

68



Commonwealth of Puerto Rico by businesses operating in the Commonwealth of Puerto Rico or distributed by agents established in the Commonwealth of Puerto Rico.

1.3.11  Seller certifies and guarantees that:

1.3.12  It has filed all the necessary and required income tax returns to the Commonwealth of Puerto Rico for the last five (5) years. Seller further certifies that it has complied and is current with the payment of any and all income taxes that are, or were due, to the Commonwealth of Puerto Rico; or

1.3.13  It does not have any legal obligation and has not had to submit income or sales and use tax returns in the Commonwealth of Puerto Rico during the past five (5) years, and it has no outstanding debt with the Commonwealth of Puerto Rico for income taxes or sales and use tax taxes.

1.3.14  Seller hereby certifies that it is in compliance with any applicable obligation it may have with the Puerto Rico Child Support Administration (Administración de Sustento de Menores (ASUME)). As evidence thereof, Seller has delivered to PREPA a certification issued by ASUME certifying that Seller does not have any debt, outstanding debt, or legal procedures to collect child support payments that may be registered with ASUME.

1.3.15  Seller hereby certifies that if there is any Judicial or Administrative Order demanding payment or any economic support regarding Act 168-2000, as amended known as the "Law for the Strengthening of the Family Support and Livelihood of Elderly People", the same is current and in all aspects in compliance.

1.3.16  Any and all necessary waivers regarding the Agreement have been obtained from any government entity and said waivers shall become part of the contracting file.

1.3.17  Seller expressly agrees that the conditions outlined throughout this Exhibit E are essential requirements of Contracts with PREPA. Consequently, should any of these representations, warranties, and certifications be incorrect, inaccurate or misleading, in whole or in part, then this will be deemed a material breach by Seller and permit PREPA to terminate the Agreement. PREPA shall also have the right to terminate the Agreement in the event of Seller's negligence, dereliction of duties or breach of this Agreement without limiting any other rights and remedies that PREPA may have as a result thereof, including the remedies available to it under Act No. 2-2018.

1.3.18  Seller hereby certifies that it has not been convicted in any Puerto Rico or United States Federal court of any of the crimes under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico ("Act 1-2012"), any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code ("Act 146-2012"), any of the crimes typified in Act No. 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico ("Act 2-2018") or any other felony that involves misuse of public funds



69

or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8- 2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico ("Act 8-2017").

1.3.19 PREPA shall have the right to terminate the Agreement in the event Seller is convicted in Puerto Rico or United States Federal court of any of the crimes under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act No. 2-2018, or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8-2017.

1.3.20 Furthermore, Seller agrees to comply with the provisions of Act 2-2018, as the same may be amended from time to time.

1.3.21 Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Agreement.

## 2.    INTERAGENCY SERVICES CLAUSE

Pursuant to Memorandum No. 2021-003, Circular Letter 001-2021, of the Office of the Governor of Puerto Rico and the Office of Management and Budget, both Parties acknowledge and agree that the contracted services herein may be provided to any entity of the Executive Branch which enters into an interagency agreement with PREPA or by direct provision of the Office of the Chief of Staff of the Governor of Puerto Rico. These services will be performed under the same terms and conditions regarding hours of work (if applicable) and compensation set forth in the Agreement.

## 3.    CONTRACT REVIEW POLICY OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

The Parties acknowledge that Seller has submitted the certification titled "*Contractor Certification Requirement*" required in accordance with the Contract Review Policy of the Financial Oversight and Management Board for Puerto Rico, effective as of November 6, 2017 and amended on October 30, 2020, signed by Seller's Executive Director (or another official with an equivalent position or authority to issue such certifications). If applicable, a signed copy of the Contractor Certification Requirement is included as Schedule E-2. Seller represents and warrants that the information included in Contractor Certification Requirement is complete, accurate and correct, and that any misrepresentation, inaccuracy of falseness in such Certification will render the contract null and void and Seller will have the obligation to reimburse immediately to the Commonwealth any amounts, payments or benefits received from the Commonwealth under the proposed contract.

## 4.    TERMINATION CLAUSE

To the extent required by Act No. 3-2017 and OE-2021-003, or other Applicable Law, order or circular letter, the office of the Chief of Staff shall have the authority to terminate this Agreement at any time; provided that in any such event Seller shall be entitled to payment in full for goods or services rendered by it through the date of termination.

*KDʃ*

70



PREPA certifies that, to the extent applicable, the Agreement has the appropriate governmental authorizations necessary for its execution, and according to the provisions in the Act No. 3-2017, known as the "Act to Address the Economic, Fiscal, and Budget Crisis to Guarantee the Operations of the Government of Puerto Rico." Furthermore, PREPA certifies that, also to the extent applicable, it has obtained written approval of the Government Chief of Staff and the Office of Management and Budget, pursuant to Memorandum Number 2017-001 and Circular Letter 141-17.

*KD7*

71

**EXHIBIT F**

**TAX BREAKDOWN**

TAX                                          RATE

| TAX | RATE |
|---|---|
| Income Tax | 4% on taxable income |
| Sales & Use Tax | 0% on purchased goods.<br><br>4% on non-maintenance services received. 11.5% on maintenance services<br><br>4% on equipment leased in |
| Personal Property Tax | 0.98% of book value |
| Municipal License Tax | 0.2% of gross receipts |
| Construction Excise Tax | 0% of construction costs |
| Dividends Withholding Tax | 0% on dividends paid |

Note: NFE operates under tax decree that provides for favorable taxation rates.

KDF

72

CY

EXHIBIT - C

**(1)    NFENERGÍA LLC**

**AS SELLER**

**AND**

**(2)    PUERTO RICO ELECTRIC POWER AUTHORITY**

**AS BUYER**

---

**ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

**JULY 17, 2025**

---

**THIS ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT** is made this 19th Day of July 2025 (**"Effective Date"**), BETWEEN:

(1)    **NFENERGÍA LLC**, a company with offices in 111 W 19th St. 8th Fl. New York, N.Y., represented in this act by Christopher Guinta, of legal age, married and authorized signatory of NFENERGÍA LLC, a limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the ("**Seller**"), and

(2)    **PUERTO RICO ELECTRIC POWER AUTHORITY** ("**PREPA**"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at P.O. Box 363928, San Juan, Puerto Rico 00936-3928, represented in this act by Genera PR LLC ("**Genera**") exclusively as agent on behalf of and for the account of PREPA, represented by Kevin D. Futch, of legal age, married and authorized signatory of Genera PR LLC, a limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the "**Buyer**").

Seller and Buyer shall each be a "**Party**" and, together, the "**Parties**."

## WITNESSETH

(A)    WHEREAS, on January 24, 2023, the P3A (as defined below), PREPA and Genera entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "**Generation O&M Agreement**"), whereby Genera became the operator of the Legacy Generation Assets (as defined therein) as an agent of PREPA;

(B)    WHEREAS PREPA, by virtue of Act No. 83 of May 2, 1941, as amended ("**Act 83**"), has the authority to engage services necessary and convenient to pursue the activities, programs, and operations of PREPA;

(C)    WHEREAS, pursuant to the Generation O&M Agreement, PREPA designated and appointed Genera as its agent;

(D)    WHEREAS, in accordance with the Generation O&M Agreement and Genera's Procurement Manual, this Agreement constitutes a Facility Contract and Genera is hereby acting solely as agent to PREPA and not for itself or on its own behalf;

(E)    WHEREAS, the U.S. Army Corps of Engineers, Omaha Division, as tasked by the Federal Emergency Management Agency, issued multiple task orders to Weston Solutions, Inc. under the Rapid Disaster Infrastructure contract to supply and operate modular, mobile power generation facilities totaling approximately (i) 180 MW on the site of the existing Palo Seco Power Plant ("**Palo Seco Units**") and (ii) 250 MW on the site of the existing San Juan Power Plant ("**San Juan Units**" and, together with the Palo Seco Units, the "**Mobile Units**"), in each case along with vaporization facilities to deliver Natural Gas to the Mobile Units;

(F)    WHEREAS, the condition of the generation fleet and reserve power margin in Puerto Rico requires ongoing operation of the Palo Seco Units, the San Juan Units and other power

2

generation units located at Delivery Points (as defined below) around the island (the "**Generation Units**");

(G)    WHEREAS, PREPA requires a secure supply of Natural Gas for use as fuel for the Mobile Units; and

(H)    WHEREAS, on July 12, 2025, the Puerto Rico Public-Private Partnerships Authority ("**P3A**") issued a formal Declaration of Energy Exigency, pursuant to Section III.D.1.c of Genera's Procurement Manual and in accordance with 2 C.F.R. § 200.320(c)(1), recognizing a public exigency that precludes the use of competitive procurement to secure the continued delivery of Natural Gas for use in the Mobile Units for the generation of electric energy; and

(I)    WHEREAS, Seller is the sole entity contractually and physically capable of receiving and storing Natural Gas in the form of liquified natural gas ("**LNG**") and of providing LNG-related terminal and logistics services supporting the delivery of Natural Gas to the Mobile Units during the declared Energy Exigency period, due to its exclusive control of the LNG receiving terminal located in San Juan Harbor through July 30, 2025; and

(J)    WHEREAS, the Parties desire to enter into this Agreement for a limited term to conclude at 5:00 p.m. on July 25, 2025, subject to possible extension, on substantially the same pricing, technical, and operational terms as previously agreed to under the Natural Gas Sale and Purchase Agreement dated March 15, 2024, as amended, between the Parties (the "**March 15, 2024 Agreement**"), a copy of which is attached hereto as **Attachment 1** and by this reference incorporated herein, solely for the purpose of providing for the sale and purchase of Natural Gas and the delivery of that Natural Gas to the Mobile Units to address the energy exigency.

**NOW**, **THEREFORE**, Seller and Buyer hereby agree as follows:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION; GOVERNMENT CONTRACTING REQUIREMENTS

Capitalized terms not specifically defined in this Agreement shall be given the meanings ascribed to such terms in the March 15, 2024 Agreement.

The Puerto Rico Government Contracting Requirements specified in Exhibit E of the March 15, 2024 Agreement and any other provision of the March 15, 2024 Agreement required for validity of the Agreement (including, but not limited to, Financial Oversight and Management Board certifications) are incorporated herein.

## ARTICLE II

## SALE AND PURCHASE

II.1    Seller agrees to sell and deliver to Buyer at the Delivery Points, and Buyer agrees to purchase from Seller, Natural Gas that conforms to the requirements in Article IV of the March 15, 2024 Agreement during the Term specified in Article III.  The quantity of Natural Gas to be delivered

by Seller and the Delivery Point(s) to which such Natural Gas is to be delivered shall be the amount(s) and location(s) scheduled in accordance with Article V of the March 15, 2024 Agreement.  The price for such quantities of Natural Gas shall be determined in accordance with Article IX of the March 15, 2024 Agreement.

II.2     Seller shall deliver LNG in ISO Containers for inland sites by truck, or by alternative means as agreed by the Parties in writing, to the areas designated by Buyer for placement of ISO Containers, re-vaporize such LNG using the relevant Regas Equipment (owned or contracted for by Seller), and deliver Natural Gas to Buyer at the Delivery Points in the quantities nominated by Buyer and as directed by Buyer pursuant to Article V of the March 15, 2024 Agreement.

II.3     Within three (3) Business Days of notice from Buyer that ISO Containers are ready for retrieval, Seller shall remove empty ISO Containers from the designated Delivery Point(s).  All deliveries and retrieval of ISO Containers shall take place during business hours for such Delivery Point as notified by Buyer to Seller from time to time.

## ARTICLE III

## TERM; TERMINATION

III.1    This Agreement shall become effective once signed by representatives of Buyer and Seller and shall remain in full force and effect through 5:00 p.m. on July 25, 2025, unless earlier terminated in accordance with the provisions of Article XV of the March 15, 2024 Agreement.

## ARTICLE IV

## QUALITY

IV.1    The Natural Gas delivered by Seller to or for the account of Buyer at any Delivery Point shall comply with the Natural Gas quality specifications set forth in Exhibit B to the March 15, 2024 Agreement (the "**Specifications**").

IV.2    Failure of LNG or Natural Gas to conform to the Specifications shall be addressed in accordance with the procedures set forth in Article IV of the March 15, 2024 Agreement.

## ARTICLE V

## SCHEDULING

Quantities of Natural Gas to be delivered on each Day during the term of this Agreement shall be nominated and scheduled in accordance with the provisions of Article V of the March 15, 2024 Agreement.

4

## ARTICLE VI

### SELLER'S SHORTFALL

Any failure on the part of Seller to deliver to Buyer on any Day the quantity of Natural Gas scheduled for delivery on such day shall be remedied in accordance with the provisions of Article VI of the March 15, 2024 Agreement.

## ARTICLE VII

### MEASUREMENT AND TESTING AND OPERATIONS

Deliveries of Natural Gas shall be measured in accordance with the provisions of Article VII of the March 15, 2024 Agreement.

## ARTICLE VIII

### RISK AND INDEMNITY

The indemnities specified in Article VIII of the March 15, 2024 Agreement shall apply during the Term of this Agreement to the fullest extent permitted under Applicable Law.

## ARTICLE IX

### PRICE; INVOICING AND PAYMENT; MAXIMUM VALUE

The "**Fuel Price**" to be paid for each MMBtu of Natural Gas delivered in a month during the Term of this Agreement shall be calculated in accordance with Article IX of the March 15, 2024 Agreement.  Seller shall invoice Buyer for Natural Gas so delivered in accordance with the provisions of that Article.  All payments made under this Agreement will be charged to Buyer's budget account number 01-2321-23215, and shall be made to Seller at the bank account to be communicated by Seller to Buyer in writing.

Invoices and other notices shall be delivered to the addresses for Seller and Buyer set forth in Article IX of the March 15, 2024 Agreement.

Seller acknowledges that payment under this Agreement will not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

All invoices submitted by Seller shall include the following certification:

*"We certify under penalty of nullity that no public servant of the Puerto Rico Electric Power Authority will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into this agreement by and among Seller and Buyer dated July 16, 2025 (the "Agreement"). The only consideration to be received for the goods or services (as defined in the Agreement) are the agreed-upon fees that have been*

*negotiated with PREPA as specified in the Agreement. The total amount shown on this invoice is true and correct. The LNG has been delivered and no payment has been received previously for said delivery."*

Buyer estimates that the maximum value of this Agreement not to exceed $**9,792,800.00**.

## ARTICLE X

## DUTIES, TAXES AND CHARGES

Each of Seller and Buyer shall be responsible for the payment of all taxes, fees, levies, royalties, duties, penalties, licenses, and other charges imposed by any Governmental Authority ("**Taxes**") which it incurs and for which it is legally responsible for as a result of complying with this Agreement as specified in Article X of the March 15, 2024 Agreement.

## ARTICLE XI

## FORCE MAJEURE

Neither Seller nor Buyer shall be liable for any failure to perform or for omission or delay in the performance of any of its obligations under this Agreement, other than the obligation to make payments of money when due, if and to the extent that the affected Party's performance is prevented, delayed or interfered with by an act, event or circumstance, or combinations of events or circumstances, whether of the kind described herein or otherwise, that is not reasonably within its control, such Party having acted as a Reasonable and Prudent Operator and which effects could not be prevented or overcome by the exercise of due diligence ("**Force Majeure**"). The definition of Force Majeure set forth in Article IX of the March 15, 2024 Agreement and the procedures the Parties shall observe in asserting Force Majeure shall be those set forth in Article XI of the March 15, 2024 Agreement.

## ARTICLE XII

## REPRESENTATIONS, WARRANTIES AND LIABILITIES

Each Party makes, as of the Effective Date, the representations and warranties to the other Party set forth in Article XII of the March 15, 2024 Agreement.

## ARTICLE XIII

## ASSIGNMENT, ETC.

The provisions of Articles XIII through XXXVIII of the March 15, 2024 Agreement shall apply to this Agreement as if set out herein in full.

6

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.

**For and on behalf of**
SELLER:

**NFENERGÍA LLC**

**EIN: 66-0889369**

Name: _____
     Christopher Guinta
Title:  Chief Financial Officer

**For and on behalf of**
BUYER:

**PUERTO RICO ELECTRIC POWER AUTHORITY, represented by its agent, Genera PR LLC**

Name: _____
     Kevin D. Futch
Title:    General Counsel

Authorized Signatory for Genera PR LLC, exclusively as agent on behalf of and for the account of PREPA

**Attachment 1**

**Natural Gas Sale and Purchase Agreement dated March 15, 2024**

2024-G00284







# Natural Gas Sale and Purchase Agreement

## Natural Gas Supply (Palo Seco, San Juan and Other Generation Units Around the Island)

### Issued by 3PPO

*KDF*

DocuSign Envelope ID: 4F0D6585-842D-4720-ABC0-D9D933F20F6F

2024-G00284

(1)   **NFENERGÍA LLC**

**AS SELLER**

**AND**

(2)   **PUERTO RICO ELECTRIC POWER AUTHORITY**

**AS BUYER**

**NATURAL GAS SALE AND PURCHASE AGREEMENT**

*KDF*

*CA*

## TABLE OF CONTENTS

RFP 3PPO-0118-04-FA ................................................................................................ 1

ARTICLE I DEFINITIONS AND INTERPRETATION ........................................... 6

ARTICLE II SALE AND PURCHASE .................................................................... 14

ARTICLE III TERM AND CONDITIONS ............................................................. 15

ARTICLE IV QUALITY ....................................................................................... 15

ARTICLE V SCHEDULING .................................................................................. 17

ARTICLE VI SELLER'S SHORTFALL ................................................................ 21

ARTICLE VII MEASUREMENT AND TESTING AND OPERATIONS ................. 21

ARTICLE VIII RISK AND INDEMNITY .............................................................. 25

ARTICLE IX INVOICING AND PAYMENT ......................................................... 27

ARTICLE X DUTIES, TAXES AND CHARGES ................................................... 32

ARTICLE XI FORCE MAJEURE ......................................................................... 33

ARTICLE XII REPRESENTATIONS, WARRANTIES AND LIABILITIES ............ 35

ARTICLE XIII ASSIGNMENT .............................................................................. 36

ARTICLE XIV SUBCONTRACTORS ................................................................... 37

ARTICLE XV TERMINATION ............................................................................. 37

ARTICLE XVI NOVATION ................................................................................... 39

ARTICLE XVII CHANGE IN LAW ....................................................................... 39

ARTICLE XVIII APPLICABLE LAW ................................................................... 40

ARTICLE XIX CODE OF ETHICS ....................................................................... 40

ARTICLE XX SETTLEMENT OF DISPUTES ...................................................... 40

ARTICLE XXI NON-WAIVER .............................................................................. 42

ARTICLE XXII CONFIDENTIALITY ................................................................... 42

ARTICLE XXIII NOTICES .................................................................................... 44    *KDF*

*CH*

ARTICLE XXIV CONTINGENT FEES ..........................................................................45

ARTICLE XXV ADDRESSES FOR NOTICES ...........................................................45

ARTICLE XXVI ...............................................................................................................45

BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT ...................45

ARTICLE XXVII TRANSFER OF FUNDS .................................................................46

ARTICLE XXVIII CONFLICT OF INTEREST ...........................................................46

ARTICLE XXIX UNFAIR LABOR PRACTICE ...........................................................47

ARTICLE XXX DISCRIMINATION ............................................................................48

ARTICLE XXXI COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS ...........................................................................48

ARTICLE XXXII PUBLIC OFFICERS OR EMPLOYEES .........................................48

ARTICLE XXXIII DISPENSATION ............................................................................49

ARTICLE XXXIV RULES OF PROFESSIONAL ETHICS .........................................49

ARTICLE XXXV ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO............50

ARTICLE XXXVI CONTRACT REVIEW POLICY .....................................................50

ARTICLE XXXVII INSURANCE ..................................................................................50

ARTICLE XXXVIII GENERAL ....................................................................................52

EXHIBIT A SPECIFICATIONS ....................................................................................55

EXHIBIT B DELIVERY POINTS .................................................................................56

EXHIBIT C FORM OF PARENT GUARANTEE ........................................................57

EXHIBIT D FORM OF BOND ......................................................................................64

EXHIBIT E GOVERNMENT CONTRACTING REQUIREMENTS ...........................66

EXHIBIT F TAX BREAKDOWN .................................................................................72

KDF

4



**THIS NATURAL GAS SALE AND PURCHASE AGREEMENT** is made this 15th

Day of March 2024 (**"Effective Date"**), BETWEEN:

(1)     **NFENERGÍA LLC**, a Limited Liability Company with offices in 111 W 19th St. 8th Fl. New York, N.Y., represented in this act by Christopher Guinta, of legal age, married and authorized signatory of NFENERGÍA LLC, limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the ("**Seller**").

(2)     **PUERTO RICO ELECTRIC POWER AUTHORITY** ("**PREPA**"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by an Act of 2 May 1941, No. 83, as amended, with its principal place of business at P.O. Box 363928, San Juan, Puerto Rico 00936-3928, represented in this act by Genera PR LLC ("**Genera**") exclusively as agent on behalf of and for the account of PREPA, represented by Kevin D. Futch, of legal age, married and authorized signatory of Genera PR LLC, a limited liability company organized and existing under the laws of Puerto Rico (hereinafter called the "**Buyer**").

Seller and Buyer shall each be a "**Party**" and, together, the "**Parties**."

### WITNESSETH

(A)     WHEREAS, on January 24, 2023, the P3A (as defined below), PREPA and Genera entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "**Generation O&M Agreement**"), whereby Genera became the operator of the Legacy Generation Assets (as defined therein) as an agent of PREPA;

(B)     WHEREAS PREPA, by virtue of Act No. 83 of May 2, 1941, as amended ("**Act 83**"), has the authority to engage services necessary and convenient to pursue the activities, programs, and operations of PREPA;

(C)     WHEREAS, pursuant to the Generation O&M Agreement, PREPA designated and appointed Genera as its agent;

(D)     The Third-Party Procurement Office (3PPO) is established under the Puerto Rico Public-Private Partnerships Authority (P3A), as mandated by the Puerto Rico Electric System Transformation Act (Act 120-2018) and the Public-Private Partnerships Act (Act 29-2009). The 3PPO is designated as the primary entity authorized to manage and oversee procurement activities pertaining to the Public-Private Partnerships, specifically in relation to the Puerto Rico Electric Power Authority (PREPA);

(E)     WHEREAS, in accordance with the Generation O&M Agreement and Genera's Procurement Manual, this Agreement constitutes a Facility Contract and Genera is hereby acting solely as agent to PREPA and not for itself or on its own behalf;

(F)     WHEREAS, the U.S. Army Corps of Engineers, Omaha Division, as tasked by the Federal Emergency Management Agency, issued multiple task orders to Weston Solutions, Inc. under the Rapid Disaster Infrastructure contract to supply and operate modular, mobile power generation facilities totaling approximately (i) 180 MW on the site of the existing Palo Seco

*KDf*

5

*CH*

Power Plant ("**Palo Seco Units**") and (ii) 250 MW on the site of the existing San Juan Power Plant ("**San Juan Units**" and, together with the Palo Seco Units, the "**Mobile Units**"), in each case along with vaporization facilities to deliver regasified LNG to the Mobile Units.

(G)    WHEREAS, the condition of the generation fleet and reserve power margin in Puerto Rico requires ongoing operation of the Palo Seco Units, the San Juan Units and other power generation units located at Delivery Points (as defined below) around the island (the "**Generation Units**");

(H)    WHEREAS, PREPA requires a secure supply of Natural Gas to use as fuel for the Generation Units; and

(I)    WHEREAS, to address such requirement, the 3PPO issued the Request for Proposals **3PPO-0118-04-FA** on **February 17, 2024** in which it seeks bids to deliver LNG to the sites of the Generation Units, provide for the vaporization of such LNG, and deliver Natural Gas to the Generation Units and Seller was selected to supply such Natural Gas pursuant to the **3PPO-0118-04-FA**,

**NOW**, **THEREFORE**, Seller and Buyer hereby agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

I.1    Definitions

In this Agreement, except where the context otherwise requires, each of the following expressions have the following meaning:

"**3PPO**" means the Third Party Procurement Office.

"**Adjusted Nominated Quantity**" shall have the meaning given to it in Article IX.2.

"**Affiliate**" means, in relation to a Party, any company, corporation, partnership or other legal entity (in this definition referred to as a "**Person**") that (a) is directly or indirectly Controlled by such Party; (b) directly or indirectly Controls such Party; or (c) is directly or indirectly Controlled by a Person that also, directly or indirectly, Controls such Party; *provided, however,* that unless and until Buyer undergoes a Change of Control permitted by this Agreement, Buyer's only Affiliates are (x) the Puerto Rico Fiscal Agency and Financial Advisory Authority and (y) the Commonwealth of Puerto Rico.

"**Agreement**" means this Agreement and its Exhibits, as may be amended, modified, varied or supplemented from time to time.

"**Annual Quantity Taken**" shall have the meaning given to it in Article IX.7.

"**Anti-Corruption Controls**" shall have the meaning given to it in Article XIX.1.

6

*KDF*

*CH*

"**Applicable Law**" means, in relation to any legal person, property, transaction or event, all applicable provisions of laws, treaties, conventions, statutes, rules, regulations, permits, official directives and orders of, and the terms of all judgments, orders, awards, and decrees issued by, any Governmental Authority by which such legal Person is bound or having application to the property, transaction or event in question, including the Electric Power Authority Revitalization Act and PROMESA.

"**Btu**" means a British thermal unit, being that amount of heat that is equal to 1,055.056 Joules or 0.000293071 kWh.

"**Business Day**" means a Day, other than a Saturday, Sunday or a public holiday in San Juan (Puerto Rico) or New York (United States).

"**Buyer**" shall have the meaning given to it in the preamble to this Agreement.

"**Buyer Group**" means Buyer, its Affiliates, and its and their respective directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Carryover Credit**" shall have the meaning given in Article V.4(d).

"**Change of Control**" means (a) in the case of Buyer, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, a Puerto Rican Governmental Authority would no longer Control Buyer, and (b) in case of Seller, a transaction or series of related transactions (including transfers and issuances of, or the enforcement of any lien or encumbrance on, equity interests) pursuant to which, if consummated, New Fortress Energy Inc. would cease to Control Seller.

"**Change of Law**" means the amendment, repeal or change of an existing Applicable Law, or a new Applicable Law, in either case that takes effect after the Effective Date.

"**Claims**" means all claims, demands, notices of violation or noncompliance, governmental requests for information, legal proceedings, liens, encumbrances, causes of action and other actions, of any kind or nature (including actions *in rem* or *in personam* and actions of Governmental Authorities). "**Claim**" means any of the foregoing.

"**Confidential Information**" shall have the meaning given to it in Article XXII.1.

"**Contract Ceiling**" shall have the meaning given to it in Article IX.6.

"**Contract Year**" shall have the meaning given to it in Article Article III(b).

"**Control**" means the beneficial ownership, either directly or indirectly, of fifty percent (50%) or more of the voting rights in a Person, or (whether alone or acting in concert with others, and whether by the ownership of share capital, the possession of voting power, contract or otherwise) the right to appoint fifty percent (50%) or more of the board of directors or equivalent management body of such Person. "**Controlled**" shall have the correlative meaning.

*KDF*

7

*CH*

"**Corporate Tax**" means any and all Taxes based on income, revenues, profits, or net worth and all state and local franchise, license, occupation and similar Taxes required for the maintenance of corporate existence or to maintain good standing that are assessed against a Party.

"**Day**" means a period of twenty-four (24) consecutive hours beginning at 00:00 hours local time in Puerto Rico.

"**Defaulting Party**" shall have the meaning given to it in Article XV.1(c).

"**Delivery Confirmation Request**" shall have the meaning given to it in Article IV.2(c).

"**Delivery Point**" means (i) with respect to any Generation Units with Metering Equipment, the outlet of the Natural Gas metering facilities between the relevant Regas Equipment and the Generation Units, and (ii) with respect to all other Generation Units, the point at which the relevant Regas Equipment interconnects with the applicable Generation Units, or such other points as may be agreed in writing by the Parties.

"**Diesel Contract Price**" with respect to a given month means the arithmetic mean of the prices for deliveries of ultra-low sulfur diesel (converted to cents per gallon and rounded to four decimal places) on each Day of that month as set forth in (i) the Diesel Fuel Purchase Contract dated October 27, 2023, Contract Number 101333, while such contract remains in full force and effect, and (ii) subsequently, in Buyer's then-effective fuel supply agreement for deliveries of ultra-low sulfur diesel to one or more of San Juan, Palo Seco, Aguirre, Mayagüez, Cambalache, and various generating stations around the island of Puerto Rico, or another reasonably similar agreement.

"**Diesel Price**" shall have the meaning given to it in Article IX.

"**Disclosing Party**" shall have the meaning given to it in Article XXII.1.

"**Dispute**" shall have the meaning given to it in Article XX.1(a).

"**Effective Date**" shall have the meaning given to it in the preamble to this Agreement.

"**Excess Nomination**" shall have the meaning given to it in Article V.4.

"**Excluded Losses**" shall have the meaning given to it in Article VIII.4.

"**Expert**" means a Person of appropriate industry expertise and experience to whom a Dispute, disagreement or another matter of interpretation is or is to be referred to pursuant to Article XX.2.

"**Extension Term**" shall have the meaning given to it in Article III(a).

"**Force Majeure**" shall have the meaning given to it in Article XI.1.

"**Forced Shutdown**" means a shutdown or dispatch condition of any of the Generation Units located at the same site as a Delivery Point nominated to receive a delivery in a Monthly Schedule or Weekly Programme, which results in a derating or otherwise makes such Generation Units

8

KD7

64

unavailable to produce power, including as a result of an unexpected or imminent breakdown, equipment failures, disruption of the fuel supply, operator error, grid operator instruction, government action and similar occurrences.

"**Fuel Price**" shall have the meaning given to it in Article IX.1.

"**Governmental Authority**" means the government of the United States of America, any state thereof, the Commonwealth of Puerto Rico, or any local jurisdiction, or any political subdivision of any of the foregoing including, but not limited to courts, administrative bodies, departments, commissions, boards, bureaus, agencies, municipalities or other instrumentalities.

"**Genera**" shall have the meaning given to it in the Preamble to this Agreement.

"**Generation O&M Agreement**" shall have the meaning given to it in the Recitals.

"**Generation Units**" shall have the meaning given to it in the Recitals.

"**Hazardous Materials**" means any substance that is either defined or regulated as hazardous or toxic by, or as to which liability including for damages or remediation may be imposed under Applicable Law, including (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing polychlorinated biphenyls and processes and certain cooling systems that use chlorofluorocarbons; (b) any chemicals, materials or substances which as of the applicable Effective Date are, or hereafter become, defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," or any words of similar import pursuant to Applicable Law; or (c) any other chemical, material, substance or waste, exposure to which is now or hereafter prohibited, limited or regulated by any Governmental Authority, or which may be the subject of liability under any Applicable Law for damages, costs or remediation.

"**Heating Value**" (also known as High Heating Value (HHV)) means the gross heating value on a dry basis, which is the number of Btus produced by the complete combustion at constant pressure of the amount of dry gas that would occupy a volume of one Standard Cubic Foot at a constant pressure of 14.73 psia and a temperature of 60° F with combustion air at the same temperature and pressure as the gas, the products of combustion being cooled to the initial temperature of the gas and air and the water formed by combustion condensed to the liquid state.

"**Initial Term**" shall have the meaning given to it in Article III.I.

"**ISO Container**" means (i) an intermodal container designed for the transportation and storage of LNG in a cryogenic state that is manufactured according to the specifications for such containers prescribed by the International Organization for Standardization or (ii) subject to Buyer's consent, such consent not to be unreasonably withheld, a truck-mounted trailer designed for the transportation and storage of LNG in a cryogenic state.

"**Joule**" means a unit of energy defined in the International System of Units.

"**kWh**" shall mean kilowatt hour.

*KD7*

9

*C4*

"**Loading Certificate**" means the loading certificate or similar document that sets forth the mass, composition, heating value per unit of mass, and quality of LNG loaded into an ISO Container.

"**Logistics Factor**" means the rate of $0 (Zero US Dollars) per MMBtu per mile for deliveries to each Delivery Point.

"**Logistics Surcharge**" means, for each Delivery Point to which Seller delivers Natural Gas in a month, a surcharge in US Dollars for such deliveries, calculated as the Logistics Factor multiplied by the quantity (in MMBtu) of such deliveries multiplied by the distance in miles to such Delivery Point as set forth in Exhibit B.

"**LNG**" means Natural Gas in a liquid state at or below its boiling point and at or near atmospheric pressure.

"**Losses**" means all liabilities, damages, losses, costs and expenses (including those on account of loss of or damage to property, bodily injury, personal injury, illness, disease, maintenance, cure, loss of consortium (parental or spousal), loss of support, death, and wrongful termination of employment, and all litigation and arbitration costs and expenses and reasonable attorneys' fees) that accrue at any time, whether created by or based upon law (including statute), contract, tort, voluntary settlement or otherwise, or under judicial proceedings, administrative proceedings or otherwise, or conditions in the premises of or attributable to any Person or Persons or any Party or Parties. "Loss" means any of the foregoing.

"**Maximum Annual Contract Quantity**" shall have the meaning given to it in Article V.1.

"**Maximum Monthly Quantity**" shall have the meaning given to it in Article V.3(a)(i).

"**Maximum Weekly Quantity**" shall have the meaning given to it in Article V.3(a)(i).

"**Metering Equipment**" shall have the meaning given to it in Article VII.3.

"**Minimum DCQ**" shall have the meaning given to it in Article V.2.

"**Minimum Volume Commitment**" means 0% (Zero Percent) of the Maximum Annual Contract Quantity.

"**Mitigation Sale**" shall have the meaning given to it in Article V.4(c).

"**MMBtu**" means 1,000,000 Btu.

"**Mobile Units**" shall have the meaning given to it in the Recitals.

"**Monthly Invoice**" shall have the meaning given to it in Article IX.3.

"**Monthly Schedule**" shall have the meaning given to it in Article V.3(a)(ii).

"**Natural Gas**" or "**NG**" means any saturated hydrocarbon or mixture of saturated hydrocarbons consisting essentially of methane and other combustible and non-combustible gases in a gaseous state.

KDf



"**NG Deficiency**" shall have the meaning set forth in Article VI.1.

"**Ninety Day Schedule**" or "**NDS**" shall have the meaning given to it in Article V.3(a).

"**Off-Spec NG**" is any LNG or Natural Gas that does not conform to the Specifications set forth in Exhibit B.

"**Oversight Board**" shall mean the Financial Oversight and Management Board for Puerto Rico.

"**P3A**" the Puerto Rico Public-Private Partnerships Authority, a public corporation of the Commonwealth of Puerto Rico.

"**Palo Seco Units**" shall have the meaning given to it in the Recitals.

"**Party**" and "**Parties**" shall have the meanings given to them in the preamble to this Agreement.

"**Permit**" means, in respect of either Party, any permit, license, consent, clearance, certificate, approval, authorization or similar document or authority (including for export or import) which any Applicable Laws requires such Party (or, in the case of Seller, any member of the Seller Group) to hold or obtain in order for any of its obligations under this Agreement to be performed, including visas and permits for personnel to work and reside in any location.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a joint stock company, a trust, any unincorporated organization, or any Governmental Authority.

"**PREPA**" shall have the meaning given to it in the preamble to this Agreement.

"**Prime Rate**" means the prime lending rate, as reported by The Wall Street Journal's bank survey.

"**PROMESA**" means the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241, as may be amended or modified.

"**Puerto Rican Governmental Authority**" means a Governmental Authority of the Commonwealth of Puerto Rico, and excludes, for the avoidance of doubt, any Governmental Authority of the federal government of the United States of America or any state therein.

"**Qualifying Bank**" means a national bank, national association, commercial bank or other financial institution organized under the laws of the United States or a political subdivision thereof or validly existing in the country of its organization and registered to do business in the United States, having a branch located within Puerto Rico or the contiguous United States, in each case that has a long-term issuer rating of at least (i) if headquartered within Puerto Rico, then "B+" by Standard & Poor's Ratings Services, "B1" by Moody's Investors Services Inc., or "B+" by Fitch Ratings Inc. or (ii) if headquartered outside of Puerto Rico, then "A-" by Standard & Poor's Ratings Services, "A3" by Moody's Investors Services Inc., or "A-" by Fitch Ratings Inc., or in each case if the relevant

*KD7*

*CA*

rating agencies cease to engage in business or rate the obligations in question, then an equivalent rating from another internationally recognized rating agency selected by Seller with the written consent of Buyer; provided that, if such financial institution's ratings satisfy such minimum ratings, no other credit rating agency shall have placed such financial institution on credit watch with negative implications.

"**Reasonable and Prudent Operator**" means a Person seeking in good faith to perform its contractual obligations and comply with Applicable Law, and in so doing, and in the general conduct of its undertaking, exercising that degree of skill, diligence, prudence and foresight which would reasonably and ordinarily be expected from a skilled and experienced international operator engaged in the same type of undertaking under the same or similar circumstances and conditions.

"**Receiving Party**" shall have the meaning given to it in Article XXII.1.

"**Regas Equipment**" means facilities located at and around a Delivery Point for the vaporization of LNG held in ISO Containers and delivery and metering, to the extent available, of the resulting Natural Gas to the Delivery Point.

"**San Juan Units**" shall have the meaning given to it in the Recitals.

"**Seller**" shall have the meaning given to it in the preamble to this Agreement.

"**Seller Group**" means Seller, its Affiliates, and its and their respective directors, officers, personnel, contractors and subcontractors, and any heirs, successors, and assigns of any of the above.

"**Seller Shortfall Payment**" shall have the meaning set forth in Article VI.1.

"**Specifications**" shall have the meaning given to it in Article IV.1.

"**Standard Cubic Foot**" or "**scf**" means Natural Gas at a base temperature of 60° F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law.

"**Supply Period**" shall have the meaning given to it in Article III.2.

"**Taxes**" shall have the meaning given to it in Article X.

"**TBtu**" means 1,000,000,000,000 Btu.

"**Term**" shall have the meaning given to it in Article Article III.1.

"**Termination Event**" shall have the meaning given to it in Article XV.1(c).

"**Termination for Convenience**" shall have the meaning given to it in Article XV.1(b).

"**Third Party**" means any Person not a Party to this Agreement; *provided, however,* that for the purpose of Article XI, "**Third Party**" means any person who is not a member of Seller Group or Buyer Group.

*KDf*

12

*CA*

"**Title III Case**" shall mean the case under Title III of PROMESA styled *In re The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Electric Power Authority (PREPA)* and numbered No. 17 BK 4780-LTS, which was instituted on July 2, 2017 by the Oversight Board by the filing of a voluntary petition for relief for Buyer.

"**Title III Court**" shall mean the United States District Court for the District of Puerto Rico, or any appellate court, presiding over the pending Title III Case of PREPA.

"**Trust Agreement**" shall mean that certain Trust Agreement, dated as of January 1, 1974, between Buyer and U.S. Bank, National Association, as Successor Trustee, as amended, restated, or otherwise modified from time to time.

"**US**" means the United States of America.

"**US Dollars**" or "**US$**" means the lawful currency of the United States of America.

"**Weekly Programme**" shall have the meaning given to it in Article V.3(a)(iii).

I.2    Interpretation

In this Agreement, unless the context requires otherwise:

(a)    References to Articles and Exhibits are to Articles and Exhibits of this Agreement. The Exhibits hereto are incorporated herein as an integral part of this Agreement.

(b)    References to a Person include that Person's successors and permitted assigns.

(c)    Headings of Articles and Exhibits are for convenience only and shall not affect the construction or interpretation of this Agreement.

(d)    Where the context requires, words denoting the singular or masculine or neuter only shall include the plural, feminine, body politic or corporate and vice versa.

(e)    References to "include" and "including" shall be construed as "including without limitation."

(f)    The words "agree," "agrees," and "agreed" refer to a written agreement, executed and delivered by the Parties.

(g)    Wherever either Party's consent or agreement is expressed to "not be unreasonably withheld," it is acknowledged that such obligation shall include, but not be limited to, the obligation of the Party not unreasonably to delay giving the relevant consent or agreement, and in the foregoing case as well as wherever either Party undertakes "efforts" or "endeavors" to do something, or refrain from doing something, it is acknowledged that such Party shall not be in breach of its obligations to the other Party to the extent that such Party's actions are limited by such Party's need to comply with its contractual obligations to any Person,

*KD7*

13

*CA*

provided that such Party has used its reasonable efforts to obtain any necessary waiver(s) of such relevant obligations and that such Party has not assumed such obligations subsequent to entering into this Agreement.

(h)    Any law, statute or statutory provision shall be construed as a reference to the same as it may be amended, modified or re-enacted, from time to time, and shall include any subordinate legislation made from time to time under that provision.

(i)    If at any time during the Supply Period, the Prime Rate becomes unavailable or inappropriate then the Parties shall meet as soon as possible thereafter and in good faith discuss and attempt to agree in writing upon a suitable alternative replacement. If the Parties are unable to so agree upon a suitable alternative replacement, then either Party may refer the matter to an Expert for determination in accordance with Article XX.2.

I.3    Seller acknowledges and agrees that as long as the Generation O&M Agreement is in effect (a) all provisions hereunder relating to Buyer as beneficiary of the terms and conditions of the Agreement or otherwise referencing Buyer taking any action, receiving any notice or disclosure, making any determination (including the termination of the Agreement) shall be understood to refer to Genera acting on Buyer's behalf; (b) all references to "Genera" shall be understood to mean Genera on its own behalf, as third party beneficiary of the Agreement; (c) Buyer is prohibited from taking any action or giving any consent hereunder directly and not through Genera as its agent; and (4) Genera shall have no liability hereunder for any actions it may take on Buyer's behalf, and all such liability shall be exclusively of Buyer.

I.4    Generation O&M Agreement. By executing this Contract, Seller acknowledges and agrees that it has reviewed the Generation O&M Agreement located at: https://www.p3.pr.gov/wp-content/uploads/2023/01/230124-LGA-OM-Agreement.pdf.

## ARTICLE II

## SALE AND PURCHASE

II.1    Seller agrees to sell and deliver to Buyer at the Delivery Points, and Buyer agrees to purchase from Seller, Natural Gas that conforms to the requirements in Article IV. The quantity of Natural Gas to be delivered by Seller and the Delivery Point(s) to which such Natural Gas is to be delivered shall be the amount(s) and location(s) scheduled in accordance with Article V. The price for such quantities of Natural Gas shall be determined in accordance with Article IX.

II.2    Seller shall deliver LNG in ISO Containers for inland sites by truck, or by alternative means as agreed by the Parties in writing, to the areas designated by Buyer for placement of ISO Containers, revaporize such LNG using the relevant Regas Equipment (owned or contracted for by Seller), and deliver Natural Gas to Buyer at the Delivery Points in the quantities nominated by Buyer and as directed by Buyer pursuant to Article V.

II.3    Within three (3) Business Days of notice from Buyer that ISO Containers are ready for retrieval, Seller shall remove empty ISO Containers from the designated Delivery Point(s).    All

*KDF*

14

*CH*

deliveries and retrieval of ISO Containers shall take place during the business hours for such Delivery Point as notified by Buyer to Seller from time to time.

II.4    If any new Delivery Point is agreed to by the Parties and such Delivery Point is capable of receiving Natural Gas by means other than ISO Container, or if any existing Delivery Point becomes capable of receiving Natural Gas by means other than ISO Container, the Parties may agree in writing to such terms and conditions as are necessary to provide for the additional means of delivery and receipt.

## ARTICLE III

## TERM AND CONDITIONS

III.1    This Agreement shall become effective once signed by Buyer and Seller, contingent upon the signing and execution of the Asset Purchase Agreement for the temporary generators by and between PREPA and NFE POWER PR LLC, if and when such signing and execution occur. This Agreement shall remain in effect for a period of one (1) year (the **"Initial Term"** and, as extended pursuant to this section, the "**Term**"), commencing on March 16, 2024, at 12:00:01 am, unless earlier terminated by either Party pursuant to Article XV.1.

(a)    Buyer may elect to extend the Term for up to three (3) additional one-year periods (each an "**Extension Term**") by delivering notice of such election to Seller no later than thirty (30) days prior to the end of the then-current Term, provided that Seller may reject such extension by delivering notice to Buyer no later than [three (3) days after receipt of Buyer's notice.

(b)    If Seller accepts Buyer's election to extend the Term or does not respond within the period set forth in Article III(a), then the Term shall be extended for one (1) year (the initial Term and each one year extension a "**Contract Year**"). If Seller delivers notice rejecting Buyer's extension notice within the period set forth in Article III(a), then the Term of this Agreement shall not be extended.

III.2    The "**Supply Period**" shall commence on the later of (a) March 16, 2024, and (b) the first Day after the termination or expiration date, without replacement, of any Task Order issued by the US Army Corps of Engineers, Omaha Division, for the operation and supply of Natural Gas to any Generation Units.

## ARTICLE IV

## QUALITY

IV.1    The Natural Gas delivered by Seller to or for the account of Buyer at any Delivery Point shall comply with the Natural Gas quality specifications set forth in Exhibit B (the "**Specifications**"). The standard test method ASTM D1945, Standard Test Method for Analysis of Natural Gas by Gas Chromatography, then in effect, shall be used to determine compliance with the Specifications. Prior to delivery, the Seller shall provide the Buyer with a Quality Compliance Certification. This certification shall affirm that the Natural Gas to be dispatched adheres to the specified quality standards outlined in Exhibit B.

15

*KD7*

*CA*

IV.2    Failure of LNG or Natural Gas to Conform to Specifications

(a)    Seller shall notify Buyer as soon as reasonably practicable after becoming aware of any existing or anticipated failure of the Natural Gas available for delivery to the Delivery Point to conform to the Specifications, giving details of the nature and expected magnitude of the variance, the cause of the non-compliance and the probable duration, including the delivery time of such Off-Spec NG.

(b)    If at any time, the Natural Gas offered for delivery by Seller is or is reasonably expected by Seller to be Off-Spec NG, Buyer may reject in whole or in part the delivery of such Off-Spec NG.

(c)    If at any time, Seller is unable to deliver Natural Gas conforming to the Specifications but is able to deliver Off-Spec NG, Seller shall withhold deliveries until such time as it is able to deliver Natural Gas conforming to the Specifications; *provided, however*, that in such event Buyer shall be entitled to (i) procure Natural Gas, LNG, or other fuel from Third Parties, (ii) utilize the relevant Regas Equipment and/or (iii) request delivery of such Off-Spec NG (a "**Delivery Confirmation Request**").

(d)    Unless both (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer makes a Delivery Confirmation Request pursuant to Article IV.2(c) (which shall constitute a waiver in writing of its right to reject such Off-Spec NG), Seller shall, subject to Article VIII.4, be liable for all cost and expense directly incurred by Buyer as a result of the delivery of Off-Spec NG, including all the out-of-pocket, actual costs and expenses incurred (over and above those normally incurred in accepting conforming Natural Gas or LNG) in receiving and treating Off-Spec NG by such means as are appropriate and available to Buyer; *provided, however*, that Buyer shall exercise commercially reasonable practices to minimize the costs and expenses which may occur.

(e)    If (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer elects not to take such Off-Spec NG, Seller shall be liable to Buyer for Seller Shortfall Payment as determined pursuant to Article VI.1.

(f)    If (i) Buyer is notified of the full extent to which Off-Spec NG actually fails to meet the Specifications, and (ii) Buyer waives in writing its right to reject such Off-Spec NG, (A) such Off-Spec NG shall be deemed to have been delivered in accordance with this Agreement and (B) Seller shall not be liable for any damages to Buyer for the acceptance of such Off-Spec NG.

(g)    When Natural Gas is not taken by Buyer due to it being Off-Spec NG or when Seller withholds Natural Gas pursuant to Article IV.2(c), Buyer shall not be obliged to pay for such Natural Gas not taken, and such Natural Gas not taken

*KDF*



shall be deemed not to have been made available and shall be considered an NG Deficiency and Article VI shall apply.

(h)    The price for all Off-Spec NG delivered to the Delivery Point, whether pursuant to paragraph (f) above or otherwise, shall equal eighty-five percent (85%) of the Fuel Price.

(i)    Buyer shall have no right or remedy with respect to the Off-Spec NG other than those stated or referred to in this Article IV.2 and Article XV.

IV.3    Any Dispute between the Parties concerning the measurement and/or testing of Natural Gas or LNG for the purposes of determining the quality thereof at the DELIVERY POINT shall be settled in accordance with the provisions of Article XX.2 of this Agreement.

## ARTICLE V

## SCHEDULING

V.1    The "**Maximum Annual Contract Quantity**" for each Contract Year shall be 80 TBtu.

V.2    In respect of each Day of every Contract Year, the contracted quantity for such Day shall be the daily nomination for such Day of the Weekly Programme or as otherwise agreed in writing.

V.3    With respect to each Contract Year during the Supply Period, the following provisions shall apply:

(a)    The Ninety Day Schedule ("**NDS**") and Weekly Programme for such Contract Year shall be established according to the following conditions:

(i)    The Maximum Annual Contract Quantity shall be divided equally (A) among the twelve months of each Contract Year, with partial months for the period from March 16-March 31 at the start of the Contract Year and for March 1-March 15 at the end of the Contract Year ("**Maximum Monthly Quantity**"); and (B) by fifty-two (52) weeks with partial weeks starting on March 16 at the beginning of each Contract Year and ending on March 15 at the end of each Contract Year ("**Maximum Weekly Quantity**").

(ii)    Except as set forth in Article V.3(a)(v) below, on or before the fifth (5th) Day of each calendar month **M-1** Buyer shall provide to Seller its Natural Gas requirements for the three (3) months following M-1 (the "**NDS**" and such three months, in chronological order, months "**M**," "**M+1**" and "**M+2**"). The NDS shall be final and binding for month **M** (the "**Monthly Schedule**"), and non-final and non-binding for months **M+1** and **M+2**. Such NDS shall include the monthly quantities of Natural Gas to be delivered in each of the next three (3) months, which monthly quantities of Natural Gas shall not exceed the Maximum Monthly Quantity, as well as the estimated daily Natural Gas requirements

*KDF*

17



for month M and Buyer's expected Delivery Point(s) for such quantities. Buyer may request additional Natural Gas from Seller for month M after the deadline for submission of the NDS. Upon receipt of such a request, Seller shall inform Buyer within one (1) Day whether Seller can deliver all or a portion of such quantities and the applicable price, and Buyer shall have two (2) Days to accept or decline Seller's offer. If Buyer accepts Seller's offer, such quantities shall become firm and binding; *provided, however,* that such quantities shall not be treated as quantities of Natural Gas to which the Monthly Schedule or the NDS apply. Further, Buyer shall use commercially reasonable efforts to include in each NDS estimated, non-binding daily requirements for months M+1 and M+2; and

(iii)    On or before 00.00 hours Puerto Rico Time of each Wednesday of each week, or, if such Day is not a Business Day, on the Business Day immediately preceding such Day, Buyer shall provide to Seller a daily nomination of its Natural Gas requirements for the coming week, the Delivery Point(s) to which such Natural Gas shall be delivered, and the quantities to be delivered to each Delivery Point on each Day ("**Weekly Programme**"), provided that the quantities to be delivered during such week shall not, without the consent of Seller, exceed the Maximum Weekly Quantity, and provided further that if no Wednesday will occur between the establishment of the first NDS and Monthly Schedule pursuant to Article V.3(a)(v) and the first Day of the Supply Period, Buyer shall provide the information for the first Weekly Programme to Seller at the same time as the information for the first NDS and Monthly Schedule.

(iv)    On or before 12.00 hours Puerto Rico Time each Business Day, Buyer may direct Seller to deliver the quantity of Natural Gas remaining in the Weekly Programme in different quantities to each Delivery Point or to different Delivery Points than those originally nominated and the Weekly Programme shall be revised accordingly, provided that Buyer may not increase or decrease the total quantity of Natural Gas to be delivered during such Weekly Programme.

(v)    With respect to the first NDS and Monthly Schedule of the Supply Period, Buyer shall provide to Seller its Natural Gas requirements for months M, M+1, and M+2, where month M shall be the period from the first Day of the Supply Period until the end of the calendar month in which such Day occurs, on or before the earlier of the third (3rd) Day following the Effective Date and the Day before the start of the Supply Period.

(b)    Under no circumstance shall Buyer, without the prior written agreement of Seller pursuant to Article V.3(a)(ii), be entitled to nominate any quantity of Natural Gas that would increase the quantity of Natural Gas that Seller is required

*KDf*

18

*Cf*

to deliver hereunder in any month to exceed the quantity set forth in the Monthly Schedule.

(c)    Except with respect to adjustments to Natural Gas deliveries pursuant to Article V.5, Buyer will use commercially reasonable efforts to provide written notice to Seller as soon as practicable after information becomes available to Buyer or any event occurs that causes a discrepancy between the quantities of Natural Gas nominated by Buyer pursuant to this Article V.3 and the quantities that Buyer is able to receive, regardless of whether such nomination is binding or non-binding. Such notice shall specify the cause of such discrepancy and the amount of such discrepancy. Unless and until Seller receives any such notice from Buyer, Seller shall be considered as acting reasonably in relying on the nominations provided by Buyer pursuant to this Article V.3.

(d)    If, for a given month or week, Buyer fails to deliver to Seller a nomination for the NDS, Monthly Schedule or Weekly Programme, as applicable, by the relevant deadline for such nomination, then Buyer's nomination shall be as follows:

(i)    With respect to an NDS or Monthly Schedule, Buyer's nomination for months M and M+1 shall be the nomination for the same calendar month from the prior NDS and the nomination for month M+2 shall be the same as for what is then month M+1, adjusted for any difference in number of days in such month by eliminating the final day (in the case of a 28- or 30-day month) or adding an additional day that is the same as the final day (in the case of a 31-day month). For example, if Buyer fails to submit a nomination by June 5th for the months of July, August and September, the nominations for July and August shall be the same as the nominations for July and August from the prior NDS, and the nomination for September shall be the same as the nomination for August with the 31st day removed; and

(ii)    With respect to a Weekly Programme, Buyer's nomination shall be the quantities and Delivery Points for the relevant Days as set forth in the Monthly Schedule, adjusted to account for any Forced Outage, Force Majeure, or Excess Nomination applicable to such Days already communicated by Buyer to Seller.

V.4    If, during any month, Buyer determines that it no longer requires, or if Buyer is unable to receive, some or all of the quantity of Natural Gas set forth in the Monthly Schedule for such month (such quantity, the "**Excess Nomination**"), then:

(a)    Buyer shall promptly provide written notice to Seller of the quantities not needed or unable to be received;



19



(b)     Buyer's notice to Seller pursuant to Article V.4(a) shall not relieve Buyer of its obligation to pay for the quantities set forth in the Weekly Programme or for the Monthly Quantity pursuant to Article IX.2;

(c)     Seller shall use commercially reasonable efforts to sell the Excess Nomination, whether as Natural Gas or as LNG, at a reasonable price. If Seller is able to sell all or a portion of such Excess Nomination (such sale, a "**Mitigation Sale**"), Seller shall credit to Buyer the proceeds of such Mitigation Sale, less the reasonable, incremental out-of-pocket costs incurred by Seller in storing and transporting the Natural Gas or LNG sold, and marketing, making and performing such sale, in each case above what Seller would have incurred in making such Natural Gas available at the Delivery Point. Seller shall furnish the details of such Mitigation Sale in writing to Buyer within thirty (30) days of the date of such sale. Any sale of LNG or Natural Gas by Seller to any Third Party that Seller was already obligated to make (as of the date Seller becomes aware of the Excess Nomination) is not a Mitigation Sale. If Seller is unable to sell all or a portion of such Excess Nomination (such inability to be documented in a writing describing the market conditions that precluded such sale or made such sale commercially impracticable), Seller shall retain such quantities and credit Buyer with an amount equal to the Fuel Price for the month it would have otherwise been made available to Buyer *multiplied by* the quantity not sold; and

(d)     To the extent that an Excess Nomination is caused by a Forced Shutdown and Buyer pays for such Excess Nomination pursuant to Article V.4(b), Buyer shall be entitled to a credit (a "**Carryover Credit**") determined by multiplying the quantities in such Excess Nomination(s) caused by a Forced Shutdown by the Fuel Price for such month and then subtracting the proceeds of any applicable Mitigation Sale or credit pursuant to Article V.4(c), provided that such Mitigation Sale proceeds or credit shall be applied first to Excess Nominations not caused by a Forced Shutdown. Such Carryover Credit shall be applied to Buyer's payment obligations in the immediately subsequent six (6) months, on a first-in first-out basis.

V.5     Seller shall deliver Natural Gas to Buyer at each Delivery Point at such rates as directed by Buyer, including stopping the flow of Natural Gas, consistent with the dispatch of the applicable Generation Units. If requested by Buyer, Seller shall use reasonable efforts to deliver Natural Gas on a Day in excess of the nomination set forth in the Weekly Programme, provided that Seller shall not be liable to Buyer if, despite the use of reasonable efforts, it is unable to provide such excess Natural Gas, and provided further that the Maximum Monthly Quantity, Maximum Weekly Quantity, and Article V.3(a)(ii), and Article V.3(b) shall continue to apply.

V.6     Notwithstanding anything in this Agreement to the contrary, Buyer shall have no obligation to pay for any portion of a Monthly Schedule or Weekly Programme to the extent not made available at the proper Delivery Point.



20



## ARTICLE VI

### SELLER'S SHORTFALL

VI.1    If, for any reason other than the occurrence of (a) an event of Force Majeure, (b) Excess Nominations, or (c) reasons attributable to Buyer, Seller fails to deliver to Buyer on any Day the scheduled quantity of Natural Gas for such Day in the Weekly Programme in the proper quantities to each Delivery Point (such quantities not delivered or delivered to the wrong Delivery Point, the "**NG Deficiency**"), then, as Buyer's sole and exclusive remedy, and Seller's sole and exclusive liability, with respect to such NG Deficiency (subject only to Buyer's termination right pursuant to Article XV.1(c)(ii) Seller shall pay to Buyer an amount equal to (i) the NG Deficiency *multiplied by* (ii) the Diesel Contract Price for such month *minus* the Fuel Price for such month (the "**Seller Shortfall Payment**").

VI.2    Any Seller Shortfall Payment shall be due and payable by Seller to Buyer in accordance with Article XIII.

VI.3    Seller agrees that Buyer's damages associated with Seller's failure to deliver Natural Gas hereunder would be difficult to estimate, and that Article VI.1 represents a reasonable estimate of such damages.

## ARTICLE VII

### MEASUREMENT AND TESTING AND OPERATIONS

VII.1    Order of Preference for Measurement

For Delivery Points where Natural Gas metering facilities exist so as to allow for the measurement of Natural Gas pursuant to Articles VII.2 through VII.5, the methodology set forth in Articles VII.2 through VII.5 shall control for purposes of measuring the quantity and quality of Natural Gas delivered pursuant to this Agreement. For Delivery Points where Natural Gas metering facilities do not exist so as to allow for the measurement of delivered Natural Gas pursuant to Articles VII.2 through VII.5, the methodology set forth in Articles VII.6 through VII.8 shall control for purposes of measuring the quantity and quality of Natural Gas delivered pursuant to this Agreement.

VII.2    Unit of Measurement

The following guidelines shall be followed with regard to the units of measurement to be used by either Party to comply, as appropriate, with the provisions of this Agreement:

> (a)    The unit for the purpose of measuring volume shall be one cubic foot of Natural Gas at a base temperature of sixty degrees (60°) F and at a pressure of 14.73 psia with correction for deviation from Boyle's Law. Computation of volumes, including any deviation from Boyle's Law, shall comply with applicable rules, regulations, and orders promulgated by the appropriate regulatory authorities having jurisdiction. For payment purposes, the volume of Natural Gas delivered hereunder will be determined at the pressure reported by the Metering Equipment or based on fifteen (15) Day average flowing pressure corrected, if

*KD7*



21

necessary, in the event that the Metering Equipment is inoperable or not measuring accurately, as applicable, and will be multiplied by the Btu content per cubic foot to obtain the total Btu contained within such volume of Natural Gas.

(b)    For purposes of measurement and meter calibration, the atmospheric pressure shall be assumed to be 14.73 psia, irrespective of actual elevation or location of the Delivery Point or any Metering Equipment above sea level, or variations in such atmospheric pressure from time to time.

(c)    The static pressure of the Natural Gas passing through the Metering Equipment shall be determined by the use of electronic measurement equipment or by the use of another pressure recording device reasonably acceptable to both Parties. The instantaneous static pressure measurements from the electronic measurement equipment or the arithmetic average of the temperature recorded each Day shall be used in computing Natural Gas volumes.

(d)    If Metering Equipment requiring the use of specific gravity is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined by a method according to accepted industry practice. If a recording gravitometer is used, then the arithmetic average of the specific gravity of the Natural Gas flowing through the meters shall be used in computing Natural Gas volumes. If a spot test method is used, then the specific gravity of the Natural Gas delivered hereunder shall be determined as often as found necessary in practice. Any such test shall determine the specific gravity to be used in computation of volumes values effective the first Day of the following month and shall continue to be used until changed in a like manner by a subsequent test.

(e)    The temperature of the Natural Gas shall be determined by a recording thermometer installed so that it will record the temperature of the Natural Gas flowing through the meters, and such flowing temperature shall be corrected to Fahrenheit.

(f)    Heating Value and energy content will be measured by Seller as described in "Appendix F – Heating Value Calculation of API MPMS, Chapter 14.3." The determination of Natural Gas composition shall be in accordance with the GPA Standard 226 "Analysis for Natural Gas Chromatography" and GPA Standard 2172 "Calculation of Gross Heating Value relative density and compressibility factor for Natural Gas Mixtures from compositional analysis". The composition of the NG shall be continuously measured by on-line chromatographs installed and maintained (or caused to be installed and maintained) by Seller at Seller's sole expense. The Heating Value of the NG shall be calculated using results from the on-line chromatograph. In the event of failure of the on-line NG chromatograph, chromatograph analysis of samples collected proportional to the flow through the meters shall be Used. All electronic metering shall comply with the API Manual of Petroleum Standards, Chapter 21, Flow Measurement Using

*KDF*

22



Electronic Metering Systems, First Edition, dated September 1993, and any subsequent modification and amendment thereof.

(g)     The energy content of all NG delivered hereunder shall be in Btu and shall equal the Standard Cubic Feet of such NG multiplied by the Heating Value of such NG.

VII.3    Metering Equipment

Buyer plans to install ultrasonic meters at the Delivery Points for the Mobile Units, and Buyer may, at its option, install an ultrasonic meter at other Delivery Points, to measure the flow, volume and Heating Value of Natural Gas (such ultrasonic meters, the "**Metering Equipment**") in accordance with Article VII.2. Any new Metering Equipment installed by Buyer shall be designed and installed in accordance with the current recommendations of the American Gas Association. Seller shall be responsible for maintaining all Metering Equipment. If the Metering Equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(a)     by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(b)     by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

VII.4    Verification of Metering Equipment

The following guidelines shall be followed with regard to the verification of the Metering Equipment to be used in accordance with this Agreement:

(a)     At least once each month, and from time to time upon at least two weeks prior written notice by either Party to the other, the Party responsible for maintaining such Metering Equipment shall verify or cause to be verified the accuracy of the Metering Equipment. When as a result of such test the Metering Equipment is found to be out of calibration by no more than one percent (1%) when compared to the manufacturer's specifications for such equipment, no adjustment shall be made in the amount paid by Buyer to Seller.

(b)     If the testing of the Metering Equipment demonstrates that a meter is out of calibration by more than one percent (1%) when compared to the manufacturer's specifications for such equipment, the applicable Metering Equipment reading for the actual period during which out of calibration measurements were made shall be adjusted based on the methods stated in Article VII.3 above.

(c)     If the actual period that such equipment has been out of calibration cannot be determined to the mutual satisfaction of Seller and Buyer, the adjustment shall be for a period equal to one-half of the time elapsed since the most recent test. The previous payments made by Buyer to Seller for this period shall be subtracted from the amount of payments that are calculated to have been owed

*KDf*

23

*CA*

under this Agreement. The difference in US Dollars (which may be a positive or negative amount) shall be added to the next Monthly Invoice pursuant to Article IX.

(d)  The cost of the monthly testing and calibration of the Metering Equipment described in this Article VII.4 shall be the responsibility of the Party that maintains such Metering Equipment. The cost of any testing and calibration of the Metering Equipment beyond the monthly test permitted in this Article VII.4 shall also be the responsibility of the Party that maintains such Metering Equipment, unless the request to test any of the Metering Equipment is made by the other Party and the results of such test requested by such other Party demonstrate that the Metering Equipment is less than one percent (1%) out of calibration, in which case the cost of such testing and calibration shall be for the account of the Party that requested the test.

(e)  Each Party shall comply with any reasonable request of the other concerning the sealing of the Metering Equipment, the presence of a representative of the other Party when the seals are broken and tests are conducted, and other matters affecting the accuracy, testing and calibration of the Metering Equipment.

(f)  If either Seller or Buyer believes that there has been a failure or stoppage of any of the Metering Equipment, it shall immediately notify the other Party.

VII.5  Availability of Readings

At the end of each Month, Seller shall make available to Buyer all readings of the Metering Equipment.

VII.6  Measurement of LNG by Mass

(a)  The quantity of LNG delivered to any Delivery Point at which Natural Gas measurement equipment is not installed or is not functioning shall be determined using the mass of LNG loaded into each ISO Container used to deliver LNG multiplied by the heating value (in MMBtu) per unit of mass, in each case as set forth on the Loading Certificate provided by the Person loading such ISO Container, reduced to reflect Natural Gas used to vaporize LNG using the relevant Regas Equipment, as agreed by Buyer and Seller from time to time. To the extent the Parties cannot agree to such reduction, Article XX.2 shall apply.

(b)  Seller shall provide to Buyer a copy of the Loading Certificate for each ISO Container of LNG delivered pursuant to this Agreement.

(c)  If an ISO Container is determined to still contain LNG after retrieval by Seller, Seller shall credit to Buyer on the next Monthly Invoice an amount equal to the quantity of LNG remaining in such ISO Container (in MMBtu) *multiplied by* the Fuel Price applicable to the LNG delivered in such ISO Container and provide to Buyer documentation supporting such calculation.



24

## VII.7   Determination of LNG Quality

The quality of LNG in any ISO Container and Natural Gas delivered from such ISO Container shall be as set forth in the Loading Certificate for the loading of such ISO Container.

## VII.8   Periodic inspections and calibrations

Seller shall ensure that all contracts or terms and conditions pursuant to which LNG loading activities occur require such periodic inspections and calibrations of the equipment for determining mass and quality as would be performed by a Reasonable and Prudent Operator.  If such equipment (or component(s) thereof) is out of service or registering inaccurately, the volumes of LNG or Natural Gas delivered hereunder shall be estimated as follows, in descending order of priority:

(a)   by correcting the error if the percentage of error is ascertainable by calibration, test, or mathematical calculation; or

(b)   by estimating the quantity of delivery by measuring deliveries during prior periods under similar conditions when any meter was registering accurately.

Any corrections shall be reflected in the next Monthly Invoice.

## VII.9   Preservation of Records

Seller or Buyer, as applicable, shall preserve or cause to be preserved for a period of at least three (3) years following the expiration of this Agreement all test data, charts, and other similar records regarding the measurement of LNG or Natural Gas delivered in accordance with this Agreement.

## VII.10   ISO Containers

Seller shall ensure at all times that ISO Containers used in the performance of this Agreement are in compliance with all Applicable Laws, are compatible with the Regas Equipment, and are fit for the purpose of meeting Seller's obligations under this Agreement.

**ARTICLE VIII**

**RISK AND INDEMNITY**

VIII.1   Supply Period. The following indemnities shall apply during the Supply Period to the fullest extent permitted under Applicable Law:

(a)   **SELLER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE BUYER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas and LNG), in each case directly or indirectly arising out of, incident to, or in connection with, Seller's delivery of Natural Gas and LNG, operation and maintenance of the

25

*KDf*

*C&*

Regas Equipment, and retrieval of ISO Containers, **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF SELLER**.

(b) **BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD HARMLESS THE SELLER GROUP** from and against any and all Claims made by a Third Party in connection with any injury or death of persons and/or any damage to or loss of any property (excluding Natural Gas and LNG), in each case directly or indirectly arising out of, incident to, or in connection with, Buyer's operation of any Generation Units, **TO THE EXTENT SUCH CLAIMS ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR WILLFUL MISCONDUCT OF BUYER**.

(c) **SELLER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE BUYER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said Natural Gas or LNG or other charges thereon which attach before title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the Natural Gas or LNG before the Delivery Point.

(d) **BUYER SHALL PROTECT, DEFEND, INDEMNIFY, RELEASE AND HOLD HARMLESS THE SELLER GROUP** from and against all Claims and Losses directly or indirectly arising out of, incident to, or in connection with (i) Third Party Claims of title to said LNG or other charges thereon which attach after title passes to the Buyer, or (ii) environmental damage caused by any release, spill or explosion of Hazardous Materials associated with the LNG from and after the Delivery Point.

VIII.2  Title to Natural Gas. The Natural Gas to be sold by Seller and purchased by Buyer in accordance with this Agreement shall be transported to the site of each Delivery Point in ISO Containers, or such other means agreed by the Parties, and vaporized using the relevant Regas Equipment at the nominated Delivery Point(s). Title to Natural Gas, and the risk of loss or contamination of such Natural Gas, shall pass from Seller to Buyer upon the delivery of Natural Gas to the Delivery Point.

VIII.3  Notice and Defense. Any Person indemnified hereunder will, as soon as practicable after receiving notice of any suit brought against it within this indemnity, furnish to the indemnifying Party the full particulars within its knowledge thereof and will render all reasonable assistance requested by the indemnifying Party in the defense of any Claims. Each indemnified party will have the right but not the duty to participate, at its own expense, with counsel of its own selection, in the defense and/or settlement thereof without relieving the indemnifying Party of any obligations hereunder; *provided, however*, that an indemnifying Party that has acknowledged its indemnity obligations with respect to

*KDF*

26

*CH*

any Claim will have control over the defense and settlement of such Claim, as long as the settlement does not impose any obligations on the indemnified parties.

VIII.4 **Excluded Losses.** Notwithstanding any other provision of this Agreement, (1) in no event shall either Party be liable to the other Party for (a) any indirect, special, incidental or consequential losses, damages, liabilities or expenses, (b) loss of profits or revenue; loss of use; loss of power; cost of replacement power; loss by way of shutdowns; costs of substitute facilities, goods or services; loss of opportunity or loss of goodwill, whether or not constituting losses, damages, liabilities or expenses contemplated by Article VIII.4(a), or (c) claims of upstream or downstream customers or service providers to either Party for any of the aforementioned categories of damages (collectively, "Excluded Losses") howsoever arising, (2) Seller waives and shall indemnify Buyer Group from and against Claims by members of Seller Group for Excluded Losses, and (3) Buyer waives and shall indemnify Seller Group from and against Claims by members of Buyer Group or by any of its Financing Entities for Excluded Losses, in each case, except to the extent that Seller's express remedies pursuant to Article V or Buyer's express remedies pursuant to Article VI (including but not limited to any Seller Shortfall Payment) may be construed as constituting or compensating for Excluded Losses.

VIII.5 Third Party Beneficiaries. The provisions of this Agreement are intended for the sole benefit of Buyer and Seller and there are no third-party beneficiaries hereof, other than indemnitees pursuant to this Article VIII, each of whom is hereby made a third party beneficiary to this Agreement, with direct enforcement rights against the relevant indemnitor, solely for the purpose of enforcing (or relying upon as a defense) the indemnification provisions under which it is a member of the indemnified group.

## ARTICLE IX

## INVOICING AND PAYMENT

IX.1    The "**Fuel Price**" to be paid for each MMBtu of Natural Gas delivered in a month during the Supply Period shall be determined by the formula:

$$FP = ((1 - BD) \times DP) / 5.8$$

where:

$FP$ = the Fuel Price in US$ per MMBtu;

$BD$ = zero decimal two seven (0.27) and

$DP$, or "Diesel Price" = $DCP / 100 \times 42$, where:

$DCP$ = the Diesel Contract Price for vessel delivery for such month in cents per gallon.

IX.2    With respect to each month during the Supply Period, Seller shall invoice Buyer for

27

*KDf*

*C4*

(a)    The sum for each Day of the previous calendar month of (i)(A) the quantities of Natural Gas nominated for delivery on such Day in the Weekly Programme (in MMBtu) less (B)any NG Deficiency and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure (such amount, with respect to a month, the "**Adjusted Nominated Quantity**") *multiplied by* (ii) the Fuel Price for such month; *plus*

(b)    The sum, for each Delivery Point to which Seller delivered Natural Gas, of the Logistics Surcharges; *plus*

(c)    (i) Any additional quantities Seller agreed to deliver pursuant to Article V.3(a)(ii) less any such additional quantities Seller fails to deliver and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure *multiplied by* (ii) the agreed price for such quantities; *minus*

(d)    Any credit due pursuant to Article VII.6(c); *plus*

(e)    The result, if greater than zero, of (i) the Monthly Quantity *minus* sum of the quantities of Natural Gas scheduled for delivery on each Day of such month in the Weekly Programme, *multiplied by* (ii) the Fuel Price; *plus*

(f)    Whatsoever other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time. Buyer certifies that the funds for the payments of Services rendered under this Agreement come from budgetary allocations. All payments made under this Agreement will be charged to Buyer's budget account number 1-2321-23215-000-000.

IX.3    Seller shall prepare and shall give to Buyer by the tenth (10th) Day of each calendar month an invoice (the "**Monthly Invoice**"), which shall show in respect of the preceding calendar month (or, in the case of (e), with respect to any prior calendar month) the following information:

(a)    The Fuel Price for such month *multiplied by* the Adjusted Nominated Quantity;

(b)    The Logistics Surcharges for each Delivery Point to which Natural Gas was delivered (including, for each Delivery Point, a breakdown of the Logistics Factor, quantity delivered, and applicable miles set forth in Exhibit B);

(c)    Any additional quantities Seller agreed to deliver pursuant to Article V.3(a)(ii) less any such additional quantities Seller failed to deliver and any quantities not delivered by Seller or not taken by Buyer due to Force Majeure *multiplied by* the price applicable to such quantities;

(d)    The proceeds from any Mitigation Sale or other sale of (or credit from) any Excess Nomination;



28



(e)     Any quantities of LNG remaining in an ISO Container where the mass of such ISO Container was used in the calculation of Natural Gas delivered *multiplied by* the Fuel Price for such month;

(f)     The amount of any Carryover Credit that, pursuant to Article V.4(d), Buyer is entitled to apply to the applicable Monthly Invoice;

(g)     The result, if greater than zero, of (i) the Monthly Quantity *minus* the sum of the quantities of Natural Gas scheduled for delivery on each Day of such month in the Weekly Programme *multiplied by* (ii) the Fuel Price;

(h)     Other amounts that are owed for those items regulated in accordance with this Agreement and current regulations governing the provision of the services at any given time;

(i)     The net amount payable by Buyer to Seller, which shall be (a) *plus* (b) *plus* (c) *minus* (d) *minus* (e) *minus* (f) *plus* (g) *plus* (h);

(j)     A breakdown of the amount of each tax listed on Exhibit F that is included in any of (a) through (j), the calculation of such amount, and supporting documentation; and

(k)     The following certification (adjusted for this Agreement):

*"We certify under penalty of nullity that no public servant of the Puerto Rico Electric Power Authority shall derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement by and among the Puerto Rico Electric Power Authority ("PREPA") and [Seller] dated [●] (the "Agreement"). The only consideration to be received for the supply of Natural Gas (as defined in the Agreement) are the agreed-upon Fuel Price that has been negotiated with PREPA as specified in the Agreement. The total amount shown on this invoice is true and correct. The Natural Gas was delivered, and no payment has been received.*

*Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Agreement.*

*By:*

*Name:*

*Title:"*

Buyer shall provide written notice to Seller of any irregularity in a Monthly Invoice submitted by Seller within twenty (20) Days of Buyer's receipt thereof, failing which such Monthly Invoice will be deemed to have been properly prepared and submitted.

*KDI*

29

*CA*

IX.4    Subject to Article IX.6 and Article IX.13, Buyer shall pay the amount to Seller due in accordance with such Monthly Invoice.

IX.5    If Seller incurs a liability to Buyer for failing to deliver Natural Gas pursuant to Article VI, then Buyer shall send to Seller (following the end of the applicable month) an invoice and reasonable supporting documentation showing the amount payable by Seller in accordance with Article VI.

IX.6    The total amount to be paid by Buyer during the Initial Term or during an Extension Term in no event shall exceed one billion one hundred forty-seven million dollars ($1,147,000,000) (the "**Contract Ceiling**"). Seller shall not exceed the Contract Ceiling without prior written approval by Buyer, as evidenced by a written amendment to this Agreement. Notwithstanding any other provision of this Agreement, Buyer will not pay and shall have no obligation to pay amounts in excess of the Contract Ceiling, and Seller exceeds the Contract Ceiling at its own risk. Seller shall inform Buyer when accrued fees and expenses under this Agreement for the Initial Term or an Extension Term reach fifty percent (50%), seventy-five percent (75%), ninety percent (90%), and one hundred percent (100%) of the Contract Ceiling.

IX.7    Promptly following the end of each Contract Year, Seller shall deliver to Buyer an invoice comparing the sum of the Adjusted Nominated Quantity with respect to each Day of such Contract Year *plus* the sum of all NG Deficiencies for such Contract Year *plus* the sum of all Natural Gas quantities not delivered by Seller or not received by Buyer due to Force Majeure ("**Annual Quantity Taken**") to the Minimum Volume Commitment. If the Annual Quantity Taken is less than the Minimum Volume Commitment, Seller shall send to Buyer an invoice reflecting the quantity by which the Annual Quantity Taken is less than the Minimum Volume Commitment *multiplied by* the arithmetic mean of the Fuel Price for each month of such Contract Year and Buyer shall pay such amount to Seller, subject to Article IX.13 and *provided that* such amount shall be considered as occurring during the Contract Year to which the calculation of the Annual Quantity Taken applies for purposes of determining whether the Contract Ceiling has been exceeded and Article IX.6 shall continue to apply to such amount.

IX.8    If any sums are due from one Party to the other Party, except for reasons addressed in Articles IX.1 and IX.5, then the Party to which such sums are owed shall furnish to the other an invoice describing in reasonable detail the basis for the invoice and providing relevant supporting documentation.

IX.9    In respect of any invoice issued pursuant to this Article IX, Buyer or Seller, as the case might be, shall pay the amount due within thirty (30) Days after physical receipt of a properly submitted invoice.

IX.10    Buyer may, upon prior written notice to Seller, offset any amount due and payable from Seller to Buyer against any amount due and payable to Seller hereunder.

IX.11    Payment of amounts due to one Party from the other Party shall be made by wire transfer in immediately available funds into the bank account nominated from time to time by the Party to which the funds are owed. Each payment of any amount owing hereunder shall be for the full amount due,

*KDf*

30

*CA*

without reduction, withholding or offset for any reason (including any exchange charges, bank transfer charges or other fees or Taxes). Until further notice, the bank account for Seller is as follows:

**SELLER**:    Bank Name: Bank of America

Bank Account #: 446026663797

For payments to Buyer, Seller shall request from Buyer wire instructions prior to transferring any funds to Buyer and shall provide Buyer bank confirmation upon completion of each such transfer.

IX.12   If any Party fails to pay the other Party the full amount of any invoice due by the due date (a) such Party shall also pay interest thereon to the other Party for the period commencing from and including the due date until and including the Day when payment is made. Interest shall be calculated at the rate of the Prime Rate percentage rate per annum, but no greater than the maximum amount allowable by law, and (b) where Buyer is the defaulting Party, Seller may suspend Natural Gas deliveries five (5) Business Days after delivering written notice of such past due amounts until the relevant amount is paid in full.

IX.13   If a Party disagrees in good faith with any invoice, such Party shall pay the undisputed amount by the due date thereof and shall immediately notify the other Party of the reasons for its disagreement. An invoice may be contested by the Party that received it, or modified by the Party that sent it, by written notice delivered to the other Party within a period of one hundred eighty (180) Days after such receipt or sending, as the case may be. If no such notice is served within such period of one hundred eighty (180) Days, such invoice shall be deemed correct and accepted by both Parties. Promptly after resolution of any Dispute as to an invoice, the amount due shall be paid by Seller or Buyer, as the case may be, to the other Party, together with interest thereon at the rate provided in Article IX.12 from the date payment was due to the date of payment.

IX.14   No later than fifteen (15) Days after the Effective Date, Seller shall deliver or cause to be delivered to Buyer either (i) a parent guarantee issued by a Creditworthy Parent to Buyer in the form set forth in Exhibit C or (ii) a bond issued by a surety authorized to do business and issue surety bonds in Puerto Rico, naming Buyer as beneficiary, with a value of at least five percent (5%) of the Contract Ceiling in the form set forth in Exhibit D.

IX.15   Invoices under this Agreement shall be delivered to the following addresses and deemed received on the date (i) personally delivered to the respective party or (ii) receipt is evidenced by certified or registered mail:

**SELLER**:    NFEnergía LLC
c/o New Fortress Energy Inc.
111 W 19th St., 8th Fl.
New York, NY 10011
Attention: Accounts Payable
Email: accountspayable@newfortressenergy.com

31

_KDf_

_CH_

**BUYER**:    PREPA
c/o Genera PR LLC, agent of PREPA
Fuels Office
250 Muñoz Rivera, Ave., Suite 1200 San Juan, Puerto Rico 00918

Attention:    Jose L. Carrasco, Fuels Manager
E-mail:    legal@genera-pr.com

IX.16  Law 127 - 2004: Contract Registration in the Comptroller's Office of Puerto Rico Act

Seller acknowledges that payment under this Agreement will not be made until this Agreement is properly registered in the Office of the Comptroller of the Government of Puerto Rico pursuant to Law Number 18 of October 30, 1975, as amended.

## ARTICLE X

## DUTIES, TAXES AND CHARGES

Each of Seller and Buyer shall be responsible for the payment of all taxes, fees, levies, royalties, duties, penalties, licenses, and other charges imposed by any Governmental Authority ("**Taxes**") which it incurs and for which it is legally responsible for as a result of complying with this Agreement and which correspond to such Party under all applicable tax regulations and laws in force at the Effective Date and throughout the Term in each of the jurisdictions relevant to this Agreement connected to the Parties. If Buyer is required to remit or pay Taxes that are Seller's responsibility hereunder, Seller shall promptly reimburse Buyer for such Taxes. Any Party entitled to an exemption from any such Taxes or charges shall furnish the other Party any necessary documentation thereof. Buyer shall cooperate and use commercially reasonable efforts to provide to Seller such information and execute and deliver such documents reasonably requested, to the extent not otherwise detrimental to Buyer, in connection with Seller's efforts to obtain any available tax exemptions and/or incentives under applicable tax regulations and laws in force at the Effective Date and throughout the Term.

X.1    For the avoidance of doubt and notwithstanding the above,

(a)    Seller represents and warrants that it is the importer of record for all Natural Gas and LNG delivered hereunder and shall be responsible for entry and entry summary filings as well as the payment of associated duties, Taxes and fees, if any, and all applicable record keeping requirements.

(b)    Seller represents and warrants that Exhibit F (in this agreement) includes a true and correct list of all Taxes and the applicable amount or tax rate that Seller has included in or intends to recover from the Fuel Price or otherwise in connection with this Agreement. Buyer shall have no obligation to pay to Seller any amounts for Taxes (including, but not limited to, excise taxes, sales taxes or any charge levied by a Government Authority on facilities used for the performance of this Agreement) not included in the Fuel Price. If any tax listed on Exhibit F

32

*KDf*

*CH*

(in this agreement) decreases or ceases to apply to the transactions under this Agreement at any time during the Term, such revised tax, tax amount, or tax rate shall automatically apply immediately upon becoming effective, *mutatis mutandis*.

## ARTICLE XI

## FORCE MAJEURE

XI.1    Neither Seller nor Buyer shall be liable for any failure to perform or for omission or delay in the performance of any of its obligations under this Agreement, other than the obligation to make payments of money when due, if and to the extent that the affected Party's performance is prevented, delayed or interfered with by an act, event or circumstance, or combinations of events or circumstances, whether of the kind described herein or otherwise, that is not reasonably within its control, such Party having acted as a Reasonable and Prudent Operator and which effects could not be prevented or overcome by the exercise of due diligence ("**Force Majeure**").

For the avoidance of doubt, provided that the requirements set out in the preceding paragraph are met, events of Force Majeure shall include but not be limited to the following:

(a)    loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of the facility for receiving and/or loading LNG in Puerto Rico.

(b)    loss of, serious accidental damage to, inaccessibility or incapacity of, or inoperability of any of the Generation Units;

(c)    any act or omission of a Governmental Authority of the United States of America (including any Puerto Rican Governmental Authority), including refusal or failure to issue, delay in issuing, or amendment, revocation, or suspension of, any Permit; and

(d)    any act of God, lightning, storm, typhoon, hurricane, tornado, earthquake, fires, floods, tsunami, landslide, soil erosion, subsidence, washout, shipwreck, navigational and maritime perils, acts of any Governmental Authority or compliance with such acts; explosions, acts of the public enemy, wars (whether declared or undeclared), terrorism or threat thereof, civil war, piracy, civil and military disturbances, strikes, blockades, insurrections, riots, epidemics and quarantine restrictions; strike, lockout or other industrial disturbances involving an enterprise other than a Party, its transporter or its agents or sub-contractors in connection with its performance of this Agreement; radioactive contamination or ionizing radiation; or breakdown or unavailability of port facilities or port services (including the channel, tugs or pilots).

XI.2    Notwithstanding the foregoing provisions of Article XI.1, the following shall not be events of Force Majeure:

(a)    events arising out of market decline, market failure, industry economic conditions, or general economic conditions;

*KDF*

33



(b)    the failure by a Party to obtain or the withdrawal of any authorization, approval, permit or permission of any Governmental Authority, because the Party claiming Force Majeure failed to act as a Reasonable and Prudent Operator in connection with its efforts to obtain or maintain such authorization, approval, permit, or permission.

XI.3    In the event of any failure or delay of a Party's performance due to the occurrence of a Force Majeure event, the affected Party shall use commercially reasonable efforts (acting as a Reasonable and Prudent Operator) to resume as soon as possible full performance of its obligations under this Agreement, provided that the settlement of strikes or boycotts, lockouts or other industrial disputes, or obstructive action by organizations or local inhabitants, shall be entirely within the discretion of the Party concerned.

XI.4    A Party intending to seek relief under this Article XI shall as soon as reasonably practicable after it becomes aware of the occurrence of a Force Majeure event:

(a)    notify the other Party of the occurrence of an event that it considers may subsequently lead it to claim Force Majeure relief under this Agreement, describing such event, in as much detail as is then reasonably available, and the obligations, the performance of which has been or could be delayed, hindered or prevented thereby, and the estimated period during which such performance may be suspended or reduced, including (to the extent known or ascertainable) the estimated extent of such suspension or reduction in performance; the obligations which could or have been actually delayed or prevented in performance and the estimated period during which such performance may be suspended or reduced, including (to the extent know or ascertainable) the estimated extent of such suspension or reduction in performance;

(b)    give a bona-fide good faith estimate of when it shall be able to resume full performance of its obligations; and

(c)    give the particulars of the programme to be implemented, if any, to resume full performance hereunder subject to any Third Party confidentiality obligations.

Such notices shall thereafter be supplemented and updated at reasonable intervals during the period of such Force Majeure, specifying the actions being taken to remedy the circumstances causing such Force Majeure and the date on which such Force Majeure is expected to terminate.

XI.5    If any Party claims relief under this Article XI, it shall allow reasonable access to the other Party, upon such other Party's written request, to examine the scene of such event or circumstance which gave rise to the Force Majeure claim, provided that the Party not claiming relief under this Article XI shall bear the cost, expense and risk of examining such site.

XI.6    Where an act, event or circumstance prevents, impedes or delays a Party's performance hereunder, even if such act, event or circumstance primarily affects a Third Party or Third Parties, it shall constitute Force Majeure hereunder as to Seller or Buyer, as appropriate, if and to the extent that it is of a kind or character that, if it had happened to a Party, would have come within the definition of Force Majeure under this Article XI.

*KDf*

34



XI.7    Force Majeure takes effect at the moment a Force Majeure event occurs, not upon giving notice. A Party whose performance is excused by Force Majeure shall not be required, during the period in which the circumstances of the Force Majeure event are continuing, to incur uneconomic cost, make additional investments in new facilities, or bring into production existing or potential reserves not already flowing in support of this Agreement.

XI.8    If the Force Majeure event lasts for a period such that Seller is prevented from or delayed in performing its obligations hereunder for a period of ninety (90) consecutive Days (or, where Seller is not using commercially reasonable efforts to overcome the relevant Force Majeure (which Seller must show by providing a weekly report to Buyer describing its efforts to overcome such Force Majeure), sixty (60) consecutive Days) or more from the date on which the Force Majeure event first occurred, Buyer shall have the right to terminate this Agreement without liability to Seller by giving written notice to Seller.

## ARTICLE XII

## REPRESENTATIONS, WARRANTIES AND LIABILITIES

XII.1    Each Party hereby represents and warrants to the other Party that, as of the Effective Date:

(a)    With regard to Seller, it is a corporation or limited liability company duly formed, validly existing and in good standing under the laws of the state and/or country of its incorporation or organization, and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(b)    With regard to Buyer, it is a Puerto Rico public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, duly organized, validly existing and in good standing under the laws of the Commonwealth of Puerto Rico and is duly qualified to do business in, and is in good standing in, all other jurisdictions where the nature of its business or nature of property owned by it makes such qualification necessary.

(c)    With regard to Buyer, all necessary consents and approvals required by Applicable Law (including PROMESA) from any relevant Governmental Authority (including, as an example, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority, and Buyer's Governing Board) to all of the terms and conditions of this Agreement have been obtained prior to the Effective Date.

(d)    With regard to Buyer, all amounts payable to Seller under this Agreement are "Current Expenses" as defined in the Trust Agreement and are reasonable and necessary expenses related to the maintenance, repair and operation of the Generation Units, and are consistent with standard practices for public utility systems and with Buyer's standard business operations performed in maintaining and operating its system.

*KDf*

35



(e)     Such Party has all requisite power and authority to conduct its business, to own or lease and operate its properties, and to execute, deliver, and perform its obligations under this Agreement.

(f)     The execution, delivery and performance by such Party of this Agreement has been duly authorized by all necessary corporate action on the part of such Party and do not (i) require any consent or approval of any Governmental Authority, such Party's governing body or any other Person, other than those that have been obtained, or the failure to obtain, of which would not have, or could not reasonably be expected to have, a material adverse effect on such Party's ability to perform its obligations hereunder, (ii) violate any provision of such Party's Articles of incorporation or by-laws, or other organizational documents, or any Applicable Law in effect, or (iii) result in a breach of or constitute a default under such Party's organizational documents or other material indentures, contracts or agreements to which it is a part or by which it or its properties may be bound.

(g)     This Agreement is a legal, valid, and binding obligation of such Party enforceable against such Party, as appropriate, in accordance with its terms.

XII.2    Seller warrants that it has good title to or good right to deliver, all Natural Gas delivered hereunder and that all Natural Gas delivered to Buyer at the Delivery Points shall be free and clear of all liens, security interests, charges, assessments encumbrances and adverse claims whatsoever. Seller makes no representation or warranty, written or oral, express or implied that the Natural Gas will be fit for a particular purpose, or will be of merchantable quality, and all such representations and warranties are expressly excluded to the fullest extent permitted by law, but nothing in this Article XII.2 affects the requirement that all Natural Gas delivered to Buyer under this Agreement will meet the Specifications.

XII.3    Seller shall take, or cause to be taken, all necessary actions to start Natural Gas deliveries from the first Day of the Supply Period including the execution of contracts for the use of any appropriate Regas Equipment and the design and construction of any facility or its elements situated upstream of the Delivery Point.

XII.4    Buyer shall take, or cause to be taken, all necessary actions to commence taking delivery of Natural Gas from the first Day of the Supply Period including the design and construction of any facility or its elements situated downstream of the Delivery Point.

XII.5    Seller's sole and exclusive liability, and Buyer's sole and exclusive remedy, for failure by Seller to deliver Natural Gas in accordance with this Agreement will be limited to the payment of the amounts detailed in Article VI, subject only to the additional remedies available to Buyer in the circumstances described Article XV.1(c)(ii).

## ARTICLE XIII

### ASSIGNMENT

This Agreement, as well as any rights, duties, liabilities, or obligations under it, may not be assigned, transferred, subcontracted, hypothecated, or otherwise disposed of by Seller without the

*KDf*

36



prior written consent of Buyer, except that Seller and its assigns may without such consent assign all or a portion of their rights and interests under this Agreement (including any collateral) in connection with any securitization or bank funding arrangement entered into by Seller or an assignee of Seller. Seller acknowledges that, other than assignments in connection with any securitization or bank funding arrangement entered into by Seller or an assignee of Seller, Buyer does not favor requests for assignment, transfer, subcontracting, hypothecation, or other types of disposal of this Agreement and/or duties or obligations under it, and will have reasonable grounds not to approve any request to that effect, unless, in the business judgment of Buyer, the particular circumstances of the request warrant its approval and the assignment, transfer, subcontracting, hypothecation, or disposal does not operate against Buyer's best interests.

## ARTICLE XIV

## SUBCONTRACTORS

No subcontract shall be considered for Buyer's approval, except when the following requirements are met: (i) Seller delivers Buyer a copy of the subcontract, not less than thirty (30) days prior to the effective date of the proposed subcontract; (ii) the subcontract includes, as a condition for its legal validity and enforceability, a provision whereby Buyer has the right to substitute, subrogate, or assume Seller's rights under the subcontract, in the event that Buyer declares Seller in breach or default of any of the Contract terms and conditions; (iii) the subcontract includes, as a condition for its validity and enforceability, a provision establishing for the subcontractor the obligation to comply with all Seller's obligations under this Agreement (a mirror image clause), except for such obligations, term, and conditions which exclusively relate to works or services not included under the subcontract. Consent to assignment or subcontracting under this Article shall not relieve Seller of its full responsibilities under this Agreement, nor be construed as an approval of the terms of said assignment or subcontract. Seller shall be responsible for all services performed by its subcontractors, employees, agents or assignees, whose performance Seller shall ensure complies with the provisions of this Agreement.

## ARTICLE XV

## TERMINATION

XV.1    This Agreement may be terminated if any of the following circumstances occur:

(a)    the mutual agreement of the Parties;

(b)    by Buyer, in its sole discretion, upon giving written notice to Seller, such termination to take effect on the date set forth in such notice, which shall be no less than ten (10) Days from the delivery of such notice ("**Termination for Convenience**"); or

(c)    if a Termination Event on the part of either Party (the "**Defaulting Party**") has occurred, the other Party (and in the case of paragraph (ii) below, Buyer only) may at any time after which such Termination Event has occurred or during which such Termination Event is otherwise continuing, terminate this

37

*KDF*

Agreement by giving written notice of termination to the Defaulting Party in accordance with this Article XIX, with such termination to take effect as from and including the date of such notice. The following shall each constitute a termination event (a "**Termination Event**"):

(i)  if any undisputed amount in excess of One Million Dollars ($1,000,000.00) payable by the Defaulting Party under this Agreement has not been paid in full by the due date for the payment of the relevant invoice and the other Party has (after such due date) given notice to the Defaulting Party requiring payment of such amount and the amount has not been paid in full within ten (10) Business Days after the date of such notice;

(ii)  in the case of Seller as the Defaulting Party, Seller abandons performance of all of its obligations under the Agreement and does not take material steps to recommence such performance within three (3) days of written notice from Buyer that it believes Seller has so abandoned;

(iii)  if the Defaulting Party is unable to pay, suspends payment of, or agrees to a moratorium (or threatens any of the foregoing with respect to all or a material part of its debts), makes a general assignment or any composition or compromise with or for the benefit of its creditors except to the extent otherwise permitted by this Agreement, takes any proceedings with view to a readjustment, rescheduling or deferral of all or a substantial part of its indebtedness (other than in the case of a refinancing, but the commencement and pendency of the Title III Case shall not be considered a Termination Event, except that if any order has been entered by the Title III Court or any other Governmental Authority providing for the appointment of a receiver, custodian, or similar fiduciary for Buyer or any material portion of its property, the entry of any such order shall be considered a Termination Event);

(iv)  if any order is made, or a petition is presented and not withdrawn within a period of twenty-one (21) Days, for the winding-up, liquidation, dissolution, custodianship or administration (or any equivalent proceedings) of the Defaulting Party;

*provided, however*, that if the circumstances of such Termination Event are cured by the Defaulting Party within the notice period (if any) provided for such Termination Event, such termination notice shall be deemed withdrawn and this Agreement shall not terminate; or

(v)  in the case of Seller as Defaulting Party, Seller breaches the representations and certifications in Article XXVIII.1 or fails to comply with Article XXVIII.2.

38

*KDF*

*CH*

XV.2    On and at any time after the occurrence of a Termination Event, any Party not subject to such Termination Event may, while such Termination Event subsists, by giving five (5) Days written notice of its intentions to the Defaulting Party, suspend performance of its obligations under this Agreement. Where the Defaulting Party is Buyer, any such suspension by Seller shall not constitute a failure by Seller to make quantities of Natural Gas available for sale and delivery pursuant to the terms of this Agreement during such period of suspension, and Buyer shall have no rights in respect of such suspended deliveries during such period of suspension. Where the Defaulting Party is Seller, any such suspension by Buyer shall not constitute a failure by Buyer to take delivery of quantities of Natural Gas pursuant to the terms of this Agreement during such period of suspension, and Seller shall have no rights in respect of such suspended deliveries during such period of suspension. If such Termination Event is remedied thereafter (including, with respect to any late payments, payment in full of any such outstanding amounts together with interest thereon), prior to the exercise of rights under Article XV.1 the notice of suspension served under this Article XV.2 shall be deemed to be revoked automatically.

XV.3    The termination of this Agreement under this Article XV for any reason shall be without prejudice to the rights and remedies of the terminating Party accrued prior to such termination under this Agreement, including in respect of any antecedent breach (whether or not a repudiatory breach) giving rise to such termination.

XV.4    In the event that this Agreement is terminated pursuant to a Termination for Convenience, Buyer shall pay to Seller US $zero ($0).

XV.5    **To the fullest extent permitted under Applicable Law, each Party hereby irrevocably waives any right it might otherwise have, for any reason, to equitable rescission of this Agreement.**

## ARTICLE XVI

## NOVATION

Buyer and Seller expressly agree that no amendment or change order which could be made to this Agreement, during its term, shall be understood as a contractual novation, unless both Parties agree to the contrary, specifically and in writing. The previous provision shall be equally applicable in such other cases where Buyer gives Seller a time extension for the compliance with any of its obligations under this Agreement or where Buyer dispenses the claim or demand of any of its credits or rights under the Agreement.

## ARTICLE XVII

## CHANGE IN LAW

During the term of this Agreement, any change in law, including, but not limited to changes in applicable tax law, which causes an increase in Seller's costs when supplying the products or services to be acquired by Buyer, shall be Seller's responsibility and Buyer shall not be obliged to make additional payments nor to pay additional sums to the price or canon originally agreed for those products or services.

*KD7*



## ARTICLE XVIII

## APPLICABLE LAW

This Agreement, the Confirmation(s) and any other document specifically incorporated into it shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico. Other than matters relating to the PREPA Bankruptcy, which shall be heard and determined in the United States District Court for the District of Puerto Rico, the Parties expressly agree that all actions and proceedings arising out of or relating to this Agreement shall be heard and determined in the courts of the Commonwealth of Puerto Rico, and the Parties hereby irrevocably submit to the jurisdiction of such court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding. The Parties hereby irrevocably waive all rights to trial by jury in any action, proceeding or counterclaim (whether based in contract, tort or otherwise) arising out of or relating to this Agreement or the actions of any Party or their respective representatives in the negotiation or performance hereof.

## ARTICLE XIX

## CODE OF ETHICS

Each Party represents and warrants that, in connection with this Agreement:

XIX.1  It has implemented adequate internal procedures designed to ensure that it shall not authorize the giving or offering of any financial or other advantage with the intention of inducing or rewarding any individual or entity to improperly perform an activity undertaken in the course of an individual's employment or connected to an entity's business activities (the "**Anti-Corruption Controls**"); and

XIX.2  It has not authorized and it will not authorize, in connection with the performance of this Agreement, any financial or any other advantage to or for the benefit of any public official, civil servant, political official, candidate for office, or any other public or private individual or entity where such authorization would violate the Anti-Corruption Controls.

## ARTICLE XX

## SETTLEMENT OF DISPUTES

XX.1  Exclusive Jurisdiction

(a)  Any claim, dispute, disagreement or controversy (each, a "**Dispute**") that arises between the Parties under this Agreement or that is otherwise related to the subject matter of this Agreement, except for those Disputes to be resolved through Expert determination pursuant to Article XX.2 below, shall be resolved exclusively in the Federal District Court for the District of Puerto Rico.

(b)  In the event of such Dispute, each Party shall continue performing its obligations hereunder except to the extent such obligations have been properly suspended

*KDf*

40



pursuant to the terms hereof. For the avoidance of doubt, Buyer shall continue paying undisputed amounts due under Article IX.

XX.2  Expert Determination

Any Dispute that arises between the Parties with respect to (i) the determination of quality under Article IV, or (ii) Article VII may be referred by either Party to an Expert for such Expert's determination of such Dispute, disagreement or other matter of interpretation in accordance with the following guidelines:

(a)  The Parties hereby agree that such determination shall be conducted expeditiously by an Expert selected unanimously by the Parties.

(b)  The Expert shall not be deemed to be acting in an arbitral capacity.

(c)  The Party requesting that any matter arising under Article IV or Article VII of this Agreement be referred to an Expert shall give the other Party notice of such request. If the Parties are unable to agree on the identity of an Expert within ten (10) Days after receipt of the notice of request for an Expert determination, then, upon the request of any of the Parties, the International Centre for Expertise of the International Chamber of Commerce shall appoint such Expert and shall administer such Expert determination through the ICC's Rules for Expertise.

(d)  The Expert shall be and remain at all times wholly impartial as between the Parties, and, once appointed, the Expert shall have no *ex parte* communications with either of the Parties concerning the Expert determination or the underlying Dispute.

(e)  The Expert procedure shall take place in San Juan, Puerto Rico in English.

(f)  Both Parties agree to cooperate fully in the expeditious conduct of such Expert determination and to provide the Expert with access to all facilities, books, records, documents, information and personnel necessary to make a fully informed decision in an expeditious manner.

(g)  Before issuing a final decision, the Expert shall issue a draft report and allow the Parties to comment on it.

(h)  The Expert shall endeavor to resolve the Dispute within thirty (30) Days (but no later than sixty (60) Days) after his appointment, taking into account the circumstances requiring an expeditious resolution of the Dispute.

(i)  The Expert's decision shall be final and binding on the Parties.

*KDF*

41



XX.3  Qualification of Experts

(a)  No Person, without the prior written agreement of the Parties, shall be appointed as an Expert pursuant to Article XX.2 if such Person:

(i)  is (or has been at any time within ten years preceding notice of the Dispute) an employee of a Party or of an Affiliate of a Party;

(ii)  is (or has been at any time within five years preceding notice of the Dispute) a consultant or contractor of a Party or of an Affiliate of a Party;

(iii)  holds any significant financial interest in a Party; or

(iv)  does not have at least ten years' experience advising or working in the North American NG industry with respect to the subject matters subject to the Expert's determination under Article XX.2.

(b)  The Parties shall, within two months after the Effective Date, agree on a list of possible Experts for purposes of Article XX.2; *provided, however,* that in the event that the Parties are unable to agree on a list of acceptable Experts, then in the event of a Dispute subject to Expert determination pursuant to Article XX.2 the Expert shall be appointed by the International Centre for Expertise of the International Chamber of Commerce in accordance with Article XX.2.

## ARTICLE XXI

### NON-WAIVER

Delay or failure to exercise any right, power or remedy accruing to any Party as the result of any breach or default hereunder shall not impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or Default.

## ARTICLE XXII

### CONFIDENTIALITY

XXII.1 Any information directly or indirectly disclosed or furnished, whether orally, in writing or in electronic, digital or any other form, by either Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Disclosing Party**") to the other Party (or its representatives, employees, directors, officers, agents or Affiliates) (the "**Receiving Party**") in connection with this Agreement (or in connection with the terms and conditions or the negotiation of any other agreement or document related to this Agreement or to is subject matter either between the Parties or otherwise) which is not:

(a)  already known to the Receiving Party; or

(b)  already in the public domain (other than in violation of the terms of this Article XXII.1), such information being "**Confidential Information**," shall,    *KD7*



unless otherwise agreed in writing by the Parties, be kept confidential and shall not be sold, traded, published or otherwise disclosed to any Third Party in any manner whatsoever (except as provided in Article XXII.2) by the Receiving Party. For the avoidance of doubt, the terms of this Agreement may be made public pursuant to Applicable Law.

XXII.2 The Receiving Party may disclose Confidential Information to the following Persons without the consent of the Disclosing Party:

(a)    To the Receiving Party's and its Affiliates' directors, agents and employees;

(b)    to the Receiving Party's lenders and prospective lenders for the sole purpose of obtaining finance based on this Agreement;

(c)    to the Receiving Party's advisors and consultants, including legal counsel, accountants and other agents of the Receiving Party for purposes connected with this Agreement;

(d)    to Third Parties on an aggregated basis to the extent such information is delivered to such Third Party for the sole purpose of calculating a published index;

(e)    to Experts and any court in connection with the resolution of a Dispute;

(f)    to co-shareholders and partners in upstream and downstream projects, any operator of Seller's facilities and any other relevant Third Parties, in all cases

(g)    limited (i) only to operational information; and (ii) to the extent strictly necessary to implement this Agreement;

(h)    to any insurer in connection with a policy of insurance required pursuant to this Agreement;

(i)    to any lender or potential lender and to any employee, representative or advisor of such Person;

(j)    to those contractor(s) that Seller retains or proposes to retain to perform any of Seller's obligations hereunder; or

(k)    to any Governmental Authority or financial markets to the extent required or advisable in connection with any future financing activity related to Seller.

XXII.3 The Receiving Party disclosing Confidential Information pursuant to Article XXII.2 to a Person identified in Article XXII.2(b) to XXII.2(f) shall ensure that such Person undertakes to hold such Confidential Information subject to confidentiality obligations equivalent to those set out in Article 26.1 (excluding legal counsel). Each Party understands that the Receiving Party, and Persons, listed in Article XXII.2(a), (b) or (c) may now or in the future work on similar projects, and the Parties agree

*KDf*

43



that, without prejudice to the other provisions in this Article XXII, such Persons shall not be precluded from working on such other projects because they have reviewed any Confidential Information.

XXII.4 In the event that disclosure is required by any Governmental Authority or Applicable Law and such disclosure is not of the kind permitted pursuant to Article XXII.2(j), the Receiving Party subject to such requirement may disclose the Confidential Information to the extent so required, but shall promptly notify the Disclosing Party of such disclosure prior to so doing, and shall cooperate (consistent with the Receiving Party's legal obligations) with the Disclosing Party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the Disclosing Party. Notwithstanding the foregoing, Seller acknowledges that Articles XXII.4 and XXII.5 shall not apply to any requirements applicable to Buyer to disclose any Confidential information that Buyer is required to disclose as a public entity under Applicable Law.

XXII.5 No press release or public statement concerning the existence, execution of, or other matters directly related to, this Agreement, or the transactions contemplated hereby, shall be issued by the representatives, directors, officers, agents or employees of either Party or its Affiliates unless otherwise agreed by the Parties in writing. In the case of any such press release or public statement, the Parties shall first consult and agree to the specific contents and the manner or timing of presentation or publication thereof. The foregoing shall not apply to any announcement by a Party required in order to comply with any Applicable Law, provided that in this case the relevant Party making such announcement notifies the other Party of the details of such announcement, the relevant Applicable Law to be complied with and, where applicable, the addressee of such announcement.

XXII.6 The Parties shall be entitled to all remedies available at law or in equity to enforce or seek relief in connection with the breach of the confidentiality obligation set out in this Article XXII.

XXII.7 If Seller connects to information systems managed by PREPA or Genera, Seller shall implement and maintain a cybersecurity system designed to prevent unauthorized access to such systems, as well as the system owned or managed by Seller. Buyer has the right to screen Seller's systems for compliance and security purposes at any time during the Term. Seller shall notify Buyer immediately if any information provided by or on behalf of Buyer has been, or is suspected of being, lost, stolen, or inappropriately disclosed. Seller shall protect the privacy of the personal information of PREPA's and Genera's employees, customers, and vendors against inadvertent or inappropriate disclosure.

## ARTICLE XXIII

### NOTICES

All notices to be given under this Agreement by one Party to the other shall be in writing, sent to the address and marked to the attention of the Person specified in Article XXV and, unless otherwise agreed, in English.

*KDf*



## ARTICLE XXIV

## CONTINGENT FEES

Seller guarantees that it has not employed any person to solicit or secure this Agreement upon any agreement for a commission percentage, brokerage or contingent fee. Breach of this guarantee shall give Buyer the right to annul the Agreement or, at its discretion to deduct from the consideration payable hereunder the amount of such commission, percentage, brokerage or contingent fees. This warranty shall not apply to commissions payable by contractors upon contract or sales secured or made through bona fide established commercial or selling agencies maintained by Seller for the purpose of securing business.

## ARTICLE XXV

## ADDRESSES FOR NOTICES

**SELLER**:    NFEnergía LLC
c/o New Fortress Energy Inc.
111 W 19th St., 8th Fl.
New York, NY 10011
Attention: General Counsel
Telephone: 516-268-7400
Email: legal@newfortressenergy.com

**BUYER**:    PREPA
c/o Genera PR LLC, agent of PREPA Fuels Office
250 Muñoz Rivera Ave., Suite 1200
San Juan, Puerto Rico 00918
Attention: Jose L. Carrasco, Fuels Manager
fuels@genera-pr.com
With a copy to legal@genera-pr.com

Either Party may change its address details by giving not less than five (5) Days written notice to the other Party.

## ARTICLE XXVI

## BUSINESS PRACTICES AND FOREIGN CORRUPT PRACTICES ACT

XXVI.1    Each Party agrees that in connection with its activities conducted pursuant to this Agreement, neither it nor any of its directors, officers, employees, or Affiliates shall (a) take any action, or omit to take any action that would violate any Applicable Law applicable to that Party, (b) make, promise to make, or authorize, the making of any payment, gift or transfer of anything of value,

*KD7*

45



directly or indirectly, to any official or employee of any government or instrumentality of any government or to any political party or official thereof or any candidate of any political party for the purpose of influencing the action or inaction of such official, employee, political party or candidate, or (c) otherwise take any action, or omit to take any action that would cause the other Party to be in violation of any Applicable Law related to the business practices of such other Party, including the United States Foreign Corrupt Practices Act.

XXVI.2    Each Party agrees and undertakes, on behalf of itself, its directors, officers, employees, or Affiliates, not to pay any fees, commissions or rebates to any employee, officer or agent of the other Party, or its Affiliates or shareholders nor provide or cause to be provided to any of them any gifts or entertainment of significant cost or value in connection with their activities conducted pursuant to this Agreement or in order to influence or induce any actions or inactions in connection with the commercial activities of the Parties under this Agreement.

XXVI.3    Without prejudice to Article XXIV, neither Party shall use any broker, agent, or other intermediary in connection with soliciting, obtaining, negotiating, structuring or performing this Agreement or in connection with the subject matter to which it applies.

XXVI.4    Each Party shall indemnify and hold the other Party harmless from and against any and all losses, damages, liabilities, costs, expenses and claims which arise out of, are incident to, or result from any breach by such Party of this Article XXVI.

XXVI.5    Each Party shall use commercially reasonable efforts to cause its contractors and agents to agree to terms concerning business practices and the Foreign Corrupt Practices Act that are substantially similar to those set forth in this Article XXVI.

## ARTICLE XXVII

### TRANSFER OF FUNDS

If Seller decides to assign or transfer any right to payment of an amount, due or payable, to which he is entitled for services rendered or goods provided during the term of this Agreement, Seller shall notify Buyer of such transfer of funds, in accordance with the provisions of Act 21- 2012. Said notice shall clearly indicate the rights granted, including a copy of the contract under which the assignment or transfer of the right to payment is made, the exact amount of funds to be assigned or transferred, and specific identification information regarding the assignee (full name of the person or company), address and any other contact information.

## ARTICLE XXVIII

### CONFLICT OF INTEREST

XXVIII.1    Seller represents and warrants that: (i) none of its representatives under this Agreement are employed by or receive payment or compensation for such employment from any governmental agency, body, public corporation or municipality of Puerto Rico; (ii) no employee of the Puerto Rico government, Buyer, or Genera and the 3PPO has any personal or economic interest in this Agreement; (iii) it may have service contracts with other governmental agencies, bodies, public corporations or municipalities of Puerto Rico, but such contracts do not constitute a conflict of interest

*KD7*

46



for Seller, Buyer, or Genera, or otherwise bias Seller's judgement, in its performance of the Agreement; (iv) at the time of execution of this Agreement, it does not have any other contractual relationship that could be deemed to constitute a conflict of interest for Seller, or otherwise bias Seller's judgement, in its performance of the Agreement; (v) at the time of execution of this Agreement, it does not have any claims or existing litigation with Buyer, Genera, the 3PPO or any instrumentality of the government of Puerto Rico; (vi) it did not, prior to submitting a proposal with respect to this Agreement, have access to another competitor's proprietary information that was obtained from a Puerto Rico government official, Buyer, Genera and/or the 3PPO without proper authorization; and (vii) it did not, prior to submitting a proposal with respect to this Agreement, have access to source selection information (i.e., information prepared for use by Buyer, Genera and/or the 3PPO for the purpose of evaluating bids or proposals to enter into a contract, if that information was not previously made available to the public or disclosed publicly) that is relevant to this Agreement but was not available to all competitors.

XXVIII.2    Conflicting Interest.

(a)    Seller acknowledges that it has a duty of ethical behavior towards Buyer, Genera and the 3PPO. Such duty includes that Seller shall not have interests that conflict with Buyer or Genera's interests in this Agreement, including (i) the representation of clients which have, or may have, interests opposed to those of Buyer or Genera and/or the 3PPO in relation to this Agreement; (ii) when Seller's conduct is described as such in the canons of ethics that may be applicable to Seller and its personnel or in the laws or regulations applicable to Seller and its personnel assigned to this Agreement; (iii) when Seller, its Affiliates, or their employees, directors, or officers directly or indirectly, for themselves or any other third party, obtain, request or give to Buyer or Genera and/or the 3PPO or an employee, officer, director or agent of Buyer or Genera and/or the 3PPO, any profit, utility, advantage or gain by way of improper acts or exercise of undue influence.

(b)    Seller agrees to avoid even the appearance of a conflict of interest.

(c)    Seller shall have the continuous obligation to promptly disclose to Buyer if any relationship with third parties could represent a conflict of interest with Buyer or Genera and/or the 3PPO in connection with this Agreement.

## ARTICLE XXIX

## UNFAIR LABOR PRACTICE

In the event that Seller or any of its subcontractors or agents do not comply with an order issued by the Puerto Rico Labor Relations Board and/or the National Labor Relations Board upon their finding that Seller or any of its subcontractors or agents have committed an unfair labor practice, no further payments shall be made by Buyer to Seller after the date of the said order, until such non-compliance is corrected. Any declaration by the Puerto Rico Labor Relations Board and/or by the National Labor Relation Board that the contractors or agents have not complied with an order issued by the Board relating to any unfair labor practice shall be binding, final, and conclusive unless such order is reversed or set aside by a Court of competent jurisdiction.

*KD7*

47



## ARTICLE XXX

## DISCRIMINATION

Seller certifies that it is an employer with equal opportunity employment, and does not discriminate by reason of race, color, religion, political ideas, sex, nationality, age or mental or physical condition.

## ARTICLE XXXI

## COMPLIANCE WITH THE COMMONWEALTH OF PUERTO RICO CONTRACTING REQUIREMENTS

XXXI.1    Seller shall comply with all applicable laws, including local and federal regulations and Executive Orders that regulate the environmental matters and contracting processes and requirements in the Commonwealth of Puerto Rico. Seller has complied or will comply with all government contracting requirements pursuant to Exhibit E.

XXXI.2    Resolution of Debt

If any of the certifications required in Exhibit E shows a debt, and Seller has requested a review or adjustment of this debt, Seller hereby certifies that it has made such request at the time of Contract execution. If the requested review or adjustment is denied and such determination is final, Seller will provide, immediately, to Buyer a proof of payment of this debt; otherwise, Seller accepts that the owed amount be offset by Buyer and retained at the origin, deducted from the corresponding payments. Seller accepts and acknowledges its responsibility for requiring and obtaining a similar warranty and certification from each and every contractor and subcontractor whose service Seller has secured in connection with the services to be rendered under this Agreement and shall forward evidence to Buyer as to its compliance with this requirement.

## ARTICLE XXXII

## PUBLIC OFFICERS OR EMPLOYEES

XXXII.1    Prohibition with respect to execution by public officers: (3 L.P.R.A. 8615(c))

Seller acknowledges that no public officer or employee authorized to contract on behalf of the executive agency for which he/she works may execute a contract between the agency for which he/she works and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

XXXII.2    Prohibition with respect to contracting with officers or employees: (3 L.P.R.A. 8615(d))

Seller acknowledges that no executive agency may execute a contract in which any of its officers or employees or any member of their family units has or has had direct or indirect economic interest during the last four (4) years prior to their holding office unless the Governor gives

*KDf*

48



DocuSign Envelope ID: 4F0D6585-842D-4729-ABC0-D9D933F20F6F

authorization thereto with the previous recommendation of the Secretary of the Treasury and the Secretary of Justice.

XXXII.3    Prohibition with respect to contracts with officers and employees of other Government entities: (3 L.P.R.A. 8615(e))

Seller acknowledges that no public officer or employee may be a party to or have any interest in any profits or benefits produced by a contract with any other executive agency or government dependency unless the Governor gives express authorization thereto with previous recommendation from the Secretary of the Treasury and the Secretary of Justice.

XXXII.4    Prohibition with respect to evaluation and approval by public officers: (3 L.P.R.A. 8615(f))

Seller acknowledges that no public officer or employee who has the power to approve or authorize contracts shall evaluate, consider, approve, or authorize any contract between an executive agency and an entity or business in which he/she or any member of his/her family unit has or has had direct or indirect economic interest during the last four (4) years prior to his/her holding office.

XXXII.5    Prohibition with respect to execution by public officers contracts with former public officers: (3 L.P.R.A. 8615(h))

Seller acknowledges that no executive agency shall execute contracts with or for the benefit of persons who have been public officers or employees of said executive agency until after two (2) years have elapsed from the time said person has ceased working as such.

## ARTICLE XXXIII

### DISPENSATION

Any and all necessary dispensations have been obtained from any government entity and that said dispensations shall become part of the contracting record.

## ARTICLE XXXIV

### RULES OF PROFESSIONAL ETHICS

Seller acknowledges and accepts that it is knowledgeable of the rules of ethics of his or her profession and assumes responsibility for his or her own actions.

*KDI*

*CA*

## ARTICLE XXXV

### ANTI-CORRUPTION CODE FOR A NEW PUERTO RICO

XXXV.1    Seller agrees to comply with the provisions of Act 2-2018, as the same may be amended from time to time, which establishes the Anti-Corruption Code for a New Puerto Rico.

XXXV.2    Seller hereby certifies that it does not represent particular interests in cases or matters that imply a conflict of interest, or of public policy, between the executive agency and the particular interests it represents.

XXXV.3    Provisions Required under Act 14-2004

Seller agrees that articles extracted, produced, assembled, packaged, or distributed in Puerto Rico by enterprises with operations in Puerto Rico, or distributed by agents established in Puerto Rico, shall be used when the service is rendered, provided that they are available.

## ARTICLE XXXVI

### CONTRACT REVIEW POLICY

XXXVI.1    The Parties acknowledge that Seller has submitted the certification titled "Contractor Certification Requirement" in accordance with Exhibit E.

XXXVI.2    For this Agreement, the transfer of skills and technical knowledge required by the Certified Fiscal Plan is inapplicable given the non-recurring or specialized nature of the contracted services.

## ARTICLE XXXVII

### INSURANCE

XXXVII.1    Insurance and Bonds:

Seller shall secure and maintain in full force and effect during the life of this Agreement as provided herein, policies of insurance covering all operations engaged in by the Agreement as follows:

(a)    Commonwealth of Puerto Rico Workmen's Compensation Insurance:

Seller shall provide Workmen's Compensation Insurance as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico. Seller shall also be responsible for compliance with said Workmen's Compensation Act by all its subcontractors, agents, and invitees, if any.

Seller shall furnish a certificate from the Puerto Rico's State Insurance Fund showing that all personnel employed in the work are covered by the Workmen's Compensation Insurance, in accordance with this Contract.

*KDf*

50

*CA*

(b) Employer's Liability Insurance:

Seller shall provide Employer's Liability Insurance with minimum bodily injury limits of $1,000,000 for each employee and $1,000,000 for each accident covering against the liability imposed by Law upon Seller as result of bodily injury, by accident or disease, including death arising out of and in the course of employment, and outside of and distinct from any claim under the Workmen's Compensation Act of the Commonwealth of Puerto Rico.

(c) Commercial General Liability Insurance:

Seller shall provide a Commercial General Liability Insurance with limits of $2,000,000 per occurrence and $2,000,000 aggregate, and including coverage for explosion, collapse, and underground (XCU) hazard.

The Commercial General Liability Insurance or its equivalent must include coverage for bodily injuries and property damages caused during the operation of a watercraft.

(d) Excess Liability Insurance:

Seller shall provide an Excess Liability Insurance in excess of the Commercial General Liability Insurance limits. This Excess Liability Insurance will have limits of $10,000,000 per occurrence and $10,000,000 aggregate.

(e) Commercial Automobile Liability Insurance:

Seller shall provide a Commercial Automobile Liability Insurance with limits of $1,000,000 combined single limit covering all owned, non-owned, and hired automobiles.

(f) Pollution Liability Insurance:

Seller shall provide a Pollution Liability Insurance with limits of $1,000,000 per claim and $1,000,000 per aggregate.

XXXVII.2    Requirements Under the Policies:

The Commercial General Liability or its equivalent and the Commercial Automobile Liability Insurance required under this Contract shall be endorsed to include:

(a) As Additional Insured:

Puerto Rico Electric Power Authority (Buyer)
Risk Management Office
PO Box 364267
San Juan, PR 00936-4267

*KDf*

51



(b)    A thirty (30) Day cancellation or nonrenewable notice to be sent to the above address.

(c)    An endorsement including this Agreement under contractual liability coverage and identifying it by number, date and parties to the contract.

(d)    Waiver of Subrogation in favor of Puerto Rico Electric Power Authority (Buyer).

(e)    Breach of Warranties or Conditions:

"The Breach of any of the Warranties or Conditions in this policy by the Insured shall not prejudice Buyer's rights under this policy."

XXXVII.3    <u>Furnishing of Policies:</u>

(a)    All required policies of insurance shall be in a form acceptable to Buyer and shall be issued only by insurance companies authorized to do business in Puerto Rico.

(b)    Seller shall furnish a certificate of insurance in original signed by an authorized representative of the insurer in Puerto Rico, describing the coverage afforded.

## ARTICLE XXXVIII

### GENERAL

XXXVIII.1    If any inconsistency appears between the provisions contained in the body of this Agreement and any Exhibit to this Agreement, then the provisions of the body of this Agreement shall prevail.

XXXVIII.2    If any one or more of the provisions, obligations, or terms herein or part thereof shall be determined by a court of competent jurisdiction to be wholly or partially invalid, void, illegal or unenforceable in any respect by operation of Applicable Law or otherwise, the validity, legality, or enforceability of the remaining provisions, obligations, or terms or part thereof in any other jurisdiction shall not in any way whatsoever be affected or impaired thereby and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the validity and enforceability hereof to the extent that the essential purposes of this Agreement can be determined and effectuated.

XXXVIII.3    The Parties do not intend any term of this Agreement to be enforceable by any Third Party.

XXXVIII.4    Nothing in this Agreement shall be deemed to create a partnership, joint venture or association, establish a principal and agent relationship or any other relationship of a similar nature, including employment, between the Parties or create any joint and several liabilities. Neither Party shall

*KDJ*

52



have any right, power or authority to enter into any agreement or undertaking for, to act on behalf of, to act as or be an agent or representative of, or to otherwise bind, the other Party.

XXXVIII.5    The Parties acknowledge that this Agreement has been negotiated and prepared by the Parties with the advice of legal counsel to the extent deemed necessary by each Party. The Parties have agreed to the wording of this Agreement and none of the provisions of this Agreement shall be construed against one Party on the ground that such Party is the author of this Agreement or any part of this Agreement.

XXXVIII.6    This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations and communications relative hereto, oral or written, and there are no other understandings or representations between the Parties hereto. This Agreement may not be amended except by an instrument in writing signed by a duly authorized representative of each Party.

[Signature Page Follows]



53



IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed by their respective duly authorized representative as of the day and year first above written.

| For and on behalf of | For and on behalf of |
|---|---|
| **SELLER:** | **BUYER:** |
| **NFENERGÍA LLC** | |
| EIN: | **PUERTO RICO ELECTRIC POWER AUTHORITY, represented by its agent, Genera PR LLC** |

Name: _____

Christopher Guinta

Title:  Chief Financial Officer

Name: _____

Kevin D. Futch

Title:    General Counsel

Authorized Signatory for Genera PR LLC, exclusively as agent on behalf of and for the account of PREPA

54

KDF

CG

## EXHIBIT A
## SPECIFICATIONS

Natural Gas delivered by Seller shall satisfy the following conditions:

| Parameter | Min | Max | Units |
|---|---|---|---|
| Sand, dust, gums, crude oil, impurities, or other objectionable substances | No traces allowed | | |
| Sulfur | -- | 1 | grain/100 scf |
| Hydrogen Sulfide | -- | 0.3 | grains/100 scf |
| Mercaptan Sulfur | -- | 0.25 | grains/100 scf |
| Carbon Dioxide ($CO_2$) | -- | 2 | Percent by volume of carbon dioxide |
| Water Vapour | -- | 7 | lb/MMscf |
| Oxygen | -- | 0.4 | Percent by volume of oxygen |
| Heating Value (Natural Gas) | 1,000 | -- | Btu/scf |
| Heating Value (LNG) | 21,350 | -- | Btu/lb |

Note: These quality parameters shall be measured by methods in accordance with accepted industry practices.

KDf

55

CY

## EXHIBIT B
## DELIVERY POINTS

| Delivery Point | Distance from Palo Seco (in miles) |
|---|---|
| Palo Seco Power Plant | 0 |
| Palo Seco MobilePacs | 0 |
| San Juan Power Plant | 0 |
| Mayaguez Power Plant | 96 |
| Aguirre Power Plant | 40 |
| Costa Sur Power Plant | 79 |
| Cambalache Power Plant | 46 |
| Vega Baja Power Plant | 22 |
| Daguao Power Plant | 39 |
| Yabucoa Power Plant | 29 |
| Jobos Power Plant | 41 |

*KDf*



## EXHIBIT C
## FORM OF PARENT GUARANTEE

This GUARANTEE (this "*Guarantee*"), dated as of  March 15th, 2024, is made by NEW FORTRESS ENERGY INC, a Delaware corporation ("*Guarantor*"), in favor of the PUERTO RICO ELECTRIC POWER AUTHORITY, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act of May 2nd 1941, No. 83, as amended ("*Buyer*," and, together with Guarantor, each a "*Party*" and, collectively, the "*Parties*").

## RECITALS

**WHEREAS,** Buyer has agreed to enter into the Fuel Sale and Purchase Agreement for the Palo Seco and San Juan Temporary Generation Facilities, dated as of March 15th, 2024, with NFENERGÍA LLC ("*Seller*"), a subsidiary of Guarantor (the "*Agreement*"), which is hereby incorporated by reference in this Guarantee and made a part hereof; and

**WHEREAS,** it is a condition to Buyer and Seller entering into the Agreement that Guarantor execute and deliver this Guarantee.

**NOW THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    **Guarantee**.

1.1    On the terms and subject to the conditions contained herein, Guarantor hereby absolutely, unconditionally and irrevocably guarantees, to and for the benefit of Buyer, the full and punctual performance and payment, as and when each such payment or performance becomes due (whether at the stated due date, by acceleration or otherwise), by or on behalf of Seller of any and all obligations or amounts owed by Seller to Buyer in connection with and to the extent provided for in the Agreement (the "*Guaranteed Obligations*").    The Guaranteed Obligations of Guarantor hereunder are direct and primary obligations.

1.2    This Guarantee is an absolute, unconditional, present, and continuing guarantee of performance and payment, and not of collection, is in no way conditioned or contingent upon any attempt to collect from or enforce performance or payment by Seller or upon any other event, contingency or circumstance whatsoever, and shall remain in full force and effect and be binding upon and against Guarantor and its successors and permitted assigns (and shall inure to the benefit of Buyer and its agents, successors, endorsees, transferees, and permitted assigns) without regard to the validity or enforceability of the Agreement. If, for any reason, Seller shall fail to punctually, and fully perform or pay, as and when such performance or payment is due, any of the Guaranteed Obligations, Guarantor shall promptly perform or pay, or cause to be performed or paid, such Guaranteed Obligations.

1.3    Guarantor agrees that any judgment between Seller and Buyer under the Agreement (whether in contested litigation or arbitration, by default or otherwise) shall be conclusive and binding on the Parties for the purposes of determining Guarantor's

*KDf*

57

*CH*

obligations under this Guarantee but no such judgment shall be required to enforce the Guarantor's obligations under this Guarantee.

1.4    Guarantor further agrees to pay to Buyer all costs, expenses (including, without limitation, all reasonable fees and disbursements of counsel), and damages which may be paid or incurred by Buyer in enforcing any rights with respect to this Guarantee, including, without limitation, collecting against Guarantor under this Guarantee.

2.    **Obligations Absolute and Unconditional, Continuing; Etc.**

2.1    Guarantor agrees that the obligations of Guarantor set forth in this Guarantee shall be direct obligations of Guarantor, and such obligations shall be absolute, irrevocable and unconditional, shall not be subject to any counterclaim, set-off, deduction, diminution, abatement, recoupment, suspension, deferment, reduction or defense (other than full and strict compliance with its obligations hereunder) based upon any claim Guarantor or any other Person may have against Buyer or any other Person and shall remain in full force and effect without regard to and shall not be released, discharged or in any way affected or impaired by, any circumstance or condition whatsoever (other than full and strict compliance by Guarantor with its obligations hereunder) (whether or not Guarantor shall have any knowledge or notice thereof), including, without limitation: (i) the existence, validity, enforceability, perfection, release, or impairment of value of any collateral for such Guaranteed Obligations; (ii) any amendment or modification of or supplement to or other change in the Agreement or any other document, including, without limitation, any change order, renewal, extension, acceleration or other changes to time, manner, place or terms of payment thereunder; (iii) any failure, omission or delay on the part of Buyer or any other Person to confirm or comply with any term of the Agreement or any other document; (iv) any waiver, consent, extension, indulgence, compromise, release or other action or inaction under or in respect of the Agreement or any other document or any obligation or liability of Buyer or any other Person, or any exercise or non-exercise of any right, remedy, power, or privilege under or in respect of any such instrument or agreement or any such obligation or liability; (v) any bankruptcy, insolvency, reorganization, arrangement, readjustment, liquidation, or similar proceeding with respect to Buyer, Seller, or any other Person or any of their respective properties, or any action taken by any trustee or receiver or by any court in any such proceeding; (vi) any discharge, termination, cancellation, frustration, irregularity, invalidity or unenforceability, in whole or in part, of the Agreement or any other document or any term or provision thereof; (vii) any merger or consolidation of Guarantor, Seller or any other Person into or with any other Person or any sale, lease or transfer of all or any of the assets of Guarantor, Seller or any other Person; (viii) any change in the ownership of Guarantor, Seller or any other Person; (ix) any winding up or dissolution of Guarantor, Seller or any other Person; (x) any assignment of, or the creation of any mortgage, pledge, charge or other encumbrance over, or in respect of, this Guarantee, the Agreement or any of Buyer's rights, benefits, or obligations under or pursuant to this Guarantee or the Agreement; or (xi) to the fullest extent permitted under Applicable Law, any other occurrence or circumstance whatsoever, whether similar or dissimilar to the foregoing, which might otherwise constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which might otherwise limit recourse against *KDf* Guarantor.

58



2.2    The Guaranteed Obligations constitute the full recourse obligations of Guarantor enforceable against it to the full extent of all its assets and properties. Without limiting the generality of the foregoing, Guarantor agrees that repeated and successive demands may be made and recoveries may be had hereunder as and when, from time to time, Seller shall fail to perform obligations or pay amounts owed by Seller under the Agreement and that notwithstanding the recovery hereunder for or in respect of any given failure to so comply by Seller under the Agreement, this Guarantee shall remain in full force and effect and shall apply to each and every subsequent such failure.

3.    **Reinstatement.** Guarantor agrees that this Guarantee shall be automatically reinstated with respect to any payment made by or on behalf of Seller pursuant to the Agreement if and to the extent that such payment is rescinded or must be otherwise restored, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

4.    **Waiver of Demands, Notices; Etc.** Guarantor hereby unconditionally waives, to the fullest extent permitted by Applicable Law: (i) notice of any of the matters referred to in Section 2.1 hereof; (ii) all notices which may be required by Applicable Law, or otherwise, now or hereafter in effect, to preserve any rights against Guarantor hereunder, including, without limitation, any demand, proof, or notice of non-payment or non-performance of any Guaranteed Obligation; (iii) any right to the enforcement, assertion, or exercise of any right, remedy, power, or privilege under or in respect of the Agreement; (iv) notice of acceptance of this Guarantee, demand, protest, presentment, notice of failure of performance or payment, and any requirement of diligence; (v) any requirement to exhaust any remedies resulting from failure of performance or payment by Seller under the Agreement or by any other Person under the terms of the Agreement; and (vi) any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge, release, or defense of a guarantor or surety, or which might otherwise limit recourse against Guarantor.

5.    **No Subrogation.** Notwithstanding any performance, payment or payments made by Guarantor hereunder (or any set-off or application of funds of Guarantor by Buyer), Guarantor shall not be entitled to be subrogated to any of the rights of Seller (or of any rights of Buyer hereunder), or any collateral, security, or guarantee or right of set-off held by Buyer, for the performance or payment of the obligations guaranteed hereunder, nor shall Guarantor seek or be entitled to assert or enforce any right of contribution, reimbursement, indemnity or any other right to payment from Seller as a result of Guarantor's performance of its obligations pursuant to this Guarantee until all Guaranteed Obligations are performed or paid in full. If any amount shall be paid to Guarantor on account of such subrogation, contribution, reimbursement or indemnity rights at any time when all of the Guaranteed Obligations and all amounts owing hereunder shall not have been performed and paid in full, such amount shall be held by Guarantor in trust for Buyer, segregated from other funds of Guarantor, and shall, forthwith upon receipt by Guarantor, be turned over to Buyer in the exact form received by Guarantor (duly endorsed by Guarantor to Buyer, if required), to be applied against the Guaranteed Obligations, whether or not matured, in such order as Buyer may determine.

6.    **Representations and Warranties.** Guarantor represents and warrants that:

6.1    it is a corporation duly organized, validly existing and is in good standing under the laws of the state of Delaware, and has the corporate power and authority to execute, deliver and carry out the terms and provisions of this Guarantee; the execution,

*KDf*

59

*CH*

delivery and performance of this Guarantee will not violate or conflict with its charter or by-laws (or comparable constituent documents), any law, regulation or order of any governmental authority or any court or other agency of government applicable to it or the terms of any agreement to which it is a party;

6.2 no authorization, approval, consent or order of, or registration or filing with, any court or other governmental entity having jurisdiction over Guarantor is required on the part of Guarantor for the execution, delivery, or performance of this Guarantee;

6.3 the execution, delivery and performance of this Guarantee have been and remain duly authorized by all necessary corporate action and do not contravene the Guarantor's constitutional documents or any contractual restriction binding on the Guarantor or its assets;

6.4 this Guarantee, when executed and delivered, will constitute a valid and legally binding agreement of Guarantor, enforceable against Guarantor in accordance with its terms, except as the enforceability of this Guarantee may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity as they apply to the Guarantor; and

6.5 Guarantor is financially solvent, able to pay all debt as they mature, and possesses sufficient working capital to perform its obligations under this Guarantee.

7. **Conveyance or Transfer.** Guarantor shall not convey, sell, lease or transfer its properties or assets to any Person to the extent that such conveyance, sale, lease or transfer could have a material adverse effect on Guarantor's ability to fulfill its obligations under this Guarantee (a "*Material Transaction*") without Buyer's written consent (not to be unreasonably withheld). For the avoidance of doubt, a sale of property or assets for market value shall not be considered a Material Transaction as long as Guarantor receives all of the proceeds from such sale and does not subsequently transfer such proceeds to another Person. If Guarantor proposes a Material Transaction, Guarantor shall (i) provide Buyer with reasonable advance notice of such proposed Material Transaction, (ii) meet with Buyer, and (iii) pursuant to a written confidentiality agreement, provide to Buyer all necessary information, reasonably requested by Buyer, regarding the proposed Material Transaction for the purpose of receiving Buyer's written consent to such Material Transaction (not to be unreasonably withheld). For the avoidance of doubt, such restriction on conveyances, sales, leases and transfers shall include conveyances, sales, leases or transfers to Guarantor's Affiliates.

8. **Dispute Resolution.**

8.1 The Parties agree that any claim, dispute, controversy, difference, disagreement, or grievance (of any kind or type, whether based on contract, tort, statute, regulation or otherwise) arising out of, connected with or relating in any way to this Guarantee (including the construction, validity, interpretation, termination, enforceability or breach of this Guarantee) ("*Dispute*") shall be decided by litigation pursuant to this Section 8.

8.2 Litigation of any Dispute shall be brought exclusively in the Commonwealth Court of First Instance, San Juan, Puerto Rico or federal court having jurisdiction over San

*KDf*

60

*CA*

Juan, Puerto Rico. Each Party hereby consents to personal jurisdiction in any legal action, suit, or proceeding brought in any state court in San Juan, Puerto Rico, or federal court having jurisdiction over San Juan, Puerto Rico having subject matter jurisdiction, and irrevocably waive, to the fullest extent permitted by Applicable Law and the law of the internal laws of the Commonwealth, any claim or any objection it may now or hereafter have, that venue or personal jurisdiction is not proper with respect to any such legal action, suit, or proceeding brought in such a court in or having jurisdiction over San Juan, Puerto Rico, including any claim that such legal action, suit, or proceeding brought in such court has been brought in an inconvenient forum. Each Party further consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Party at its address specified herein for the giving of notices, or by such other notice given in accordance with the rules and procedures of such courts. Each Party hereby waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any proceeding brought under this Guarantee.

9.    **Miscellaneous.**

9.1    This Guarantee shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns.  Guarantor may not assign or transfer this Guarantee or any rights or obligations hereunder without Buyer's prior written consent, which consent may be withheld in Buyer's sole and absolute discretion.  Buyer may, without Guarantor's consent: assign this Guarantee, in whole or part, to any Person who is a permitted successor or assignee of Buyer under the Agreement.  Except as otherwise provided in this Section 9.1, nothing herein, express or implied, is intended or shall be construed to confer upon or to give to any Person other than the Parties hereto any rights, remedies, or other benefits.

9.2    This Guarantee shall be governed by, interpreted and construed in accordance with the laws of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any jurisdiction other than New York.

9.3    No modification or amendment of this Guarantee shall be of any force or effect unless made in writing, signed by the Parties hereto, and specifying with particularity the nature and extent of such modification or amendment. This Guarantee constitutes the entire and only understanding and agreement among the Parties hereto with respect to the subject matter hereof and cancels and supersedes any prior negotiations, proposals, representations, understandings, commitments, communications, or agreements, whether oral or written, with respect to the subject matter hereof.

9.4    All notices, demands, offers, requests and other written instruments required or permitted to be given pursuant to this Guarantee shall be in writing signed by the Party giving such notice and shall be hand delivered or sent by overnight courier, messenger, facsimile or certified mail, return receipt requested, to the other Parties at the address set forth below.

*KD7*



| | **If to Buyer** | | **If to Guarantor** |
|---|---|---|---|
| Name | General Counsel | Name: | General Counsel |
| Title: | | Title: | |
| Address: | 250 Ave. Muñoz Rivera | Address: | 111 W, 19th St. 8th Fl. |
| | Suite 1200 San Juan P.R. 00918 | | New York, N.Y. 10011 |
| Phone Number: | | Phone Number: | (516)268-7400 |
| Email: | legal@genera-pr.com | Email: | legal@newfortressenergy.com |

Each Party shall have the right to change the place to which such notices shall be sent or delivered by sending a similar notice to the other Parties in like manner. Notices, demands, offers, requests or other written instruments shall be deemed to have been duly given on the date actually received by the intended recipient, provided that if the day of receipt is not a Business Day then it shall be deemed to have been received on the next succeeding Business Day.

9.5    The headings of the several provisions of this Guarantee are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Guarantee.

9.6    No forbearance or delay by Buyer in asserting rights against Seller shall affect or impair in any way Guarantor's obligations hereunder or the rights of Buyer hereunder.

9.7    Capitalized terms used, but not otherwise defined, herein shall have the respective meanings ascribed to such terms in the Agreement. The term "Person" shall mean any individual, company, joint venture, corporation, partnership, association, joint stock company, limited liability company, trust, estate, unincorporated organization, governmental entity or other entity having legal capacity.

9.8    If any provision of this Guarantee is ultimately determined by a court of competent jurisdiction to be invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Guarantee except to the extent necessary to give effect to the construction of such invalidity, and any such invalid portion shall be deemed severed without affecting the validity of the remaining portions of this Guarantee.

KDA

62



9.9  This Guarantee may be executed in any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

[*Signature page follows.*]

**IN WITNESS WHEREOF,** the undersigned have duly executed this Guarantee as of the date first above written.

NEW FORTRESS ENERGY INC

By: _____

Name:  Christopher Guinta

Title:   Chief Financial Officer

63

KDJ

CA

**EXHIBIT D**
**FORM OF BOND**

KNOW ALL MEN BY THESE PRESENTS, that we, [_____] ("**Principal**"), and [_____] ("**Surety**"), are held and firmly bound unto PUERTO RICO ELECTRIC POWER AUTHORITY ("**Obligee**"), in the penal sum of up to, but not greater than, [5% of the Contract Ceiling] lawful money of the United States (the "**Penal Sum**"), to the payment of which well and truly to be made we hereby bind ourselves and our heirs, administrators, successors, and assigns, jointly and severally, firmly by these presents. This limited payment guarantee is made effective as of the day it is delivered to Obligee (the "**Effective Date**").

WHEREAS the above bound Principal has entered into that certain Fuel Sale and Purchase Agreement for the Palo Seco and San Juan Temporary Generation Facilities (the "**Contract**") with the above named Obligee, effective the [___] day of [_____], 2024, which Contract is hereby referred to and made a part hereof as fully and to the same extent as if copies at length were attached herein.

WHEREAS, in the event of an NG Deficiency (as defined in the Contract), Principal has agreed to pay Obligee certain amounts in accordance with the terms and conditions of Article VI of the Contract.

NOW THEREFORE, the condition of the obligations is such that if Principal and/or Surety has paid to Obligee all amounts that are due and owing to Obligee by Principal under Article VI of the Contract over the Term (as defined in the Contract), then this limited payment guarantee shall be null and void, otherwise to be in full force and effect.

This limited payment guarantee is executed by Surety and accepted by Obligee subject to the following expressed conditions. Capitalized terms used herein and not defined herein shall have the meaning set forth in the Contract.

1.  Obligee shall provide notice of Principal's failure to pay any undisputed amount due and owing under Article VI of the Contract ("**Default**") to both Principal and Surety, providing ten (10) business days for Principal to cure the Default. If Principal has not cured the Default within such period of time, then Obligee may make a Demand on this limited payment guarantee pursuant to Sections 2 and 3 below, in an amount not to exceed the Penal Sum. Any Demand for an amount that exceeds the Penal Sum shall be invalid to the extent that it exceeds the Penal Sum.

2.  Subject to satisfaction of the requirements of Section 1, within fifteen (15) business days of Surety's receipt of a valid demand for payment under this limited payment guarantee ("**Demand**"), accompanied by the documentation referred to in Section 3 below, Surety shall pay to Obligee via wire transfer the amount stated in the Demand. Payment of a Demand by Surety shall constitute full satisfaction of all Claims against Principal in respect of which the Demand was made. Any Demand paid by Surety to Obligee in any Contract Year shall reduce the Penal Sum of this limited payment guarantee during such Contract Year.

3.  Documentation to be provided to Surety in support of a Demand under this Guarantee shall be the following:

    a.  A photocopy of this limited payment guarantee.

*KDf*

64



b. A certificate, executed by a duly authorized representative of Obligee, that specifies the amount of the relevant Default.

c. All documentation (including invoices and records of nominations and Natural Gas and LNG [or diesel] quantities, quality and price) reasonably necessary to establish that the relevant amount is due and owing by Seller to Obligee under Article VI of the Contract.

4. The term of this limited payment guarantee is initially from the Effective Date to the conclusion of the Initial Term. This limited payment guarantee will automatically renew for successive one (1) calendar year terms following expiration of the previous term, unless cancelled by Surety by providing Principal and Obligee no less than sixty (60) calendar days written notice of cancellation. This limited payment guarantee shall terminate automatically upon termination of the Contract for any reason. Any notice of cancellation or termination of the limited payment guarantee pursuant to this Section 4 will not nullify or void any liability or indebtedness incurred or accrued by Principal and Surety named herein prior to said date of cancellation or termination.

5. Surety's liability under this limited payment guarantee (a) shall in no event exceed the Penal Sum and (b) is strictly limited to payment of Default amounts in accordance with Section 2 hereof; it being agreed that Surety shall not be obligated to perform (and shall not be liable for any performance or failure to perform by Principal of) any other obligations of Principal pursuant to the Contract.

6. This limited payment guarantee is governed by the laws of New York (with exclusion of its choice of law rules). Any dispute arising from or in connection to this limited payment guarantee shall be finally settled by binding arbitration in accordance with the International Chamber of Commerce Rules then in force (ICC Rules). The seat of the arbitration shall be New York and the arbitration shall be conducted in the English language.

Signed, sealed and dated this _____ day of _____, _____.

ATTEST_____    BY _____
                                                          Principal

ATTEST_____    BY _____

*KD7*

65

*CX*

**EXHIBIT E**

**GOVERNMENT CONTRACTING REQUIREMENTS**

1.     **SELLER ACKNOWLEDGMENTS**

1.1     Seller, for itself and its members or partners (if Seller is a partnership under the Puerto Rico Internal Revenue Code of 2011, as amended), represents and warrants that as of the Effective Date (a) neither it nor its members or partners, as applicable, has any outstanding debts for unemployment insurance, temporary disability, or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, workman's compensation with the State Insurance Fund, income taxes or sales and use taxes with the Department of Treasury of the Commonwealth, or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (b) it or its members or partners, as applicable, have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

1.2     Seller shall have delivered to PREPA prior to, or shall deliver to PREPA on, the Effective Date:

1.2.1     a copy of its current Certificate of Incorporation, Certificate of Organization or Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable; and

1.2.2     evidence (in each case dated no earlier than sixty (60) days prior to the Effective Date) of either:

(a)     the Seller's current RUL or RUP registration; or

(b)     in lieu of the RUL or RUP registration required in Section 1.2.2(a), each of the following:

(i)     a copy of Seller's Merchant's Registration Certificate.

(ii)     a copy of Seller's Merchant's Registration Certificate;

(iii)     a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iv)     a certification issued by the Puerto Rico Treasury Department indicating that Seller and its members and partners, if applicable, do not owe Puerto Rico sales and use taxes to the Commonwealth of Puerto Rico;

(v)     a Puerto Rico Sales and Use Tax Filing Certificate issued by the Puerto Rico Treasury Department reflecting that Seller has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods;

*KDJ*

66

*CA*

(vi)    a certification issued by the Puerto Rico Treasury Department indicating that Seller and its members and partners, if applicable, do not owe Puerto Rico income taxes to the Commonwealth;

(vii)    a Puerto Rico Income Tax Filing Certificate issued by the Puerto Rico Treasury Department reflecting that Seller has filed its Puerto Rico Income Tax returns for the last five (5) tax years;

(viii)    a certification issued by the Puerto Rico Child Support Administration (ASUME) reflecting that Seller is in compliance with the withholdings required to be made by employers under Applicable Laws;

(ix)    a sworn statement under Act 2-2018, signed before a notary public, in the form attached hereto as Attachment 1.

(x)    an all concepts debt certification issued by CRIM reflecting that Seller does not owe any taxes to CRIM with respect to real or personal property; and

(xi)    a certification issued by the Puerto Rico Labor Department reflecting that Seller is in compliance with the withholdings required to be made by employers with respect to Unemployment and Disability Insurance.

1.3    In providing the services, Seller, covenants, represents and warrants to PREPA as follows:

1.3.1    Neither Seller, its subsidiaries or affiliates, nor, when acting on behalf of Seller or its subsidiaries or affiliates, any director or officer or employee of Seller or its subsidiaries or its affiliates (together "**Seller Group Members**" and each a "**Seller Group Member**") has violated as of the Effective Date, or shall violate, conspire to violate, or aid and abet the violation of, any Anti-Corruption Laws. No funds transferred by PREPA to Seller shall be transferred by Seller or any Seller Group Member, directly or indirectly, in violation of any Anti-Corruption Laws.

1.3.2    Neither Seller nor any Seller Group Member are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Seller nor any Seller Group Member shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by PREPA to Seller shall be transferred by Seller or any Seller Group Member, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions;

1.3.3    Seller and Seller Group Members maintain and implement as of the Effective Date, and shall maintain and implement, policies, procedures and controls

*KDf*

reasonably designed to ensure compliance by Seller with the Anti-Corruption Laws and Sanctions;

1.3.4    Seller shall promptly notify PREPA in writing if, to Seller's knowledge, Seller, or any Seller Group Member, in connection with this Agreement or the Services, becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions;

1.3.5    Seller shall at all times comply with all Applicable Law regarding non-discrimination;

1.3.6    neither Seller nor Seller Group Members, nor any of their representatives, directly or indirectly, to the best of Seller's knowledge, has entered into or offered to enter into, or in the case of Seller shall enter into, any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement; and Seller attests, subject to the penalties for perjury, that the foregoing representation is true;

1.3.7    Seller shall inform PREPA and Genera and/or the 3PPO if, at any time during the Term, there are any material Tax disputes with any Governmental Body of the Commonwealth;

1.3.8    Seller shall inform PREPA if, at any time during the Term, it or any of its Seller Group Members becomes aware that any of them are subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property;

1.3.9    Pursuant to Section 5(f) of Act 120 and subject to the provisions of the Generation O&M Agreement, Seller shall at all times comply with the public policy and regulatory framework applicable it with respect to the PREPA generation assets; and

1.3.10  In delivering the goods or services, Seller shall:

    (a)    to the extent that the goods or services are subject to rules of ethics of a profession, comply with any such applicable rules;

    (b)    to the extent that the goods or services involve performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988, as amended ("Act 173"), comply with Act No. 173; and

    (c)    as required by Article 11 of Act No. 14-2004, use commercially reasonable efforts to use, to the extent available and applicable to the goods or services, and to the extent permitted by law and the Federal Funding Requirements, goods extracted, produced, assembled, packaged, bottled or distributed in the

*KDT*

68

Commonwealth of Puerto Rico by businesses operating in the Commonwealth of Puerto Rico or distributed by agents established in the Commonwealth of Puerto Rico.

1.3.11 Seller certifies and guarantees that:

1.3.12 It has filed all the necessary and required income tax returns to the Commonwealth of Puerto Rico for the last five (5) years. Seller further certifies that it has complied and is current with the payment of any and all income taxes that are, or were due, to the Commonwealth of Puerto Rico; or

1.3.13 It does not have any legal obligation and has not had to submit income or sales and use tax returns in the Commonwealth of Puerto Rico during the past five (5) years, and it has no outstanding debt with the Commonwealth of Puerto Rico for income taxes or sales and use tax taxes.

1.3.14 Seller hereby certifies that it is in compliance with any applicable obligation it may have with the Puerto Rico Child Support Administration (Administración de Sustento de Menores (ASUME)). As evidence thereof, Seller has delivered to PREPA a certification issued by ASUME certifying that Seller does not have any debt, outstanding debt, or legal procedures to collect child support payments that may be registered with ASUME.

1.3.15 Seller hereby certifies that if there is any Judicial or Administrative Order demanding payment or any economic support regarding Act 168-2000, as amended known as the "Law for the Strengthening of the Family Support and Livelihood of Elderly People", the same is current and in all aspects in compliance.

1.3.16 Any and all necessary waivers regarding the Agreement have been obtained from any government entity and said waivers shall become part of the contracting file.

1.3.17 Seller expressly agrees that the conditions outlined throughout this Exhibit E are essential requirements of Contracts with PREPA. Consequently, should any of these representations, warranties, and certifications be incorrect, inaccurate or misleading, in whole or in part, then this will be deemed a material breach by Seller and permit PREPA to terminate the Agreement. PREPA shall also have the right to terminate the Agreement in the event of Seller's negligence, dereliction of duties or breach of this Agreement without limiting any other rights and remedies that PREPA may have as a result thereof, including the remedies available to it under Act No. 2-2018.

1.3.18 Seller hereby certifies that it has not been convicted in any Puerto Rico or United States Federal court of any of the crimes under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, as amended, known as the Organic Act of the Office of Government Ethics of Puerto Rico ("Act 1-2012"), any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code ("Act 146-2012"), any of the crimes typified in Act No. 2-2018, as amended, known as the Anti-Corruption Code for a New Puerto Rico ("Act 2-2018") or any other felony that involves misuse of public funds

*KDf*



or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8- 2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico ("Act 8-2017").

1.3.19  PREPA shall have the right to terminate the Agreement in the event Seller is convicted in Puerto Rico or United States Federal court of any of the crimes under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code, any of the crimes typified in Act No. 2-2018, or any other felony that involves misuse of public funds or property, including but not limited to the crimes mentioned in Article 6.8 of Act No. 8-2017.

1.3.20  Furthermore, Seller agrees to comply with the provisions of Act 2-2018, as the same may be amended from time to time.

1.3.21  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Agreement.

## 2.    INTERAGENCY SERVICES CLAUSE

Pursuant to Memorandum No. 2021-003, Circular Letter 001-2021, of the Office of the Governor of Puerto Rico and the Office of Management and Budget, both Parties acknowledge and agree that the contracted services herein may be provided to any entity of the Executive Branch which enters into an interagency agreement with PREPA or by direct provision of the Office of the Chief of Staff of the Governor of Puerto Rico. These services will be performed under the same terms and conditions regarding hours of work (if applicable) and compensation set forth in the Agreement.

## 3.    CONTRACT REVIEW POLICY OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

The Parties acknowledge that Seller has submitted the certification titled "*Contractor Certification Requirement*" required in accordance with the Contract Review Policy of the Financial Oversight and Management Board for Puerto Rico, effective as of November 6, 2017 and amended on October 30, 2020, signed by Seller's Executive Director (or another official with an equivalent position or authority to issue such certifications). If applicable, a signed copy of the Contractor Certification Requirement is included as Schedule E-2. Seller represents and warrants that the information included in Contractor Certification Requirement is complete, accurate and correct, and that any misrepresentation, inaccuracy of falseness in such Certification will render the contract null and void and Seller will have the obligation to reimburse immediately to the Commonwealth any amounts, payments or benefits received from the Commonwealth under the proposed contract.

## 4.    TERMINATION CLAUSE

To the extent required by Act No. 3-2017 and OE-2021-003, or other Applicable Law, order or circular letter, the office of the Chief of Staff shall have the authority to terminate this Agreement at any time; provided that in any such event Seller shall be entitled to payment in full for goods or services rendered by it through the date of termination.

*KDf*

70



PREPA certifies that, to the extent applicable, the Agreement has the appropriate governmental authorizations necessary for its execution, and according to the provisions in the Act No. 3-2017, known as the "Act to Address the Economic, Fiscal, and Budget Crisis to Guarantee the Operations of the Government of Puerto Rico." Furthermore, PREPA certifies that, also to the extent applicable, it has obtained written approval of the Government Chief of Staff and the Office of Management and Budget, pursuant to Memorandum Number 2017-001 and Circular Letter 141-17.

*KDf*

## EXHIBIT F

### TAX BREAKDOWN

TAX                              RATE

| TAX | RATE |
|---|---|
| Income Tax | 4% on taxable income |
| Sales & Use Tax | 0% on purchased goods.<br><br>4% on non-maintenance services received. 11.5% on maintenance services<br><br>4% on equipment leased in |
| Personal Property Tax | 0.98% of book value |
| Municipal License Tax | 0.2% of gross receipts |
| Construction Excise Tax | 0% of construction costs |
| Dividends Withholding Tax | 0% on dividends paid |

Note: NFE operates under tax decree that provides for favorable taxation rates.

KDf

72

CY

## SECOND AMENDMENT TO THE NATURAL GAS SALE AND PURCHASE AGREEMENT

This **Second Amendment to the Natural Gas Sale and Purchase Agreement** (the "Second Amendment") is made and entered into as of 6/23/2025 _____, 2025 (the "Amendment Effective Date"), by and between **NFENERGIA LLC** ("Seller"), a Limited Liability Company with offices at 111 W 19th St. 8th Fl., New York, N.Y., and the **Puerto Rico Electric Power Authority** ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by **Genera PR LLC** ("Genera") as agent on behalf of and for the account of PREPA. **Seller and Buyer** shall each be a "Party" and collectively, the "Parties."

**RECITALS**

WHEREAS, the Parties entered into that certain **Natural Gas Sale and Purchase Agreement** dated **March 15, 2024** (the "Agreement");

WHEREAS, the Parties previously extended the Agreement through a First Amendment executed on March 15, 2025, extending the term to **Monday June 23, 2025**;

WHEREAS, the Parties now wish to extend the Agreement an additional **four (4) days**, through **June 27, 2025**, in order to provide continuity of service while the procurement process is finalized;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties agree as follows:

1. **EXTENSION OF TERM**

a) **Article III, Section III.1** of the Agreement is hereby amended to extend the term of the Agreement from **June 23, 2025, to June 27, 2025** (the "Second Extended Term").

b) All terms and conditions of the Agreement, as amended, shall remain in full force and effect during the Second Extended Term, except as expressly modified by this Second Amendment.

2. **MISCELLANEOUS**

a) **No Other Changes**. Except as specifically provided in this Second Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) **Governing Law**. This Second Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its choice of law principles.

c) **Counterparts**. This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Execution and delivery of this Second Amendment by electronic means (including PDF or other electronic signature) shall be deemed to have the same effect as delivery of an original signature.

d) **Binding Effect**. This Second Amendment shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties hereto have caused this Second Amendment to be executed by their duly authorized representatives as of the Amendment Effective Date.

**NFENERGIA LLC**

Signed by:

By: <u>Matthew Reinhard</u>
183C8DA5AD1B400...

Name: Matthew Reinhard

Title: Authorized Signatory


**PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent, GENERA PR LLC**

Signed by:

By: <u>Kevin D. Futch</u>
AC491FE76AD44DF...

Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

## FIRST AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This First Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "First  Amendment") is made and entered into as of July 25, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement dated July 17, 2025 (the "Agreement");

WHEREAS, the Parties now wish to further extend the Agreement until August 1st, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be August 1st, 2025, at 5:00 p.m.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from $9,792,800.00 to $16,267,696.00 (representing an additional $6,474,896.00 for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This First Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This First Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same

instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This First Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this First Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____ *Christopher S. Guinta*
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: _____ *Kevin D. Futch*
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

SECOND AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE
AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Second Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Second Amendment") is made and entered into as of August 1st, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement dated July 17, 2025 (the "Agreement");

WHEREAS, the Parties now wish to further extend the Agreement until August 8th, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be August 8th, 2025, at 5:00 p.m.

2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from $16,267,696.00 to $22,742,592.00 (representing an additional $6,474,896.00 for the extended term), effective as of the Amendment Effective Date.

3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Second Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Second Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Second Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same

instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Second Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Second Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

By: _____ *Christopher S. Guinta* _____
A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

By: _____ *Kevin D. Futch* _____
AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C


THIRD AMENDMENT TO THE NATURAL GAS SALE AND PURCHASE AGREEMENT


This Third Amendment to the Natural Gas Sale and Purchase Agreement (the "Third Amendment") is made and entered into as of June 27th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Natural Gas Sale and Purchase Agreement dated March 15, 2024 (the "Agreement");

WHEREAS, the Parties previously executed a First Amendment dated March 15, 2025, and a Second Amendment dated June 23, 2025, which extended the term of the Agreement through June 27, 2025;

WHEREAS, the Parties now wish to further extend the Agreement to July 9, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:


1. EXTENSION OF TERM

a) Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement from June 27, 2025, to July 9, 2025 (the "Third Extended Term").

b) All terms and conditions of the Agreement, as previously amended, shall remain in full force and effect during the Third Extended Term, except as expressly modified by this Third Amendment.


2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Third Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Third Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Third Amendment may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Third Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Third Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

By: _____Matthew Reinhard_____
      35DFE4513EF447C...
Name: Matthew Reinhard
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

By: _____Kevin D. Futch_____
      AC491FE70AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

Docusign Envelope ID: 11B476ED-84A4-4592-842C-4C69A7BB1998

EXHIBIT - C

THIRD AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE
AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Third Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Third Amendment") is made and entered into as of August 8th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement dated July 17, 2025 (the "Agreement");

WHEREAS, the Parties now wish to further extend the Agreement until August 14th, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (6) days, such that the new termination date shall be August 14th, 2025, at 5:00 p.m.

2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$22,742,592.00** to **$28,292,502.86** (representing an additional **$5,549,910.86** for the extended term), effective as of the Amendment Effective Date.

3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Third Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Third Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Third Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same

instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Third Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Third Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

By: _____*Christopher S. Guinta*_____
         A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

By: _____*Kevin D. Futch*_____
         AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

FOURTH AMENDMENT TO THE NATURAL GAS SALE AND PURCHASE AGREEMENT

This Fourth Amendment to the Natural Gas Sale and Purchase Agreement (the " Fourth Amendment") is made and entered into as of July 9, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Natural Gas Sale and Purchase Agreement dated March 15, 2024 (the "Agreement");

WHEREAS, the Parties previously executed a First Amendment dated March 15, 2025, and a Second Amendment dated June 23, 2025, and a Third Amendment dated June 27, 2025, which extended the term of the Agreement through July 9, 2025;

WHEREAS, the Parties now wish to further extend the Agreement July 11, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. EXTENSION OF TERM

a) Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement from July 9, 2025 to July 11, 2025 (the "Fourth Extended Term").

b) All terms and conditions of the Agreement, as previously amended, shall remain in full force and effect during the Fourth Extended Term, except as expressly modified by this Fourth Amendment.

2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Fourth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Fourth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Fourth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Fourth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Fourth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____

Name: Matthew Reinhard

Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent GENERA PR LLC

By: _____

Name: Kevin D. Futch

Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

Docusign Envelope ID: 919078A6-2DEB-4EFB-BA12-8C144870B1C7

EXHIBIT - C

## FOURTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Fourth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Fourth Amendment") is made and entered into as of August 14th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement dated July 17, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnership Authority (P3A), as the Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter on August 11, 2025, requesting approval for an extension of the Exigency period for an additional thirty (30) days (until September 13th, 2025) pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers if an LNG supplier is not selected and contracted;

WHEREAS, to avoid any disruption of services and prevent any delay in the ongoing RFP process, P3A has agreed to extend for thirty (30) days the exigency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, the Parties now wish to further extend the Agreement until August 22, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by eight (8) days, such that the new termination date shall be August 22nd, 2025, at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$28,292,502.86** to **$35,692,384.01** (representing an additional **$7,399,881.15** for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Fourth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Fourth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Fourth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Fourth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Fourth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: *Christopher S. Guinta*
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: *Kevin D. Futch*
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

**FIFTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

Contract Number 2026-G10112

This Fifth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Fifth Amendment") is made and entered into as of August 22nd, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 13th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for thirty (30) days the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that extension, the Parties agreed on August 14, 2025, to extend the Agreement until August 22, 2025;

WHEREAS, the Parties now wish to further extend the Agreement until August 29th, 2025, in order to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be August 29th, 2025, at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from $35,692,384.01 to $41,855,274.74 (representing an additional $6,162,890.73 for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Fifth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Fifth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Fifth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Fifth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Fifth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____

Signed by:
Christopher S. Guinta
A4F4DDE00631441...

Name: Chris Guinta

Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent

GENERA PR LLC

By: _____

Signed by:
Kevin D. Futch
AC491EE76AD44DF...

Name: Kevin D. Futch

Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

## SIXTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Sixth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Sixth Amendment") is made and entered into as of August 29th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for thirty (30) days the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that extension, the Parties agreed on August 22nd, 2025, to extend the Agreement until August 29th, 2025;

WHEREAS, the Parties now wish to further extend the Agreement until September 5th, 2025, in order to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be September 5th, 2025, at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$41,855,274.74** to **$48,048,711.12** (representing an additional **$6,193,436.38** for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Sixth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Sixth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Sixth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Sixth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.


IN WITNESS WHEREOF, the Parties have executed this Sixth Amendment as of the Amendment Effective Date.


NFENERGIA LLC

Signed by:
*Christopher S. Guinta*
A4F4DDE00631441...

By: _____
Name: Chris Guinta
Title: Authorized Signatory


PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:
*Kevin D. Futch*
AC491FE76AD44DF...

By: _____
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

## SEVENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Seventh Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Seventh Amendment") is made and entered into as of September 5th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 13th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for thirty (30) days the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that extension, the Parties agreed on August 29th, 2025, to extend the Agreement until September 5th, 2025;

WHEREAS, the Parties now wish to further extend the Agreement until September 12th, 2025, in order to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be September 12th, 2025, at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$48,048,711.12** to **$53,808,368.02** (representing an additional **$5,759,656.90** for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Seventh Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Seventh Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Seventh Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Seventh Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Seventh Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

*Christopher S. Guinta*
A4F4DDE00631441...

By: _____
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

*Kevin D. Futch*
AC491FE76AD44DF...

By: _____
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

EIGHT AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE
AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Eight Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Eight Amendment") is made and entered into as of September 12th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, the Parties, having been unable to reach a final agreement within the prior exigency period, Genera has once again requested a thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for a second thirty (30)-day period the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until September 19th, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be September 19th, 2025, at 5:00 p.m. AST.

2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$53,808,368.01** to **$59,521,551.22** (representing an additional **$5,713,183.21** for the extended term), effective as of the Amendment Effective Date.

3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Eight Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Eight Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Eight Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Eight Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Eight Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____ *Christopher S. Guinta*
Signed by:
A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: _____ *Kevin D. Futch*
Signed by:
AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

NINTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE
AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Ninth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Ninth Amendment") is made and entered into as of September 19th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, the Parties, having been unable to reach a final agreement within the prior exigency period, Genera has once again requested a thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for a second thirty (30)-day period the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until September 26th, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be September 26th, 2025, at 5:00 p.m. AST.

2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$59,521,551.22** to **$65,240,984.50** (representing an additional **$5,719,433.27** for the extended term), effective as of the Amendment Effective Date.

3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Ninth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Ninth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Ninth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Ninth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Ninth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

*Christopher S. Guinta*
A4E4DDE00631441

By: _____

Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

*Kevin D. Futch*
AC491EE76AD44DE

By: _____

Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

2026-G10112-J

## TENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Tenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Tenth Amendment") is made and entered into as of September 26th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, the Parties, having been unable to reach a final agreement within the prior exigency period, Genera has once again requested a thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for a second thirty (30)-day period the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 3rd, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be October 3rd, 2025, at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$65,240,984.50** to **$70,960,908.84** (representing an additional **$5,719,924.35** for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Tenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Tenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Tenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Tenth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Tenth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____ *Christopher S. Guinta*
Signed by: A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory
EIN: 66-0889369

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: _____ *Kevin D. Futch*
Signed by: AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

EXHIBIT - C

ELEVENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS
SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Eleventh Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Eleventh Amendment") is made and entered into as of October 3rd, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an LNG supplier is not selected and contracted;

WHEREAS, the Parties, having been unable to reach a final agreement within the prior exigency period, Genera has once again requested a thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend for a second thirty (30)-day period the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 10th, 2025, to maintain continuity of service while procurement activities are completed;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be October 10th, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Eleventh Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Eleventh Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Eleventh Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Eleventh Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Eleventh Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____ *Christopher S. Guinta*
Signed by:
A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: _____ *Kevin D. Futch*
Signed by:
AC491EE76AD44DE...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

TWELFTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE
AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Twelfth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Twelfth Amendment") is made and entered into as of October 10th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an Liquified Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 10th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, on October 8th, 2025, Genera informed the P3A that all parties concerned had been unable to reach a final agreement within the second exigency period, and accordingly, Genera requested a further thirty (30)-day exigency extension pursuant to the Procurement Manual; and

WHEREAS, the P3A authorized this additional thirty (30)-day extension, representing the third thirty (30)-day period (until November 12th, 2025) under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be October 17th, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Twelfth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Twelfth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Twelfth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Twelfth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Twelfth Amendment as of the Amendment Effective Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

NFENERGIA LLC

Signed by:

*Christopher S. Guinta*

By: _____
A4F4DDE00631441...

Name: Chris Guinta
Title: Authorized Signatory


PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

*Kevin D. Futch*

By: _____
AC491EE76AD44DF...

Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of
PREPA

EXHIBIT - C

## THIRTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Thirteenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Thirteenth Amendment") is made and entered into as of October 17th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an Liquified Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 10th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, on October 8th, 2025, Genera informed the P3A that all parties concerned had been unable to reach a final agreement within the second exigency period, and accordingly, Genera requested a further thirty (30)-day exigency extension pursuant to the Procurement Manual; and

WHEREAS, the P3A authorized this additional thirty (30)-day extension, representing the third thirty (30)-day period (until November 12th, 2025) under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be October 24th, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Thirteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Thirteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Thirteenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Thirteenth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Thirteenth Amendment as of the Amendment Effective Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

NFENERGIA LLC

By: _____ *Christopher Guinta*
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

By: _____ *Kevin D. Futch*
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of
PREPA

FOURTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT

Contract Number 2026-G10112

This Fourteenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Fourteenth Amendment") is made and entered into as of October 24th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an Liquified Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 10th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, on October 8th, 2025, Genera informed the P3A that all parties concerned had been unable to reach a final agreement within the second exigency period, and accordingly, Genera requested a further thirty (30)-day exigency extension pursuant to the Procurement Manual; and

WHEREAS, the P3A authorized this additional thirty (30)-day extension, representing the third thirty (30)-day period (until November 12th, 2025) under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be October 31st, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Fourteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Fourteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Fourteenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Fourteenth Amendment shall be binding upon and insure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Fourteenth Amendment as of the Amendment Effective Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGE FOLLOWS]

NFENERGIA LLC

Signed by:

*Christopher Guinta*

A4F4DDE00631441...

By: _____

Name: Chris Guinta
Title: Authorized Signatory


PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

*Kevin D. Futch*

AC401FE76AD44DF...

By: _____

Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of
PREPA

**FIFTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

This **Fifteenth Amendment** to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Fifteenth Amendment") is made and entered into as of **October 31st, 2025** (the "Amendment Effective Date"), by and between **NFENERGIA LLC** ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the **Puerto Rico Electric Power Authority** ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by **Genera PR LLC** ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

**RECITALS**

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an Liquified Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement until October 10th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, on October 8th, 2025, Genera informed the P3A that all parties concerned had been unable to reach a final agreement within the second exigency period, and accordingly, Genera requested a further thirty (30)-day exigency extension pursuant to the Procurement Manual; and

WHEREAS, the P3A authorized this additional thirty (30)-day extension, representing the third thirty (30)-day period (until November 12th, 2025) under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants;

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be **November 7th, 2025**, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) **No Other Changes.** Except as specifically provided in this Fifteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.
b) **Governing Law.** This Fifteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.
c) **Counterparts.** This Fifteenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.
d) **Binding Effect.** This Fifteenth Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**IN WITNESS WHEREOF**, the Parties have executed this **Fifteenth Amendment** as of the Amendment Effective Date.

**NFENERGIA LLC**
By: _____ *Christopher Guinta*
Signed by: A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

**PUERTO RICO ELECTRIC POWER AUTHORITY**, by its agent
**GENERA PR LLC**
By: _____ *Kevin D. Futch*
Signed by: AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

Docusign Envelope ID: CA49A3A5-2873-465A-A159-8550F69773BB

**SIXTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

**Contract**

This Sixteenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Sixteenth Amendment") is made and entered into as of November 7th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

**RECITALS**

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event an Liquefied Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested on October 8th 2025 additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement through a series of amendments, most recently through the Fifteenth Amendment, which extended the term until November 7th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, the P3A has authorized a fourth thirty (30)-day exigency extension on under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants; and

WHEREAS, in connection with such fourth exigency authorization, the Parties desire to extend the Agreement for an additional seven (7) days to ensure continued service and operational stability while the ongoing procurement process is finalized;

Docusign Envelope ID: CA49A3A5-2873-46FA-A159-8550F69773BB

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be November 14th, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) **No Other Changes.** Except as specifically provided in this Sixteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) **Governing Law.** This Sixteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) **Counterparts**. This Sixteenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) **Binding Effect.** This Sixteenth Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

**IN WITNESS WHEREOF,** the Parties have executed this Sixteenth Amendment as of the Amendment Effective Date.

**NFENERGIA LLC**

By: _____ Christopher Guinta
_____ A4F4DDE00631441...
Name: Chris Guinta
Title: Authorized Signatory

**PUERTO RICO ELECTRIC POWER AUTHORITY**, by its agent
**GENERA PR LLC**

By: _____ Kevin D. Futch
_____ AC491FE76AD44DF...
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC, as agent on behalf of and for the account of PREPA

**SEVENTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS**
SALE AND PURCHASE AGREEMENT

This Seventeenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Seventeenth Amendment") is made and entered into as of November 14th, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event a Liquefied Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested on October 8th, 2025 an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement through a series of amendments, most recently through the Sixteenth Amendment, which extended the term until November 14th, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, the P3A has authorized a fourth thirty (30)-day exigency extension under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants; and

WHEREAS, in connection with such fourth exigency authorization, the Parties desire to extend the Agreement for an additional seven (7) days to ensure continued service and operational stability while the ongoing procurement process is finalized;

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement by seven (7) days, such that the new termination date shall be November 21st, 2025, at 5:00 p.m. AST.

## 2. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Seventeenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Seventeenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Seventeenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Seventeenth Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Seventeenth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

*Christopher Guinta*
A4F4DDE00631441...

By: _____
Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY, by its agent
GENERA PR LLC

Signed by:

*Kevin D. Futch*
AC491FE76AD44DF...

By: _____
Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC,
as agent on behalf of and for the account of PREPA

**EIGHTEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

This Eighteenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Eighteenth Amendment") is made and entered into as of November 21st, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Fl., New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and collectively, the "Parties."

RECITALS

WHEREAS, the Parties entered into a certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event a Liquefied Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Parties were unable to reach a final agreement within the prior exigency period, and Genera accordingly requested on October 8th, 2025 an additional thirty (30)-day exigency extension pursuant to the Procurement Manual;

WHEREAS, in order to avoid any disruption of services and prevent delays in the ongoing Request for Proposals ("RFP") process, P3A agreed to extend the emergency procurement process for the acquisition and supply of LNG to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants for a second thirty (30)-day period;

WHEREAS, pursuant to that approval, the Parties extended the term of the Agreement through a series of amendments, most recently through the Seventeenth Amendment, which extended the term until November 21st, 2025, to maintain continuity of service while procurement activities are completed;

WHEREAS, the P3A has authorized a fourth thirty (30)-day exigency extension under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants; and

WHEREAS, in connection with such fourth exigency authorization, the Parties desire to extend the Agreement for an additional period to ensure continued service and operational stability while the ongoing procurement process is finalized;

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term of the Agreement, such that the new termination date shall be December 1st, 2025, at 5:00 p.m. AST.

2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$70,960,908.84** to **$79,733,893.64** (representing an additional **$8,772,984.80** for the extended term), effective as of the Amendment Effective Date.

3. MISCELLANEOUS

a) No Other Changes. Except as specifically provided in this Eighteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Eighteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to its conflict of law principles.

c) Counterparts. This Eighteenth Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery by PDF or other electronic means shall be deemed valid and effective.

d) Binding Effect. This Eighteenth Amendment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Eighteenth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

By: _____
Signed by: *Christopher Guinta*
A4E4DDE00631441...

Name: Chris Guinta
Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY,
by its agent GENERA PR LLC

By: _____
Signed by: *Kevin D. Futch*
AC491FE76AD44DF...

Name: Kevin D. Futch
Title: Authorized Signatory of Genera PR LLC,
as agent on behalf of and for the account of PREPA

EIN: 66-0889369

**NINETEENTH AMENDMENT TO THE ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

This Nineteenth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Nineteenth Amendment") is made and entered into as of December 1st, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Floor, New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and together as the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Puerto Rico Public-Private Partnerships Authority ("P3A"), in its capacity as Administrator of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement ("OMA"), received Genera's letter dated August 11th, 2025, requesting approval of a thirty (30)-day extension of the emergency period (until September 12th, 2025), pursuant to the Procurement Manual, recognizing that such extension would help prevent power outages, mitigate financial impacts, and avoid harm to ratepayers in the event a Liquefied Natural Gas ("LNG") supplier is not selected and contracted;

WHEREAS, the Agreement has been subsequently extended through multiple amendments, most recently through the Eighteenth Amendment, which extended the term of the Agreement through November 30th, 2025;

WHEREAS, the Parties now desire to extend the Agreement for an additional two (2) days to ensure continuity of LNG supply and uninterrupted operation of the generating assets pending final procurement actions.

WHEREAS, the P3A has authorized a fourth thirty (30)-day exigency extension under the emergency procurement process for the acquisition and supply of Liquefied Natural Gas ("LNG") to fuel the mobile generation units located at the San Juan and Palo Seco Power Plants; and

WHEREAS, in connection with such fourth exigency authorization, the Parties desire to extend the Agreement for an additional period to ensure continued service and operational stability while the ongoing procurement process is finalized.

## 1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term for an additional two (2) days, such that the new termination date shall be December 3rd, 2025 at 5:00 p.m. AST.

## 2. CONTRACT AMOUNT

Article IX of the Agreement is hereby amended to increase the total contract amount from **$79,733,893.64** to **$84,033,969.34** (representing an additional **$4,300,075.70** for the extended term), effective as of the Amendment Effective Date.

## 3. MISCELLANEOUS

a) No Other Changes. Except as expressly modified by this Nineteenth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Nineteenth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to conflict-of-laws principles.

c) Counterparts. This Nineteenth Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument. Electronic or PDF signatures shall be valid and effective.

d) Binding Effect. This Nineteenth Amendment shall be binding upon and enforceable against the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Nineteenth Amendment as of the Amendment Effective Date.

NFENERGIA LLC

Signed by:

*Christopher Guinta*

By: _____
A4F4DDE00631441

Name: Chris Guinta

Title: Authorized Signatory

PUERTO RICO ELECTRIC POWER AUTHORITY,

by its agent GENERA PR LLC

Signed by:

*Kevin D. Futch*

By: _____
AC491EE76AD44DE

Name: Kevin D. Futch

Title: Authorized Signatory on behalf of PREPA

**TWENTIETH AMENDMENT TO THE
ENERGY EXIGENCY SHORT-TERM NATURAL GAS SALE AND PURCHASE AGREEMENT**

This Twentieth Amendment to the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the "Twentieth Amendment") is made and entered into as of December 3rd, 2025 (the "Amendment Effective Date"), by and between NFENERGIA LLC ("Seller"), a Limited Liability Company with offices at 111 W 19th St., 8th Floor, New York, NY, and the Puerto Rico Electric Power Authority ("Buyer"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, represented exclusively by Genera PR LLC ("Genera") as agent on behalf of and for the account of PREPA. Seller and Buyer shall each be referred to as a "Party" and together as the "Parties."

RECITALS

WHEREAS, the Parties entered into that certain Emergency Short-Term Natural Gas Sale and Purchase Agreement dated July 17th, 2025 (the "Agreement");

WHEREAS, the Agreement has been subsequently extended through multiple amendments, most recently through the Nineteenth Amendment, which extended the term of the Agreement through December 3rd, 2025;

WHEREAS, the Parties now desire to extend the Agreement for an additional period to ensure continuity of LNG supply and uninterrupted operation of the generating assets pending final procurement actions;

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties agree as follows:

1. EXTENSION OF TERM

Article III, Section III.1 of the Agreement is hereby amended to extend the term through December 5th, 2025 at 5:00 p.m. AST.

2. MISCELLANEOUS

a) No Other Changes. Except as expressly modified by this Twentieth Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

b) Governing Law. This Twentieth Amendment shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico, without regard to conflict-of-laws principles.

c) Counterparts. This Twentieth Amendment may be executed in multiple counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument. Electronic or PDF signatures shall be valid and effective.

d) Binding Effect. This Twentieth Amendment shall be binding upon and enforceable against the Parties and their respective successors and permitted assigns.

IN WITNESS WHEREOF, the Parties have executed this Twentieth Amendment as of the Amendment Effective Date.


NFENERGIA LLC

By: _____ *Signed by:* **Christopher Guinta**
A4F4DDE00031441...

Name: Chris Guinta

Title: Authorized Signatory


PUERTO RICO ELECTRIC POWER AUTHORITY,

by its agent GENERA PR LLC    *Signed by:* **Kevin D. Futch**

By: _____ AC491FE76AD44DF...

Name: Kevin D. Futch

Title: Authorized Signatory on behalf of PREPA

EXHIBIT - D



**U.S. Department of
Homeland Security**

**United States
Coast Guard**

Commander
United States Coast Guard
Sector San Juan

5 Calle La Puntilla
San Juan, PR 00901-1819
Phone: (787) 729-2300

16610
P 405-18
September 26, 2018

NFEnergia, LLC
Attn: Capt. Mark Lane
111 W. 19th Street, 8th Floor
New York, NY 10011

Dear Captain Lane:

This Letter of Recommendation (LOR) is issued pursuant to 33 C.F.R. § 127.009 and in response to the Letter of Intent submitted by your company on December 12, 2017, proposing to transport Liquefied Natural Gas (LNG) by ship to Wharves A and B in Puerto Nuevo, Puerto Rico. This LOR conveys the Coast Guard's recommendation that the waterways approaching and entering San Juan Harbor to Wharves A and B in Puerto Nuevo, Puerto Rico be considered suitable for LNG marine traffic. In addition to meeting the requirements of 33 C.F.R. § 127.009, this letter also fulfills the Coast Guard's commitment to provide information to your agency.

My recommendation on the suitability of these waterways is provided to assist your company in the proposal, planning, and execution of the concept of operations for your facility. Because certain sections of the LOR Analysis contain security related data that is "Security Sensitive Information" (SSI), two versions are enclosed. The first contains SSI. The second has all SSI redacted and is marked as such, indicating that it is releasable to the general public. This letter and redacted version of the accompanying analysis may be provided to other agencies as needed.

My staff will continue to monitor the progress of this project and will maintain communications with the project managers from your company and its partners. We are committed to ensure that all safety and security measures necessary to safeguard the public health and welfare, critical marine infrastructure and the marine environment are fully implemented and maintained.

If you have questions regarding this letter of recommendation, my point of contact is Lieutenant Commander Jose Rosario, who can be reached at (787) 289-2378 or Jose.M.Rosario@uscg.mil.

Sincerely,

E.P. King
Captain, U. S. Coast Guard
Captain of the Port

Enclosures: (1) Letter of Recommendation Analysis (Redacted)
            (2) Letter of Recommendation Analysis (SSI)

Copy:    Commander Coast Guard District 7 (dp)
         Commander Atlantic Area (ap)

SENSITIVE SECURITY INFORMATION
Enclosure (1)

ANALYSIS SUPPORTING THE LETTER OF RECOMMENDATION ISSUED BY COTP SECTOR SAN JUAN ON SEPTEMBER 26, 2018

## TABLE OF CONTENTS

**SECTION 1**   **3**

**INTRODUCTION**

**SECTION 2**   **3**

**BACKGROUND**

**SECTION 3**   **4**

**RESOLUTION PRECISION**

**SECTION 4**   **5**

**PROJECT OVERVIEW**

**SECTION 5**   **7**

**MARINE TRANSPORTATION OF LNG**

**SECTION 6**   **10**

**WATERWAY TRANSIT CONSIDERATIONS**
SUBSECTION 6.1 TRANSIT ROUTE   **10**
SUBSECTION 6.2 DEPTH OF WATER & TIDAL RANGES   **11**
SUBSECTION 6.3 HYDROGRAPHIC & WEATHER CHARACTERISTICS   **12**
SUBSECTION 6.4 ANCHORAGES   **13**

**SECTION 7**   **14**

**PORT LEVEL CONSIDERATIONS**
SUBSECTION 7.1 MARITIME COMMERCE   **14**
SUBSECTION 7.2 REGIONAL IMPACT   **15**
SUBSECTION 7.3 CULTURAL AND ECONOMIC IMPACT   **17**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                        Enclosure (1)

**SECTION 8**                                                                    **18**

**OPERATIONAL CONSIDERATIONS**
SUBSECTION 8.1 SHORE-SIDE EMERGENCY RESPONSE                                      **18**
SUBSECTION 8.2 MARINE FIREFIGHTING CAPABILITIES                                   **19**
SUBSECTION 8.3 APPLICATION OF SAFETY ZONES                                        **20**

**SECTION 9**                                                                    **20**

**RISK MANAGEMENT & MANAGEMENT STRATEGIES**
SUBSECTION 9.1 ASSESSMENTS METHODOLOGY                                            **20**
SUBSECTION 9.2 SAFETY RISK ASSESSMENTS & ASSOCIATED SCENARIOS                     **21**
SUBSECTION 9.3 PROPOSED MITIGATION MEASURES                                       **22**

**SECTION 10**                                                                   **32**

**SECURITY SENSITIVE SUPPLEMENT**
SUBSECTION 10.1 BACKGROUND                                                        **32**
SUBSECTION 10.2 TARGETS                                                           **32**
SUBSECTION 10.3 SECURITY RISKS ASSESSMENTS                                        **32**
SUBSECTION 10.4 CURRENT SSJ COTP SECURITY MEASURES                                **33**
SUBSECTION 10.5 ATTACK MODES                                                      **34**
SUBSECTION 10.6 SAFETY ZONE CONSIDERATIONS                                        **34**
SUBSECTION 10.7 CONSEQUENCE MANAGEMENT AND RESOURCE EVALUATION                    **34**

**SECTION 11**                                                                   **34**

**EMERGENCY RESPONSE PLANNING**

**SECTION 12**                                                                   **35**

**RECOMMENDED RISK MITIGATION MEASURES**

**SECTION 13**                                                                   **37**

**CONCLUSIONS**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

## 1. INTRODUCTION

A. This analysis supplements my Letter of Recommendation (LOR) dated September 26th, 2018 which conveys Sector San Juan's recommendation on the suitability of San Juan Harbor for Liquid Natural Gas (LNG) marine traffic associated with LNG operations at the Army Terminal Turning Basin.  NFEnergia, LLC is proposing to construct and operate the required infrastructure for offloading and transferring LNG via a miro-fuel handling facility located at the Army Terminal Turning Basin in Puerto Nuevo, Puerto Rico.  This supplement documents the processes followed in analyzing NFEnergia, LLC's Waterway Suitability Assessment (WSA), Follow-on Waterway Suitability Assessment and the Coast Guard's assessment of the suitability of the waterway for LNG marine traffic.

B. For the purpose of this analysis, the following assumptions were made:

1. The applicant is fully capable of and would fully implement all risk mitigation measures identified in its WSA and measures referenced in the LOR Analysis.
2. The conditions of the port identified in the WSA fully and accurately describe the actual conditions of the port at the time of the WSA submission.
3. The conditions of the port have not changed substantially during the analysis process.
4. The applicant will fully meet all regulatory requirements including the development and/or amendment of its Facility Security Plan, Emergency Manual and Operations Manual.

## 2. BACKGROUND

A. The data and information regarding the proposed LNG Operations at the Army Turning Basin detailed in this Letter of Recommendation Analysis (LOR-A) were derived from NFEnergia, LLC's Letter of Intent (LOI), WSA, and related correspondence provided directly to the Captain of the Port (COTP) Sector San Juan (SSJ) from regional stakeholders.  The WSA is an applicant prepared risk-based assessment, designed to document and address all safety and security concerns related to the marine transportation of LNG for U.S. ports or waterways. The scope of LNG operations proposed by NFEnergia, LLC was analyzed with perspective from U.S. Code of Federal Regulations (C.F.R.) Part 127, and U.S. Coast Guard policy guidance (in part) contained in Navigation and Vessel Inspection Circular (NVIC or Circular) 01-2011, *Guidance Related to Waterfront Liquefied Natural Gas Facilities.*

B. Portions of the NVIC were beneficial to the applicant during the development stages of the WSA and equally useful during the COTP's review and validation of the document.  Included in this evaluation were the hydrodynamics of the

3

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

Enclosure (1)

waterway (tides, currents etc.), density of deep-draft vessel traffic, climatic weather, identification of environmentally sensitive areas and critical industrial infrastructure, detection of hazards to navigation (pipelines, sandbars, etc.), and available response capabilities along the transit route.

C.  The lead state agency responsible for the permitting of LNG Operations at the Army Turning Basis is the Commission for Public Service.  Information contained in NFEnergia, LLC's LOI and WSA enables the COTP to provide specific input, via his LOR, to the Commission as to the suitability of the waterway to support LNG marine traffic associated with the LNG operations at the NFEnergia, LLC project.  It should be noted that the LOR is based upon the Coast Guard's expertise in navigation safety and maritime security and neither the LOR nor this LOR-A impose conditions on the Commission permit.

D.  Certain sections of the LOR-A contain security-related data that has been determined "Sensitive Security Information" (SSI).  Therefore, two versions of the LOR-A have been developed and provided to the Commission; the original containing SSI and a copy with all SSI removed and marked as a "redacted" version of the original.  This provides the Commission with the maritime-related information it needs for its decision-making process while also allowing the Commission to have a redacted copy that is releasable to the general public.

## 3. RESOLUTION PRECISION

A.  The following sections summarize the specifics considered and reasoning behind the COTP's determination. This summary is not all-inclusive; background information and amplifying data are contained in the applicant's WSA; including: vessel traffic studies, casualty analysis, port characterization appraisals, and risk-based safety/security assessments -- among others.

B.  COTP has confirmed that the hydrographic characteristics of the waterway as described in the WSA will sustain vessel movement -- confirming that the transit and maneuvers are comparatively feasible for the design range of LNG carriers anticipated. Identified safety/security risk mitigation measures, resource shortfalls, and/or implementation strategies from the WSA are discussed in the following paragraphs, where applicable.

C.  COTP comments pertinent to a particular WSA recommendation, and/or the identification of additional risk management measures recommended by the COTP, are also provided where relevant.

4

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                          Enclosure (1)

## 4. PROJECT OVERVIEW

A. NFEnergia, LLC is a global energy company engaged in the transport and sale of LNG to customers.

B. NFEnergia, LLC, a wholly owned subsidiary of New Fortress Energy, and has entered a lease with Puerto Rico Port's Authority (PRPA) to lease the locations of wharves A and B of the Puerto Nuevo Terminal in San Juan Bay, Puerto Rico. As part of this process, on December 12, 2017, NFEnergia, LLC submitted to the U.S. Coast Guard (USCG) Captain of the Port at San Juan, Puerto Rico, a LOI to receive LNG vessels at the Berths B & C in Puerto Nuevo, Puerto Rico.

C. NFEnergia, LLC is proposing to construct and operate the required infrastructure for offloading and transferring LNG via a ship-to-ship-to-shore transfer procedure that will facilitate truck loading operations within the port.  ISO-Containers with LNG will be sold on a spot basis to behind-the-fence customers around the island of Puerto Rico.  Future expansion is planned to supply PREPA generators 5 and 6 with LNG as an alternative fuel source.  Both generators are currently outfitted to accept LNG as fuel.

D. On May 22, 2018, NFE submitted the Follow-On Water Suitability Assessment (WSA) fulfilling the requirements as defined in the U.S. Coast Guard (USCG) Navigation and Vessel Inspection Circular (NVIC) No. 01-11 and Title 33 of the *Code of Federal Regulations* (C.F.R.), section 127.007 (33 C.F.R. § 127.007), for the proposed NFE LNG service.

E. This Follow-On WSA provided a fully developed analysis of the following:

1. Port Characterization;
2. Characterization of LNG Facility (permanent and temporary) and LNG Tanker Route;
3. Risk Assessments for Maritime Safety and Security;
4. Risk Management Strategies;
5. Resource Needs for Maritime Safety, Security and Response.

**(INTENTIONALLY LEFT BLANK)**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION    Enclosure (1)

**Figure 4A: Project Site Map (Footprint)**



**Figure 4B: Chart with Footprint of Facility and STS mooring arrangement**



6

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                    Enclosure (1)

**5. MARINE TRANSPORTATION OF LIQUEFIED NATURAL GAS (LNG)**

   A.  NFEnergia, LLC has identified LNG carriers for use as a Floating Storage Unit to facilitate the ship-to-ship transport of LNG.

**(INTENTIONALLY LEFT BLANK)**

7

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                                                     Enclosure (1)

B.  "Pocket Sized" LNG carriers will be utilized for transport of LNG to San Juan Harbor.  These vessels will have a cargo capacity of 30,000m$^3$, which is analogous with the proposed FSUs. These vessels will have valid USCG-issued Subchapter O endorsements and be in compliance with Classification Society Rules and subject to Flag and Port State Inspections.

**(INTENTIONALLY LEFT BLANK)**

8

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                    Enclosure (1)

C. While the marine transportation of liquefied gases incurs its own special hazards, some of the features are less hazardous than those of heavier petroleum cargos. Hazards peculiar to the carriage of LNG cargoes include:

1. Cold from leaks and spillages can affect the strength and ductility of a vessel's structural steel. Likewise, skin contact with the liquids or escaping gases can produce frostbite and inhalation of the cold vapor can permanently damage certain organs, such as the lungs.
2. Rupture of a pressure system containing LNG could release a massive evolution of vapor, termed a vapor cloud and potential for fire.

D. LNG transportation hazards that are reduced, as compared with "normal petroleum tanker operations, include:

1. Loading or ballasting does not eject gas to the atmosphere in the vicinity of decks and superstructures.  Gas freeing is rarely performed and does not produce gas on deck.
2. Liquefied gas compartments are never within flammable limits throughout the cargo cycle.  Within a cargo tank the vapor space above the liquid cargo is virtually 100% rich with cargo vapor and thus far above the upper flammable limit.  Static electricity and other in-tank ignition sources are, therefore, no hazard.

9

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION    Enclosure (1)

3. There is no requirement for tank cleaning; therefore, the hazards associated with that operation are eliminated

4. Gas carriers are fitted with fixed water spray systems for added fire protection.  The spray nozzles cover cargo tank domes, above deck cargo tank areas, manifolds, and provide a curtain of spray over the front accommodation spaces, cargo control rooms, etc.

5.


## 6. WATERWAY TRANSIT CONSIDERATIONS

### 6.1. TRANSIT ROUTE

A. The intended transit route for the deep-draft LNG's is the sea buoy (18°28.13'N 066°07.47'W) to PRPA Wharves A and B (18°26.00'N 066°06.00'W), approximately 6 nautical miles (nm). The transit from the sea buoy to the Bar Channel entrance (18°27.51'N 066°07.27'W) is approximately 3nm of open water with a depth ranging from approximately 500 feet at the buoy to 56 feet at the entrance to the Bar Channel and San Juan Bay. The Bar channel is approximately 0.92 nm long, with a design depth of 40 feet and between 800-950 feet in width. The Bar Channel entrance to PRPA Berths A and B is approximately 3nm in a SE direction and varies in width from 0.6 to 1.6 nm, with the entire SW side as shoal. The Anegado Channel (18°27.51'N 066°07.27'W to 18°26.45"N 066°06.31'W) is approximately 1.22nm long, with a design depth of 40 feet, and 800 feet in width. The Army Terminal Channel (18°26.45'N 066°06.31'W to 18°25.44'N 066°06.33'W) is approximately 0.87nm long, with a design depth of 40 feet, and 350 feet in width. It is approximately 600 feet from the end of the Army Terminal Channel to the PRPA Berths A and B with a depth of 44 feet. All aspects of the transit route to and from the proposed terminal and storage facility were evaluated, including tides and currents, prevailing weather, density and character of marine traffic, deep draft vessel management, recreational boating and commercial fishing, navigational aids, regional waterway events, surrounding community/port impacts, and relevant environmental/iconic considerations.


**(INTENTIONALLY LEFT BLANK)**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                     Enclosure (1)

**Figure6A: Channel Depth Charts**

| BAHIA SAN JUAN CHANNEL DEPTHS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TABULATED FROM SURVEYS BY THE ARMY CORPS OF ENGINEERS – SURVEYS TO APRIL 2016 | | | | | | | | |
| AND REPORT OF MAY 2016 | | | | | | | | |
| CONTROLLING DEPTHS FROM SEAWARD IN FEET AT MEAN LOWER LOW WATER (MLLW) | | | | | | PROJECT DIMNENSIONS | | |
| NAME OF CHANNEL | LEFT OUTSIDE QUARTER | LEFT INSIDE QUARTER | RIGHT INSIDE QUARTER | RIGHT OUTSIDE QUARTER | DATE OF SURVEY | WIDTH (FEET) | LENGTH (NAUT. MILES) | DEPTH (MLLW – FEET) |
| BAR CHANNEL | 43.3 | 42.9 | 43.1 | 38.7 | 4-16 | 900-950 | 0.91 | 42 |
| ANEGADO CHANNEL | 40.9 | 41.8 | 43.3 | 38.0 | 4-16 | 800 | 1.19 | 40 |
| SAN ANTONIO APPROACH CHANNEL | 37.3 | 37.1 | 37.3 | 33.4 | 4-16 | 600 | 0.52 | 35 |
| SAN ANTONIO CHANNEL | 32.8 | 35.9 | 35.7 | 32.4 | 4-16 | 500-950 | 0.70 | 30 |
| GRAVING DOCK CHANNEL | 35.2 | 38.7 | 35.6 | 33.9 | 4-16 | 350 | 1.21 | 36 |
| ARMY TERMINAL CHANNEL | 37.7 | 41.1 | 42.5 | 38.6 | 4-16 | 350 | 0.90 | 40 |
| PUERTO NUEVO CHANNEL (TO A POINT IN 18°26'21.9"N, 066°05'21.4"W) | 37.3 | 39.6 | 38.1 | 37.9 | 4-16 | 350 | 1.06 | 39 |

B.  Applicable navigation charts are National Oceanic and Atmospheric Administration (NOAA) #'s 25669 *Approaches to San Juan* and 25670 *San Juan Bay*. General Information on the region is available from the U.S. Coast Pilot Volume 5 *Gulf of Mexico, Puerto Rico & the Virgin Islands, Chapter 13: Puerto Rico*. Figure 6A provides an overview of the San Juan Bay Waterway and transit route to the Berth C and D.

**Figure 6B: Waterway overview**



WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                              Enclosure (1)

## 6.2. DEPTHS OF WATER & TIDAL RANGES

A. LNG carrier routes that will be used are open water deep transits. Depths at the LNG Wharves A and B will be approximately 23-28 feet. NOAA tidal range prediction for the area in 2018 is a 2 foot maximum high tide and a -0.21 maximum low tide. See Figure 6C for monthly tidal range for San Juan Harbor.   The 2018 NOAA Tidal Current predictions for San Juan Bay are weak and variable but there is a slight W flow that prevails. When N seas set into the harbor entrance, an undertow and surge may be felt as far as the San Antonio Channel.

B. Vessels calling NFEnergia's facility and the FSU will draft less than 10 feet laden. Given projected tidal ranges and relatively shallow draft of the vessels, there should be no risk posed by surveyed depths of 23-28 feet at PRPA Wharves A and B.

**Figure 6C: Typical monthly tide table**.



## 6.3. HYDROGRAPHIC & WEATHER CHARACTERISTICS

A. The vessel master and port facility operator shall monitor weather conditions and forecasts by official weather advisories to ensure cargo unloading and regasification operations occur within the safe operating parameters of the port facility. Should existing conditions or forecasts exceed normal safe operating parameters established for the port facility, the vessel master and port facility operator shall follow a Severe Weather Action Plan, published in the Operations Manual, in accordance with 33 U.S.C § 1221. The Severe Weather Action Plan shall include the following basic provisions:

1. Given the semi-permanent status of the FSU at this facility, weather shall be monitored by the port facility operator and vessel master at all times. Any significant weather disturbances within a 500-mile radius of the port facility

12

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

shall warrant special attention. Additional weather information shall be made available through several sources, including commercial weather services, the NOAA Tropical Prediction Center, the National Data Buoy Center, and local weather broadcasts;

2.  As required by the Captain of the Port, Liquefied Natural Gas Carriers (LNGC) moored to the port facility will make initial preparations to depart the port facility when a weather disturbance is forecasted to generate wave heights in excess of 3 meters and is projected to approach the port facility within 24-hours;

3.  LNGCs moored at the port facility shall secure LNG transfer operations, disconnect from the port facility, and depart whenever a weather disturbance forecasted to generate wave heights in excess of 3m is projected at the port facility within 12-hours, or at any time the port facility operator or LNG master determine there is an unsafe condition or other occurrence that requires the need for the LNG carrier to depart the port facility;

4.  For all situations where a LNGC departs the port facility due to weather or unsafe conditions, permission to return to the port facility shall not be granted by the port facility operator until the weather disturbance is well clear of the area, sea and swell have subsided, and the port facility is prepared to return to normal operation in accordance with the established safe operating parameters and permission from the COTP has been granted to resume operations.  The facility may be inspected by COTP to ensure it is safe to return to operations.

B.  Average wind speeds in Puerto Rico vary by season and month.  In summer the island is windier in comparison to winter.  On the north coast, including San Juan Harbor, wind speed averages approximately 5.5 MPH in the summer months and 6.3 MPH in the winter months. The prevailing winds of the island under normal conditions come from the northeast trade winds.  During hurricane season the facility may be affected depending on the course of the storm.  There are five port conditions implemented by COTP.  Condition 4 is to be set by all vessels and waterfront facilities from 1 June through 30 November.  All remaining conditions shall be set when gale force winds (34KTS/39 MPH) are expected: Port Condition Whiskey 72 hrs, X-ray 48 hrs, Yankee 24 hrs, and Zulu 12 hrs. All ocean going commercial vessels greater than 500 GT are required to depart port or the designated representative must request permission in writing, for the COTP prior to setting Port Condition X-Ray and all ocean going commercial vessels over 500 GT not having written permission to remain in port must be at open sea when Port Condition Yankee is set in the COTP zone. It is recommended that the facility implement the five port conditions as per the COTP requirements.

## 6.4. ANCHORAGES

A.  Temporary anchorage E (general) begins at a point which bears 262° T, 878 yards from Isla Grande Aero Beacon, and is authorized to vessels awaiting customs or

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

quarantine. No vessel shall remain in anchorage E more than 24 hours without permit from the U.S. Coast Guard COTP. (See 33C.F.R. §§ 110.1, 110.74c, and 110.240)

B.  Restricted anchorage F begins at a point which bears 212°30', 1.337.5 yards from Isla Grande Light, and is authorized as an additional general anchorage area in cases where the temporary anchorage (E) is full.  No vessel shall enter or anchor without first obtaining a permit from the U.S. Coast Guard COTP. (See 33 C.F.R. § 110.240)

## 7.  PORT LEVEL CONSIDERATIONS

### 7.1. MARITIME COMMERCE

A.  The NFEnergia's facility will be located within the land and waters of San Juan Bay.  Currently, there are three federally regulated shipping lanes in the vicinity of the terminal site and traffic along the waterway consist of deep draft, passenger vessels, cruise ships, tug and barges as well as recreational and smaller size fishing boats.

**Figure 7A: Port of San Juan 2017 Vessel Arrivals by Type**

| Vessel Type | Annual Average | % of Total |
|---|---|---|
| TANKER / TANK BARGE | 801 | 20.26% |
| CONTAINER | 606 | 15.33% |
| GOLETA / OSV | 590 | 14.92% |
| BARGE - DRY CARGO | 522 | 13.20% |
| CRUISE SHIP | 521 | 13.18% |
| RORO / CAR CARRIER | 492 | 12.44% |
| FERRY | 119 | 3.01% |
| GENERAL CARGO | 98 | 2.48% |
| BULK CARRIER | 75 | 1.90% |
| FISHING | 44 | 1.11% |
| YACHT | 44 | 1.11% |
| NAVAL VESSEL | 21 | 0.53% |
| RESEARCH VESSEL | 21 | 0.53% |
| Total | 3954 | 100.00% |

B. San Juan Bay is restricted to one-way traffic for all deep draft vessels. Each deep draft vessel transiting through Commonwealth of Puerto Rico waters must be operated under the direction of a licensed pilot.  Pilots board all inbound vessels at the Sea Buoy.  The Pilots are well experienced with marine LPG operations having worked with LPGC vessels in San Juan Bay for approximately 20 years. This experience should be portable to LNGC transits. Additionally, the pilots have participated in simulator training to increase their skill levels to accommodate the newer and larger LNGCs.  This training was provided, at the cost of NFEergia, LLC, at Resolve Maritime's facilities.

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                                              Enclosure (1)

C. There are two oil transfer anchorage areas (anchorages E and F), which alleviate the necessity or requirements for commercial vessels to anchor or to conduct fuel/oil transfer operations.

D. The amount of recreational boating traffic remains constant throughout the year.

## 7.2. REGIONAL IMPACT

A. An accidental spill or release of LNG consequent to a marine casualty could pose serious harm and multiple hazards to the general population, the navigable waterways, and surrounding environment.  The nature and severity of the spill, climatic and sea conditions are all factors that must be taken into consideration in order to mount a rapid and effective response.

B. NFEnergia, LLC has articulated zones of hazard associated with a release from a LNGC carrier.

C. A moving safety zone around a transiting LPG carrier, and a fixed safety zone around a moored LPG carrier, will be established to ensure the safety of people, property, and the marine environment during transit and transfer operations.  Most significantly, no vessel will be permitted to enter in, transit through, remain within, or anchor in the waters within the safety zone while a LPGC is moving and moored.

**(INTENTIONALLY LEFT BLANK)**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

D.  In Figure 7B, the Sandia Zones of Concern (Zones 1 through 3) are charted based on data from the 2008 Study from Sandia National Lab's Report SAND2008-3153 "Breach and Safety Analysis of Spills over water from Large Liquefied Natural Gas Carriers."  These zones represent a worst-case scenario based on unmitigated spills from an LNGC carrier nine times the size of the carriers proposed by NFE.  Zone 1, represented in red, is the area within 500 meters of the LNGC spill and could pose a sever public safety and property hazard and disrupt critical infrastructure and key assets.  Zone 2, represented in green, is the area from 500 meters to 1600 meters and would have less severe consequences for public safety, property, critical infrastructure and key assets.  Zone 3, represented in purple, is the area from 1600 meters to 3500 meters and would have the least likelihood of severe consequences in the event a cargo breach and dispersal.

1.

16

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                      Enclosure (1)

2.

NFEnergia, LLC is keenly aware of the MARSEC scheme, and will be required under 33 C.F.R. § 105 to demonstrate compliance with applicable security regulations.

## 7.3. CULTURAL/ECONOMIC IMPACT

A. This region has a large maritime footprint and close connectivity to different commercial operations that include: container yards, passenger vessel terminals, grain mills, an electric power producing plant, oil and LNG receiving docks.

17

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

Additionally, there are some local tourism and small commercial fishing villas that also utilize the San Juan Bay on a normal basis.

B.  In addition to a semi-permanently moored, small LNGC acting as a FSU, NFEnergia, LLC anticipates ten round-trip transits per month, or around 120 port calls per year.  This would entail, on average, one LNGC calling every three days. It is anticipated that the supply of LNG will decrease demand for other fuels – thus, lowering the traffic of other LHG traffic.  The exact decrease of traffic due to demand drop is unknown at this time.

C.  While this project does represent an increase in deep-draft vessel traffic and the enforcement of a safety zone regulation, this LOR-A takes into consideration restrictions that impact the nearby coastal resources beyond the proposed 50 yard safety zone while the vessel is moored.

## 8. OPERATIONAL CONSIDERATIONS

### 8.1. SHORE-SIDE EMERGENCY RESPONSE.

A.  It is imperative that shore-based fire departments, emergency response units, and emergency management organizations located in close proximity to the NFEnergia, LLC terminal have the appropriate training and equipment necessary to launch an initial response to an LNG fire and/or related medical emergency.

As per 33 C.F.R. §§ 127.1305-1307, NFEnergia, LLC must submit an Emergency Response Manual and an Operations Manual before commencement of operations.  During this process, a detailed assessment of shore-side response capabilities will be undertaken.  The scope of this analysis is limited to waterway suitability. Accordingly, in terms of waterway suitability, given the likely limited area of impact and the planned native capabilities of shore-side response NFEnergia, LLC plans to provide, the impact to the waterway is *de minimus*.

B.  As per 33 C.F.R. § 127.1305-1307, NFEnergia, LLC must submit an Emergency Response Manual and an Operations Manual before commencement of operations. During this process, a detailed assessment of shore-side response capabilities will be undertaken.

C.  Furthermore, the staff from NFEnergia, LLC, in collaboration with first responders and emergency management agencies, must take a proactive approach toward emergency plan development, resource identification, response training, and emergency response management public education.  Risk reduction measures such as these will need to be further considered by the Commonwealth of Puerto Rico.

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION                                       Enclosure (1)

## 8.2. MARINE FIREFIGHTING CAPABILITIES

A. Due to the nature of LNG cargoes, and the potential for severe consequence subsequent to a major casualty, it is imperative that adequate firefighting capabilities are present both from the land and the sea-side.

B. Puerto Rico Fire Department (PRFD) is the agency responsible for fire prevention, firefighting, and property protection in Puerto Rico. PRFD assures the development and maintenance of firefighting capabilities within ports and harbors across Puerto Rico.

C.

D. Currently, the LNG assist tug boats in the San Juan Bay are the primary waterborne firefighting resources. Tug services for the San Juan Bay are provided by:

1. Puerto Rico Towing & Barge (PRTB) owns and operated two (2) tugs with firefighting capability for shoreline or off-board fires: the Z ONE and the HANDY THREE. The Z ONE has a pump and two fire monitors capable of pumping a total of 3,000 US gpm and the HANDY THREE has one fire pump and monitor capable of pumping 2,000 US gpm. In addition, the Z ONE monitors have two (2) 4" connections that can supply unlimited sea water to hoses or fire trucks

2. McAllister Towing has two (2) tugs with firefighting capabilities: BROOKLYN and BETH. The BROOKLYN has a 3,000 gpm fire pump, while the BETH has a 2,000 gpm fire pump. All tugs have two (2) fire monitors and 1,500-gal. fire suppression foam capabilities.

E. The COTP emphasizes the need to maintain and improve firefighting capabilities for the San Juan port area. Enhanced firefighting capabilities will not only serve the LNG proposal, it will increase the margin of safety for all deep draft freighters and tankers servicing the north coast area. Accordingly, a detailed gap analysis of firefighting capabilities should be undertaken in conjunction with the review, analysis, and apprval of NFEnergia, LLC's Operations and Emergency Response manuals.

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED
SENSITIVE SECURITY INFORMATION

Enclosure (1)

### 8.3. APPLICATION OF THE SAFETY ZONES

A. An important consideration in assessing the suitability of the proposed transit route and approaches to support LNG marine traffic, is establishing a moving safety zone and a fixed safety zone.

1. A moving safety zone of 100 yards will be implemented for all transiting LNG Carriers.

2. A fixed 50-yard safety zone will be implemented around the vessel at all times while the vessel is moored at the Wharves A and B.

## 9. RISK ASSESSMENT AND MANAGEMENT STRATEGIES

### 9.1. ASSESMENT METHODOLOGY

A. The **safety** risk assessment portion of the WSA evaluated the risks of an *accidental* release of LNG from a carrier, where events may be triggered by incidents such as allisions, collisions, groundings, or spill during cargo transfer/handling, etc. Potential problems that could lead to an accidental release were considered and the likelihood and consequences of these events further evaluated.

B.                                           performed and documented the risk assessments for the LNG operations at the Wharves A and B. The risk assessment summarizes the risks associated with those changes and identifies current mitigation strategies. These included:

1. The COTP's jurisdictional authority under 33 C.F.R. Part 127, as defined in 33 C.F.R. § 127.005, is that part of a waterfront facility located between the vessel, or where the vessel moors, and the first shutoff valve on the pipeline immediately inland of the terminal manifold or loading arm.

2. NFEnergia, LLC and associated LNG carriers that serve them will comply with all applicable international treaty requirements and federal laws and regulations regarding the implementation of safety measures, security plans, and other specifically mandated requirements.

3. Only a single LNGC will be allowed to transit within the San Juan Bay at any one time.

C. The safety analysis also took into consideration historical data and informational exchanges with area stakeholders. Specific questions that the safety assessment was structured to answer included:

20

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

Enclosure (1)

1. What potential incidents involving an LNG carrier transiting through the proposed route would threaten members of the public, commerce, or the environment?

2. What is the likelihood and consequences of such events?

3. What additional safety or security measures are needed to reduce the identified risks?

D. In consideration of the risk factors acknowledged in the NFEnergia, LLC, WSA it's apparent that it is a sound recommendation to implement the mitigation measures stated in the WSA to effectively manage the identified navigation and safety risks associated with the project.

## 9.2. SAFETY RISK ASSESMENT AND SCENARIOS

A. Consistent with the guidelines contained in NVIC 01-2011, NFEnergia, LLC applied the Coast Guard's *Risk-Based Decision-Making Guidelines* to develop a comprehensive assessment strategy that adequately analyzes the safety risks that arise with the potential increase in LNG operations within San Juan Bay.

B. An inventory of scenarios were developed and analyzed to determine the likelihood of occurrence and severity of risk.  Based on the overall potential impact, resource needs were considered to identify and recommend scalable prevention, mitigation and response strategies necessary to counter the risks and support the proposed operation.

C. The WSA documented the qualitative analysis of the safety related scenarios applied to each phase. For each risk based scenario, the corresponding tables provided:

1. A description of the scenario examined (*Event*, e.g., collision, allision, spill while transferring cargo, etc.);

2. Probability, consequence and potential frequency of each risk based scenario;

3. A list of the existing safeguards that either help prevent the scenario or facilitates response activities (*Existing Safeguards,* e.g., safety zone, positive pilot control, day transit only, commercial tug escort, electronic surveillance, limited traffic, vessel construction and vessel safety systems).

21

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

### 9.3. PROPOSED MITIGATION MEASURES

A.  To counter or reduce risks and consequences associated with LNG operations at the Wharves A and B the following mitigation measures provide the most realistic and viable alternatives:

1.  There are international protocols, design standards, and operational measures that promote the safe marine transportation of LNG. These include:

    a.  Enhanced crew competency linked to the internationally required "Standards of Training, Certification and Watch keeping" (STCW);

    b.  Higher classification society standards regarding carrier design, construction and Flag State Control

    c.  Employment of Automatic Identification System (AIS);

    d.  USCG Port State Control safety-related exam's and testing of operational and cargo systems.

2.  Additionally, the WSA provided the following list of events that could lead to an accidental or unintentional release of LNG, the level of risk associated with each event and mitigation measures are provided for each of the following segments in for in-bound transit in the  waterway:

**Figure 9A Segment 1 – Territorial Sea to Pilot Boarding Area:**



WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION
Enclosure (1)

**Figure 9B Segment 2 – Pilot Boarding Station to Entrance of Channel:**





**Figure 9C Segment 3 – LNGC Inbound from Pilot Boarding Station to Bar:**



23

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

**Figure 9D Segment 4 – Army Terminal Channel to Puerto Nuevo Berth:**



**Figure 9E Segment 5 & 6 – LNGC Maneuvering in Army Terminal Turning Basis and at Puerto Nuevo Berth B:**



24

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION <span style="float:right">Enclosure (1)</span>

3.  For a full development of vulnerability analysis, risk assessments, and counter-measures, one should refer to the follow on WSA provided by NFEnergia, LLC. NFEnergia, LLC conducted an adequate and in-depth analysis of the vulnerabilities with a WSA workshop that included pertinent port partners and stakeholders. NFEnergia, LLC incorporated fully the input from this workshop into the follow-on WSA.

25

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION     Enclosure (1)

26

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED
SENSITIVE SECURITY INFORMATION

Enclosure (1)

27

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED
SENSITIVE SECURITY INFORMATION

Enclosure (1)

28

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

REDACTED

SENSITIVE SECURITY INFORMATION

Enclosure (1)

29

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

**(INTENTIONALLY LEFT BLA NK)**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

## 10. SECURITY SENSITIVE SUPPLEMENT



32

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.



33

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.



## 11. EMERGENCY RESPONSE PLANNING

A.  As per 33 C.F.R. § 127.1307, NFEnergia, LLC must submit an Emergency Manual to the COTP.

B.  Additionally, NFEnergia, LLC is also required to submit an *Operations Manual* to the COTP as per 33 C.F.R. § 127.1305.

34

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

## 12. RECOMMENDED RISK MITIGATION MEASURES

A. Based on the NFEnergia, LLC WSA, LNG workgroup effort, and comprehensive assessment conducted of the waterway surrounding San Juan Bay, the COTP has determined that the following mitigation measures shall be established and maintained:

1. Inbound, loaded or partially loaded LNG carriers shall only transit the waterway during daylight hours, with daylight being interpreted, in practical terms, as being able to clearly see the horizon, shoreline and receiving berths clearly under conditions of natural light.

2. A minimum of three miles of clear visibility shall be required for the movement of LNG carriers. In marginal weather conditions visibility can vary significantly along the route; the decision as to whether sufficient visibility exists, and is likely to continue to exist for the full transit, is a judgment call that will need to be made jointly between the attending pilot(s) in consultation with, and the concurrence of, the COTP.

3. Thirty knots shall be the maximum sustained true wind speed, as measured on the LNG carriers, at which an inbound or outbound transit should be allowed to commence. Docking and undocking evolutions poses particular risks and should only be undertaken if wind-gusts do not exceed 25 knots. As with visibility, significant variation in wind conditions can exist along the route, and the decision as to whether wind conditions permit a safe transit will be made by the attending pilot(s) in consultation with, and concurrence by, the COTP.

4. The NFEnergia, LLC should continue to conduct full mission bridge simulator training for all pilots providing services to LNG carriers. The training should take into account the full spectrum of vessel design and length, cargo carrying capacity, method of propulsion, steering and rudder configuration, thruster arrangements, and maneuvering characteristics for those carriers being considered for charter. In addition, expanded simulator training incorporating the number and design of tug boats having the minimum performance and operating criteria should be conducted.

5. The NFEnergia, LLC must prepare and submit an Operations Manual, as required by 33 C.F.R. § 127.1305, an Emergency Manual, as required by 33 C.F.R. § 127.1307, and a Facility Security Plan as required by 33 C.F.R. § 105.120 to the COTP for review and approval. The Operations and Emergency Manuals must be submitted at least 30 days before any transfer of LNG can take place, and the Facility Security Plan must be submitted at least 60 days before the facility begins operations. Comprehensive and coordinated response planning should consider:

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION     Enclosure (1)

a. In-transit and dockside emergency procedures in the event of fire, mechanical malfunction, allision, grounding, and/or need of safe anchorage or refuge.
b. The potential environmental impact of an LNG release and the identification and acquisition of joint resource needs to respond to the potential release.
c. A contingency response plan specific to LNG and focusing on a layered response approach.
d. Coordinated marine firefighting training and emergency response, with an emphasis on containing and extinguishing LNG fires.
e. An incident management training and collaborative exercise program.

6.

Once operational, periodic threat assessments should be conducted by NFEnergia, LLC in order to ensure that in-place security measures are adequate and appropriate to meet circumstances specific to that timeframe.

7. As per the enclosure (10) of NVIC 1-11, and prior to commencement of LNG operations, the NFEnergia, LLC must provide the COTP with the following information pertaining to vessels that are reasonably anticipated to be servicing the facility: a) Intended LNGCs nation of registry; b) The nationality or citizenship of the officers serving on board the intended LNGCs; and c) The nationality or citizenship of the crew members serving on board the intended LNGCs.

8. Until the facility goes into operation, NFEnergia, LLC must conduct an annual review of their WSA and provide the COTP with an update that accurately reflects all changes (actual and planned), to include changes of planned LNG carrier size or load frequency, port characterization modifications, facility-related design alternations, and conditions potentially affecting cumulative considerations. The annual review cycle should coincide with the anniversary date of the LOR.

9. NFEnergia, LLC should consider providing an education program directed at personnel residing or working near the proposed operation that outlines the steps NFEnergia, LLC operators and local emergency response organizations may take in the event of an emergency, and what the public can do to contribute to their own safety if an LNG release should occur.

10. In concert with the U.S. Coast Guard and Area Maritime Security Committee, NFEnergia, LLC shall consider developing and executing an educational program intended for the general public that encourages increased vigilance and outlines the steps to follow to report suspicious behavior concerning maritime activities along, or near the LNG carrier's transit route.

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

SENSITIVE SECURITY INFORMATION                                    Enclosure (1)

11. The COTP proposes to establish a moving 100 yard safety zone for all LNG carriers entering the surrounding areas of San Juan Bay while on approach and departure to the terminal.  Wharves A and B will have a fixed 50 yard safety zone while the LNGC is moored and conducting cargo transfer operations.

12. As part of the establishment of the moving safety zones and the limiting space of the channels into the Bahia de San Juan; only one LNGC will be allowed to transit at any specific time through the waterways of the San Juan Bay NFEnergia, LLC shall be responsible for coordinating and making necessary arrangements with the COTP and San Juan Bay pilots to ensure that only one LNGC transits at all times.

13. The COTP recommends that the PRFD continue efforts and initiatives to participate in advanced marine firefighting training.  Furthermore, the PRFD should ensure that firefighters assigned to the municipalities surrounding the Wharves A and B are properly trained and competent with shipboard firefighting techniques.

## 13. CONCLUSIONS

Based on a review and validation of the information contained in the NFEnergia, LLC WSA as per 33 C.F.R. § 127.007 and 33 C.F.R. § 127.009 respectively, and evaluation of the waterway in consultation with a variety of port stakeholders, the COTP has determined that the San Juan Bay transit route is suitable for the type and frequency of marine traffic associated with this proposed project.

The U.S. Coast Guard's evaluation focused on the navigation safety and maritime security aspects of LNG vessel transits along the intended waterways and included analyses of safety and security risk methodologies and corresponding risk mitigation measures. These risk mitigation measures are *recommended* tools intended to enhance maritime safety and security and effectively manage waterway priorities and mitigate law enforcement and safety resource shortfalls.

Resource requirements and associated operational procedures are based on existing USCG authorities and policies. These policies take into account a changing threat environment and the potential for unknown threats. If the conditions of the waterway change and/or situational awareness dictate the need, the COTP may reconsider this determination. Pursuant to his authority under the Ports and Waterways Safety Act of 1972 (33 U.S.C.§§ 1221 et.seq.), among other authorities, the COTP will continue to assess the San Juan Bay waterway to determine and implement controls and safeguards as necessary for the protection of the public's health and welfare, regional infrastructure and marine environment. Any orders to this effect may well be separate and apart from this LOR process.

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION (SSI) THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR 1520.5, EXCEPT WITH THE WRITTEN PERMISSION OF THE SECRETARY OF HOMELAND SECURITY. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 532 AND 49 CFR PART 1520.

**U.S. Department of Homeland Security**

**United States Coast Guard**

Commander
United States Coast Guard
Sector San Juan

5 Calle La Puntilla
San Juan, PR 00901-1800
Staff Symbol: s
Phone: (787) 289-2060
Email: luis.j.rodriguez@uscg.mil

16610
P 374-24
September 26, 2024

New Fortress Energy Waterfront Facility
Attn: Mr. Johnny Mercado
Address: 1 Magazine Road, # 03-10
954 Ponce De Leon Suite 406
San Juan PR, 00907

Subj: LETTER OF WARNING IN LIEU OF CIVIL PENALTY

Dear Mr. Mercado,

Pursuant to 46 U.S.C. § 70002(3), a vessel in a port or place subject to the jurisdiction of the United States shall not operate in a manner that creates port congestion or a hazardous circumstance. The U.S. Coast Guard observed vessels engaged in ship-to-ship transfers at the New Fortress Energy facility in San Juan, PR, and analyzed the distance of the berthed vessels from the channel and the width of the channel. Some vessels mooring side by side to your Floating Storage Unit (FSU) are obstructing the waterway. This obstruction hampers the channel in the Army Terminal Turning Basin and the mouth of the Puerto Nuevo Channel, where other vessel traffic is present, leading to potentially hazardous situations. Further investigation discovered the following violation and henceforward, your facility may not obstruct any portion of the navigable channel.

**Violation Cite:** 33 USC § 409
**To Wit:** Obstruction of navigable waters by vessels:

It was determined that justice will be best served by issuing you a warning rather than pursuing a monetary penalty for your conduct as set forth above. You are advised that this warning will become a matter of U.S. Coast Guard record and will be considered for any future enforcement actions against you. You may accept or decline this warning by indicating your choice below. Sign and date below and return a copy to the address above within 30 days of receipt. Failure to return a signed copy will result in the U.S. Coast Guard considering this warning accepted. Should you choose to decline this warning, civil penalty proceedings will be initiated against you in accordance with Title 33 CFR Part 1.07.

If you have any questions, please contact the Investigations Branch at (787) 560-4577 and reference MISLE Activity# 8003301.

Sincerely,

Luis J. Rodríguez
Captain, U.S. Coast Guard
Captain of the Port

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I hereby **accept / decline** (circle one) the above-mentioned warning.

_____    _____
Name (print and signature)              Date



| **U.S. Department of Homeland Security** **United States Coast Guard** | | Commander United States Coast Guard Sector San Juan | 5 calle La Puntilla San Juan, PR 00901-1800 Staff Symbol: s Phone: (787) 729-2300 Email: luis.j.rodriguez@uscg.mil |

16610
P 373-24
September 26, 2024

Director of Gas Environment and Engineering, PJ11
Attn: Jonathan Turquette
Federal Energy Regulatory Commission
888 1ST St. NE
Washington, DC 20426-0002

Dear Mr. Turquette,

My office issues this Letter of Recommendation (LOR) pursuant to Title 33, Code of Federal Regulations (CFR) § 127.009, which also fulfills the Coast Guard's commitment for providing information to your agency under the Interagency Agreement signed in February 2004. NFEnergía LLC, subsidiary to New Fortress Energy, is subject to the Order on Show Cause issued by your agency on March 19, 2021, and submitted a Letter of Intent (LOI) on April 12, 2024, and a Waterway Suitability Assessment (WSA) on August 26, 2024. Both of which my office reviewed following the guidance provided in U.S. Coast Guard Navigation and Vessel Inspection Circular (NVIC) 01-2011 of January 24, 2011. After careful examination of NFEnergía LLC' (hereon the applicant) LOI and WSA, and consultation with federal and local stakeholders, it was determined that the waterway is **not suitable** for the applicant's proposed LNG operation. The following comments apply:

1. The applicant's facility is operating, as allowed in the discussion section of the Order on Show Cause. Amongst other circumstances that the Federal Energy Regulatory Commission (FERC) considered, see paragraph 38, one was the U.S. Coast Guard's review of the WSA conducted in 2018. Nevertheless, the vessels proposed in 2018 had a shorter combined breadth, approximately 140 feet, and did not obstruct the navigable channel (currently set at 150 feet from the wharf) while moored side to side to conduct transfers. The applicant has expanded the vessels' dimensions to sizes that are unsuitable for waterway as determined by a review of the factors listed in 33 CFR § 127.007 and § 127.009. The U.S. Coast Guard has jurisdiction to enforce laws protecting U.S. navigable waters and has a duty to discourage obstructions in violation of 33 USC 409. Pursuant to these authorities, the Coast Guard may refer these matters to the Department of Justice (DOJ) and request that DOJ pursue civil penalty.

2. Per 33 CFR § 127.009 (a) (4) (vi), my office analyzed the distance of the proposed berthed vessel from the channel and the width of the channel. Title 33, U.S. Code (USC) § 409, establishes that it shall not be lawful to tie up vessels or other craft in navigable channels in such a manner as to obstruct the passage of other vessels or craft. Furthermore, 33 USC § 403a explicitly prohibits the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters. My office and the U.S. Army Corps of Engineers (USACE) carefully examined the applicable charts, the applicant's proposed operation, and the future improvements to the navigable channel and berth areas in vicinity the proposed operation. The "Marine Traffic Reduction Project" WSA submitted by the applicant, and subject of this LOR, is for vessels which would affect an already narrow navigable channel by more than 150 feet. NFE's proposed operation would obstruct the Army Terminal Turning Basin (18° 25' 51.0888" N; 66° 6' 26.964" W) and the mouth of the Puerto Nuevo Channel (18° 25' 48.6588" N; 66° 6' 15.8148" W).

3. My recommendation is based on review of the factors listed in 33 CFR § 127.007 and 33 CFR § 127.009 and is provided to assist your agency in their determination of whether the proposed operation should be commissioned. The risk management measures identified in the applicant's WSA and the information in the attached analysis may be used by you if you deem conditions are warranted in your Commission Order. The applicant several risk reduction measures that could help smaller vessels navigate around the obstruction. These include, additional and larger harbor assist tugs, transit simulations with the pilots, and coordination with nearby commercial port facilities. Nevertheless, the applicant's proposal lacks alternatives to obstructing the channel.

4. As the applicant is actively operating the facility, I will evaluate each transit on a case-by-case basis to determine any necessary safety and security measures to protect public health and welfare, critical marine infrastructure, and key resources, the port, the marine environment, and the vessels. My office will notify your agency if any issues concerning the applicant are referred to the DOJ to pursue civil penalty.

Should there be significant changes which would cause my recommendation to change, I may reconsider it provided that supporting documentation is submitted for my review. The USACE, Caribbean District, along with the local Port Authority, neighboring facilities, and NFE will receive copy of this letter. These stakeholders may submit comments and relevant information, as described in 33 CFR § 127.009 paragraphs (a) and (d), for consideration in the permitting process; and the owner or operator (as well as the State or local government in the vicinity of the facility) may request reconsideration from my office, as set forth in 33 CFR § 127.010, with copy to FERC.

If you have questions, my point of contact is CDR Alejandro Collazo. He may be reached at (787) 729-2378, (281) 678-7609 or alejandro.m.collazo@uscg.mil.

Sincerely,

Luis J. Rodríguez
Captain, U.S. Coast Guard
Captain of the Port

Enclosure: (1) LOR Analysis

Copy: Commander Coast Guard District 7 (p)
Commander Atlantic Area (p)
Commandant (CG-5), (CG-522), (CG-532), (CG-544), (CG-741)
New Fortress Energía, San Juan, PR
U.S. Army Corps of Engineers, Caribbean District, San Juan, PR
Puerto Rico Port Authority, San Juan, PR
San Juan Bay Pilots, San Juan, PR

2

EXHIBIT - F



Confidential

111 W. 19TH STREET, 8TH FLOOR
NEW YORK, NY 10011

**<u>Via Electronic Mail</u>**

October 15, 2024

3PPO
Attention: Osvaldo Carlo, Esq.,
President
Recoms Group

Copy:

Genera PR LLC
as agent of PREPA
Attention: General Counsel
legal@genera-pr.com
Copy:
Jose.Carrasco@genera-pr.com
jose.delrio@genera-pr.com

RE: Notice of Force Majeure Event; Natural Gas Sales and Purchase Agreement between NFEnergía LLC ("NFE") and the Puerto Rico Electric Power Authority ("PREPA"), represented by its agent, Genera PR LLC, dated March 15, 2024 (the "NGSPA"). Capitalized terms not defined in this letter shall have the meanings ascribed to them in the NGSPA.

Dear 3PPO and Genera Team:

We hereby give notice of an ongoing Force Majeure event, as defined in Article XI.1(a) and (c), and send this Notice in accordance with Article XI.4.

### a. Description of Force Majeure Event

On October 2, 2024, in a sudden and drastic change in policy the United States Coast Guard ("USCG") informed NFE that in order for our incoming LNG carrier, the CNTIC VPOWER GLOBAL, to discharge its LNG cargo via ship-to-ship transfer (STS), this STS operation necessitated the closing of the Army Terminal Channel, the Army Terminal Turning Basin and the Puerto Nuevo Channel. As such, the USCG denied NFE's STS operations (the circumstances described in this paragraph are referred to as the "USCG Actions").

The USCG Actions directly contradict the USCG's September 26, 2018 Letter of Recommendation ("LOR"), which determined that "the waterways approaching and entering San Juan Harbor to Wharves A and B in Puerto Nuevo, Puerto Rico be considered suitable for LNG

marine traffic."[1]  The LOR was issued based on a thorough evaluation by the USCG of "the navigation safety and maritime security aspects of LNG vessel transits along the intended waterways and included analyses of safety and security risk methodologies and corresponding risk mitigation measures."[2]

NFE relied on the LOR to enter into the NGSPA and acted as a Reasonable and Prudent Operator in planning to perform its obligations under the NGSPA by conducting STS loading operations. The USCG Actions, which now deny NFE the ability to conduct such operations, are beyond the reasonable control of NFE and could not be prevented or overcome by the exercise of due diligence.  This shocking revocation of our long-standing USCG approval for STS operations within the port clearly constitutes an unforeseen extraordinary act by a Governmental Authority and a Force Majeure event. We have been carrying out STS operations in the exact same way, at the exact same site within the port, including with this specific ship, for the past few years.

### b.  NFE's Estimate of Resuming Performance of Its Obligations

Unfortunately, this Force Majeure event on October 2 resulted in Buyer having to switch to ADO for 4.83 hours.  Although NFE has implemented an effective mitigation plan noted in item (c) below, as of today, it is not possible to estimate the date on which full performance under the NGSPA will resume unless and until the USCG reverts to its prior policy of authorizing STS loading operations.

### c.  Program Implemented

As of the date of this letter, NFE has implemented several actions to resume full performance and are working around the clock for LNG to be discharged to the Port of San Juan, including, but not limited to:

   (1) Program implemented: Effective October 15, 2024, NFE's mitigation plan is to swap and alternate 30 thousand m3 LNG vessels instead of conducting STS operations;
   (2) Met with the USCG in person in San Juan;
   (3) Working with all stakeholders and Governmental Authorities in the federal government and Puerto Rico government in order to find a practical solution;
   (4) Working with all other affected parties based on the USCG Actions, including other Port of San Juan stakeholders;
   (5) Requesting the USCG an appeal under 33 CFR 160.7;

This letter is sent without prejudice to any actions NFE may take with respect to the referenced USCG Actions. We will send you an updated report next week once we have any updates (if any).

< Signature Page to Follow>

---

[1] USCG, Letter of Recommendation Cover Letter (Sept. 26, 2018).
[2] USCG, Letter of Recommendation Analysis (Redacted) (Sept. 26, 2018).

**For and on behalf of**

**NFENERGÍA LLC**

*Chris Guinta*
_____

Name: Christopher S. Guinta
Title: Chief Financial Officer

EXHIBIT - G



Confidential

111 W. 19TH STREET, 8TH FLOOR
NEW YORK, NY 10011

**Via Electronic Mail**

February 14, 2025

Genera PR LLC
as agent of PREPA
Attention: General Counsel
legal@genera-pr.com
Copy:
Jose.Carrasco@genera-pr.com
jose.delrio@genera-pr.com
Third-Party Procurement Office (3PPO)
management@recomspr.net

RE: Notice of Force Majeure Event re USACE's Dredging; Natural Gas Sales and Purchase Agreement between NFEnergía LLC ("NFE") and the Puerto Rico Electric Power Authority ("PREPA"), represented by its agent, Genera PR LLC, dated March 15, 2024 (the "NGSPA"). Capitalized terms not defined in this letter shall have the meanings ascribed to them in the NGSPA.

Dear Genera Team:

We hereby give notice of the occurrence of a Force Majeure event and send this Notice in accordance with Article XI.

a. **Description of Force Majeure Event**

As you are aware, per our Force Majeure notice dated October 24, 2024, in October 2024 Curtin Maritime ("Curtin"), on behalf of the U.S. Army Corps of Engineers ("USACE"), completed maintenance dredging at Seller's MFH Facility as part of the San Juan Harbor Construction and Maintenance Dredging Project (the "USACE Dredging"). Due to proximity limits in USACE's Dredging contract with Curtin, areas within 25 feet of the wharf face were not dredged, resulting in a nominal 4 feet / approximate 5,000 cubic yard differential between the dredged and undredged areas within the MFH Facility's berth pocket. This differential represents a potential hazard to storage vessels berthing at the MFH Facility. Seller will need to dredge the remaining area along the wharf face to remove the potential draft hazard.

b. **Impact on Performance**

As a result of this Force Majeure event, Seller will be unable to deliver Natural Gas to the

Delivery Point while dredging operations are conducted at the MFH Facility. Based on our current assessment, we estimate that the dredging operations will impact the MFH Facility from February 15, 2025 through February 24, 2025. Our team will provide updates and coordinate with you regarding scheduling of the required dredging operations as more information becomes available.

**c. Mitigation Actions**

We are taking all commercially reasonable efforts to mitigate the impact of this Force Majeure event and to resume full performance of our obligations under the NGSPA as soon as possible. We are minimizing the impact by staging eighty six (86) ISO containers at the MFH Facility so that, for an approximate 3-4 days during dredging operations, Natural Gas will continue to be delivered at the Palo Seco Delivery Point. Additionally, we have taken the following steps to minimize the duration of the dredging operation and the associated interruption to Natural Gas deliveries under the NGSPA:

   a. We performed a bathymetry study which revealed unevenness in the USACE Dredging;
   b. Engaged all commercially available dredging equipment in Puerto Rico; and
   c. The dredging crew will work on a 24 hour/7 days shift

Seller reserves all rights under the NGSPA and Applicable Law, including the right to claim Force Majeure relief for the duration of the event and any additional time required to remedy its effects. For further information or to discuss this notice, please contact Julian Villalon (JVillalon@newfortressenergy.com) and Juan Perez (jperez@newfortressenergy.com), with copy to legal@newfortressenergy.com. We appreciate your understanding and cooperation.

< Signature Page to Follow>

**For and on behalf of**

**NFENERGÍA LLC**

_Chris Guinta_
_____

Name: Christopher S. Guinta
Title: Chief Financial Officer

EXHIBIT - H



Confidential

111 W. 19TH STREET, 8TH FLOOR
NEW YORK, NY  10011

**Via Electronic Mail**

October 3, 2025

Genera PR LLC
as agent of PREPA
Attention: General Counsel
legal@genera-pr.com
Copy:
Jose.Carrasco@genera-pr.com
jose.delrio@genera-pr.com
Third-Party Procurement Office (3PPO)
management@recomspr.net

RE: Notice of Force Majeure Event regarding the San Juan Bay Pilots' Temporary Restraining Order; Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement by and between NFEnergía LLC ("Seller" or "NFE") and the Puerto Rico Electric Power Authority ("Buyer" or "PREPA"), represented by its agent, Genera PR LLC, dated July 17, 2025, as amended (the "NGSPA"). Capitalized terms not defined in this letter shall have the meanings ascribed to them in the NGSPA.

Dear Buyer:

We hereby give notice of the occurrence of a Force Majeure event and send this Notice in accordance with Article XI.

**a.  Description of Force Majeure Event**

As you are aware, the San Juan Pilots et al. requested a temporary restraining order ("TRO") regarding the use of escort-rated tugs that was granted by United States Court for the District of Puerto Rico ("Court") on September 26, 2025.  The TRO has not permitted Seller's LNG vessel, which was originally scheduled to arrive on or around September 28, 2025, to approach the San Juan bay and deliver Natural Gas to the MFH Facility.

**b.  Impact on Performance**

As a result of this Force Majeure event, Seller has been unable to conduct full operations regarding the delivery of Natural Gas to the Delivery Points.  Based on our current assessment and the Court's order the TRO will continue until at least October 10, 2025.  Our team will provide updates and coordinate with you as more information becomes available.

Docusign Envelope ID: 2B839F15-ACEB-411E-A920-470BB5197810

c. **Mitigation Actions**

We are taking all commercially reasonable efforts to mitigate the impact of this Force Majeure event and to resume full performance of our obligations under the NGSPA as soon as possible.

Seller reserves all rights under the NGSPA and Applicable Law, including the right to claim Force Majeure relief for the duration of the event and any additional time required to remedy its effects. We appreciate your understanding and cooperation.

< Signature Page to Follow>

**For and on behalf of**

**NFENERGÍA LLC**

*Chris Guinta*
_____

Name: Christopher S. Guinta
Title: Chief Financial Officer

EXHIBIT V



## Report on LNG Supply Shortfalls and Associated Costs Under the NGSPA, FSPA, and Exigency Contracts

Prepared for:
Public-Private Partnerships Authority (P3A)

Prepared by:
Third-Party Procurement Office (3PPO)

Date: November 17, 2025

In October 2024, New Fortress Energy (NFE) began experiencing operational disruptions in LNG deliveries following the revocation of its U.S. Coast Guard (USCG) authorization to perform ship-to-ship (STS) LNG transfers in San Juan Harbor. The loss of this permit stemmed from NFE's failure to maintain compliance with operational requirements, including the safe use of appropriately sized vessels for the channel's navigational constraints. As a result, the USCG issued a determination under 33 U.S.C. § 409, deeming San Juan Harbor unsuitable for the larger LNG vessels utilized by NFE, effectively revoking its STS privileges.

To continue operations, NFE implemented ship-swap procedures, where LNG carriers had to exit the bay and conduct offshore transfers before returning to port. These new logistics substantially reduced LNG availability and efficiency, causing persistent delivery shortfalls. The effects were first observed in October 2024, coinciding with the beginning of the shortfall period.

On October 15, 2024, NFEnergía LLC ("NFE") issued a formal Notice of Force Majeure pursuant to Articles XI.1(a), XI.1(c), and XI.4 of the Natural Gas Sales and Purchase Agreement (NGSPA) executed on March 15, 2024. In its notice, NFE asserts that a Force Majeure event commenced on October 2, 2024, following actions taken by the United States Coast Guard (USCG).

The operational impact extended across all major LNG supply agreements with PREPA:

- **Fuel Supply and Purchase Agreement (FSPA):** Covering San Juan's LNG-fueled generation units.

- **Natural Gas Sale and Purchase Agreement (NGSPA):** Supplying temporary power generation facilities under the Temporary Generation contract. (contract expired July 2025)

- **Exigency Contract:** A short-term arrangement implemented after the NGSPA expired in July 2025, continuing LNG supply for the same temporary units.

The transition from STS transfers to ship swaps led to cumulative delivery deficiencies, increased reliance on diesel, and elevated system costs. Across all three contracts, the total estimated financial impact through October 2025 exceeded **$55 million** in excess fuel expenses. These disruptions originated from NFE's operational failures rather than unforeseen or force-majeure events, as later determined through the contractual review process.

Cumulative LNG delivery deficiencies across all three agreements resulted in an estimated $55,326,573.87 in excess fuel costs due to diesel substitution.

The total cost breakdown by contract is as follows:

A. NGSPA: $19,248,152.01
B. FSPA: $29,910,460.55
C. Exigency: $6,167,961.31

Genera has provided revised shortfall calculations that include certain adjustments and operational factors; however, these have not yet been explained or supported with detailed documentation (see attached Emails). Until such justification is provided, the original NGSPA values through July 2025 remain the reference for financial analysis.

On October 24, 2024, NFEenergía LLC ("NFE") issued a Notice of Force Majeure under Articles XI.1(a), XI.1(c), and XI.4 of the NGSPA, citing activities related to the U.S. Army Corps of Engineers (USACE) San Juan Harbor Dredging and Deepening Project. In its notice, NFE stated that USACE's contractor, Curtin Maritime, would be dredging the berths adjacent to NFE's Micro Fueling Facility for an estimated 24–36 hours beginning October 27, 2024, and that these activities would require the LNG vessel to leave the berth, interrupting natural gas availability until approximately October 29, 2024.

NFE estimated that it would resume full operations once dredging was completed and the LNG ship returned to the MFH facility, representing a short disruption of fewer than two days.

However, based on subsequent information received, the operational impacts attributed to this event did not occur in October as initially reported. Instead, the conditions referenced by NFE appear to have taken place in February 2025, and the duration of the alleged interruption was approximately 10 days, far exceeding the originally stated 24–36 hours. This discrepancy between

NFE's initial representation and the later-identified timeframe and duration remains unsubstantiated and requires formal clarification and supporting documentation from NFE.

On October 3, 2025, NFEenergía LLC ("NFE") submitted a Notice of Force Majeure under Article XI of the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement, citing limitations created by a Temporary Restraining Order (TRO) issued by the U.S. District Court for the District of Puerto Rico. The TRO, obtained by the San Juan Bay Pilots on September 26, 2025, restricted the use of escort-rated tugboats required for the entry of NFE's LNG vessel into San Juan Bay. NFE stated that this restriction prevented the LNG vessel scheduled to arrive around September 28, 2025 from entering the bay and delivering natural gas to the Micro Fueling Facility (MFH), thereby limiting its ability to supply gas to the Delivery Points.

NFE estimated that the TRO would remain in effect until at least October 10, 2025, after which normal operations might resume depending on the status of the court order. NFE also indicated that it was undertaking commercially reasonable mitigation actions and reserved all rights under the NGSPA and applicable law.

However, the 3PPO does not consider this circumstance to constitute a valid Force Majeure event under the terms of the NGSPA. Based on the information reviewed, the TRO arises from regulatory and operational matters that fall within NFE's foreseeable and manageable risks and therefore does not relieve NFE from its contractual delivery obligations.

## Quantification of LNG Shortfalls

The following tables summarize the monthly deficiencies and corresponding incremental costs as provided by Genera PR for each applicable contract.

A. **NGSPA Contractual Basis – Seller's Shortfall (Article VI.1)**
   Pursuant to Article VI.1 of the Agreement, if Seller fails to deliver the scheduled quantity of Natural Gas on any given Day except in cases of (a) Force Majeure, (b) Excess Nominations, or (c) causes attributable to Buyer the undelivered quantity constitutes an "NG Deficiency." For any such NG Deficiency, Seller is obligated to compensate Buyer through a Seller Shortfall Payment, defined as:

**NG Deficiency × (Diesel Contract Price for the month – Fuel Price for the month)**

**NGSPA Seller's Shortfall Calculations (as per Article VI )**

| Month | NG Deficiency (MMBtu) | Diesel Price ($/MMBtu) | NG Contract Price ($/MMBtu) | Difference ($/MMBtu) | Excess Cost ($) |
|---|---|---|---|---|---|
| Oct-24 | 173,353 | 17.6266 | 12.6325 | 4.9941 | $865,736.24 |
| Nov-24 | 171,227 | 17.2198 | 12.4589 | 4.7609 | $815,201.09 |
| Dec-24 | 90,538 | 16.7017 | 12.2309 | 4.4708 | $404,771.26 |
| Jan-25 | 391,625 | 18.3480 | 13.5974 | 4.7506 | $1,860,448.45 |
| Feb-25 | 1,369,668 | 18.2538 | 13.4511 | 4.8027 | $6,578,139.93 |
| Mar-25 | 681,455 | 17.0680 | 12.4160 | 4.6520 | $3,170,141.90 |
| Apr-25 | 432,191 | 16.0481 | 11.8473 | 4.2008 | $1,815,533.28 |
| May-25 | 445,077 | 15.6271 | 11.5974 | 4.0297 | $1,793,535.83 |
| Jun-25 | 160,070 | 15.8864 | 11.5974 | 4.2890 | $686,532.83 |
| Jul-25 | 218,654 | 17.5888 | 12.6665 | 4.9223 | $1,258,111.20 |
| Total | 4,133,858 | — | — | — | **$19,248,152.01** |

**B.   FSPA Contractual Basis – Seller's Shortfall (Clause 9.1)**

Pursuant to Clause 9.1 of the Agreement, if Seller fails to deliver the scheduled quantity of Natural Gas in the Binding Monthly Schedule except in cases of (a) Force Majeure, (b) a Planned Seller Shutdown, (c) Excess Nominations, (d) failure of any Firm Supply Solvency Condition (per Clause 7.7), or (e) reasons attributable to Buyer (including Unplanned Shutdowns, Scheduled Maintenance, or suspensions under Clause 13.9(b)) the undelivered quantity constitutes a "Natural Gas Deficiency."

For any such Natural Gas Deficiency, Buyer's *sole and exclusive remedy* and Seller's *sole and exclusive liability* (subject only to Buyer's termination rights under Clause 19.1(b)(ii)(B)) are as follows:

1. **Back-Up Fuel Obligation**
   At Seller's option, Seller must either:

   - **(i)** make available at the SJ 5&6 Units a **Back-up Fuel Quantity** equivalent in energy content to the Natural Gas Deficiency (calculated per Exhibit G), or

   - **(ii)** pay the **Back-up Fuel Cover Amount**, enabling Buyer to procure the Back-up Fuel Quantity from Third Parties.

2. **Reimbursement Obligation (Clause 9.1(b))**

If Buyer procures the Back-up Fuel Quantity under Clause 9.1(a)(ii), and if the Back-up Fuel Quantity Index Price on the purchase date exceeds the Natural Gas Fuel Price that would have applied, Seller must reimburse Buyer for the lesser of:

- o **(i)** the price difference multiplied by the applicable Back-up Fuel Quantity Index Price, or

- o **(ii)** Buyer's actual incremental cost to procure and deliver the Back-up Fuel Quantity relative to the Natural Gas Fuel Price that would have been paid.

### FSPA Seller's Shortfall Calculations (as per Article IX)

| Month | ULSD Price ($/MMBtu) | LNG Contract Price ($/MMBtu) | Difference ($/MMBtu) | Incremental Cost ($) |
|---|---|---|---|---|
| Oct-24 | 17.6266 | 9.4728 | 8.1538 | $2,185,784.84 |
| Nov-24 | 17.2196 | 9.1799 | 8.0219 | $1,176,476.24 |
| Dec-24 | 16.7017 | 10.4457 | 6.2560 | $779,253.31 |
| Jan-25 | 18.3480 | 10.5411 | 7.8069 | $848,675.20 |
| Feb-25 | 18.2538 | 10.5653 | 7.6885 | $1,293,653.32 |
| Mar-25 | 17.0680 | 10.6534 | 6.0710 | $4,585,084.65 |
| Apr-25 | 16.0481 | 11.0425 | 5.0056 | $2,985,696.54 |
| May-25 | 15.6271 | 11.0458 | 5.4168 | $774,471.96 |
| Jun-25 | 17.0568 | 11.0836 | 6.8212 | $1,507,170.76 |
| Jul-25 | 18.4518 | 10.2502 | 8.2016 | $3,949,177.05 |
| Aug-25 | 17.2125 | 10.1846 | 7.0279 | $1,150,059.76 |
| Sep-25 | 17.5459 | 10.1846 | 7.3613 | $2,536,329.00 |
| Oct-25 | 17.1952 | 9.7603 | 7.4349 | $6,138,627.92 |
| Total | — | — | — | $29,910,460.55 |

C. **Exigency Contractual Basis – Seller's Shortfall (Article VI.1)**
   Pursuant to Article VI.1 of the Agreement, if Seller fails to deliver the scheduled quantity of Natural Gas on any given Day except in cases of (a) Force Majeure, (b) Excess Nominations, or (c) causes attributable to Buyer the undelivered quantity constitutes an "NG Deficiency." For any such NG Deficiency, Seller is obligated to compensate Buyer through a Seller Shortfall Payment, defined as:

**NG Deficiency × (Diesel Contract Price for the month – Fuel Price for the month)**

**Energy Exigency Short-Term Seller's Shortfall Calculations (as per Article VI)**

| Period | Diesel Price ($/MMBtu) | NG Contract Price ($/MMBtu) | Difference ($/MMBtu) | Excess Cost ($) |
|---|---|---|---|---|
| Jul 17–31, 2025 | 18.4518 | 13.4603 | 4.9915 | $315,606.94 |
| Aug-25 | 17.2125 | 13.4603 | 3.7522 | $186,259.04 |
| Sep-25 | 17.5459 | 13.4603 | 4.0856 | $1,018,245.75 |
| Oct-25 | 17.1952 | 12.5833 | 4.6119 | $4,647,849.58 |
| Total | — | — | — | $6,167,961.31 |

## Financial Impacts by Contract

### NGSPA Contract
• Total LNG Shortfall (Oct 2024 – Jul 2025): 4,133,858 MMBtu
• Total Excess Fuel Cost: $19,248,152.01

### FSPA Contract
• Total Excess Fuel Cost: $29,910,460.55

### Short-Term Exigency Contract
• Total Excess Fuel Cost: $6,167,961.31

*Original values remained as official reference pending clarification of later adjustments.*

**Total Across All Contracts: $55,326,573.87**

The LNG delivery shortfalls experienced under the NGSPA, FSPA, and Exigency contracts were the result of NFE's failure to maintain the permits necessary for ship-to-ship (STS) LNG transfers in San Juan Harbor. This loss of authorization and subsequent shift to ship-swap operations caused delivery disruptions that began in October 2024 and affected all fuel supply contracts under PREPA.

Genera has formally requested that the Public-Private Partnerships Authority (P3A) intervene in the recovery of funds owed, citing a conflict of interest in direct negotiations with NFE. This recovery must be pursued at all costs for the benefit of Puerto Rico and to uphold the integrity of the contractual process. The Third-Party Procurement Office (3PPO) remains fully committed to assisting the Public-Private Partnerships Authority (P3A) in any way possible to ensure that recovery actions are effectively carried out.

Respectfully,

Third-Party Procurement Office (3PPO)



12/19/2025                                                          <span style="color:red">CONFIDENTIAL</span>

Dear, NFE Legal Team

This correspondence is issued on behalf of the Government of Puerto Rico, through the Third-Party Procurement Office ("3PPO"), in coordination with the Puerto Rico Electric Power Authority ("PREPA"), Genera PR, LLC ("Genera"), and the Puerto Rico Public-Private Partnerships Authority ("P3A"), in connection with unresolved liquefied natural gas delivery shortfalls attributed to NF Energía, LLC ("NFE") The purpose of this communication is to provide formal notice of those outstanding matters and to initiate discussions regarding the recovery of amounts associated with such shortfalls.

The Third-Party Procurement Office is the entity designated to administer, oversee, and audit public procurement processes on behalf of LUMA and Genera in circumstances where an organizational conflict of interest exists. The Third-Party Procurement Office exercises authority delegated under Act No. 29-2009, as amended, and Act No. 120-2018, and operates as an independent oversight and compliance body. Its role is to ensure that procurement and contract enforcement activities are conducted in accordance with applicable public policy, the Code of Federal Regulations, including 2 C.F.R. Part 200, and the core principles of transparency, open competition, and protection of the public interest.

As you are aware, the Financial Oversight and Management Board for Puerto Rico conditioned its approval of the Multisite LNG Supply Agreement on the Government of Puerto Rico undertaking a prompt and thorough evaluation of delivery failures under existing and prior gas supply contracts and formally enforcing the recovery of amounts owed as a result of such failures. Both, the Government of Puerto Rico and the Oversight Board  expect that costs incurred due to replacement fuel usage, including diesel expenses resulting from non-delivery of LNG, be evaluated and recovered for the benefit of the people of Puerto Rico. This communication is issued in furtherance of those conditions and expectations.

This correspondence represents the formal initiation of the contractual reclamation process against NFE.

Based on the procurement, operational, and compliance record developed to date, multiple LNG delivery shortfalls under prior agreements remain unresolved.[1] These matters arise from circumstances that include limitations affecting ship-to-ship transfer operations following the loss of required authorizations, operational constraints associated with dredging activities, and issues related to tugboat availability and escort requirements. As reflected in contemporaneous operational records and prior correspondence, these circumstances resulted in the non-delivery

---

[1] See Annex 1.

of contracted LNG volumes and required reliance on alternative fuels to maintain generation operations. In response to the related notices and correspondence, NFE has asserted that these events constitute force majeure; however, such assertions are expressly disputed and are not supported by the procurement, operational, or contractual record.

Based on preliminary calculations derived from operational data received from Genera, the cumulative financial impact associated with LNG delivery shortfalls under prior agreements is estimated to exceed approximately $55,000,000.00 . This amount reflects excess fuel costs incurred as a result of diesel substitution attributable to non-delivery of LNG volumes beginning in or around October 2024. The estimated exposure includes approximately $19,000,000.00associated with shortfalls under the Natural Gas Sale and Purchase Agreement applicable to temporary generation facilities, approximately $29,000,000.00associated with shortfalls under the Fuel Supply and Purchase Agreement serving the San Juan generation units, and approximately $6,000,000.00associated with shortfalls under a subsequent short-term exigency arrangement. These figures remain subject to further validation, reconciliation, and contractual application.

The Government of Puerto Rico does not accept the characterization of these delivery shortfalls as Force Majeure events. Based on the information reviewed to date and the applicable contractual standards, the Government has not identified sufficient support demonstrating that the relevant circumstances satisfied the requirements necessary to excuse performance or relieve NFE from liability under the governing agreements. The Government therefore expressly reserves all rights with respect to claims arising from non-excused non-performance under prior contracts.

Certain data associated with San Juan Units 5 and 6 remains subject to further validation, as the 3PPO has not historically administered the applicable fuel supply agreement and is in the process of assuming administrative oversight of that contract. The operational data related to those units, has been provided to the Government by Genera and used for purposes of developing preliminary estimates. The 3PPO will conduct a reconciliation and validation of quantities and costs upon assuming full administrative responsibility. Upon completion of that review, the Government anticipates presenting a verified demand supported by the applicable records. The existence of data limitations at this stage does not constitute a waiver, reduction, or impairment of any rights or claims. The Government considers the contractual reclamation process formally initiated as of the date of this correspondence.

In light of the foregoing, the Government of Puerto Rico hereby requests that NFE engage in good-faith discussions to address the outstanding LNG delivery shortfalls arising under the contracts and the associated financial impacts. The Government requests confirmation of NFE availability in the next 5 days to commence such discussions and identification of representatives authorized to participate on its behalf. All rights are expressly reserved.

Sincerely,

Osvaldo Carlo Esq.

PresidentThird-Party Procurement Office (3PPO)

EXHIBIT-J

**PROFESSIONAL SERVICES AGREEMENT**

by and between

**THE PUERTO RICO ELECTRIC POWER AUTHORITY, represented by its agent**
**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**

and

**REGULATORY COMPLIANCE SERVICES CORP.**

Dated as of July 24, 2025

# PROFESSIONAL SERVICES AGREEMENT

This Professional Services Agreement (the "Agreement") is made and entered into as of this 24 day of July, 2025, by and among the **PUERTO RICO ELECTRIC POWER AUTHORITY**, an instrumentality of the Government of Puerto Rico ("PREPA"), represented herein by its agent, the **PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY** ("Authority"), a public corporation of the Government of Puerto Rico, represented herein by its Executive Director, Josué A. Colón Ortiz, of legal age, engineer, married, and resident of Caguas, Puerto Rico,  and **REGULATORY COMPLIANCE SERVICES CORP.**, a corporation duly organized and existing under the laws of Puerto Rico, represented herein by its Project Manager, Mariela Quiñones Ramos, of legal age, Attorney-At-Law, single, and resident of Dorado, Puerto Rico (the "Contractor" or the "Consultant"), duly authorized to execute this Agreement on behalf of the Contractor. The Authority and Contractor are also referred to individually as a "Party" and collectively referred to as the "Parties".

## RECITALS

**WHEREAS**, the Authority, by virtue of the powers conferred to it under the Public-Private Partnerships Act, Act No. 29 of June 8, 2009, as amended ("Act 29"), is authorized to engage professional, technical, and consulting services that are necessary and convenient to the activities, projects, and operations of the Authority;

**WHEREAS**, pursuant to the Puerto Rico Electric Power Authority Act, Act No. 83 of May 2, 1941, as amended ("Act 83"), PREPA owns, among other assets, electric generation, transmission, and distribution systems, and, in accordance with the terms and conditions set forth in Act 29 and the Puerto Rico Electric System Transformation Act, Act No. 120-2018, as amended ("Act 120), PREPA and the Authority have entered into agreements with private parties for the operation and maintenance of these systems;

**WHEREAS**, On June 22, 2020, PREPA and the Authority entered into the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (the "T&D OMA") with LUMA Energy, LLC ("LUMA" or "T&D Operator"), and on January 24, 2023, PREPA and the Authority entered into the *Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement* (the "LGA OMA", and collectively with the T&D OMA, "OMAs") with Genera PR LLC ("Genera" or "LGA Operator"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the OMAs unless the context clearly requires otherwise;

**WHEREAS**, under the OMAs, PREP A retains ownership of the T&D System and Legacy Generation Assets ("LGA"), but LUMA acts as Operator of the T&D System, Genera acts as Operator of the LGA, and the Authority is Administrator and representative of PREPA in the operation and maintenance of PREPA's T&D System and LGA;

Initial

**WHEREAS**, the Authority, as Administrator of the OMAs, is authorized to execute and deliver this Agreement, perform its obligations hereunder and enter into the transactions contemplated hereby under Sections 6.1 and 6.2 of the OMAs, which provide the Authority with direct authority and responsibility for oversight and support to the Operators in their performance of the OMAs, and establishes that PREPA shall be responsible for all acts and omissions of Administrator in connection with the OMAs and the other Transaction Documents, and the transactions contemplated thereby, in the same manner as if such acts and omissions were those of PREPA;

**WHEREAS**, Section 4.1 of the T&D OMA, and 4.2 of the LGA OMA required the Operators to create procurement manuals addressing, among other things, employee and organizational conflicts of interest ("OCI"), and both Operators developed plans that envisioned the use of an independent third-party procurement office to avoid or mitigate potential organizational conflicts of interest in compliance with the Puerto Rico Code of Ethics, and with the LUMA and Genera Procurement Manuals;

**WHEREAS**, in accordance with Executive Order 2021-29, and in support of PREPA and its Operators in their performance of the OMAs, on February 3, 2023, the Authority published a *Request for Proposals for Procurement & Contract Management Services* (Authority-RFP-2023-01) (the "RFP"), for procurement and contract management services to prevent organizational conflicts of interest stemming from the roles of the T&D Operator and the LGA Operator under the OMAs, respectively;


Initial

**WHEREAS**, after the evaluation of the proposals, the favorable recommendation for the award of the RFP to the Consultant was approved by the Board of Directors of the Authority ("Board of Directors") through Resolution No. 2023-26, adopted on April 28, 2023;

**WHEREAS**, on August 23, 2023, the Authority and the Consultant executed a Professional Services Agreement registered at the Office of the Comptroller as Contract No. 2024-PPP039 pursuant to which the Consultant agreed to act as a Third-Party Procurement Office ("3PPO"):

**WHEREAS**, upon the expiration of the original agreement, the Parties deemed it advisable to continue the Consultant's services, and entered into a subsequent Professional Services Agreement, executed on July 31, 2024, registered with the Office of the Comptroller under Contract No. 2025-PPP021, with a term extending through June 30, 2025;

**WHEREAS**, on June 4, 2025, the Consultant submitted to the Authority its proposal for Fiscal Year 2025-2026 (the "Proposal"), to continue serving as the 3PPO and carry out procurement processes and provide contract management services in connection with PREPA Transactions. (Attached hereto as **Appendix B**).

**WHEREAS**, the Consultant is engaged in the business of providing the required services and is willing to continue to provide such services;

**NOW, THEREFORE**, in consideration of the mutual undertakings set forth herein, the

3

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

Parties, intending to be legally bound, covenant and agree as follows:

## TERMS AND CONDITIONS

### ARTICLE I
### SCOPE; TERM; ADVICE AND RECOMMENDATIONS; SUBCONTRACTING

### Section 1.1    Scope of Services.

**1.1.1**   Subject to the terms and conditions of this Agreement, the Consultant's services shall be consistent with the provision of the deliverables, tasks, and services described in the Proposal, as set forth herein as **Appendix A,** and such other tasks delegated to it by the Authority and within the capabilities of the Consultant.

**Section 1.2  Term.** This Agreement shall be in effect from its execution, until June 30, 2026 (the "Expiration Date"), provided that the Expiration Date may be extended by amendment executed in writing by both Parties.

**Section 1.3  Advice and Recommendations.** The services to be provided under this Agreement may include advice and recommendations for the benefit of PREPA, the Authority and/or the Government of Puerto Rico, but the Consultant will not make any decisions on behalf of the Authority, PREPA, or the Government of Puerto Rico in connection with the implementation of such advice and recommendations.


Initial

### Section 1.4    Subcontracting.

**1.4.1**   The Consultant is the primary service provider and responsible for all work performed, including any work performed by subcontractors. The Consultant recognizes that its subcontractors are subject to the same requirements applicable to Consultant.

**1.4.2**   The Consultant shall not subcontract the services under this Agreement or engage third-party experts or other persons to render the services under this Agreement, without prior written authorization from the Authority; provided, however, that the Authority hereby acknowledges and accepts that the Consultant may subcontract Quest Business Development and Finance, LLC. Any request to engage a subcontractor shall specify the services or matters in which the subcontractor would participate.

**1.4.3**   The Authority's consent to the Consultant's right to subcontract any of the services under this Agreement shall not relieve the Consultant of any of its duties or obligations under this Agreement, and Consultant shall indemnify and hold the Authority harmless from any claims or payments arising from or relating to compensation owed to any such subcontractor.

4

## ARTICLE II
## COMPENSATION; INVOICES; OUT OF POCKET EXPENSES

**Section 2.1    Professional Fees.** LUMA and the Authority intend to enter into a Memorandum of Understanding ("LUMA MOU") pursuant to which LUMA will agree to use PREPA's funds to pay any and all fees, costs, and expenses payable to the Consultant under this Agreement. Similarly, Genera and the Authority intend to enter into a Memorandum of Understanding in substantially similar form to the LUMA MOU ("Genera MOU"). Upon execution, the LUMA MOU and the Genera MOU shall be incorporated into this Agreement as **Appendix E** and **Appendix F**, respectively, and shall form an integral part of this Agreement as if fully set forth herein.

Either LUMA or Genera, as applicable, acting on behalf of PREPA, as PREPA's agents, shall compensate the Consultant for the actual time incurred in delivering the services and completing the tasks, assignments and deliverables set forth in **Appendix A**, at the applicable hourly rates provided in **Appendix B** of this Agreement. Should the Consultant assign an additional team member not included in **Appendix B** to attend the Authority's matters, the Consultant shall promptly send the Authority an amended schedule to include such person's name, position, and hourly rate, and request written approval from the Authority for such amended schedule.

**Section 2.2.    Agreement Ceiling.** Provided the Consultant complies with all the terms and conditions of this Agreement and all applicable laws and regulations, LUMA or Genera, acting as PREPA's agents, as established in the MOU, agree to pay the Consultant for services rendered under this Agreement as provided in **Appendix A and Appendix B**. The total amount payable under this Agreement shall not exceed **ONE MILLION FIVE HUNDRED EIGHTY THOUSAND THREE HUNDRED FORTY-TWO DOLLARS AND TWENTY-NINE CENTS ($1,580,342.29)**, including reimbursable expenses, unless otherwise agreed to in writing by the Parties. If the Consultant exceeds any Task Order Ceiling or the Agreement Ceiling, it does so at its own risk. The Task Order Ceiling may only be modified in writing- signed by each Party's authorized representative and the Agreement Ceiling may only be modified through an amendment to this Agreement.

**Section 2.3.    Invoicing.**

2.3.1    The Consultant will submit detailed monthly invoices to the Authority showing all services provided and expenses incurred during the invoice period using the rates set forth in **Appendix B** and the applicable Task Order within 30 days of performing the services being provided. The Invoices shall be divided individually by PREPA system: (1) procurement activities in support of PREPA under the T&D OMA (the "T&D Invoices"), and (2) procurement activities in support of PREPA under the LGA OMA (the "LGA Invoices").

2.3.2    Invoices must have the following information for payment to be made: invoice number; invoice date; Task Order reference; date(s) the services were provided and expenses incurred; detailed description of the service provided (or milestones

5

completed/delivered, as applicable); and the itemized invoice amount. All invoices containing expenses must include supporting documentation for each expense.

**2.3.3**   Invoices must comply with the *Authority's Billing Guidelines* attached hereto as **Appendix C**, and must detail the activities performed by each individual, segregated by task and the contract procured or managed (such that the cost of the work can be tied to the procurement process or contract for which the cost was incurred), and specify the number of hours worked and hourly rates, with the total cost per person for the reporting period.

**2.3.4**   The Authority will not honor invoices submitted after one hundred twenty (120) days of services having been rendered. The Consultant accepts and agrees to this requirement, and understands that if it does not comply accordingly, it waives its right to payment for rendered services covered by such invoices. The Authority reserves the right to review the invoices and if they comply with the requirements set forth in this Agreement, will authorize payment.

**2.3.5**   Each invoice must be certified as accurate by an authorized representative of the Consultant.

**2.3.6**   Each invoice must include a written certification stating that no officer or employee of PREPA, Operators, or the Authority will derive or obtain any benefit or profit of any kind from this Agreement, with the acknowledgment that invoices which do not include this certification will not be paid. This certification must read as follows:

> **"We certify under penalty of nullity that no public servant of the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority or the Operators, as defined in the Professional Services Agreement, will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for services provided is the agreed-upon price that has been negotiated with an authorized representative of the Puerto Rico Public-Private Partnerships Authority. The total amount shown on this invoice is true and correct. The services have been rendered, and no payment has been received in respect thereof."**

**2.3.7**   All invoices shall be in portable document format (PDF), signed and transmitted by electronic mail transmission to the following electronic mail address: InvoiceP3@p3.pr.gov.

Initial

6

**Section 2.4  Cost Oversight.**  The Consultant agrees to notify the Authority within five (5) working days after having reached 75% of the Agreement Ceiling. The written notification shall include a report of projected services for the duration of the Agreement that entail a possible increase to the limit established and a request addressed to the Executive Director to increase said amount. The Consultant hereby agrees to comply with these responsibilities with respect to the notification requirements and the report to be submitted. Furthermore, the Consultant understands and accepts that it may not exceed the amount established in the Agreement unless and until the Agreement is amended accordingly and the increase is authorized by the Authority. If the Consultant does not comply with the amendment requirement, it waives its rights to payment for services rendered, even after they have been provided. The Authority acknowledges and understands that to the extent services are required of the Consultant beyond the Agreement Ceiling or Task Order Ceiling, the Consultant cannot provide those additional services until the Authority agrees to additional compensation and expenses, and in the case of the Agreement Ceiling, until this Agreement is amended in writing accordingly.

**Section 2.5  Prohibition on Retroactive Contracting.**  The Consultant acknowledges and agrees that retroactive contracting is contrary to government contracting requirements and that the Authority will not issue retroactive payments. The Consultant acknowledges and agrees that Services rendered before the effective date of this Agreement or an applicable Task Order, or before this Agreement is duly registered at the Puerto Rico Comptroller's Office, as applicable, will not be paid.

**Section 2.6  Payment.**

2.6.1  Consultant acknowledges and agrees that payment shall not be made until appropriate and quality deliverables are received pursuant to the Task Orders issued by the Authority, and documentation is provided and determined to be correct, accurate, and consistent with the Agreement, Task Order, Government of Puerto Rico, and if applicable, federal reimbursement requirements. Consultant will be paid within a reasonable time after invoice acceptance. Consultant acknowledges and agrees that payment may be withheld of any amounts that are disputed by the Authority in good faith pending resolution of the dispute.

2.6.2  The Consultant agrees to submit checking account transfer data to the Authority to facilitate future payments by means of electronic transfers.

2.6.3  The Consultant further acknowledges and agrees that Operators, as PREPA's agents, and the Authority have the right to recover any erroneous payment, including but not limited to, any overpayment, duplicate payment and/or any other payment not authorized by law, regulation, and/or this Agreement. The Consultant agrees to promptly return any erroneous payment to Operators, as PREPA's agents, upon receipt of a written notice. In addition, if the Consultant becomes aware of an erroneous payment made by Operators as PREPA's agents, the Consultant shall immediately notify the Authority's management and request instructions to proceed accordingly. The Consultant acknowledges and agrees that PREPA, Operators and

7

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

the Authority reserve the right to make the necessary adjustments in any remaining payments to the Consultant until any erroneous amount paid is recovered.

2.6.4    All disbursements for payments of the T&D invoices shall be made by T&D Operator directly to the Consultant by drawing funds from time to time from the 108502350 FirstBank Account under the T&D O&M Agreement or such other accounts as agreed between the T&D Operator and the Authority. All disbursements for payments of the LGA Invoices shall be made by the LGA Operator directly to the 3PPO by drawing funds from time to time from an account to be agreed between Genera and the Authority.

### Section 2.7    Travel and Out of Pocket Expenses

2.7.1    The Consultant will be reimbursed on a monthly basis for out-of-pocket expenses directly related to the services rendered under this Agreement, including, but not limited to, travel and lodging, filing fees, taxi fares, and delivery expenses.

2.7.2    Any expense for which a reimbursement is requested shall be reasonable and necessary, and any expenses exceeding FIVE HUNDRED DOLLARS ($500.00) individually shall be authorized in writing and in advance by the Authority. Expenses which do not comply with this provision will not be reimbursed. Under no circumstances will expenses for alcoholic beverages be reimbursed.

2.7.3    Any invoice including expenses must be accompanied by the corresponding invoice and receipt and must specify the relation of the expense to the services rendered. All reimbursements must be for actual expenses incurred and must be billed at cost.

Initial

8

**ARTICLE III**
**INFORMATION; CONFIDENTIALITY**

Section 3.1    <u>Information Provided by the Consultant</u>. No information or advice provided or materials prepared by the Consultant as a result of its activities hereunder may be disclosed, in whole or in part, or summarized, excerpted from or otherwise referred to a third party outside of the Executive Branch (other than, on a confidential, non-reliance, need to know basis, to PREPA and the Authority's employees, advisors, counsel and other representatives) without the Consultant's prior written consent, which shall be conditioned on the execution of a release letter in the form provided by Consultant unless compelled by law or court order. In addition, the Authority agrees that any reference to the Consultant in any press release or communication is subject to the Consultant's prior written approval, which may be given or withheld in its reasonable discretion, for each such reference. the Authority shall retain the right to use, refer, share, or provide to any third party, as the Authority may determine, the results of any: posting, analyses, reports, and other documentation resulting from the Services performed by the Consultant that were provided to the Authority under this Agreement.

Section 3.2    <u>Confidential Information.</u>

3.2.1    The Consultant acknowledges the proprietary and confidential nature of all internal, non-public, information systems, financial, and business information relating to procurements to be carried out by Operators on behalf of PREPA, Operators, the Authority, and the Government of Puerto Rico, its agencies, corporations, or municipalities, now or hereafter provided to the Consultant (the "<u>Confidential Information</u>").

3.2.2    The Consultant and its Representatives (as defined below) shall keep in confidence in accordance with the terms this Agreement all such Confidential Information and shall not, except as otherwise set forth herein, make of public or disclose any of said information without the previous written consent of the Authority. The Consultant and its Representatives may use the Confidential Information in connection with providing the services contemplated by this Agreement. The term Confidential Information shall not include information which (i) is previously known to the Consultant and/or its Representatives, (ii) is available to the public prior to the time of disclosure hereunder, (iii) subsequent to the time of disclosure hereunder, becomes available to the public other than as a result of a breach of this Agreement by the Consultant, (iv) subsequent to the time of disclosure hereunder becomes available to the Consultant or its Representatives by a third party who, to the knowledge of the Consultant, is under no obligation to keep the information confidential, (v) is independently developed by the Consultant without reference to the Confidential Information or (vi) is approved for disclosure or release by the Authority.

3.2.3    Notwithstanding the above, the Consultant and/or its Representatives, as applicable, may disclose Confidential Information to (a) the Consultant's affiliates and approved subcontractors and their respective directors, officers, employees,

9

agents, Consultants, advisors and/or representatives (such individuals receiving Confidential Information hereunder, collectively, the "Representatives") who need to know such Confidential Information to fulfill the purposes of this Agreement, provided that such persons shall have been advised of the confidential nature of such materials and information and the Consultant shall direct them to treat as confidential such information and to return all materials to the Consultant upon request; provided, that the Consultant shall be responsible for any breach of this Agreement by its Representatives and (b) pursuant to a request or requirement by law, regulation or governmental, regulatory or self-regulatory authority or legal process (including by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or other process) to provide such Confidential Information.

3.2.4    The Consultant will promptly, upon the written request of the Authority, deliver to the Authority, or at the Authority's election, destroy all Confidential Information; provided, however, that the Consultant and its Representatives may retain copies of Confidential Information, subject to the confidentiality terms of this Agreement, in accordance with their respective internal record retention policies for legal, compliance or regulatory purposes or to establish the rights of the Consultant and its Representatives under this Agreement.

3.2.5    This provision shall survive the termination or expiration of this Agreement for a period of two (2) years.

**ARTICLE IV**
**TERMINATION AND REMEDIES**

**Section 4.1    Remedies for Breach.**

4.1.1    If any work performed by the Consultant fails to meet the requirements of the Contract, any other applicable standards, codes or laws, or otherwise breaches the Contract, the Authority may in its sole discretion:

a.    elect to have the Consultant re-perform or cause to be re-performed at Consultant's sole expense, any of the work which failed to meet the requirements of the Contract;

b.    hire another consultant to perform the work and deduct any additional costs incurred by the Authority or Operators, as agents of PREPA as a result of substituting consultants from any amounts due; or

c.    pursue and obtain any and all legal or equitable remedies.

4.1.2    This Section shall in no way be interpreted to limit the Authority's right to pursue and obtain any and all other available legal or equitable remedies against Consultant.

**Section 4.2    Termination for Cause**

10

**4.2.1.1** The Consultant's improper or inept performance of services under this Contract;

**4.2.1.2** The Consultant's failure to comply with the terms and provisions of this Contract;

**4.2.1.3** The Consultant's submission of invoices, data, statements and/or reports that are incorrect, incomplete, and/or false;

**4.2.1.4** In the Authority's sole discretion, if termination is necessary to protect the health and safety of its customers or clients;

**4.2.1.5** If the Consultant becomes or is declared insolvent or bankrupt, or is the subject of any proceedings relating to its liquidation or insolvency or for the appointment of a receiver or similar officer for it, has a receiver of its assets or property appointed or makes an assignment for the benefit of all or substantially all of its creditors, institutes or causes to be instituted any proceeding in bankruptcy or reorganization or rearrangement of its affairs, enters into an agreement for the composition, extension, or adjustment of all or substantially all of its obligations, or has a material change in its key employees; and/or g. The Consultant's inability to perform under this Contract due to judicial order, injunction or any other court proceeding.



Initial

**4.2.2** In the event of termination, the Authority may finish the work by whatever method it may deem expedient. In such cases, the Consultant shall only be entitled to receive payment for work satisfactorily completed prior to the termination date, subject to any setoffs for the cost of completing the work and for reimbursement of damages incurred. If the expense incurred by the Authority to finish the work exceeds the unpaid balance on this Contract, the Consultant shall pay the difference to the Authority. If the Authority makes a determination to hold the Consultant in default and terminate the Contract for cause and it is subsequently determined that the Authority's default determination was improper, unwarranted, or wrongful, then any such termination shall be deemed for all purposes to be a termination for convenience with the same rights and obligations as provided in Clause 4.3 of this Agreement. The Consultant agrees that it shall be entitled to no damages, allowances or expenses of any kind other than as provided in this Contract in connection with such termination, and does expressly waive any and all claims for consequential damages, loss of bonding capacity, destruction of business, unabsorbed home office overhead, lost profit and other such losses or damages.

**Section 4.3     Termination with or without Cause.** Notwithstanding any provision to the contrary in this Agreement, the Authority shall have the right to terminate this Agreement without cause by providing the Consultant thirty (30) days' notice by registered mail, return receipt requested, or overnight express mail. Any provisions of this Agreement which expressly or by implication are intended to survive its termination or expiration will survive and continue to bind the Parties. The Authority shall also have the right to terminate this Agreement immediately, without prior notice, if the Consultant incurs in negligence, abandonment of its obligations and/or breach of the terms of the Agreement.

The Consultant may terminate this Agreement if it determines any part of the services rendered hereunder would be in conflict with law or professional standards.

11

**Section 4.4     Termination for Convenience.**   To the extent required by Act No. 3-2017 and OE-2021-003, or other applicable law, order or circular letter, the Authority, the Office of the Chief of Staff shall have the authority to terminate this Agreement at any time; provided that in any such event Consultant shall be entitled to payment in full for the Services provided by it through the date of termination. Upon such termination, Consultant waives any claims for damages from the termination including, without limitation, any and all consequential claims. Consultant's sole right and remedy shall be to recover payment for any authorized work satisfactorily completed through the termination date.

**Section 4.5     Termination by the Office of the Governor's Chief of Staff.** The Office of the Governor of Puerto Rico's Chief of Staff has the authority to terminate this Agreement at any time on behalf of the Authority.

**Section 4.6     Payment.** Upon any termination or expiration of this Agreement, LUMA or Genera, as applicable, acting as PREPA's agent shall promptly pay the Consultant any accrued but unpaid fees hereunder and shall reimburse the Consultant for any unreimbursed expenses that are reimbursable hereunder.

**Section 4.7     Rights and Obligations.**   Upon any termination or expiration of this Agreement, the rights and obligations of the Parties shall terminate, except for the rights and obligations that shall survive the termination or expiration of this Agreement.


Initial

## ARTICLE V
## INDEMNIFICATION; INSURANCE

**Section 5.1  Indemnification and Liability.**

5.1.1   If Operators, acting as PREPA's agents or the Authority suffer any damages, losses, liabilities, and expenses (including reasonable attorneys' fees and expenses) (collectively, a "Loss" or "Losses") (regardless of whether such Loss is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose, statutory liability or otherwise) as a result of the Consultant's breach of its obligations hereunder, the Consultant shall defend, indemnify and hold harmless Operators and the Authority and any entity of the Executive Branch from and against such Losses.

5.1.2   In no event will any Party be liable to another Party for incidental, consequential, special, or punitive damages (including loss of profits, data, business or goodwill, or government fines, penalties, taxes, or filing fees), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose, statutory liability or otherwise, and even if advised of the likelihood of such damages. The Consultant hereby agrees to use reasonable efforts to mitigate any and all damages and other Losses to Operators and/or the Authority and any entity of the Executive Branch. To the extent permitted by law, all claims and Losses relating to, directly or indirectly, or arising from this

12

Agreement, however caused, regardless of the form of action and on any theory of liability, including contract, strict liability, negligence, or other tort, shall be brought under and shall be subject to the terms of this Agreement.

### Section 5.2  Insurance.

5.2.1    The Consultant represents that as of the date of execution of this Agreement, it maintains professional liability insurance to provide for errors, omissions and negligent acts that may arise from the services rendered under this Agreement in the minimum amount of ONE MILLION DOLLARS ($1,000,000.00).

5.2.2    The Consultant also represents that it maintains Commercial General Liability insurance in the minimum amount of ONE MILLION DOLLARS ($1,000,000.00). It shall be the Consultant's obligation to submit to the Authority the corresponding certifications from its insurance company evidencing such coverages. The certifications provided must identify Operators and the Authority as Additional Insured.

5.2.3    With respect to the Commercial General Liability insurance policy, the certification to be provided by the Consultant must identify Operators and the Authority as Additional Insured and include the following cancellation notice:

> "CANCELLATION CLAUSE: It is understood and agreed that in the event of cancellation of this policy at the request of the insurance company, thirty (30) days written notice shall be given to the above-mentioned additional insured, PUERTO RICO PUBLIC PRIVATE PARTNERSHIPS AUTHORITY and LUMA ENERGY SERVCO, LLC AND GENERA PR, LLC. However, it is agreed that if cancellation is due to non-payment of premium, ten (10) days written notice will be given".

5.2.4    It shall be the Consultant's obligation to submit to the Authority the corresponding certifications from its insurance company evidencing the abovementioned insurance coverage. The insurance policies required herein must remain in effect during the term of this Agreement, including any amendments to extend said term.

Initial

13

## ARTICLE VI
## APPLICABLE LAWS OF PUERTO RICO

**Section 6.1    Interagency Services Clause.** All Parties acknowledge and agree that the contracted services may be provided to any entity of the Executive Branch with which the Authority subscribes an interagency agreement or by direct disposition of the Office of the Chief of Staff of the Governor of Puerto Rico; provided, that the provision of services by the Consultant to such entity does not pose a conflict that would prevent the Consultant from providing services to such entity. These services will be provided under the same terms and conditions regarding work hours and/or compensation as set forth in this Agreement. For purposes of this section, the term "entity of the Executive Branch" includes all agencies of the Government of Puerto Rico, as well as its instrumentalities, public corporations, and the Governor's Office.

**Section 6.2    Source of Funds.** All disbursements for such payments shall be made from LUMA and Genera's accounts, respectively.

**Section 6.3    Professional Standards.** The Consultant acknowledges and accepts that, to the extent applicable, it is aware of Puerto Rico's laws and regulations regarding ethics and assumes responsibility for its own actions. The Consultant agrees to act with integrity, to perform its duties in compliance with applicable federal and Commonwealth law, and otherwise acknowledges that in executing its professional services pursuant to this Agreement it has the obligation to exhibit complete loyalty towards Operators, acting as PREPA's agents, and the Authority. The Consultant shall avoid even the appearance of the existence of conflicting interests.


Initial

**Section 6.4    Anti-Corruption Provisions.**

**6.4.1**    The Contractor certifies that it has received a copy of and agrees to comply with Act No. 2-2018, known as the Anti-Corruption Code for the New Puerto Rico ("Act No. 2-2018"), and with the Puerto Rico Government Ethics Law of 2011, Act No. 1-2012, as amended ("Act No. 1-2012").

**6.4.2**    The Contractor shall furnish a sworn statement to the effect that neither the Contractor nor any president, vice president, executive director or any member of a board of officials or board of directors, or any person performing equivalent functions for the Contractor has been convicted of or has pled guilty to any of the crimes listed in Article 6.8 of Act No. 8-2017, as amended, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico ("Act No. 8-2017"), or any of the crimes included in Act No. 2-2018.

**6.4.3**    The Contractor hereby certifies that it has not been convicted in Puerto Rico or United States Federal Court under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, for any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, as amended, known as the Puerto Rico Penal Code ("Act No. 146-2012"), any of the crimes typified in Act No. 2-2018, or any other felony that involves misuse of public funds or property, including, but not limited to, the crimes mentioned in Article 6.8 of Act No. 8-2017.

14

Docusign Envelope ID: 1314C065-74C8-444D-97C2-BC61643B8745

**6.4.4**  The Authority shall have the right to terminate this Agreement in the event the Contractor is convicted in Puerto Rico or United States Federal Court under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, any of the crimes listed in Articles 250 through 266 of Act No. 146-2012, any of the crimes typified in Act No. 2-2018, or any other felony that involves misuse of public funds or property, including, but not limited to, the crimes mentioned in Article 6.8 of Act No. 8-2017.

**6.4.5**  It is expressly acknowledged that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute sufficient cause for the Authority to terminate this Agreement immediately, without prior notice, and the Contractor will have to reimburse PREPA any amount of money received under this Agreement.

**6.4.6**  If the status of the Contractor or any of its any president, vice president, executive director, or any member of a board of officials or board of directors, or any person performing equivalent functions for the Contractor with regards to the charges previously mentioned should change at any time during the term of the Agreement, the Contractor shall notify in writing to the Authority immediately. The failure to comply with this responsibility constitutes a violation of this Clause and shall result in the remedies mentioned previously.

### Section 6.5  Conflicts of Interest.



Initial

**6.5.1**  All Parties hereby declare that, to the best of their knowledge, as of the date hereof, no public officer or employee of the Government of Puerto Rico, or any of its agencies, instrumentalities, public corporations or municipalities or employee of the Legislative or Judicial branches of the Government has any direct or indirect interest in the present Agreement. The Consultant certifies that neither it, nor any of its directors, executives, officers, or employees, offered or paid, directly or indirectly, any commissions, referrals, contracts, or any other consideration having an economic value, to a third party as a condition for obtaining this Agreement or to influence in any way its execution. In addition, the Consultant certifies that it shall not pay any commissions, make any referrals, execute any contracts, or provide any other consideration having an economic value, to a third party for the services to be rendered under this Agreement, except for any subcontracts authorized by the Authority in accordance with the provisions established herein.

**6.5.2**  The Consultant certifies that none of its partners, directors, executives, officers, and employees receives salary or any kind of compensation for the delivery of regular services by appointment (or otherwise) in any agency, instrumentality, public corporation, or municipality of the Government of Puerto Rico.

**6.5.3**  The Consultant certifies that, at the time of the execution of this Agreement, it does not have nor, to its knowledge, does it represent anyone who has interests that are in conflict with the Authority. If such conflicting interests arise after the execution

15

of this Agreement, the Consultant shall notify the Authority during a period of five (5) business days from the day the Consultant learned of such conflict of interest, to determine the actions needed to resolve such potential conflict.

6.5.4   The Consultant acknowledges and agree that, when engaged to perform services in connection with the Puerto Rico Electric Power Authority Transactions contemplated under Act No. 120-2018, as amended, Consultant will not hold any position nor have a financial interest in the natural or legal entity selected as Consultant (as defined in Act No. 29), with regards to the Consultant's business in Puerto Rico, during the year after the Agreement expires. Failure to comply with this clause will result in the immediate repayment of all fees paid under the Agreement.

6.5.5   The Consultant certifies that at the time of execution of this Agreement it has entered the following contracts with agencies, public corporation, municipalities and/or instrumentalities of the Government of Puerto Rico, as listed below, and the performance of the services rendered thereunder does not conflict with the terms and conditions set forth in this Agreement. The Consultant acknowledges and accepts that the failure to list any current contractual relationship with any governmental entity may result in the termination of this Agreement if required by the Authority:

1.  Puerto Rico Electric Power Authority (PREPA)
2.  Administración de Servicios de Salud Mental y contra la Adicción (ASSMCA)
3.  Municipality of Ponce- Grant Management for Comprehensive Disaster Recovery

6.5.6   The Consultant certifies that they have read and acknowledge the provisions of the "Code of Ethics for contractors, suppliers, and incentives applicants of the Government of Puerto Rico" included as part of the dispositions of Act No. 2-2018. Specifically, the Consultant acknowledges that, in accordance with Article 3.2(h) of Act No. 2-2018, they may not intervene in matters that could result in a conflict of interest or that have the appearance of it. In that regard, the Consultant acknowledges that they have read and know the provisions of Memorandum No. OSG-2025-001 issued by the Office of the Chief of Staff of the Governor of Puerto Rico, and certifies and guarantees that, during the term of the Agreement, it shall not, nor its shareholders, officers, or employees, engage in direct or indirect lobbying activities, as defined in Memorandum No. OSG-2025-001, before the Government entity that is a party to this Agreement, or any of its ascribed entities. The Consultant acknowledges that is an essential condition of this Agreement, and that if it incurs in a violation of the provisions established in the "Code of Ethics for contractors, suppliers, and incentives applicants of the Government of Puerto Rico" of Act No 2-2018 and/or Memorandum No. OSG-2025-001, it shall be sufficient cause for the

Initial

16

immediate cancellation of this Agreement.

## Section 6.6   Required Certifications.

**6.6.1**   The Consultant will comply with all applicable laws, regulations, and executive orders that regulate the contracting process and requirements of the Government of Puerto Rico, including Act No. 73-2019, as amended, known as the "2019 General Services Administration Act for the Centralization of Purchases of the Government of Puerto Rico" ("Act 73-2019").

**6.6.2**   In compliance with the provisions of Act 73-2019, the Consultant has provided the Authority the Certification of Eligibility of the Unique Registry of Professional Services Providers (known in Spanish as "Certificado de Elegibilidad del Registro Único de Proveedores de Servicios Profesionales" and hereinafter referred to as the "RUP Certification"), issued by the General Services Administration. It is hereby acknowledged that pursuant to the provisions of Article 42 of Act 73-2019, a valid RUP Certification serves as evidence of compliance with the documentation requirements necessary for contracting professional services with the Government of Puerto Rico, particularly those applicable under Act No. 237-2004, as amended, which establishes uniform contracting requirements for professional and Consultant services for the agencies and governmental entities of the Commonwealth of Puerto Rico (3 L.P.R.A. § 8611 et seq.), the Puerto Rico Department of Treasury Circular Letter Number 1300-16-16 issued on January 22, 2016, as amended, which is available at: http://www.hacienda.pr.gov/publicaciones/carta-circular-num-1300-16-16, and the sworn statement before notary public required pursuant to Article 3.3 of Act No. 2-2018. In addition, the RUP Certification substitutes the Single Debt Certification ("Certificación Única de Deuda"), issued pursuant to Act 85-2009, as amended, known in Spanish as "Ley de Certificados y Comprobantes Electrónicos", which serves as evidence of compliance with certifications issued by the Department of Treasury of Puerto Rico, the Department of Labor and Human Resources of Puerto Rico, the Municipal Revenue Collection Center, and ASUME (as defined below).

**6.6.3**   Further, the Consultant hereby certifies, guarantees, acknowledges, and agrees to the following:

**6.6.3.1** The Consultant represents that at the execution of this Agreement, it has submitted income tax returns in Puerto Rico (if required by applicable law) during the past five (5) years. The Consultant also represents that it does not have outstanding debts with the Government of Puerto Rico for income taxes, real or chattel property taxes, unemployment insurance premiums, workers' compensation payments or Social Security for chauffeurs in Puerto Rico and the Administration for the Sustenance of Minors (known by its Spanish acronym as "ASUME").

**6.6.3.2** The Consultant has provided the Authority with a certificate of

Initial

17

incorporation, if required by the Authority, and a Good Standing Certificate issued from the Department of State of Puerto Rico as proof that it has complied with the applicable annual corporation report filing obligations.

6.6.3.3 It is expressly acknowledged that the certifications provided by the Consultant, pursuant to this Section, are essential conditions of this Agreement, and if these certifications are incorrect, the Authority shall have sufficient cause to terminate this Agreement immediately, without prior notice to the Consultant.

6.6.3.4 For purposes of this Agreement, tax debt shall mean any debt that the Consultant, or other parties which the Authority authorizes the Consultant to subcontract, may have with the Government of Puerto Rico for income taxes, real or chattel property taxes, including any special taxes levied, license rights, tax withholdings for payment of salaries and professional services, taxes for payment of interest, dividends and income to individuals, corporations and non-resident accounting firms, for payment of interests, dividends and other earnings shares to residents, unemployment insurance premiums, workers' compensation payments, Social Security for chauffeurs and ASUME.

6.6.3.5 The Consultant shall also be responsible for providing the Authority with the certifications required under this clause from any professional or technical Consultant subcontracted by the Consultant and authorized by the Authority that dedicates twenty-five percent (25%) or more of his or her or its time to provide advisory services related to the Agreement. Such subcontractors shall be considered subcontractors for the purposes of this Clause. Notwithstanding anything herein to the contrary, the Consultant shall have the right to rely conclusively on the aforementioned certifications from government agencies in making the representations in this Clause.

6.6.3.6 Investment Act for the Puerto Rican Industry, Act No. 14-2004, as amended: In compliance with the dispositions of Act No. 14-2004, known as the Investment Act for the Puerto Rican Industry, the Consultant shall use articles extracted, produced, assembled, packaged or distributed by companies with operations in Puerto Rico or distributed by agents established in Puerto Rico while rendering the Services, provided such articles are available.

6.6.3.7 Improvement of Family Assistance and Support for the Elderly. The Consultant also certifies and warrants that it is in compliance with Act No. 168-2000, as amended, known as the "Act for the Improvement of Family Assistance and for the Support of the Elderly." In the event the Consultant is under a court or administrative order directing it to provide financial support or to fulfill any obligation under the mentioned Act, the Consultant further certifies and warrants that it is in compliance with said obligations.

Initial

18

It is expressly acknowledged that this certification is an essential condition of this Agreement. If the certification is not correct in its entirety or in any of its parts, it shall constitute sufficient cause for the Authority to terminate the Agreement immediately, without prior notice to the Consultant.

**6.6.3.8** Financial Oversight and Management Board for Puerto Rico's ("FOMB") Policy for Review of Contracts: The Parties acknowledge that the Contractor has presented to the Authority the certification entitled "Contractor Certification Requirement" required pursuant by FOMB's Policy for Review of Contracts effective as of November 6, 2017, as modified on October 30, 2020, signed by the Chief Executive Officer of the Contractor (or other officer with equivalent position or authority to issue such certifications). A copy of the signed "Contractor Certification Requirement" is included herein as an **Appendix D** to this Agreement.

**6.6.3.9** The Parties hereby acknowledge the requirements and procedures set forth in Administrative Bulletin No. OE-2021-029 issued by the Governor of Puerto Rico, Hon. Pedro R. Pierluisi, on April 27, 2021 ("OE-2021-029") and Circular Letter No. 013-2021 issued on June 7, 2021, by OMB ("CC-013-2021"), applicable to professional services agreements with a maximum amount of $250,000 or more per fiscal year. However, this Agreement arises as a direct result of the procurement process conducted pursuant to the above-mentioned RFP and, accordingly, complies with all requirements and procedures set forth in OE-2021-029 and CC-012-2021.

**6.6.3.10** The Consultant certifies that at the time of the execution of this Agreement, it is not a public company with shares that are traded on a regulated stock exchange. The Consultant certifies that prior to the execution of this Agreement, it has submitted to the Authority a Certification of Legal Entity (known in Spanish as "Certificación sobre Personas Jurídicas").

**Section 6.7** **Withholdings.** The Consultant is an independent contractor and, as such, shall be responsible for the payment of all of its income taxes, its subcontractors, and its individual and employers' withholdings under the applicable tax laws of Puerto Rico or the U.S. Internal Revenue Code. No withholdings or deductions shall be made from payments to the Consultant for services rendered by Consultant, except the special contribution of one point five percent (1.5%) of the gross amounts paid under this Contract, required by Act No. 48-2013, as amended, and income tax withholding applicable under the Puerto Rico Internal Revenue Code of 2011, as amended, and its regulations, if any. In particular, when invoicing, the Consultant will allocate fees between those relating to activities undertaken by the Consultant outside Puerto Rico and constituting gross income from sources without Puerto Rico, and those relating to activities undertaken within Puerto Rico and constituting gross income from sources within Puerto Rico. PREPA or its agents shall forward any required withholdings or deductions to the Secretary of the Treasury of Puerto Rico.

Initial

19

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

**Section 6.8  Registration at the Office of the Comptroller.** No party shall be obliged to comply with the provisions of this Agreement until it is duly registered in the Office of the Comptroller of Puerto Rico pursuant to Act No. 18 of October 30, 1975, as amended.

**Section 6.9    Dispensation.** The Consultant certifies it is not required to obtain a dispensation or waiver in compliance with the applicable laws and regulations of the Government of Puerto Rico prior to or in connection with the execution of this Agreement. The Parties agree that the proven illegality of any of the provisions of this Agreement shall not invalidate it as a whole.

## ARTICLE VII
## GOVERNING LAW; DISPUTE RESOLUTION

**Section 7.1  Governing Law.** This Agreement and any dispute relating to the services hereunder shall be governed, construed, interpreted, and enforced in accordance with the laws of the Government of Puerto Rico.

**Section 7.1  Dispute Resolution.** The Parties agree that any dispute, claim or controversy directly or indirectly relating to or arising out of this Agreement, the termination or validity of this Agreement, any alleged breach of this Agreement, the engagement contemplated by this Agreement or the determination of the scope of applicability of this Agreement shall be brought only in the Courts of First Instance of the Commonwealth of Puerto Rico or in the United States District Court for the District of Puerto Rico. The Authority and the Consultant also agree that service of process may be effected through next-day delivery using a nationally-recognized overnight courier or personally delivered to the addresses set forth or referred to in this Agreement. In any claim, all of the costs and the reasonable attorneys' fees of the prevailing party (as determined by the court in such claim) shall be borne by the party who did not prevail. The Authority and the Consultant further agree that a final, non-appealable judgment in respect of any claim brought in any such court shall be binding and may be enforced in any other court having jurisdiction over the party against whom the judgment is sought to be enforced.

## ARTICLE VIII
## FEDERAL CONTRACTING REQUIREMENTS

**Section 8.1  Equal Employment Opportunity**

**8.1.1**  During the performance of this contract, the contractor agrees as follows:

1. The Contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, sexual orientation, gender identity, or national origin. The Contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, sexual orientation, gender identity, or national origin. Such action shall include, but not be limited to the following: Employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and

20

selection for training, including apprenticeship. The Contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this non-discrimination clause.

2. The Contractor will, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, sexual orientation, gender identity, or national origin.

3. The Contractor will not discharge or in any other manner discriminate against any employee or applicant for employment because such employee or applicant has inquired about, discussed, or disclosed the compensation of the employee or applicant or another employee or applicant. This provision shall not apply to instances in which an employee who has access to the compensation information of other employees or applicants as a part of such employee's essential job functions discloses the compensation of such other employees or applicants to individuals who do not otherwise have access to such information, unless such disclosure is in response to a formal complaint or charge, in furtherance of an investigation, proceeding, hearing, or action, including an investigation conducted by the employer, or is consistent with the Contractor's legal duty to furnish information.

4. The Contractor will send to each labor union or representative of workers with which he has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the said labor union or workers' representatives of the Contractor's commitments under this section and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

5. The Contractor will comply with all provisions of Executive Order 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

6. The Contractor will furnish all information and reports required by Executive Order 11246 of September 24, 1965, and by rules, regulations, and orders of the Secretary of Labor, or pursuant thereto, and will permit access to his books, records, and accounts by the administering agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders.

7. In the event of the Contractor's noncompliance with the non-discrimination clauses of this contract or with any of the said rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the Contractor may be declared ineligible for further Government contracts or federally assisted construction contracts in accordance with procedures authorized in Executive Order 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order 11246 of September 24, 1965, or by rule, regulation, or order of the Secretary of Labor, or as otherwise provided by law.

8. The Contractor will include the portion of the sentence immediately preceding paragraph (1) and the provisions of paragraphs (1) through (8) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to section 204 of Executive Order 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The Contractor will take such action with respect to any subcontract or purchase order as the administering agency may direct as a means of enforcing such provisions, including sanctions for noncompliance.

8.1.2    Provided, however, that in the event a Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the administering agency, the Contractor may request the United States to enter into such litigation to protect the interests of the United States.

8.1.3    The Authority further agrees that it will be bound by the above equal opportunity clause with respect to its own employment practices when it participates in federally assisted construction work: *Provided,* that if the Authority so participating is a State or local government, the above equal opportunity clause is not applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under the contract.

8.1.4    The Authority agrees that it will assist and cooperate actively with the administering agency and the Secretary of Labor in obtaining the compliance of Contractors and subcontractors with the equal opportunity clause and the rules, regulations, and relevant orders of the Secretary of Labor, that it will furnish the administering agency and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist the administering agency in the discharge of the agency's primary responsibility for securing compliance.

8.1.5    The Authority further agrees that it will refrain from entering into any contract or contract modification subject to Executive Order 11246 of September 24, 1965, with a Contractor debarred from, or who has not demonstrated eligibility for, Government contracts and federally assisted construction contracts pursuant to the Executive Order and will carry out such sanctions and penalties for violation of the equal opportunity clause as may be imposed upon Contractors and subcontractors by the administering agency or the Secretary of Labor pursuant to Part II, Subpart D of the Executive Order. In addition, the Authority agrees that if it fails or refuses to comply with these undertakings, the administering agency may take any or all of the following actions: Cancel, terminate, or suspend in whole or in part this grant (contract, loan, insurance, guarantee); refrain from extending any further assistance to the applicant under the program with respect to which the failure or refund occurred until satisfactory assurance of future compliance has been received from such applicant; and refer the case to the Department of Justice for appropriate legal proceedings.

Initial

22

**Section 8.2    Contract Work Hours and Safety Standards Act (40 U.S.C. 3701–3708)**

**8.2.1**    *Overtime requirements.* No Contractor or subcontractor contracting for any part of the contract work which may require or involve the employment of laborers or mechanics shall require or permit any such laborer or mechanic in any workweek in which he or she is employed on such work to work in excess of forty hours in such workweek unless such laborer or mechanic receives compensation at a rate not less than one and one-half times the basic rate of pay for all hours worked in excess of forty hours in such workweek.

**8.2.2**    *Violation; liability for unpaid wages; liquidated damages.* In the event of any violation of the clause set forth in paragraph (b)(1) of this section the Contractor and any subcontractor responsible therefor shall be liable for the unpaid wages. In addition, such Contractor and subcontractor shall be liable to the United States (in the case of work done under contract for the District of Columbia or a territory, to such District or to such territory), for liquidated damages. Such liquidated damages shall be computed with respect to each individual laborer or mechanic, including watchmen and guards, employed in violation of the clause set forth in paragraph (b)(1) of this section, in the sum of $27 for each calendar day on which such individual was required or permitted to work in excess of the standard workweek of forty hours without payment of the overtime wages required by the clause set forth in paragraph (b)(1) of this section. 3. *Withholding for unpaid wages and liquidated damages.* The (write in the name of the Federal agency or the loan or grant recipient) shall upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld, from any moneys payable on account of work performed by the Contractor or subcontractor under any such contract or any other Federal contract with the same prime Contractor, or any other federally-assisted contract subject to the Contract Work Hours and Safety Standards Act, which is held by the same prime Contractor, such sums as may be determined to be necessary to satisfy any liabilities of such Contractor or subcontractor for unpaid wages and liquidated damages as provided in the clause set forth in paragraph (b)(2) of this section.

**8.2.3**    *Subcontracts.* The Contractor or subcontractor shall insert in any subcontracts the clauses set forth in paragraph (1) through (4) of this section and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime Contractor shall be responsible for compliance by any subcontractor or lower tier subcontractor with the clauses set forth in paragraphs (b)(1) through (4) of this section.

**Section 8.3    Clean Air Act and Federal Water Pollution Control Act.**

**8.3.1**    The Contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq. and the Federal Water Pollution Control Act, as amended, 33 U.S.C. § 1251 et seq.

**8.3.2** The Contractor agrees to report each violation to the Authority and understands and agrees that the Authority will, in turn, report each violation as required to assure notification to the federal funding agency and the appropriate Environmental Protection Agency Regional Office.

**8.3.3** The Contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with federal assistance.

**Section 8.4   Debarment and Suspension.** Federal regulations restrict the Authority from contracting with parties that are debarred, suspended, or otherwise excluded from or ineligible for participation in Federal assistance programs and activities, where the contract is funded in whole or in part with federal funds. Accordingly, a contract or subcontract must not be made with any parties listed on the SAM Exclusions list. SAM Exclusions is the list maintained by the General Services Administration and contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under certain statutory or regulatory authority. The Contractor can verify its status and the status of its principals, affiliates, and subcontractors at www.SAM.gov.

**8.4.1** This contract is a covered transaction for purposes of 2 C.F.R. pt. 180 and 2 C.F.R. pt. 3000. As such, the Contractor is required to verify that none of the Contractor's principals (defined at 2 C.F.R. § 180.995) or its affiliates (defined at 2 C.F.R. § 180.905) are excluded (defined at 2 C.F.R. § 180.940) or disqualified (defined at 2 C.F.R. § 180.935).

**8.4.2** The Contractor shall comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.

**8.4.3** This certification is a material representation of fact relied upon by the Authority. If it is later determined that the Contractor did not comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, in addition to remedies available to the Authority, the Federal Government may pursue available remedies, including but not limited to suspension and/or debarment.

**8.4.4** The bidder or proposer agrees to comply with the requirements of 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C while this offer is valid and throughout the period of any contract that may arise from this offer. The bidder or proposer further agrees to include a provision requiring such compliance in its lower tier covered transactions.

**Section 8.5   Byrd Anti–Lobbying Amendment.** Contractors that apply or bid for an award exceeding $100,000 shall file the required certification at 31 U.S.C. 1352. Each tier shall certify to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of

Congress in connection with obtaining any Federal contract, grant or any other award covered by 31 U.S.C. 1352. Each tier shall also disclose any lobbying with non–Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non–Federal award.

### Section 8.6    Procurement of Recovered Materials.

8.6.1    A non-Federal entity that is a state agency or agency of a political subdivision of a state and its Contractors must comply with Section 6002 of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act. See 2 C.F.R. Part 200, Appendix II, J; and 2 C.F.R. § 200.322.

8.6.2    In the performance of this contract, the Contractor shall make maximum use of products containing recovered materials that are EPA-designated items unless the product cannot be acquired— a. Competitively within a timeframe providing for compliance with the contract performance schedule; meeting contract performance requirements; or at a reasonable price.

8.6.3    Information about this requirement, along with the list of EPA- designated items, is available at EPA's Comprehensive Procurement Guidelines web site, https://www.epa.gov/smm/comprehensive-procurement-guideline-cpg-program.

8.6.4    The Contractor also agrees to comply with all other applicable requirements of Section 6002 of the Solid Waste Disposal Act.

### Section 8.7    Access to Records.

8.7.1    The Contractor agrees to provide PREPA through the Operators, the Authority, the Puerto Rico grant recipient, the federal grant awarding agency, the Comptroller General of the United States, or any of their authorized representatives access to any books, documents, papers, and records of the Contractor which are directly pertinent to this contract for the purposes of making audits, examinations, excerpts, and transcriptions.

8.7.2.    The Contractor agrees to permit any of the foregoing parties to reproduce by any means whatsoever or to copy excerpts and transcriptions as reasonably needed.

8.7.3.    The Contractor agrees to provide the federal grant awarding agency or their authorized representatives access to construction or other work sites pertaining to the work being completed under the contract.

8.7.4.    In compliance with the Disaster Recovery Act of 2018, the Parties acknowledge and agree that no language in this contract is intended to prohibit audits or internal reviews by the Federal Emergency Management Agency ("FEMA") Administrator or the Comptroller General of the United States.

25

**Section 8.8**    <u>Changes.</u> No changes to the scope of work, price, or schedule shall be effective unless made in writing and signed by an authorized representative of each party.

**Section 8.9**    <u>DHS Seal, Logo and Flags.</u> The Contractor shall not use the DHS seal(s), logos, crests, or reproductions of flags or likeness of DHS agency officials without specific FEMA pre-approval. The contractor shall include this provision in any subcontracts.

**Section 8.10**    <u>Compliance with Federal Law, Regulations and Executive Orders.</u> This is an acknowledgement that federal financial assistance will be used to fund all or a portion of the contract. The Contractor will comply with all applicable Federal law, regulations, executive orders, federal grant policies, procedures, and directives.

**Section 8.11**    <u>No Obligation by Federal Government.</u> The Federal Government is not a party to this contract and is not subject to any obligation or liabilities to the non-Federal entity, Contractor, or any other party pertaining to any matter resulting from the contract.

**Section 8.12**    <u>Program Fraud and False or Fraudulent Statements or Related Acts.</u> The Contractor acknowledges that 31 U.S.C. Chap. 38 (Administrative Remedies for False Claims and Statements) applies to the Contractor's actions pertaining to this contract.

**Section 8.13**    <u>Davis–Bacon Act, as amended (40 U.S.C. 3141–3148).</u>



Initial

**8.13.1.** All transactions regarding this contract shall be done in compliance with the Davis-Bacon Act (40 U.S.C. 3141- 3144, and 3146-3148) and the requirements of 29 C.F.R. pt. 5 as may be applicable. The Contractor shall comply with 40 U.S.C. 3141-3144, and 3146-3148 and the requirements of 29 C.F.R. pt. 5 as applicable.

**8.13.2.** Contractors are required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor.

**8.13.3.** Additionally, Contractors are required to pay wages not less than once a week.

**Section 8.14**    <u>Copeland "Anti–Kickback" Act.</u>

**8.14.1.** Contractor. The Contractor shall comply with 18 U.S.C. § 874, 40 U.S.C. § 3145, and the requirements of 29 C.F.R. pt. 3 as may be applicable, which are incorporated by reference into this contract.

**8.14.2.** Subcontracts. The Contractor or subcontractor shall insert in any subcontracts the clause above and such other clauses as the federal grant awarding agency may by appropriate instructions require, and also a clause requiring the subcontractors to include these clauses in any lower tier subcontracts. The prime Contractor shall be responsible for the compliance by any subcontractor or lower tier subcontractor with all of these contract clauses.

**8.14.3.** Breach. A breach of the contract clauses above may be grounds for termination of the contract, and for debarment as a Contractor and subcontractor as provided in 29 C.F.R. § 5.12.

### Section 8.15 Prohibition on Contracting for Covered Telecommunications Equipment or Services.

**8.15.1.** Contractor *and its subcontractors* are prohibited from spending the proceeds of this Agreement on certain telecommunications and video surveillance products and contracting with certain entities for national security reasons as set forth in section 889 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("McCain Act"), and 2 C.F.R. section 200.216. Contractor and its subcontractors shall not use funds paid under this Agreement to fund the purchase, installation, or services of the telecommunications and video surveillance products or to contract with the entities prohibited by section 889 of the McCain Act or 2 C.F.R. section 200.216.

**8.15.2.** *Subcontracts.* The Contractor shall insert the substance of this clause, including this paragraph (b), in all subcontracts and other contractual instruments resulting from this Agreement.

### Section 8.16 Domestic Preference for Procurements.

**8.16.1** As appropriate, and to the extent consistent with law, the contractor should, to the greatest extent practicable, provide a preference for the purchase, acquisition, or use of goods, products, or materials produced in the United States. This includes, but is not limited to iron, aluminum, steel, cement, and other manufactured products.

**8.16.2** For purposes of this clause:
Produced in the United States means, for iron and steel products, that all manufacturing processes, from the initial melting stage through the application of coatings, occurred in the United States.

Manufactured products mean items and construction materials composed in whole or in part of non-ferrous metals such as aluminum; plastics and polymer-based products such as polyvinyl chloride pipe; aggregates such as concrete; glass, including optical fiber; and lumber.

### Section 8.17 Affirmative Socioeconomic Steps. If the Contractor intends to subcontract any portion of the work covered by this Contract, the Contractor must take all necessary affirmative steps to assure that small and minority businesses, women's business enterprises and labor surplus area firms are solicited and used when possible. Affirmative steps must include:

**8.17.1** Providing opportunities for training and employment for lower income residents of the project area and awarding subcontracts to business concerns which provide



Initial

Docusign Envelope ID: 1314C065-74C8-444D-97C2-BC61643B8745

opportunities to low-income residents, as described in 24 C.F.R. part 135 (Section 3 Businesses (SEC3));

**8.17.2** Placing qualified SEC3, small and minority businesses, and women's business enterprises ("MBE/WBE") on solicitation lists;

**8.17.3** Assuring that MBE/WBE/SEC3 are solicited whenever they are potential sources;

**8.17.4** Dividing total requirements, when economically feasible, into smaller tasks or quantities to permit maximum participation by MBE/WBE/SEC3;

**8.17.5** Establishing delivery schedules, where the requirement permits, which encourage participation by MBE/WBE/SEC3 enterprises; and

**8.17.6** Using the services and assistance, as appropriate, of such organizations as the Small Business Administration and the Minority Business Development Agency of the Department of Commerce.


Initial

**Section 8.18    Copyright and Data Rights.** The Contractor grants to Operators, as PREPA's agents, the Authority, and the federal awarding agency a paid-up, royalty-free, nonexclusive, irrevocable, worldwide license in data, materials and other results and proceeds first produced in the performance of this contract ("Work Product") the right to reproduce, publish, or otherwise use Work Product, including the preparation of derivative works, to distribute copies to the public, and to publicly perform and display the Work Product. For data and materials required by the contract but not first produced in the performance of this contract ("Acquired Work Product"), the Consultant will identify and grant to the Authority or acquire on its behalf a license in Acquired Work Product that meets requirements, as determined solely by the Authority, for the Authority to use and to license others to use the Work Product and Acquired Work Product for all PREPA activities and for ongoing use, training, maintenance, and improvement of the resulting technology improvements. Work Product and Acquired Work Product shall include, but not be limited to, data, research, written reports or literary works, software and/or source code, pictures or images, graphics, audiovisual works, sound and/or video recordings. Upon or before the completion of this contract, the Consultant will deliver to the Authority, in formats acceptable to the Authority, copies of Work Product and Acquired Work Product.

### ARTICLE IX
### MISCELLANEOUS

**Section 9.1    Independent Contractor.** The Parties agree that the Consultant's status hereunder, and the status of any agents, employees and subcontractors engaged by the Consultant, shall be that of an independent contractor only and not that of an employee or agent of PREPA or the Authority. The Consultant shall not have any power or right to enter into agreements on behalf of PREPA or the Authority.

**Section 9.2    Assignment.** This Agreement may not be assigned by any party hereto without the prior written consent of the other, to be given in the sole discretion of the party from whom such consent is being requested. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning party.

**Section 9.3    Notice.** Notice required to be given in writing pursuant to any of the provisions of this Agreement shall be mailed by next-day delivery using a nationally-recognized overnight courier or hand-delivered, if to the Consultant, at 1509 López Landrón, PH San Juan, PR 00911, and if to the Authority at the following address:

<u>POSTAL ADDRESS</u>

PO Box 42001
San Juan, PR 00940-2001

<u>PHYSICAL ADDRESS</u>

De Diego Avenue No. 100
Roberto Sánchez Vilella Government Center
Central Building Floor 3
Santurce, PR 00907-2345

**Section 9.4    Patriot Act.** The Consultant hereby notifies the Authority that pursuant to the requirements of the USA PATRIOT Improvement and Reauthorization Act. Pub. L. N 109-177 (Mar. 9, 2006) (the "Patriot Act"), it is required to obtain, verify, and record information that identifies the Authority in a manner that satisfies the requirements of the Patriot Act. This notice is given in accordance with the requirements of the Patriot Act.

**Section 9.5    No Third Party Rights.** This Agreement is solely for the benefit of PREPA the Operators, its agents including the Authority, the Consultant and, to the extent expressly set forth herein, the indemnified persons and no other party shall be a third-party beneficiary to, or otherwise acquire or have any rights under or by virtue of, this Agreement.

**Section 9.6    Entire Agreement.** It is understood that this Agreement is the sole agreement between the Parties with regard to the services covered hereby and supersedes any prior agreements, written or verbal relating to the provision of procurement and contract management services. The Agreement may not be changed orally but may be amended in writing by mutual agreement of the parties.

**Section 9.7    Appendices.** All Appendices are incorporated herein by reference and are expressly made a part of this Agreement. In the event that the terms of the RFP and related documents or the Proposal conflict with other terms of this Agreement, the Agreement terms shall prevail over the RFP, the Proposal and any other documents expressly referenced in this Agreement. Furthermore, in the event of any conflict between the RFP and the Proposal, the terms of the RFP shall prevail over the Proposal.

**Section 9.8    Drafting Responsibility.** This Agreement has been reviewed by each of the signatories hereto and counsel. There shall be no construction of any provision against either Party because this Agreement was drafted by either Party, and the Parties waive any statute or rule of law to such effect.



Initial

29

**Section 9.9** <u>Severability</u>. If any provision hereof shall be held by a court of competent jurisdiction to be invalid, void, or unenforceable in any respect, or against public policy, such determination shall not affect such provision in any other respect nor any other provision hereof.

**Section 9.10** <u>Counterparts</u>. This Agreement may be executed in facsimile or other electronic counterparts, each of which will be deemed to be an original and all of which together will be deemed to be one and the same document.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement on the aforementioned date.

THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY

REGULATORY COMPLIANCE SERVICES CORP.

Signed by:

*Josué A. Colón Ortiz*
ACAE19A8DEF549C
Josué A. Colón Ortiz
Executive Director
Tax Id No. 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

Mariela Quiñones Ramos
Project Manager
Tax Id No. 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

**Appendices:**

Appendix A: Scope of Services
Appendix B: Consultant's Proposal
Appendix C: Billing Guidelines for Consultants
Appendix D: Puerto Rico Contractor Certification Requirement
Appendix E: Memorandum of Understanding between the Authority and LUMA
Appendix F: Memorandum of Understanding between the Authority and Genera

30

## Appendix A
## Scope of Services

When procuring goods and services as agent for PREPA, LUMA and Genera must comply with all applicable Puerto Rico and Federal requirements, such as those relating to actual or apparent conflicts of interest. The Consultant's role as 3PPO is to independently manage procurement activities, as needed, to help ensure that: (i) procurements undertaken by PREPA's agents for PREPA's T&D System and PREPA's LGA are planned, awarded, and managed in a manner that identifies, avoids, mitigates, and/or neutralizes actual or apparent conflicts of interest as early in the procurement process as possible, and (ii) administration of any contract which, consistent with the requirements in the Applicable Procurement Manual, as amended from time to time, may require either full or partial independent third-party oversight. To this end, the Consultant will be required to comply with all applicable state and federal laws, regulations, executive orders, and the Applicable Procurement Manual.

Consultant will provide 3PPO services, which include but are not limited to those described below:

### 1.0 Procurements

In the event that the Applicable Procurement Manual requires the 3PPO's intervention in the procurement processes carried out by LUMA as agent of PREPA for the T&D System or Genera as PREPA's agent for the LGA, the 3PPO will be responsible for the following, among others:

**a.      Tender Preparation:** The 3PPO will prepare the tender documents when required to do so by the Applicable Procurement Manual. The tender documents will set forth the program and technical requirements for the project based on the planning documents.

   Tender documents will include:
      i. Scope of Work; and
      ii. Standards (which will be engineering and construction standards or based on typical industry practices where no applicable standards are available).

**b.      Sourcing Strategy:** Consultant will prepare the sourcing strategy for procurements. The Sourcing Strategy includes:
      i. The approach to market (i.e., RFP, etc.);
      ii. Commercial requirements (bonding, payment schedules based on milestones, etc.);
      iii. Proposal/bid requirements, schedules, etc.;
      iv. A list of key stakeholders who will participate in the evaluation of responses (Evaluation Committee);
      v. A timeline for the process;
      vi. Evaluation criteria and weighting; and
      vii. The contract template that will be used and added to the procurement package, which will follow and comply with the Procurement Manual.

Consultant may also be asked to review Sourcing Strategies it does not develop, consistent with the planning documents.

31

c.  **RFI, RFQ, or other solicitations ("RFx"):** The 3PPO will prepare all RFIs, RFQs and all other types of solicitations. The 3PPO will publicly advertise and solicit responses consistent with the Applicable Procurement Manual to gather a list of companies that may participate in the resulting tender.

  i.  The RFx will: request the submittal by Proponents/Bidders of specific qualifications in accordance with the nature of the need communicated by PREPA's agent; provide potential Proponents/Bidders an opportunity to identify ambiguous, unrealistic, and unduly restrictive requirements; and establish how potential Proponents/Bidders will be evaluated (e.g., competency, safety, prior work experience, financial health, capacity, independence, and other relevant factors for the scope of work).

d.  **Proposer/Bidder Pre-Qualification:** The RFx responses will be reviewed and evaluated by the 3PPO based on criteria established in the RFx.

e.  **Tender Final Review:** Upon pre-qualification of Proponents/Bidders, when required by the Applicable Procurement Manual, the procurement package will be finalized and approved by the 3PPO (with further consultation with Authority, as appropriate) prior to posting.

f.  **Tender Posting:** The 3PPO will issue the procurement package to pre-qualified Proponents/Bidders.



g.  **Procurement Clarifications:** The 3PPO will receive and respond to any questions and clarification requests from Proponents/Bidders.

h.  **Process/Functional Owner for Procurement Compliance:** The 3PPO will receive and review proposals/bids, when required by the Applicable Procurement Manual.

i.  **Shortlist Presentations:** The 3PPO will determine if any proposal/bid submittal is non-responsive, materially deviates from the scope of work or other technical requirements or is non-compliant with the solicitation requirements and the Sourcing Strategy. The 3PPO may request, coordinate, and attend presentations by Proponents/Bidders and thereafter summarize the evaluation all in order to assist the 3PPO in making an award decision.

j.  **Select and Recommend Awardee:** The 3PPO will prepare a Notice of Award Recommendation (or cancellation) document to Authority, who may accept or reject the recommendation.

k.  **Bid Evaluations and Award Authorization:** The 3PPO will document its evaluation, findings, and conclusions (including the scoring given to each Proponent/bidder, the basis therefor, and any notes regarding variations and potential noncompliance).

l.  **Bid Award Challenge:** The 3PPO will intervene in the process for the review of a bid award challenge, in accordance with and following the process established in the Applicable Procurement Manual.

**m.      Review and Approval of Contract:** The 3PPO will prepare the final form of the contract with the selected Proponent/Bidder, pursuant to the Applicable Procurement Manual, which will be provided to the awardee for review before acceptance. Any negotiations regarding the terms of the contract will be performed by the 3PPO. PREPA's agent will execute the final contract with the awardee.

## 2.0 Contract Administration

**a.      Contract Administration:** When required by the Applicable Procurement Manual and, upon carrying out the procurement process for a contract as specified above, the 3PPO might be required to review, approve, and manage payments, contract changes, change requests and other matters, among other responsibilities related to contract administration.

**b.      Recordkeeping and Reporting:** The 3PPO will maintain records of all activities performed under the terms of its Agreement with Authority such that procurement actions comply with state and federal procurement under grants laws, the Applicable Procurement Manual, including but not limited to the record retention requirements at 2 C.F.R. § 200.334. The 3PPO will support LUMA and Genera in connection with any record retention requirements and required reporting that the agents are obligated to provide pursuant to Applicable Laws, the O&M Agreements, or otherwise.



**c.      Audits:** The 3PPO will provide the Government of Puerto Rico, the FEMA Administrator, the Comptroller General of the United States, external auditors hired by LUMA or Genera, or any of their authorized representatives access to any books, documents, papers, and records which are directly pertinent to any contract resulting from this RFP, including any contract executed by LUMA or Genera in their role as agents of PREPA with the assistance of the 3PPO, for the purposes of making audits, examinations, excerpts, and transcriptions. The 3PPO will keep its books, documents, papers, and records available for this purpose for at least five (5) years after the contract resulting from this RFP expires. To the extent any of the information includes confidential commercial information that may not be provided to LUMA or Genera, as applicable, the 3PPO will provide the information to the appropriate requestor via Authority.

## 3.0 Key Personnel & Staff Requirements

### 3.1 Staff Requirements

The Contractor shall have or will secure, at its own expense, all personnel required in performing the services under the Agreement. Authority expects the Contractor to provide competent and fully qualified staff that are authorized or permitted under federal, state, and local law to perform the scope of work under the Agreement. Authority reserves the right to request the removal of any staff not performing to standard. No additional personnel may be assigned to the resulting agreement without the written consent of Authority.

**a.      Key Personnel and Qualifications:** The Contractor should provide detailed information about the experience and qualifications of the Contractor's principals, project managers, key

33

personnel, and staff to be assigned, including degrees, certifications, licenses, and years of relevant experience. Contractor shall specifically identify those persons currently employed by the Proponent who will serve as Key Personnel. This includes the Contractor's own staff and staff from any subcontractors to be used. The Contractor should demonstrate that its staff (and/or subcontractor's staff) meet the desired requirements and have the necessary experience and knowledge to successfully implement and perform the tasks and services.

b.    **Organizational and Staffing Plan:** Contractor shall submit an initial organizational chart detailing the title/role of each person (whether employed by Contractor or a subcontractor) who shall perform any of the work under the Agreement. The Contractor t's organization and staffing plan shall specifically include the required number of personnel, role and responsibilities of each person on the project, name of the resource or subcontractor, résumé or professional information, their planned level of effort, their anticipated duration of involvement, and their on-site availability. The Contractor should demonstrate its ability to adequately staff and scale each functional area to maintain satisfactory service levels throughout the life of the Agreement.

c.    **Staffing Requirements:** Contractor must comply with and be able to adhere to the Procurement Manual and any ancillary document, as applicable, any Federal Funding requirements, and any requirements in the O&M Agreement related to procurement, such as, without limitation, Section 5.9(c), 5.15(d) and Articles 9, 10, 11, and 13, as applicable.

Contractor must have relevant experience and capacity in tender processes, including procurement definition, evaluation, and source selection, and in general be experienced in construction, information technology, finance, and any other areas of competency for large capital projects rollout and effective implementation.

Contractor must have access to individuals with Architecture/Engineering knowledge, mandatory certifications, and experience sufficient to perform scope development when required.

Contractor must review and approve solicitation packages when applicable, typically in 5 business days in order to allow LUMA or Genera to meet the requirements of an efficient tender process and to allow LUMA or Genera to meet its service requirements (unless 3PPO provides notice and reasonable reasons for requiring more time, in which event this date can be extended for a reasonable time specified in such notice, without the prior consent of LUMA or Genera and meet the following timeline requirements for a standard tender evaluation:

From receipt of tender qualifications or proposals/bids submittals:
  i.    Preliminary evaluation and clarifying questions – target in 10 business days.
  ii.   Final evaluation and award decision – target in 15 business days.

The timelines in a solicitation package, as reviewed and approved by the 3PPO, will be the governing timelines for a given procurement.

4.0 Key Deliverables

34

Deliverables shall be considered those tangibles and resulting work products that are to be delivered to Authority, LUMA, or Genera, such as documents, data, meetings, presentations, and reports. Reports shall include a detailed narrative, including assumptions and clarifications, and any other information or documentation that was used to reach the conclusions as established in the reports. Reports must also indicate each and every resource that participated in its development.

Deliverables shall be in an editable format such as Word, Excel, PowerPoint, Adobe Illustrator, Photoshop, InDesign, or Visio and/or other formats. All deliverables and resulting work products from this contract will become the property of Authority. The Proponent shall certify the accuracy of its deliverables to Authority.

Proponents shall outline in their Proposal the types of deliverables and timelines they expect to produce, in performing the Scope of Services. The proposed deliverables may or may not be included in the final contract, which may contain deliverables developed by Authority. At a minimum, the key deliverables to be provided shall include such items as:



    a. Comprehensive reports on actions taken
    b. Procurement Strategies developed
    c. Tender documents prepared
    d. Sourcing Strategies developed
    e. RFxs issued
    f. Proposer/Bidder Pre-Qualification lists
    g. Review of single source justifications
    h. Final tender package
    i. Posting of Tender packages
    j. Responses to requests for clarification
    k. Tender evaluations
    l. Awardee selections
    m. Bid evaluations and recommendations
    n. Award packages
    o. Assistance in bid award challenge actions
    p. Contract administration documents
    q. Recordkeeping system(s)
    r. Responses to requests for information from COR3, Authority, LUMA, Genera, and state and federal auditors

## 5.0 Reporting

Authority maintains a high degree of contractor oversight and efficient and effective cost controls. Following is a list of the Reports that may be required:

a. Weekly Status Report: A weekly report that contains the following information:
    i. Staffing: a description of significant anticipated changes to Contractor's staffing plan, including, but not limited to, additions or departures of employees, independent contractors, subcontractors, etc.; promotions and demotions of the aforementioned persons as it relates to their 3PPO work; planned vacations or leaves of absence that

will impact workflow; and other human resource related information that will affect the Contractor's provision of 3PPO services.

 ii. Summary of Work Performed: a brief description of the work performed in the preceding work week, including a list of open projects (along with RFPs and contracts being managed by the 3PPO) and their progress as compared to the previous week.

 iii. List of Meetings: a list of meetings the Contractor held in the preceding week with third parties (i.e., LUMA, Genera, federal agencies, or other contractors), including a description of the discussion and the result of the discussion or action items.

 iv. Needs List: a numbered list of work items, information, or decision points that the Contractor requires from Authority, PREPA, LUMA, or Genera for the week ahead, listed in priority order, with the highest priority item first.

 b. Monthly Presentation: A monthly presentation by the Contractor's Project Manager and any other key personnel as may be requested by Authority. The presentation should include a PowerPoint or similar document that provides the status of the overall scope of services, including quantifiable metrics and milestones. The presentation should also highlight key successes and challenges of the preceding month.



## 6.0 Milestones

Proponent shall establish Key Performance Metrics within the Proposal that clearly indicate project milestones and deliverables tied to an overall project schedule. These milestones and deliverables will be considered by Authority during issuance of task orders but are not binding on Authority in any way. At a minimum, the milestones must include at least the following, but Authority reserves the right to require additional or different milestones and deliverables in the Agreement or any task order.

Percentage of reviews and decisions completed within required timelines
a. Development of scopes when required within xx days
b. Decisions on single source situations within xx days
c. Approval of solicitation documents within xx days
d. Issue of solicitation (as required) within xx days
e. Clarification responses within xx days
f. Tender evaluation within xx days
g. Prepare Bid Award Recommendation within xx days
h. Decisions on Bid Award Challenge within xx days
i. Prepare contract within xx days
j. Decisions on change orders or relief claims within in xx days

## 7.0 Anticipated Task Orders

The scope of work presented is based on circumstances existing at the time this RFP is released. Authority reserves the right to modify or delete specific tasks listed and, if appropriate, add

additional tasks prior to and during the term of the contemplated agreement, as long as the additional tasks are within or logically related to the Scope of Services contemplated herein and in the resulting agreement. Authority reserves the right to retain some of these services and tasks internally or to assign some of the services and tasks to other Selected Proponents to whom a contract is awarded, if applicable.

The Selected Proponent will be directly responsible for ensuring the accuracy, timeliness, and completion of all tasks and all tasks, will be assigned by Task Order. When a Task Order is issued pursuant to the Agreement, the Selected Proponent will be responsible for communicating with and providing necessary assistance to Authority. Each Task Order will describe the Scope of Services, rates, and other compensation, including the not to exceed amount.

**Appendix B**
**Contractor's Proposal**

## Appendix C
## Billing Guidelines for Consultants

The Puerto Rico Public Private Partnerships Authority ("P3 Authority") may engage the services of consulting firms or independent consultants (collectively and hereinafter "Consultant") to provide certain consulting services for managing its affairs (the "Consulting Services").

The Consultant shall be committed to providing Consulting Services with the highest quality standards and in the most reasonable, prompt, efficient and cost-effective manner. Therefore, the P3 Authority expects Consultant to stress integrity and to uphold the highest standards of professionalism and ethical conduct in ensuring timely, responsive, and cost- effective consulting services by complying with these billing guidelines (the "Guidelines").



The Guidelines set forth the P3 Authority's expectations relative to the Consulting Services being provided and the nature of the working relationship with Consultant. Through the Guidelines, the P3 Authority hereby provides Consultant with an understanding of what consulting fees and expenses the P3 Authority will pay and reimburse. Furthermore, these Guidelines shall constitute a written agreement by the parties for any matter to which the Consultant is engaged on behalf of the P3 Authority. These Guidelines shall govern the billing terms of the professional relationship between the P3 Authority and Consultant.

The P3 Authority considers Consultant's invoices for services rendered (the "Invoices") as a certification by Consultant that the billing for services, as reflected on the Invoices, is reasonable for the matters involved, and necessary for the proper rendering of the Consulting Services relative thereto.

The P3 Authority expects Consultant to strictly adhere to the Guidelines and to charge for actual consulting services rendered, at the rates established and agreed in advance by the parties, and to refrain from billing non-billable work or expenses. Compliance with the Guidelines will avoid delays in processing Invoices or the possible nonpayment of the services provided. The P3 Authority expects Consultant to become familiar with the Guidelines and if there are any questions relative thereto then Consultant should contact P3 Authority's Legal Department.

The following rules shall govern Consultant's billing for the Consulting Services and its presentation of the Invoices:

### A. Billing Rates and Fee Arrangements

    i.    The P3 Authority expects to be charged reasonable fees for the Consulting Services, pursuant to the applicable code of professional conduct. A reasonable fee is considered to be the product of: a) the amount of time reasonably necessary to devote to the matter by appropriately qualified consulting professionals, and b) the customary or previously agreed to billing rates (the "Billing Rates") of those professionals involved in the rendering of the Consulting Services. Furthermore, the P3 Authority expects Consultant to use prudence and reasonableness in

39

Docusign Envelope ID: 1314C065-74C8-444D-97C2-BC61643B8745

rendering the Consulting Services, refraining from providing more consulting services than are actually needed to complete the same.

ii. Under no circumstance will the P3 Authority pay for Consultant's overhead expenses, as they are generally categorized in accordance to applicable accounting principles.

iii. Consulting Services will be billed in increments of **[6 minutes or 1/10 of an hour]**.

iv. Unless otherwise agreed upon in advance, all hourly billing rates shall be solely on the basis of the Billing Rates. Absent a specific agreement for an alternative fee arrangement for a specific consulting service, Consultant's fees shall be computed by applying the Billing Rates to the reasonable time actually incurred in rendering the Consulting Services.



v. The level of expertise of the consultant assigned to a matter referred by the P3 Authority shall be appropriate to the complexity of the issue therein. Therefore, partners, principals or directors of the consulting firm shall not bill for tasks that can be performed by a less senior consultant at a lower cost. Furthermore, the P3 Authority requires Consultant to assign less demanding tasks to less senior consultants in order to minimize consulting expenses. Additionally, for matters of similar nature occasionally referred to Consultant, the P3 Authority expects Consultant to assign a consultant with prior experience with such matter. Consultant shall ensure that the work performed by the assigned consultant(s) is reasonable, useful, and done efficiently.

## B. Referrals and Budgets

i. If applicable, in the event that Consultant anticipates incurring in significant time or expenses in excess of the normal amount within a particular month, Consultant shall contact the P3 Authority to notify of the anticipated excess amount of billable hours or expenses during that month and shall include a reasonably detailed explanation of the reasons for such additional costs.

## C. Staffing Matters

i. The P3 Authority will not pay for or authorize:

    a) Administrative charges such as:

        i. Scheduling or review of personnel;

        ii. Preparation and review of billing statements;

        iii. Preparation of budgets of time plan, staffing of total costs of projected consulting work;

<blockquote>

iv.   Preparation of Audit Letters to our external auditors;

v.   Preparation of any other status report; or negotiation, review, and/or drafting of retention or engagement agreement between the P3 Authority and the Consultant.

</blockquote>

b) Grazing: The P3 Authority will not pay for billed time for getting up to date with any consulting matter. This includes time spent by newly assigned consultants to familiarize themselves with a matter.

c) Block billing: All tasks must be billed separately.

d) Vague, confusing or otherwise undetailed time entries.

e) Time associated with research on general client or industry trends, and time expended on "canned" research, such as research of a generic nature or for a prior matter or issue.



f) Intra-office conferences that deal with substantive issues are reimbursable when a thorough description of the purpose is provided. Consultants should use intra-office billing exceptionally and not as a common billing practice. Consultants shall reasonably limit the amount of consultant's personnel involved in intra office conferences to those necessary for the rendering of the services relative to the task assigned.

g) Overstaffing: A minimum number of consultants should be assigned to each matter. Overstaffing includes:

i.   More than one consultant billing for reading or reviewing internal written communication (including email); or

ii.   Inclusion of more than one consultant at meetings or hearings for the purpose of consultant development.

Consultant should explain why the circumstances warrant an exception from this general rule. The P3 Authority reserves the right of not paying the hours billed by any additional consultant if P3 Authority's prior written approval was not obtained by Consultant.

h) The review, execution, and processing of agreements with the P3 Authority.

i) Any time spent at seminars or other training, unless otherwise specifically approved in writing.

41

j) Summer intern, temporary or contract consultant, or other intern time unless it has previously been identified as part of the approved staffing in the Billing Rates approved by the P3 Authority.

ii. If a previously drafted or standard form is available, the P3 Authority will pay only for the amount of time necessary to modify the document for use in the specific consulting matter and not the time originally incurred to draft the standard document.

iii. Subject to the provisions of subsection (i) of this Section C, the P3 Authority will not pay for administrative work performed by consultants, such as managing or supervising other consultants, nor will pay for in-firm meetings, conferences, and consultations.

iv. The P3 Authority shall not pay for duplication of time caused by:

    a. Transfer of a consulting matter to a new consultant for internal reasons;
    b. Double teaming; or
    c. One consultant redoing the work of another.



v. It is recommended, but not required, that prior to any meeting or conference call, Consultant shall provide the P3 Authority team members with an agenda for said meeting or conference call detailing the matters to be discussed, as well as a guideline for suggested next steps after any such meeting or conference call.

## D. Billing and Invoicing

i. Each task or activity shall be separately itemized on the Invoices, including a break-down thereof that at a minimum shall include:

    a. A chronological listing of all services;
    b. A description of the service being billed. The description shall include (i) the type of work being performed and (ii) the subject matter;
    c. The name of each consultant or consulting professional whose work is being billed;
    d. The date of the service;
    e. The amount of time spent by each person on each item in the interval increments defined herein; and
    f. The Billing Rate at which the service is being billed.

ii. Entries for telephone conversations, conferences and meetings must specifically describe all parties involved and the subject matter or purpose of the task.

iii. The P3 Authority will not pay for billed services whose descriptions lack specificity.

iv. The Invoices shall include a summary thereof, including:

42

    a. Name and initials of each time keeper;

    b. Staff classification including for each category of consulting personnel (Partner, Junior Partner, Manager, Senior Consultant, Consultant, Principal, Director, Associate, Intern, etc.);

    c. Hourly billing rate of each time keeper; and

    d. Total time and fees billed for each time keeper by subject matter.

v. The Invoices shall also include an overall summary by staff classification, including for each category of consulting personnel (Partner, Junior Partner, Manager, Senior Consultant, Consultant, Principal, Director, Associate, Intern, etc.), the number of individuals in each category, the total number of hours by each category, and the total fees by category.

vi. The Invoices shall be divided individually by project or matter (e.g. T&D Invoices; LGA Invoices). Invoices shall also include a billing history or summary of all fees and expenses incurred in a particular matter up to the invoicing date along with a comparison to the total budgeted or contracted amounts.

vii. The P3 Authority reserves the absolute right to make any changes, at its sole discretion, to the fees included in the Invoices if it reasonably believes that the amount of time devoted to the matter by the consulting professional or the timekeeper should be reduced.

viii. In addition, Consultant shall provide the Certificate of Waiver from Withholding (total or partial) from the Puerto Rico Department of Treasury to the P3 Authority, if applicable.

ix. Any Invoices without the required information included or attached will not be processed for payment and will be returned to Consultant for the corresponding corrections or modifications.

x. The Consultant's in charge of the P3 Authority account (the "Account Partner") shall review the Invoices prior to submitting them to the P3 Authority and should be able to explain all of its time charges if so requested.

xi. Furthermore, the Account Partner shall certify the accuracy and reasonableness of the Invoices and their compliance to the Guidelines and all applicable ethical rules. The P3 Authority reserves the right to withhold or deny approval of the Invoices in the event the Guidelines are not complied with.

### E. Expense Reimbursement

i. The P3 Authority will not pay and will not separately reimburse Consultant for overhead costs. Expenses that are considered Consultant's overhead are part of the professional's hourly rate and are not reimbursable. The term overhead includes, but is not limited to all administrative or general costs incidental to the operation of the Consultant including without limitation office rent, conference rooms, equipment, computer software, office supplies, transportation, telephone and mobile charges, books, meals, routine postage, the

43

services of librarians, file clerics, data entry clerks, photocopy operators, secretaries, overtime or utilities, word processors, messengers, other support personnel, or any other overhead expense as recognized by applicable accounting standards.

ii.   Non reimbursable tasks include binding, scanning, indexing, collating, coding, filing, transmitting and preparing letters, mailing, faxing, emailing, word processing, proofreading, scheduling, events, deliveries, data entry, conference call charges, invoicing, billing, staffing, or other similar clerical or ministerial functions.

iii.   The Invoices may also include additional consulting expenses to be charged by Consultant as previously authorized by the P3 Authority, with a total for those consulting expenses charged at a reasonable market price. Each such additional expense item shall be:

      a. Separately itemized;
      b. Show the date the expense was incurred;
      c. Include a descriptive explanation of the charge;
      d. Indicate the amount of the charge; and
      e. Indicate the timekeeper who incurred the charge.

iv.   Disbursements for pre-approved reimbursable expenses will be compensated at actual cost with the appropriate documentation to substantiate the expenses such as actual vendor receipts, which shall be included in the Invoices as an attachment. Actual cost is defined as the amount paid to a third-party service provider, net of any discounts ("Actual Cost").



v.   All expenses will be reimbursed at Actual Cost and Consultant shall not upcharge any of the expenses incurred in providing services to the P3 Authority. The P3 Authority will not pay for normal transportation costs incurred in travel to and from the office, for overtime transportation, or for valet services. Car services during travel are limited to taxicab or transportation network companies' fares, and Consultant shall provide appropriate documentation to substantiate the expenses such as actual receipts, which shall be included in the Invoices as an attachment.

vi.   The P3 Authority will reimburse Consultant for reasonable and necessary delivery charges and messenger services at Actual Cost. However, charges for time spent preparing mail packages are considered as part of the Consultant's overhead and are not reimbursable. Disbursements for messenger services expenses will be compensated with the appropriate documentation to substantiate the expenses such as actual receipts, which shall be included in the Invoices as an attachment. Third party courier and express delivery services should be used cautiously.

vii.   Photocopying will be reimbursed at the Actual Cost to Consultant and which under no circumstances shall exceed ten (10) cents per page. Documentation for photocopying expenses shall include evidence of the amount of copies executed with the date.

viii.   Reimbursements of expenses made by Consultant during travel to Puerto Rico are limited to:

44

a. Fifty-eight (58) dollars per day for food, for which Consultant need not provide a receipt; and

b. One hundred and ninety-five (195) dollars per night, for hotel for which Consultant must provide appropriate documentation subject to agreement by the P3 Authority.

ix. Reimbursements of expenses made by Consultant during travel outside of Puerto Rico are subject to the regulations published by the U.S. General Service Administration and the Defense Travel Management Office of the Department of Defense.

x. Expenses for airfare travel will be reimbursed with the appropriate documentation to substantiate the expense, such as receipt of the air fare where the trip detail is presented. The P3 Authority will only reimburse for economy class airfare travel. The P3 Authority will not pay for any costs incurred in for "extra leg room" space. Any reimbursement for cancelled air travel must be pre-approved by the P3 Authority.

xi. The P3 Authority expects Consultant to immediately provide any back up documentation for a particular disbursement charge if it so requires. The P3 Authority will not pay for unsupported charges.

xii. The P3 Authority will only reimburse for expenses made within the time frame of the contract between the P3 Authority and Consultant.

## F. Third Party Subcontracting

i. If Consultant deems it necessary to use any other consulting firm, consultant, or other third party providers (the "Third Party") in providing a service in a matter it is handling for the P3 Authority, then such request shall be made to the P3 Authority A prior to the retention or hiring thereof and shall obtain written consent from the P3 Authority to proceed with the subcontracting.

ii. Unless a different billing arrangement is authorized by the P3 Authority, Consultant shall directly pay the Third Party for work performed in connection with services rendered on behalf of the P3 Authority.

iii. Payments to the Third Party should be included as a disbursement on Consultant's next subsequent invoice to the P3 Authority and said invoice shall be accompanied by the Third Party's corresponding billing detail which shall also be in full compliance with the Guidelines.

iv. Consultant shall not upcharge or surcharge any of the Third Party's billings or expenses incurred in providing services to the P3 Authority. The P3 Authority will only reimburse the Actual Cost of pre-approved Third Party's services.

45

v.    All Third Party invoices paid by Consultant shall be included in the Invoices as an attachment and as an itemized expense must, absent specific prior approval to the contrary, also comply with the Guidelines.

### CONSULTANT ACKNOWLEDGMENT

The Consultant through its Account Partner, or representative noted herein, acknowledges the receipt and review of the P3 Authority 's Billing Guidelines for Consultants.

By signing this acknowledgment, you further certify that you will only remit invoices to the P3 Authority that fully comply with all terms and conditions contained in the Guidelines.

This document may be signed in counterparts and a copy of the execution signature shall be as effective as an original. Furthermore, all fully executed copies shall be considered duplicate originals.

So acknowledged and accepted by:

## Appendix D
## Puerto Rico Contractor Certification Requirement

The following certification shall be provided to the Oversight Board and the Commonwealth's Contracting Government Entity by the Chief Executive Officer (or equivalent highest rank officer) of each proposed contractor under contracts submitted for review:

1.  The expected contractor's subcontractor(s) in connection with the proposed contract[1] is (are) the following:

    (Name of individual or firm, including names of principals or owners of the latter)

    (Principal terms and conditions of the contractual relation and role of the subcontractor)

    (Amount of proposed contract payable to each subcontractor)

2.  Neither the contractor nor any of its owners[2], partners, directors, officials or employees, has agreed to share or give a percentage of the contractor's compensation under the contract to, or otherwise compensate, any third party, whether directly or indirectly, in connection with the procurement, negotiation, execution or performance of the contract, except as follows:

    (Name of individual or firm, including names of principals or owners of the latter)

    (Principal terms and conditions of the compensation sharing arrangement and consideration for such benefit)

3.  To the best knowledge of the signatory (after due investigation), no person has unduly intervened in the procurement, negotiation or execution of the contract, for its own benefit or that of a third person, in contravention of applicable law.

4.  To the best knowledge of the signatory (after due investigation), no person has: (i) offered, paid, or promised to pay money to; (ii) offered, given, or promised to give anything of value to; or (iii) otherwise influenced any public official or employee with the purpose of securing any advantages, privileges or favors for the benefit of such person in connection with the contract (such as the execution of a subcontract with contractor, beneficial treatment under the contract, or the written or unwritten promise of a gift, favor, or other monetary or non-monetary benefit).

5.  Neither the contractor, nor any of its owners, partners, directors, officials or employees or, to the best of its knowledge (after due investigation), its representatives or sub-contractors, has required, directly or indirectly, from third persons to take any action with the purpose of

---

[1] As used herein, the term "contract" is inclusive of any amendments, modifications or extensions.
[2] For purposes of this certification, a contractor's "owner" shall mean any person or entity with more than a ten percent (10%) ownership interest in the contractor.

47

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

influencing any public official or employee in connection with the procurement, negotiation or execution of the contract, in contravention of applicable law.

6. Any incorrect, incomplete or false statement made by the contractor's representative as part of this certification shall cause the nullity of the proposed contract and the contractor must reimburse immediately to the Commonwealth any amounts, payments or benefits received from the Commonwealth under the proposed contract.

The above certifications shall be signed under penalty of perjury by the Chief Executive Officer (or equivalent highest rank officer) in the following form:

"I hereby certify under penalty of perjury that the foregoing is complete, true and correct."

By: Mariela Quinones

Signature: Marile Q.

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

**Appendix E**
**Memorandum of Understanding between the Authority and LUMA**

**Appendix F**
**Memorandum of Understanding between the Authority and Genera**

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745



PROPOSAL FOR:

Procurement & Contract Management Services (2024–2026 Term) – Second Renewal Submission

## Procurement & Contract Management Services

**Summited to:** The Puerto Rico Public-Private Partnership Authority

**Summited by:** Regulatory Compliance Services Corp

1509, López Landrón, PH San Juan, PR 00911

**Duns -199732715**
**SAMS- NCF3ZV79NTS**

June 4, 2025

**RE: Proposal for Procurement and Contract Management Services**

To: Mr. Josue Colón
Executive Director, The Puerto Rico Public-Private Partnership Authority

Dear Mr.Colón,

On behalf of Regulatory Compliance Services Corp. (ReComS), I extend our sincere appreciation for the opportunity to support the Puerto Rico Public-Private Partnership Authority (P3A) since our initial engagement began in 2023. It has been a privilege to provide procurement and contract management services to such a critical and impactful initiative, and we are proud of the strong, collaborative partnership that has been built.

We are pleased to submit our proposal for a third-term renewal, extending our services through June 30, 2026. This proposal reflects our continued commitment to delivering strategic support in the areas of RFP development, procurement compliance, and contract lifecycle management—particularly in processes where an Organizational Conflict of Interest (OCI) has been identified and our independent oversight is required.

ReComS remains steadfast in its mission to assist both LUMA and Genera in fulfilling their obligations under their respective O&M agreements. Our primary goal is to help protect public investment and prevent revenue erosion by ensuring fair competition and strict adherence to regulatory and procedural frameworks governing PREPA's generation, transmission, and distribution (T&D) assets.

Founded in San Juan in 2003, ReComS brings over two decades of trusted experience in both the public and private sectors. Our team's work with FEMA, COR3, HUD, and other federal and local agencies has positioned us as a reliable partner capable of delivering high-quality results in complex, capital-intensive environments.

Over the past two years, we have supported the development and management of more than 18 RFPs while successfully establishing a robust contract management program. In doing so, we have helped navigate sensitive issues such as fuel supply shortages, interconnection delays, and regulatory and technical compliance—ensuring the continuity of mission-critical operations. These efforts reflect our dedication to operational excellence and the strategic advancement of both state and federally funded projects.

As we look forward , we are prepared to support the launch of an additional 17 LUMA RFPs and provide full contract administration services for at least eight transitioning projects. This expanded scope reflects the maturing needs of the program and aligns with our mission to ensure transparency, compliance, and programmatic integrity.

We remain committed to being a responsive, flexible, and solutions-oriented partner to P3A, LUMA, and Genera. We are enthusiastic about the opportunity to continue serving and to help advance your objectives through effective procurement and contract oversight.

Thank you again for your trust and partnership.



Osvaldo Carlo Linares
President
Regulatory Compliance Services, Corp.
1509, López Landrón, PH San Juan, P.R. 00911
787-300-6483
ocarlo@carlolaw.com | mquinones@recomspr.net

## EXECUTIVE SUMMARY

ReComS is pleased to submit this proposal for the second renewal of our engagement with the Puerto Rico Public-Private Partnership Authority (P3A), continuing our support in the operation and enhancement of the Third-Party Procurement Office (3PPO). This proposal reflects our evolving strategy, shaped by practical lessons, federal compliance updates, and internal process refinements—to ensure continued excellence in procurement and contract management.

Over the past two years, RECOMS has spearheaded the development and management of over 18 RFPs while formalizing a robust contract management program, navigating challenges such as fuel shortages, interconnectivity issues, and stringent compliance requirements. Although not all RFPs were published due to evolving priorities, each initiative represented a strategic investment by the Third-Party Procurement Office (3PPO).

For the years 2025-2026, RECOMS projects the launch of 17 new RFPs and the transition of at least eight into full contract administration, marking a pivotal shift toward comprehensive lifecycle oversight. The $1.58M cost estimate that is presented reflects a workload increase, grounded in historical labor analysis and the expanded demands of active contract execution—ensuring continued procurement integrity and scalable, compliant support.

### Proposal History Summary

⇒ Initial Engagement (2023): Contract initiated following the first proposal, establishing foundational support for 3PPO operations.
⇒ First Renewal (2024): Engagement extended through June 2025, with continued delivery of regulatory compliance and contract administration.
⇒ Second Renewal Proposal (2025): This submission outlines strategic improvements and seeks to extend services through June 30, 2026.

### Key Changes and Enhancements Since 2024 Proposal

⇒ Expanded staffing capacity to address increased workload and project complexity.
⇒ Deployed a SharePoint-integrated Contract Tracker for real-time visibility and document control.
⇒ Updated standard operating procedures (SOPs) to align with LUMA and federal procurement standards.
⇒ Introduced KPI dashboards for tracking performance and delivery timelines.
⇒ Strengthened compliance protocols and risk mitigation strategies.

These improvements allow ReComS to successfully provide,

⇒ Adaptive Staffing: Enabled through our re-baselining capability, allowing efficient realignment of resources to meet emergent needs.
⇒ Real-Time Reporting: Integrated Project Status Report detailing active and pending RFPs across the full procurement lifecycle.

The Regulatory Compliance Services Corp. (ReComS) team has embedded all relevant documentation, analysis, and evidentiary support in this proposal, reaffirming our readiness to continue serving as P3A's trusted partner for Regulatory Compliance and Program/Project Management within the 3PPO framework.

## PROPONENT DESCRIPTION AND EXPERIENCE

Regulatory Compliance Services Corp. (ReComS) brings together a multidisciplinary team with the expertise and operational capability required to meet the evolving needs of the Puerto Rico Public-Private Partnership Authority (P3A). Our professionals are seasoned in managing procurement and contract functions for capital-intensive, time-sensitive projects—ensuring delivery on schedule, within budget, and in compliance with regulatory frameworks.

Our approach is rooted in a proven track record, both in this program and in similar initiatives. Over the course of our engagement, we have:

1. Established a strong foundation for the Third-Party Procurement Office (3PPO) with a dedicated, qualified team.
2. Demonstrated deep experience in procurement and contract management specific to state and federally funded programs.
3. Implemented a scalable contract management structure already showing measurable impact.
4. Delivered clear, data-driven budget forecasting tied to each RFP, helping P3A anticipate resource commitments with precision.

### Procurement And Contract Management Qualifications

Our proposal includes comprehensive documentation showcasing our qualifications to continue serving as the 3PPO. ReComS offers an agile and responsive team with the technical and regulatory acumen to support both LUMA and Genera across the procurement lifecycle.

From regulatory oversight to cross-sector coordination, ReComS brings the right balance of experience and innovation. Our operational strengths are grounded in:

⇒ Long-Term Strategic Planning
⇒ Stakeholder and Interagency Coordination
⇒ Project Controls and Budget Oversight
⇒ Procurement Compliance and Contract Execution
⇒ Real-Time Data and Performance Reporting

These pillars enable us to manage the full contract lifecycle and proactively mitigate risks that could otherwise impact delivery timelines or regulatory compliance.

### Long-Term Planning

ReComS has established enduring Standard Operating Procedures (SOPs) that form the backbone of the Third-Party Procurement Office (3PPO). These SOPs cover Legal, Grant Management, Finance, and Engineering functions and are designed to provide continuity and stability—even beyond ReComS' direct involvement. We continuously update these procedures based on lessons learned, ensuring a legacy of sound practices and operational efficiency.

## Communication And Reporting

Our communication protocols ensure seamless coordination between stakeholders and efficient project oversight. Weekly and ad hoc reporting cycles provide real-time visibility to P3A, LUMA, Genera, the FOMB, and other stakeholders. This robust communication framework enables proactive issue resolution and KPI tracking. It also ensures smooth leadership transitions, allowing new executives to be effectively briefed and brought up to speed without disrupting program continuity.

## Responsibility Matrix

To reinforce accountability and enhance coordination, our Program Manager has implemented a responsibility matrix, identifying each team member's role and communication flow across the contract lifecycle. This matrix is an integral reference point to clarify expectations and ensure transparency in task execution.



| Activity / Responsibility | Program Manager | Project Manager | Contract Administrator | Finance/Compliance |
|---|---|---|---|---|
| Kickoff Meetings | Lead | Support | Support | Consult |
| Task Order Issuance | Support | Lead | Support | Consult |
| Change Order Review | Support | Support | Lead | Consult |
| Invoice Validation | Oversight | Lead | Lead | Support |
| Performance Monitoring | Lead | Support | Support | Consult |
| Compliance Reporting | Oversight | Support | Lead | Lead |
| Document Control | Oversight | Support | Lead | Support |
| Closeout Activities | Oversight | Support | Lead | Consult |

## Technical Support

Our regulatory compliance division is spearheaded by seasoned legal, financial, and program management professionals, including former federal prosecutors and investigators with deep institutional knowledge. This elite team provides guidance in policy alignment, risk mitigation, and inter-agency communication, offering critical support in navigating federal oversight and ensuring defensible procurement integrity.

## Budget And Cost Management

Our integrated Budget and Cost Management (BCM) framework allows detailed tracking and analysis across grants, contracts, and expenses. The approach features dynamic rebase-lining and resource realignment, allowing the program to remain agile amid evolving priorities. Executives receive real-time dashboards to anticipate and address funding gaps and cash flow challenges proactively.

## Detailed Technical Approach

This section outlines ReComS comprehensive methodology for executing procurement and contract management responsibilities as established in the original Scope of Services. Our approach is rooted in rigor, accountability, and adaptability, ensuring that every action is aligned with applicable regulations and

programmatic goals. With the success demonstrated in the previous contract term, ReComS is well positioned to build on this momentum and further strengthen the 3PPO's operational capacity.

## Establishing A Programming Approach and Milestones

ReComS has developed and implemented a programming approach designed for scalability, compliance, and effectiveness. Central to this framework is our suite of Standard Operating Procedures (SOPs), which were designed in alignment with the Oversight Compliance and Integrity Management Program (OCIMP) and consolidated procurement manuals. These SOPs serve as the blueprint for program execution and continuity, establishing consistent protocols across all procurement functions including legal review, grants management, finance, and engineering.

In FY2026, we will continue to leverage and refine these SOPs, ensuring each milestone—whether related to solicitation issuance, evaluation, or contract closeout—is achieved on schedule and with the transparency and procedural integrity that stakeholders demand. This framework enables P3A, LUMA, and Genera to meet their goals with assurance, while also serving as an auditable record of compliance and performance

## Reporting On Actions Taken

ReComS ensures that every procurement activity undertaken is both deliberate and thoroughly documented. Our team manages the full procurement lifecycle from market analysis to contract closeout, guided by internal controls and regulatory requirements such as 2 CFR Part 200.

Each procurement begins with a deep dive into market conditions and end-user needs. We analyze the financial and operational implications of the requested goods or services, assess lifecycle costs, and ensure that specifications are neutral, non-restrictive, and outcome oriented. Working closely with technical leads, ReComS prepares clear and comprehensive scope and aligns each solicitation with applicable procurement policies.

Once issued, the procurement is actively managed to ensure timely responses to bidder questions, transparent evaluations, and adherence to thresholds for approvals and authorizations. Post-award, we ensure that audit trails are maintained, reports are delivered, and procurement manuals are updated based on lessons learned. This loop of execution and continuous improvement ensures accountability, mitigates risk, and supports long-term program credibility.

## Program Status Reporting

To maintain visibility and performance tracking, ReComS has developed and institutionalized status reporting protocols, including:

1. Weekly reports to LUMA and Genera
2. Bi-weekly Project Status Meetings
3. Contract Management Review Sessions
4. Task Order Logs per RFP and Associated Contract

These reports enhance transparency and support proactive program oversight.

**Procurement Strategies and Documentation**

ReComS emphasizes proactive planning as a core element of our procurement strategy. We begin by defining scope with precision, identifying both minimum and desired requirements. We validate that each procurement aligns with strategic priorities and that funding is available before advancing. These safeguards ensure that each solicitation is not only compliant but also fiscally sound and operationally feasible.

Tender documents are developed in strict accordance with procurement manuals and federal guidance. This includes scopes of work, evaluation criteria, performance requirements, and engineering specifications. ReComS also helps LUMA and Genera define the appropriate solicitation method—whether Request for Proposals (RFPs), Request for Quotations (RFQs), or Invitations to Bid (ITBs)—and designs all supporting documentation, including bidder instructions, templates, and draft contracts.

Prequalification processes are employed when appropriate to ensure only responsible and capable vendors participate. When single-source procurements are proposed, ReComS performs a rigorous justification review to confirm necessity and exclusivity. Once finalized, tender packages are distributed, and a period is established for clarifications, ensuring that all bidders have equal access to information and that responses are consistently documented.

**Evaluation, Award, and Negotiation**

Once proposals are received, ReComS facilitates a unbiased evaluation process. We begin with a compliance screening to eliminate ineligible or incomplete offers. Technical proposals are reviewed according to criteria defined in the solicitation documents, and scoring is assigned based on clarity, feasibility, qualifications, and innovation. Financial proposals are analyzed in parallel, taking into account price reasonableness, historical benchmarks, and budget constraints.

In the event of a single bid, ReComS conducts a price-cost analysis to validate the offer's competitiveness and market alignment. Our evaluation documentation includes detailed scoring matrices, evaluator observations, and a recommendation memo which is submitted to the P3A for approval.

Where negotiations are permissible, ReComS ensures that discussions are conducted only with the top-ranked vendor, maintaining fairness and integrity. Our negotiations focus on refining scope, confirming deliverables, and securing favorable commercial terms. ReComS then prepares the full award package, including notice of award, debriefing documents, and execution protocols, ensuring a seamless transition to contract finalization.

**Contract Finalization and Legal Clearance**

Following award confirmation, ReComS leads the contract finalization phase. This includes preparation of the contract instrument, review of annexes and schedules, and coordination with legal advisors to ensure

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745

that all terms align with regulatory requirements. We validate signatory authority on behalf of the awarded vendor and coordinate the signature process, ensuring proper documentation for the official record.

For contracts that require additional review or approvals, such as those requiring FOMB authorization, ReComS consolidates all documentation and submits them through the designated channels in a timely manner. Our legal and compliance teams also conduct regulatory clearance checks to confirm that all conditions for execution have been met.

## Recordkeeping and Responses to RFIs

Proper documentation is essential for transparency, audit readiness, and institutional memory. ReComS maintains a procurement and contract registry file for every solicitation we manage. These files include procurement documentation, evaluation records, award communications, and contract versions. Once a contract is executed, the file is passed to the relevant program leading to administration and closeout.

We treat Requests for Information (RFIs) from COR3, P3A, LUMA, and auditors with the utmost urgency. Our internal document management system enables rapid retrieval of pre-recorded data, with most responses delivered within 2–5 business days depending on complexity. Each RFI is logged, assigned, and tracked until completion to ensure full visibility and accountability.

## Contract Monitoring and Performance Control

ReComS monitors each contract to ensure compliance with scope, timelines, pricing, and quality standards. Through clearly defined Key Performance Indicators (KPIs), we continuously assess whether vendors are meeting expectations. Our monitoring strategy includes regular status reviews, milestone verification, and written documentation of all variances.

When performance issues arise, corrective measures are implemented swiftly. If needed, amendments are processed to reflect updated requirements. Our contract oversight also covers the management of deliverables in service-based contracts, ensuring timely submission and approval of progress reports, technical documentation, and other outputs.

## Remedies And Dispute Resolution

In cases where performance deviates from expectations, ReComS works with LUMA and Genera to investigate root causes and implement corrective actions. If remediation is not possible, changes to the contract may be negotiated. In extreme cases, early termination is considered after evaluating technical, financial, and legal implications.

All remedial actions and communications are documented in the contract registry. When disputes arise, ReComS follows the protocols set out in the LUMA or Genera contract terms. If there is a potential for legal

escalation, ReComS provides direct support to ensure compliance with applicable procedures. In cases involving suspected criminal conduct, ReComS will assist in the referral to appropriate authorities.

**Milestones And Metrics**

ReComS measures procurement performance through data-driven indicators, ensuring visibility across all phases of procurement and contract management. Our Microsoft Asset Suite tools track the following metrics:

| Metric | Category | Measurement |
|---|---|---|
| Price Competitiveness | Cost Efficiency | % deviation from benchmark prices |
| RFQ to Contract Time | Timeliness | Avg. days from issuance to contract signature |
| Total Time per Procurement | Timeliness | Days from initiation to award |
| Time per Procurement Step | Process Detail | Days per phase (e.g., evaluation, award) |
| Compliance | Governance | % fully aligned with regulatory requirements |
| Supplier Lead Time | Supplier Management | Avg. delivery time from award to execution |
| Cost per Invoice/PO | Cost Efficiency | Admin cost per transaction |

These tools ensure that each Task Order is delivered on time and within scope, with all stakeholder expectations managed through weekly status meetings and real-time performance tracking.

**STAFFING PLAN & KEY PERSONNEL**

Our staffing strategy is designed to align with projected project volumes, evolving timelines, and available funding. With dedicated project control personnel and agile resource allocation protocols, we maintain consistent performance—even amid shifting priorities. Our capacity to rebase line and reassign team members ensures operational continuity and program adaptability. Additionally, the ReComS team is reinforced by a core group of seasoned subject matter experts—many of whom have been with us since inception—offering a deep bench of specialized support to meet complex project demands.

| Name | Role | Start Date | End Date |
|---|---|---|---|
| Antonio Pavia | Sr. Project Manager | 3/1/2024 | Present |
| Edwin J. Quinones | Legal Advisor | 4/1/2024 | Present |
| Fabián W. Vélez | IT Data Specialist / Document Control | 8/1/2023 | Present |
| Isabel Rodriguez | Technical Specialist / Engineer | 3/1/2024 | Present |
| Luis Machicote | Technical Writer / Paralegal | 11/1/2023 | Present |
| Vicente Diaz | Sr. Legal Advisor | 8/1/2023 | Present |
| Ruben Tapia | Senior Financial Analyst | 6/1/2024 | Present |

| Miguel Garcia | Project Manager | 5/1/2024 | Present |
|---|---|---|---|
| Gerardo Mechaly | Project Manager | 10/1/2023 | Present |
| Mariela Quiñones | Program Manager | 7/1/2023 | Present |
| Francisco Amill | Legal Advisor | 3/1/2023 | Present |
| Ivette Arocho | Sr. Financial Analyst | 11/1/2023 | Present |
| Joel Rojas | Financial Analyst | 11/1/2023 | Present |
| Nahomi Santiago | Administrative Support | 11/1/2023 | Present |
| Luis Rivera | Sr. Regulatory Compliance | 7/1/2023 | Present |
| Osvaldo Carlo Linares | Sr. Regulatory Compliance | 7/1/2023 | Present |
| Yolanda Velez | Technical Specialist / Engineer | 11/1/2023 | Present |
| Rosa M Diaz | Administrative Support | 8/1/2024 | Present |
| Daniela Santiago | Administrative Support | 11/6/2024 | Present |
| Isabel Rivera | Administrative Support | 5/1/2025 | Present |
| Jardany Diaz | Project Manager | 5/1/2025 | Present |

## ORGANIZATIONAL STRUCTURE



Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745



**COST PROPOSAL**

**Budget Breakdown and Justification**

Over the past two years, ReComS has led the successful development and administration of more than 15 Requests for Proposals (RFPs), while also laying the groundwork for a comprehensive and sustainable contract management program. Throughout this time, we have responded effectively to a wide array of operational and regulatory challenges, including fuel shortages, interconnection logistics, and evolving environmental compliance requirements, thereby helping ensure continuity in critical utility functions.

Looking ahead to FY2026, ReComS anticipates supporting the launch of 17 new RFPs and transitioning at least eight previously awarded projects into full contract administration. This anticipated growth signals a significant evolution in our role—from initial procurement planning to ongoing, full-cycle contract oversight.

| | |
|---|---|
| 1 Metal-Clad RFP | 10 Repair Towers Group B |
| 2 MSA – Site Make Ready Work | 11 Cerro Punta Tower |
| 3 Transmission Pole Services | 12 Repair Towers Group E |
| 4 Transmission Line Testing | 13 Repair Towers Group D |
| 5 Transmission Underground Line | 14 Cerro Punta Access Road |
| 6 Transmission Surveying | 15 Repair Towers Group F |
| 7 Transmission Concrete Services | 16 Repair Towers Group H |
| 8 Distribution Underground Construction Line | 17 Repair Towers Group G |
| 9 Repair Towers Group A | |

The total estimated cost of $1.58 million included in this proposal reflects the increasing scope of work. This projection is based on a rigorous analysis of past labor utilization, an 85% projected increase in workload, and the expanding need for ongoing contract administration across multiple concurrent projects.

To ensure accountability and flexibility, ReComS will continue to operate under a Task Order structure. Each Task Order will be developed in coordination with P3A, following a formal meeting to review project priorities, funding availability, timelines, scope of work, and performance expectations. Adjustments to scope, goals, or budgets that may impact project timelines will trigger a formal review and the submission of a revised Task Order for approval by P3A.

Our staffing approach is designed to guarantee continuous operational coverage while mitigating risks of change orders, work stoppages, or administrative delays. The accompanying rate structure and personnel categories reflect our commitment to providing cost-effective, high-quality services that align with P3PO's evolving needs.

**Proposed Contract Value Based on Time and Material Pricing**

| Labor Category | Position Qty | Billable Rate ($/hr) | Forecast Hours | Adjusted Contract Value ($) |
|---|---|---|---|---|
| Sr. Regulatory Compliance Officer | 2 | $300.00 | 78 | $23,400.00 |
| Administrative Support | 2 | $42.00 | 740 | $31,092.41 |
| Financial Analyst | 2 | $98.00 | 276 | $27,013.70 |
| Grant Administrator | 2 | $120.00 | 260 | $31,200.00 |
| IT / Data Specialist | 1 | $105.00 | 1,920 | $201,600.00 |
| Legal advisor | 3 | $189.00 | 1,352 | $255,531.12 |
| Program Manager | 1 | $160.00 | 660 | $105,550.64 |
| Project Manager | 3 | $110.00 | 3,163 | $347,944.91 |
| Sr. Financial Analyst | 1 | $189.00 | 569 | $107,629.26 |
| Sr. Legal Advisor | 1 | $250.00 | 477 | $119,135.38 |
| Sr. Project Manager | 1 | $190.00 | 71 | $13,444.88 |
| Technical Specialist / Engineer | 3 | $165.00 | 1,920 | $316,800.00 |
| TOTAL CONTRACT VALUE | | | 11,486 | $1,580,342.29 |

**Appendix A – Active Project Status Report**

The following report provides a snapshot of active RFPs

1. **Distribution Line Construction – RFP 3PPO-1123-01-DL**
Contract redlines were submitted by the proponent and forwarded for validation on May 20, 2025. Additional scope items originally in the RFP were found to be missing from the pricing exhibit. A revised ICE and comparison table are being developed.
**Next Milestone:** Final pricing review and contract signature expected by May 31, 2025.

2. **Emergency Restoration Services – RFP 3PPO-1212-03-EM**
Contract was sent for final review on May 16, 2025. All insurance issues have been resolved. A final meeting was held on May 20, 2025, to align scope changes.
**Next Milestone:** Contract ready for signature by May 27, 2025.

3. **Substation EPC (Batch #1) – RFP 3PPO-0412-09-SUB**
Proposals were re-evaluated using the updated ICE received in mid-May 2025. BAFO letters were issued due to identified price deviations. A revised BAFO from one proponent is expected this week.
**Next Milestone:** Updated scoring and submission of final evaluation report by June 3, 2025.

4. **Distribution Poles and Conductor Repairs – RFP 3PPO-0328-08-DP**
Updated contract was submitted on May 16, 2025, and is currently under review. RFI responses on mobilization and cost items are pending.
**Next Milestone:** Final pricing integration and contract feedback expected by May 30, 2025.

5. **Substation EPC (Batch #2) – RFP 3PPO-0703-11-SUB2**
Legal and financial reviews are complete. A pricing clarification RFI was sent on May 20, 2025, with responses due by May 22. Partial ICE received; remainder is pending.
**Next Milestone:** Complete evaluation and prepare summary report by June 7, 2025.

6. **Streetlight Construction – RFP 3PPO-1101-16-SC**
Pending response from utility to Q&A submitted on May 13, 2025. Data collection is active via a shared platform. Labor agreement provisions have been updated via addenda.
**Next Milestone:** Finalize responses and determine need for an additional addendum by May 28, 2025.

7. **Transmission Line Construction – RFP 3PPO-0312-19-TL25** *(On Hold)*
Original proposals have been received but were not reviewed due to PLA compliance issues. The utility instructed the cancellation and reissue of the RFP with a 10-day extension.
**Next Milestone:** Revised RFP to be published by May 23, 2025, with updated PLA language.

8. **Costa Sur Autotransformer #2 HPFF Cable Repair – RFP 3PPO-0515-21-CSAT**
Procurement process was reinitiated on May 20, 2025, under a new RFP number. The original event was canceled and republished with timeline adjustments.
**Next Milestone:** RFP to be published on May 21, 2025; site visit scheduled for May 26 or May 27, 2025; proposals due June 4, 2025.

9. **Emergency Temporary Power Generation – RFP 3PPO-0314-20-TPG** RFP process was completed in April 2025, with seven proposals received. Only three proponents were deemed compliant. Negotiations are currently underway with eligible bidders.
**Next Milestone:** Contract signature recommendations to be finalized by June 5, 2025.

10. **Genera LNG Supply – RFP 3PPO-1125-17-MSIN** RFP was issued in March 2025. Site visits were conducted in May 2025 at Palo Seco, San Juan, Cambalache, and Mayagüez.
**Next Milestone:** Proposal submission deadline is May 30, 2025; evaluation and contract signature targeted by June 23, 2025.

11. **Dry and Wet Helicopter 3PPO-0120-18-HELI -** Returned No Organizational Conflict of Interest (OCI) was found.
Next Milestone: Monitor for future resubmission or reclassification request that may reintroduce OCI relevance.

12. **Vieques and Culebra Microgrid 3PPO-0517-10-VCM-02**

   Returned After internal assessment, no OCI being identified. Request was formally returned to originating entity.
   **Next Milestone:** Await determination if new project scope or OCI justification will prompt resubmission.

13. **Workforce Augmentation 3PPO-0909-14-WA**

   Submitted - Post-Evaluation: The RFP process was concluded and the evaluation finalized. Proposal has been submitted to the contracting authority for final review and award coordination.
   **Next Milestone:** Final award decision and initiation of contract negotiation or execution.

14. **3PPO-0118-04-FA-02** – Contract Management Stage- The contract has been executed and is currently in the active management phase. ReComS is overseeing compliance, deliverables, and vendor coordination in alignment with procurement SOPs.
Next Milestone: Conduct quarterly contract performance review and initiate supplier evaluation checklist.





## Appendix B

**FY2026 Budget Allocation Justification: LUMA vs. Genera**
**Regulatory Compliance Services Corp. (ReComS)**
**Proposal for Procurement & Contract Management Services – Second Renewal**
**Submitted to: Puerto Rico Public-Private Partnership Authority (P3A)**

To support the issuance of Memorandums of Understanding (MOUs) by the Puerto Rico Public-Private Partnership Authority (P3A), this appendix outlines the internal cost allocation rationale for the proposed **$1,580,342.29** contract value between **LUMA Energy** and **Genera PR** for FY2026.

### Budget Allocation Summary



| Operator | Primary Scope (FY2026 Forecast) | Allocation % | Allocated Amount |
|---|---|---|---|
| LUMA Energy | RFP Development & Contract Administration | 85% | $1,343,290.95 |
| Genera PR | Contract Administration & Potential RFP Support | 15% | $237,051.34 |
| Total | | 100% | $1,580,342.29 |

### Allocation Rationale

**LUMA Energy (85%)**
ReComS is actively planning and publishing over 10 RFPs for LUMA in FY2026. In addition, an estimated 10 additional RFPs are in the pipeline, many of which are anticipated to present Organizational Conflict of Interest (OCI) scenarios, requiring ReComS' independent oversight. These RFPs, once awarded, will subsequently transition into contract administration, resulting in a significant and sustained labor requirement. This dual-phase engagement—spanning both procurement design and full lifecycle management—justifies the majority allocation to LUMA.

**Genera PR (15%)**
Genera's current scope centers on contract administration functions, including compliance tracking, deliverables monitoring, and vendor oversight. While there is potential for additional RFP assignments during FY2026, such expansion is not confirmed at this time.
This allocation reflects current known workload while maintaining flexibility within the task order-based framework to accommodate expanded Genera support should new procurements be initiated.

Docusign Envelope ID: 1314C065-71C8-444D-97C2-BC61643B8745



## Purpose and Implementation

This budget allocation will guide the development of entity-specific MOUs by P3A and provide a framework for financial accountability across both LUMA and Genera activities. The 85/15 split is based on operational volume, staffing forecasts, and anticipated regulatory requirements. The structure ensures that ReComS can scale support responsively under the existing contract as additional task orders are issued.



Cuantía Estimada $169.9 millones
Orden Núm. 01-40096-24-17550-686

2023-P00093

EXHIBIT-K

*Execution Version*

**PRIVILEGED AND CONFIDENTIAL**

---

**PUERTO RICO THERMAL GENERATION FACILITIES**

**OPERATION AND MAINTENANCE AGREEMENT**

**dated as of**

**January 24, 2023**

**by and among**

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**
as Owner,

**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**
as Administrator,

and

**GENERA PR LLC**
as Operator

---

CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

Article 1 Definitions; Interpretation................................................................2
**Section 1.1**    Definitions................................................................................2
**Section 1.2**    Interpretation; Construction ...................................................35

Article 2 Purpose; Effective Date; Term ........................................................37
**Section 2.1**    Purpose..................................................................................37
**Section 2.2**    Effective Date .......................................................................37
**Section 2.3**    Term.......................................................................................39

Article 3 Ownership of the Legacy Generation Assets.....................................40
**Section 3.1**    Ownership..............................................................................40
**Section 3.2**    Engagement of Operator .........................................................40
**Section 3.3**    Use of Legacy Generation Assets .........................................40
**Section 3.4**    Liens.......................................................................................40
**Section 3.5**    Right of Access ......................................................................40
**Section 3.6**    Exclusivity .............................................................................41
**Section 3.7**    Essential Public Service........................................................41
**Section 3.8**    Reporting Obligations............................................................41
**Section 3.9**    Qualified Management Contract.............................................41

Article 4 Mobilization Period .........................................................................42
**Section 4.1**    Mobilization Period Generally................................................42
**Section 4.2**    Operator Responsibilities.......................................................44
**Section 4.3**    Owner and Administrator Responsibilities.............................53
**Section 4.4**    Governmental Approvals and Tax Matters.............................55
**Section 4.5**    Conditions Precedent to Service Commencement Date .........56
**Section 4.6**    Mobilization Period Compensation ........................................57
**Section 4.7**    Closing the Mobilization Period .............................................59
**Section 4.8**    Failure of Service Commencement Date Conditions..............60

Article 5 O&M Services .................................................................................62
**Section 5.1**    Services Generally .................................................................62
**Section 5.2**    Facility Contracts...................................................................63
**Section 5.3**    Facility Regulatory Matters ...................................................64
**Section 5.4**    Safety and Security ................................................................66
**Section 5.5**    Labor and Employment; Employee Benefits...........................67
**Section 5.6**    Capital Spare Parts and Capital Improvements .....................68
**Section 5.7**    Management of Fuel and Fuel Contracts.................................70
**Section 5.8**    Federal Funding .....................................................................70
**Section 5.9**    Environmental, Health and Safety Matters.............................71
**Section 5.10**  Accounting and Financial Services.........................................74
**Section 5.11**  Legal Matters .........................................................................74
**Section 5.12**  Coordination with T&D Operator............................................75

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

**Section 5.13**   Notification of Incidents and Emergencies..........................................................76
**Section 5.14**   Information ....................................................................................................76
**Section 5.15**   Bill Payments ................................................................................................78
**Section 5.16**   Compliance with Obligations .........................................................................78
**Section 5.17**   Energy Policy.................................................................................................78
**Section 5.18**   Enforcement of Easements .............................................................................78
**Section 5.19**   Out-of-Service Units......................................................................................78
**Section 5.20**   Communications Plan .....................................................................................79
**Section 5.21**   Other Services ...............................................................................................79
**Section 5.22**   Annual Performance Test ...............................................................................79

Article 6 Rights and Responsibilities of Owner and Administrator ...................................79
**Section 6.1**   Rights and Responsibilities of Owner..............................................................79
**Section 6.2**   Rights and Responsibilities of Administrator....................................................81
**Section 6.3**   Reporting; Audits............................................................................................82
**Section 6.4**   Staffing Levels ...............................................................................................83

Article 7 Compensation; O&M Budgets............................................................................83
**Section 7.1**   Service Fee.....................................................................................................83
**Section 7.2**   Pass-Through Expenditures .............................................................................86
**Section 7.3**   O&M Budgets.................................................................................................87
**Section 7.4**   O&M Budget Policy .......................................................................................89
**Section 7.5**   PREB Rate Proceedings..................................................................................90
**Section 7.6**   Service Accounts ...........................................................................................90
**Section 7.7**   Disallowed Costs. ..........................................................................................95
**Section 7.8**   Unfunded Amounts.........................................................................................95
**Section 7.9**   Owner Payment of Administrator Costs ...........................................................96
**Section 7.10**   Payment Disputes...........................................................................................96

Article 8 Credit Support....................................................................................................96
**Section 8.1**   Guarantee.......................................................................................................96
**Section 8.2**   Guarantor Reports...........................................................................................96

Article 9 Compliance with Applicable Law .......................................................................97
**Section 9.1**   Compliance Obligations..................................................................................97
**Section 9.2**   Anti-Corruption and Sanctions Laws...............................................................97
**Section 9.3**   Commonwealth Requirements.........................................................................98
**Section 9.4**   Non-Discrimination Laws................................................................................98
**Section 9.5**   Non-Collusion and Acceptance .......................................................................98
**Section 9.6**   Commonwealth Tax Liabilities........................................................................99
**Section 9.7**   Certifications Required by Commonwealth Contractor Requirements .................99
**Section 9.8**   Duty to Inform of Criminal Investigations .......................................................99

CONFIDENTIAL

## TABLE OF CONTENTS
### (continued)

**Page**

**Section 9.9**     Act 120...................................................................................................99

        Article 10 Insurance....................................................................................99
**Section 10.1**    Insurance Generally ...............................................................................99
**Section 10.2**    Commercial Availability........................................................................99
**Section 10.3**    Additional Named Insureds ..................................................................100
**Section 10.4**    Warranties ............................................................................................101
**Section 10.5**    Certificates of Insurance, Policies and Notice ....................................101

        Article 11 Subcontractors ...........................................................................101
**Section 11.1**    Ability to Subcontract...........................................................................101
**Section 11.2**    Subcontract Terms................................................................................102
**Section 11.3**    Indemnity for Subcontractor Claims.....................................................102
**Section 11.4**    Disclosure Related to Operator Affiliates..............................................103

        Article 12 Taxation .....................................................................................103
**Section 12.1**    Withholding Tax ....................................................................................103
**Section 12.2**    Tax Obligations.....................................................................................103

        Article 13 Intellectual Property; Proprietary Information .............................104
**Section 13.1**    Intellectual Property..............................................................................104
**Section 13.2**    Proprietary Information..........................................................................106
**Section 13.3**    Data Security.........................................................................................108

        Article 14 Events of Default; Remedies .......................................................109
**Section 14.1**    Events of Default by Operator ...............................................................109
**Section 14.2**    Termination for Operator Event of Default ............................................111
**Section 14.3**    Events of Default By Owner...................................................................112
**Section 14.4**    Termination for Owner Event of Default................................................113
**Section 14.5**    Additional Termination Rights ...............................................................114
**Section 14.6**    Remedies Upon Early Termination ........................................................114

        Article 15 Dispute Resolution......................................................................116
**Section 15.1**    Scope.....................................................................................................116
**Section 15.2**    Commencement of the Dispute Resolution Procedure .........................117
**Section 15.3**    Negotiation............................................................................................117
**Section 15.4**    Expert Technical Determination Procedure for Technical Disputes ...... 118
**Section 15.5**    Mediation ..............................................................................................119
**Section 15.6**    Litigation as a Final Resort....................................................................121
**Section 15.7**    Waiver of Jury Trial...............................................................................121
**Section 15.8**    Provisional Relief..................................................................................121
**Section 15.9**    Continuing Obligations..........................................................................121

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

**Page**

Article 16 Decommissioning ..................................................................................122
Section 16.1    Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services. .............................................122
Section 16.2    Decommissioning Compensation. .........................................................123

Article 17 Demobilization..................................................................................124
Section 17.1    Demobilization Services. ...................................................................124
Section 17.2    Termination Prior to Completion of Decommissioning ...................................125
Section 17.3    Demobilization Period Compensation ..................................................126

Article 18 Force Majeure Events ..........................................................................128
Section 18.1    Notice; Mitigation..........................................................................128
Section 18.2    Relief..........................................................................................128

Article 19 Indemnification..................................................................................129
Section 19.1    Indemnification by Operator..............................................................129
Section 19.2    Indemnification by Owner ................................................................130
Section 19.3    Limitation on Liability.....................................................................132
Section 19.4    Insurance and Other Recovery............................................................133
Section 19.5    Liability Limitation for Certain Damages.................................................134
Section 19.6    Additional Liability Limitation for Certain Damages ...................................134

Article 20 Representations and Warranties..................................................................135
Section 20.1    Representations and Warranties of Owner ...............................................135
Section 20.2    Representations and Warranties of Operator.............................................136

Article 21 Miscellaneous ...................................................................................140
Section 21.1    Fees and Expenses .........................................................................140
Section 21.2    Notices .....................................................................................140
Section 21.3    Amendments ...............................................................................141
Section 21.4    Entire Agreement...........................................................................142
Section 21.5    Relationship of the Parties .................................................................142
Section 21.6    Assignment and Transfer..................................................................142
Section 21.7    Interest on Overdue Obligations .........................................................143
Section 21.8    Waivers......................................................................................143
Section 21.9    Severability .................................................................................144
Section 21.10   Survival......................................................................................144
Section 21.11   No Third-Party Beneficiaries..............................................................144
Section 21.12   Remedies....................................................................................144
Section 21.13   Counterparts.................................................................................145
Section 21.14   Office of the Comptroller..................................................................145
Section 21.15   Governing Law .............................................................................145

CONFIDENTIAL

**TABLE OF CONTENTS**
(continued)

**Page**

**Section 21.16** Commonwealth Obligations ................................................................145
**Section 21.17** PREB Authority ....................................................................................145
**Section 21.18** Non-Recourse .......................................................................................146
**Section 21.19** Commonwealth Support Provisions ....................................................146

ANNEXES

Annex I Legacy Generation Assets.............................................................................I-1
Annex II Compensation ............................................................................................. II-1
Annex III Baseline Environmental Study ...................................................................III-1
Annex IV [Reserved] ................................................................................................. IV-1
Annex V Communications Plan................................................................................. V-1
Annex VI Organizational Conflict of Interest Policy ................................................ VI-1
Annex VII Mobilization Plan...................................................................................... VII-1
Annex VIII PREPA-Genco-Hydroco Operating Agreement........................................ VIII-1
Annex IX Scope of Services ......................................................................................IX-1
Annex X Operator Employment Requirements........................................................ X-1
Annex XI Mobilization Hourly Fully Allocated Rates...............................................XI-1
Annex XII Pass-Through Expenditures ...................................................................... XII-1
Annex XIII Insurance Specifications...........................................................................XIII-1
Annex XIV Termination Fees.......................................................................................XIV-1
Annex XV Decommissioning Plan...............................................................................XV-1
Annex XVI Demobilization Plan..................................................................................XVI-1
Annex XVII Fuel Contracts..........................................................................................XVII-1

EXHIBITS

Exhibit A Form of Guarantee Agreement................................................................... A-1
Exhibit B Form of Reliance Letter.............................................................................. B-1
Exhibit C Form of Sworn Statement........................................................................... C-1
Exhibit D Form of Tax Opinion – Effective Date ...................................................... D-1
Exhibit E Form of Commonwealth Certifications.......................................................E-1
Exhibit F Form of Anti-Corruption Certifications......................................................F-1
Exhibit G Form of Acknowledgement of Consent Decree.......................................... G-1
Exhibit H Form of Consent to Federal Funding ......................................................... H-1

CONFIDENTIAL

## PUERTO RICO THERMAL GENERATION FACILITIES
## OPERATION AND MAINTENANCE AGREEMENT

This PUERTO RICO THERMAL GENERATION FACILITIES OPERATION AND MAINTENANCE AGREEMENT (this "Agreement") is made and entered into as of this 24th day of January, 2023 by and among: (i) the Puerto Rico Electric Power Authority ("PREPA" or "Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; and (iii) Genera PR LLC ("Operator" and, together with Owner and Administrator, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1 (*Definitions; Interpretation*).

## RECITALS

**WHEREAS**, Owner owns and operates the base-load generation plants and combustion turbine peaking units listed on Annex I (*Legacy Generation Assets*) in which Owner has an ownership interest (the "Legacy Generation Assets");

**WHEREAS**, in accordance with Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), known as the "Puerto Rico Electric System Transformation Act," the Legislative Assembly established a path for a more reliable, efficient and low-cost electric system with the intent of economic development;

**WHEREAS**, pursuant to Act 120, Owner desires to engage Operator to provide the O&M Services for the Legacy Generation Assets in accordance with the terms of this Agreement and has designated Administrator as a Representative of Owner for purposes of this Agreement;

**WHEREAS**, pursuant to, and under the terms and conditions contained in, Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29"), known as the "Public-Private Partnership Authority Act," and Act 120, Owner is authorized to execute and deliver this Agreement, perform its obligations hereunder and enter into the transactions contemplated hereby;

**WHEREAS**, the Government of Puerto Rico is a vital and active participant in the energy transformation and public policy process, and Operator recognizes the responsibility that the Governmental Bodies have in representing the Puerto Rican people and ensuring their continued prosperity and bright future;

**WHEREAS**, in light of the foregoing, Operator seeks to have a positive and constructive relationship with the Legislative Assembly, including transparent communications as a fundamental pillar of the public-private partnership, as it executes the Agreement and works to provide a more reliable, efficient and low-cost generation system for the people of the Commonwealth of Puerto Rico and its businesses; and

1

CONFIDENTIAL

**WHEREAS**, Operator desires to provide the O&M Services for the Legacy Generation Assets in accordance with the terms of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

**Article 1**
**DEFINITIONS; INTERPRETATION**

**Section 1.1**    Definitions. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority.

"Act 2" means Act No. 2 of the Legislative Assembly of Puerto Rico, enacted on January 4, 2018 (known as the "Anticorruption Code for the New Puerto Rico").

"Act 3" means Act No. 3 of the Legislative Assembly of Puerto Rico, enacted on January 23, 2017 (known as the "Puerto Rico Financial Emergency and Fiscal Responsibilities Act").

"Act 17" means Act No. 17 of the Legislative Assembly of Puerto Rico, enacted on April 11, 2019 (known as the "Puerto Rico Energy Public Policy Act").

"Act 26" means Act No. 26 of the Legislative Assembly of Puerto Rico, enacted on January 27, 2017 (known as the "Fiscal Plan Compliance Act").

"Act 29" has the meaning set forth in the Recitals.

"Act 38" means Act No. 38 of the Legislative Assembly of Puerto Rico, enacted on June 30, 2017 (known as the "Government of Puerto Rico Uniform Administrative Procedure Act").

"Act 57" means Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 17, 2014 (known as the "Puerto Rico Energy Transformation and RELIEF Act").

"Act 66" means Act No. 66 of the Legislative Assembly of Puerto Rico, enacted on June 17, 2014 (known as the "Special Law for the Fiscal and Operational Sustainability of the Government of the Commonwealth of Puerto Rico").

"Act 120" has the meaning set forth in the Recitals.

"Act 173" has the meaning set forth in Section 9.3(b) (*Commonwealth Requirements – Practice of Engineering, Architecture and Other Professions in the Commonwealth*).

2

CONFIDENTIAL

"Act 237" means Act No. 237 of the Legislative Assembly of Puerto Rico, enacted on August 31, 2004, which establishes parameters and procedures for contracting professional or consulting services for government agencies and entities in the Commonwealth of Puerto Rico.

"Actual Fuel Savings" has the meaning set forth in Annex II, Section III.B.6 (*Compensation – O&M Services Categories – Fuel Optimization*).

"Adjusted O&M Fixed Fee" has the meaning set forth in Section I.B of Annex II (*Compensation – O&M Fixed Fee – Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services*).

"Adjustment Date" has the meaning set forth in Section I.B of Annex II (*Compensation – O&M Fixed Fee – Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services*).

"Administrator" has the meaning set forth in the introductory paragraph.

"Administrator Dispute" has the meaning set forth in Section 6.2(b) (*Rights and Responsibilities of Administrator – Disputes*).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person; provided, that each Equity Participant and its Affiliates shall be deemed "Affiliates" of Operator.

"Agreed Operating Procedures" means the written operating procedures developed in accordance with the PREPA-Genco-Hydroco Operating Agreement, which shall include: (i) a method of day-to-day and real-time communications; (ii) clearances and switching practices; (iii) outage scheduling; (iv) daily available energy reports; (v) economic dispatch of dependable capacity, spinning reserve capacity and excess capacity; (vi) reactive power support; (vii) voltage scheduling; (viii) emergency procedures; and (ix) other necessary reporting procedures.

"Agreement" has the meaning set forth in the introductory paragraph.

"Annual Performance Test" means the performance tests to be conducted each Contract Year to determine the Tested Capacity and Heat Rate for each Legacy Generation Asset in accordance with the requirements and procedures to be agreed upon with T&D Operator in accordance with the PREPA-Genco-Hydroco Operating Agreement.

"Anti-Corruption Laws" has the meaning set forth in Section 9.2(a) (*Anti-Corruption and Sanctions Laws – Anti-Corruption*).

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, or PROMESA, and any order issued by the Title III Court, in each case applicable to the Parties.

3

CONFIDENTIAL

"Audit" means a review with respect to any matter relating to the Legacy Generation Assets, the O&M Services or this Agreement, including compliance with the terms of this Agreement, conducted in accordance with applicable United States audit practices customarily accepted in the electric sector and the terms of this Agreement or as required by Applicable Law.

"Authorized Inspector" has the meaning set forth in Section 6.3(a) (*Reporting; Audits – Generally*).

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. 101 et seq. "Bankruptcy Code" shall also include (i) Title III of PROMESA, (ii) Title VI of PROMESA, (iii) any similar state or Commonwealth law relating to bankruptcy, insolvency, the rights and remedies of creditors, the appointment of receivers or the liquidation of companies and estates that are unable to pay their debts when due and (iv) any similar insolvency or bankruptcy code applicable under the laws of any other jurisdiction.

"Baseline Environmental Study" means the environmental study identifying Pre-Existing Environmental Conditions attached hereto as Annex III (*Baseline Environmental Study*) and to be updated during the Mobilization Period.

"Baseload Unit" means each Legacy Generation Asset designated as a Baseload Unit in Annex I (*Legacy Generation Assets*).

"Bid Security" means a letter of credit or other form of acceptable security to backstop Operator's commitment to execute this Agreement, the requirements of which are described in the RFP.

"Budgets" means the O&M Budget, the Operating Budget, the Decommissioning Budget, a Default Budget or the Fuel Budget, and "Budget" means any one of the foregoing.

"Budget Allocation Meeting" has the meaning set forth in Section 7.3(a) (*O&M Budgets – Budget Allocation Meeting*).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"Capital Spare Part" means any major, new or refurbished, equipment item the cost of which is equal to or in excess of US$1,000,000 that is required to ensure the reliability of the Legacy Generation Asset.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

"Change in Law" means any of the following events or conditions occurring on or after the Proposal Submission Date that has had, or is reasonably expected to have, a material adverse effect on the performance or the cost of performance by the Parties of their respective obligations under this Agreement (other than payment obligations), or on the operation or maintenance of the Legacy Generation Assets:

4

CONFIDENTIAL

(i)    the adoption, promulgation or issuance of a modification or written change in the Applicable Law or the administrative or judicial interpretation thereof, unless such modification or written change was duly adopted, promulgated or issued in final form prior to the Proposal Submission Date and becomes effective without any further action by any Governmental Body or governmental official having jurisdiction;

(ii)    any order or judgment of any Governmental Body to the extent such order or judgment is not the result of willful misconduct or negligent action or omission or lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such order or judgment shall not constitute or be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party;

(iii)    the denial of an application for, the delay in the review, issuance or renewal of, or the suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or the failure of issuance or renewal of any Governmental Approval to the extent that such denial, delay, suspension, termination, interruption, imposition of a new condition or failure (A) interferes with the performance of this Agreement and (B) is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition of a new condition or failure shall not be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party; or

(iv)    the commencement by or joinder of Operator in any action or contested matter in the Title III Case in order to protect its rights under this Agreement,

provided that "Change in Law" shall not include (x) the imposition of a Tax, or an increase in Taxes, unless (A) the Tax Decree is revoked (unless if due to Operator's noncompliance with the terms thereof) or amended without Operator's consent in a manner materially detrimental to Operator or any of its Affiliates or (B) the imposition or increase has a materially disproportionate impact on any of Operator, the Legacy Generation Assets or private operators of generation facilities in the Commonwealth or Contractors (as defined in Act 29) compared to any other entities that operate in the Power and Electricity sector in the Commonwealth; or (y) the delay or denial of any request to approve an O&M Budget or performance relief, except where arising out of the Title III Case.

"Change in Regulatory Law" means any change, amendment or modification to any Commonwealth Applicable Law (and not, for the avoidance of doubt, the Applicable Law of any other jurisdiction) or any adoption of, or change to, any administrative or judicial interpretation (having the force of law) of any Commonwealth Applicable Law or any regulation or regulatory action under any Commonwealth Applicable Law, including the entry of any consent decree to resolve any Legal Proceeding arising under any Environmental Law or any Environmental Approval, in each case occurring on or after the Proposal Submission Date, that:

5

CONFIDENTIAL

(i)      alters the scope of PREB's statutory oversight over Operator or Owner in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement;

(ii)      renders unenforceable or invalid, in whole or in part, any right or privilege granted to Operator under this Agreement, including by invalidating Operator's selection under the RFP; or

(iii)      subjects Operator (or any of its Affiliates or Subcontractors that provides O&M Services hereunder) to other substantive regulation by PREB in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement to the extent not otherwise mitigated by the terms of this Agreement, or that constitutes a default by the FOMB under the terms of the FOMB Protocol Agreement, provided, that written notice of such default has been given to FOMB by Operator and such default continues unremedied for a period of thirty (30) days following such written notice, provided, further, that any such default by the FOMB shall constitute a Change in Regulatory Law regardless of whether the conditions in the introductory paragraph of this definition are satisfied.

"Change of Control" means, with respect to Operator, whether accomplished through a single transaction or a series of related transactions and whether accomplished directly or indirectly, (i) a change in ownership resulting in more than 50% of the direct or indirect voting or economic interests in Operator being transferred to another Person or group of Persons acting in concert that did not have such direct or indirect voting or economic interests immediately prior to such transaction or transactions, (ii) the power directly or indirectly to direct or cause the direction of management and policy of Operator, whether through ownership of voting securities, by contract, management agreement or common directors, officers or trustees or otherwise, being transferred to another Person or group of Persons acting in concert that did not have such power immediately prior to such transaction or transactions or (iii) the merger, consolidation, amalgamation, business combination involving Operator or sale of substantially all of the assets of Operator for the purpose of or with the effect contemplated in clauses (i) or (ii) above; provided, however, that, notwithstanding anything to the contrary set forth in this definition, so long as either (x) the Guarantee continues to be provided or (y) Operator is a Controlled direct or indirect subsidiary of Parent Company upon completion of the relevant transaction(s), none of the following shall constitute a "Change of Control" for the purposes of this Agreement:

(A)      transfers of direct or indirect ownership, voting or economic interests in Operator between or among Persons that are Affiliates of each other or Persons who are under common Control;

(B)      transfers or sales of shares of Operator or the direct or indirect shareholders of Operator pursuant to bona fide open market transactions (including block trades) on the New York Stock Exchange, NASDAQ, London Stock Exchange or comparable United States or foreign securities exchange, including any such transactions involving an initial or "follow on" public offering;

(C)      transfers of direct or indirect ownership interests in Operator by any Equity Participant(s) or its/their beneficial owner(s) to any Person(s) so long as the Equity Participants or

6

CONFIDENTIAL

their respective beneficial owner(s) having ownership interests in Operator (as of the later of (1) the Effective Date or (2) the date on which Administrator most recently approved a Change of Control pursuant to Section 21.6 (*Assignment and Transfer*) or waived a Change of Control pursuant to Section 14.2(b) (*Termination for Operator Event of Default – Termination for Other Operator Event of Default*)) together retain, in the aggregate, 50% or more of the direct or indirect voting or economic interests in Operator or the power directly or indirectly to direct or cause the direction of management and policy of Operator, through ownership of voting securities or common directors, officers or trustees; or

(D)    a transfer of the direct or indirect ownership interest in Operator, including any events contemplated in (i), (ii) and (iii) of this definition above, or in any Affiliates of Operator.

"Claiming Party" has the meaning set forth in Section 18.1(a) (*Notice; Mitigation – Notice*).

"Clean Air Act" means the means the Clean Air Act of 1970, 42 U.S.C. §§ 7401 et seq, and regulations promulgated thereunder.

"Commencement Date Governmental Approvals" has the meaning set forth in Section 4.4 (*Governmental Approvals and Tax Matters*).

"Commonwealth" means the Commonwealth of Puerto Rico.

"Commonwealth Court" means the Commonwealth Court of First Instance, San Juan Part.

"Communications Plan" has the meaning set forth in Section 2.2(b)(xi) (*Effective Date – Conditions to Execution*).

"Confidential Information" means data or information in any form disclosed by one Party to the other Party by any means, if and for so long as the data and information are protectable as trade secrets by the disclosing Party or are otherwise confidential. As a non-exhaustive list of examples, "Confidential Information" includes non-public information regarding a Party's Intellectual Property, financial condition and financial projections, business and marketing plans, product plans, product and device prototypes, the results of product testing, research data, market intelligence, technical designs and specifications, secret methods, manufacturing processes, source code of proprietary software, the content of unpublished patent applications, customer lists, vendor lists, internal cost data, the terms of contracts with employees and third parties, and information tending to embarrass the disclosing Party or tending to tarnish its reputation or brand. For the avoidance of doubt, information in this list of examples is only considered "Confidential Information" for so long as it has not been made known to the general public by the disclosing Party or through the rightful actions of a third party.

"Consent Decree" means the Consent Decree between PREPA and the United States of America (through the United States Department of Justice and the EPA), as entered by the United States District Court for the District of Puerto Rico on March 19, 1999 in Civil Action No. 93-2527(CCC), as modified on September 9, 2004, and as may be further modified in the future, including any successor consent decree thereto.

CONFIDENTIAL

"Consumables" means consumables of all kinds that are necessary for the operation and maintenance of the Legacy Generation Assets, or any part thereof, including gaskets, parts that are not repairable, oils, grease, chemicals, lubricants, filters, resins and specialty gases but excluding fuel, electricity and water.

"Contract Nullification or Cancellation" has the meaning set forth in Section 14.6(c)(i) (*Remedies Upon Early Termination – Termination Fee*).

"Contract Standards" means the terms, conditions, methods, techniques, practices and standards imposed or required by: (i) Applicable Law; (ii) Prudent Industry Practice; (iii) applicable equipment manufacturer's specifications and reasonable recommendations set forth in the Facility Contracts; (iv) applicable insurance requirements under any insurance procured pursuant to this Agreement; (v) the Procurement Manual; and (vi) any other standard, term, condition or requirement specifically contracted in this Agreement to be observed by Operator.

"Contract Year" means the period from July 1 through June 30 of the following year during that portion of the Term commencing on the Service Commencement Date; provided, however, that (i) the initial Contract Year shall commence on the Service Commencement Date and end on June 30th of the following calendar year and (ii) the final Contract Year shall end on June 30th of the calendar year after the calendar year in which the tenth (10th) anniversary of the Service Commencement Date occurs. Any computation made on the basis of a Contract Year shall be adjusted on a Pro Rata basis to take into account any Contract Year of more or less than 365 days.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of an entity, whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control another Person (i) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (ii) if such Person has the direct or indirect power whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise to designate a majority of the board of directors (or equivalent governing body) of such other Person.

"Copyright" means the exclusive legal rights held by the owner of a copyright including the rights to copy, publicly perform, publicly display, distribute, adapt, translate, modify and create derivative works of copyrighted subject matter, including the rights to any registrations and applications therefor, together with all renewals, extensions, translations, adaptations, derivations and combinations therefor, works of authorship, publications, documentation, website content, rights in fonts and typefaces and database rights.

"COR3" means the Central Office of Recovery, Reconstruction and Resiliency.

"Covered Contract" means any contract (i) for management, service, or incentive payment arrangements between Owner, Administrator, or Operator and another Person under which such Person provides services involving all, a portion of, or any function of, the Legacy

8

CONFIDENTIAL

Generation Assets; (ii) for the sale, lease, or use of Legacy Generation Assets and (iii) to sell Power and Electricity or electric capacity if (x) the term of such contract is in excess of three (3) years or (y) any fees under such contract were not based on a negotiated, arm's length agreement that provides for compensation at fair market value or generally applicable and uniformly applied rates; provided that "Covered Contract" shall not include any (A) Subcontract in which the compensation to the Subcontractor is paid by Operator solely out of the applicable Service Fee, (B) contract for services that are solely incidental to the primary governmental function or functions of the Legacy Generation Assets (such as contracts for janitorial, equipment repair, bookkeeping, physical security, or similar services), (C) contract for services performed exclusively during the Mobilization Period, pursuant to Article 16 (*Decommissioning*) or Article 17 (*Demobilization*) or in accordance with the Shared Services Agreement, (D) contract to design, build, rehabilitate or purchase property, assets, equipment or supplies, (E) contract to procure natural gas, coal or fuel oil, (F) contract for management, service or incentive payment arrangement or for consulting services under which the compensation consists entirely of a fixed fee and/or fees at hourly rates, (G) a negotiated, arm's length contract with a term of less than fifty (50) days, and (H) sales of assets (other than real property) in the ordinary course of business at the end of their expected useful lives.

"CPI Factor" means, with respect to any Contract Year, the amount equal to (i) CPI Value for the twelve month period immediately prior to the relevant Contract Year *divided by* (ii) the CPI Value for the twelve month period from and including December 2020 to and including November 2021 (subject only to a re-basing of the value for such period during the Term, if applicable), rounded to the fifth decimal place; provided, however, that in no case shall be the CPI Factor for any adjustment period be less than 1.000 or greater than 3.000.

"CPI Value" for any year means the "Annual Value" of such year obtained from "Consumer Price Index—All Urban Consumers—U.S. All Items Less Food and Energy (CUUR0000SA0L1E)" published by the Bureau of Labor Statistics of the United States Department of Labor, which is the calendar year 12-month average rounded to three decimal places; provided, however, that: (i) if such index is changed so that the base year thereof changes, such index shall be converted in accordance with the conversion factor published by the Bureau of Labor Statistics of the United States Department of Labor; (ii) if such index is discontinued or revised during the Term, such other index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if such index had not been discontinued or revised; and (iii) any such revision shall not result in the retroactive adjustment of any amounts paid or payable pursuant to this Agreement prior to such revision. For illustrative purposes only, the CPI Value for the calendar year 2020 is 267.693, which can be obtained directly as an annual value or computed using monthly values with data from the official website of the Bureau of Labor Statistics of the United States Department of Labor.

"Critical Employee Positions" has the meaning set forth in Section 4.2(h) (*Operator Responsibilities – Owner Employees in Critical Positions*).

"Cybersecurity Breach" means any successful act to gain unauthorized access to, disrupt or misuse an Information System or information stored on such Information System.

CONFIDENTIAL

"Data Room" means the virtual data room containing written documents and information relating to the Owner and the Legacy Generation Assets made available on the Intralinks online datasite under the name "P3 Power System Projects" and to which Operator and its Representatives has had access on and prior to the date of this Agreement.

"Declared Emergency or Major Disaster" means an event declared as an emergency or major disaster in accordance with the provisions of the Stafford Act.

"Decommissioning Account" has the meaning set forth in Section 7.6(c)(i) (*Service Accounts – Decommissioning Account*).

"Decommissioning Budget" has the meaning set forth in Section 16.2(a) (*Decommissioning Compensation – Decommissioning Budget*).

"Decommissioning Budget Dispute" has the meaning set forth in Section 16.2(c) (*Decommissioning Compensation – Decommissioning Budget Disputes*).

"Decommissioning Commencement Date" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Completion Date" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Incentive Payment" means one or more incentive payments based on Operator's performance of the Decommissioning Services, as calculated pursuant to Section III.C.1 of Annex II (*Compensation – Incentives and Penalties – Decommissioning Services Categories – Decommissioning Costs Efficiency*).

"Decommissioning Notification Date" has the meaning set forth in Section 16.1(a) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Generally*).

"Decommissioning Penalty" means one or more liquidated damages penalties based on Operator's performance of the Decommissioning Services.

"Decommissioning Plan" has the meaning set forth in Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

"Decommissioning Services" means services provided under this Agreement in order to complete the dismantlement and removal of the structures comprising the Legacy Generation Assets, and all other activities indispensable for the retirement, dismantlement, Decontamination or storage of the Legacy Generation Assets, including the services contemplated by the Decommissioning Plan, in each case in compliance with Applicable Law and in accordance with the Integrated Resource Plan; provided that the Decommissioning Services shall not include O&M Services or Demobilization Services.

10

CONFIDENTIAL

"Decontamination" means the removal of Hazardous Materials from a specified area in accordance with Prudent Industry Practice and Applicable Law.

"Default Budget" has the meaning set forth in Section 7.3(g) (*O&M Budgets – Default Budget*).

"Delay Liquidated Damages" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Delay Period Date" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Demobilization Account" has the meaning set forth in Section 17.3(c)(i) (*Demobilization Period Compensation – Funding*).

"Demobilization Commencement Date" has the meaning set forth in Section 17.1(a) (*Demobilization Services – Generally*).

"Demobilization Period" means the period of time from and including the Demobilization Commencement Date through the last day of the Term.

"Demobilization Plan" has the meaning set forth in Section 17.1(b) (*Demobilization Services – Demobilization Plan*).

"Demobilization Service Fee" has the meaning set forth in Section 17.3(b) (*Demobilization Period Compensation – Demobilization Service Fee*).

"Demobilization Service Fee Dispute" has the meaning set forth in Section 17.3(d)(ii) (*Demobilization Period Compensation – Invoices*).

"Demobilization Service Fee Estimate Dispute" has the meaning set forth in Section 17.3(c)(iii) (*Demobilization Period Compensation – Funding*).

"Demobilization Services" means services provided under this Agreement in order to complete the demobilization and handover of the rights and responsibilities, if any, with respect to the remaining Legacy Generation Assets, back to Owner or to a successor operator upon the early termination or expiration of the Term, including the services contemplated by the Demobilization Plan; provided that the Demobilization Services shall not be O&M Services or Decommissioning Services.

"Designated Person" means each Representative of Operator or Administrator who is designated as such for the purposes of Article 15 (*Dispute Resolution*).

"DHS" means U.S. Department of Homeland Security.

11

CONFIDENTIAL

"Disallowed Costs" has the meaning set forth in Section 7.7(a) (*Disallowed Costs – Generally*).

"Disallowed Costs Dispute" has the meaning set forth in Section 7.7(b) (*Disallowed Costs – Disallowed Costs Disputes*).

"Dispute" has the meaning set forth in Section 15.1 (*Scope*).

"Dispute Resolution Procedure" has the meaning set forth in Section 15.1 (*Scope*).

"Easement" means those certain real property rights vested or to be vested in Owner, whether or not recorded in the Registry of the Property of Puerto Rico, that: (i) encumber land portions or estates for the benefit of the Legacy Generation Assets to permit the ingress to and egress from each Generation Site to the public road; (ii) grant air rights; (iii) constitute restrictive use and construction covenants (*servidumbres en equidad*) for the operation of the Legacy Generation Assets; and (iv) allow for the construction and installation of above- or below-ground improvements and equipment and for the addition to, or maintenance, repair, restoration, replacement or alteration of, the Legacy Generation Assets or any other service for the Legacy Generation Assets.

"Effective Date" has the meaning set forth in Section 2.2(a) (*Effective Date – Execution of the Agreement*).

"Emergency" or "Emergency Event" means (i) any Declared Emergency or Major Disaster and (ii) any other circumstance defined as an Emergency in the Legacy Generation Emergency Response Plan to be prepared pursuant to Section 4.2(e) (*Operator Responsibilities – Legacy Generation Emergency Response Plan*).

"Emergency Unit" means each Legacy Generation Asset designated as an Emergency Unit in Annex I (*Legacy Generation Assets*).

"Energy Compliance Certificate" means the certificate issued by the PREB certifying that this Agreement complies with Act 120 and the regulatory framework, including Act 17.

"Environmental Approval" means any Governmental Approval issued under any Environmental Law.

"Environmental Claim and Cleanup Liability" means: (i) any liabilities, costs or expenses arising from or relating to any claim by a Governmental Body or other third party pursuant to any Environmental Law for personal injury, property damage or damage to natural resources or the environment (whether based on negligent or grossly negligent acts or omissions, statutory liability or strict liability without fault or otherwise) in connection with the Legacy Generation Assets, the O&M Services, the Decommissioning Services, the Mobilization Services or the Demobilization Services; (ii) any liabilities, costs or expenses arising from or relating to any investigation, study, response, remediation or abatement of any Release or threatened Release of Hazardous Materials, to the extent required by any Environmental Law or to meet the published cleanup standards of any Governmental Body with jurisdiction over such Release, and in

12

CONFIDENTIAL

accordance with the Safety and Hazardous Materials Procedures Manual, in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; (iii) any fines or penalties assessed for Environmental Noncompliance in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; or (iv) any liabilities, costs or expenses necessary to restore, achieve or maintain compliance with any Environmental Law.

"Environmental Law" means (i) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body or the Consent Decree, and (ii) any other consent order or decree, settlement agreement or other similar agreement between Owner and the Puerto Rico Department of Natural and Environmental Resources, EPA, the United States Department of Justice, or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (A) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (B) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (C) the storage, treatment, disposal, recycling or transportation of any Hazardous Material or (D) human health or safety. For avoidance of doubt, Environmental Law includes the Consent Decree and the State Implementation Plan.

"Environmental Noncompliance" means the ownership or operation of the Legacy Generation Assets or Generation Sites in violation of Environmental Laws or the terms of any Environmental Approval.

"EPA" means the United States Environmental Protection Agency.

"Equity Participant" means any Person who holds any shares of capital stock or securities of, or units, partnership interests, membership interests or other equity interests in, Operator.

"Event of Default" means an Operator Event of Default or an Owner Event of Default, as the case may be.

"Existing Litigation" means any legal claims involving or affecting the Legacy Generation Assets and/or the Generations Sites, or the Owner as they relate to the Legacy Generation Assets and/or the Generation Sites, in each case which are pending or threatened in writing as of the Service Commencement Date.

"Expert Technical Determination" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Extended Event" has the meaning set forth in Section 18.2(c) (*Relief – Extended Event*).

"Extension Term" has the meaning set forth in Section 2.3(b)Section 2.3(b) (*Term – Extension*).

"Facility Contracts" means (i) the contracts, leases, licenses, permits and other similar arrangements of all types related to the Legacy Generation Assets that have been entered

13

CONFIDENTIAL

into by Owner (or pursuant to which Owner otherwise has rights), remain in effect as of the Service Commencement Date and (ii) any other contracts, leases, licenses, permits and similar arrangements of all types entered into after the Effective Date by Owner, or by Operator on behalf and as agent of Owner related to the Legacy Generation Assets, O&M Services, Decommissioning Services or the Demobilization Services pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities – Additional Facility Contracts Between Effective Date and Service Commencement Date*) and/or Section 5.2(d) (*Facility Contracts – Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date*), including contracts related to:

(A)    the ownership and operation and maintenance of the Legacy Generation Assets (including long-term service agreements with original equipment manufacturers and other related agreements);

(B)    the procurement, delivery, quality-testing and storage of fuel, and the maintenance of fuel tanks and pipelines (i.e., Fuel Contracts);

(C)    all information technology hardware and software used to operate or administrate the Legacy Generation Assets; or

(D)    Legacy Generation Assets operation, decommissioning, or ancillary services.

For the avoidance of doubt, Facility Contracts shall not include the PREPA-Genco-Hydroco Operating Agreement, the Shared Services Agreement, collective bargaining agreements with union labor or, with regard to clause (C) above, any agreement related exclusively to information technology, hardware and software utilized by Operator before the Effective Date and extended thereafter to operate or administer the Legacy Generation Assets.

"Facility Information" means any and all information relating to the Legacy Generation Assets, including: (i) actual and budgeted operating expenses (including actual and budgeted expenses related to maintenance and repair and actual and budgeted fuel-related expenses); (ii) daily operations log for the Legacy Generation Assets, which shall include information known to it customary and appropriate for the operation and maintenance of thermal generation facilities and any significant events related to the operation of the Legacy Generation Assets; (iii) all certificates, correspondence, data (including test data), documents, facts, files, information, investigations, materials, notices, plans, projections, records, reports, requests, samples, schedules, statements, studies, surveys, tests and test results analyzed, categorized, characterized, created, collected, generated, maintained, processed, produced, prepared, provided, recorded, stored or used by Operator or any of its Representatives in connection with the Legacy Generation Assets, the O&M Services or the Decommissioning Services; and (iv) books, records, accounts and documents relating to the O&M Services or the Decommissioning Services, including any information that is stored electronically or on computer-related media but not including (A) Operator's Confidential Information or other information that Operator reasonably believes is subject to attorney-client or other legal privilege, confidentiality restrictions or trade secret protections, (B) personally identifiable information protected by Applicable Law, other than Owner Personal Information, (C) correspondence between employees or other Representatives of Operator, (D) information and records pertaining to the applicable Service Fee or (E) information

14

CONFIDENTIAL

or records pertaining to any dispute with Owner or Administrator or their respective Representatives.

"Failure to Pay Penalties" has the meaning set forth in Section 14.1(k) (*Events of Default by Operator – Failure to Pay Penalties*).

"Federally Funded Generation Project Plan" has the meaning set forth in Section 4.2(u) (*Operator Responsibilities – Federally Funded Generation Project Plan*).

"Fees-and-Costs" means reasonable and documented fees and expenses of attorneys, expert witnesses, engineers and consultants with respect to any Legal Proceeding.

"Fiscal Plan" means each of the PREPA Fiscal Plan, certified on June 28, 2022 by the FOMB, and the 2021 Fiscal Plan for Puerto Rico, certified by the FOMB on January 27, 2022, in each case as supplemented and amended from time to time, and any successors thereto.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"FOMB Protocol Agreement" means a protocol agreement among Operator, Administrator, Owner, and the FOMB, which shall include provisions governing the FOMB's interaction with the Parties with respect to the respective duties of the FOMB and Owner under PROMESA, which shall apply only during the period the FOMB is in existence and Owner is a covered territorial instrumentality pursuant to PROMESA.

"Forced Outage" means, as defined by IEEE 762-2006, an unplanned disconnection or stoppage of a Legacy Generation Asset due to failure or defect of the unit or its equipment, or another such event, including due to the operational or unplanned malfunctioning of equipment on the transmission grid or human error that impacts the operation of the Legacy Generation Asset.

"Force Majeure Event" means any act, event, circumstance or condition (other than lack of finances) whether affecting the Legacy Generation Assets, Owner, Operator or any of Owner's contractors or Operator's Subcontractors that (i) is beyond the reasonable control of and unforeseeable by, or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by, the Party relying on such act, event or condition as justification for not performing an obligation or complying with any condition required of such Party under this Agreement, and (ii) materially interferes with or materially increases the cost of performing, such Party's obligations hereunder, to the extent that such act, event, circumstance or condition is not the result of the willful or negligent act, error or omission or breach of this Agreement by such Party; provided, however, that the contesting in good faith or the failure in good faith to contest such action or inaction shall not be construed as a willful or negligent act, error or omission or breach of this Agreement by such Party.

Subject to the requirements specified in the foregoing paragraph, Force Majeure Event shall include, by way of example, the following acts, events or conditions:

(A)    act of God, lightning, landslide, earthquake, fire, explosion, flood or similar occurrence;

15

CONFIDENTIAL

(B)    war, armed conflict, invasion, acts of terror, acts of civil or military authority, sabotage or similar occurrence, computer sabotage or virus, acts of a public enemy, acts of a foreign enemy, extortion, blockade, embargo, revolution, interference by military authorities, quarantine, epidemic, pandemic (including COVID-19), insurrection, riot or civil commotion or disturbance or civil disobedience; breakdown or unavailability of port facilities or port services (including the channel, tugs or pilots) or any similar occurrence;

(C)    to the extent not covered by (A) or (B) above, any event that causes any federal or Commonwealth Governmental Body to declare the municipality in which the applicable Legacy Generation Asset is located part of a "disaster zone," "disaster area," "state of emergency" or any similar pronouncement (for the avoidance of doubt, a "state of emergency" in the context of this provision is not limited to events defined herein as an Emergency Event);

(D)    a Change in Law;

(E)    refusal or failure to issue, delay in issuing, or amendment, revocation or suspension of, any Governmental Approvals if such refusal or failure, delay, amendment, revocation or suspension results in a delay or curtailment of the performance of any of the O&M Services, the Mobilization Services, the Decommissioning Services or the Demobilization Services;

(F)    the failure of any appropriate Governmental Body or private utility having operational jurisdiction in the area in which the respective Legacy Generation Asset is located (including Genco and the T&D Operator) to provide and maintain services to any facility comprising part of the Legacy Generation Assets, which services are required for the performance of this Agreement, if such failure results in a delay or curtailment of the performance of any of the O&M Services, the Mobilization Services, the Decommissioning Services or the Demobilization Services;

(G)    any failure of title to any portion of the Generation Sites, any revocation or termination or invalidity or material impairment of any Easement or other access right, or any other failure or restriction of access to or use of the Generation Sites;

(H)    any enforcement of any Lien on the Generation Sites or on any improvements thereon not consented to in writing by, or arising out of any action or agreement entered into by, the Party adversely affected thereby;

(I)    the preemption of materials or services by a Governmental Body in connection with a public emergency or any condemnation or other taking by eminent domain of any portion of the Legacy Generation Assets;

(J)    the presence of archeological finds, endangered species or Hazardous Materials at the Generation Sites, except to the extent Operator's negligence directly caused such presence, or the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner;

16

CONFIDENTIAL

(K)    strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of Operator, but only if occurring in the twelve (12) months immediately following the Service Commencement Date;

(L)    any significant failure in the transmission grid;

(M)    denial of access to the transmission grid or malfunctioning or unavailability of the transmission grid; and

(N)    the unavailability in Puerto Rico of a disposal facility for waste produced in connection with Operator's performance of Decommissioning Services if such unavailability is due to a change in Applicable Law or environmental policy during the time the Decommissioning Services are being performed.

It is specifically understood that none of the following acts, events or conditions shall constitute a Force Majeure Event:

(1)    to the extent that Operator deviates from Prudent Industry Practice or fails to adequately prepare for and/or mitigate the effects of an act of God, lightning, landslide, earthquake, fire, explosion, flood or similar occurrence on Operator's ability to provide Services hereunder;

(2)    general economic conditions, interest or inflation rates, increases in wage rates of Operator's employees and Subcontractors, insurance costs, commodity prices or currency fluctuations, or exchange rates;

(3)    the financial condition of Owner, Operator, any of their Affiliates (including Guarantor) or any Subcontractors;

(4)    any increase for any reason in premiums charged by Operator's insurers or the insurance markets generally for the required insurance that are compensated as Pass-Through Expenditures;

(5)    the failure of Operator to secure Patents or intellectual property licenses in connection with the technology necessary to perform its obligations under this Agreement, if available on commercially reasonable terms;

(6)    equipment malfunction or failure due to Operator's failure to provide the Services in accordance with Prudent Industry Practices (unless caused by an event that would otherwise constitute a Force Majeure Event);

(7)    interruption in the delivery of fuel or gas to the applicable Legacy Generation Asset or Legacy Generation Assets (unless caused by an event that would otherwise constitute a Force Majeure Event);

(8)    union or labor work rules, requirements or demands relating to Operator's employees which have the effect of increasing the number of employees employed at the Legacy

17

CONFIDENTIAL

Generation Assets, reducing the operating flexibility of Operator or otherwise increasing the cost to Operator of performing the O&M Services or the Decommissioning Services;

(9)    any impact of prevailing wage laws on Operator's operation and maintenance costs with respect to wages and benefits;

(10)    the failure of any Subcontractor or supplier to furnish labor, materials, services or equipment for any reason (unless caused by an event or circumstance that constitutes a Force Majeure Event); and

(11)    strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of Operator, but only if occurring from and after the date that is twelve (12) months immediately following the Service Commencement Date.

"Force Majeure Event Dispute" has the meaning set forth in Section 18.1(c) (*Notice; Mitigation – Burden of Proof*).

"Fuel" means natural gas, propane, gasoline (vehicles), light distillate no. 2 fuel oil (diesel), residual no. 6 fuel oil bunker fuel, or hydrogen, as applicable.

"Fuel Account" has the meaning set forth in Section 7.6(b)(i) (*Service Accounts – Fuel Account*).

"Fuel Adjustment Clause" means the applicable cost recovery rate provision, as approved by PREB from time to time pursuant to Applicable Law, which is made up of the estimated charges related to the purchase, transportation, testing and delivery of fuel for the Legacy Generation Assets for the next quarterly period, along with any prior period cost reconciliations.

"Fuel Budget" means, for any given Contract Year, the budget of the Fuel Costs for such Contract Year, together with the projected budget of the Fuel Costs for the following two (2) Contract Years, and including monthly forecasts and quarterly budgets of estimated variable Fuel Costs expected to be incurred pursuant to the terms and conditions of any fuel supply agreement for the applicable Legacy Generation Assets, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement and, with respect to the quarterly budgets described above, as adjusted pursuant to Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*) in connection with the Fuel Adjustment Clause, the applicable fuel-supply agreements, and the PREPA-Genco-Hydroco Operating Agreement.

"Fuel Contracts" means any contracts, leases, licenses, permits and similar arrangements of all types entered into by Owner, or by Operator on behalf and as agent of Owner, related to the procurement, delivery, quality-testing and storage of fuel, and the maintenance of fuel tanks and pipelines.

"Fuel Cost Savings Initiatives" means any initiatives undertaken by Operator, its Affiliates or Subcontractors in connection with this Agreement, that reduce Fuel Costs, including by (i) improving the fuel efficiency of any Legacy Generation Assets, (ii) converting any Legacy Generation Assets to be able to operate on any new alternative fuel(s) (including natural gas and hydrogen), (iii) supplementing Legacy Generation Assets with power generation equipment at or

CONFIDENTIAL

in the vicinity of the relevant Generation Site that is more fuel efficient and/or operates on any new alternative fuel(s) (including natural gas and hydrogen), (iv) reducing transportation, testing, delivery or storage (including tank maintenance) costs or (v) pursuing savings opportunities related to credit and portfolio optimization, in each case whether such initiatives are implemented as Pass-Through Expenditures, at Operator's cost as Operator's own capital improvements pursuant to Section 5.6(b) (*Capital Spare Parts and Capital Improvements – Capital Improvements*), by replacement or renegotiation of Fuel Contracts or Facility Contracts, or otherwise.

"Fuel Costs" has the meaning set forth in Section 7.6(b)(i) (*Service Accounts – Fuel Account*).

"Fuel Optimization Payment" has the meaning set forth in Annex II, Section III.B.6(a) (*Compensation – Incentives and Penalties – O&M Services Categories – Fuel Optimization – Operator shall receive…*).

"Fuel Optimization Plan" has the meaning set forth in Section 4.2(t) (*Operator Responsibilities – Fuel Optimization Plan*).

"Fuel Optimization Report" has the meaning set forth in Annex II, Section III.B.6(b) (*Compensation – Incentives and Penalties – O&M Services Categories – Fuel Optimization – Operator shall prepare…*).

"Generation Sites" means the real property and interests therein (in each case, up to the corresponding Interconnection Point) upon which the components of the Legacy Generation Assets are and shall be located, including any land subject to Easements.

"Governmental Approvals" means all orders of approval, permits, licenses, authorizations, consents, certifications, exemptions, registrations, rulings and entitlements issued by a Governmental Body of whatever kind and however described that are required under Applicable Law to be obtained or maintained by any Person with respect to the performance of the O&M Services, including Environmental Approvals.

"Governmental Body" means any U.S. federal, state, Commonwealth, municipal or local, including but not limited to, legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than Owner and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Grant Manager" means the relevant Governmental Body and any third-parties, in either case, authorized by Owner, and reasonably acceptable to Operator, to act as grant manager to administer federal funding.

"Grant Management Services" means recordkeeping and financial management of awards of federal funds, including project monitoring, quarterly reporting, submitting reimbursement requests, delivery of technical assistance, audit and appeal support, submitting responses to requests for information, and supporting timely closeout. For the avoidance of doubt, Grant Management Services do not include the submission of application materials to federal

19

CONFIDENTIAL

agencies, determining the scope of work of projects to be funded by federal grants, or procuring goods and services to complete the scope of work using such grants.

"Guarantee" means the guarantee agreement, dated as of the date hereof, by and between Guarantor and Owner in the form of Exhibit A (*Form of Guarantee Agreement*).

"Guarantor" means Parent Company and, as determined pursuant to the terms and conditions of the Guarantee, its permitted successors and assigns.

"Handover Checklist" means the handover checklist set forth in Annex VII (*Mobilization Plan*), which shall include individual checklists for each Legacy Generation Asset and details all of the requirements for Operator to complete the Mobilization Services by the Target Service Commencement Date.

"Handover Checklist Dispute" has the meaning set forth in Section 4.7(a) (*Closing the Mobilization Period – Notice of Service Commencement Date*).

"Hazardous Material" means: (a) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (b) any oil or petroleum product, lead-based paint, per- or poly-fluoroalkyl substances, polychlorinated biphenyl, or asbestos or asbestos-containing materials; and (c) any other pollutant, contaminant, material, substance or waste that has deleterious or hazardous properties and that is listed, defined or is subject to regulation or as to which liability may attach under any Environmental Law.

"Heat Rate" means the thermal efficiency (heat rate) of a respective Legacy Generation Asset's ability to convert Fuel into Power and Electricity, determined for each Contract Year pursuant to Section 5.22 (*O&M Services – Annual Performance Test*) and Section IV.A of Annex IX (*Scope of Services – Testing, Reports and Records – Annual Performance Test*).

"Hired Former Employees of Owner" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Hydroco" means PREPA Hydroco LLC or its successor.

"Hydropower Assets" means all of PREPA's hydroelectric generating units and the public irrigation facilities.

"Hydroco Budget" has the meaning set forth in the PREPA-Genco-Hydroco Operating Agreement.

"ICC" has the meaning set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*).

"IEEE 762-2006" means the IEEE Standard Definitions for Use in Reporting Electric Generating Unit Reliability, Availability, and Productivity.

20

CONFIDENTIAL

"Incentive Payment" means each of the O&M Incentive Payment and Decommissioning Incentive Payment, as described in Section III of Annex II (*Compensation – Incentives and Penalties*).

"Incentives and Penalties" means the incentives and penalties set forth in Section III of Annex II (*Compensation – Incentives and Penalties*).

"Incentives and Penalties Report" has the meaning set forth in Section 7.1(c)(ii) (*Service Fee – Incentives and Penalties*).

"Indemnifying Party" means (i) in the case of a claim for indemnification by Operator Indemnitee, Owner and (ii) in the case of a claim for indemnification by an Owner Indemnitee, Operator.

"Independent Expert" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Information System" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, including, such resources organized as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems, and "Information Systems" means more than one Information System.

"Initial O&M Budgets" means, collectively, the Operating Budget and the Fuel Budget, in each case, for the initial Contract Year, and the projected budget for the following two (2) Contract Years.

"Initial Term" has the meaning set forth in Section 2.3(a) (*Term – Initial Term*).

"Insurance Proceeds Account" has the meaning set forth in Section 10.3 (*Additional Named Insureds*).

"Integrated Resource Plan" means the latest integrated resource plan contemplated under Act 57, as (i) set forth in the Final Resolution and Order issued by PREB on August 24, 2020, as supplemented and amended from time to time, and (ii) subsequently approved by PREB in accordance with Applicable Law.

"Intellectual Property" means all (i) Patents, (ii) Trademarks, (iii) domain names, URLs and any other addresses for use on the Internet or any other computer network or communication system, (iv) Copyrights, (v) rights of publicity, rights of privacy and moral rights, (vi) Know-How, (vii) other intellectual property or similar corresponding or equivalent right to any of the foregoing or other proprietary or contract right relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions) and (viii) copies and tangible embodiments thereof (including Software), in each case whether or not the same are in existence as of the date of this Agreement or developed after such date and in any jurisdiction throughout the world.

21

CONFIDENTIAL

"Interconnection Point" means the physical demarcation point(s) where the output of the respective Legacy Generation Asset is delivered to the T&D System, as set forth in the PREPA-Genco-Hydroco Operating Agreement.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986.

"Know-How" means proprietary rights in all, trade secrets, confidential or proprietary information, including confidential or proprietary concepts, ideas, knowledge, rights in research and development, financial, marketing and business data, pricing and cost information, plans (including business and marketing plans), algorithms, formulae, inventions, processes, techniques, technical data, designs, drawings (including engineering and AutoCAD drawings), specifications, databases, blueprints and customer and supplier lists and information, in each case whether patentable or not and whether or not reduced to practice.

"Legacy Generation Assets" has the meaning set forth in the Recitals; provided that the Legacy Generation Assets shall include Out-of-Service Units solely for the purposes of the Decommissioning Services and the O&M Services described in Section 5.19 (*Out-of-Service Units*).

"Legacy Generation Emergency Response Plan" has the meaning set forth in Section 4.2(e) (*Operator Responsibilities – Legacy Generation Emergency Response Plan*).

"Legal Proceeding" means any claim, litigation, action, suit (whether civil, criminal, administrative, judicial or investigative), audit, hearing, investigation, binding arbitration or mediation or proceeding, in each case commenced, brought, conducted, heard before or otherwise involving any Governmental Body, arbitrator or mediator.

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" means any and all actual out of pocket (i) losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties (including Penalties, whether paid or incurred by Operator or set-off or otherwise deducted from any Service Fee or otherwise), forfeitures, obligations, deposits, Taxes, costs, offsets, expenses or other charges of any kind, including Fees-and-Costs, Environmental Claim and Cleanup Liability and costs of enforcing any right to indemnification hereunder or pursuing any insurance providers and (ii) settlements in connection with Section 19.1 (*Indemnification by Operator*) and Section 19.2 (*Indemnification by Owner*), the amount of which either has been agreed by Operator and Administrator or is below a specified amount to be agreed by Operator and Administrator from time to time.

"Management Co" means Genera Management LLC.

CONFIDENTIAL

"Material Facility Contract" has the meaning set forth in Section 5.2(d) (*Facility Contracts – Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date*).

"Material Subcontractor" has the meaning set forth in Section 11.1 (*Ability to Subcontract*).

"Mediation Rules" has the meaning set forth in Section 15.5(b) (*Mediation – Procedures*).

"Minimum Performance Threshold" has the meaning set forth in Section III.A of Annex II (*Compensation – Incentives and Penalties*).

"Minimum Performance Threshold Default" has the meaning set forth in Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

"Mobilization Account" has the meaning set forth in Section 4.6(c)(i) (*Mobilization Period Compensation – Funding*).

"Mobilization Period" means the period of time from and including the Effective Date to and excluding the Service Commencement Date.

"Mobilization Plan" has the meaning set forth in Section 4.1(a) (*Mobilization Period Generally – Role of Operator*).

"Mobilization Service Fee" has the meaning set forth in Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*).

"Mobilization Service Fee Cap" has the meaning set forth in Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*).

"Mobilization Service Fee Dispute" has the meaning set forth in Section 4.6(d)(ii) (*Mobilization Period Compensation – Invoices*).

"Mobilization Service Fee Estimate Dispute" has the meaning set forth in Section 4.6(c)(ii) (*Mobilization Period Compensation – Funding*).

"Mobilization Services" means services provided by Operator under this Agreement prior to the Service Commencement Date in order to complete the mobilization and handover to Operator of the operation, management and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to this Agreement, including the services contemplated by the Mobilization Plan; provided that the Mobilization Services shall not be O&M Services.

"National Ambient Air Quality Standard" means an ambient air quality standard set by the EPA at 40 C.F.R. Part 50 that includes standards for carbon monoxide, particulate matter, ozone, sulfur dioxide, lead, and nitrogen dioxide.

23

CONFIDENTIAL

"Negotiation Period" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*).

"Notice of Dispute" has the meaning set forth in Section 15.2(a) (*Commencement of the Dispute Resolution Procedure – Notice*).

"Notice of Mediation" has the meaning set forth in Section 15.5(a) (*Mediation – Generally*).

"Notice of Violation" means any written directive, notice of violation or infraction, or notice relating to actual or alleged Environmental Noncompliance.

"O&M Budget" means each of the Operating Budget and the Fuel Budget, and "O&M Budgets" means, collectively, both of them.

"O&M Budget Dispute" has the meaning set forth in Section 7.3(h) (*O&M Budgets – O&M Budget Disputes*).

"O&M Fixed Fee" means, for a given Contract Year, the fee specified in Section I.A of Annex II (*Compensation – O&M Fixed Fee – O&M Fixed Fee Amounts*).

"O&M Fixed Fee Adjustment" means a proportional adjustment of the O&M Fixed Fee, in any of Contract Year 6 through Contract Year 10, in the event that (i) Operator has begun or begins to perform Decommissioning Services with respect to a Legacy Generation Asset; or (ii) one or more Legacy Generation Assets has been or is removed from the scope of O&M Services, in each case, in accordance with this Agreement, in each case, calculated in accordance with Annex II, Section I (*Compensation – O&M Fixed Fee*).

"O&M Incentive Payment" means one or more incentive payments based on Operator's performance of the O&M Services, as determined pursuant to Annex II (*Compensation*).

"O&M Penalty" means one or more liquidated damages penalties based on Operator's performance of the O&M Services.

"O&M Service Fee" means the O&M Fixed Fee *plus* any O&M Incentive Payment *plus* any Decommissioning Incentive Payment *minus* any O&M Penalty *minus* any Decommissioning Penalty.

"O&M Services" has the meaning set forth in Section 5.1 (*Services Generally*).

"OSHA" means the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.

"Operating Account" has the meaning set forth in Section 7.6(a)(i) (*Service Accounts – Operating Account*).

24

CONFIDENTIAL

"Operating Budget", for any given Contract Year, (i) means the budget of the Pass-Through Expenditures required to perform the O&M Services (including the reasonably foreseeable costs of Planned Outages, Unplanned Outages and Forced Outages) for such Contract Year, together with the projected budget for the following two (2) Contract Years, in each case including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement and the PREPA-Genco-Hydroco Operating Agreement; and (ii) includes amounts equal to the maximum amounts of the O&M Fixed Fee and the O&M Incentive Payment available in such Contract Year.

"Operations and Maintenance Procedures" has the meaning set forth in Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*).

"Operator" has the meaning set forth in the introductory paragraph.

"Operator Benefit Plans" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

"Operator Employees" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Operator Event of Default" has the meaning set forth in Section 14.1 (*Events of Default By Operator*).

"Operator Indemnitee" has the meaning specified in Section 19.2(a) (*Indemnification by Owner – Generally*).

"Operator Intellectual Property" means any Intellectual Property owned by or licensed to Operator or its Affiliates that is (i) used in the performance of the O&M Services or in connection with the Legacy Generation Assets and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the Legacy Generation Assets, but which does not constitute Work Product.

"Operator Overhead" means any amount incurred by Management Co, including for the on-island executive management team and their associated corporate overhead.

"Operator Related Parties" means Operator, Parent Company, Guarantor, their Affiliates and any of their respective employees, directors and officers.

"Operator Service Commencement Date Conditions" has the meaning set forth in Section 4.2 (*Operator Responsibilities*).

"Operator Termination Fee" has the meaning set forth in Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*).

"Operator Training Program" has the meaning set forth in Section 4.2(o) (*Operator Responsibilities – Operator Training Program*).

25

CONFIDENTIAL

"Organizational Conflict of Interest Policy" has the meaning set forth in Section 2.2(b)(xii) (*Conditions to Execution*).

"Other Employees" has the meaning set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*).

"Out-of-Service Unit" means the Legacy Generation Assets identified on Annex I (*Legacy Generation Assets*) that, as of the Service Commencement Date, are out of service and not being repaired, or are decommissioned, and not scheduled to return to service in the future.

"Outside Date" has the meaning set forth in Section 2.2(c) (*Effective Date – Outside Date*).

"Overdue Rate" means the lower of (i) the Prime Rate *plus* two percent (2%) and (ii) the highest rate permitted by Applicable Law.

"Oversight" means, with respect to any matter relating to the Legacy Generation Assets, the O&M Services or this Agreement, the performance of such reviews, investigations, inspections, or examinations relating to such matters as are reasonably necessary in the circumstances, conducted, in each case, in accordance with generally accepted contract administration practices used in the electric utility industry.

"Owner" has the meaning set forth in the introductory paragraph.

"Owner Employees" has the meaning set forth in Section 4.2(f) (*Operator Responsibilities – Employment Evaluations*).

"Owner Event of Default" has the meaning set forth in Section 14.3 (*Events of Default By Owner*).

"Owner Fault" means (i) any breach (including any breach of any representation or warranty set forth in any Transaction Document), (ii) any failure of compliance or nonperformance by Owner or Administrator with its respective obligations under any Transaction Document, (iii) any negligence, tort, willful misconduct or non-compliance by Owner or Administrator with respect to performance of its respective obligations under any Transaction Document (whether or not attributable to any officer, trustee, member, agent, employee, representative, contractor, subcontractor of any tier or independent contractor of Owner or Administrator other than Operator and its Subcontractors), or (iv) any settlement, judgment or other circumstance arising in connection with Existing Litigation, in each case which has had, or is reasonably expected to have, a material adverse effect on Operator's performance or cost of performance or on Operator's rights or obligations under this Agreement or on the operation or maintenance of the Legacy Generation Assets.

"Owner Indemnitee" has the meaning specified in Section 19.1 (*Indemnification by Operator*).

"Owner Intellectual Property" means any Work Product and other Intellectual Property owned by Owner or its Affiliates.

26

CONFIDENTIAL

"Owner Licensed Intellectual Property" means any Intellectual Property licensed by Owner from a third-party not a party to this Agreement.

"Owner Payments" means Pass-Through Expenditures, the O&M Service Fee, the Mobilization Service Fee, the Demobilization Service Fee, indemnity obligations under Section 19.2 (*Indemnification by Owner*) or interest payable on any of the foregoing amounts pursuant to this Agreement.

"Owner Personal Information" means any and all personally identifiable information, in any form, collected by or provided to Operator, Operator Related Parties or Subcontractors in connection with the provision of O&M Services or services under this Agreement and that, alone or in combination with other information, uniquely identifies a current, former or prospective director, trustee, officer, employee, elected official, supplier, retiree of Owner, an Owner Related Party or a customer of any Owner Related Party (e.g., names, addresses, telephone numbers, or any other personally identifiable information as otherwise defined under Applicable Law) including (i) copies of such information or materials to the extent containing such information or (ii) such information Owner notifies Operator in advance in writing is subject to a duty of confidentiality that Owner owes to Owner's customers or pursuant to contracts of Owner or Owner Related Parties.

"Owner Related Parties" means Owner, its Affiliates and any of their respective employees, directors, trustees, elected officials and officers.

"Owner Service Commencement Date Conditions" has the meaning set forth in Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*).

"Owner Termination Fee" has the meaning set forth in Section 14.6(c)(ii) (*Remedies Upon Early Termination – Termination Fee*).

"Parent Company" means New Fortress Energy Inc. and its successors and assigns.

"Party" has the meaning set forth in the introductory paragraph.

"Pass-Through Expenditures" has the meaning set forth in Section 7.2 (*Pass-Through Expenditures*).

"Patents" means the exclusive legal rights held by the owner of a patent (including utility and design patents) to exclude others from using, making, having made, selling, offering to sell, and importing patented subject matter and to practice patented methods. Patents include all legal rights in any patent applications, PCT filings, patent disclosures, issued patents and all related extensions, continuations, continuations-in-part, divisions, reissues and reexaminations, utility models, certificates of invention and design patents, and all extensions thereto.

"Peaking Unit" means each Legacy Generation Asset designated as a Peaking Unit in Annex I (*Legacy Generation Assets*).

"Penalty" means each of the O&M Penalty and the Decommissioning Penalty.

27

CONFIDENTIAL

"Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body and (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements.

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership, limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"Planned Outage" means, as defined by IEEE 762-2006, a planned partial or complete disconnection or stoppage of the generating capability of the applicable Legacy Generation Asset that is for the purpose of inspection, testing, major overhauls, preventive maintenance, corrective maintenance or improvement of such Legacy Generation Asset and for which notice has been previously given to the T&D Operator.

"Power and Electricity" means the electrical energy, capacity and ancillary services available from the Legacy Generation Assets.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energia de Puerto Rico*, an independent body created by Act 57.

"PREB Actions" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"PREB Regulatory Charge" means the fee required by Section 4.03 of Regulation 8701 and established annually by PREB; provided that the methods of determining such fee may be subject to change if an amendment to Regulation 8701 or resolution by PREB so provides.

"PREB Successor" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"PREPA" means the Puerto Rico Electric Power Authority, a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

"PREPA-Genco-Hydroco Operating Agreement" means the operating agreement by and among PREPA, Owner, Hydroco, T&D Operator, Administrator and Operator, substantially consistent with the provisions set forth in Annex VIII (*PREPA-Genco-Hydroco Operating Agreement*), and any ancillary documents to the extent attached thereto or expressly incorporated therein by reference, including the respective interconnection agreements and the System Operation Principles and Agreed Operating Procedures, providing for certain rights and responsibilities, including fuel and non-fuel budgeting and account funding, the demarcation of the Legacy Generation Assets, dispatch and shut down procedures and protocols, planned maintenance communications, switching and clearance procedures, access to plant substations and

28

CONFIDENTIAL

other related equipment, and agreed upon requirements and procedures related to Annual Performance Tests.

"PREPA Retirement System" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits*).

"Pre-Existing Contamination" means the presence or Release of Hazardous Materials in environmental media anywhere in, at, from, on or under the Legacy Generation Assets or the Generation Sites, on or before the Service Commencement Date that continues after the Service Commencement Date.

"Pre-Existing Contamination Liability Standard" has the meaning set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters — Pre-Existing Environmental Conditions*).

"Pre-Existing Environmental Condition" means any Pre-Existing Contamination and/or any Pre-Existing Environmental Noncompliance.

"Pre-Existing Environmental Noncompliance" means the ownership or operation of the Legacy Generation Assets or Generation Sites in violation of Environmental Laws or the terms of any Environmental Approval on or before the Service Commencement Date that continues after the Service Commencement Date.

"Pre-Existing Noncompliance Liability Standard" has the meaning set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*).

"Prime Rate" means a variable per annum rate equal, as of any date of determination, to the rate as of such date published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the "Prime Rate," then the highest of such rates), or a mutually agreeable alternative source of the prime rate if it is no longer published in the "Money Rates" section of The Wall Street Journal or the method of computation thereof is substantially modified.

"Prior Obligations" has the meaning set forth in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

"PRIRC" means the Internal Revenue Code for a New Puerto Rico of 2011.

"Procurement Manual" has the meaning set forth in Section 4.2(p) (*Operator Responsibilities – Procurement Manual*).

"Pro Rata" and similar expressions mean a decrease or increase (as applicable) to a cost, payment, target or other amount applicable to a specific period of time to account for the increase or decrease of the relevant period of time (e.g. a Contract Year that is greater than or less than three hundred and sixty five (365) calendar days).

CONFIDENTIAL

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Proposal" means the proposal submitted by Operator in response to the RFP.

"Proposal Submission Date" means December 22, 2021.

"Prudent Industry Practice" means, at any particular time, the practices, methods, techniques, conduct and acts that, at the time they are employed, are generally recognized and utilized by companies operating gas and/or oil-fired, electric power generation plants in the United States, as such practices (including timely reporting), methods, techniques, conduct and acts relate to the operation, maintenance, repair and replacement of assets, facilities and properties of the type covered by this Agreement. The interpretation of acts (including the practices, methods, techniques, conduct, and acts engaged in or adopted by a significant portion of the electrical generation industry prior thereto) shall consider the facts and the characteristics of the Legacy Generation Assets known at the time the decision was made. Prudent Industry Practice is not intended to be limited to the optimum or minimum practice, method, technique, conduct or act, to the exclusion of all others, but rather to be a spectrum of possible practices, methods, techniques, conduct or acts that a prudent operator would take to accomplish the intended objectives at reasonable cost consistent with Applicable Law, public and employee safety, reliability, and environmental compliance.

"Public Information Disclosure Requirements" means any Applicable Law requiring the disclosure of public documents or information.

"Public-Private Partnerships Authority's Ethical Guidelines" means the "Public-Private Partnerships Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts," promulgated by the Public-Private Partnerships Authority and dated as of December 19, 2009.

"Rate Order" means any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of an application by T&D Operator requesting a change in customer rates or charges and the subsequent rate review proceeding.

"Rate Order Modification Request" shall have the meaning set forth in Section 7.5 (*PREB Rate Proceedings*).

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, migration or release of Hazardous Materials from any source into or upon the environment.

"Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit B (*Form of Reliance Letter*) that shall accompany a Tax Opinion and shall permit Operator to rely on such Tax Opinion.

CONFIDENTIAL

"Remedial Action" means (A) any investigation, clean-up, removal action, remedial action, restoration, repair, abatement, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials, or (B) any changes in operating procedures, actions or equipment including emissions control devices that are, individually or collectively, necessary to install, operate or utilize in order for the operations at one or more Legacy Generation Assets to comply with Environmental Laws or the terms of an Environmental Approval.

"Reporting Obligation Charge" has the meaning set forth in Section III.B.5 of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories – Reporting Obligations*).

"Representative" means, with respect to any Person, any director, officer, employee, official, lender (or any agent or trustee acting on its behalf), partner, member, owner, agent, lawyer, accountant, auditor, professional advisor, consultant, engineer, contractor, Subcontractor, other Person for whom such Person is responsible at law or other representative of such Person and any professional advisor, consultant or engineer designated by such Person as its "Representative."

"Required Insurance" has the meaning set forth in Section 10.1 (*Insurance Generally*).

"Reserve Account" has the meaning set forth in Section 7.6(d)(i) (*Service Accounts – Reserve Account*).

"Revenue Procedure 2017-13" means the revenue procedure issued by the United States Internal Revenue Service that provides safe harbor conditions under which a management contract does not result in private business use under § 141(b) of the Internal Revenue Code or subsequent guidance from the United States Internal Revenue Service.

"RFP" means the Puerto Rico Electric Power Thermal Generation Facilities Request for Proposals 2020-1 issued by the Puerto Rico Public-Private Partnerships Authority.

"Safety and Hazardous Materials Procedures Manual" has the meaning set forth in Section 4.2(n) (*Operator Responsibilities – Safety and Hazardous Materials Procedures Manual*).

"Sanctioned Country" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctioned Person" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctions" has the meaning set forth in Section 20.2(g)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

31

CONFIDENTIAL

"Service Accounts" means the Mobilization Account, the Operating Account, the Fuel Account, the Decommissioning Account, the Demobilization Account and the Reserve Account, each of which is a "Service Account."

"Service Account Dispute" has the meaning set forth in Section 7.6(e) (*Service Accounts – Service Account Disputes*).

"Service Co" means Genera Services LLC.

"Service Commencement Date" has the meaning set forth in Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*).

"Service Commencement Date Conditions" has the meaning set forth in Section 4.5 (*Conditions Precedent to Service Commencement Date*).

"Service Fee" means each of the Mobilization Service Fee, the O&M Service Fee and the Demobilization Service Fee.

"Service Fee Dispute" has the meaning set forth in Section 7.1(e) (*Service Fee – Service Fee Disputes*).

"Services" means Mobilization Services, O&M Services, Demobilization Services, Decommissioning Services and Grant Management Services.

"Services Documentation" means, collectively, the Operations and Maintenance Procedures, the Legacy Generation Emergency Response Plan, the Safety and Hazardous Materials Procedures Manual and the Operator Training Program.

"Shared Services Agreement" means the shared services agreement, or similar contractual arrangement, by and among the T&D Operator, PREPA, Owner and the other parties thereto, pursuant to the T&D O&M Agreement, providing the terms and conditions pursuant to which T&D Operator shall provide certain shared services to Owner or its designee or agent.

"Software" means computer programs, proprietary software, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, operating systems, design documents, website code and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof.

"Spare Parts" means any new or refurbished replacement parts and tools, equipment and components or combination thereof such maintained or to be maintained by Operator in accordance with this Agreement in connection with the operation, maintenance, repair of the Legacy Generation Assets, excluding any Capital Spare Parts.

"Stafford Act" means the Robert T. Stafford Disaster Relief and Recovery Act, enacted on November 23, 1988.

"State Implementation Plan" means the plan required under the Clean Air Act, and developed by the Puerto Rico Department of Natural and Environmental Resources in

32

CONFIDENTIAL

collaboration with PREPA, to achieve National Ambient Air Quality Standards by reducing sulfur dioxide emissions and any other air pollutants, and as such plan may be modified in the future.

"Subcontract" means an agreement or purchase order by Operator to a Subcontractor or a Subcontractor to Operator, as applicable.

"Subcontractor" means every Person (other than employees of Operator) employed or engaged by Operator or any Person directly or indirectly at any subcontracting tier engaged for the performance of any Operator obligations hereunder (other than Operator Overhead activities), including any portion of the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services, whether for the furnishing of labor, materials, equipment, supplies, services or otherwise. For the avoidance of doubt: (i) Subcontractors includes any Affiliates of Operator and personnel from any Affiliates of Operator assigned to perform the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services under this Agreement, (ii) Subcontractors does not include third parties merely providing commercially available "off-the-shelf" Software or Information Systems to Operator (directly or as a service) and (iii) Subcontractors does not include counterparties to any Facility Contract (it being agreed that Operator shall enter into such agreements merely as agent for Owner).

"Subcontractor Intellectual Property" means any Intellectual Property owned by or licensed to a Subcontractor that is (i) used in the performance of the O&M Services or in connection with the Legacy Generation Assets and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the Legacy Generation Assets, but which does not constitute Work Product.

"Sworn Statement" means a sworn statement in the form set forth as Exhibit C (*Form of Sworn Statement*).

"System Operation Principles" means the operation principles and procedures conditionally approved by PREB on June 1, 2021, as may be amended from time-to-time in accordance with Section 4.1(h) or Section 5.13(c) of the T&D O&M Agreement.

"T&D O&M Agreement" means the operation and maintenance agreement for the T&D System, entered into on June 22, 2020, by and among PREPA, Administrator, LUMA Energy, LLC and LUMA Energy ServCo, LLC, pursuant to which T&D Operator shall operate, maintain and modernize the T&D System.

"T&D Operator" means LUMA Energy, LLC together with LUMA Energy ServCo, LLC.

"T&D System" means PREPA's transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which PREPA has an ownership or leasehold interest.

"Target Service Commencement Date" means the date that is one hundred (100) days following the Effective Date, as such date may be extended pursuant to Section 4.8(c) (*Failure of Service Commencement Date Conditions – Effect of Force Majeure Events or Owner Fault*).

CONFIDENTIAL

"Tax" means all U.S. federal, state, Commonwealth, municipal, local and non-U.S. taxes and similar governmental charges, imposts, levies, fees and assessments, however denominated (including income taxes, business asset taxes, franchise taxes, net worth taxes, capital taxes, estimated taxes, withholding taxes, use taxes, value added tax, gross or net receipt taxes, sales taxes, transfer taxes or fees, excise taxes, real and personal property taxes, ad valorem taxes, payroll related taxes, employment taxes, unemployment insurance, social security taxes, minimum taxes and import duties and other obligations of the same or a similar nature), together with any related liabilities, penalties, fines, additions to tax or interest imposed by a Governmental Body.

"Tax Decree" has the meaning set forth in Section 4.2(s) (*Operator Responsibilities – Tax Decree*).

"Tax Opinion" means an opinion of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Agreement and providing that neither this Agreement nor any provision hereof, nor the performance by each Party of its obligations hereunder (including Operator's administration of the Facility Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and which, in the case of the opinion delivered on the Effective Date, shall be substantially in the form set forth in Exhibit D (*Form of Tax Opinion – Effective Date*).

"Tax Return" means any report, return, information return, form, declaration, statement or other information (including any amendments thereto and including any schedule or statement thereto) required to be filed or maintained by Applicable Law in connection with the determination, assessment or collection of any Tax.

"Technical Dispute" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*)

"Term" means the Initial Term together with the Extension Term, if any.

"Tested Capacity" means, with respect to each Legacy Generation Asset, the capacity of such asset, determined for each Contract Year pursuant to Section 5.22 (*O&M Services – Annual Performance Test*) and Section IV.A of Annex IX (*Scope of Services – Testing, Reports and Records – Annual Performance Test*).

"Third-Party Intellectual Property" means Intellectual Property that is licensed to Operator by a third-party that is not an Affiliate of Operator and is used in the performance of this Agreement.

"Third-Party Payments" has the meaning set forth in Section 19.4(a) (*Insurance and Other Recovery – Generally*).

"Title III Case" means Owner's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

34

CONFIDENTIAL

"Trademarks" means the exclusive legal rights to use and display any marks, names or symbols in association with businesses, products or services as an indication of ownership, origin, affiliation, or sponsorship, including trademarks, service marks, trade dress, brand names, certification marks, logos, slogans, rights in designs, industrial designs, corporate names, trade names, business names, geographic indications and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, in each case whether registered or unregistered, and all applications and registrations therefor.

"Transaction Documents" means this Agreement, the Guarantee, the FOMB Protocol Agreement and any other agreement entered into by Operator with Owner, Administrator and/or any other ancillary Person from time to time in connection with the transactions contemplated hereby and expressly designated as a "Transaction Document" by the parties thereto (other than Facility Contracts, Fuel Contracts and Subcontracts).

"U.S. District Court" means the United States District Court for the District of Puerto Rico.

"United States" or "U.S." means the United States of America.

"Unplanned Outage" means, as defined by IEEE 762-2006, a partial or complete disconnection or stoppage of the generating capability of the applicable Legacy Generation Asset that is not a Planned Outage or a Forced Outage.

"Work Product" has the meaning set forth in Section 13.1(c) (*Intellectual Property – Work Product*).

**Section 1.2**    Interpretation; Construction.

(a)    Headings. The table of contents, articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections", "Annexes" and "Exhibits" are intended to refer to Articles and Sections of this Agreement and Annexes and Exhibits to this Agreement.

(b)    Annexes and Exhibits. The Annexes and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence shall govern: (i) this Agreement, (ii) the Annexes and (iii) the Exhibits.

(c)    Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the

CONFIDENTIAL

word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; provided, however, that amendments, supplements and modifications to any of the following agreements, documents or instruments shall not be binding on Operator or in any way applicable to this Agreement unless Operator confirms in writing, by reference to this Section 1.2(c)(x), that it accepts the terms of such amendment, supplement or modification: the Shared Services Agreement, the Agreed Operating Procedures, any Facility Contract, any Fuel Contract, the PREPA-Genco-Hydroco Operating Agreement or the FOMB Protocol Agreement; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; (xii) whenever this Agreement requires the Administrator's consent or approval of any matter, unless expressly otherwise provided, such consent or approval shall not be unreasonably withheld, conditioned or delayed and (xiii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(d)    Days and Time. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Agreement are to Atlantic Standard Time.

(e)    Accounting Principles. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(f)    Negotiated Agreement. The Parties have participated jointly in the negotiation and drafting of this Agreement with the benefit of competent legal representation, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

(g)    References to Generation of Power. The phrases "generate", "generated", "generating" and "generation" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the Legacy Generation Assets in accordance with this Agreement and the generation of Power and Electricity in accordance with this Agreement and the PREPA-Genco-Hydroco Operating Agreement.

(h)    Actions Taken Pursuant to Agreement. The Parties acknowledge that this Agreement sets forth procedures and intended results with respect to various circumstances that may arise during the Term. Such circumstances include the "generation" of Power and Electricity; Changes in Law and Force Majeure Events; the preparation, revision and updating of the O&M Budgets, the Procurement Manual and any other plan, manual, program, schedule or similar document to be prepared or amended under Article 4 (*Mobilization Period*); the provision of the Mobilization Services and the Demobilization Services; the provision of the O&M Services and

36

CONFIDENTIAL

additional services; the provision of the Decommissioning Services; and the assignment and transfer of this Agreement. Unless otherwise agreed to by the Parties, any correspondence, report, submittal, revision update, consent or other document or communication given pursuant to this Agreement on account of such a circumstance shall be considered as among the Parties to be an action taken pursuant to this Agreement and not an amendment hereto.

(i)    Unspecified Time Periods; Equitable Adjustment of Timetables. Whenever this Agreement provides that the approval of certain matters shall not be unreasonably withheld, conditioned or delayed, or language to similar effect, and no specific time period is provided for such approval, Owner or Administrator, as the case may be, shall respond no later than ten (10) Business Days after Operator notifies Owner or Administrator, as applicable, in writing of Operator's request for approval. To the extent that a response is not received within ten (10) Business Days, Operator shall have the right to a day-for-day extension of the time for completion or occurrence of any obligation under this Agreement that requires such approval.

## Article 2
## PURPOSE; EFFECTIVE DATE; TERM

**Section 2.1**    Purpose. Owner hereby contracts with Operator for the provision of (i) O&M Services commencing on the Service Commencement Date, (ii) the Mobilization Services, (iii) the Decommissioning Services and (iv) the Demobilization Services, in each case, subject to the terms and conditions of this Agreement. The Parties acknowledge and agree that (x) this Agreement is a "Partnership Contract" as defined in Act 29, (y) Operator is a "Contractor" as defined in Act 29, entitled to all of the benefits, rights and protections granted to a "Contractor" thereunder and (z) Operator is not a "Contractor" as that term is defined in Title 2, Part 200 of the Code of Federal Regulations, Section 200.23.

**Section 2.2**    Effective Date.

(a)    Execution of the Agreement. This Agreement shall become effective on the date that it is executed by the Parties, by which execution the Parties acknowledge and agree that the conditions in Section 2.2(b) (*Effective Date – Conditions to Execution*) have been satisfied (the "Effective Date").

(b)    Conditions to Execution. The following conditions shall have been satisfied prior to the Effective Date:

(i)    receipt by the Parties of an Energy Compliance Certificate issued by PREB;

(ii)    receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to Administrator and Operator, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iii)    receipt by the Parties of a resolution adopted by the board of directors of Owner, in form and substance reasonably acceptable to Administrator and Operator,

37

CONFIDENTIAL

authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iv)    receipt by the Parties of authorization from the FOMB, in form and substance reasonably acceptable to Administrator and Operator, of the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(v)    receipt by the Parties of approval from the Governor of the Commonwealth or his/her delegate, in form and substance reasonably acceptable to Administrator and Operator, for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(vi)    receipt by Owner of the Guarantee;

(vii)    receipt by Owner of a copy of a certificate as to certain matters of Commonwealth law in the form set forth as Exhibit E (*Form of Commonwealth Certifications*), duly executed by Operator;

(viii)    receipt by Owner of a Tax Opinion in the form set forth as Exhibit D (*Form of Tax Opinion – Effective Date*) and receipt by Operator of a Reliance Letter;

(ix)    receipt by Owner of a Sworn Statement executed by Operator;

(x)    Operator's receipt of, and written agreement to be subject to, the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree. Such written agreement shall contain the acknowledgement required by Section 20.2(i) (*Representations and Warranties of Operator – Ability to Perform Obligations*) and shall be substantially in the form of Exhibit G (*Form of Acknowledgment of Consent Decree*). To the extent required to effectuate this Section 2.2(b)(x) (*Effective Date – Conditions to Execution*), Operator shall assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval;

(xi)    receipt by Administrator of a communications plan in a form satisfactory to Administrator in its reasonable discretion, which plan is attached hereto as Annex V (*Communications Plan*), (the "Communications Plan");

(xii)    Administrator's receipt of an organizational conflict of interest policy in the final form agreed to by Administrator and Operator, which is attached hereto as Annex VI (*Organizational Conflict of Interest Policy*) (the "Organizational Conflict of Interest Policy");

(xiii)    a final plan for the reorganization of PREPA shall have been filed with the applicable Governmental Bodies; and

(xiv)    Operator, Administrator, Owner and the FOMB shall have reached agreement on and formally executed the FOMB Protocol Agreement.

CONFIDENTIAL

(c)    Outside Date. If the Effective Date has not occurred by the latest of (i) the Business Day not later than one hundred twenty (120) days after the partnership committee accepts the Proposal and notifies Operator of its decision, (ii) such later date as the Parties may mutually agree in writing or (iii) upon request of Administrator, subject to an extension for an additional period, not to exceed one hundred twenty (120) days, if the satisfaction of any of the conditions to execution set forth in Section 2.2(b) (*Effective Date – Conditions to Execution*) is delayed by any action or omission of Administrator or any Governmental Body of the Commonwealth occurring prior to the date that is the later of clauses (i) and (ii) (the latest of (i), (ii) and (iii), the "Outside Date"), the Bid Security shall be held, drawn or returned as provided in the RFP.

**Section 2.3**    Term.

(a)    Initial Term. This Agreement shall be in full effect from the Effective Date through June 30 of the calendar year after the calendar year in which the tenth (10th) anniversary of the Service Commencement Date occurs (such period of time, the "Initial Term"), unless extended or earlier terminated, in whole or in part, in accordance with the terms hereof.

(b)    Extension. Operator and Administrator (acting on Owner's behalf) may mutually agree to extend, for all or some of the Legacy Generation Assets, the Initial Term for an additional period to be determined at the time and on terms and conditions to be agreed in good faith (the "Extension Term"); provided that (i) the Extension Term shall not exceed the maximum term permitted under Act 29 at the time of such extension, (ii) a Tax Opinion shall have been delivered to Owner and a Reliance Letter shall have been received by Operator in connection with such Extension Term, (iii) to the extent required by Applicable Law, the conditions precedent to the Effective Date set forth in Section 2.2(b) (*Conditions to Execution*) shall have been satisfied prior to the first date of the Extension Term (iv) to the extent required by Applicable Law, the Extension Term shall not be effective until approved by the PREB, and (v) Administrator's approval shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. This Agreement shall be deemed a PREPA Transaction subject to the requirements of Act 120. Notwithstanding the foregoing, in the event that the Initial Term is extended solely for the purpose of Operator completing Decommissioning Services pursuant to Section 17.2 (*Termination Prior to Completion of Decommissioning*) and any remaining Demobilization Services, none of the requirements of clauses (ii) and (iii) of the proviso to the prior sentence shall be applicable.

(c)    Reduction. Upon written notice to Operator, Administrator (acting on behalf of Owner) shall have the right to reduce the scope of the O&M Services, the Decommissioning Services and/or the Term, if and to the extent necessary, (1) in accordance with Section 3.9 (*Qualified Management Contract*), to prevent any adverse effect to the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code or (2) to comply with the Fiscal Plan or any other Applicable Law or contractual requirement, including in connection with the development of new generation capacity as mandated by the Integrated Resource Plan. Notwithstanding any reduction in the scope of the O&M Services, the O&M Fixed Fee shall not be reduced other than pursuant to an O&M Fixed Fee Adjustment in accordance with Annex II (*Compensation*). If (i) Administrator (acting on Owner's behalf) exercises its rights under this Section 2.3(c) (*Term – Reduction*) and (ii) any such reduction affects Operator's ability to achieve

39

CONFIDENTIAL

Actual Fuel Savings outlined in a Fuel Optimization Plan approved by PREB, then Operator and Administrator shall negotiate proportional adjustments to the Fuel Optimization Plan and Fuel Optimization Payment, to reasonably assure that Operator has a reasonable opportunity to earn the Fuel Optimization Payment, which adjustments shall be submitted to PREB for its review and approval.

**Article 3**
**OWNERSHIP OF THE LEGACY GENERATION ASSETS**

**Section 3.1**    Ownership. The Legacy Generation Assets are and shall be owned by Owner throughout the Term, and Operator shall have no ownership interest in the Legacy Generation Assets.

**Section 3.2**    Engagement of Operator. Operator shall perform the O&M Services as an independent contractor and shall not have any legal, equitable, tax, beneficial or other ownership or leasehold interest in the Legacy Generation Assets. Without limiting Operator's right to be reimbursed for all Pass-Through Expenditures, the only compensation payable by Owner to Operator for providing the O&M Services and the Decommissioning Services for the Legacy Generation Assets shall be the O&M Service Fee. The Service Accounts shall be funded in the manner contemplated hereunder for Operator's payment of Pass-Through Expenditures (without limiting Owner's indemnity or other obligations hereunder).

**Section 3.3**    Use of Legacy Generation Assets. From the Service Commencement Date and for the remainder of the Term thereafter, Operator and Subcontractors shall have the exclusive right (except as set forth in this Agreement), subject to Section 3.5 (*Right of Access*), to enter upon, occupy and use the Legacy Generation Assets and the Generation Sites for the sole purpose of performing the O&M Services, Mobilization Services, Decommissioning Services, and Demobilization Services, as applicable, in accordance with the terms hereof. Owner shall ensure that Operator and its Subcontractors are provided with all necessary access to exercise such right.

**Section 3.4**    Liens. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall keep the Legacy Generation Assets free and clear of any and all Liens (other than Permitted Liens) arising out of or in connection with any acts, omissions or debts of Operator, Guarantor or their Affiliates. Nothing in this Agreement shall be deemed to create any Lien in favor of Operator on any asset of Owner, including the Legacy Generation Assets, as security for the obligations of Owner hereunder.

**Section 3.5**    Right of Access. Upon reasonable notice to Operator, at reasonable times during normal business hours and at their own respective cost and risk, each of Owner, Administrator, PREB and their respective Representatives shall have the right to access the Legacy Generation Assets, Generation Sites and all Facility Information for Oversight of Operator's performance of the O&M Services and to otherwise carry out their obligations under Applicable Law; provided that such access shall not interfere with Operator's performance of the O&M Services and may be provided by read-only access where available, or a reasonably equivalent form of access to such information. Owner, Administrator, PREB and their respective Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Owner shall be responsible for the security

40

CONFIDENTIAL

of all access credentials provided to, and each access made and use and disclosure of Facility Information by, Owner, Administrator, PREB and their respective Representatives hereunder. At Administrator's request and sole cost and expense, Operator shall provide Administrator with dedicated on-site office space and access to and use of office facilities and equipment located at Operator's facilities in the Commonwealth or another suitable site mutually agreed upon; provided that such space is reasonable and adequate to enable Administrator to exercise its Oversight rights and responsibilities under this Agreement.

**Section 3.6**    Exclusivity. The Parties covenant and agree that Operator, acting directly or through Subcontractors, together with their respective Representatives, shall be the sole and exclusive providers of O&M Services with respect to the Legacy Generation Assets and that Operator shall not (i) generate Power and Electricity using the Legacy Generation Assets other than on behalf of Owner, or with the approval of PREB (or Administrator, if applicable), pursuant to the terms and conditions of this Agreement and in accordance with Applicable Law or (ii) use the Legacy Generation Assets (A) for any purpose other than the purposes contemplated hereby or (B) to serve or benefit any person other than Owner.

**Section 3.7**    Essential Public Service. The Parties acknowledge that Owner's provision of the Power and Electricity requirements of the Commonwealth constitutes an essential public service; it being understood that such acknowledgement shall not impose any obligation on the Parties other than those set forth in this Agreement. Owner acknowledges that Operator shall rely on (i) the certifications, resolutions, authorizations and approvals referred to in Section 2.2 (*Effective Date*) and (ii) the funding of the Service Accounts caused by Owner in the manner contemplated hereunder, in each case in order for Operator to (A) perform the O&M Services and Decommissioning Services under this Agreement and (B) have the opportunity to earn the applicable Service Fee in full.

**Section 3.8**    Reporting Obligations. In accordance with Sections IV and V of Annex IX (*Scope of Services – Testing, Reports and Records; Finance and Accounting Services*) Operator shall provide (i) Facility Information (both financial and operational), as reasonably available (and in any event on a monthly basis), to support Owner's financing activities, including Owner's administration of debt service and Owner's required disclosure and tax requirements, (ii) upon the request of Owner and/or Administrator, assistance to Owner and Administrator in connection with Owner's preparation of reports and other documents to satisfy Owner's reporting requirements and (iii) upon the request of Administrator, any Facility Information, information regarding the Hired Former Employees of Owner, or other information that it reasonably requires to comply with its obligations under this Agreement, including as described in Section 6.2 (*Rights and Responsibilities of Administrator*).

**Section 3.9**    Qualified Management Contract.

(a)    Generally. The Legacy Generation Assets have been financed with obligations the interest on which is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code. The Parties intend for this Agreement to constitute a "qualified management contract" under Revenue Procedure 2017-13, such that the provision of O&M Services by Operator under this Agreement does not adversely affect the exclusion from gross income for federal income tax purposes under the Internal Revenue Code of

41

CONFIDENTIAL

the interest on such obligations. The Tax Opinion and the Reliance Letter delivered as of the Effective Date or thereafter have been and will be delivered on such basis.

(b)     Covenants.

(i)     Operator covenants and agrees that: (A) neither it nor any direct or indirect owner of an equity interest in it is entitled to any U.S. federal income tax benefits relating to the Legacy Generation Assets that are available to an owner or lessor of the Legacy Generation Assets covered by this Agreement; (B) it shall not take any tax position inconsistent with it being a service provider with respect to such Legacy Generation Assets; and (C) it shall not, and shall not permit or enable any direct or indirect owner of any equity interest in it to, claim any depreciation or amortization deduction, investment tax credit or deduction for any payment as rent, with respect to the Legacy Generation Assets.

(ii)     Owner, Administrator and Operator each covenant and agree that the terms of this Agreement shall be construed so as to comply with the requirements of Revenue Procedure 2017-13. To the extent that this Agreement is determined to fail to comply with Revenue Procedure 2017-13 for any reason or otherwise is determined to result in private business use of the Legacy Generation Assets within the meaning of Section 141 of the Internal Revenue Code, the Parties agree that they shall use reasonable efforts to amend the terms of this Agreement in order to comply with Revenue Procedure 2017-13 and Section 141 of the Internal Revenue Code to prevent any adverse effect to the exclusion from gross income of the interest on obligations of Owner, its Affiliate or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

(c)     PREB Actions. The Parties hereby acknowledge and agree that to the extent PREB (i) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("PREB Actions"), all of which PREB is deemed to have acknowledged by delivery of the Energy Compliance Certificate, or (ii) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of the Governmental Body of the Commonwealth designated under Applicable Law to assume and succeed to the interest of PREB hereunder or, absent such designation, Administrator (the "PREB Successor"). In the event that such PREB Actions become the rights, duties and obligations of the PREB Successor, it shall exercise such rights, duties and obligations (x) taking into account the standards, processes and procedures previously used by PREB with respect to the PREB Actions, (y) in a manner that does not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and (z) taking into account any obligations under Section 10.1 of Act 120, to the extent applicable.

## Article 4
## MOBILIZATION PERIOD

**Section 4.1**     Mobilization Period Generally.

(a)     Role of Operator. Throughout the Mobilization Period, Operator shall not provide the O&M Services or otherwise be responsible for the Legacy Generation Assets, but shall,

42

CONFIDENTIAL

subject to and conditioned upon Owner providing funding pursuant to Section 4.6(b) (*Mobilization Period Compensation – Mobilization Service Fee*), solely provide the Mobilization Services as described in the Mobilization Plan set forth in Annex VII (*Mobilization Plan*) (the "Mobilization Plan"). The Mobilization Services are intended to ensure an orderly transfer of the care, custody and control of the Legacy Generation Assets to Operator by the Target Service Commencement Date without disruption of business continuity, in a manner consistent with the Mobilization Plan and Applicable Law.

(b)      Owner and Administrator Cooperation. Each of Owner and Administrator shall take all such actions as may be reasonably necessary to enable or assist Operator in providing the Mobilization Services, including (i) providing Operator's Representatives with a designated space and facilities at Owner's principal offices and each of the Generation Sites for their use throughout the Mobilization Period, (ii) allowing access, during normal business or operational hours (as may be applicable and relevant) and at such other times as are required, to Owner's premises for the purpose of providing the Mobilization Services, (iii) cooperating with and assisting, and causing its Representatives to cooperate with and assist, Operator in its performance of the Mobilization Services and its efforts to timely satisfy the Operator Service Commencement Date Conditions, and (iv) encouraging and facilitating a positive and cooperative working relationship with respect to the implementation and completion of the Mobilization Plan and the performance of the Mobilization Services.

(c)      Administrative Expense Treatment.

(i)      No later than ten (10) Business Days after the Effective Date, Owner shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by Owner under this Agreement during the Mobilization Period, including the Mobilization Service Fee.

(ii)      Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with a copy to PREB) (A) if such motion is denied by the Title III Court, or (B) if such motion has not been approved by the Title III Court on or before the date that is ninety (90) days following the date on which such motion is filed, which ninety (90) day period may be extended for an additional forty-five (45) days by Administrator at its sole discretion, or such later date as Administrator and Operator may agree or (C) if the Title III Court approval is ultimately reversed on appeal.

(iii)      In the event of the termination of this Agreement pursuant to this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*), Operator shall retain any Mobilization Service Fee earned as of the effective date of such termination, and, within five (5) Business Days of the effective date of such termination, shall return to Administrator any amounts held in the Mobilization Account in excess of any earned Mobilization Service Fee. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability

43

CONFIDENTIAL

specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*) and Section 19.3 (*Limitation on Liability*)) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to this Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*).

**Section 4.2**    Operator Responsibilities. As soon as practicable after the Effective Date, but in any event prior to the Target Service Commencement Date (subject to Owner and Administrator complying with their obligations set forth in Section 4.3 (*Owner and Administrator Responsibilities*) and elsewhere in the Agreement to the extent relevant), Operator shall be required to satisfy the following conditions precedent to (i) Owner's obligations to handover to Operator the O&M Services and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*) and (ii) the occurrence of the Service Commencement Date (collectively, the "Operator Service Commencement Date Conditions"):

(a)    Mobilization Plan. Operator shall carry out and complete the Mobilization Plan, and shall provide for management, technical, administrative, engineering, labor relations and other personnel necessary in connection therewith.

(b)    Handover Checklist. On or prior to the tenth (10th) day and the twenty-fifth day (25th) of each month during the Mobilization Period, Operator shall provide Administrator written monthly reports with respect to Operator's performance of the Mobilization Services for each Legacy Generation Asset, including a copy of the Handover Checklist updated to reflect (i) the progress of each item, (ii) the percentage completion for each item, (iii) the dollars expended for each item, and (iv) the identification of any risks to the completion of the Handover Checklist tasks, listed therein. From time to time during the Mobilization Period, in light of experience developed up to such point in the Mobilization Period, the Handover Checklist shall be adjusted, updated or otherwise modified by Operator and Administrator, each acting reasonably, as necessary to reflect such experience.

(c)    Confirmation of Guarantee. Operator shall execute and deliver a confirmation to Administrator that the Guarantee remains in full force and effect.

(d)    Required Insurance. Subject to Article 10 (*Insurance*), Operator shall submit to Administrator certificates of insurance for all Required Insurance to be effective as of the Service Commencement Date.

(e)    Legacy Generation Emergency Response Plan. As soon as reasonably practicable, but not less than ninety (90) days, following the Effective Date, Operator shall develop in consultation with T&D Operator and submit to Administrator and PREB, for their information and approval, a plan of action that takes effect from the Service Commencement Date and outlines the procedures and actions necessary for responding to any Emergency affecting or reasonably likely emergency that could affect the Legacy Generation Assets after the Service Commencement Date (the "Legacy Generation Emergency Response Plan"), including fire, weather, environmental, health, safety and other potential emergency conditions, which Legacy Generation

44

CONFIDENTIAL

Emergency Response Plan shall become effective on the Service Commencement Date. The Legacy Generation Emergency Response Plan shall (i) provide for appropriate notice of any such emergency to T&D Operator, Administrator, PREB and all other Governmental Bodies that Operator is notified in writing have jurisdiction over the Legacy Generation Assets, (ii) establish measures that facilitate coordinated emergency response actions by all appropriate Governmental Bodies, (iii) specifically include outage minimization and response measures and (iv) include measures designed to assure the timely availability of all personnel required to respond to any emergency in accordance with the Contract Standards. In the event of a Declared Emergency or Major Disaster, such Legacy Generation Emergency Response Plan shall be updated by Operator as necessary or appropriate.

(f)    Employment Evaluations. As soon as reasonably practicable, but not less than thirty (30) Business Days, following the Effective Date, Operator shall, in accordance with the Owner Employee Interview Plan set forth in Schedule 1 to Annex X (*Operator Employment Requirements – Owner Employee Interview Plan*), interview and evaluate as candidates for employment at Operator, effective as of the Service Commencement Date, the regular employees of Owner and its Affiliates (other than Owner's transmission and distribution employees who have been hired by T&D Operator) who were, as of June 30, 2022, and currently remain employed by Owner and its Affiliates or are hired by Owner or its Affiliates on or after the Effective Date in the ordinary course of business consistent with the past practices of Owner and its Affiliates to replace any existing employee of Owner (collectively, the "Owner Employees"). For the avoidance of doubt, Operator shall not be liable for severance or other pay or benefits for Owner Employees who are not hired by Operator, including those to whom an offer of employment is made but who do not accept such offer. Owner and its Affiliates shall waive any non-competition, confidentiality or other obligation arising under any employment contract between Owner or Affiliate and any Owner Employee that may otherwise restrict any of Owner Employee's rights to be employed by Operator or an Affiliate. Owner shall provide Operator with the following information regarding Owner Employees promptly on request and to the extent permitted by Applicable Law: (v) job description for current and any prior positions occupied by such Owner Employee, (w) date of employment, (x) current salary and/or regular hourly wage, (y) any appraisals and accolades, as well as any reprimands or disciplinary actions, contained in the potential employees' personnel files, and (z) any other such information regarding Owner Employees that may be reasonably requested.

(g)    Employment Offers. Operator, the Authority and Owner acknowledge that Applicable Law establishes that no Owner Employee shall be left unemployed nor lose benefits as a result of the transactions contemplated hereby. Operator shall offer employment to fulltime plant Owner Employees who were employed and in good standing as of June 30, 2022; provided that such employees complete and satisfy customary background checks. Operator shall give priority in hiring to any other Owner Employee who meets Operator's stated requirements for employment as set forth in Annex X (*Operator Employment Requirements*) over other equally qualified applicants for the same job category that are not Owner Employees, it being understood that the determination of which Owner Employees, who are not plant Owner Employees, to hire shall be made by Operator in Operator's sole discretion, acting in good faith. Each Owner Employee who accepts an offer of employment with Operator pursuant to this Section 4.2(g) (*Operator Responsibilities – Employment Offers*) and commences such employment with Operator shall be referred to as a "Hired Former Employees of Owner." On the Service Commencement Date and

45

CONFIDENTIAL

during the Term, Operator shall employ such other employees, including any employees of Operator or any of its Affiliates as of the Effective Date hired for the operation of the Legacy Generation Assets ("Other Employees" and, together with the Hired Former Employees of Owner, the "Operator Employees"), as are necessary to provide the O&M Services. Upon Administrator's or Owner's reasonable request, Operator shall provide to Owner and Administrator information regarding the total employment offers made and accepted, including a breakdown between Hired Former Employees of Owner and Other Employees. The following initial terms and conditions of employment shall apply to the Hired Former Employees of Owner, but not to any Other Employees:

(i)    Offers of employment shall remain open for a period of thirty (30) Business Days. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

(ii)    Offers of employment shall provide for employment with Operator on terms and conditions that are set at Operator's sole discretion, but shall in all cases provide for (A) a base salary or regular hourly wage rate at least equal to the base salary or wage rate provided by Owner or its Affiliates (as applicable) to the Owner Employee immediately prior to the Service Commencement Date, (B) the employee fringe benefits established in Act 26 and (C) any other benefits required to be offered to Owner Employees pursuant to Act 120, as any such benefits may have been restricted, conditioned, modified or annulled by Act 3, Act 26 and Act 66.

(iii)    Pursuant to Section 21.19(b), Operator agrees that any Hired Former Employees of Owner that receive and accept offers of employment from Operator shall enjoy the following additional protections: (A) his or her job will be guaranteed for a minimum period of two (2) years, and (B) Hired Former Employees of Owner may only be separated from the position during such period of two (2) years if he or she engages in behavior that warrants dismissal or constitutes just cause under Act 80 of May 30, 1970, as amended.

(h)    Owner Employees in Critical Employee Positions. Notwithstanding the foregoing, Operator shall prioritize filling positions that are critical to the reliable operation and maintenance of the respective Legacy Generation Assets and are filled by highly skilled employees, as agreed by Administrator (in consultation with Owner) and Operator and listed in Annex X (*Operator Employment Requirements*) ("Critical Employee Positions"). For such purpose, as soon as reasonably practicable, but not less than ten (10) Business Days following the Effective Date, Operator shall interview each of the Owner Employees employed at such time in a Critical Employee Position. If Operator deems such employee qualified to fill such position, Operator shall offer such employee employment. If such employee rejects the offer of employment, or Operator deems that an Owner Employee occupying a Critical Employee Position is not qualified to do so, Operator shall use its commercially reasonable efforts to hire as promptly as possible a replacement for such employee, with a view towards ensuring that such replacement is trained in the relevant Critical Employee Position by the date that is thirty (30) days prior to the Target Service Commencement Date. Offers of employment to Owner Employees in Critical Employee Positions shall remain open for a period of thirty (30) Business Days, and such employees may accept Operator's offer of employment on the terms and conditions set forth therein. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable.

CONFIDENTIAL

   (i)  Periodic Reports.

     (i)  Operator shall provide Administrator with detailed reports every two weeks and as Administrator may reasonably request from time to time with respect to Operator's performance of the Mobilization Services, including the progress against the Handover Checklist and any other completion schedules and milestones included in the Mobilization Plan, and including total actual dollar expenditures and any request for information submitted by Operator to Owner. In addition, Administrator may request any other periodic reports from time to time. In connection therewith, Operator shall provide Administrator (with copy to PREB) with any other information that (A) Administrator may reasonably request, including performance reports related to any of the Mobilization Services, and (B) may be reasonably produced from records maintained by Operator in the normal course of business consistent with the provisions of this Agreement relating to document retention.

     (ii)  Operator shall promptly advise Administrator of any actual or potential failure or inability to achieve milestones by the dates set forth in the Mobilization Plan, and shall promptly report to Administrator any problems encountered in performing the Mobilization Services that Operator has been unable to promptly and adequately resolve.

   (j)  Consumables, Spare Parts and Capital Spare Parts. Promptly (and in any event within sixty (60) days) following the Effective Date, and in accordance with the Mobilization Plan, Operator shall review the inventory of Consumables, Spare Parts and Capital Spare Parts for each Legacy Generation Asset and submit to Administrator and PREB (with copy to Owner), for their review and approval, a recommendation in consultation with the original equipment manufacturers of any additional Consumables, Spare Parts and Capital Spare Parts necessary to provide Operator with a supply of such Consumables, Spare Parts and Capital Spare Parts to allow Operator to comply with its obligations under this Agreement for twelve (12) months following the Service Commencement Date (with any modifications deemed to be appropriate by Administrator). During the twelve (12) months following the Service Commencement Date, in the event that, following review of the inventory of Consumables, Spare Parts and Capital Spare Parts for a Legacy Generation Asset, Operator determines that additional Consumables, Spare Parts and Capital Spare Parts are necessary to allow Operator to comply with its obligations under this Agreement for the remainder of such twelve (12) month period, Operator may submit to Administrator and PREB (with copy to Owner), for their review and approval, a revision to the initial approved recommendation. After such twelve (12) month period, it shall be Operator's responsibility to procure any additional, necessary Consumables and Spare Parts, and any additional, necessary Capital Spare Parts in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*), in each case in accordance with the then-approved Operating Budget.

   (k)  Representations. The representations of Operator set forth in Section 20.2 (*Representations and Warranties of Operator*) and Guarantor set forth in its Guarantee shall be true and correct in all material respects as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), as if made on and as of the Service Commencement Date, and both Operator and Guarantor shall deliver to Administrator a certificate of an authorized officer of such entity to that effect.

47

CONFIDENTIAL

(l)      Notice of Default. Operator shall provide to Administrator, promptly following the receipt thereof, copies of any notice of default, breach or noncompliance received under or in connection with any Governmental Approvals, if any, or Subcontract pertaining to the Mobilization Period.

(m)      Operations and Maintenance Procedures. As soon as practicable (and in any event within ninety (90) days) after the Effective Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*Operator Responsibilities*), Operator shall prepare and submit to Administrator (with copy to Owner) procedures related to the operation and maintenance and fuel supply of each Legacy Generation Asset (such procedures, the "Operations and Maintenance Procedures"), which procedures shall be developed in accordance with Prudent Industry Practice and Applicable Law. Within thirty (30) days following its receipt of such proposed Operations and Maintenance Procedures, Administrator shall provide Operator comments on the appropriateness of the proposed Operations and Maintenance Procedures and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Operations and Maintenance Procedures, if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Operations and Maintenance Procedures incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Operations and Maintenance Procedures shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate. Until the Operations and Maintenance Procedures have been approved pursuant to this Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*), Operator shall perform the Services in accordance with the Consent Decree and corresponding PREPA operations and maintenance procedures.

(n)      Safety and Hazardous Materials Procedures Manual. Promptly (and in any event within ninety (90) days) following the Effective Date, Operator shall prepare and submit to Administrator (with copy to Owner), for its information and approval, a manual, for each applicable Legacy Generation Asset and consistent with the Safety and Hazardous Materials Procedures Manual outline set forth in Schedule 1 to Annex IX (*Scope of Services – Safety and Hazardous Materials Procedures Manual Outline*), that sets forth an illness and injury prevention program, a description of Operator's participation in workplace safety and health management programs and a risk management plan that meets the latest requirements of Applicable Law (the "Safety and Hazardous Materials Procedures Manual"). Within thirty (30) days following its receipt of such proposed Safety and Hazardous Materials Procedures Manual, Administrator, acting reasonably, shall provide Operator comments on the appropriateness of the proposed Safety and Hazardous Materials Procedures Manual and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Safety and Hazardous Materials Procedures Manual if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Safety and Hazardous Materials Procedures Manual incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Safety and

48

CONFIDENTIAL

Hazardous Materials Procedures Manual shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate.

(o)    Operator Training Program. Promptly (and in any event within one hundred twenty (120) days) following the Effective Date, Operator shall prepare and submit to Administrator (with copy to Owner), for its information and approval, a written program, for each applicable Legacy Generation Asset, that ensures all personnel involved in providing the O&M Services have the required knowledge, training and experience for their respective assigned duties, including special training required for meeting all requirements under the Consent Decree and for the handling Hazardous Materials (the "Operator Training Program"). Within thirty (30) days following its receipt of such proposed Operator Training Program, Administrator, acting reasonably and in consultation with Owner, shall provide Operator comments, on the appropriateness of the proposed Operator Training Program and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Operator Training Program, if Administrator has no comments, Operator shall submit to Administrator for its review and approval the revised Operator Training Program incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as Operator shall reasonably deem appropriate in its sole discretion. Such Operator Training Program shall be updated by Operator, subject to review by Administrator, on an annual basis as necessary or appropriate.

(p)    Procurement Manual.

(i)    Promptly (and in any event within ninety (90) days) following the Effective Date, Operator shall prepare and submit to Administrator and COR3 for review and approval (with copy to the Federal Emergency Management Agency, the Department of Homeland Security Office of the Inspector General and PREB) a manual that (A) includes the agreed Organizational Conflict of Interest Policy, which shall require the use of a third-party procurement office to be retained by the Administrator through an independent procurement process, whom shall be tasked with conducting all procurement processes where there is a possible organizational conflict of interest and of administering any and all contracts where there is an organizational conflict of interest (for the avoidance of doubt, Operator shall not participate in the procurement of the third-party procurement office) and (B) describes (i) the procurement guidelines to be applied to the procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Subcontract or Facility Contract (including Capital Spare Parts and Spare Parts, but excluding Operator-funded capital improvements that do not involve the installation of equipment that becomes a part of the system at a Legacy Generation Asset), which guidelines shall aim to ensure that such procurement processes remain competitive, fair and transparent, (ii) the contractual provisions to be included in any new or replacement Facility Contract, including any contract relating to Owner-funded capital improvements (whether federally or non-federally funded), or any other Facility Contract involving federal funding and (iii) procedures for contract administration and oversight, including standards and methods for (1) avoiding acquisition of unnecessary or duplicative items, (2) granting awards to responsible contractors, (3) maintaining records of procurement history, (4) managing time-and-materials contracts, (5) resolving disputes, (6) selecting transactions for procurement, (7) conducting technical evaluations, (8) providing for oversight by Owner and Administrator and (9) Operator's reporting requirements thereunder (such

49

CONFIDENTIAL

manual, the "Procurement Manual"). Except as otherwise provided herein, the Procurement Manual shall comply with Prudent Industry Practice and Applicable Law in all respects, including, to the extent applicable, federal regulations and any applicable procurement rules set forth in 2 C.F.R. Part 200. For the avoidance of doubt procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable.

(ii)    Upon receipt of the Procurement Manual prepared in accordance with clause (i), Administrator, acting reasonably and in consultation with COR3 and PREB (each of which shall provide comments no later than thirty (30) days following receipt of a copy of the Procurement Manual), shall provide Operator comments on the proposed Procurement Manual including any changes or modifications it believes are necessary or appropriate.

(iii)    Within thirty (30) days following receipt of Administrator's consolidated comments, if any, Operator shall submit to Administrator and COR3 (with copy to PREB) the revised Procurement Manual, incorporating the feedback from Administrator, COR3 and PREB. If Operator disagrees with any comment from either Administrator, COR3 or PREB, Operator will deliver with the revised Procurement Manual a written statement describing such disagreement, and the parties will meet within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator and COR3's approval of a Procurement Manual that is acceptable to Operator; provided that Operator must accept any comments from Administrator or COR3 that require measures to comply with applicable federal grant regulations.

(iv)    Operator shall not procure, amend and/or enter into any new Facility Contract until (A) Administrator and COR3 approve the Procurement Manual and (B) the Service Commencement Date has occurred.

(v)    Operator shall update the Procurement Manual (A) on an annual basis, (B) as necessary to reflect any changes in Applicable Law that affect any procurement and (C) upon any reasonable request from Administrator; provided that if such request may prohibit the avoidance, mitigation, or resolution of any conflict of interest identified in the Procurement Manual through the processes and procedures set forth in the Organizational Conflict of Interest Policy, then Operator shall promptly deliver to Administrator a written statement describing the possible impact on such processes and procedures, and Administrator and Operator shall meet within five (5) Business Days to discuss and agree upon a mutually acceptable update to the Procurement Manual. Such updates and other substantial changes to the Procurement Manual must be submitted to Administrator in writing no later than forty-five (45) days prior to the expected date of implementation of the revised Procurement Manual or thirty (30) days from the date of Administrator's request (or thirty (30) days from the date of any meeting between Administrator and Operator under clause (C) above), whichever occurs first.

(q)    Communications Plan. No later than thirty (30) days after the Effective Date, Operator shall prepare and submit to Administrator an updated Communications Plan, such plan in a form satisfactory to Administrator in its reasonable discretion, that (i) demonstrates a thorough understanding of the Commonwealth's communications landscape, (ii) describes systems to ensure that communication to Governmental Bodies, public officials, regulators, local municipalities and counties, employees, the media, the general public, and other such Persons as

50

CONFIDENTIAL

appropriate, is timely, effective, efficient and consistent, (iii) has been developed and will be implemented by the services of a communications team, which services may be contracted from a communications firm or consultant with expertise and experience in the areas of communications strategies, media relations, crisis management, relations with different public entities and stakeholders, public affairs and government relations, advertising, digital platforms, and community relation, and (iv) identifies the key personnel that will oversee and implement such plan, provided that such personnel must include spokesperson(s) fluent in Spanish to manage the Operator's communications. Operator shall coordinate with Administrator on all such communications and shall update the Communications Plan (x) on an annual basis and (y) upon reasonable request from Administrator. Such updates and other substantial changes to the Communications Plan must be submitted to Administrator in writing no later than forty-five (45) days prior to the expected date of implementation of the revised Communications Plan. The Parties agree that the Communications Plan will include a requirement that Owner's and Administrator's senior representatives attend, and Administrator shall request that senior representatives of the FOMB, the PREB and the T&D Operator attend, an in-person bimonthly (*i.e.*, every other month) meeting, it being the intent of the Parties to communicate and coordinate effectively on a regular basis with a view towards optimizing performance, operation and maintenance of the Legacy Generation Assets.

(r)    Invoice Review and Approval Procedures Manual. As soon as reasonably practicable, but no less than thirty (30) days following the Effective Date, Operator and Administrator shall coordinate and develop together in good faith a manual that sets forth procedures related to the review and approval of all invoices under this Agreement.

(s)    Tax Decree. Either (i) Operator shall have received a decree under Act 60, Section 2071.01, 13 L.P.R.A., Section 45651, with respect to all payments for services received pursuant to this Agreement on terms reasonably acceptable to Operator (the "Tax Decree"), to the extent that Operator and its Affiliates, as applicable, meet the requirements and are eligible for the matters requested in the Tax Decree or (ii) the Parties have amended this Agreement to provide that, on an after-tax basis, the amounts Operator will receive for services performed pursuant to this Agreement are at least equal to the amounts Operator would have been entitled to receive on an after-tax basis for services performed pursuant to this Agreement had the Tax Decree been granted.

(t)    Fuel Optimization Plan. As soon as reasonably practicable, but not less than ninety (90) days following the Effective Date, Operator shall develop and submit to Administrator a plan intended to take effect from the Service Commencement Date and describing the Fuel Cost Savings Initiatives and outlining the expected methods and estimated fuel savings to be achieved during the Term of the Agreement (the "Fuel Optimization Plan"). Administrator, acting reasonably, shall provide Operator comments on the appropriateness of the proposed Fuel Optimization Plan and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Fuel Optimization Plan, if Administrator has no comments, Operator shall submit to PREB for its review and approval the revised Fuel Optimization Plan, incorporating the feedback from Administrator. If Operator disagrees with any comment from Administrator, Operator will deliver with the revised Fuel Optimization Plan a written statement describing such disagreement, and the parties will meet

51

CONFIDENTIAL

within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator's approval of a Fuel Optimization Plan that is acceptable to Operator. Operator shall update the Fuel Optimization Plan (A) on an annual basis, (B) as necessary pursuant to Section 2.3(c) (*Term – Reduction*) and (C) upon any order from PREB or reasonable request from Administrator. Notwithstanding anything to the contrary herein, Operator's submission of the Fuel Optimization Plan to the Administrator shall be sufficient to satisfy this Operator Service Commencement Date Condition; provided that, for the avoidance of doubt, the Fuel Optimization Plan shall not be effective until approved by Administrator and PREB pursuant to this Section 4.2(t) (*Operator Responsibilities – Fuel Optimization Plan*).

(u)    Federally Funded Generation Project Plan. As soon as reasonably practicable, but not less than ninety (90) days following the Effective Date, Operator shall develop and submit to Administrator and COR3 a plan of action intended to take effect from the Service Commencement Date and, taking into account the Integrated Resource Plan, listing and describing those projects proposed by Operator for priority in the receipt of any funding for the Legacy Generation Assets received or to be received by or for the benefit of Owner from any U.S. federal agency (the "Federally Funded Generation Project Plan"). Within thirty (30) days following its receipt of such proposed Federally Funded Generation Project Plan, Administrator, acting reasonably and in consultation with COR3 (which shall provide comments no later than thirty (30) days following its receipt of such proposed Federally Funded Generation Project Plan), shall provide Operator comments on the appropriateness of the proposed Federally Funded Generation Project Plan including any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Federally Funded Generation Project Plan, if Administrator has no comments, Operator shall submit to PREB and COR3 (with copy to the Federal Emergency Management Agency and the Department of Homeland Security Office of the Inspector General) the revised Federally Funded Generation Project Plan, incorporating the feedback from Administrator and COR3. If Operator disagrees with any comment from either Administrator or COR3, Operator will deliver with the revised Federally Funded Generation Project Plan a written statement describing such disagreement, and the parties will meet within five (5) Business Days to seek to resolve any such disagreement and obtain Administrator and COR3's approval of a Federally Funded Generation Project Plan that is acceptable to Operator. Such Federally Funded Generation Project Plan shall be updated by Operator, subject to review by Administrator and COR3, on an annual basis as necessary or appropriate. Notwithstanding anything to the contrary herein, Operator's submission of the Federally Funded Generation Project Plan to the Administrator shall be sufficient to satisfy this Operator Service Commencement Date Condition; provided that, for the avoidance of doubt, the Federally Funded Generation Project Plan shall not be effective until approved by Administrator and COR3 pursuant to this Section 4.2(u) (*Operator Responsibilities – Federally Funded Generation Project Plan*).

(v)    Annual Performance Test. No later than sixty (60) days prior to the Target Service Commencement Date, and in accordance with the Gridco-Genco-Hydroco Operating Agreement, Operator shall coordinate with T&D Operator to submit to PREB, for its review and approval, the procedures for the Annual Performance Test developed pursuant to the PREPA-Genco-Hydroco Operating Agreement. Within thirty (30) days following its receipt of such procedures, PREB, acting reasonably, shall provide Operator and T&D Operator comments on the

52

CONFIDENTIAL

appropriateness of the proposed procedures and recommend any changes or modifications it believes are necessary or appropriate. If PREB does not deliver such comments during such thirty (30) day period, it shall be deemed to have agreed with the procedures for the Annual Performance Test.

Section 4.3    Owner and Administrator Responsibilities. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*Operator Responsibilities*), Owner and Administrator shall, at Owner's sole cost, satisfy the following conditions precedent (i) to Operator's obligations to take over the O&M Services and other rights and responsibilities with respect to the Legacy Generation Assets pursuant to Section 4.7(b) (*Closing the Mobilization Period – Establishment of Service Commencement Date*) and (ii) to the occurrence of the Service Commencement Date:

(a)    Representations. The representations of Owner set forth in Section 20.1 (*Representations and Warranties of Owner*) shall be true and correct in all material respects as of the Service Commencement Date as if made on and as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), and Owner shall deliver to Operator a certificate of an authorized officer to that effect.

(b)    Access. Owner shall provide Operator, its Subcontractors, if any, and their Representatives with access to the Legacy Generation Assets and the Generation Sites for the sole purpose of performing the Mobilization Services in accordance with the terms hereof.

(c)    Initial O&M Budget. Administrator shall provide Operator with the Initial O&M Budgets as soon as practicable following the Effective Date, which Initial O&M Budgets shall have been prepared in accordance with the PREPA-Genco-Hydroco Operating Agreement, approved by PREB and shall reflect the then applicable Rate Order, in the case of the Operating Budget, and the then-current Fuel Adjustment Clause, in the case of the Fuel Budget.

(d)    Additional Facility Contracts Between Effective Date and Service Commencement Date. During the Mobilization Period, the Parties agree that it is the intent that Owner and Administrator shall not amend or enter into any new Facility Contracts; provided, however, that:

(i)    if Owner and Administrator identify a need to do so, then Administrator shall notify Operator of such need and coordinate with Operator to implement any such amendment or new Facility Contract; provided that as part of such consultation process the Parties shall review the impact of any such amendment or new Facility Contract on the Initial O&M Budgets; and

(ii)    following such consultation process, Administrator shall ultimately determine if such amendment or new Facility Contract is required; provided that such amendment or new Facility Contract shall not be entered into if it causes Operator to exceed the Initial O&M Budgets.

(e)    Notices with respect to Facility Contracts. Owner shall (i) notify each counterparty to a Facility Contract in writing of Owner's delegation of authority to Operator with

53

respect to such Facility Contract in the manner contemplated by Section 5.2(a) (*Facility Contracts – Generally*) and (ii) have obtained all required consents from such counterparties as may be required thereby in connection with such delegation of authority and (iii) take all such other actions as may be necessary for Operator to be able to comply with its obligations under Section 5.2(a) (*Facility Contracts – Generally*).

(f)     Mobilization Plan. Owner and Administrator shall perform all obligations of Owner and Administrator agreed in the Mobilization Plan.

(g)     Labor.

(i)     Owner and Administrator shall use commercially reasonable efforts to provide Operator the opportunity to hire Owner Employees in a manner consistent with the Proposal submitted by Operator or its Affiliate.

(ii)     Owner shall make good faith efforts to make Owner Employees available to support the Mobilization Plan upon Operator's reasonable request, including for training and consultation in connection with the Operations and Maintenance Procedures and the Safety and Hazardous Materials Procedures Manual.

(h)     Service Accounts. Owner shall provide evidence satisfactory to Operator that it has opened the Service Accounts and that each Service Account shall have been funded by such date and in an amount not less than the amount required to be funded in accordance with Section 7.6 (*Service Accounts*).

(i)     Consumables, Spare Parts and Capital Spare Parts.

(i)     Subject to Administrator's and PREB's approval of the initial recommendation and any revised recommendation provided by Operator pursuant to Section 4.2(j) (*Operator Responsibilities – Consumables, Spare Parts and Capital Spare Parts*), Owner shall procure and deliver to the applicable Generation Site the additional Consumables, Spare Parts and Capital Spare Parts, if any, in accordance with such recommendation, to allow Operator to comply with its obligations under this Agreement for twelve (12) months following the Service Commencement Date. After such twelve (12) month period, it shall be Operator's responsibility to procure any additional, necessary Consumables and Spare Parts, and any additional, necessary Capital Spare Parts in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*), in each case in accordance with the then-approved Operating Budget.

(ii)     For the avoidance of doubt, title to the Consumables, Spare Parts and Capital Spare Parts shall remain vested in, or be vested in, Owner at all times.

(j)     Delivery of Fuel.

(i)     Subject to Operator recommending quantities in accordance with the Operations and Maintenance Procedures, which shall specifically detail the manner in which necessary quantities of Fuel shall be determined and delivered, Owner shall procure and supply the initial delivery of Fuel to each Legacy Generation Asset sufficient to allow Operator to comply

CONFIDENTIAL

with its obligations under this Agreement for two (2) months after the Service Commencement Date.

(ii)    For the avoidance of doubt, title to Fuel shall remain vested in, or be vested in, Owner at all times.

(k)    [Reserved].

(l)    Procurement Manual. No later than thirty (30) days following Administrator's and COR3's approval of the Procurement Manual prepared by Operator in accordance with Section 4.2(p) (*Operator Responsibilities – Procurement Manual*), Owner shall acknowledge in writing that, after the Service Commencement Date, such approved and agreed Procurement Manual shall govern any procurement of any new or replacement, or modifications, amendments, renewals and extensions of any, Facility Contract (including contracts for Capital Spare Parts, Spare Parts, certain specified Subcontractor services, and any contract relating to Owner-funded capital improvements (whether federally or non-federally funded)), or any other Facility Contract involving federal funding.

(m)    Identification of Facility Contracts. From and after the Effective Date, but in any event by the date that is one hundred twenty (120) days following the Effective Date, Operator, Administrator and Owner shall together identify all material existing Facility Contracts and provide Operator and Administrator with copies thereof.

(n)    Approval of Fuel Contracts. During the Mobilization Period, each (i) procurement process related to the renewal of existing, or entry into new Fuel Contracts, (ii) nominations or similar actions under existing Fuel Contracts, (iii) decisions or actions to terminate, issue penalties, amend or otherwise modify or extend the term related to existing Fuel Contracts shall require the prior written consent of the Operator, not to be unreasonably withheld, conditioned, or delayed, in a manner consistent with the Mobilization Plan; provided that, in each of clauses (i), (ii) and (iii), Operator shall only have such consent right over a Fuel Contract that (x) has a term of twelve (12) months or longer and (y) the termination of which would result in a material termination payment by Owner or result in a material loss of volume in Owner's fuel supply.

Section 4.4    Governmental Approvals and Tax Matters. Except as otherwise provided herein, the Parties intend that all Governmental Approvals shall continue to name Owner as the permittee or applicant and that Operator shall only be a permittee, applicant, co-permittee or co-applicant if and to the extent required by Applicable Law or the terms of such Governmental Approval. Promptly following the Effective Date, Administrator and Owner shall coordinate to identify the Governmental Approvals required for the commencement on the Service Commencement Date of the O&M Services (the "Commencement Date Governmental Approvals"). Once the Parties have identified the Commencement Date Governmental Approvals: (i) (A) Operator shall coordinate with Owner and Administrator to prepare for and support Owner's efforts related to the transfer or assignment, to the extent required by Applicable Law, or the reissuance or assistance with the issuance of the Commencement Date Governmental Approvals, (B) Owner, with Operator's assistance, shall submit complete applications and take all other steps necessary under Applicable Law to obtain and maintain all required Commencement

55

CONFIDENTIAL

Date Governmental Approvals and (C) Owner shall provide Operator and Administrator with copies of any such Commencement Date Governmental Approvals; and (ii) Operator and Administrator shall cooperate with Owner in good faith in identifying, preparing, applying for, obtaining and maintaining the Commencement Date Governmental Approvals.

Section 4.5    Conditions Precedent to Service Commencement Date. The Service Commencement Date shall not occur, and the obligations of the Parties to proceed with their respective obligations hereunder on, and after, the Service Commencement Date shall not commence, until all of the following conditions precedent (the "Service Commencement Date Conditions") are, unless otherwise mutually agreed between the Parties in writing, either satisfied as determined, or waived in writing, by (i) Administrator, in the case of Section 4.5(a) (*Conditions Precedent to Service Commencement Date – Operator Responsibilities*), except for Section 4.2(s) (*Operator Responsibilities – Tax Decree*), (ii) Operator, in the case of (x) Section 4.2(s) (*Operator Responsibilities – Tax Decree*) and (y) Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*) or (iii) both Administrator and Operator, in the case of Section 4.5(c) (*Conditions Precedent to Service Commencement Date – Governmental Approvals*), Section 4.5(d) (*Conditions Precedent to Service Commencement Date – Acceptability and Effectiveness of Documents*), Section 4.5(e) (*Conditions Precedent to Service Commencement Date – No Governmental Prohibitions or Injunctions*), Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Initial O&M Budgets*), and Section 4.5(g) (*Conditions Precedent to Service Commencement Date – Delivery of Fuel*).

(a)    Operator Responsibilities.

(i)    Operator shall have fulfilled the Operator Service Commencement Date Conditions with respect to the Mobilization Period;

(ii)    Operator shall have executed the joinder agreement to the PREPA-Genco-Hydroco Operating Agreement, and executed or agreed to, as applicable, the System Operation Principles and the Agreed Operating Procedures attached thereto; and

(iii)    As of the date of satisfaction of all Service Commencement Date Conditions, the Critical Employee Positions have been filled in a manner consistent with the Mobilization Plan.

(b)    Owner and Administrator Responsibilities.

(i)    Owner and Administrator shall have fulfilled all of their respective obligations with respect to the Mobilization Period under this Agreement, including Section 4.3 (*Owner and Administrator Responsibilities*) (the "Owner Service Commencement Date Conditions").

(ii)    Administrator and COR3 shall have approved a Procurement Manual acceptable to Operator in accordance with Section 4.2(p) (*Operator Responsibilities – Procurement Manual*) and Owner has submitted to Operator a written acknowledgement that such Procurement Manual shall apply as contemplated by Section 4.3(l) (*Owner and Administrator Responsibilities – Procurement Manual*).

56

CONFIDENTIAL

(iii)    Administrator and any other applicable Governmental Bodies shall have approved the Operations and Maintenance Procedures developed by Operator pursuant to Section 4.2(m) (*Operator Responsibilities – Operations and Maintenance Procedures*).

(iv)    Evidence reasonably satisfactory to Operator that an amount equal to at least the applicable amount set forth in Section 7.6 (*Service Accounts*) has been deposited by Owner in each Service Account has been provided.

(v)    An update of the Baseline Environmental Study, reasonably identifying Pre-Existing Environmental Conditions that present a risk of material liability as of the date set forth in such updated study, shall have been completed and provided to Operator in final form.

(c)    <u>Governmental Approvals</u>. All Commencement Date Governmental Approvals shall have been issued or obtained by the Parties and shall be in full force and effect.

(d)    <u>Acceptability and Effectiveness of Documents</u>. All of the documents and instruments identified in this Article 4 (*Mobilization Period*) shall be in form and substance reasonably satisfactory to Administrator and Operator and shall be valid, in full force and effect and enforceable against each party thereto on the Service Commencement Date. No such document, instrument or agreement shall be subject to the satisfaction of any outstanding condition precedent except those expressly waived in writing or to be satisfied after the Service Commencement Date. No party to any such document, instrument or agreement shall have repudiated or be in default thereunder, and each Party shall have received such certificates or other evidence reasonably satisfactory to it of such facts as such Party shall have reasonably requested.

(e)    <u>No Governmental Prohibitions or Injunctions</u>. No Governmental Body shall have enacted, issued, promulgated or enforced any Applicable Law that shall be in effect, and no injunction shall be in effect, which, in each case, would make it illegal for, or otherwise prohibit or enjoin, any Party's performance of its obligations hereunder in accordance with the terms of this Agreement from and after the Service Commencement Date.

(f)    <u>Initial O&M Budgets</u>. The Initial O&M Budgets (including any amendment thereto pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities – Additional Facility Contracts Between Effective Date and Service Commencement Date*)) shall have been finalized for purposes of this Agreement in accordance with Section 4.3(c) (*Owner and Administrator Responsibilities – Initial O&M Budget*).

(g)    <u>Delivery of Fuel</u>. Owner shall have procured and delivered the Fuel in accordance with Section 4.3(j) (*Owner Responsibilities – Delivery of Fuel*).

**Section 4.6**    Mobilization Period Compensation.

(a)    <u>Generally</u>. As compensation for the Mobilization Services provided by Operator, Owner shall pay Operator the Mobilization Service Fee. The Mobilization Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

57

CONFIDENTIAL

(b)    Mobilization Service Fee. The "Mobilization Service Fee" shall be an aggregate amount equal to: (i) (A) the hourly fully allocated cost rate for each category of Operator employee, Affiliate personnel providing Mobilization Services, as set out in Annex XI (*Mobilization Hourly Fully Allocated Rates*); *multiplied by* (B) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Mobilization Services; *plus* (ii) all other reasonably necessary and documented costs and expenses incurred by Operator (without markup for Operator profit) in the course of providing the Mobilization Services and satisfying the Service Commencement Date Conditions, including the cost of any Subcontractors and/or consultants providing Mobilization Services; provided, however, that the aggregate Mobilization Service Fee shall not exceed $15 million (the "Mobilization Service Fee Cap"). If the aggregate Mobilization Service Fee paid to Operator reaches 70% of the Mobilization Service Fee Cap, Operator shall provide notice to Administrator, and within five (5) Business Days of such notice, Operator shall meet with Administrator to discuss and review the pending Mobilization Services required to complete the Mobilization Plan and the cost thereof.

(c)    Funding.

(i)    Owner shall establish one or more dedicated accounts from which Owner shall draw funds from time to time to pay Operator the Mobilization Service Fee (collectively, the "Mobilization Account"). Promptly after the Effective Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator, for its review and approval, an estimate of the anticipated Mobilization Service Fee for the lesser of (A) the following four and a half (4.5) months of the Mobilization Period and (B) the entirety of the Mobilization Period (such fee, the "Mobilization Period Deposit"). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Mobilization Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the Mobilization Period Deposit has been funded in the Mobilization Account by Owner. Prior to the end of each month during the Mobilization Period, Operator shall deliver to Administrator an estimate of the anticipated Mobilization Period Deposit for the applicable duration of such period. Such estimate shall include any updates to the estimated aggregate Mobilization Service Fee for the entirety of the Mobilization Period. No later than the eleventh (11th) Business Day of the following month during the Mobilization Period, the Mobilization Account shall be replenished so as to maintain a balance in the Mobilization Account at the end of each calendar month equal to such anticipated Mobilization Period Deposit (excluding from the Mobilization Period Deposit any disputed amounts with respect to the Mobilization Service Fee that remain in the Mobilization Account), and so on subsequently until the Mobilization Services conclude.

(ii)    In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Mobilization Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Mobilization Service Fee Estimate Dispute").

(d)    Invoices.

(i)    On or prior to the tenth (10th) day of each month from the Effective Date until completion of the Mobilization Services, Operator shall submit to Administrator for its review and approval a monthly invoice describing in reasonable detail the prior calendar month's

58

CONFIDENTIAL

Mobilization Services and the corresponding Mobilization Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) and shall include evidence of the certifications required by Commonwealth contractor requirements, among others.

(ii)     Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Mobilization Services, if any, including evidence of the payment of any Subcontractor whose fees are included in the Mobilization Service Fee, and the calculation of the Mobilization Service Fee related thereto, and a copy of the agreements with any Subcontractor, as Administrator may reasonably request and as may be required by Applicable Law. To the extent reasonably necessary for Administrator to complete its review of the applicable invoice, upon Administrator's request such additional supporting documentation shall include any relevant Confidential Information. Administrator shall promptly, but under no circumstance in excess of twenty (20) days after receipt of the invoice, advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Mobilization Service Fee Dispute").

(iii)    Payments of undisputed amounts under any invoice for Mobilization Service Fees shall be due within thirty (30) days of Administrator's receipt of such invoice. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

(iv)    All invoices and supporting documentation shall be provided by electronic transmission upon Administrator's request.

(e)     Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the Mobilization Period, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Mobilization Service Fee, together with the supporting vouchers and statements, and the calculation of the Mobilization Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

**Section 4.7**     Closing the Mobilization Period.

(a)     Notice of Service Commencement Date. Operator shall provide Administrator with prompt written notice (with a copy to PREB), including a completed Handover Checklist, at such time as Operator determines it has satisfactorily completed all items on the Handover Checklist and is therefore ready to perform all O&M Services under this Agreement. Such notice shall include the total number of Operator Employees, together with a breakdown between Hired Former Employees of Owner and Other Employees. Administrator shall respond within ten (10) Business Days whether Administrator confirms or disputes the completion of any item on the Handover Checklist, together with a written statement providing reasonable detail and supporting evidence for the basis of any dispute. In the event Administrator disputes completion

59

CONFIDENTIAL

of any item(s) on the Handover Checklist, Operator may advise Owner of its disagreement with Administrator's decision. The Parties shall attempt to resolve in good faith any disputed item(s) and, in the event the Parties are unable to resolve such disputed item(s) within thirty (30) days, such disputed item(s) only shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Handover Checklist Dispute").

(b)    Establishment of Service Commencement Date. The "Service Commencement Date" shall be the date on which a handover to Operator of the O&M Services occurs, which shall be (i) the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which Administrator delivers a certificate to Operator confirming that all Service Commencement Date Conditions have been met or (ii) such other date as the Parties may agree. The satisfaction or waiver by Owner, Operator, or Administrator of all the Service Commencement Date Conditions applicable to each of them is required for the achievement of the Service Commencement Date.

**Section 4.8**    Failure of Service Commencement Date Conditions.

(a)    Remedy for Delay of Service Commencement Date Conditions. If any of the Operator Service Commencement Date Conditions are not satisfied or waived by Administrator on or before the date that is ninety (90) days following the Target Service Commencement Date or such other later date as Administrator and Operator may agree (such date, the "Delay Period Date"), and the failure to satisfy any outstanding Operator Service Commencement Date Condition(s) is not caused by any Force Majeure Event or Owner Fault, and the other Service Commencement Date Conditions have been or are immediately capable of being satisfied or waived by the Delay Period Date, Operator shall pay to Owner, as Owner's sole and exclusive remedy for all monetary damages, costs, Losses and expenses of whatever type or nature arising from or related to such failure of Operator Service Commencement Date Conditions to occur by the Delay Period Date, liquidated damages (the "Delay Liquidated Damages"), calculated from the first Business Day immediately following the Delay Period Date, in the amount of US$1 million per week for each week (or for any portion of a week on a Pro Rata basis) the Target Service Commencement Date is delayed beyond the Delay Period Date, up to a maximum of US$15 million. Operator shall not be required to pay Delay Liquidated Damages after the earlier of (i) the date on which the Operator Service Commencement Date Conditions are satisfied by Operator or waived by Administrator or (ii) the date of termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*); provided that Operator shall pay any accrued and unpaid Delay Liquidated Damages as of such earlier date. It is understood and agreed by the Parties that if any of the Operator Service Commencement Date Conditions are not satisfied or waived by the Delay Period Date, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment provided for in this Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur. Operator hereby irrevocably waives any right it may have to raise as a defense that the Delay Liquidated Damages are excessive or punitive.

60

CONFIDENTIAL

  (b) <u>Termination for Failure of Service Commencement Date Conditions</u>.

    (i) Administrator shall have the right, subject to approval by PREB, to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator if all of the Owner Service Commencement Date Conditions are satisfied but any of the Operator Service Commencement Date Conditions are not satisfied by Operator or waived by Administrator (unless such failure to satisfy the Operator Service Commencement Date Conditions is the result of the acts, omissions or breach of Owner) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

    (ii) Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with copy to PREB) if all of the Operator Service Commencement Date Conditions are satisfied but any of the Owner Service Commencement Date Conditions are not satisfied by Owner or waived by Operator (unless such failure to satisfy the Owner Service Commencement Date Conditions is the result of the acts, omissions or breach of Operator) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

    (iii) Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator or Administrator (with copy to PREB), respectively, if any of the Service Commencement Date Conditions (other than those referred to in Section 4.8(b)(i) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) and Section 4.8(b)(ii) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*)) are not satisfied or waived by each of Administrator and Operator by the date that is nine (9) months following the Target Service Commencement Date or such later date as Administrator and Operator may agree.

    (iv) Notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), if the Service Commencement Date Conditions are satisfied or waived prior to any such termination right being exercised, then neither Administrator nor Operator shall have the right to terminate this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

    (v) In the event of the termination of this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), (A) Operator shall retain any Mobilization Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Mobilization Account in excess of any earned Mobilization Service Fee and (B) Operator shall pay any accrued and unpaid Delay Liquidated Damages as of the effective date of such termination. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party

61

CONFIDENTIAL

from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*) and Section 19.3 (*Limitation on Liability*)), Article 15 (*Dispute Resolution*), and Article 21 (*Miscellaneous*) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(vi)    In addition to and notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in the event this Agreement is terminated prior to the Service Commencement Date other than as a result of the acts, omissions or breach of Operator, Operator shall be reimbursed for any reasonable and documented costs and expenses incurred by Operator (without markup for Operator profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Mobilization Services, including reasonable and documented breakage fees for any Subcontractors providing Mobilization Services.

(c)    Effect of Force Majeure Events or Owner Fault. The dates in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall each be extended on a day-for-day basis for the period of any Force Majeure Event or any Owner Fault (except in the case of clauses (ii) and (iii) of Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in which case Owner shall not receive any such extension where the delay is caused by any Owner Fault).

## Article 5
## O&M SERVICES

**Section 5.1**    Services Generally. Commencing on the Service Commencement Date, and in exchange for Owner's payment to Operator of all amounts owing to Operator under this Agreement, Operator shall (i) provide management, operation, maintenance, repair, restoration, replacement and other related services for the Legacy Generation Assets, as well as any optimization (including fuel and efficiency) approved by PREB, in each case that are customary and appropriate, or as required by Applicable Law, including the services set forth in this Article 5 (*O&M Services*) and Annex IX (*Scope of Services*), and (ii) establish policies, programs and procedures with respect thereto, to the extent not already established in the Services Documentation (all such services, the "O&M Services"), in each case, in accordance with the Contract Standards and Applicable Law. It is the Parties' intent that except for the rights and responsibilities reserved to Owner and Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as may otherwise be expressly provided in this Agreement, Operator shall (A) be entitled to exercise all of the rights and perform the responsibilities of Owner in providing the O&M Services, and (B) have the autonomy and responsibility to operate and maintain the Legacy Generation Assets and establish the related

62

CONFIDENTIAL

plans, policies, procedures and programs with respect thereto as provided in this Agreement. In providing such O&M Services, Operator must comply with all requirements of Applicable Law, including the requirements of the Consent Decree.

Section 5.2    Facility Contracts.

(a)    Generally. Operator, as agent for and on behalf of Owner, shall administer and perform Facility Contracts, if any, and Owner's payment obligations thereunder, which shall be an expense that is paid by Operator as a Pass-Through Expenditure in accordance with Section 7.6(g) (*Service Accounts – Use of Funds by Operator*). Notwithstanding the foregoing but subject to the Contract Standards, (i) Operator shall administer and perform Owner's rights and obligations under such Facility Contracts in such a manner so as not to expand or increase the liabilities assumed by Owner thereunder, other than with respect to an amendment, renewal or expansion of existing Facility Contracts as required to provide the O&M Services or Decommissioning Services hereunder and (ii) Owner shall administer and perform any rights and obligations under such Facility Contracts to the extent that Applicable Law requires Owner's performance of such functions or Applicable Law or such Facility Contract prohibits Owner from delegating such functions. Owner hereby authorizes Operator to enforce Owner's rights under any such Facility Contracts. In the event that the cost of administering and performing Owner's rights and obligations, including enforcement, for any Facility Contract exceeds $1,000,000, then such costs shall be subject to approval by Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

(b)    Agent Designation. Owner hereby designates and appoints Operator as its agent, and Operator hereby accepts such designation and appointment, for the purpose of entering into Facility Contracts on behalf of and for the account of Owner, as may be necessary or appropriate to operate, maintain and/or decommission the Legacy Generation Assets and to make such additions and extensions thereto in accordance with the terms of this Agreement.

(c)    Powers. In such capacity as Owner's designated agent pursuant to Section 5.2(b) (*Facility Contracts – Agent Designation*), Operator shall have full power and authority to act on Owner's behalf and to legally bind Owner, subject, in each case, to (i) Operator's action in such regard being consistent with Prudent Industry Practice and (ii) Owner's rights and responsibilities provided in Section 6.1 (*Rights and Responsibilities of Owner*) and the other terms of this Agreement. Operator and Owner shall promptly implement such policies and procedures as may be necessary or appropriate to effect the activities contemplated by this Section 5.2 (*Facility Contracts*) and to separately identify and segregate the equipment, material, supplies and services that Operator is purchasing as agent of Owner from those Operator (or its Affiliates) may be purchasing for its own or another Person's account. Where necessary or required by a Governmental Body or other Person, Operator and Owner shall execute and deliver such instruments, agreements, certificates or other evidence confirming Operator's designation, appointment and authority to act as Owner's agent as provided in this Section 5.2 (*Facility Contracts*) and confirming that the Facility Contracts are entered into on Owner's account.

(d)    Additional Facility Contracts or Expired Facility Contracts After Service Commencement Date. After the Service Commencement Date, if any Facility Contracts are required: (i) for the operation, maintenance and/or decommissioning of the Legacy Generation

63

CONFIDENTIAL

Assets or to comply with the provisions of this Agreement or Contract Standards or (ii) to replace any existing Facility Contract that has expired or has been terminated, then, in each case, Operator shall be responsible for obtaining such Facility Contract in Owner's name, on Owner's behalf and for Owner's account; provided that (x) any new or replacement Facility Contract shall be procured in accordance with the Procurement Manual, (y) any new or replacement Facility Contract that provides for payments in excess of US$1,000,000 in any Contract Year or US$3,000,000 in the aggregate (each a "Material Facility Contract") shall be subject to approval by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, following which such proposed Facility Contract shall be executed by Owner and (z) a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner, with respect to any new, extended, amended or replacement Facility Contract that is a Covered Contract. For the avoidance of doubt, Operator, as agent for Owner, may procure new or replacement Facility Contracts in a manner consistent with the Procurement Manual, provided that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable. Administrator shall not withhold approval of any Material Facility Contract based on a conflict of interest that Operator has mitigated, avoided or otherwise resolved in accordance with the Procurement Manual.

(e)       Reporting Obligations. Operator shall on or about the tenth (10th) Business Day of each Contract Year provide to Administrator a report documenting each Material Facility Contract and Material Subcontractor, which report shall include the name of the third party, the term, if applicable, of the Facility Contract or Subcontract, a description of the services or goods to be procured and the estimated amount payable thereunder.

(f)       Conditions on Term. Any Facility Contract entered into by Operator on behalf of Owner in connection with the O&M Services and/or the Decommissioning Services, and contracts with Subcontractors, shall, unless otherwise approved in writing by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, either (i) be for a term that is no longer than the Term or (ii) provide that such contract is terminable at will (subject to any notice requirements) from and after the end of the Term, without cost or penalty. As permitted by Section 6(d)(ii) of Act 120, Facility Contracts for the provision of professional or consulting services (as defined in Act 237) entered into by Operator on behalf of Owner shall not be subject to the limitations on term established in Article 3(F.) of Act 237.

**Section 5.3**     Facility Regulatory Matters.

(a)       Generally. From the Service Commencement Date and during the duration of the Term thereafter, solely with respect to the Legacy Generation Assets, Operator shall function as agent of Owner, and Owner may request Operator to (i) represent Owner before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, (ii) prepare all related filings and other submissions before PREB and (iii) represent Owner before any Governmental Body and any other similar industry or regulatory institutions or organizations having regulatory jurisdiction, in each case in consultation with T&D Operator, if deemed necessary by Operator. For the avoidance of doubt, Operator's responsibilities under this Section 5.3 (*Facility Regulatory Matters*) shall not include any matters related to PREPA's debt obligations, including any obligations pursuant to federal tax or securities laws.

64

CONFIDENTIAL

(b)    <u>Applications and Submittals</u>. Operator, as agent of Owner, shall cooperate with T&D Operator, as necessary, to make all filings and applications and submit all reports necessary to (i) comply with Applicable Law and Governmental Approvals, and (ii) obtain and maintain all Governmental Approvals in the name of Owner or, if required by Applicable Law, Operator. Owner and Administrator shall cooperate with Operator and, as necessary, T&D Operator, in fulfilling all such obligations under this Agreement including in this Section 5.3 (*Facility Regulatory Matters*), including by promptly (and in any event within fifteen (15) Business Days or such shorter time as may be required by Applicable Law, a Governmental Approval or a Governmental Body) providing any necessary information to Operator, executing, signing or endorsing such applications, reports, submissions, or other related documents as Operator may reasonably request, and making all such filings and applications and submitting such reports requested by Operator in cases where Applicable Law does not permit Operator to do so. With respect to Governmental Approvals that are obtained or maintained in the name of Owner, Operator shall: (i) prepare the application and develop and furnish all necessary supporting material, data and information that may be required; (ii) familiarize itself with the terms and conditions of such Governmental Approvals; (iii) attend all meetings and hearings required to obtain such approvals; and (iv) take all other action necessary or otherwise reasonably requested by Administrator in order to assist and support Owner in obtaining, maintaining, renewing, extending and complying, as may be relevant, with the terms of such Governmental Approvals. Operator shall agree to be named as a co-permittee on any Governmental Approval if so required by the issuing Governmental Body.

(c)    <u>Data and Information</u>. All data and information required to be supplied and actions required to be taken in connection with the Governmental Approvals required for the O&M Services shall be supplied and taken by Operator on a timely basis considering the requirements of Applicable Law and the responsibilities of Owner as the legal and beneficial owner of the Legacy Generation Assets. The data and information supplied by Operator (as agent for Owner) to Owner, T&D Operator, Administrator and all regulatory agencies in connection therewith shall be correct and complete in all material respects; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner, T&D Operator or Administrator.

(d)    <u>Non-Compliance and Enforcement</u>. Operator shall report to Administrator and PREB, in writing, as soon as possible upon obtaining knowledge thereof (but in no event more than forty-eight (48) hours (or such shorter period within which notice is required to be given to a Governmental Body under Applicable Law) after obtaining such knowledge), all violations of the terms and conditions of any Governmental Approval.

(e)    <u>Reports to Governmental Bodies</u>. Operator, as agent for Owner, shall prepare all periodic and annual reports, make all information submittals and provide, on a timely basis, all notices to all Governmental Bodies required by all Governmental Approvals and under Applicable Law with respect to the Legacy Generation Assets; <u>provided</u>, <u>however</u>, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner, T&D Operator or Administrator or from errors or omissions in such information. Such reports shall contain all information required by the Governmental Body and under Applicable Law and may be

CONFIDENTIAL

substantially similar or identical to comparable reports previously prepared for Administrator if such are acceptable to the Governmental Body.

(f)    Opportunity for Comment. In connection with applications, reports, or submissions made to a Governmental Body under this Section 5.3 (*Facility Regulatory Matters*), Operator shall: (i) provide Administrator with a reasonable opportunity (and in any event within thirty (30) days) to comment in advance upon material written communications, filings, reports, or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith, and (ii) to the extent practical, provide Administrator with a reasonable opportunity to participate in any meetings with any Governmental Body.

**Section 5.4**    Safety and Security.

(a)    Safety. Consistent with the Contract Standards, Operator shall: (i) take all reasonable precautions and actions for the health and safety of, and provide all reasonable protection to prevent physical damage, bodily injury or loss as a result of the operation of the Legacy Generation Assets to, (A) all members of the public, including Persons involved in providing the O&M Services, (B) all materials and equipment used in the provision of the O&M Services and under the care, custody or control of Operator and (C) other property constituting part of the Legacy Generation Assets and under the care, custody or control of Operator; (ii) establish and enforce all reasonable applicable safeguards for health and safety and protection, including posting danger signs and other warnings against hazards and promulgating health and safety regulations; (iii) provide all notices and comply with all Applicable Law relating to the health and safety of Persons or property or their protection from physical damage, bodily injury or loss; (iv) designate qualified and responsible employees, in such numbers as Operator shall determine at its sole discretion in accordance with Prudent Industry Practice, whose duty shall be the supervision of health and safety at the Legacy Generation Assets; (v) operate all equipment in a manner consistent with the manufacturer's safety recommendations; (vi) provide for safe and orderly equipment and vehicular movement; and (vii) develop and carry out a site-specific health and safety program, including OSHA required and other employee training and periodic inspections, designed to implement the requirements of this Section 5.4(a) (*Safety and Security – Safety*). Administrator agrees that Operator may withdraw funds necessary for taking such reasonable precautions and actions in the first instance out of the Reserve Account. In the event that there are no funds on deposit in the Reserve Account, Operator shall provide written notice to Administrator of such shortfall. Until the Reserve Account is replenished, to the extent that Operator determines reasonable precautions and actions are necessary to comply with its obligations under this Section 5.4(a) (*Safety and Security – Safety*), Operator may withdraw the necessary funds from any Service Account (other than the Fuel Account); provided that, prior to any withdrawal, Operator shall provide written notice of the intended withdrawal to Administrator for its review and approval. Operator may withdraw such funds only upon either (x) receipt of Administrator's written approval or (y) Administrator's failure to provide a response within ten (10) Business Days. Such withdrawal notice shall include the amount of the withdrawal and describe the precautions and actions to be funded by such withdrawal.

(b)    Security. From and after the Service Commencement Date Operator shall guard against and be responsible for as agent of Owner all physical damage to the Legacy Generation Assets in accordance with the Contract Standards, and DHS to the extent DHS has

66

CONFIDENTIAL

jurisdiction, caused by trespass, theft, negligence, vandalism, malicious mischief or cyber-attacks of third parties. Operator shall guard against, and be responsible for as agent of Owner, in each case to the extent of Operator's negligence or willful misconduct, all physical damage to the Legacy Generation Assets caused by trespass, theft, vandalism or malicious mischief of third parties. Any reasonable and documented costs and expenses arising therefrom shall be treated as Pass-Through Expenditures hereunder, except to the extent such costs are Disallowed Costs.

Section 5.5    Labor and Employment; Employee Benefits.

(a)    Employee Plans. Operator shall provide employee benefits to Operator Employees pursuant to the plans created by Operator to provide benefits to Operator Employees (collectively, the "Operator Benefit Plans"). Operator shall not assume nor shall it be responsible at any time during the term of the Agreement as provided for in Section 2.3 (*Term*) or after its termination for any obligations or debts to employees or independent contractors for any Legacy Generation Assets or Generation Sites (including of Owner under Owner's retirement plans or any benefit accruals under Owner's retirement plans) accrued or accruing with respect to any time prior to the term of the Agreement (collectively referred to as "Prior Obligations") and Owner shall protect, defend, indemnify and hold harmless Operator and its Affiliates from and against any and all Losses arising in connection with such Prior Obligations. These Prior Obligations include, but are not limited to, any amount owed or to be owed to cover benefits, accruals, and/or expenses of the Electric Power Authority Employees Retirement System approved by the Board of Directors of the Puerto Rico Electric Power Authority through the approval of Resolution 200 of June 25, 1945 in effect as of the Effective Date or any other system that replaces it in any way or form (the "PREPA Retirement System") related to all past, current and future participants, beneficiaries, employees, contractors or any other persons that are or could be entitled to the receipt or allocation of funds by any reason since the inception of the PREPA Retirement System until its termination and the extinction of all its obligations. Operator shall, pursuant to Act 29, make any employer contributions (other than Prior Obligations) required under Applicable Law to the PREPA Retirement System with respect to any Hired Former Employee of Owner who has ten (10) years or more of service accumulated prior to the Hired Former Employee's hiring date by Operator and who elects to continue participating in and making his/her individual contributions to the PREPA Retirement System. To the extent permitted by the PREPA Retirement System, any such Hired Former Employee of Owner may continue to make his/her individual contributions to the PREPA Retirement System. The payment of these employer contributions, which are considered Pass-Through Expenditures as described in Annex XII (*Pass-Through Expenditures*), shall be the only ongoing obligation of Operator as it relates to the PREPA Retirement System. This obligation shall be limited only to current amounts allocable to any Hired Former Employee of Owner participating in and contributing to such system corresponding only to their period of participation while employed by Operator during the term of the Agreement as provided for in Section 2.3 (*Term*).

(i)    Hired Former Employees of Owner shall not receive credit for their service prior to the Service Commencement Date for purposes of benefit accrual except as otherwise required by Act 120.

67

CONFIDENTIAL

(ii)     Operator shall exercise commercially reasonable efforts to cause the Operator Benefit Plans to waive all limitations as to pre-existing conditions, actively-at-work exclusions and waiting periods for transitioned employees (and their eligible dependents).

(b)     Exclusivity. Operator shall not, without the prior written approval of Administrator (such approval not to be unreasonably withheld, delayed or conditioned), utilize Operator or its employees for any purpose other than providing the O&M Services or Decommissioning Services under this Agreement. In addition, Operator shall not hire, for any other business of Operator or an Affiliate, any existing Operator Employees without Owner's prior written consent (such consent not to be unreasonably withheld, delayed or conditioned). Owner acknowledges and agrees that this Section 5.5(b) (*Labor and Employment; Employee Benefits – Exclusivity*) applies solely to Genera PR LLC and not to any other Person (including any Affiliates or Subcontractors of Operator).

(c)     Other. Other than what it is expressly provided for in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*) above (or what is necessary to effectuate what is expressly provided in Section 5.5(a) (*Labor and Employment; Employee Benefits – Employee Plans*)), nothing in this Agreement is intended to amend any employee benefit plan or affect the applicable plan sponsor's right to amend or terminate any employee benefit plan pursuant to the terms of such plan.

**Section 5.6**     Capital Spare Parts and Capital Improvements.

(a)     Capital Spare Parts. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall procure, store, maintain and administer the Consumables, Spare Parts and any Capital Spare Parts, in accordance with the applicable O&M Budget then in effect; provided that during the twelve (12) months following the Service Commencement Date, Owner shall be responsible for the procurement of any additional Consumables, Spare Parts and Capital Spare Parts approved in accordance with Section 4.2(j) (*Operator Responsibilities – Consumables, Spare Parts and Capital Spare Parts*). In connection with such maintenance and administration, Operator shall conduct a physical inventory and review of all Capital Spare Parts in accordance with the Contract Standards on an annual basis. Operator shall promptly provide the results of such review to Administrator and PREB (with copy to Owner) following the completion of such review. If, pursuant to such review, Operator determines that the procurement and future installation of any replacement Capital Spare Parts (a) is necessary to allow Operator to continue to operate the respective Legacy Generation Asset to comply with its obligations under this Agreement, in accordance with the Integrated Resource Plan and the anticipated duration of the O&M Services for such Legacy Generation Asset, or (b) would improve unit availability and/or reduce fuel costs, which improvement and/or reduction would be realized within the anticipated duration of the O&M Services for such Legacy Generation Asset, then Operator shall submit a detailed recommendation of such procurement (including anticipated costs (taking into account the then-applicable Operating Budget), schedules and risk assessments in connection therewith) to Administrator and PREB (with copy to Owner) for their review and approval. Within thirty (30) days following its receipt of such recommendation, Administrator and PREB shall each provide Operator with its written approval or rejection of the recommendation. To the extent such approval is granted, Operator shall be entitled to withdraw funds from the Reserve Account to fund payment for costs in connection with such procurement and installation

CONFIDENTIAL

in accordance with Section 7.6(d) (*Service Accounts – Reserve Account*) and the approved recommendation. Any such procurement and installation shall be performed in accordance with Applicable Law and in a manner consistent with the Procurement Manual, provided that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable.

(b)    Capital Improvements.

(i)    Operator may from time to time during the Term propose to PREB certain capital improvements, taking into account the Integrated Resource Plan and the Federally Funded Generation Project Plan, that would be (x) federally funded and owned by Owner, (y) made, owned and funded by Owner or (z) made, owned and funded by Operator or its designated Affiliate; provided, however, that no such capital improvements shall be made that would in any manner jeopardize the exclusion from gross income of interest on Owner's or its Affiliates' obligations under the Internal Revenue Code. Operator shall provide PREB, with copy to Administrator and Owner, with a description of the capital improvement in sufficient detail to enable PREB to make a fully informed assessment and analysis thereof; provided that any such proposal pertaining to Operator-owned capital improvements shall contemplate Operator having the opportunity to earn a reasonable rate of return thereon consistent with the returns permitted to be earned by companies operating in the United States generation business on similar investments. Any such proposed federally funded or Owner-owned capital improvement shall be subject to review, and approval or rejection, by PREB in accordance with Applicable Law and shall be accompanied by an opinion of tax counsel to Administrator providing that such capital improvement shall not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code. In reviewing any such proposed capital improvement, PREB may request additional information or reports from Operator, and may require that any such proposed capital improvement be presented as part of a rate review proceeding.

(ii)    Owner shall notify Operator in writing of any Capital Improvements that may be eligible for federal funding. In such case, Owner and Operator shall cooperate with each other to address and comply with federal agency requirements, so as not to jeopardize the relevant Legacy Generation Asset's eligibility to receive federal funding. Such cooperation shall include Owner (i) providing Operator with such documents and information it requests with respect to all applicable federal funding requirements, (ii) sharing with Operator any specific requirements imposed by the relevant funding agency to maintain eligibility to receive federal funding and (iii) making requests to such federal agencies to review Owner and Operator's systems and plans to comply with federal funding requirements.

(iii)    The inclusion of the provisions of this Section 5.6(b) (*Capital Spare Parts – Capital Improvements*) shall in no way constitute an obligation by any of PREB, Owner or Administrator to agree to or pursue any Operator-owned capital improvement or require Owner or Administrator to pay for or reimburse the cost or expenses of pursuing any proposed Operator-owned capital improvement or an obligation of Operator to propose or pursue any Operator-owned capital improvement.

69

CONFIDENTIAL

**Section 5.7**    Management of Fuel and Fuel Contracts. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall source, procure and manage the nomination, transportation, delivery, supply, quality-testing, storage and handling of Fuel, manage and maintain fuel tanks, perform any required environmental reporting, and maintain and administer the Fuel Contracts, in accordance with the Contract Standards and the applicable Fuel Budget then in effect. Any renewal of an existing Fuel Contract and any procurement of a new Fuel Contract shall be subject to approval by Administrator and performed in accordance with Applicable Law and in a manner consistent with the Procurement Manual, provided that procurement requirements that would otherwise apply to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder) or Act 38 (including those relating to approval process and judicial review) shall not be applicable. Administrator shall not withhold approval of any Fuel Contract based on a conflict of interest that Operator has mitigated, avoided or otherwise resolved in accordance with the Procurement Manual.

**Section 5.8**    Federal Funding.

(a)    Generally. As among the Parties, Owner shall retain the exclusive right to any federal funds received or to be received by or for the benefit of Owner, for the repair, improvement, resiliency, construction or hazard mitigation of the applicable Legacy Generation Assets, from any U.S. federal agency, including the U.S. Federal Emergency Management Agency and the U.S. Department of Housing and Urban Development. Owner shall also own any equipment and improvements purchased using federal funds, including any funds collected from the disposition thereof.

(b)    Cooperation and Participation. Owner shall cooperate, participate in and complete any and all necessary actions, and execute any and all necessary documents, to maximize the receipt of federal funds for which the Legacy Generation Assets are eligible. The Parties shall cooperate and participate with any relevant Governmental Body and any third parties, including those authorized to act as Grant Manager, to maximize, maintain, and appropriately use federal funds. The Parties shall cooperate and participate in any audits or investigations performed by Commonwealth or federal authorities in connection with federal funding.

(c)    Agent Designation. Owner hereby designates and appoints Operator as Owner's agent for the purpose of requesting and expending federal funds for the repair, improvement, resiliency, construction or hazard mitigation of the applicable Legacy Generation Assets, thereby delegating Owner's rights and responsibilities with respect to communicating with agencies awarding federal funds as necessary to obtain and maintain grants of federal funds, submitting application materials to federal agencies, determining the scope of work of projects to be funded by grants of federal funds, and procuring goods and services to complete the scope of work using such grants, all in compliance with all Applicable Law and the terms of any applicable grant agreements, and subject to the oversight provisions throughout this Agreement. Operator hereby accepts such designation, appointment and delegation. Owner and Administrator shall inform applicable U.S. federal agencies of such designation, appointment and delegation, by means of a written letter substantially in the form set forth in Exhibit H (*Form of Consent to Federal Funding*). For the avoidance of doubt, Owner's designation, appointment and delegation of Operator, and Operator's entry into this Agreement, shall not be construed as authorization for Operator or any of its Subcontractors or Affiliates to act as Grant Manager. Under no

70

CONFIDENTIAL

circumstances shall Operator or any of its Subcontractors or Affiliates act as Grant Manager, except as the result of a separate and express procurement process for such services by Owner or Administrator. The Parties hereby acknowledge that the procurement process leading to the execution of this Agreement was not intended to engage a Grant Manager, and that Grant Management Services are outside of the scope of the O&M Services covered hereunder.

Section 5.9    Environmental, Health and Safety Matters.

Generally. Operator shall perform the following environmental, health and safety activities related to the generation of Power and Electricity: (i) managing an environmental, health and safety program for each of the applicable Legacy Generation Assets in accordance with the Safety and Hazardous Materials Procedures Manual, Environmental Law, and the Prudent Industry Practices; (ii) coordinate, oversee and maintain compliance of the Legacy Generation Assets with applicable Environmental Law, the requirements of Environmental Approvals issued and the Consent Decree, including documentation thereof; (iii) monitor emerging federal, state, Commonwealth, municipal and local Environmental Law to manage future and ongoing compliance and operational efficiencies; (iv) perform analyses of proposed Environmental Law to prepare for future compliance thereunder; and (v) provide environmental permitting services to support operations. Notwithstanding the foregoing, Operator shall not be responsible for any of the foregoing activities with respect to any Pre-Existing Contamination, all of which shall be the sole obligation of Owner, except (x) Operator shall be responsible for the foregoing activities to the extent that Operator materially exacerbates Pre-Existing Contamination, and such exacerbation is attributable to Operator's gross negligence or willful misconduct and in that event, only to the extent of such exacerbation; (y) to the extent Owner and Operator agree in writing that Operator shall assume responsibility for any of the foregoing and (z) Operator shall undertake, at Owner's expense, all required Remedial Actions with respect to Pre-Existing Contamination to the extent such Pre-Existing Contamination would reasonably be expected to result in an imminent threat to human health or the environment.

(a)    Pre-Existing Environmental Conditions.

(i)    Operator shall perform the O&M Services so as not to exacerbate any Pre-Existing Environmental Condition that is either disclosed with reasonable specificity by Owner in the Data Room, including in the Baseline Environmental Study, or is encountered or discovered by Operator after the Effective Date. Discovery of a Pre-Existing Environmental Condition not reflected in the Baseline Environmental Study, and, as may be required, its reporting to the appropriate Governmental Body by Operator shall not be deemed an exacerbation of such condition or noncompliance.

(ii)    Except with respect to Pre-Existing Contamination, which Operator is required to address under the first paragraph of this Section 5.9 (*Environmental, Health and Safety Matters – Generally*), if Operator at any time identifies a Pre-Existing Environmental Condition that (A) requires Remedial Action under Applicable Law, (B) materially interferes with the performance of the O&M Services, (C) materially increases the cost of performing the O&M Services, or (D) constitutes Environmental Noncompliance, or, alternatively, receives written notice from any Governmental Body or third party asserting or claiming any such Pre-Existing Environmental Condition requires Remedial Action or constitutes Environmental Noncompliance,

71

CONFIDENTIAL

Operator shall notify Administrator and Owner of this finding by written notice and Owner shall then, as soon as reasonably practicable given the condition in question, commence and diligently prosecute such Remedial Actions as are required by Applicable Law or to prevent future material interference with the performance of the O&M Services or material increases in costs of performing the O&M Services. Operator and Owner may agree that Operator shall assume responsibility for developing and implementing any required Remedial Actions, subject to reimbursement from Owner.

(iii)    Administrator shall have the right to contest any claim of a Pre-Existing Environmental Condition and shall not be required to take any action under this Section 5.9 (*Environmental, Health and Safety Matters*) so long as (A) it is contesting any determination of a Pre-Existing Environmental Condition in good faith by appropriate proceedings conducted with due diligence and (B) Applicable Law permits continued operation of the area in question for the applicable Legacy Generation Asset(s) pending resolution of the contest. In any contest regarding whether the Release of Hazardous Materials on, under, at or from the Legacy Generation Assets or Generation Sites that is discovered on or after the Effective Date is a Pre-Existing Environmental Condition, where Operator submits a sworn certification that, after due inquiry (which inquiry shall not require any further environmental studies), and to the best of its knowledge, the alleged Pre-Existing Environmental Condition did not arise from facts, circumstances, conditions, actions or omissions first occurring after the Service Commencement Date, then Owner shall bear the burden of proof by a preponderance of the evidence that the Release of such Hazardous Material is not a Pre-Existing Environmental Condition.

(iv)    Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Contamination, including the failure to pursue those O&M Services impeded by the existence of Pre-Existing Contamination, except to the extent such Losses (A) are caused in whole or in part by Operator's material exacerbation of Pre-Existing Contamination that is attributable to Operator's gross negligence or willful misconduct and, in that event, only to the extent of such exacerbation (the "Pre-Existing Contamination Liability Standard"), or (B) result from Operator's negligent failure to take Remedial Action necessary to address an imminent threat to human health or the environment. Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Environmental Noncompliance, except to the extent such Losses are caused by Operator's negligence or willful misconduct ("Pre-Existing Noncompliance Liability Standard"); provided, however, that any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that are incurred or sustained within the first (1st) full fiscal year after the Service Commencement Date and that arise out of the condition of or defects in the equipment and systems at any Legacy Generation Asset with respect to such equipment or systems that were in place on or prior to the Service Commencement Date shall not be the responsibility of Operator, except where the Operator failed to repair, maintain, or replace such equipment or systems in conformance with an approved O&M Budget; provided, further, however, that any Losses related to any Environmental Noncompliance, including Pre-Existing Environmental Noncompliance, that arise out of or relate to the storage tanks or the associated piping at any Legacy Generation Asset shall not be the responsibility of the Operator until the earlier of (x) the first (1st) full fiscal year after the Service Commencement Date or (y) such time as Operator has completed an inspection pursuant to American Petroleum Institute (API) Standard 653 (or a comparable standard addressing out-of-service tank inspection) and has implemented any remedial or repair measures as may be required to restore such tank to

72

CONFIDENTIAL

compliance with Environmental Laws or any Governmental Approval issued pursuant to any Environmental Law.

(v)    Operator shall not be required to conduct O&M Services to the extent they are impeded by Owner's implementation of Remedial Actions to address the Pre-Existing Environmental Condition pursuant to Section 5.9(a)(ii) (*Environmental, Health and Safety Matters—Pre-Existing Environmental Conditions*) above. Owner shall coordinate with Operator to prevent any such implementation of Remedial Actions that could impede or prevent Operator's performance of the O&M Services and any of its obligations under this Agreement.

(b)    Notice and Remedial Action Requirements.

(i)    Operator shall, promptly upon obtaining knowledge thereof, and in accordance with the Safety and Hazardous Materials Procedures Manual, report to Administrator and Owner, on a per occurrence basis, the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner or Operator. Such report shall include details regarding the location at which the Release has occurred, the time, the agencies involved, the damage that has occurred and the Remedial Action alternatives to be considered for decision-making by Owner. Notice of any such Release, if initially delivered orally, shall be delivered to Administrator in writing promptly following Operator's knowledge of such Release. This reporting obligation shall be in addition to any other reporting obligation under Environmental Laws.

(ii)    Following delivery of the notification described in Section 5.9(b)(i) (*Environmental, Health and Safety Matters – Notice and Remedial Action Requirements*), Operator shall promptly propose to Administrator and Owner the Remedial Action to be taken to address the Release, which Remedial Action shall (A) comply with Environmental Law and (B) not unreasonably interfere with Operator's performance of its obligations under this Agreement. Operator, Owner and Administrator shall work in good faith to reach a prompt, written agreement for the pursuit of the Remedial Action, including terms assuring the pre-funding of Operator's reasonable and documented costs and expenses in effectuating the Remedial Action as a Pass-Through Expenditure, except to the extent such costs are Disallowed Costs. If such an agreement cannot be reached within ten (10) Business Days, or such other time as Administrator, Owner and Operator may agree, Owner may proceed with the Remedial Action at its cost, including at such times and in a manner so as to not materially interfere with the performance of the O&M Services. In the event of a Pre-Existing Environmental Condition, Owner and Operator may also reach an agreement whereby Operator is prepaid for effectuating the Remedial Action proposed by Owner after the presentation of Remedial Action alternatives by Operator for such condition. Operator shall cause such Hazardous Material to be handled, transported, manifested, and disposed of in Owner's name and in accordance with Environmental Law and the Safety and Hazardous Materials Procedures Manual. Administrator and Owner agree to promptly execute all such applications, submissions and related documents as required in connection with any such Remedial Action.

(iii)    With respect to any Release caused by the gross negligence or willful misconduct of Operator or Operator's employees, contractors, guests or invitees in

73

CONFIDENTIAL

connection with the O&M Services or the Decommissioning Services, Operator shall promptly obtain the necessary Environmental Approvals for, and then commence and diligently pursue to completion all Remedial Action necessary to comply with Environmental Law to address such Release. Operator shall keep Administrator and Owner reasonably informed of the progress of such Remedial Action and the schedule for completing it. In addition, in connection with such Remedial Action, Operator shall: (A) provide Administrator and Owner with a reasonable opportunity to comment in advance upon any material written communications, filings, reports, correspondence or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith; (B) to the extent practical, provide Administrator and Owner with a reasonable opportunity to participate in any meetings with any Governmental Body regarding the Remedial Action; (C) comply with Applicable Law; and (D) within five (5) Business Days of sending or receipt, use commercially reasonable efforts to provide to Administrator and Owner copies of all non-privileged material written communications, filings, reports, correspondence or other writings, photographs or materials sent by Operator to or received by Operator from any Person (including any Governmental Body) in connection with any such Remedial Action. Operator shall be deemed the owner of Hazardous Materials subject to Remedial Actions under this Section 5.9(b)(iii) (*Environmental, Health, and Safety Matters – Notice and Remedial Action Requirements*) and identified as the "generator" on any manifest or bill of lading.

(iv)    Operator shall promptly notify Administrator and Owner, and any other Governmental Body as may be required by Environmental Law, in writing of its intention to handle, transport or dispose of Hazardous Material as part of a Remedial Action under this Section. Operator shall cause such Hazardous Material to be handled, transported, manifested, and disposed of in accordance with Environmental Law and the Safety and Hazardous Materials Procedures Manual.

(c)    Consent Decree.

(i)    This Agreement is conditioned on Operator's agreement to be subject to the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree. To the extent required to effectuate this Section 5.9(c) (*Environmental, Health and Safety Matters – Consent Decree*), Operator shall assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval.

(ii)    During the term of this Agreement, neither Owner nor Administrator may enter into a consent decree or other form of settlement in resolution of any Legal Proceeding that may be brought or asserted under any Environmental Law by a Governmental Body or third party that imposes, or has the potential to impose, any injunctive relief or other prospective restrictions on operations at any Legacy Generation Asset without notifying Operator.

**Section 5.10**    Accounting and Financial Services. Operator shall provide accounting and financial services in respect of the Legacy Generation Assets, including those services listed in Annex IX (*Scope of Services*).

**Section 5.11**    Legal Matters. Operator shall manage Owner's legal matters in respect of the O&M Services including in consultation with Administrator and Owner, the selection of

CONFIDENTIAL

outside counsel, other than with respect to any dispute with, or other legal matters involving, Operator and Owner pursuant to this Agreement (including for those services listed in Annex IX (*Scope of Services*)), and Owner's related reporting obligations. In performing this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

**Section 5.12**    Coordination with T&D Operator.

(a)    <u>PREPA-Genco-Hydroco Operating Agreement</u>. Commencing on the Service Commencement Date, Operator, as agent for Owner, shall perform its obligations, covenants and undertakings under the PREPA-Genco-Hydroco Operating Agreement and shall coordinate with T&D Operator, as agent for PREPA, as required thereunder.

(b)    <u>System Operation Principles and Agreed Operating Procedures</u>. Operator, as agent for Owner and in accordance with the PREPA-Genco-Hydroco Operating Agreement, the Agreed Operating Procedures developed thereunder and the System Operation Principles, shall: (i) coordinate the dispatch of Power and Electricity from available Legacy Generation Assets to the respective Interconnection Point and provide related services; (ii) coordinate the scheduling of load requirements with T&D Operator; (iii) develop inputs to T&D Operator with respect to scheduling requirements and capacity requirements taking into consideration unit outages, including, but not limited to, maintenance of program outages, and other operational constraints; (iv) provide information with respect to operational constraints, including air permit constraints; and (v) provide any other related ancillary services.

(c)    <u>Generation Information</u>. At the request of T&D Operator, Operator shall grant reasonable access to information consistent with Prudent Industry Practice required to perform the dispatch and scheduling of Power and Electricity, inclusive of Heat Rate, fuel inventory, unit availability, unit marginal cost, unit outage schedules and any other information reasonably requested by T&D Operator consistent with Prudent Industry Practice required to perform the dispatch, scheduling and coordination of Power and Electricity and any related ancillary services.

(d)    <u>PREB Submittals</u>. At the reasonable request of T&D Operator, Operator shall coordinate with T&D Operator and grant reasonable access to information and documents consistent with Prudent Industry Practice required to prepare all filings and other submissions before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, including in connection with the Fuel Adjustment Clause. Operator shall further cooperate in good faith with T&D Operator in anticipation of and throughout the course of any Rate Order modification proceedings before PREB, pursuant to Section 7.5 (*PREB Rate Proceedings*). With respect to PREB rate filing requirements, Operator shall provide such documents and information to T&D Operator at such times as such parties may mutually agree, but no later than seven (7) Business Days prior to the time T&D Operator is required to file such documents or information with PREB.

CONFIDENTIAL

**Section 5.13**    Notification of Incidents and Emergencies.

(a)    <u>Incidents</u>. Operator shall promptly notify Administrator and any other required authority, pursuant to Applicable Law, including OSHA and PREB, in writing of any material accident or incident involving injuries to person or property related to the Legacy Generation Assets within twenty-four (24) hours of receiving knowledge of the occurrence thereof, promptly notify Administrator in writing of all material claims made by or against Operator of which Operator has knowledge, and provide any information reasonably requested by Administrator to identify and assess potential material claims that may reasonably be expected to arise as a result of or in connection with such accident or incident.

(b)    <u>Emergencies</u>. Operator shall promptly notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing of all Emergencies related to the Legacy Generation Assets upon receiving knowledge thereof. To the extent that any such Emergency materially precludes or impairs, in whole or in part, the dispatch of Power and Electricity, Operator shall also notify T&D Operator and any other person listed under the Legacy Generation Emergency Response Plan of such Emergency within twenty-four (24) hours. Notwithstanding anything to the contrary in this Agreement, if at any time Operator determines in good faith that an Emergency Event exists with respect to the Legacy Generation Assets such that immediate action must be taken to (i) protect the safety of the public, Owner's employees and Operator's employees, (ii) protect the safety or integrity of the Legacy Generation Assets or prevent or limit environmental harm or (iii) mitigate the immediate consequences of such Emergency Event, Operator shall take all such action that it deems in good faith to be reasonable and appropriate under the circumstances in accordance with the Legacy Generation Emergency Response Plan. As promptly thereafter as is reasonable, Operator shall notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing of Operator's response to such Emergency Event. For so long as the Emergency Event continues, Operator shall provide a weekly written update to Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan (<u>provided</u> that PREB may otherwise request more frequent updates in accordance with Applicable Law) specifying the nature of the Emergency Event, the remediation measures being taken by Operator, the expected duration of the Emergency Event and an estimate of any increases in costs resulting therefrom. Operator shall notify Administrator, PREB and any other person listed under the Legacy Generation Emergency Response Plan in writing as soon as the Emergency Event has ended. All necessary and documented costs related to the remediation of the Emergency Event shall be Pass-Through Expenditures and Operator shall be entitled to draw upon any Service Account to pay for such costs. As soon as practicable following the end of such Emergency Event, all such costs incurred shall be reflected in a proposed amendment to the approved Operating Budget, subject to the provisions of Section 7.3(e) (*O&M Budgets – Amendments to the Operating Budget*).

**Section 5.14**    Information.

(a)    <u>Facility Information and Computer Databases</u>. Operator shall, subject to the applicable Services Documentation, administer and maintain an Information System to record, and to the extent practicable, provide retrieval for Administrator's review and copying of Facility Information.

76

CONFIDENTIAL

(b) <u>Ownership of Owner Personal Information</u>. Any Owner Personal Information in existence as of the Service Commencement Date of this Agreement shall be considered Confidential Information of Owner and, as among the Parties, shall at all times remain the Intellectual Property of Owner.

(c) <u>Information Access</u>.

(i) Operator shall provide Owner with timely read-only access where available, or a reasonably equivalent form of access, to all information necessary to (A) maintain, protect and preserve the Legacy Generation Assets or (B) carry out any of Owner's responsibilities related to the Legacy Generation Assets under Applicable Law. For the avoidance of doubt, the access to information provided under this Section 5.14(c)(i) (*Information – Information Access*) shall be on the same basis as set out in Section 5.14(c)(ii) (*Information – Information Access*).

(ii) To the extent necessary for Owner and Administrator, as applicable, to carry out its responsibilities under this Agreement, Operator shall provide Administrator and its Representatives with (A) unrestricted read-only access where available, or a reasonably equivalent form of access to such information, to all Facility Information, all Owner Personal Information, and all information regarding Hired Former Employees of Owner, in each case contained in any database or system created or managed by Operator hereunder, and (B) to the extent that Operator has developed, compiled, collected, prepared or archived such information in the conduct of its services under this Agreement, full and complete access to such information, subject to confidentiality obligations applicable to Operator's Confidential Information and provided that Administrator and its Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Administrator shall be responsible for the security of all access credentials provided to and each access made and use and disclosure of Facility Information by Administrator or its Representatives hereunder.

(iii) Pursuant to Section 21.19(e), at the reasonable request of Administrator, by electronic transmission, Operator shall timely provide to Administrator all information related to this Agreement or the Legacy Generation Assets as may be specified in such request and as shall be in the possession or control of Operator or its Representatives. In the event that Operator fails to timely provide such information, Operator shall be subject to the Reporting Obligation Charge described in Section III of Annex II (*Compensation – Incentives and Penalties*). Operator acknowledges that (i) it is the public policy of the Commonwealth to promote transparency and citizen participation in every process related to the electric power service in the Commonwealth and (ii) in furtherance of this, the Administrator shall request information under this Section 5.14 (c)(iii) for other Governmental Bodies.

(d) <u>Restrictions</u>. Operator may not share or use any Facility Information or Owner Personal Information for any purpose unrelated to the O&M Services without the prior written consent of Administrator, such approval not to be unreasonably withheld, delayed or conditioned; <u>provided</u> that Operator may share or use such information with employees of Operator and Subcontractors. To the extent such consent is granted, Operator shall comply with all Applicable Law, and otherwise obtain any necessary consents, prior to any such permitted use.

CONFIDENTIAL

**Section 5.15**   Bill Payments. Subject to Section 7.6 (*Service Accounts*) and Section 7.8 (*Unfunded Amounts*) and to the extent not prevented from doing so by Owner Fault, Operator shall (i) timely pay all Subcontractor bills and other Pass-Through Expenditures related to the Legacy Generation Assets, that are proper, appropriate and not otherwise disputed, and (ii) assure that, to the extent within Operator's control and not otherwise caused by Owner Fault (including non-payment or insufficiency of funding), no mechanics' or similar Liens (other than those arising automatically by operation of law) are filed by Subcontractors against any component of the Legacy Generation Assets. In the event that Operator fails to timely pay any such bill with funds that are available in the relevant Service Account, Administrator shall have the right to instruct Owner to pay such bill and deduct an administrative fee in an amount of US$500 from the Incentive Payment otherwise due to Operator.

**Section 5.16**   Compliance with Obligations. Each Party shall use reasonable efforts to provide all representations, certifications, records and other documents necessary or appropriate for it and other Parties to comply with any obligations under Applicable Law (including obligations (i) with respect to PREB, (ii) with respect to the FOMB under PROMESA, (iii) related to the federal securities laws and (iv) related to maintaining the exclusion from gross income of interest on Owner's or its Affiliates' obligations for federal income tax purposes) or any of the agreements that Owner or its Affiliates may be party to from time to time that relate to the O&M Services.

**Section 5.17**   Energy Policy. As further detailed in Annex IX (*Scope of Services*), in accordance with the O&M Budget then in effect, Operator shall coordinate and assist with the services and operations required under Act 17 and any other Applicable Law, including Environmental Law, including services and operations related to the purchase and storage of fuel for Power and Electricity generation, the provision and maintenance of information regarding the Legacy Generation Assets, and decommissioning the Legacy Generation Assets in accordance with (a) the Integrated Resource Plan and (b) any order by PREB consistent with the intent of Act 17, and any other Applicable Law, including Environmental Law and the Integrated Resource Plan.

**Section 5.18**   Enforcement of Easements. Owner hereby authorizes Operator to enforce Owner's rights under the Easements. Operator, to the extent permitted by Applicable Law, may remove any obstruction of any kind or form hindering the area encumbered by an Easement.

**Section 5.19**   Out-of-Service Units. Operator shall provide O&M Services for the Out-of-Service Units, consisting of management, maintenance, and other related services, in each case that are customary and appropriate, or as required by Applicable Law, to maintain the Out-of-Service Units for the period of time from and including the Service Commencement Date to and excluding the Decommissioning Commencement Date for the applicable Out-of-Service Unit. In the event Applicable Law requires that any of the Out-of-Service Units become operational, Operator shall provide the O&M Services as provided in this Agreement. Operator shall take all necessary measures to ensure the safety of authorized personnel and visitors that may access the surroundings or interior of the Out-of-Service Units.

CONFIDENTIAL

**Section 5.20**    Communications Plan. Operator shall make all communications on all matters related to the Legacy Generation Assets and this Agreement in accordance with the Communications Plan set forth in Annex V (*Communications Plan*).

**Section 5.21**    Other Services.

(a)    Implied Services. If any services, functions or responsibilities not specifically described in this Agreement are reasonably required for the proper performance and provision of the O&M Services in accordance with Contract Standards, as mutually determined and agreed by Administrator and Operator, they shall be deemed to be implied by and included within the O&M Services, except to the extent they are obligations, rights or responsibilities reserved to Owner or Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as otherwise expressly provided in this Agreement.

(b)    Additional Services. If requested by Administrator, Operator may perform such additional services reasonably related to the Legacy Generation Assets not included within O&M Services, based upon terms and conditions, including price and additional reasonable and documented fees payable to Operator, as agreed to by Operator and Administrator.

(c)    Exclusivity. Without the prior approval of Administrator, Operator may not engage in any other business or activity other than to employ Operator employees and Subcontractors and to provide the Mobilization Services, the O&M Services, the Decommissioning Services and the Demobilization Services, and otherwise perform its obligations, pursuant to this Agreement. Owner acknowledges and agrees that this Section 5.21(c) (*Other Services – Exclusivity*) applies solely to Genera PR LLC and not to any other Person (including any Affiliates or Subcontractors of Operator).

**Section 5.22**    Annual Performance Test. No later than ninety (90) days following the Service Commencement Date, Operator shall conduct the first Annual Performance Test for each Legacy Generation Asset with reasonable assistance from Administrator, (as requested by Operator) and PREB's right to observe (upon PREB's election to observe), and in a manner consistent with the PREPA-Genco-Hydroco Operating Agreement and procedures developed pursuant to the PREPA-Genco-Hydroco Operating Agreement and reviewed by PREB in accordance with Section 4.2(u) (*Annual Performance Test*). Operator shall promptly submit the results of such test, the proposed Equivalent Availability Factor targets and Minimum Performance Thresholds, and all supporting calculations and documentation, to PREB for its review.

**Article 6**
**RIGHTS AND RESPONSIBILITIES OF OWNER AND ADMINISTRATOR**

**Section 6.1**    Rights and Responsibilities of Owner.

(a)    Generally. From and after the Service Commencement Date, Owner shall have the following rights and responsibilities with respect to the operation, management and maintenance of the Legacy Generation Assets:

79

CONFIDENTIAL

(i)    grant and assure Operator unrestricted access to and use of the Legacy Generation Assets and the Generation Sites for the performance of Operator's obligations hereunder;

(ii)    pay the applicable Service Fee and any other amounts due Operator, and fund the Service Accounts, all in accordance with the terms and conditions of this Agreement;

(iii)    ensure that, to the extent PROMESA requires Owner to submit any Budget to the FOMB for approval, such Budget provides that Owner is authorized to pay amounts due to Operator under this Agreement and fund the Service Accounts in accordance with Section 7.6 (*Service Accounts*);

(iv)    cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contract Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment;

(v)    (A) respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator confirming its position or decision (as applicable) with respect to all matters requiring the approval, review or consent of Owner (and in each such case, unless otherwise specifically stated in this Agreement, Owner shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Owner in accordance with the provisions of this Agreement, (B) provide Operator with such information, data and assistance as may be reasonably necessary or appropriate for Operator to perform its obligations (including with respect to any PREB rate or other proceeding or requirement) hereunder, and (C) from time to time, as and when requested by Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for Operator to perform its obligations under this Agreement;

(vi)    except as otherwise contemplated by Section 5.11 (*Legal Matters*), manage Owner's legal matters, including Owner's reporting and related legal compliance;

(vii)    cooperate with Operator and Administrator in obtaining and maintaining all Governmental Approvals;

(viii)    take all other actions, and cause its employees and other Representatives to take all other actions, reasonably required or reasonably requested by Operator to permit Operator to perform the O&M Services in compliance with the Contract Standards and this Agreement, including the enforcement of existing Easements and, to the extent necessary, the constitution of new Easements;

(ix)    exercise its statutory powers pertaining to any and all rights and remedies granted to it under Applicable Law, including doing so promptly when requested by Operator;

(x)    comply with all Applicable Law; and

CONFIDENTIAL

(xi)    coordinate any Audits that Owner is entitled to perform hereunder with any Audits being undertaken by Administrator and any other Governmental Body that has the right under Applicable Law to perform an Audit.

(b)    Authorization of Administrator. On behalf of the Government of Puerto Rico, Owner hereby assigns and delegates to Administrator the rights and responsibilities under this Agreement necessary for Administrator to administer this Agreement and act as Owner's liaison with Operator in connection with the O&M Services; provided that such assignment and delegation shall not release Owner from any of its obligations set forth herein; and provided, further, that Owner, on behalf of the Government of Puerto Rico, shall be responsible for all acts and omissions of Administrator in connection with this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, in the same manner as if such acts and omissions were those of Owner. For the avoidance of doubt, Owner's delegation of rights and responsibilities under this Agreement includes Owner's submission to applicable oversight by, and obligations to, PREB.

Section 6.2    Rights and Responsibilities of Administrator.

(a)    Generally. Operator shall be entitled to rely on the written directions of Administrator. Administrator shall be responsible for overseeing, in the manner provided for and subject to the terms and conditions of this Agreement, Operator's compliance with its obligations under this Agreement. Without limiting the generality of the foregoing, from and after the Service Commencement Date, Administrator shall have the following rights and responsibilities with respect to the operation, management and maintenance of the Legacy Generation Assets:

(i)    as set forth in Section 7.3 (*O&M Budgets*), review and approve O&M Budgets, including modifications thereto, to ensure compliance with the then applicable Rate Order;

(ii)    review and approve the Incentive Payment payable to Operator for a given Contract Year, including based on Administrator's evaluation of Operator's performance with respect to the Incentives and Penalties;

(iii)    cooperate with Operator such that the Budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contract Standards and provide a reasonable opportunity for Operator to achieve the Incentive Payment;

(iv)    exercise Oversight in relation to Operator's compliance with O&M Budgets, including Pass-Through Expenditures, in accordance with the procedures set forth in this Agreement; provided that, Administrator shall (i) reasonably coordinate with Owner to avoid duplicative Oversight and (ii) except to the extent provided under this Agreement, avoid exercising Oversight with respect to items that fall within the scope of PREB's statutory oversight;

(v)    exercise Oversight in relation to Operator's compliance with its obligations hereunder;

(vi)    respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to matters requiring

81

CONFIDENTIAL

the approval, review or consent of Administrator (and in each such case, unless otherwise specifically stated in this Agreement, Administrator shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Administrator in accordance with the provisions of this Agreement;

(vii)    (A) cooperate with Operator by providing Operator such information, data and assistance as may be reasonably necessary for Operator to perform its obligations hereunder and (B) from time to time, as and when requested by Owner, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as necessary for Operator to perform its obligations under this Agreement;

(viii)    declare an Event of Default and exercise remedies under this Agreement, including termination of this Agreement upon the occurrence of an Operator Event of Default in accordance with Section 14.1 (*Events of Default By Operator*);

(ix)    exercise Oversight, as agent of Owner, in relation to Operator's compliance with federal funding requirements; and

(x)    coordinate any Audits that Administrator is entitled to perform hereunder with any Audits being undertaken by Owner and any other Governmental Body that has the right under Applicable Law to perform an Audit.

For the avoidance of doubt, the Parties acknowledge that Owner delegates unto Administrator all rights, responsibilities and obligations pertaining to the Oversight of Operator's compliance with its obligations under this Agreement. The Parties acknowledge that PREB is the entity responsible for overseeing all technical and operational aspects of Operator's performance under this Agreement.

(b)    Disputes. In the event of a Dispute among the Parties with respect to clauses (ii) through (x) of Section 6.2(a) (*Rights and Responsibilities of Administrator – Generally*), such Dispute shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "Administrator Dispute").

(c)    Approvals and Consents. When any approval or consent by Owner to an Operator submission, request or report is required pursuant to the terms of this Agreement, the approval or consent shall be given by Administrator in writing, and such writing shall be conclusive evidence of such approval or consent and shall be binding on Owner.

**Section 6.3**    Reporting; Audits.

(a)    Generally. At the reasonable request of Administrator or its relevant consultant (each, an "Authorized Inspector"), at Administrator's sole cost and expense, at reasonable times during normal business hours, Operator shall: (i) make available or cause to be made available to such Authorized Inspector all information related to this Agreement or the Legacy Generation Assets as may be specified in such request and as shall be in the possession or control of Operator or its Representatives; (ii) permit such Authorized Inspector, upon ten

82

CONFIDENTIAL

(10) Business Days' prior notice to Operator, which notice shall identify the persons such Authorized Inspector requests to be present for an interview and describe with reasonable specificity the subject matter to be raised in the interview, to discuss the obligations of Operator under this Agreement with any of the directors, chief executive officer and chief financial officer of Operator and its Representatives, for the purpose of enabling such Authorized Inspector to determine whether Operator is in compliance with this Agreement; and (iii) otherwise provide such cooperation as may reasonably be required by such Authorized Inspector in connection with any such Audit of the information required to be maintained or delivered by Operator under this Agreement or required by Applicable Law. Such Authorized Inspector shall be entitled to make copies of the information related to the conduct of such Audit and to take extracts therefrom at such Authorized Inspector's sole cost and expense. Absent good cause or as may be required by Applicable Law, audits shall occur no more than once every Contract Year. In the course of performing its Audits hereunder, each Authorized Inspector and its Representatives shall avoid any disruption to Operator's performance of the O&M Services or Operator's rights or responsibilities under this Agreement, having regard to the nature of the Audits being performed, and when accessing the Legacy Generation Assets, each Authorized Inspector and its Representatives shall do so at its own risk and shall comply with all of Operator's safety procedures.

(b)    No Other Audit Rights. This Agreement does not provide any Governmental Body any rights to undertake any Audit other than those stated herein, and, without restricting the foregoing, this Agreement does not provide any regional, municipal or local body with any rights to perform any Audit in addition to those permitted by Applicable Law. For the avoidance of doubt, nothing in this Section 6.3 (*Reporting; Audits*) shall be construed as a limitation on the right of PREB to conduct audits as needed in the performance of its statutory duties.

**Section 6.4**    Staffing Levels. From and after the Service Commencement Date and at all times during the Term, Owner and Administrator, including any of their subcontractors, shall maintain staffing in connection with the O&M Services only at those levels strictly necessary for Owner and Administrator to timely and efficiently perform their obligations under this Agreement. At all times before the Service Commencement Date, Owner shall maintain staffing necessary to continue to perform its obligations at the same or higher level than it performed such obligations as of the Proposal Submission Date.

**Article 7**
**COMPENSATION; O&M BUDGETS**

**Section 7.1**    Service Fee.

(a)    Generally.

(i)    In addition to Owner's funding or payment of Pass-Through Expenditures, in accordance with the then-currently approved Operating Budget, and any other amounts that become due and owing to Operator hereunder, from and after the Service Commencement Date, Owner shall pay Operator, in accordance with this Agreement, the O&M Fixed Fee.

83

CONFIDENTIAL

(ii)    In addition to the fees described in the foregoing paragraph, with respect to each Contract Year from and after the Service Commencement Date and as described in Section III of Annex II (*Compensation – Incentives and Penalties*) of this Agreement, Operator may (A) be eligible to receive an O&M Incentive Payment and a Decommissioning Incentive Payment, and (B) be subject to an O&M Penalty or a Decommissioning Penalty.

(iii)    For the avoidance of doubt, the applicable Service Fee shall constitute payment for Operator Overhead, none of which shall be subject to reimbursement as a Pass-Through Expenditure. Except as otherwise expressly provided for in this Agreement, the applicable Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)    O&M Fixed Fee.

(i)    The O&M Fixed Fee payable to Operator for each Contract Year as compensation for the performance of the O&M Services shall be as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*). Owner and Administrator agree that an amount equal to the maximum amount of the O&M Fixed Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)    Owner shall pay the O&M Fixed Fee in monthly installments equal to (i) one-twelfth (1/12) of the O&M Fixed Fee for a Contract Year of twelve (12) months or (ii) in the case of any Contract Year that includes more or less than twelve (12) months, an amount equal to one (1) divided by the number of months in such Contract Year. In the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis.

(iii)    On or prior to the tenth (10th) Business Day of each month of any Contract Year, Operator shall submit to Administrator for its review and approval an invoice for the O&M Fixed Fee payable in respect of the prior month. The invoice shall specify the monthly portion of the O&M Fixed Fee for the relevant month, together with (A) the aggregate portion of the annual O&M Fixed Fee paid through such month and (B) the accumulated payments to the date of such invoice. Owner shall pay the invoice by the last Business Day of the month on which the invoice was submitted. Owner's sole responsibility with respect to all invoices shall be payment of such invoices and shall not include review of any invoice. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) hereto.

(iv)    The O&M Fixed Fee shall not be subject to the O&M Fixed Fee Adjustment during the first five (5) Contract Years. Beginning on the sixth (6th) Contract Year and for any Contract Year thereafter, the O&M Fixed Fee shall be subject to the O&M Fixed Fee Adjustment at any time and from time to time upon (i) the commencement of Decommissioning Services with respect to a Legacy Generation Asset or (ii) the removal, permanently or indefinitely, of a Legacy Generation Asset from the scope of the O&M Services by Administrator pursuant to Section 2.3(c) (*Term – Reduction*), as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*).

84

CONFIDENTIAL

      (c)     Incentives and Penalties.

      (i)     Based on Operator's performance with respect to the Incentives and Penalties described in Section III of Annex II (*Compensation – Incentives and Penalties*), Operator shall be eligible to receive Incentive Payments or be subject to Penalties as a deduction from the applicable Service Fee in any given Contract Year. For the avoidance of doubt, no Incentive Payments or Penalties shall be earned or incurred during the Mobilization Period or the Demobilization Period. The Incentive Payments or Penalties to be earned or incurred on any given Contract Year shall be calculated as set forth in Section III of Annex II (*Compensation – Incentives and Penalties*), as adjusted on a Pro Rata basis for a Contract Year that is more or less than three hundred and sixty-five (365) days. Owner and Administrator agree that an amount equal to the maximum amount of the Incentive Payments available in any given Contract Year shall be included in the Operating Budget or the Decommissioning Budgets, as applicable, for such Contract Year.

      (ii)     No later than thirty (30) days following the end of a Contract Year or the date of termination of this Agreement, Operator shall submit a report in a form substantially consistent with the form attached to the Mobilization Plan (the "Incentives and Penalties Report"), which report shall include the separate Fuel Optimization Report, to Administrator and PREB with (A) supporting performance data, information and reports evidencing its performance with respect to one or more of the categories of Incentives and Penalties and (B) based thereon, its good faith calculation of the proposed Incentive Payment and/or Penalties, in each case for the relevant Contract Year(s). The Incentives and Penalties Report shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

      (iii)     Administrator shall have a period of one hundred twenty (120) days after receipt of the Incentives and Penalties Report to review such report and during such period, Administrator and Operator shall meet weekly to discuss the Incentives and Penalties Report until an agreement is reached. During this period, Operator shall grant to Administrator reasonable access during normal business hours to all relevant personnel, Representatives of Operator, books and records of Operator and other items reasonably requested by Administrator in connection with the review of the Incentives and Penalties Report.

      (iv)     If Administrator delivers to Operator a written statement describing any disagreements with the Incentives and Penalties Report during such one hundred twenty (120) day review period, then Operator and Administrator shall attempt to resolve in good faith any such disagreements; provided that any unresolved disagreements shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*). If (A) Administrator does not deliver such statement during such one hundred twenty (120) day review period (in which case it shall be deemed to have agreed with the Incentives and Penalties Report), (B) Operator and Administrator reach a resolution with respect to such matters or (C) Administrator has no disagreements with the Incentives and Penalties Report, then Owner shall pay the Incentive Payment in accordance with Section 7.1(c)(v) (*Service Fee – Incentives and Penalties*) based on Operator's Incentives and Penalties Report or in the case of sub-clause (B) the terms of the relevant resolution.

CONFIDENTIAL

(v)    Owner shall pay the undisputed portion of the Incentive Payment for a given Contract Year within one hundred twenty (120) days of the date of receipt of the Incentives and Penalties Report. If any Penalties are determined to be due in accordance with Section 7.1(c)(iv) (*Service Fee – Incentives and Penalties*), Owner shall deduct the Penalty, or any portion thereof that is not subject to a Dispute, from the next payment of the applicable Service Fee due to Operator following such determination (or in the event the Penalty is higher than such payment, from the next series of payments). In the event that due to an early termination of this Agreement or the end of the Term, the Service Fee payments due to Operator after such determination are not sufficient to deduct the full amount of the Penalty, Operator shall pay to Owner the amount of the Penalty that has not been deducted from the Service Fee within six (6) months following the date of such termination or end of the Term.

(vi)    If any Force Majeure Event (other than a Force Majeure Event that is a Forced Outage) occurs, Operator and Administrator shall negotiate proportional adjustments to the relevant categories of Incentives and Penalties, as applicable, which shall apply during the duration of the Force Majeure Event to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment.

(vii)    Each Penalty shall be Owner's sole and exclusive remedy and Operator's sole and exclusive liability with respect to the circumstances to which the relevant Penalty applies and any breach or other act or omission attributable Operator that directly or indirectly caused or contributed to such circumstances, except to the extent that such circumstances resulted from a violation of Applicable Law; provided that if such violation of Applicable Law results in the imposition of a fine or other penalty for which Operator is liable or otherwise responsible under this Agreement, then such fine or other penalty shall be in lieu of (and not in addition to) the Penalty under this Agreement.

(viii)    If there is any material error or inaccuracy in any information provided by Owner or any of its Affiliates to Operator or any of its Affiliates in connection with the Legacy Generation Assets or the Generation Sites, Operator and Administrator shall negotiate proportional adjustments to the relevant categories of Incentives and Penalties, to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment.

(d)    Reporting Obligation Charge. Any Reporting Obligation Charge incurred by Operator as a result of its failure to provide required reporting under this Agreement, as provided in Section III of Annex II (*Compensation – Incentives and Penalties*), may be automatically deducted from the Service Fee payable to Operator.

(e)    Service Fee Disputes. The Parties hereby agree that, in the event that a Dispute arises between Operator and Administrator in connection with the applicable Service Fee (including any Incentives, Penalties or other adjustments thereto as permitted by this Agreement), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Fee Dispute").

**Section 7.2**    Pass-Through Expenditures. For purposes of this Agreement, "Pass-Through Expenditures" shall be any reasonable and documented costs and expenses incurred by Operator in connection with the performance of its obligations (including O&M

CONFIDENTIAL

Services and the Decommissioning Services) pursuant to this Agreement (without markup for Operator profit), including as set forth in Annex XII (*Pass-Through Expenditures*); provided that Pass-Through Expenditures shall not include any (i) Disallowed Costs or (ii) Operator Overhead which is included in the applicable Service Fee; provided, further that such costs and expenses subject to reimbursement shall comply with Applicable Law, including the applicable federal guidelines. Operator shall pay Pass-Through Expenditures in accordance with Section 7.6 (*Service Accounts*). Operator shall provide promptly such additional supporting documentation evidencing the provision of the O&M Services and Decommissioning Services, if any, including evidence of the payment of any Subcontractor whose fees or allocated expenditures (in the case of Subcontractors that are Affiliates of Operator, charging any amounts to Operator on an allocation basis) are included in the applicable Pass-Through Expenditures, and the calculation of the Pass-Through Expenditures related thereto, as Administrator may request and as may be required by Applicable Law. To the extent necessary for Administrator to complete its review of the applicable invoice, upon Administrator's reasonable request such additional supporting documentation shall include any relevant Confidential Information. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

Section 7.3    O&M Budgets.

(a)    Budget Allocation Meeting. For any Contract Year in which there is a single base rate covering each of the T&D System and related assets, Owner's Hydropower Assets, and the Legacy Generation Assets (other than the initial Contract Year, for which the procedures for the Initial O&M Budget set forth in Section 4.3(c) (*Owner and Administrator Responsibilities – Initial O&M Budget*) shall apply, or a year in which a rate adjustment approved by PREB enters into effect, in which case the O&M Budget used in connection with obtaining such rate adjustment shall be used), in accordance with the PREPA-Genco-Hydroco Operating Agreement, Operator shall, no later than one hundred twenty-five (125) days prior to the commencement of such Contract Year, meet with T&D Operator, Administrator and other relevant parties to determine the allocation of such base rate and the resulting revenues among the non-generation budgets T&D Operator must prepare, the Hydroco Budget, the budgets for PREPA and its subsidiaries other than Genco and Hydroco, and the generation budgets Operator must prepare, which allocation shall be proportionate to, and consistent with, the cost allocation among such budgets in the then applicable Rate Order (the "Budget Allocation Meeting"); provided that if, (i) during the Budget Allocation Meeting for a Contract Year, T&D Operator, Operator, Hydroco and PREPA are unable to reach agreement on the allocation of the base rate among such budgets for such Contract Year and/or (ii) after the Budget Allocation Meeting is held for a Contract Year but before the start of such Contract Year, the load forecast, on which the allocation of the base rate was based, changes, then, in each case, the final allocation shall be determined in accordance with the applicable procedures set forth in the PREPA-Genco-Hydroco Operating Agreement.

(b)    O&M Budget Preparation. Subject to the requirements of Section 7.3(a) (*O&M Budgets – Budget Allocation Meeting*), Operator shall prepare the proposed O&M Budgets for such Contract Year, consolidate such budgets with the proposed Hydroco Budget (which Hydroco shall submit to Operator no later than one hundred fifteen (115) days prior to the commencement of the relevant Contract Year), and, no later than one hundred five (105) days prior to the commencement of the relevant Contract Year, submit to T&D Operator the proposed O&M Budgets for such Contract Year. In the event that Operator receives a Genco Budget Notice or a

87

CONFIDENTIAL

Hydroco Budget Notice (as such terms are defined in the PREPA-Genco-Hydroco Operating Agreement), Operator shall follow the resolution procedures set forth in the PREPA-Genco-Hydroco Operating Agreement.

(c)    Administrator Review of O&M Budgets. Once Administrator has received the proposed O&M Budgets submitted by T&D Operator in accordance with the PREPA-Genco-Hydroco Operating Agreement, Administrator shall review the O&M Budgets to ensure compliance with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement. Within forty-five (45) days following its receipt of such budgets, Administrator shall notify T&D Operator, Operator and Hydroco whether the proposed budgets are compliant with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement, and shall request, acting reasonably, any changes or modifications to the proposed budgets to conform the proposed budgets with the then applicable Rate Order and Section 7.4 of the T&D O&M Agreement.

(d)    Compliance with Existing Rate Order. Without limiting Operator's rights under Section 7.6(d) (*Service Accounts – Reserve Account*), Section 7.8 (*Unfunded Amounts*) and Article 14 (*Events of Default; Remedies*), (i) Operator acknowledges that the Initial O&M Budget represents the maximum expenditure budget (excluding expenditures related to Fuel Costs, which shall be subject to rates determined pursuant to the Fuel Adjustment Clause as described in Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*)) allocated to the Legacy Generation Assets under the then applicable Rate Order approved by PREB as of the Effective Date, (ii) in no event shall the Operating Budget for any subsequent Contract Year exceed the maximum expenditure budget allocated to the Legacy Generation Assets under the then applicable Rate Order and (iii) Owner and Administrator acknowledge that the O&M Budgets shall be compliant with the then-applicable Rate Order.

(e)    Amendments to the Operating Budget.

(i)    Operator may, from time to time, propose to Administrator to amend the approved Operating Budget for a given Contract Year; provided that any such amendment shall be compliant with the then applicable Rate Order and subject to approval by PREB. If, during a Contract Year, Operator becomes aware that the Pass-Through Expenditures for such Contract Year are expected to exceed the relevant Budget for such Contract Year, then (A) Operator shall promptly notify Administrator and T&D Operator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall and, (C) as promptly as practicable, Operator shall prepare and submit to PREB proposed amendments to the relevant Budget for such Contract Year, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB.

(ii)    Notwithstanding anything to the contrary contained in this Section 7.3(e) (*O&M Budgets – Amendments to the Operating Budget*), in the event that PREB takes any action or issues any order that could result in a change in the portion of rates that relate to the Legacy Generation Assets, then Operator shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator, Administrator and Hydroco, the proposed amendments to the Operating Budget, which amendments must be consistent with the then applicable Rate Order and shall require and be subject to approval by PREB.

88

CONFIDENTIAL

(iii)    In the event Decommissioning Services for one or more of the Legacy Generation Assets occur during any given Contract Year and the applicable Decommissioning Budgets for such Legacy Generation Assets has been approved pursuant to Section 16.2(a) (*Decommissioning Compensation – Decommissioning Budget*), as of the month such Decommissioning Services commence, the approved Operating Budget for such Contract Year shall be amended to reflect the transition of all costs related to such Legacy Generation Assets, including the O&M Fixed Fee Adjustment as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*), from the relevant operation line items to separate line items for the decommissioning of such Legacy Generation Asset.

(f)    Quarterly Adjustments to Fuel Budget. No later than fourteen (14) days prior to the end of a quarter, Operator shall prepare and submit to PREB for approval (with copy to Administrator and the T&D Operator), as necessary, (i) a record of actual Fuel Costs spent in the current quarter, with all applicable invoices and necessary supporting information for auditing purposes, and (ii) revised quarterly budgets describing the estimated variable Fuel Costs for the following quarter for the purpose of resetting the Fuel Costs to be recovered for that quarter. In the event PREB does not timely approve a proposed revised quarterly Fuel Budget prior to the start of the applicable quarter, the proposed quarterly Fuel Budget shall be adjusted to reflect the maximum amount of Fuel Costs to be recovered through the rates set forth in the applicable Fuel Adjustment Clause then in effect.

(g)    Default Budget. In the event any O&M Budget for a given Contract Year has not been finalized in accordance with Section 7.3(c) (O&M *Budgets – Administrator Review of O&M Budgets*) by July 1 of such Contract Year, the applicable approved O&M Budget for the immediately preceding Contract Year (as the same may have been amended) (such O&M Budget as it relates to the given Contract Year, a "Default Budget") shall remain in effect until such time as the applicable O&M Budget for such Contract Year is so finalized; provided that any such Default Budget shall be compliant with the then applicable Rate Order.

(h)    O&M Budget Disputes. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with an O&M Budget or the relevant Default Budget (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "O&M Budget Dispute").

Section 7.4    O&M Budget Policy. The O&M Budgets and the related Operator staffing levels for each Contract Year shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related O&M Services in accordance with the Contract Standards to reasonably assure that Operator has a reasonable opportunity to earn the Incentive Payment. The O&M Budgets for each Contract Year shall comply with (a) the then applicable Rate Order, (b) any PREB-approved directive or requirement applicable to Hydroco, Owner or PREPA, (c) Applicable Law and (d) amounts allocated to the generation budget as agreed in the Budget Allocation Meeting for such Contract Year and any follow up to such meeting. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the relevant categories of Incentives and Penalties or the O&M Budgets as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Forced Outages or (iv) additional requirements imposed by Owner, Administrator, PREB or any other

89

CONFIDENTIAL

Governmental Body after approval of the O&M Budgets, in the case of each of clauses (i) to (iv), which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator promptly following the occurrence of an event contemplated above and the Parties shall, acting in good faith and acting reasonably, consider necessary adjustments to the Incentives and Penalties or the O&M Budgets that are based on rates that are reasonable and necessary and shall submit such to PREB for approval.

Section 7.5    PREB Rate Proceedings.

(a)    Operator acknowledges that from time to time, or as otherwise required by Applicable Law or ordered by PREB, T&D Operator may apply to PREB to request a change in the then applicable Rate Order (a "Rate Order Modification Request"). In accordance with the terms of the PREPA-Genco-Hydroco Operating Agreement, upon receipt of notice from T&D Operator that it plans to submit a Rate Order Modification Request which contemplates modifications to the O&M Budgets, Operator shall cooperate in good faith with T&D Operator and Administrator to prepare proposed O&M Budgets to be included in or otherwise form the basis of such Rate Order Modification Request. Operator shall provide reasonable further support to the T&D Operator through any applicable proceedings arising in connection with the Rate Order modification request to ensure that adequate amounts are available for inclusion in any O&M Budget. In the event that Operator wishes to propose capital improvements to the Legacy Generation Assets, or unforeseen circumstances require increases to the O&M Budgets, Operator shall discuss such proposal or requirements with Administrator and, with Administrator's approval, may coordinate with T&D Operator to prepare an application to PREB to request a change in the then applicable Rate Order. For the avoidance of doubt, nothing in this Agreement shall be construed to prohibit Operator from soliciting an audience with PREB at any applicable proceedings arising in connection with the Rate Order Modification Request or otherwise in order to advocate for any positions it may have with respect to the O&M Budgets. Operator, T&D Operator, Administrator and PREPA shall appear before PREB as may be requested by PREB in any proceedings arising in connection with a Rate Order Modification Request.

(b)    Operator, the Authority and Owner acknowledge that the Rate Order and the resulting customer rates may be subject to adjustment (including decreases) by PREB in accordance with the provisions set forth in Applicable Law, including the requirement that all rates be just and reasonable, and consistent with sound fiscal and operational practices that provide for a reliable and adequate service at the lowest reasonable cost including reflecting any saving incentives for Puerto Rico rate payers per Section 7.1.

Section 7.6    Service Accounts.

(a)    Operating Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass-Through Expenditures actually incurred by Operator in performing the O&M Services and from which Owner shall pay the O&M Service Fee (collectively, the "Operating Account"). Owner shall pay Operator the O&M Service Fee in

90

CONFIDENTIAL

accordance with the terms of Section 7.1 (*Service Fee*) from funds available in the Operating Account.

(ii)     No later than ten (10) Business Days prior to the Service Commencement Date, the Operating Account shall be funded with an amount equal to the sum of (A) anticipated Pass-Through Expenditures for the following two (2) months *plus* (B) the anticipated O&M Service Fee for the following two (2) months, in each case based on the then-currently approved Operating Budget or the relevant Default Budget then in effect. Thereafter, beginning in the month in which the Service Commencement Date occurs, the Operating Account shall be replenished monthly in accordance with the procedures set forth in the PREPA-Genco-Hydroco Operating Agreement to maintain a minimum balance of the amount that is equal to the sum of (A) anticipated Pass-Through Expenditures for the following two (2) months *plus* (B) the anticipated O&M Service Fee for the following two (2) months.

(iii)     In each Contract Year, Operator shall be entitled to withdraw funds from the Operating Account for Pass-Through Expenditures actually incurred under the approved Operating Budget or the relevant Default Budget then in effect without Administrator approval. Operator shall not withdraw funds from the Operating Account for Pass-Through Expenditures that are not covered by the then-currently approved Operating Budget or the relevant Default Budget then in effect without prior Administrator approval; <u>provided</u> that no such approval shall be required in case of: (A) a Force Majeure Event, Owner Fault or Forced Outage; or (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Operating Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the Legacy Generation Assets would expend funds prior to the time that the applicable O&M Budget could reasonably be expected to be amended; <u>provided further</u>, <u>however</u>, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition, (y) provide a description of the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Operating Account and (z) withdraw such amount from the Operating Account.

(iv)     Simultaneous with each withdrawal of funds from the Operating Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Pass-Through Expenditures being paid. Not later than nine (9) Business Days following each month end, Operator shall provide Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Pass-Through Expenditures actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(b)     <u>Fuel Account</u>.

(i)     No later than the Service Commencement Date, Owner shall have established one or more fuel accounts from which Operator shall draw funds from time to time to pay for costs and expenses related to the purchase, transportation, testing, delivery and storage

91

CONFIDENTIAL

(including tank maintenance) of fuel for the Legacy Generation Assets actually incurred by Operator (the "Fuel Costs") in performing the O&M Services (collectively, the "Fuel Account").

(ii)    No later than ten (10) Business Days prior to the Service Commencement Date, the Fuel Account shall be funded with an amount equal to at least an average of two (2) months of Fuel Costs, based on the average monthly Fuel Costs set forth in the then-currently approved Fuel Budget for the current quarter. Thereafter, beginning in the month in which the Service Commencement Date occurs, the Fuel Account shall be replenished monthly in accordance with the procedures set forth in the PREPA-Genco-Hydroco Operating Agreement. The required funding of the Fuel Account may be increased in accordance with any special stipulations in the approved and in-force fuel supply agreements for the applicable Legacy Generation Assets.

(iii)    In each Contract Year, Operator shall be entitled to withdraw funds from the Fuel Account for Fuel Costs actually incurred under the approved Fuel Budget without Administrator approval. Operator shall withdraw funds from the Fuel Account only for Fuel Costs that are incurred pursuant to approved and in-effect fuel supply agreements for the Legacy Generation Assets. Operator shall not withdraw funds from the Fuel Account for any non-fuel costs or Fuel Costs that are not incurred pursuant to approved and executed fuel supply agreements for the Legacy Generation Assets without Administrator approval.

(iv)    Simultaneous with each withdrawal of funds from the Fuel Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Fuel Costs being paid. Not later than nine (9) Business Days following each month end, Operator shall provide Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Fuel Costs actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(c)    Decommissioning Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for Pass-Through Expenditures actually incurred by Operator in performing the Decommissioning Services (collectively, the "Decommissioning Account").

(ii)    No later than ten (10) Business Days prior to the Decommissioning Commencement Date for the applicable Legacy Generation Asset, the Decommissioning Account shall be funded with an amount equal to the sum of all anticipated Pass-Through Expenditures for the following one (1) month, based on the then-currently approved Decommissioning Budget. Thereafter, beginning in the month in which the Decommissioning Commencement Date for the applicable Legacy Generation Asset occurs, the Decommissioning Account shall be replenished monthly in accordance with procedures set forth in the PREPA-Genco-Hydroco Operating Agreement until all payments for the Decommissioning Services contemplated by this Agreement have been made.

92

CONFIDENTIAL

(iii)    During the performance of the Decommissioning Services for the applicable Legacy Generation Asset, Operator shall be entitled to withdraw funds from the Decommissioning Account for Pass-Through Expenditures actually incurred under the approved Decommissioning Budget. Operator shall not withdraw funds from the Decommissioning Account for Pass-Through Expenditures that are not included in the then-currently approved Decommissioning Budget; provided that such approval shall not be required in case of: (A) a Force Majeure Event, Owner Fault or Forced Outage; and/or (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Decommissioning Budget and for which a prudent Person in the business of decommissioning the Legacy Generation Assets would expend funds prior to the time that such Decommissioning Budget could reasonably be expected to be amended. Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Decommissioning Account.

(iv)    Simultaneous with each withdrawal of funds from the Decommissioning Account, Operator shall provide Administrator (with copy to T&D Operator) with written notice of such withdrawal, including a summary of Pass-Through Expenditures being paid. Not later than nine (9) Business Days following each month end, Operator shall furnish Administrator, with a copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Pass-Through Expenditures actually incurred and paid during the prior month and (B) a written certification that all such withdrawals are Pass-Through Expenditures.

(d)    Reserve Account.

(i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more reserve accounts (each, a "Reserve Account") from which Operator (A) shall draw funds from time to time to pay for costs in connection with Forced Outages, Force Majeure Events or Owner Fault, and costs in connection with the procurement and installation of any Capital Spare Parts approved by Administrator and PREB in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*) and (B) may draw funds from time to time to pay for any shortfalls in the required funding of any other Service Account. In the event there are no funds on deposit in the Reserve Account, Operator shall provide written notice to Administrator of such shortfall. Until the Reserve Account is replenished, to the extent costs are incurred under clause (A) of this Section 7.6(d)(i) (*Service Accounts – Reserve Account*), Operator may withdraw the necessary funds from any Service Account (other than the Fuel Account) provided that, prior to any withdrawal, Operator shall provide written notice of the intended withdrawal to Administrator for its review and approval. Operator may withdraw such funds only upon either (x) receipt of Administrator's written approval or (y) Administrator's failure to provide a response within a reasonable period. Such withdrawal notice shall include the amount of the withdrawal and describe the Forced Outage, Force Majeure Event or Owner Fault, or procurement and installation of any Capital Spare Parts approved by Administrator and PREB pursuant to which such costs were incurred.

93

CONFIDENTIAL

(ii)     No later than ten (10) Business Days prior to the Service Commencement Date, the Reserve Account shall be funded with an amount equal to US$30 million. Following a withdrawal from the Reserve Account, the Reserve Account shall be replenished no later than the eleventh (11th) Business Day of the month immediately succeeding the month in which the withdrawal occurred, with an amount equal to the aggregate amount withdrawn from the Reserve Account during the previous month; provided that if in any given month, Owner does not have sufficient funds to fund the Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Reserve Account is topped up to the level at which it should be in at any given point as soon as Owner has sufficient funds to do so.

(iii)     Subject to the terms of this Section 7.6(d) (*Service Accounts – Reserve Account*), Operator shall be entitled to withdraw funds from the Reserve Account from time to time only as necessary to pay for (A) costs in connection with Forced Outages, Force Majeure Events or Owner Fault, (B) any shortfalls in the required funding of any other Service Account or (C) costs in connection with the procurement and installation of any Capital Spare Parts approved by Administrator and PREB in accordance with Section 5.6 (*Capital Spare Parts and Capital Improvements*). Simultaneous with each such withdrawal, Operator shall provide Administrator with written notice of such withdrawal, including a summary of costs being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Reserve Account, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the costs related to the applicable event or circumstance actually incurred and paid during the prior month, the transfer of funds to other Service Account(s) or the costs related to the approved procurement and installation of such Capital Spare Part.

(e)     Service Account Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with a Service Account, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Account Dispute").

(f)     Withdrawals by Owner. Owner shall not withdraw funds held in any Service Account (other than from (i) the Operating Account for payment of the O&M Service Fee due to Operator, (ii) the Mobilization Account for payment of the Mobilization Service Fee due to Operator and (iii) the Demobilization Account for payment of the Demobilization Service Fee due to Operator), without the prior written approval of each of Administrator and Operator.

(g)     Use of Funds by Operator. Notwithstanding any other provision of this Agreement (i) Operator shall under no circumstances be required to pay for or incur any Pass-Through Expenditure, liabilities under Facility Contracts, or Fuel Costs on its own account and (ii) Operator is hereby authorized by Owner to process direct payments from the Service Accounts to any Person to which payments are owed under any Facility Contract, Subcontract or under any other arrangement with respect to Pass-Through Expenditures, Facility Contracts, Fuel Costs, or employment, in each case in accordance with the applicable Budget(s).

94

CONFIDENTIAL

**Section 7.7**     Disallowed Costs.

(a)     Generally. Subject to the limitations on liability in Section 19.3 (*Limitation on Liability*), none of the following shall be treated as Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator (collectively, "Disallowed Costs"):

(i)     any and all Pass-Through Expenditures incurred as a result of Operator's gross negligence or willful misconduct, except as otherwise provided in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*) where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard, or are otherwise subject to an indemnity from Owner to Operator under this Agreement;

(ii)     any and all fines, penalties or other similar payments or charges imposed by PREB, Puerto Rico Department of Natural and Environmental Resources, the EPA, the United States Department of Justice, OSHA or any other Governmental Body on Operator, except to the extent that such fines, penalties or other similar payments or charges arise out of violations or circumstances that arose prior to the Effective Date, or are otherwise subject to an indemnity from Owner to Operator under this Agreement; and

(iii)     any and all expenditures in excess of the then-currently approved Operating Budget or the relevant Default Budget, or the then-currently approved Decommissioning Budget(s) that are incurred by Operator other than as a result of Owner Fault, Operator's compliance with the Consent Decree or other Applicable Law, or a Force Majeure Event.

(b)     Disallowed Costs Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with Disallowed Costs, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Disallowed Costs Dispute"). In such event, Operator may continue to withdraw such Pass-Through Expenditures from the applicable Service Account; provided Operator shall be responsible to reimburse Owner promptly (and in any event within five (5) Business Days) any Pass-Through Expenditures that are determined to be Disallowed Costs pursuant to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*).

**Section 7.8**     Unfunded Amounts. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that Operator shall have no obligation or responsibility to incur or pay any costs or make expenditures in providing Services (other than Disallowed Costs) to the extent any of the Service Accounts do not contain sufficient funds to pay such costs and expenditures. Without limiting the foregoing or Operator's termination rights hereunder, and except to the extent Operator exercises its rights to cease providing the Services pursuant to Section 14.4 (*Termination for Owner Event of Default*), to the extent sufficient funds for the performance of all of Operator's obligations hereunder are not available for withdrawal by Operator from the Service Accounts, the Mobilization Account or the Demobilization Account, as applicable, (a) Operator shall take reasonable measures (to the extent practicable utilizing only the funding available in the Service Accounts) to maintain the continuity of the Services in accordance

95

CONFIDENTIAL

with the Contract Standards to the extent possible in the absence of its receipt of such sufficient funding (b) Owner shall protect, defend, indemnify and hold harmless Operator and its Affiliates from and against any and all Losses arising in connection with the discontinuation of any Services that occurs notwithstanding Operator's efforts pursuant to this Section 7.8(b) (*Unfunded Amounts*), and (c) Operator shall not be liable for, and Owner hereby waives and releases Operator from any claims for, Penalties (other than the Safety Compliance and the Environmental Compliance Penalties pursuant to Annex II, Section III.B (*Compensation – Incentives and Penalties – O&M Services Categories*)), and Operator shall not be liable for any failure to perform its obligations in accordance with the terms of this Agreement, until sufficient funds are made available.

**Section 7.9**   Owner Payment of Administrator Costs. Owner shall be solely responsible for all costs and expenses of Administrator in connection with the performance of Administrator's obligations under this Agreement, and shall pay or reimburse Administrator promptly for any out-of-pocket or third-party costs and expenses.

**Section 7.10**   Payment Disputes. Except as otherwise provided in Section 7.1(c) (*Service Fee – Incentives and Penalties*), if Owner or Administrator disagrees in good faith with any invoice submitted under this Agreement, then such Person shall promptly notify Operator of such dispute (and in any event no later than the due date for the applicable invoice) and the reasons for the disagreement. Any amounts set forth in an invoice that are not paid as of the due date for such invoice shall be deemed disputed by the owing Person.

**Article 8**
**CREDIT SUPPORT**

**Section 8.1**   Guarantee. Operator shall cause the Guarantee to be provided on or prior to the Effective Date and maintained thereafter throughout the Term.

**Section 8.2**   Guarantor Reports. While the Guarantee is outstanding, Operator shall deliver to Administrator (with copy to PREB): (i) within sixty (60) days after the end of the second quarter of Guarantor's fiscal year, a copy of the unaudited balance sheets of Guarantor at the end of each such period and the related unaudited statements of income, changes in equity and cash flows for each such period, in a manner and containing information consistent with Guarantor's current practices; and (ii) within one hundred twenty (120) days after the end of Guarantor's fiscal year, a copy of the audited balance sheets of Guarantor at the end of each such fiscal year, and the related audited statements of income, changes in equity and cash flows for such fiscal year, including, in each case, the notes thereto, in each case prepared in accordance with generally accepted accounting principles consistently applied in the United States (or the equivalent jurisdiction of Guarantor), together with a certificate from Guarantor's chief financial officer that such financial statements fairly present, in all material respects, the financial condition and the results of operations, changes in equity and cash flows of Guarantor as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States (or the equivalent jurisdiction of Guarantor) consistently applied. Such financial statements shall reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. In addition to the foregoing, Operator shall provide an opinion thereon of an independent public accountant of national stature in the United States (or the equivalent

96

CONFIDENTIAL

jurisdiction of Guarantor) engaged by Guarantor. Notwithstanding the foregoing, if the Guarantor is a publicly traded company in the United States, then the delivery by Operator of the quarterly and annual reports of Guarantor filed with the U.S. Securities and Exchange Commission shall be deemed to satisfy the financial information delivery requirements of Operator as otherwise described above.

## Article 9
## COMPLIANCE WITH APPLICABLE LAW

**Section 9.1**    Compliance Obligations. Operator shall perform, and shall cause all Subcontractors to perform, the Services in accordance with Contract Standards, including the Consent Decree and the payment of the PREB Regulatory Charge.

**Section 9.2**    Anti-Corruption and Sanctions Laws.

(a)    Anti-Corruption. Neither Operator, its subsidiaries or Parent Company, nor, when acting on behalf of Operator or its subsidiaries, any director or officer or employee of Operator or its subsidiaries, nor, in connection with this Agreement or the O&M Services, any Affiliates of Operator shall violate, conspire to violate, aid and abet the violation of any anti-bribery, anti-corruption or anti-money laundering law or regulation, including Act 2 and any other laws or regulation related to political activity, conflicts of interest, embezzlement, the misuse of public funds, or property or bidding on or otherwise seeking government contracts (collectively, the "Anti-Corruption Laws"). No funds transferred by Owner to Operator shall be transferred by Operator, directly or indirectly, in violation of any Anti-Corruption Laws. Operator acknowledges and agrees that, it shall be subject to Title III of Act 2, known as the Code of Ethics for Subcontractors, Suppliers and Applicants for Economic Incentives of the Government of Puerto Rico.

(b)    Sanctions. Neither Operator, its subsidiaries, Parent Company or Affiliates, nor any director or officer of Operator, its subsidiaries, Parent Company or Affiliates are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Operator nor its subsidiaries, nor any director, or officer or employee of Operator, its subsidiaries (when acting on behalf of Operator or its subsidiaries), shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by Owner to Operator or its subsidiaries shall be transferred by Operator or its subsidiaries, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions.

(c)    Policies and Procedures. Operator and its subsidiaries, Parent Company and Affiliates shall maintain and implement policies, procedures and controls reasonably designed to ensure compliance by Operator and its subsidiaries with the Anti-Corruption Laws and Sanctions. Operator shall include in all invoices to Administrator a written certification substantially in the form of Exhibit F (*Form of Anti-Corruption Certification*), and Operator acknowledges that any invoice not including such certification shall not be accepted by Administrator. Operator shall require any Subcontractors engaged by Operator to execute at the commencement of the

97

CONFIDENTIAL

Subcontract (i) a Sworn Statement and (ii) a certification substantially in the form of Exhibit F (*Form of Anti-Corruption Certification*).

(d)  Notice. Operator shall within five (5) Business Days notify Administrator in writing in accordance with Section 21.2 (*Notices*) if, to Operator's knowledge, Operator, its subsidiaries, any director, officer or employee of Operator or its subsidiaries or Parent Company, or, in connection with this Agreement or the O&M Services, any Affiliates of Operator becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions.

**Section 9.3**  Commonwealth Requirements.

(a)  Subcontractor and Supplier Contracts. To the extent permitted by Applicable Law, Operator shall include the provisions of this Article 9 (*Compliance with Applicable Law*) in every Subcontract and supply contract in order for such provisions to be binding on each Subcontractor or supplier. Operator shall require any Subcontractors engaged by Operator to execute at the commencement of such Subcontract a certification substantially in the form of Exhibit E (*Form of Commonwealth Certifications*). Operator shall use commercially reasonable efforts to select a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico as its Material Subcontractors.

(b)  Practice of Engineering, Architecture and Other Professions in the Commonwealth. To the extent that performance of the O&M Services involves performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988 ("Act 173"), known as the "Architects, Surveyor and Landscape Architects of Puerto Rico Act", then (i) Operator shall comply (and shall require Subcontractors or agents, if any, to comply) with Act 173 and (ii) Operator shall require that its Subcontractors and agents comply with Act 173.

(c)  Local Goods and Services. As required by Article 10 of Act No. 14 of the Legislative Assembly of Puerto Rico, enacted on January 8, 2004, Act No. 42 of January 21, 2018 of the Legislative Assembly, enacted on February 10, 2018, and any other Applicable Law, Operator shall not excuse by specification and shall use commercially reasonable efforts to use, goods and services extracted, produced, assembled, packaged, bottled, distributed, as applicable, in the Commonwealth by businesses, municipalities and consortiums operating in the Commonwealth or distributed by agents established in the Commonwealth.

**Section 9.4**  Non-Discrimination Laws. Operator shall comply with all Applicable Law regarding non-discrimination.

**Section 9.5**  Non-Collusion and Acceptance. Operator attests, subject to the penalties for perjury, that no Representative of Operator, directly or indirectly, to Operator's knowledge, entered into or offered to enter into any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement.

98

CONFIDENTIAL

**Section 9.6**    Commonwealth Tax Liabilities. Operator shall inform Administrator if, at any time during the Term, there are any material tax disputes with any Governmental Body of the Commonwealth (other than Commonwealth Tax liabilities for which Operator is not responsible under this Agreement, if any).

**Section 9.7**    Certifications Required by Commonwealth Contractor Requirements. Operator has (i) certified that it has complied and is in compliance with the provisions of the Public-Private Partnerships Authority's Ethical Guidelines and (ii) delivered the Sworn Statement in accordance with Section 2.2(b)(ix) (*Effective Date – Conditions to Execution*).

**Section 9.8**    Duty to Inform of Criminal Investigations. Operator shall inform Administrator and PREB if, at any time during the Term, it becomes aware that it is subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property.

**Section 9.9**    Act 120. Pursuant to Section 5(f) of Act 120 and subject to the provisions of this Agreement, Operator shall at all times comply with the public policy and regulatory framework applicable to the Legacy Generation Assets.

## Article 10
## INSURANCE

**Section 10.1**    Insurance Generally. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall maintain in effect, and cause any Subcontractor performing any of the O&M Services or the Decommissioning Services to maintain in effect, for the benefit of Owner and Operator, as applicable, the insurance policies and limits of coverage specified in Annex XIII (*Insurance Specifications*), and such additional coverage (i) as may be required by Applicable Law and (ii) as may be required by Prudent Industry Practice (the "Required Insurance"), and shall provide insurance management services, including placing insurance with carriers, and claims management and processing, as more fully described in Annex IX (*Scope of Services*). All Required Insurance shall be in a form reasonably acceptable to Administrator and shall only be issued by generally recognized financially responsible insurers that (x) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (y) at a minimum have a rating of A-(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). All premiums, deductibles, and other reasonable fees, costs and expenses (including uninsured Losses that are not Disallowed Costs and losses in excess of insurance) shall be Pass-Through Expenditures.

**Section 10.2**    Commercial Availability. Notwithstanding anything to the contrary herein, if any Required Insurance policy shall not be available on commercially reasonable Terms, Operator shall promptly notify Administrator, in writing, but in no event less than sixty (60) days prior to the expiration of any Required Insurance. In the event that any Required Insurance policy is not available on commercially reasonable Terms, as reasonably determined by Operator, the requirement that Operator obtain and maintain such Required Insurance under this Article 10 (*Insurance*) shall be waived, provided that such waiver shall be effective only for so long as such

99

CONFIDENTIAL

insurance shall not be available on commercially reasonable Terms; provided, further, that during the period of such waiver, (i) Operator shall maintain the maximum amount of such insurance otherwise available on commercially reasonable Terms and (ii) Administrator shall have the right to seek alternative coverage acceptable to Administrator. During the period of any such waiver, any loss that would otherwise have been insured shall be treated as a Pass-Through Expenditure, and the Parties shall consider appropriate adjustments to the O&M Budgets in accordance with Section 7.4 (*O&M Budget Policy*). If Administrator elects to purchase alternative coverage for the period of such waiver (x) Operator shall use its commercially reasonable efforts to ensure that Administrator is able to timely obtain such coverage and (y) any reasonable excess cost of such alternative coverage shall be treated as a Pass-Through Expenditure. For the purposes of this Article 10 (*Insurance*), "Terms" shall include rates, conditions, self insured retentions such as deductibles or excesses and other terms of any of the Required Insurances.

Section 10.3    Additional Named Insureds. Operator, Operator Indemnitees and Owner shall be included as additional named insureds, where commercially applicable and pertinent to the coverage, including as provided in Annex XIII (*Insurance Specifications*), along with waivers of subrogation, breach of warranties or separation of insureds and contractual liability endorsements on any Required Insurance policies, as applicable, which policies shall require thirty (30) days prior written notice to Administrator by Operator prior to the effective date of any change in or non-renewal or cancellation of such policies. Insurance coverage required pursuant to this Section 10.3 (*Additional Named Insureds*) shall be maintained with generally recognized financially responsible insurers that (i) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (ii) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). In addition, Operator shall be named as a "loss payee" for each of the policies of insurance contemplated herein and shall be entitled to receive all proceeds of the Required Insurance. In the event of a Loss relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall open an account in which to deposit any proceeds of insurance for any such Losses (the "Insurance Proceeds Account"). If Operator receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Operator shall deposit such amounts into the Insurance Proceeds Account within three (3) Business Days of receipt of such proceeds. If Owner receives any proceeds of insurance for any Losses relating to the O&M Services, the Legacy Generation Assets or any Generation Site, Owner shall hold such amounts in trust, for the benefit of Operator, and Owner shall deposit such amounts in the Insurance Proceeds Account within three (3) Business Days following the request of Operator. Funds in the Insurance Proceeds Account shall be used either to remediate or decommission the Legacy Generation Assets in a manner consistent with Prudent Industry Practice and reasonably approved by Administrator. In consultation with and subject to the approval of Administrator (not to be unreasonably withheld, conditioned or delayed, with notice to PREB), Operator shall determine whether to use such funds to remediate or decommission the Legacy Generation Assets, taking into account the Integrated Resource Plan and the other generation resources available to the T&D System (including load and energy forecasts and long and short range system plans prepared by T&D Operator), each to the extent applicable.

CONFIDENTIAL

**Section 10.4**  Warranties. Operator shall maintain and enforce any warranties or guarantees on any facilities, vehicles, equipment or other items owned or leased by Owner (to the extent made known to Operator), or purchased or leased on behalf of Owner and used by Operator in performing O&M Services under this Agreement. Operator shall not, by act or omission, negligently or knowingly invalidate in whole or part such warranties or guarantees without the prior approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

**Section 10.5**  Certificates of Insurance, Policies and Notice. Operator shall supply Administrator with copies of certificates of insurance promptly following issuance by the insurers. Not later than sixty (60) days prior to the beginning of each Contract Year following the Service Commencement Date, Operator shall furnish certificates of insurance to Administrator to confirm the continued effectiveness of the Required Insurance. Whenever a Subcontractor is utilized, Operator shall either obtain and maintain on behalf of the Subcontractor, or require the Subcontractor to obtain and maintain, insurance in accordance with the applicable requirements of Annex XIII (*Insurance Specifications*). Administrator's receipt of certificates that do not comply with the requirements stated herein, or Operator's failure to provide certificates, shall not limit or relieve Operator of the duties and responsibility of maintaining insurance in compliance with the requirements in this Article 10 (*Insurance*) and shall not constitute a waiver of any of the requirements in this Article 10 (*Insurance*).

**Article 11**
**SUBCONTRACTORS**

**Section 11.1**  Ability to Subcontract. Operator shall have the right, but not the obligation, to engage Subcontractors to perform Operator's obligations under this Agreement, including the Mobilization Services, the O&M Services, the Demobilization Services or the Decommissioning Services. Operator's payment obligations under any Subcontract shall be a Pass-Through Expenditure. Operator shall provide Administrator (with copy to PREB) with a list of any and all Subcontractors that Operator has engaged or intends to engage for the performance of any of the O&M Services or the Decommissioning Services. If the cost of any Subcontractor is expected to exceed US$5,000,000 per year or US$15,000,000 in the aggregate (each a "Material Subcontractor"), the list provided to Administrator and PREB shall include the expected costs for each Material Subcontractor. Administrator shall have the right to approve any Material Subcontractor engaged by Operator to perform any O&M Services or Decommissioning Services, which approval shall not be unreasonably withheld, delayed or conditioned. Operator shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Subcontractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Subcontractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; (iii) Administrator receives any information that it reasonably requests in respect of any Subcontractor; and (iv) the costs incurred with respect to any Subcontractor shall be consistent with the applicable O&M Budget or Decommissioning Budget and Operator shall use reasonable efforts to ensure such costs are reasonable and consistent with market terms, as applicable.

101

CONFIDENTIAL

**Section 11.2**    Subcontract Terms.

(a)    Generally. A Tax Opinion and a Reliance Letter shall be obtained, at the expense of Owner or Administrator, with respect to any Subcontract that is entered into, extended, replaced or amended and is a Covered Contract. Operator shall use commercially reasonable efforts to ensure that all agreements with third parties entered into after the Service Commencement Date in its own name or as agent for Owner that are material to Operator's performance of its obligations hereunder grant Owner or a Person designated by Administrator the right to own or license the goods and services to be provided thereunder. All contracts entered into with Subcontractors by Operator as agent for Owner, and all warranties and other rights related thereto, with respect to the Legacy Generation Assets (a) shall be assignable to Administrator or a Person designated by Administrator, solely at Administrator's election and without cost or penalty, upon early termination of this Agreement, and each Subcontractor shall acknowledge in writing the rights of Administrator to take such assignments and (b) shall terminate at the end of the Term. Operator shall be responsible for settling and resolving with all Subcontractors all claims arising out of delay, disruption, interference, hindrance or schedule extension caused by Operator or inflicted on Operator or a Subcontractor by the actions of another Subcontractor.

(b)    Terms Related to Consent Decree. Operator shall provide to each person, firm, corporation, contractor, or subcontractor hired to perform any requirement of the Consent Decree (including its attachments or appendices) a copy of all sections of the Consent Decree (including its attachments and appendices) relevant to the employment of the person, firm, corporation, contractor, or subcontractor, and shall condition all contracts or subcontracts entered into upon performance of the requirement(s) in conformity with the terms of the Consent Decree (including its attachments and appendices). Operator shall further require that each such person, firm, corporation, contractor, or subcontractor provide written notice of the Consent Decree to all subcontractors hired to perform any portion of any requirement of the Consent Decree.

**Section 11.3**    Indemnity for Subcontractor Claims. Operator shall retain full responsibility to Owner and Administrator under this Agreement for all matters related to the O&M Services and Decommissioning Services notwithstanding the execution or terms and conditions of any Subcontract. Subject to the limitations on liability set forth in Section 19.3 (*Limitation on Liability*), no failure of any Subcontractor used by Operator in connection with the provision of the O&M Services or Decommissioning Services shall relieve Operator from its respective obligations hereunder to perform the O&M Services and Decommissioning Services. Subject to Section 7.7 (*Disallowed Costs*) and Section 7.8 (*Unfunded Amounts)*, Operator shall pay when due all undisputed claims and demands of Subcontractors, mechanics, materialmen, laborers and others for any work performed on, or materials delivered for incorporation into any part of, the Legacy Generation Assets by or on behalf of Operator, and shall promptly discharge all mechanics', materialmen's and other construction Liens registered against the Legacy Generation Assets. All such reasonable and documented costs and expenses (other than Disallowed Costs) shall be treated as Pass-Through Expenditures. No Subcontractor shall have any right against Owner or Administrator for labor, services, materials or equipment furnished after the Service Commencement Date for the O&M Services or the Decommissioning Services. Operator acknowledges that its indemnity obligations under Section 19.1 (*Indemnification by Operator*) shall extend to all claims for payment or damages by any Subcontractor that furnishes or claims to

102

CONFIDENTIAL

have furnished any labor, services, materials or equipment in connection with the O&M Services after the Service Commencement Date or in connection with the Decommissioning Services.

**Section 11.4**  Disclosure Related to Operator Affiliates. In the event that any Affiliate of Operator proposes to participate in any procurement relating to subcontracting of services to be provided under this Agreement, Operator shall provide Administrator with information regarding the identity of the Affiliate, the services to be provided and any other reasonable information as Administrator may reasonably request prior to such Affiliate participating in any such procurement process or receiving any information in connection therewith.

## Article 12
## TAXATION

**Section 12.1**  Withholding Tax. Owner shall be entitled to (i) deduct and withhold (or cause to be deducted or withheld) from any consideration payable or otherwise deliverable pursuant to this Agreement, such amounts as may be required to be deducted or withheld therefrom under any provision of the U.S. federal, state, Commonwealth, municipal, local or non-U.S. Tax law or under any applicable legal requirement and (ii) request any necessary Tax forms or information, from Operator or any other Person to whom a payment is required to be made pursuant to this Agreement. To the extent such amounts are so deducted or withheld and paid to the applicable taxing authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. The Parties agree to cooperate in good faith to reduce or eliminate the amount of any applicable withholding Taxes. In the event any withholding Taxes are paid by Owner in respect of amounts payable to Operator, Owner shall use commercially reasonable efforts to provide Operator (x) receipts or other evidence of payment of such withholding taxes and (y) all informative statements required by Applicable Law.

**Section 12.2**  Tax Obligations.

(a)    Payment of Taxes. Operator and each of its subsidiaries shall prepare and timely file, or cause to be prepared and filed at its cost, all Tax Returns required to be filed by it under any Applicable Law and shall pay any Taxes required to be paid by it under Applicable Law (whether or not shown as due on such Tax Returns). Such Tax Returns shall be true, correct and complete in all material respects.

(b)    Exemption from Taxes. During the Term, Operator shall not be responsible for, and Operator and the Legacy Generation Assets shall not be subject to, (i) any real property Tax imposed on or measured by the value of the Legacy Generation Assets (including any real property constituting part of the Legacy Generation Assets) that is imposed by any Governmental Body of the Commonwealth or that is imposed on the "owner" of the Legacy Generation Assets (including relating to future expenditures for real property) or (ii) any personal property tax that is imposed by any Governmental Body of the Commonwealth on property owned by Owner and used by Operator exclusively for the Legacy Generation Assets or for the services or functions subject to this Agreement, all of which shall be obligations of Owner, if and to the extent any such Taxes are payable.

103

CONFIDENTIAL

(c)    Tax Deductions. Operator and each of its subsidiaries shall comply with all applicable withholding, employment, social security and similar provisions of applicable U.S. federal, state, Commonwealth, municipal, local and foreign laws, and timely withhold and pay all Taxes that it is required to withhold and pay from any Person, including its employees and independent contractors. Owner shall not make any such withholdings or deductions on behalf of Operator.

## Article 13
## INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION

Section 13.1    Intellectual Property.

(a)    Operator Intellectual Property and Subcontractor Intellectual Property. Operator hereby grants to Owner, and shall cause its Affiliates and Subcontractors to grant to Owner, a perpetual, non-exclusive, fully paid-up, royalty-free license and sublicense, under all of such party's rights in, to and under the Operator Intellectual Property and Subcontractor Intellectual Property solely in connection with the Legacy Generation Assets and related facilities of Owner and their related operations (including the O&M Services or the Decommissioning Services) by or on behalf of Owner or any successors or operators thereto to (i) make, have made, use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works in any medium or format, whether now known or later developed, in connection with any of the foregoing. Owner shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Operator Intellectual Property or Subcontractor Intellectual Property to, by or on behalf of anyone other than Owner and its Affiliates, any successors or operators thereto or any other third-party with whom Owner, its Affiliates or any successors or operators thereto contract solely for purposes of operating the Legacy Generation Assets and related facilities. Operator Intellectual Property and Subcontractor Intellectual Property are Operator's Confidential Information to the extent disclosed to Owner and for so long as they are protectable as trade secrets or are otherwise confidential, and for the avoidance of doubt shall remain the Intellectual Property of the owner thereof.

(b)    Third-Party Intellectual Property. Operator shall use commercially reasonable efforts to ensure that any Third-Party Intellectual Property is (i) licensed to Operator on the substantially same terms as are set forth in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property and Subcontractor Intellectual Property*), subject to appropriate modifications relative to the scope of the particular third-party relationship and (ii) sublicensable to Owner under terms substantially similar to those obtained by Operator for the use thereof in connection with the Legacy Generation Assets and related facilities and their related operations. The use of Third-Party Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent Operator wishes to use any non-commercially available Intellectual Property of any third-party in the provision of the O&M Services or the Decommissioning Services, Operator shall identify to Administrator, in writing in advance of any use of any such Intellectual Property, whether or not Operator has a right to sublicense same to Owner under the same terms as those of the foregoing license requirements. If, despite using commercially reasonable efforts, Operator cannot secure such license or sublicense rights, then Operator shall (i) assist Owner in obtaining any necessary license directly from such third-party or

104

CONFIDENTIAL

(ii) pursue licensing of a non-infringing alternative capable of accomplishing the same purpose in substantially the same manner, and, in the case of clauses (i) and (ii), Operator shall not use such Third-Party Intellectual Property or such alternative prior to Owner obtaining a sufficient license thereto.

(c)    Work Product. The Parties hereby acknowledge and agree that, as between them, Owner shall own all right, title and interest in and to all Intellectual Property, regardless of format, created or produced in the performance of the O&M Services or the Decommissioning Services by Operator and its Affiliates if the cost of such creation or development is a Pass-Through Expenditure (collectively, "Work Product"), all of which shall, to the fullest extent under Copyright law, be considered works made for hire. For the avoidance of doubt, Work Product shall not include any Intellectual Property created or produced (A) prior to the Effective Date or (B) outside the performance of the O&M Services or the Decommissioning Services. To the extent that ownership in any Work Product does not automatically vest in Owner, Operator does hereby transfer and assign, and shall cause its Affiliates to transfer and assign, and shall use commercially reasonable efforts to cause any of its or their Subcontractors to transfer and assign, all right, title and interest in, to and under such Work Product and any Intellectual Property therein to Owner, and to execute all documents and take all actions requested by Administrator to transfer and record such ownership. Notwithstanding the foregoing, Owner acknowledges that nothing in this Agreement is intended to prevent Operator from independently developing, researching, or distributing any products or offerings similar to but separate from and not based on, nor constituting, Work Product, and Operator acknowledges that nothing in this Agreement is intended to prevent Owner from developing, researching, or distributing any products or offerings similar to but separate from and not based on, nor constituting, any such items developed, researched or distributed by Operator.

(d)    License of Owner Intellectual Property. Subject to the terms and conditions of this Agreement, Owner hereby grants, and shall cause its Affiliates to grant, to Operator and its Affiliates a fully paid-up, royalty-free, non-exclusive, non-transferable, sub-licensable (only to Subcontractors), limited license and sublicense under the Owner Intellectual Property and, to the extent sub-licensable without the need to obtain third-party consent or pay any fees, Owner Licensed Intellectual Property, during the Term, to: (i) use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works, in the case of each of clause (i) and (ii), solely as necessary for Operator and its Affiliates to perform their obligations pursuant to this Agreement. The use of Owner Licensed Intellectual Property shall be subject to the applicable license terms governing the use of such Intellectual Property. To the extent any Owner Licensed Intellectual Property cannot be licensed to Operator or its Affiliates (or can only be licensed subject to third-party consent or the payment of fees), their Subcontractors for any reason, and where such Owner Licensed Intellectual Property is reasonably required for the performance of this Agreement, then Operator or its Affiliates, their Subcontractors shall promptly obtain their own third-party license for the relevant Intellectual Property or any reasonably equivalent Intellectual Property, and, provided that Owner approved in writing the procurement of such required replacement license (including the cost and expense associated therewith), Owner shall bear the cost and expense of such required replacement licenses.

CONFIDENTIAL

**Section 13.2**    Proprietary Information.

(a)    Confidentiality Obligation.

(i)    Subject to the remainder of this Section 13.2 (*Proprietary Information*), any and all written, recorded or oral Facility Information furnished or made available in connection with this Agreement, or that constitutes Work Product, shall be deemed Owner's Confidential Information, with respect to which Operator shall be deemed to be the receiving Party and Owner shall be deemed to be the disclosing Party. Operator's Confidential Information includes Confidential Information pertaining to Operator Intellectual Property or Subcontractor Intellectual Property, or to Operator's policies and strategies. Confidential Information shall not include any of the foregoing that: (A) is when furnished, or thereafter becomes, available to the public other than as a result of a disclosure by the receiving Party or its Representatives; (B) is already in the possession of or become available to the receiving Party or its Representatives on a non-confidential basis from a source other than the disclosing Party or its Representatives; provided, that to the knowledge of the receiving Party or its Representatives, as the case may be, such source is not and was not bound by an obligation of confidentiality to the disclosing Party or its Representatives; or (C) the receiving Party or its Representatives can demonstrate has been independently developed without a violation of this Agreement.

(ii)    Subject to the remainder of this Section 13.2 (*Proprietary Information*), each receiving Party shall, and shall cause its Representatives to, (A) keep strictly confidential and take reasonable precautions to protect against the disclosure of all Confidential Information of the disclosing Party, and (B) use all Confidential Information of the disclosing Party solely for the purposes of performing its obligations under the Transaction Documents and not for any other purpose; provided, that:

(A)    a receiving Party may disclose Confidential Information of the disclosing Party to those of its Representatives who need to know such information for the purposes of performing the receiving Party's obligations under this Agreement if, to (i) counterparties and prospective counterparties to Subcontracts, Fuel Contracts and Facility Contracts and their respective Representatives who need to know such information in connection with an existing or proposed Subcontract, Fuel Contract or Facility Contract, (ii) any lender or prospective lenders and its Representatives, and (iii) any insurer in connection with a policy of insurance required pursuant to this Agreement, in each case of the foregoing (i) through (iii) solely to the extent required and for the purposes of the receiving Party's obligations under this Agreement, and only if, prior to being given access to such Confidential Information, such Representatives are informed of the confidentiality thereof and the requirements of this Agreement and are obligated to comply with the requirements of this Agreement;

(B)    the foregoing shall not limit any rights or licenses granted under Article 13 (*Intellectual Property; Proprietary Information*); provided that the licensee shall treat any Confidential Information included in such license in a manner consistent with this Section 13.2 (*Proprietary Information*) and in any event with the same care as it would treat its own comparable information, acting reasonably; and

106

CONFIDENTIAL

(C)    each Party shall be responsible for any breach of this Agreement by its Representatives.

(b)    Permitted Disclosures.

(i)    Subject to the terms of this Section 13.2 (*Proprietary Information*), each receiving Party may disclose Confidential Information of the disclosing Party to a duly authorized Governmental Body where required to do so by Applicable Law. None of the Parties shall have any liability whatsoever to the other Party in the event of any unauthorized use or disclosure by a Governmental Body of any Confidential Information of another Party to the extent such disclosure was required by Applicable Law and was in accordance with the requirements of this Section 13.2 (*Proprietary Information*).

(ii)    Subject to the terms of this Section 13.2 (*Proprietary Information*), each Party may disclose Confidential Information of the other Party to the extent necessary to comply with any subpoena or order of any Commonwealth Court or other judicial entity having jurisdiction over the receiving Party, or in connection with a discovery or data request of a party to any proceeding before any of the foregoing.

(c)    Ownership and Return of Information. Subject to the remainder of this Section 13.2 (*Proprietary Information*), Confidential Information shall be and remain the property of the Party disclosing it. Nothing in this Agreement shall be construed as granting any rights in or to Confidential Information to the Party or Representatives receiving it, except the right to use it in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Parties and Administrator shall have the right to retain copies of Confidential Information, subject to the confidentiality obligations in this Section 13.2 (*Proprietary Information*).

(d)    Public Information Disclosure Requirements-Related Obligations.

(i)    Operator acknowledges and agrees that any documents or other materials relating to this Agreement in Owner's or Administrator's possession may be considered public information subject to disclosure in accordance with applicable Public Information Disclosure Requirements. Operator shall then have the opportunity to either consent to the disclosure or assert its basis for non-disclosure and claimed exception under Applicable Law to Owner or Administrator within the time period specified in the notice issued by Owner or Administrator, which such time period shall be no less than two (2) Business Days unless otherwise required by Applicable Law. Notwithstanding the foregoing, Operator shall monitor requests for disclosure issued by Owner or Administrator and related proceedings, make any filings or submit any applicable responses in connection thereto on a timely basis, and notify Owner and Administrator of any documents or portions of documents that may be exempted from disclosure (including by marking as "CONFIDENTIAL"). Owner or Administrator may make filings or submit responses of its own concerning possible disclosure; provided, however, that if Operator provides notice that certain documents or portions of documents may be exempted from disclosure, then Owner and Administrator shall reasonably cooperate with Operator in such contest solely to the extent, in Owner's or Administrator's respective counsel's reasonable opinion, such cooperation would not cause Owner or Administrator to violate Applicable Law.

107

CONFIDENTIAL

(A)    Subject to Section 13.2(d)(i) (*Proprietary Information -- Public Information Disclosure Requirements-Related Obligations*) above, by entering this Agreement, Operator consents to, and expressly waives any right to contest, the provision by Owner or Administrator to Owner's or Administrator's counsel of all or any part of any documents or materials in Owner's or Administrator's possession in accordance with the Public Information Disclosure Requirements. Owner or Administrator shall have no responsibility or obligation for Operator's failure to respond or to respond timely to any request for disclosure in accordance with the Public Information Disclosure Requirements, and other than the obligations of Owner or Administrator expressly stated hereunder and subject to Section 13.2(d)(i) (*Proprietary Information -- Public Information Disclosure Requirements-Related Obligations*) above, Owner or Administrator shall not be required, except where required under Applicable Law, to wait for a response before making a disclosure or otherwise taking action under the Public Information Disclosure Requirements.

(B)    Under no other circumstances shall Owner or Administrator be responsible or liable to Operator or any other party as a result of disclosing any such documents or materials, including materials marked "CONFIDENTIAL", where the disclosure is required by Applicable Law or by an order of court.

(ii)    Nothing contained in this Section 13.2(d) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*) shall modify or amend requirements and obligations imposed on Owner or Administrator by the Public Information Disclosure Requirements, and the provisions of the Public Information Disclosure Requirements shall control to the extent of a conflict with the procedures under this Agreement or Owner's or Administrator's obligations with respect to Confidential Information. Owner or Administrator shall not advise a submitting party or Operator as to the nature or content of documents or materials that may be entitled to protection from disclosure under the Public Information Disclosure Requirements, as to the interpretation thereof, or as to relevant definition (e.g., "trade secret").

(iii)    In the event of any proceeding or litigation concerning the disclosure of any documents or other materials in accordance with the Public Information Disclosure Requirements to third-parties, subject to the other provisions of this Section 13.2(d) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*), Owner's or Administrator's sole involvement shall be as a stakeholder retaining the material until otherwise ordered by a Commonwealth Court or other court or authority having jurisdiction. Operator shall be responsible for prosecuting or defending any action, acting on its own behalf, concerning such documents or materials at its sole expense and risk; provided, however, that Owner or Administrator may intervene or participate in the litigation in such manner as it deems necessary or desirable.

**Section 13.3**    Data Security.

(a)    Cybersecurity Breaches. Operator shall comply with, and shall use commercially reasonable efforts to ensure that all Operator Related Parties and all Subcontractors comply with all Contract Standards and all requirements of Applicable Law regarding data security, cyber security and information security in respect of the Facility Information and related Information Systems. Operator shall promptly notify, and shall use commercially reasonable

108

CONFIDENTIAL

measures to ensure that all Operator Related Parties and Subcontractors promptly notify, Administrator and PREB (in writing) of any material Cybersecurity Breaches or any other material losses or theft of any data of which it has knowledge. At Administrator's direction, Operator shall (i) perform an analysis of the cause, (ii) remedy any Cybersecurity Breach including notification of consumers or government entities when required by Applicable Law, and (iii) cooperate fully with any civil or criminal authority in any investigation or action relating to such breach or attempted breach.

(b)      Cybersecurity Program. Without limiting the foregoing, Operator shall: (A) establish and maintain reasonable and appropriate organizational, administrative, physical and technical measures in place to maintain the security of and to protect the internal and external integrity of the Facility Information and related Information Systems against any unlawful or unauthorized use, processing, destruction, loss, alteration, disclosure, theft or access (including to any data or information contained in or stored on such systems); (B) establish and maintain backup, security and disaster recovery measures to safeguard the Facility Information and related Information Systems; (C) limit the risk of introducing or knowingly permitting the introduction of any virus, worm, bomb, Trojan horse, trap door, stop code or other harmful code, timer, clock, counter or other limiting design, instruction or routine, device, feature or function into the Facility Information and related Information Systems; and (D) require security audits, at a frequency consistent with industry standards, to assess and confirm compliance with this Section 13.3 (*Data Security*), (including using reputable third-party vendors to perform, penetration testing, cybersecurity audits and vulnerability assessments) and requires taking prompt measures to remedy any gaps that may be identified. Operator shall provide a summary of the security program as well as a copy of any written audit reports and remedial measures to Administrator and PREB, for their information to the extent not prohibited by Applicable Law. Any security audit information is Confidential Information of Owner, and neither Party shall disclose such security audit information without the consent of the other Party.

## Article 14
## EVENTS OF DEFAULT; REMEDIES

**Section 14.1**    Events of Default by Operator. Each of the following shall constitute an event of default by Operator (an "Operator Event of Default"):

(a)      Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Operator or Guarantor or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(b)      Voluntary Bankruptcy. Operator or Guarantor shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.1(a) (*Events of Default by Operator – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver,

CONFIDENTIAL

trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)    <u>Failure to Provide or Maintain the Guarantee</u>. Operator shall fail to provide or maintain in full force and effect the Guarantee, which failure shall not be cured in a manner acceptable to Administrator within five (5) Business Days following receipt of written notice thereof;

(d)    <u>Failure to Perform a Material Obligation</u>. Operator shall fail to perform any material obligation, covenant, term or condition under this Agreement or Guarantor shall fail to perform any material obligation, covenant, term or condition under the Guarantee (in each case other than a payment obligation as provided in Section 14.1(e) (*Events of Default By Operator – Failure to Pay*)), which failure shall not be cured within sixty (60) days following receipt of written notice thereof by Administrator detailing the relevant failure and proposed cure; <u>provided</u>, <u>however</u>, that as long as Operator or Guarantor, as the case may be, is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Operator or Guarantor, as the case may be, shall have an additional thirty (30) days to cure such default; <u>provided</u>, <u>further</u>, that any failure to perform which is not curable shall not be deemed an Operator Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Operator or Guarantor shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Operator Event of Default;

(e)    <u>Failure to Pay</u>. Except with respect to Failure to Pay Penalties (which are addressed in clause (k) below), Operator or Guarantor shall fail to pay any undisputed amount required to be paid by Operator under this Agreement or by Guarantor under the Guarantee, which failure shall not be cured within sixty (60) days following written notice thereof by Administrator; <u>provided</u> that if such payment relates to a Pass-Through Expenditure, an Operator Event of Default shall not be deemed to have occurred if sufficient funds for such payment are not available in the relevant Service Account;

(f)    <u>False or Inaccurate Representation or Warranty</u>. Any representation or warranty of Operator under this Agreement or any other document delivered in connection herewith or of Guarantor under the Guarantee shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the Guarantee or the ability of Operator or Guarantor to carry out its obligations hereunder or thereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Administrator;

(g)    <u>Failure to Obtain or Maintain Insurance</u>. Operator shall fail to obtain or maintain the Required Insurance specified in Section II of Annex XIII (*Insurance Specifications*), unless such failure is due to carrier insolvency or the fact that the Required Insurance is not available on commercially reasonable Terms (as defined in Section 10.2 (*Commercial Availability*)) but only for such period of time and to the extent specified in Section 10.2

110

CONFIDENTIAL

(*Commercial Availability*) (in which case no failure shall be understood to have occurred), which failure shall not be cured within ten (10) Business Days following written notice thereof by Administrator;

(h)    Change of Control. A Change of Control of Operator that is not permitted by this Agreement or otherwise approved by Administrator in accordance with Section 21.6(c) (*Assignment and Transfer – Change of Control*) shall occur on or after the Effective Date;

(i)    Illegal Transfer. Operator shall enter into an agreement to, or shall assign, transfer, convey, lease, encumber or otherwise dispose of all or any portion of its rights or obligations under this Agreement other than (i) in accordance with the express terms of this Agreement and Applicable Law or (ii) with the consent of Administrator and PREB;

(j)    Violation of Law. Either (A) a court of competent jurisdiction shall have determined that Operator shall have violated any of the provisions of Article 3.2 of Act 2, (B) Operator shall be convicted by a court of competent jurisdiction, or (C) Operator shall enter a plea of *nolo contendere* with such court, in each case, resulting in a final, non-appealable judgment with respect to any of the crimes listed in Section 20.2(g)(i)(B) (*Representations and Warranties of Operator – Applicable Law Compliance*);

(k)    Failure to Pay Penalties. Operator or Guarantor shall fail to pay any one or more undisputed Penalties in the aggregate in excess of US$100,000 that are required to be paid by Operator under this Agreement or by Guarantor under the Guarantee, which failure shall not be cured within thirty (30) days following written notice thereof by Administrator (a "Failure to Pay Penalties"); or

(l)    Failure to Meet Minimum Performance Threshold. Following the Service Commencement Date, if Operator fails to meet the Minimum Performance Thresholds for two (2) consecutive Contract Years with respect to any of the following Incentives and Penalties standards: (i) availability and reliability, (ii) safety compliance, (iii) environmental compliance and (iv) decommissioning; provided that such failure to meet the Minimum Performance Thresholds shall not have been excused by a Force Majeure Event, a Forced Outage or Owner Fault (a "Minimum Performance Threshold Default").

Section 14.2    Termination for Operator Event of Default.

(a)    Termination for Involuntary Bankruptcy, Voluntary Bankruptcy or Violation of Law. Upon the occurrence of an Operator Event of Default under Section 14.1(a) (*Events of Default By Operator – Involuntary Bankruptcy*), Section 14.1(b) (*Events of Default By Operator – Voluntary Bankruptcy*) or Section 14.1(j) (*Events of Default By Operator – Violation of Law*), this Agreement shall immediately terminate without further action by Administrator, without need for a court decision or arbitral award confirming Administrator's right to terminate.

(b)    Termination for Other Operator Event of Default. Upon the occurrence of any other Operator Event of Default (and for so long as the same is continuing), Administrator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Operator, subject, to the extent required by Applicable Law, to the prior approval of PREB or the FOMB (if then in existence), without need for a court decision or arbitral award

111

CONFIDENTIAL

confirming Administrator's right to terminate; provided, however, that any such notice of termination with respect to an Operator Event of Default under Section 14.1(h) (*Events of Default By Operator – Change of Control*) must be given no later than thirty (30) days following Administrator's receipt of written notice from Operator of the occurrence of such Change of Control. If Administrator fails to give such notice to Operator within such thirty (30) day period, Administrator shall be deemed to have waived the Operator Event of Default with respect to such Change of Control and its termination rights with respect thereto (but not with respect to any subsequent Change of Control) shall expire and be of no further force or effect. For the avoidance of doubt, nothing in this Section 14.2 (*Termination for Operator Event of Default*) shall limit Operator's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Operator Event of Default has occurred, or any of its other rights herein.

**Section 14.3**    Events of Default By Owner. Each of the following shall constitute an event of default by Owner (an "Owner Event of Default"):

(a)    Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Owner or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or other applicable insolvency statute or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered; provided, however, that the pursuit by creditors of Owner of relief from the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code in the current Title III Case for the purpose of seeking appointment of a receiver under applicable law shall not constitute an Owner Event of Default unless and until any such receiver is duly appointed;

(b)    Voluntary Bankruptcy. Owner shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code or other applicable insolvency statute (other than the current Title III Case), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.3(a) (*Events of Default By Owner – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)    Failure to Perform a Material Obligation. Owner shall fail to perform any material obligation, covenant, term or condition under this Agreement (other than a payment obligation as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*) or Section 14.3(e) (*Events of Default By Owner – Failure to Pay Other Undisputed Amount*) or a failure to fund the Mobilization Account or Service Account, or as provided in Section 14.3(f) (*Events of Default By Owner – Failure to Fund Mobilization Account or Service Account*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator; provided, however, that as long as Owner is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Owner shall have an additional thirty

112

CONFIDENTIAL

(30) days to cure such default; provided, further, that any failure to perform which is not curable shall not be deemed an Owner Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Owner shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Owner Event of Default;

(d)     Failure to Pay Service Fee. Owner shall fail to pay any undisputed Service Fees to be paid to Operator under this Agreement, which failure shall continue for thirty (30) days following written notice thereof by Operator;

(e)     Failure to Pay Other Undisputed Amount. Owner shall fail to pay any other undisputed amount required to be paid by Owner to Operator under this Agreement (other than as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator;

(f)     Failure to Fund any Service Account. Owner shall fail (i) to initially fund any Service Account in an amount equal to the requisite funding for such Service Account pursuant to the then current applicable Budget(s) and in accordance with the other terms of this Agreement (including Section 7.6 (*Service Accounts*)) or (ii) to replenish any Service Account (other than the Reserve Account which is addressed in clause (iii) below) in an amount equal to at least one half (1/2) of the requisite funding for such Service Account pursuant to the then current applicable Budget(s) and in accordance with the other terms of this Agreement (including Section 7.6 (*Service Accounts*)) or (iii) to replenish the Reserve Account in accordance with the other terms of this Agreement (including Section 7.6(d)(ii) (*Service Accounts – Reserve Account*)), in each case of clauses (i), (ii) and (iii), which failure shall not be cured within five (5) Business Days following written notice thereof by Operator; or

(g)     False or Inaccurate Representation or Warranty. Any representation or warranty of Owner under this Agreement or any other document delivered in connection herewith shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the ability of Operator to carry out its obligations hereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Operator.

**Section 14.4**    Termination for Owner Event of Default. Upon the occurrence of an Owner Event of Default under Section 14.3 (*Events of Default By Owner*), Operator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate; provided that upon the occurrence of an Owner Event of Default under Section 14.3(f) (*Events of Default By Owner – Failure to Fund any Service Account*) relating to funding of a Service Account, upon written notice from Operator, the Agreement shall terminate and, subject to Article 17 (*Demobilization*), Operator's obligation to perform the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services, as applicable, shall cease, upon the earlier of (i) the date that is one hundred twenty (120) days following the date on which Administrator receives written notice from Operator, (ii) the date that is sixty (60) days following the date on which Administrator receives written notice from Operator that there is no funding in

113

CONFIDENTIAL

the Mobilization Account, or (iii) the date that is sixty (60) days following the date on which Administrator receives written notice from Operator that there is no funding in any Service Account other than the Mobilization Account, in each case without need for a court decision or arbitral award confirming Operator's right to terminate. For the avoidance of doubt, nothing in this Section 14.4 (*Termination for Owner Event of Default*) shall limit Owner's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Owner Event of Default has occurred, or any of its other rights herein. Owner agrees the automatic stay extant in the Title III Case pursuant to section 362(a) of the Bankruptcy Code shall not apply to the exercise by Operator of its termination rights or other remedies under this Section 14.4 (*Termination for Owner Event of Default*), Section 14.5 (*Additional Termination Rights*) or Section 14.6 (*Remedies Upon Early Termination*).

Section 14.5    Additional Termination Rights.

(a)    Failure of Service Commencement Date Conditions. As set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), each of Administrator and Operator shall have the right to terminate this Agreement for failure to satisfy the Service Commencement Date Conditions, in accordance with and subject to the terms set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) in all respects.

(b)    Extended Force Majeure Event. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event that a Force Majeure Event continues for a period in excess of eighteen (18) consecutive months and materially interferes with, delays or increases the cost of the Mobilization Services, the O&M Services, the Decommissioning Services or the Demobilization Services.

(c)    Change in Regulatory Law. Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Administrator in the event of a Change in Regulatory Law.

(d)    Revocation of Procurement Manual. Operator shall have the right to terminate this Agreement upon not less than two hundred seventy (270) days' prior written notice to Administrator in the event that the Procurement Manual is revoked and not replaced within such period by a procurement manual that is mutually agreed by the Parties.

Section 14.6    Remedies Upon Early Termination.

(a)    Accrued and Unpaid Amounts. In the event of an early termination of this Agreement for any reason, as of the effective date of such termination (i) Owner shall pay Operator any accrued and unpaid amounts required to be paid by Owner under this Agreement, including the Mobilization Service Fee, the Pass-Through Expenditures, the O&M Fixed Fee, and the Incentive Payment, in each case, as of the effective date of such termination and (ii) Operator shall pay Owner (A) any accrued and unpaid Penalties and (B) any penalties, fines or moneys incurred

114

CONFIDENTIAL

by Operator and owed to Governmental Bodies for violations of Applicable Law, including Environmental Law.

(b)    Pass-Through Expenditure; Demobilization Service Fee. In the event of an early termination of this Agreement for any reason (including pursuant to Section 14.2, (*Termination for Operator Event of Default*), Section 14.4 (*Termination for Owner Event of Default*) or Section 14.5 (*Additional Termination Rights*)), (i) Owner shall pay or reimburse Operator all Pass-Through Expenditure accruing after the date of such early termination that cannot reasonably be avoided by Operator and (ii) subject to all terms of Article 7 (*Compensation; O&M Budgets*), notwithstanding the termination of this Agreement for all other purposes, Operator shall complete the Demobilization Services for each Legacy Generation Asset promptly following such termination, and Owner shall pay Operator all amounts required to be made hereunder with respect to such Demobilization Services.

(c)    Termination Fee.

(i)    In the event this Agreement is (A) terminated, revoked, nullified, cancelled or otherwise rendered invalid by any duly enacted law of the Commonwealth, as determined by a final non-appealable judgment by a court of competent jurisdiction (a "Contract Nullification or Cancellation") or (B) terminated by Operator pursuant to Section 14.5(c) (*Additional Termination Rights – Change in Regulatory Law*), but only if such termination is as a result of the circumstances described in clauses (ii) or (iii) of the definition of "Change in Regulatory Law", Owner shall pay Operator the Operator Termination Fee set forth in Section I of Annex XIV (*Termination Fees – Operator Termination Fee*) (the "Operator Termination Fee"). For the avoidance of doubt, (x) Owner shall have no obligation to pay the Operator Termination Fee other than in the circumstances described in clauses (A) and (B) of the preceding sentence and (y) the "resolution" of this Agreement pursuant to Act 2 as described under Section 14.1(j) (*Events of Default by Operator - Violation of Law*) shall not be considered a Contract Nullification or Cancellation.

(ii)    In the event of an early termination of this Agreement by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default, Operator shall pay Owner the amount set forth in Section II of Annex XIV (*Termination Fees – Owner Termination Fee*) (the "Owner Termination Fee"). For the avoidance of doubt, Operator shall have no obligation to pay the Owner Termination Fee other than in the event of an early termination of this Agreement by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default.

(iii)    The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Agreement:

(A)    if this Agreement is (1) terminated due to a Contract Nullification or Cancellation, (2) terminated by Operator pursuant to Section 14.5(c) (*Additional Termination Rights – Change in Regulatory Law*) (but only if such termination is as a result of the circumstances described in clauses (ii) or (iii) of the definition of "Change in Regulatory Law"), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Operator of the Operator Termination Fee (x) is a payment of

115

CONFIDENTIAL

liquidated damages (and not penalties), which is based on the Parties' estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Agreement due to the events described in clauses (1) and (2) of this sentence; provided, however, that the foregoing shall not limit Operator's right to receive any payments or reimbursements required to be made under any other provision of this Agreement with respect to any period prior to or after the termination of this Agreement; and

(B)    if this Agreement is terminated by Administrator due to a Failure to Pay Penalties or a Minimum Performance Threshold Default, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Owner of the Owner Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur, and (y) shall constitute Owner's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to termination of this Agreement due to a Failure to Pay Penalties or a Minimum Performance Threshold Default.

(iv)    Each of Operator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Owner Termination Fee and Operator Termination Fee, respectively, are excessive or punitive.

(d)    Additional Remedies. The Parties agree that (i) except as otherwise provided in this Agreement (including the sole and exclusive remedies set forth in Section 4.1(c) (*Mobilization Period Generally – Administrative Expense Treatment*), Section 4.8 (*Failure of Service Commencement Date Conditions*) and Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*)) in which cases the remedy specified in such provision shall be the sole remedy available and (ii) subject to the limitations set forth in Section 19.3 (Limitation on Liability), in the event that the Agreement is terminated early due to an Event of Default in accordance with the terms hereof, any Party may exercise any rights it has under this Agreement and under Applicable Law to recover damages, secure specific performance or obtain injunctive relief.

(e)    Debarment. Upon the termination of this Agreement pursuant to Section 14.2 (*Termination for Operator Event of Default*), Operator shall be disqualified from contracting with any Commonwealth Governmental Body for ten (10) years in accordance with Section 10(a)(15)(c) of Act 29.

**Article 15**
**DISPUTE RESOLUTION**

Section 15.1    Scope. Except as otherwise expressly provided in this Agreement, any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof (a "Dispute") shall be resolved in accordance with the procedures set forth in this Article 15 (*Dispute Resolution*), which shall constitute the sole and exclusive procedures for the resolution of such Disputes (the "Dispute Resolution Procedure"), including as to the validity of any termination or effective date of any termination. Operator acknowledges and agrees that Administrator (or any Designated Person appointed by Administrator) shall be authorized to participate in or act for and on behalf of Owner

116

CONFIDENTIAL

in any Dispute Resolution Procedure contemplated by this Article 15 (*Dispute Resolution*). For the avoidance of doubt, the Dispute Resolution Procedures set forth in this Agreement shall not apply to any dispute between a Party and PREB, which disputes shall be subject to resolution in accordance with Applicable Law. Notwithstanding anything to the contrary herein, in the event that Operator disagrees with a decision of PREB, nothing shall prejudice, limit or otherwise impair Operator's right to exercise its rights pursuant to Act No. 38 of June 30, 2017 and Section 6.5(c) of Act 57.

**Section 15.2**    Commencement of the Dispute Resolution Procedure.

(a)    Notice. If a Dispute arises, any Party may initiate the Dispute Resolution Procedure by giving a written notice of the Dispute to the other Party (a "Notice of Dispute"). The Notice of Dispute shall contain a brief statement of the nature of the Dispute, set out the relief requested and request that the Dispute Resolution Procedure of this Article 15 (*Dispute Resolution*) be commenced. Notwithstanding the foregoing, if either Party elects to proceed to litigation of a Technical Dispute pursuant to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes – Election*), then only the provisions of Section 15.6 (*Litigation as a Final Resort*) shall apply to any such dispute.

(b)    Tolling. Any limitation period imposed by this Agreement or by Applicable Law in respect of a Dispute shall be tolled upon the delivery of a Notice of Dispute pursuant to this Section 15.2 (*Commencement of the Dispute Resolution Procedure*) for the duration of any Dispute Resolution Procedure pursuant to this Article 15 (*Dispute Resolution*).

**Section 15.3**    Negotiation.

(a)    Generally. Upon receipt of a Notice of Dispute from a Party, the Parties shall refer the Dispute to the Designated Person of each Party. The Designated Persons shall negotiate in good faith and attempt to resolve the Dispute within thirty (30) days after the date on which the Notice of Dispute was issued, or such longer period as the Designated Persons may otherwise agree. All communications, negotiations and discussions pursuant to this Section 15.3 (*Negotiation*) shall be (i) confidential, (ii) without prejudice privileged, (iii) treated as compromise settlement discussions and negotiations and (iv) not used, offered or admissible as evidence in any subsequent proceeding without the mutual consent of the Parties. If the Dispute is an O&M Budget Dispute or Decommissioning Budget Dispute, then during the Negotiation Period the Designated Persons may agree to refer such Dispute to an Independent Expert appointed in accordance with the procedures set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*) for a non-final, non-binding determination.

(b)    Negotiation Period.

(i)    If the Dispute remains unresolved thirty (30) days after the Notice of Dispute is issued (or such longer period as Operator and Administrator may mutually agree in writing) (the "Negotiation Period"), then any Mobilization Service Fee Estimate Dispute, Mobilization Service Fee Dispute, Demobilization Service Fee Estimate Dispute, Demobilization Service Fee Dispute, Handover Checklist Dispute, Administrator Dispute, Service Fee Dispute, O&M Budget Dispute, Decommissioning Budget Dispute, Service Account Dispute, Disallowed

117

CONFIDENTIAL

Costs Dispute or Force Majeure Event Dispute (each a "Technical Dispute"), or any engineering or technical dispute Operator and Administrator mutually agree in writing is a Technical Dispute shall be referred to the Expert Technical Determination procedure set forth in Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) for a final and binding determination.

(ii)    If the Dispute, other than a Technical Dispute, remains unresolved after the end of the Negotiation Period, then the Dispute shall proceed to mediation pursuant to Section 15.5 (*Mediation*), and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort*), for a final and binding determination.

**Section 15.4**    Expert Technical Determination Procedure for Technical Disputes.

(a)    Generally. Any Technical Disputes unresolved within the Negotiation Period shall, subject to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes – Election*), be referred to an independent expert (the "Independent Expert") for a final and binding expert determination ("Expert Technical Determination"); provided that if an O&M Budget Dispute or Decommissioning Budget Dispute was referred to an Independent Expert pursuant to Section 15.3(a) (*Negotiation – Generally*), then the parties may agree to retain such Independent Expert or to appoint a new Independent Expert in accordance with the procedure set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*) to perform the Expert Technical Determination.

(b)    Procedures.

(i)    For the purposes of this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*), the Independent Expert shall be a reputable Person or Persons possessing expert knowledge and experience for the Expert Technical Determination of the Technical Dispute in question and shall be independent of and impartial as among the Parties. Operator and Administrator shall, in the first instance, attempt to agree on an Independent Expert through their respective Designated Persons. If Operator and Administrator cannot so agree within ten (10) days after the end of the Negotiation Period, the Parties shall promptly (and in any event within five (5) Business Days) apply to the ICC International Centre for ADR (the "ICC") for the appointment of an Independent Expert in accordance with the ICC Rules for the Appointment of Experts and Neutrals.

(ii)    Once selected by Operator and Administrator, neither Party shall communicate independently with the expert, and all communications the Parties make with the Independent Expert must be simultaneously copied to all other Parties.

(iii)    The Independent Expert shall, in consultation with the parties, determine the procedure to be undertaken in the Expert Technical Determination. The Independent Expert shall determine the Technical Dispute within sixty (60) days after his or her appointment or as otherwise agreed by the Parties. This sixty (60) day time period may be extended by the Independent Expert or by the agreement of the Parties. A failure to determine the matter within sixty (60) days shall not be a ground to challenge any award or determination by the Independent Expert.

118

CONFIDENTIAL

(iv)    The determination by the Independent Expert on any Technical Dispute shall be final and binding on the Parties hereto, and Owner or Operator, as applicable, shall pay any amounts due to the other Party pursuant to such determination, together with interest pursuant to Section 21.7 (*Interest on Overdue Obligations*) (as applicable), within five (5) Business Days of the Independent Expert's determination. The costs of the Independent Expert shall be borne by Operator (and, for the avoidance of doubt, shall not be a Pass-Through Expenditure), to the extent that the Independent Expert resolves any dispute in Owner's favor, and by Owner, to the extent that the Independent Expert resolves any dispute in Operator's favor, or as determined by the Independent Expert if the dispute is not resolved entirely in favor of Owner or Operator. Notwithstanding any other provisions of this Article 15 (*Dispute Resolution*), enforcement of any determination of an Independent Expert may be sought by either of the Parties before any court of competent jurisdiction. To the extent permitted by law, any rights to appeal from or cause a review of any such determination by any Independent Expert are hereby waived by the Parties.

(c)    Not an Arbitrator. The Independent Expert is not an arbitrator and shall not be deemed to be acting in an arbitral capacity.

(d)    Confidentiality. The Parties agree that any Expert Technical Determination carried out pursuant to this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) shall be kept private and confidential, and that the existence of the Expert Technical Determination and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon in the Expert Technical Determination, all materials created for the purposes of the Expert Technical Determination, all testimony or other oral submissions in the Expert Technical Determination, and all documents produced by a Party in connection with an Expert Technical Determination that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the Expert Technical Determination, (iii) where disclosure is lawfully required by a legal duty; provided, however, that where a Party is required to produce confidential information pursuant to a legal duty it shall provide the other Party prompt written notice of such requirement and not object to any effort by the other party to intervene in any applicable legal proceedings to seek to prevent the confidential information from being produced and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the Technical Dispute for any purpose other than in connection with the Expert Technical Determination.

(e)    Election. Any Technical Dispute with a disputed value equal to or in excess of US$10 million will proceed to litigation pursuant to Section 15.6 (*Litigation as a Final Resort*) at the election of either Party at the time the Technical Dispute is initiated.

**Section 15.5**    Mediation.

(a)    Generally. If a Dispute, other than a Technical Dispute, remains unresolved after the Negotiation Period, either Operator or Administrator may refer the Dispute to mediation through a written notice of mediation (the "Notice of Mediation"). Each Party to this Agreement agrees that it may not initiate a civil action as provided in Section 15.6 (*Litigation as a Final*

CONFIDENTIAL

*Resort*) (other than provisional relief sought on an expedited basis) unless (i) the matter in question has first been submitted to mediation in accordance with the provisions of this Section 15.5(a) (*Mediation – Generally*) or (ii) such Party would be barred from asserting its claim in a civil action if it were required to submit to mediation pursuant to Section 15.3 (*Negotiation*).

(b)      Procedures.

(i)      The Parties shall, in the first instance, attempt to agree on a mediator through their respective Designated Persons. If the Parties cannot so agree within thirty (30) days after the Notice of Mediation is sent, either of the Parties may promptly apply to the ICC for appointment of a single mediator in accordance with the Mediation Rules of the International Chamber of Commerce (the "Mediation Rules"). Absent any written agreement to the contrary by the Parties, the mediator shall be an attorney or mediator authorized to practice law in the United States or the Commonwealth of Puerto Rico and shall be independent of and impartial as among the Parties. The mediator shall be paid for the mediation services, and shall be reimbursed for all reasonable and documented out-of-pocket costs incurred in carrying out the mediation duties hereunder, including the costs of consultants. All Fees-and-Costs of the mediation shall be shared equally by the Parties (and, for the avoidance of doubt, shall not be a Pass-Through Expenditure). The Parties shall request that the mediator schedule the mediation within thirty (30) days of the mediator's appointment, and shall comply with all procedures the mediator establishes for the conduct of the mediation. Absent any written agreement to the contrary by the Parties, if the Dispute is not resolved within ninety (90) days of the Notice of Mediation, the mediation shall be terminated.

(ii)      For the avoidance of doubt, absent the written agreement of the Parties, the Mediation Rules shall not apply to any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*). Rather, the reference to the ICC and the Mediation Rules above should be understood as referring solely to the designation of the ICC as an appointing authority to appoint a mediator pursuant to the procedures set forth in the Mediation Rules in the event the Parties are unable to agree on a mediator within the timeframe specified.

(c)      Confidentiality. The Parties agree that any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*) shall be kept private and confidential, and that the existence of the mediation and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon at the mediation, all materials created for the purposes of the mediation, all testimony or other oral submissions at the mediation, and all documents produced by a Party in connection with a mediation that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the mediation, (iii) where disclosure is lawfully required by a legal duty; provided, however, that where a Party is required to produce confidential information pursuant to a legal duty, it shall provide the other Party prompt written notice of such requirement and not object to any effort by the other Party to intervene in any applicable legal proceedings to seek to prevent the confidential information from being produced, and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the mediation for any purpose other than in connection with the mediation.

120

CONFIDENTIAL

**Section 15.6**   Litigation as a Final Resort.

(a)     Civil Action. In the event that the Parties fail to resolve any Dispute, other than a Technical Dispute, within ninety (90) days after the date the mediator is selected pursuant to the procedures set forth in Section 15.5(b) (*Mediation – Procedures*) (or such longer period as the Parties may mutually agree), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. In the event that either Party elects to immediately proceed to litigation of a Technical Dispute pursuant to Section 15.4(e) (*Expert Technical Determination Procedure for Technical Disputes –. Election*), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. The Parties acknowledge and understand that, to resolve any and all claims arising out of this Agreement, they may file a civil action, including actions in equity, in the Commonwealth Court. Owner and Operator each irrevocably consents to the exclusive jurisdiction of such court in any such actions or proceedings, waives any objection it may have to the jurisdiction of any such action or proceeding, as well as objections or defenses based on sovereign immunity. The Parties acknowledge and agree that the terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

(b)     Costs and Expenses. Except as required by Operator's indemnity obligations under Section 19.1 (*Indemnification by Operator*), each Party shall bear its own costs and expenses in any Legal Proceeding where it is the named defendant or in any Legal Proceeding among the Parties (and, for the avoidance of doubt, such costs and expenses shall not be a Pass-Through Expenditure). Notwithstanding the foregoing, each Party retains its rights to bring any Legal Proceeding or to implead the other Party as to any matter arising hereunder.

**Section 15.7**   Waiver of Jury Trial. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT. Each Party (i) certifies that no representative of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it and each other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Agreement.

**Section 15.8**   Provisional Relief. Notwithstanding any other provision in this Agreement, no Party shall be precluded from initiating a proceeding in the Commonwealth Court for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent and irreparable harm to provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation. The commencement of or participation in an action for provisional relief with regard to Technical Disputes shall not constitute a waiver of the requirements or procedures of Section 15.5 (*Mediation*).

**Section 15.9**   Continuing Obligations. The Parties agree that during the resolution of a Dispute pursuant to the Dispute Resolution Procedure, the Parties shall continue to perform their obligations under this Agreement; provided that such performance shall (i) be without prejudice

121

CONFIDENTIAL

to the rights and remedies of any of the Parties and (ii) not be read or construed as a waiver of a Party's right to claim for recovery of any loss, costs, expenses or damages suffered as a result of the continued performance of this Agreement.

## Article 16
## DECOMMISSIONING

**Section 16.1**   Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services.

(a)      <u>Generally</u>. After the Service Commencement Date (i) Administrator (acting on behalf of Owner and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator) may deliver to Operator a decommissioning notice to commence Decommissioning Services for one or more of the Legacy Generation Assets or (ii) in the event that Operator determines in accordance with Prudent Industry Practice and taking into account the Integrated Resource Plan, and in consultation with PREB and T&D Operator that, due to an Emergency Event, Extended Event or other critical developments at the applicable Legacy Generation Asset, all or a portion of the Legacy Generation Asset cannot continue to be safely operated and maintained, Operator may deliver to Administrator and PREB (with copy to Owner and T&D Operator) a request to commence Decommissioning Services for the applicable Legacy Generation Asset, which request Administrator and PREB shall approve or deny within thirty (30) days of receipt. The date on which Operator receives the notice referenced in clause (i) above or the date on which Operator receives the approval from Administrator and PREB referenced in clause (ii) above shall be the "<u>Decommissioning Notification Date</u>" for the respective Legacy Generation Asset. Operator shall not commence any Decommissioning Services under clause (ii) above until it has provided T&D Operator at least two (2) years advance written notice of the commencement of such Decommissioning Services, unless mandated by PREB to commence such Decommissioning Services on a specific earlier date.

(b)      <u>Decommissioning Plan</u>. No later than one hundred twenty (120) days after the Decommissioning Notification Date for a Legacy Generation Asset, Operator shall prepare and submit to Administrator and PREB (with copy to Owner and T&D Operator), for their review and approval, a decommissioning plan for such Legacy Generation Asset (the "<u>Decommissioning Plan</u>") consistent with the Decommissioning Plan outline set forth in Annex XV (*Decommissioning Plan*). The Decommissioning Plan shall provide for (i) the permitting, demolition, Decontamination, waste disposal and dismantling/or preparation for conversion to such other future use as Administrator and PREB may designate, as applicable, of the Legacy Generation Asset, and waste disposal, for achievement of end-state conditions within a prescribed time (<u>provided</u> that Operator does not have any obligation to perform Decommissioning Services after the expiration of the Term unless the Agreement is extended by Owner and Administrator to allow Operator to complete such services), (ii) the development of the Decommissioning Budget, as set forth in Section 16.2 (*Decommissioning Compensation*) below, (iii) reasonably acceptable arrangements to facilitate the transition of Operator Employees, who meet certain qualifications at such Legacy Generation Asset and whose positions will be eliminated after the completion of the Decommissioning Services, into new jobs or industries, including a training and/or severance plan (to be funded by Owner) for any Operator Employees not hired into a successor job or industry, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement,

122

CONFIDENTIAL

and (iv) a timeline setting forth when Decommissioning Services shall be provided, including the date on which the Decommissioning Services shall commence (the "Decommissioning Commencement Date") and the date on which the Decommissioning Services for such Legacy Generation Asset shall be completed (the "Decommissioning Completion Date").

(c)    Out-of-Service Units. On or after the Service Commencement Date, Administrator (acting on behalf of Owner) may deliver to Operator a decommissioning notice to proceed regarding one or more of the Out-of-Service Units. Operator shall prepare the Decommissioning Plan for such Out-of-Service Unit in accordance with Section 16.1(b) (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services – Decommissioning Plan*).

Section 16.2    Decommissioning Compensation.

(a)    Decommissioning Budget. As part of Operator's Decommissioning Plan, Operator shall create a budget of the Pass-Through Expenditures required to perform the Decommissioning Services for the applicable Legacy Generation Asset, including monthly budgets of such expenditures and cash flows for each applicable Contract Year during which the Decommissioning Services are expected to be provided (such budget, as amended or adjusted from time to time, the "Decommissioning Budget"). Unless otherwise approved by PREB, such Decommissioning Budget shall not exceed the sum of all costs related to the performance of the O&M Services for such Legacy Generation Asset, including the O&M Fixed Fee Adjustment as set forth in Section I of Annex II (*Compensation – O&M Fixed Fee*), which shall be reflected in the amended Operating Budget as described in Section 7.3(e)(ii) (*O&M Budgets – Amendments to the Operating Budget*). Operator shall submit the Decommissioning Budget to Administrator and PREB (with copy to Owner) as part of the Decommissioning Plan, which Decommissioning Budget shall propose the basis and methodology to determine cost savings, including the Incentive and Penalty for Decommissioning Costs Efficiency set forth in Section III.C.1 of Annex II (*Compensation – Incentives and Penalties*). Within thirty (30) days following its receipt of the Decommissioning Budget, Administrator shall notify Operator whether the proposed Decommissioning Budget is compliant with Section 16.2(b) (*Decommissioning Compensation – Decommissioning Budget Policy*), and shall request, acting reasonably, any changes or modifications to the proposed Decommissioning Budget to conform the proposed Decommissioning Budget with Section 16.2(b) (*Decommissioning Compensation – Decommissioning Budget Policy*). Within ten (10) days following receipt of Administrator's request for changes or modifications, if applicable, Operator shall submit to Administrator a revised Decommissioning Budget including such changes or modifications requested by Administrator.

(b)    Decommissioning Budget Policy. The Decommissioning Budget shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related Decommissioning Services in accordance with the parameters promulgated by PREB for such Legacy Generation Asset, if applicable, and the Contract Standards. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the Decommissioning Budget or the related Incentives and Penalties as a result of (i)Force Majeure Events, (ii) Owner Fault or (iii) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Decommissioning Budget,

123

CONFIDENTIAL

in the case of each of clauses (i) to (iii) which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator promptly following the occurrence of an event contemplated above and the Parties shall, in good faith and acting reasonably, consider necessary adjustments to the Decommissioning Budget or the related Incentives and Penalties. Notwithstanding the foregoing, any such adjustments shall be compliant with the then-applicable Rate Order.

(c)    Decommissioning Budget Disputes. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with a Decommissioning Budget submitted with the respective Decommissioning Plan (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Decommissioning Budget Dispute").

(d)    Decommissioning Payments. Owner shall pay Operator all Pass-Through Expenditures required to perform the Decommissioning Services and shall continue to pay the O&M Fixed Fee in full (subject to any applicable O&M Fixed Fee Adjustment) for the duration of the Term, notwithstanding the commencement of Decommissioning Services with respect to any Legacy Generation Assets prior to the end of the Term. Operator shall be entitled to earn an Incentive Payment or shall incur a Penalty based on Operator's performance of the Decommissioning Services in accordance with the Incentives and Penalties, as set forth in Section 7.1(c) (*Service Fee – Incentive and Penalties*).

(e)    Funding. Owner shall establish the Decommissioning Account in accordance with Section 7.6(c) (*Service Accounts – Decommissioning Account*).

**Article 17**
**DEMOBILIZATION**

**Section 17.1**    Demobilization Services.

(a)    Generally. Subject to Section 17.1(d) (*Demobilization Services – Demobilization Expiry Date*) and Section 17.3(c)(ii) (*Demobilization Period Compensation – Funding*), upon (i) Operator's receipt of a termination notice from Owner or Administrator's receipt of a termination notice from Operator, in each case under Article 14 (*Events of Default; Remedies*) or (ii) six (6) months prior to the expiry of the later of (A) the Initial Term or (B) the Extension Term (such date, the "Demobilization Commencement Date"), Operator, in addition to providing any remaining O&M Services and/or Decommissioning Services, as applicable, shall (1) perform the Demobilization Services specified in the Demobilization Plan, and (2) commence preparations for an orderly surrender of the Generation Sites and any remaining Legacy Generation Assets to Owner or Administrator (or their designee). In the event of an early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*), Operator shall reasonably cooperate with Administrator during any procurement process to identify a successor operator.

(b)    Demobilization Plan. No later than thirty (30) days after the Demobilization Commencement Date, Operator shall prepare and submit to Administrator (with copy to Owner

124

CONFIDENTIAL

and PREB), for its information and approval, a detailed demobilization plan consistent with the Demobilization Plan outline set forth in Annex XVI (*Demobilization Plan*), which plan shall (i) in the event of the early termination of this Agreement, include reasonably acceptable arrangements to facilitate the transition of Operator Employees, who meet certain qualifications at such Legacy Generation Asset and whose positions will be eliminated after the completion of the Demobilization Services, into new jobs or industries, including (A) the possible hiring of Operator Employees by a successor operator and (B) a training and/or severance plan (to be funded by Owner) for any Operator Employees not hired into a successor job or industry, which arrangements Operator, Owner and Administrator shall cooperate as needed to implement, and (ii) provide for the transfer and handover of the rights and responsibilities with respect to the Generation Sites and any remaining Legacy Generation Assets back to Owner or to a successor operator upon the expiration or early termination of the Term (the "Demobilization Plan"). Regardless of whether the Demobilization Plan is prepared pursuant to clause (i) or (ii), the Demobilization Plan shall include a decommissioning report detailing (1) the status of each of the Legacy Generation Assets for which Decommissioning Services were or are being performed, (2) the condition of each of the Legacy Generation Assets in operation and (3) all notifications given pursuant to, and retirements of, applicable permits with respect to each Legacy Generation Asset.

(c)    Successor Operator. In the event that the Demobilization Commencement Date occurs pursuant to clause 17.1(a) (*Demobilization Services – Generally*), Administrator, on behalf of Owner, shall initiate efforts, including such procurement process as may be required, to identify and select a successor operator as promptly as practicable. Operator shall have the right to submit a proposal in such procurement on the same basis as other proponents. For the avoidance of doubt, if this Agreement is terminated prior to the Service Commencement Date, the Demobilization Commencement Date shall not occur.

(d)    Demobilization Expiry Date. Operator shall have no obligation to continue performing any Demobilization Services as of the earlier of (i) the date which is twelve (12) months following the expiration or early termination of the Term and (ii) the date on which there are no funds available in the Demobilization Account, without a need for a court decision or arbitral award confirming Operator's right to terminate.

(e)    Surrender of the Legacy Generation Assets. Upon completion or the earlier expiration of the obligation to provide the Demobilization Services in accordance with this Article 17 (*Demobilization*), Operator and, if and to the extent Administrator requests, its Subcontractors shall peaceably leave and surrender any remaining Legacy Generation Assets to Owner or its designee in a condition consistent with Operator's responsibilities hereunder. For the avoidance of doubt, if the early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*) occurs prior to the decommissioning of each and every Legacy Generation Asset, Operator shall surrender each remaining Legacy Generation Asset with a sufficient supply of Fuel to allow Owner or its designee to operate the applicable Legacy Generation Asset for one (1) month after the date of surrender.

Section 17.2    Termination Prior to Completion of Decommissioning. The Parties shall, immediately upon the early termination of this Agreement pursuant to Article 14 (*Events of Default; Remedies*) that occurs prior to the decommissioning of each and every Legacy Generation Asset, implement any arrangements contemplated by the Demobilization Plan, including

125

CONFIDENTIAL

arrangements relating to (i) the completion of any remaining Decommissioning Services currently being performed for a Legacy Generation Asset and that will not be completed by Operator; (ii) the possible hiring of Operator Employees by a successor operator; and (iii) the treatment of severance costs associated with any Operator Employees not hired by a successor operator. For the avoidance of doubt, any reasonable, properly incurred and ordinary course costs and expenses related to Operator Employees that are incurred pursuant to this Section 17.2 (*Termination Prior to Completion of Demobilization*) and covered by the then currently approved O&M Budget shall be Pass-Through Expenditures in accordance with Section 7.2 (*Pass-Through Expenditures*) and Section 7.3 (*O&M Budgets*).

**Section 17.3**    Demobilization Period Compensation.

(a)    Generally. As compensation for the Demobilization Services provided by Operator, Owner shall pay Operator the Demobilization Service Fee. The Demobilization Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)    Demobilization Service Fee. The "Demobilization Service Fee" shall be an aggregate amount equal to (i) the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel providing Demobilization Services *multiplied by* (ii) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Demobilization Services *plus* (iii) ten percent (10%) of the product of (i) and (ii), *plus* (iv) all other reasonable and documented costs and expenses incurred by Operator (without markup for Operator profit) that are necessary and reasonable in the course of providing the Demobilization Services and/or implementing the Demobilization Plan, including the cost of any Subcontractors providing Demobilization Services.

(c)    Funding.

(i)    Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Demobilization Service Fee (collectively, the "Demobilization Account").

(ii)    Promptly after the Demobilization Commencement Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Demobilization Service Fee for the following two (2) months. Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Demobilization Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Demobilization Service Fee for the following two (2) months, has been funded in the Demobilization Account. Prior to the end of each month during the period in which Operator performs the Demobilization Services, Operator shall deliver to Administrator an estimate of the anticipated Demobilization Service Fee for the two (2) months. No later than the eleventh (11th) Business Day of each month during the period in which Operator performs the Demobilization Services, the Demobilization Account shall be replenished so as to maintain a balance in the Demobilization Account at the end of each calendar month equal to the sum of the anticipated Demobilization Service Fee for the subsequent two (2) months, and so on subsequently until the Demobilization Services conclude.

126

CONFIDENTIAL

(iii)    In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Demobilization Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Demobilization Service Fee Estimate Dispute").

(d)    Invoices.

(i)    On or prior to the tenth (10th) day of each month during which Operator is performing the Demobilization Services, Operator shall submit to Administrator for its review and approval a monthly invoice describing in detail the prior calendar month's Demobilization Services and the corresponding Demobilization Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(ii)    Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Demobilization Services, if any, including evidence of the payment of any Subcontractor whose fees are included in the Demobilization Service Fee, and the calculation of the Demobilization Service Fee related thereto, as Administrator may reasonably request and as may be required by Applicable Law. To the extent necessary for Administrator to complete its review of the applicable invoice, upon Administrator's reasonable request such additional supporting documentation shall include any relevant Confidential Information. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Demobilization Service Fee Dispute").

(iii)    Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice. Owner's sole responsibility with respect to all invoices shall be payment of undisputed amounts and shall not include review of any invoice.

(e)    Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the period during which Operator performs the Demobilization Services, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Demobilization Service Fee, together with the supporting vouchers and statements, and the calculation of the Demobilization Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

127

CONFIDENTIAL

## Article 18
## FORCE MAJEURE EVENTS

**Section 18.1**    Notice; Mitigation.

(a)    Notice. The Party claiming a Force Majeure Event (the "Claiming Party") shall notify the other Party in writing (with copy to Administrator and PREB), on or promptly after the date it first becomes aware of such Force Majeure Event, followed within five (5) Business Days by a written description of (i) the Force Majeure Event and the cause thereof (to the extent known), (ii) the date the Force Majeure Event began and its estimated duration, (iii) the manner in which and the estimated time during which the performance of the Claiming Party's obligations hereunder shall be affected and (iv) mitigating actions that the Claiming Party plans to take in order to reduce the impact of the Force Majeure Event; provided that the Claiming Party's failure to promptly notify the other Party shall not preclude the Claiming Party from obtaining relief with respect to the Force Majeure Event to the extent the other Party has not been prejudiced by the Claiming Party's delay to provide prompt notice.

(b)    Mitigation. Whenever a Force Majeure Event shall occur, the Claiming Party shall, as promptly as reasonably possible, use commercially reasonable efforts to mitigate or eliminate the cause therefor, reduce costs resulting therefrom, mitigate and limit damage to the other Party and resume full performance under this Agreement.

(c)    Burden of Proof. The Claiming Party shall bear the burden of proof as to the existence and impact of the Force Majeure Event, and shall furnish promptly in writing (if and to the extent available to it) any additional documents or other information relating to the Force Majeure Event reasonably requested by the other Party. While the Force Majeure Event continues, the Claiming Party shall give notice to the other Party before the first day of each succeeding month updating the information previously submitted with respect to the nature, cause, impact and potential duration of the Force Majeure Event pursuant to this Section 18.1 (*Notice; Mitigation*). The Parties hereby agree that, in the event that a Dispute arises between the Parties in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Force Majeure Event Dispute").

(d)    Notice of Cessation of Force Majeure Event. Upon the cessation of a Force Majeure Event, including a determination by the Independent Expert that a Force Majeure Event no longer exists, the Claiming Party shall (i) promptly (but in any event within five (5) Business Days) provide notice to the other Party and (ii) promptly thereafter resume compliance with this Agreement.

**Section 18.2**    Relief.

(a)    Generally. If and to the extent a Force Majeure Event interferes with, delays or increases the cost of, a Party's performance of its obligations under this Agreement, and such Party has given timely notice and description as required by Section 18.1 (*Notice; Mitigation*), such Party shall be excused from performance and any associated Events of Default, except to the

128

CONFIDENTIAL

extent contemplated in Section 18.2(c) (*Relief – Extended Event*). In the event Operator is the party claiming the Force Majeure Event, Operator shall be entitled to request appropriate adjustments to the O&M Budgets or the Incentives and Penalties in accordance with Section 7.4 (*O&M Budget Policy*).

(b)    Limitations. The occurrence of a Force Majeure Event shall not excuse or delay the performance of (i) a Party's obligation to pay amounts previously accrued and owing under this Agreement, including any earned but unpaid Service Fees, (ii) Owner's obligation to continue to pay all Owner Payments and to deposit and make funds available for Operator's use in the Service Accounts and the Insurance Proceeds Account in accordance with Article 7 (*Compensation; O&M Budgets*) and/or other applicable terms of this Agreement and (iii) any obligation hereunder not affected by the occurrence of the Force Majeure Event.

(c)    Extended Event. In addition to all other relief pursuant to this Agreement, including under Section 4.8(c) (*Failure of Service Commencement Conditions – Effect of Force Majeure Events or Owner Fault*) and Section 7.4 (*O&M Budget Policy*), if and to the extent a Force Majeure Event continues for a period in excess of one hundred twenty (120) consecutive days and materially interferes with, delays or increases the cost of the O&M Services in accordance herewith (an "Extended Event"), without limiting the rights of either Party under Section 14.5(b) (*Additional Termination Rights – Extended Force Majeure Event*), and a Party has given timely notice and detailed and documented description as required by Section 18.1 (*Notice; Mitigation*), Administrator and Operator shall negotiate in good faith to determine whether modifications to the Incentive Payment, in accordance with Section III of Annex II (*Compensation – Incentives and Penalties*) or other provisions of this Agreement are appropriate under the circumstances; provided any such modification (i) shall not be effective until Administrator has obtained, at the cost of Owner or Administrator, a Tax Opinion and a Reliance Letter with respect to any such modification and (ii) shall be subject to approval by PREB in accordance with Applicable Law.

## Article 19
## INDEMNIFICATION

Section 19.1    Indemnification by Operator.

(a)    Generally. Subject to the limitations on liability set forth in this Section 19.1 (*Indemnification by Operator*), Section 19.3 (*Limitation on Liability*), Section 19.4 (*Insurance and Other Recovery*), Section 19.5 (*Liability Limitation for Certain Damages*) and Section 19.6 (*Additional Liability Limitation for Certain Damages*), Operator shall indemnify, defend and hold harmless Owner, Administrator and their respective Affiliates and Representatives (each, including Owner, an "Owner Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Owner Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Operator of any representation or warranty of Operator in this Agreement that has a material adverse effect on (x) Operator's ability to perform its obligations under this Agreement in respect of the Legacy Generation Assets or (y) the performance or the cost of performance by any Party of its obligations under this Agreement or (ii) the gross negligence or willful misconduct of Operator Indemnitees in connection with the performance of Operator's obligations under this Agreement, except, in each case of the foregoing, as otherwise provided in Section 5.9(a)(iv)

129

CONFIDENTIAL

(*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*), where the applicable standard shall be either the Pre-Existing Contamination Liability Standard or the Pre-Existing Noncompliance Liability Standard. Operator's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Operator which is intended to respond to such events. In the event that any Losses are incurred by an Owner Indemnitee in connection with Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*), then Operator's liability for such Owner Indemnitee's Losses shall be reduced by the amount of the Penalty paid or owed, if any, with respect to the environmental compliance category in Section III of Annex II (*Compensation – Incentives and Penalties*), if such Penalties arose as a result of the same conduct that led to Owner Indemnitee's Losses.

(b)    Limitations. Notwithstanding the foregoing, Operator shall not be required to reimburse or indemnify any Owner Indemnitee for any Losses to the extent caused by or due to (i) Owner Fault, (ii) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee in responding to such Force Majeure Event, (iii) gross negligence or willful misconduct of any Owner Indemnitee, (iv) any matter for which Owner expressly indemnifies Operator pursuant to Section 19.2 (*Indemnification by Owner*), (v) events or circumstances arising prior to the Service Commencement Date, in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction or (vi) any Pre-Existing Environmental Condition (except as set forth in Section 5.9(a)(iv) (*Environmental, Health and Safety Matters – Pre-Existing Environmental Conditions*)).

(c)    Notice, Defense and Survival. An Owner Indemnitee shall promptly notify Operator in writing pursuant to Section 21.2 (*Notices*) of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Operator shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. For the avoidance of doubt, any Fees-and-Costs associated with Operator defending Owner Indemnitees pursuant to this Section 19.1 (*Indemnification by Operator*) shall be Pass-Through Expenditures, except to the extent Operator's liability to pay such Fees-and-Costs is determined by a final and non-appealable judgment by a court of competent jurisdiction. The indemnification provisions in this Section 19.1 (*Indemnification by Operator*) are (i) for the protection of Owner Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 19.2**    Indemnification by Owner.

(a)    Generally. Subject to the limitations on liability set forth in this Section 19.2 (*Indemnification by Owner*), Section 19.3 (*Limitation on Liability*), Section 19.4 (*Insurance and Other Recovery*), Section 19.5 (*Liability Limitation for Certain Damages*) and Section 19.6 (*Additional Liability Limitation for Certain Damages*), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Owner or Administrator of any of its respective

130

CONFIDENTIAL

representations or warranties in this Agreement that has a material adverse effect on the Legacy Generation Assets or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; (ii) any failure by Owner or Administrator to perform its obligations under this Agreement or resulting from any Owner Fault; (iii) claims of any nature relating to the Legacy Generation Assets, Owner's operation thereof or any matter in the nature of the services to be provided by, or any other obligations imposed on, Operator hereunder, in each case based on events or circumstances to the extent arising prior to the Service Commencement Date; (iv) the gross negligence or willful misconduct of Owner Indemnitees in connection with this Agreement; (v) other than as expressly set forth in Section 5.5 (*Labor and Employment; Employee Benefits*), claims brought by Owner's or its Affiliates' former, current or future employees with respect to the non-payment or underfunding of benefits under Owner's pension plans, the PREPA Retirement System or any other employee benefit plans of Owner; (vi) claims brought against Operator by a Person not party to this Agreement in connection with the Legacy Generation Assets or Operator's performance of the O&M Services, including (A) for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages (except to the extent arising out of fraud or intentional misrepresentation of any Operator Indemnitee), or (B) to the extent such claims are for Losses that would cause Operator's total liability to all Persons (including Owner Indemnitees) under or in connection with this Agreement in aggregate to exceed the amount of any applicable limitation of liability set forth in Section 19.3 (*Indemnification – Limitation on Liability*); (vii) claims brought against Operator in connection with the T&D System or the performance by the T&D Operator of its obligations under the T&D O&M Agreement; (viii) Pre-Existing Environmental Conditions, except to the extent of an exacerbation of such Pre-Existing Environmental Conditions to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee; or (ix) all claims brought against Operator after the Effective Date by any creditor or other Person in connection with or related to the Title III Case.

(b)    Limitations. Owner's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Owner which is intended to respond to such events. Notwithstanding the foregoing, other than with respect clauses (vi), (vii), (viii) and (ix) of Section 19.2(a) (*Indemnification by Owner – Generally*), to which the following statement shall not apply, Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: (i) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Owner Indemnitee in responding to such Force Majeure Event, (ii) any matter for which Operator expressly indemnifies Owner pursuant to Section 19.1 (*Indemnification by Operator*), in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction or (iii) any Delay Liquidated Damages payable by Operator under Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) of this Agreement. Other than with respect to clause (vi) of Section 19.2(a) (*Indemnification by Owner – Generally*), Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to the gross negligence or willful misconduct of any Operator Indemnitee.

(c)    Notice, Defense and Survival. An Operator Indemnitee shall promptly notify Owner in writing pursuant to Section 21.2 (*Notices*) of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Owner shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such

131

CONFIDENTIAL

approval not to be unreasonably withheld, delayed or conditioned. Any amount payable by Owner to any Operator Indemnitee pursuant to this Section 19.2 (*Indemnification by Owner*) that remains unsatisfied for a period of sixty (60) days shall be treated as a Pass-Through Expenditure; provided, however, that the foregoing shall not limit Owner's ability to contest whether such payment is due. The provisions in this Section 19.2 (*Indemnification by Owner*) (i) are for the protection of Operator Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 19.3** Limitation on Liability. Notwithstanding anything contained in this Agreement to the contrary:

(a)    Operator General Limitations.

(i)    Except as set forth in Section 19.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), Operator's liability to Owner Indemnitees or any other Person under or in connection with this Agreement, including under Section 19.1 (*Indemnification by Operator*) and including for Disallowed Costs, shall be limited to US$5 million in the aggregate for Losses occurring in any Contract Year; and US$20 million in the aggregate for all Losses during the Term.

(ii)    From the Effective Date until the end of the second (2nd) Contract Year, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified pursuant to Section 19.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$1 million (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$1 million (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 19.3(a) (*Limitations on Liability – Operator General Limitations*).

(iii)    From the beginning of the third (3rd) Contract Year until the end of the Term, Operator shall not be liable for any Loss for which an Owner Indemnitee is entitled to be indemnified pursuant to Section 19.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 19.3(a) (*Limitations on Liability – Operator General Limitations*).

(iv)    For the avoidance of doubt, Operator shall not be liable to Owner Indemnitees to the extent Owner is determined, by a final and non-appealable judgment by a court of competent jurisdiction, to have acted or refrained from acting in accordance with the terms of this Agreement.

(v)    The limitations on liability set forth in this Section 19.3(a) shall not apply to Operator's obligation to pay Delay Liquidated Damages (if any).

132

CONFIDENTIAL

(b)    Gross Negligence; Willful Misconduct.

(i)    Notwithstanding anything to the contrary in this Agreement, Operator's liability to Owner Indemnitees or any other Person for any Losses attributable to any Operator Indemnitee's gross negligence or willful misconduct as set forth in this Agreement, including under Section 19.1 (*Indemnification by Operator*) or with respect to any Disallowed Costs attributable to Operator Indemnitee's gross negligence or willful misconduct, shall be limited to:

(A)    US$15 million for all Losses occurring in each Contract Year for each of the first five (5) Contract Years;

(B)    US$20 million for all Losses occurring in each Contract Year for each subsequent Contract Year, and

(C)    a total maximum of US$20 million in the aggregate for all Losses during the Term.

(D)    The limitations on liability set forth in this Section 19.3(b)(i) shall not apply to Operator's obligation to pay Delay Liquidated Damages (if any).

(ii)    If any liability for Losses is attributable in part to gross negligence and in part to negligence, then such liability shall be apportioned such that the portion of the Loss attributable to negligence shall be subject to the limitation on liability set forth in set forth in Section 19.3(a)(i) (*Limitations on Liability – Operator General Limitations*).

(c)    No Administrator Liability. Administrator shall not be liable to Operator Indemnitees under this Agreement.

Section 19.4    Insurance and Other Recovery.

(a)    Generally. The amount of any Losses that are subject to indemnification, compensation or reimbursement under this Agreement shall be reduced by the amount of any insurance proceeds and any indemnity, contribution or other similar payment actually received by Owner Indemnitee or Operator Indemnitee, as applicable, in respect of such Losses or any of the events, conditions, facts or circumstances resulting in or relating to such Losses ("Third-Party Payments"). If an Owner Indemnitee or Operator Indemnitee, as applicable, receives any Third-Party Payment with respect to any Losses for which it has previously been indemnified (directly or indirectly) by an Indemnifying Party, Owner Indemnitee or Operator Indemnitee, as applicable, shall promptly (and in any event within five (5) Business Days after receiving such Third-Party Payment) pay to the Indemnifying Party an amount equal to such Third-Party Payment or, if it is a lesser amount, the amount of such previously indemnified Losses. Owner Indemnitee or Operator Indemnitee, as applicable, shall use commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements other than this Agreement for any Losses to the same extent such Party would if such Losses were not subject to indemnification, compensation or reimbursement hereunder.

CONFIDENTIAL

(b)      Subrogation of Claims. If a Party makes any indemnity payment for any Losses suffered or incurred by an Owner Indemnitee or Operator Indemnitee, as applicable, pursuant to the provisions of this Article 19 (*Indemnification*), such indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Owner Indemnitee or Operator Indemnitee, as applicable, to any insurance benefits or other claims of the Owner Indemnitee or Operator Indemnitee, as applicable, with respect to such Losses and with respect to the matter giving rise to such Losses.

Section 19.5   Liability Limitation for Certain Damages. TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER OPERATOR INDEMNITEES NOR OWNER INDEMNITEES SHALL BE LIABLE, WHETHER IN CONTRACT, INDEMNITY, TORT (INCLUDING NEGLIGENCE, GROSS NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSS OF PROFITS OR REVENUES (OTHER THAN COMPENSATION DUE BY OWNER TO OPERATOR UNDER THIS AGREEMENT), OR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH ARISE FROM, RELATE TO OR ARE CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE OF OR FAILURE TO PERFORM THEIR RESPECTIVE OBLIGATIONS HEREUNDER EXCEPT FOR CLAIMS OF FRAUD OR INTENTIONAL MISREPRESENTATION OR CLAIMS BROUGHT AGAINST OPERATOR BY A PERSON NOT PARTY TO THIS AGREEMENT IN CONNECTION WITH THE LEGACY GENERATION ASSETS OR OPERATOR'S PERFORMANCE OF THE O&M SERVICES.

Section 19.6   Additional Liability Limitation for Certain Damages.

(a)      OWNER AND ADMINISTRATOR UNDERSTAND THAT OPERATOR MAY BE PROVIDING O&M SERVICES THAT:

(i)      AS OF THE SERVICE COMMENCEMENT DATE, INCORPORATE OR ARE RELIANT UPON ASSETS (INCLUDING THE LEGACY GENERATION ASSETS) THAT ARE IN A CONDITION REQUIRING REPAIRS OR IMPROVEMENTS; AND

(ii)      INCORPORATE OR ARE RELIANT UPON INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS THAT HAVE BEEN, ARE OR ARE TO BE PROVIDED BY OWNER OR THIRD PARTIES.

(b)      AS SUCH, OWNER AND ADMINISTRATOR ACKNOWLEDGE AND AGREE THAT, EXCEPT TO THE EXTENT ARISING OR RESULTING FROM THE NEGLIGENCE (INCLUDING GROSS NEGLIGENCE) OR WILLFUL MISCONDUCT OF OPERATOR INDEMNITEES IN CONNECTION WITH THIS AGREEMENT, OPERATOR INDEMNITEES SHALL HAVE NO LIABILITY HEREUNDER FOR ANY DATA PROCESSING DEFECT, ERROR, DEFAULT, DELAY OR LOSSES ARISING AS A RESULT OF ANY PROCESSING DEFICIENCY, INACCURACY, ERROR OR OMISSION TO THE EXTENT CAUSED BY A THIRD PARTY OR BY INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS PROVIDED BY A THIRD PARTY, OWNER, ADMINISTRATOR OR THEIR RESPECTIVE REPRESENTATIVES.

134

CONFIDENTIAL

## Article 20
## REPRESENTATIONS AND WARRANTIES

**Section 20.1**    Representations and Warranties of Owner. Owner hereby represents and warrants to Operator that:

(a)    <u>Existence and Powers</u>. Owner is a limited liability company and a governmental instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Agreement.

(b)    <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Owner of this Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    <u>No Conflicts</u>. Neither the execution, delivery or performance by Owner of this Agreement, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

(d)    <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)    <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

135

CONFIDENTIAL

(f)  No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Agreement and the transactions contemplated hereby.

(g)  Title III Approval. No approval of the Title III Court is required for Owner to enter into this Agreement. Owner's entry into, and the Parties' performance of, this Agreement, constitutes use or enjoyment by Owner of its revenue-producing property within the meaning of section 305(3) of PROMESA.

(h)  Facility Contracts. To Owner's knowledge and except as otherwise disclosed to Operator, (i) each material Facility Contract is in full force and effect and was procured in accordance with applicable Commonwealth law, (ii) there are no pending claims by or against any counterparty to a material Facility Contract, (iii) neither Owner nor any counterparty to a material Facility Contract is in default of its obligations under any material Facility Contract and (iv) Operator is permitted to administer and perform Owner's obligations under each material Facility Contract on Owner's behalf.

(i)  Operation of Legacy Generation Assets. Without limiting any other representations or warranties set out herein, from the Effective Date to the Service Commencement Date, Owner has, except as otherwise permitted by this Agreement or required by Applicable Law (including requirements related to the Title III Case), operated the Legacy Generation Assets in the ordinary course.

(j)  Pre-Existing Environmental Conditions. As of the Service Commencement Date, after commercially reasonable inquiry, Owner is not aware of material Pre-Existing Environmental Conditions on or at the Generation Sites which have not been disclosed to Operator pursuant to the Baseline Environmental Study.

(k)  Accuracy of Fuel Contracts. As of the Effective Date, to the best of Owner's knowledge, each of the Fuel Contracts listed on Annex XVII, including (a) all executed versions, amendments or other material documents that modify or waive any party's rights or obligations thereunder, and (b) all written instructions, notifications, and nominations issued thereunder that relate to the current fiscal year and any subsequent fiscal years, in ease case, have been provided to Operator.

Section 20.2  Representations and Warranties of Operator. Operator hereby represents and warrants to Owner that:

(a)  Existence and Powers. Operator is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Operator has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)  Due Authorization and Binding Obligation. The execution and delivery by Operator of this Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator.

136

CONFIDENTIAL

This Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance by Operator of this Agreement, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)     No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Agreement and the transactions contemplated hereby.

(g)     Applicable Law Compliance.

(i)     None of Operator or its subsidiaries or, when acting on behalf of Operator or its subsidiaries, any director, officer, manager, administrator or employee of Operator or its subsidiaries or, in connection with this Agreement or the O&M Services or the Decommissioning Services, any Affiliates of Operator has:

(A)     violated, conspired to violate, aided and abetted the violation of any Anti-Corruption Laws or committed any felonies or misdemeanors under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2, or any other felony that involves misuse of public funds or property, including the crimes mentioned in Article 6.8 of Act 8-2017, known as

137

CONFIDENTIAL

the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico;

(B)    failed to comply at any time with the Anti-Corruption Laws and any other Applicable Law that prohibit corruption and regulate criminal acts involving public functions or public funds applicable to Operator under state, Commonwealth or federal law, or solely with respect to Operator, failed to furnish a Sworn Statement; or

(C)    been convicted of offenses against public integrity, as defined in the Puerto Rico Penal Code, or of embezzlement of public funds, or has been found guilty of any such type of offense in the courts of the Commonwealth, the courts of the United States or any court of any jurisdiction.

(ii)    Operator has not, directly or indirectly, made or received, and shall not make or receive, any payments in connection with this Agreement or the O&M Services or the Decommissioning Services in order to illegally or improperly to obtain business or other rights.

(iii)    Operator is not aware that it is being investigated as part of a criminal or civil process by any law enforcement or regulatory authority in connection in any way with the Anti-Corruption Laws or any criminal laws or regulations.

(iv)    None of Operator, its subsidiaries, Parent Company or any directors, officers or employees of any thereof is (A) a Person, or is a Person owned or controlled by a Person (a "Sanctioned Person"), with whom dealings are restricted or prohibited by, or are sanctionable under, any economic sanctions or trade restrictions administered or enforced by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council, the European Union or Her Majesty's Treasury or any other authority with jurisdiction over Operator, its subsidiaries or its Affiliates (collectively, "Sanctions") or (B) located, organized or resident in a country or territory with which dealings are broadly restricted, prohibited or made sanctionable under any Sanctions (currently, the Crimea, Cuba, Iran, North Korea and Syria) (each, a "Sanctioned Country"). Operator and its subsidiaries have not violated and have not engaged in any conduct sanctionable under Sanctions. There are not now, nor have there been within the past five (5) years, any formal or informal proceedings, allegations, investigations or inquiries pending, expected or, to the knowledge of the Parent Company, threatened against the Parent Company, Operator, its subsidiaries, or any of their respective officers or directors concerning violations or potential violations of, or conduct sanctionable under, any Sanctions.

(v)    No official or employee of Owner has a direct or indirect economic interest in Operator's rights under this Agreement in accordance with the provisions of Act 2, which Operator herein certifies it has received a copy of, read, understood and complied with at all times prior to the execution of this Agreement and shall subsequently comply with it in its entirety.

138

CONFIDENTIAL

(vi)    Operator does not represent particular interests in cases or matters that imply conflicts of interest, or of public policy, between Owner and the particular interests it represents.

(h)    Accuracy of Information. All of the information relating to Operator or any of its Affiliates delivered by or on behalf of Operator to Owner and Administrator in connection with the execution of this Agreement was true, accurate and complete in all material respects when delivered.

(i)    Ability to Perform Obligations. Except as contemplated elsewhere in this Agreement, including in Article 2 (*Purpose; Effective Date; Term*), Article 4 (*Mobilization Period*) and Article 7 (*Compensation; O&M Budgets*), Operator has the required authority, ability, skills, access to funds, technical support and capacity to perform all its obligations with respect to the O&M Services and the Decommissioning Services and all of its other obligations under this Agreement, all in accordance with the Transaction Documents and assuming each of Owner's and Administrator's performance of its obligations in accordance with the terms of this Agreement and the Transaction Documents. Operator acknowledges that it has been provided with a complete copy of the Consent Decree (including its appendices and attachments) at least thirty (30) days prior to the Effective Date, and has the required authority, ability, skills, access to funds, technical support and capacity to meet the requirements of the Consent Decree relating to its obligations under this Agreement.

(j)    Knowledge of Requirements. Operator has knowledge in all material respects of all legal requirements, Applicable Law, and business and engineering practices that must be followed in performing its obligations under this Agreement.

(k)    No Litigation with Owner. Neither Operator nor any of its shareholders or its or their Affiliates are involved in any litigation, arbitration or claim against Owner, Administrator, AAFAF or the FOMB.

(l)    Representation in FOMB Certification. The information included in the Contractor Certification Requirement, as included in Appendix C of the FOMB's Contract Submission Questionnaire dated November 16, 2022 (the "Certification"), completed by Operator, is complete, accurate and correct as of the date thereof. Without limiting the foregoing in any way, Operator acknowledges and agrees that Administrator, in consultation with the FOMB, shall have the right to declare this Agreement null and void in the event of any misrepresentation, or inaccuracy of falseness with respect to a material fact in the Certification.  In addition, Administrator, after disclosure to and consultation with the FOMB, may provide in its discretion an opportunity to the Operator to attempt to cure any such such misrepresentation, or inaccuracy of falseness in the Certification and Administrator, after disclosure to and consultation with the FOMB, shall have the discretion to determine whether any such cure is acceptable.  In the event that Administrator declares this Agreement null and void in  the event of any misrepresentation, or inaccuracy of falseness with respect to a material fact in the Certification,  Operator shall have the obligation to reimburse immediately to Owner or the Commonwealth, as applicable, any amounts, payments or benefits received from Owner or the Commonwealth under this Agreement.

139

CONFIDENTIAL

**Article 21**
**MISCELLANEOUS**

**Section 21.1**  Fees and Expenses. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred, including fees and disbursements of counsel, financial advisors and accountants, in connection with the negotiation and execution of this Agreement shall be borne by the Party incurring such costs and expenses; provided, however, that, in the event this Agreement is terminated in accordance with its terms, the obligation of each Party to bear its own costs and expenses shall be subject to any rights of such Party arising from a breach of this Agreement by the other Party prior to such termination.

**Section 21.2**  Notices. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 21.2 (*Notices*)):

If to Owner:                            Puerto Rico Electric Power Authority
                                        PO BOX 364267
                                        San Juan, Puerto Rico 00936-4267
                                        Attention: Chief Executive Officer – Josué Colón Ortiz
                                        Telephone: (787) 521-4663
                                        Email: director_ejecutivo@prepa.com


                                        with copies to:


                                        Administrator
                                        PO BOX 42001
                                        San Juan, Puerto Rico 00940-2001
                                        Attention: Executive Director – Fermín E. Fontanés Gómez
                                        Telephone: (787) 722-2525 Ext. 15330
                                        Email: Fermin.Fontanes@p3.pr.gov and
                                        Administrator@p3.pr.gov

                                        *And*

                                        PREB
                                        268 Avenida Muñoz Rivera
                                        Edificio World Plaza
                                        Piso 7, Suite 704

140

CONFIDENTIAL

Hato Rey, Puerto Rico 00918
Attention: President - Edison Avilés Deliz
Telephone: (787) 523-6262
Email: eavilesdeliz@energia.pr.gov

If to Administrator:

Administrator
PO BOX 42001
San Juan, Puerto Rico 00940-2001
Attention: Executive Director – Fermín E. Fontanés Gómez
Telephone: (787) 722-2525 Ext. 15330
Email: Fermin.Fontanes@p3.pr.gov and
Administrator@p3.pr.gov

with copies to:

Genera PR LLC
954 Ponce de Leon Ave.,
Miramar Plaza, Suite 400
San Juan, Puerto Rico 00907
Attention: General Counsel
Email: legal@genera-pr.com

If to Operator:

Genera PR LLC
954 Ponce de Leon Ave.,
Miramar Plaza, Suite 400
San Juan, Puerto Rico 00907
Attention: General Counsel
Email: legal@genera-pr.com

with copies to:

Administrator
PO BOX 42001
San Juan, Puerto Rico 00940-2001
Attention: Executive Director – Fermín E. Fontanés Gómez
Telephone: (787) 722-2525 Ext. 15330
Email: Fermin.Fontanes@p3.pr.gov and
Administrator@p3.pr.gov

**Section 21.3**    Amendments. Neither this Agreement nor any provision hereof may be changed, modified, amended or waived, except by written agreement duly executed by the Parties. Any such amendment shall not be effective until (i) to the extent required by Applicable Law, approved by PREB and the FOMB (if then in existence) and (ii) Administrator has obtained a Tax

141

CONFIDENTIAL

Opinion and a Reliance Letter, at the cost of Owner or Administrator, with respect to any such amendment. Wherever this Agreement requires the Parties to use good faith, reasonable, commercially reasonable or other efforts to amend the terms of this Agreement, Operator shall not be deemed to be in breach of such requirement as a result of its insistence that such amendment not adversely affect Operator's compensation under, or its return on investment or other economic interests with respect to, this Agreement, except to the extent such adverse effect results solely from inflation or the imposition of a Tax or an increase in Taxes of general application.

**Section 21.4**    Entire Agreement. This Agreement, together with the Annexes and Exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

**Section 21.5**    Relationship of the Parties. Nothing in this Agreement is intended to create, or shall be deemed or construed as creating, any partnership, joint venture or other legal entity, or give rise to any fiduciary duty, among the Parties. Except as otherwise expressly provided in this Agreement, no Party shall have the authority or right, or hold itself out as having the authority or right, to assume, create or undertake any obligation of any kind whatsoever, express or implied, on behalf of or in the name of any other Party, except as expressly provided herein. No provision in this Agreement shall result in Operator or any of its employees, Subcontractors, agents or Representatives being considered an employee, contractor or Representative of Owner. Operator shall be an independent contractor and shall be responsible for and have control over the performance of the O&M Services hereunder, subject to the standards set forth in this Agreement. Nothing in this Agreement shall be interpreted to create a relationship of co-employer between Owner and Operator or Administrator and Operator as to the employees of Operator or any of its respective subcontractors, nor to make Operator an alter ego or a successor employer of Owner.

**Section 21.6**    Assignment and Transfer.

(a)    <u>By Operator</u>. Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement or related to the O&M Services or the Decommissioning Services without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB or other Governmental Bodies; <u>provided</u>, <u>however</u>, that Operator may, without the prior written consent of Administrator:

(i)    assign or otherwise dispose of any of its rights and obligations hereunder to an Affiliate of Operator so long as: (A) such Affiliate is (1) a Controlled direct or indirect subsidiary of the Parent Company, (2) reasonably capable of discharging the duties and obligations of Operator hereunder and (3) assumes in writing all of Operator's obligations hereunder; and (B) such assignment is otherwise permitted under, and in compliance with, Applicable Law; and

142

CONFIDENTIAL

(ii)    assign solely its rights to payment under this Agreement to one, and only one, trust, trustee, bank, paying agent, financial entity or other Person or company for the purposes of any bona fide financing or in order to facilitate the making of any such payment.

Any such consent given in one instance shall not relieve Operator of its obligation to obtain the prior written consent of Administrator to any further assignment. Any assignment of this Agreement that is approved by Administrator shall require the assignee of Operator to assume the performance of and observe all obligations, representations and warranties of Operator under this Agreement, and no such assignment shall relieve Guarantor of any of its obligations under the Guarantee. The consent to any assignment, transfer or conveyance shall not operate to release Operator in any way from any of its obligations under this Agreement unless such consent specifically provides otherwise. Any amendments to this Agreement requested by a potential assignee or transferee of Operator shall be submitted to and approved by the board of directors of Administrator pursuant to Section 10(a)(19) of Act 29.

(b)    By Owner. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Operator; provided, however, that Owner may, without the prior written consent of Operator, assign or otherwise dispose of any of its rights and obligations hereunder: (i) to Administrator; (ii) with prior approval of Administrator, to a newly-created subsidiary of PREPA to which the Legacy Generation Assets are contributed or otherwise transferred; or (iii) with prior approval of the FOMB (if then in existence and to the extent such approval is required by Applicable Law), to another Governmental Body if such assignee assumes, and is reasonably and legally, operationally and financially capable of discharging, the duties and obligations of Owner hereunder.

(c)    Change of Control. Nothing contained in the foregoing shall be deemed to prohibit or limit, whether accomplished through a single transaction or a series of related or unrelated transactions and whether accomplished directly or indirectly, transfers of direct or indirect ownership interests in Operator by any Equity Participant or its beneficial owner(s) to any Person; provided that if any such transfer results in a Change of Control of Operator, the approval of Administrator (not to be unreasonably withheld, conditioned or delayed) shall be required for any such transfer.

**Section 21.7**    Interest on Overdue Obligations. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 21.8**    Waivers. Either Operator or Administrator may, at any time, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or (iii) waive compliance by the other Party with any of the agreements or conditions contained herein to the extent consistent with Applicable Law. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Agreement shall operate or be

143

CONFIDENTIAL

construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 21.9**   Severability. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 21.10**  Survival. The rights and obligations of the Parties pursuant to this Section 21.10 (*Survival*), Article 13 (*Intellectual Property; Proprietary Information*), Article 15 (*Dispute Resolution*), Article 17 (*Demobilization*), Article 19 (*Indemnification*), Section 21.2 (*Notices*) and Section 21.15 (*Governing Law*) shall survive the expiration or termination of this Agreement. No expiration or early termination of this Agreement shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination (including Owner's obligation to pay Operator for Pass-Through Expenditures accruing prior to such termination pursuant to Section 7.2 (*Pass-Through Expenditures*) and Section 7.6 (*Service Accounts*)) or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third party as to any matter occurring during the Term.

**Section 21.11** No Third-Party Beneficiaries. Unless specifically set forth herein, this Agreement is exclusively for the benefit of the Parties and shall not provide any third parties with any remedy, claim, liability, reimbursement, cause of action or other rights.

**Section 21.12** Remedies.

(a)    Cumulative and Non-Exclusive Remedies. Except as otherwise provided in this Agreement, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)    Irreparable Damage and Harm. Except where sole and exclusive remedy(ies) are identified herein with respect to any provision, act or omission that do not include specific performance or injunctive relief: The Parties agree that irreparable damage and harm would occur in the event that any provision of this Agreement were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary

144

CONFIDENTIAL

damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Agreement, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

**Section 21.13** Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

**Section 21.14** Office of the Comptroller. Owner agrees to file this Agreement with the Comptroller of the Commonwealth promptly after its execution and to provide Operator with evidence of its filing within fifteen (15) days following the Effective Date. The Parties acknowledge and agree that the obligations and considerations under this Agreement shall not be enforceable until this Agreement shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 21.15** Governing Law. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 21.16** Commonwealth Obligations. THE OBLIGATIONS OF OWNER AND ADMINISTRATOR UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER AND ADMINISTRATOR.

**Section 21.17** PREB Authority. Notwithstanding anything to the contrary herein, but without affecting Operator's remedies in the event of a Change in Regulatory Law, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the Legacy Generation Assets, Owner or Operator.

145

CONFIDENTIAL

**Section 21.18** Non-Recourse. Notwithstanding anything that may be expressed or implied in this Agreement or any document, agreement, or instrument delivered contemporaneously herewith except for the Guarantee, each Party, by its acceptance of the benefits of this Agreement, covenants, agrees and acknowledges that no Persons other than the Parties shall have any obligation hereunder and that it has no rights of recovery hereunder against, and no recourse hereunder or under any documents, agreements, or instruments delivered in connection with this Agreement (unless and to the extent such Person is expressly a party to such other agreement, document or instrument) or in respect of any oral representations made or alleged to be made in connection herewith or therewith shall be had against, any former, current or future director, officer, agent, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, Representative or employee of any former, current, or future general or limited partner, manager, stockholder or member of any Party (or any of their successors or permitted assignees) or any Affiliate thereof or against any former, current or future director, officer, agent, employee, Affiliate, manager, assignee, incorporator, controlling Person, fiduciary, Representative, general or limited partner, stockholder, manager or member of any of the foregoing, whether by or through attempted piercing of the corporate veil, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other Applicable Law, or otherwise.

**Section 21.19** Commonwealth Support Provisions. With a view toward fostering a positive and constructive relationship between Operator and the applicable Government Bodies, Operator shall:

(a)    Ratepayer Savings. No later than 90 days after the end of each Contract Year, provide a summary (derived from the periodic reports otherwise provided to Administrator by this Agreement) to T&D Operator of Operator's calculation of the fuel and operational savings, which summary shall clearly show Operator's calculations of the savings created by Operator activities in the prior Contract Year. This summary shall provide T&D Operator with the information necessary to take such savings into account when proposing applicable electricity rates for PREB approval. Operator shall assist T&D Operator in developing strategies to use such savings to lower the applicable electricity rates. Operator will make copies of such summary available to the Administrator, PREB, and FOMB.

(b)    Employee Benefits and Protections. Offer employment to fulltime plant Owner Employees in the manner set forth in Section 4.2(g) (*Operator Responsibilities – Employment Offers*) of this Agreement, and provide such Hired Former Employees of Owner with the following additional protections: (i) his or her job will be guaranteed for a minimum period of two (2) years, and (ii) Hired Former Employees of Owner may only be separated from the position during such period of two (2) years if he or she engages in behavior that warrants dismissal or constitutes just cause under Act 80 of May 30, 1970, as amended.

(c)    Limits on Subcontracts. Disclose to Administrator information related to any Affiliate of Operator that proposes to participate in any procurement relating to subcontracting of services to be provided under this Agreement in a manner consistent with Section 11.4 (*Disclosure Related to Operator Affiliates*) of this Agreement. Operator shall make commercially reasonable efforts to ensure that a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico are included in the procurement process for materials and services under this Agreement.

146

CONFIDENTIAL

(d)    Local Workforce Prioritization. Use commercially reasonable efforts to select a company established under the Commonwealth of Puerto Rico or a company that has a significant presence in the Commonwealth of Puerto Rico as its Material Subcontractors.

(e)    Enhanced Transparency. No later than ninety (90) days following each Contract Year, provide to Administrator an annual report for the Administrator to make available to the Legislative Assembly, which report shall include a summary of the Operator's operational performance for such prior Contract Year and expectations for the upcoming Contract Year. From time to time, Operator shall provide such information as Administrator may reasonably request pursuant to Section 21.19(e), which requests Operator acknowledges and accepts, shall also include those on behalf of another Governmental Body.

(f)    Agreement. Parties may seek to extend this Agreement only in conformity with the terms of Section 2.3(b) (*Term – Extension*) of this Agreement. For the avoidance of doubt, Administrator's approval of such extension pursuant to Section 2.3(b) (*Term – Extension*) of this Agreement shall be provided only following a decision of the Administrator's Board of Directors in accordance with Act 29 and Act 120. This Agreement shall be deemed a PREPA Transaction subject to the requirements of Act 120.

*[Signature page follows]*

147

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator and Operator each has caused this Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY, solely in its capacity as OWNER**

By: _____
Name: Fernando Gil Enseñat
Title: Chairman of the Board

By: _____
Name: Josué A. Colón-Ortiz
Title: Executive Director


**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____
Name: Fermín E. Fontanes
Title: Executive Director

*[Signature Page to Legacy Gen O&M Agreement]*

CONFIDENTIAL

GENERA PR LLC, solely in its capacity as
OPERATOR

By: _____
Name: Christopher Guinta
Title: Chief Financial Officer

**Acknowledged for purpose of the references to Management Co in this Agreement:**

GENERA MANAGEMENT LLC, solely in its
capacity as MANAGEMENT CO

By: _____
Name: Christopher Guinta
Title: Authorized Signatory

*[Signature Page to Legacy Gen O&M Agreement]*

CONFIDENTIAL

**Annex I**

**Legacy Generation Assets**

| Legacy Generation Asset | Operational Classification | Out-of-Service Unit |
|---|---|---|
| Aguirre Steam Unit 1 | Baseload Unit | |
| Aguirre Steam Unit 2 | Baseload Unit | |
| Aguirre GT Unit 1 | Peaking Unit | Yes |
| Aguirre GT Unit 2 | Peaking Unit | |
| Aguirre CC 1 – Steam | Baseload Unit | |
| Aguirre CC 1 – Combustion | Baseload Units | |
| Aguirre CC 2 – Steam | Baseload Unit | Yes |
| Aguirre CC 2 – Combustion | Baseload Units | Yes |
| Cambalache Unit 1 | Peaking Unit | Yes |
| Cambalache Unit 2 | Peaking Unit | |
| Cambalache Unit 3 | Peaking Unit | |
| Costa Sur Unit 1 | Baseload Unit | Yes |
| Costa Sur Unit 2 | Baseload Unit | Yes |
| Costa Sur Unit 3 | Baseload Unit | Yes |
| Costa Sur Unit 4 | Baseload Unit | Yes |
| Costa Sur Unit 5 | Baseload Unit | |
| Costa Sur Unit 6 | Baseload Unit | |
| Costa Sur GT Unit 1 | Peaking Unit | Yes |
| Costa Sur GT Unit 2 | Peaking Unit | Yes |
| Culebra Unit 1 | Emergency Unit | |
| Culebra Unit 2 | Emergency Unit | |
| Culebra Unit 3 | Emergency Unit | |
| Mayaguez Unit 1 | Peaking Unit | |
| Mayaguez Unit 2 | Peaking Unit | |
| Mayaguez Unit 3 | Peaking Unit | |
| Mayaguez Unit 4 | Peaking Unit | |
| Palo Seco Unit 1 | Baseload Unit | |
| Palo Seco Unit 2 | Baseload Unit | Yes |
| Palo Seco Unit 3 | Baseload Unit | |
| Palo Seco Unit 4 | Baseload Unit | |
| Palo Seco CT Unit 1-1 | Peaking Unit | |
| Palo Seco CT Unit 1-2 | Peaking Unit | |
| Palo Seco CT Unit 2-1 | Peaking Unit | |
| Palo Seco CT Unit 2-2 | Peaking Unit | |
| Palo Seco CT Unit 3-1 | Peaking Unit | |
| Palo Seco CT Unit 3-2 | Peaking Unit | |
| Palo Seco MobilePacs | Peaking Unit | |
| San Juan Unit 1 – Steam | Baseload Unit | Yes |
| San Juan Unit 2 – Steam | Baseload Unit | Yes |

1

CONFIDENTIAL

| Legacy Generation Asset | Operational Classification | Out-of-Service Unit |
|---|---|---|
| San Juan Unit 3 – Steam | Baseload Unit | Yes |
| San Juan Unit 4 – Steam | Baseload Unit | Yes |
| San Juan CC 5 - Gas | Baseload Unit | |
| San Juan CC 5 - Steam | Baseload Unit | |
| San Juan CC 6 - Gas | Baseload Unit | |
| San Juan CC 6 – Steam | Baseload Unit | |
| San Juan Unit 7 - Steam | Baseload Unit | |
| San Juan Unit 8 – Steam | Baseload Unit | |
| San Juan Unit 9 – Steam | Baseload Unit | |
| San Juan Unit 10 – Steam | Baseload Unit | Yes |
| Daguao CT Unit 1 | Peaking Unit | |
| Daguao CT Unit 2 | Peaking Unit | |
| Yabucoa CT Unit 1 | Peaking Unit | |
| Yabucoa CT Unit 2 | Peaking Unit | |
| Jobos CT Unit 1 | Peaking Unit | |
| Jobos CT Unit 2 | Peaking Unit | |
| Vega Baja CT Unit 1 | Peaking Unit | |
| Vega Baja CT Unit 2 | Peaking Unit | |
| Vieques Unit 1 | Emergency Unit | |
| Vieques Unit 2 | Emergency Unit | |

2

CONFIDENTIAL

## Annex II

## Compensation

### I.    O&M Fixed Fee

#### A.    O&M Fixed Fee Amounts

Subject to the O&M Fixed Fee Adjustment (as defined below), the O&M Fixed Fee payable to Operator in each Contract Year as compensation for the performance of the O&M Services pursuant to Article 7 (*Compensation; O&M Budgets*) shall be as follows:

| Contract Year | O&M Fixed Fee* |
|---|---|
| 1 | US$22.5 million x CPI Factor |
| 2 | US$22.5 million x CPI Factor |
| 3 | US$22.5 million x CPI Factor |
| 4 | US$22.5 million x CPI Factor |
| 5 | US$22.5 million x CPI Factor |
| 6 | US$22.5 million x CPI Factor** |
| 7 | US$22.5 million x CPI Factor** |
| 8 | US$22.5 million x CPI Factor** |
| 9 | US$22.5 million x CPI Factor** |
| 10 | US$22.5 million x CPI Factor** |

\*    The O&M Fixed Fee for any Contract Year containing more or less than three hundred and sixty-five (365) calendar days shall be automatically increased or decreased (as applicable) on a Pro Rata basis.

\*\*    The O&M Fixed Fee for specified years is subject to adjustment in accordance with the below.

#### B.    Adjustments to O&M Fixed Fee upon Decommissioning or Removal from Scope of Services

Commencing in Contract Year 6, the O&M Fixed Fee for any of Contract Year 6 through Contract Year 10 shall be subject to an O&M Fixed Fee Adjustment in the event that (i) Operator has begun or begins to perform Decommissioning Services with respect to a Legacy Generation Asset; or (ii) one or more Legacy Generation Assets has been or is removed from the scope of O&M Services, permanently or indefinitely, in each case, pursuant to Section 2.3 (*Term*); provided, however, that notwithstanding anything in this Agreement to the contrary, the O&M Fixed Fee shall not be reduced below US$5 million. For the avoidance of doubt, there shall be no O&M Fixed Fee Adjustment in Contract Year 1 through Contract Year 5 as a result of Operator beginning to provide Decommissioning Services with respect to a Legacy Generation Asset or a Legacy Generation Asset being removed from the scope of O&M Services.

Any O&M Fixed Fee Adjustment shall be effective as of the date (such date, an "Adjustment Date") on which (i) Operator commences Decommissioning Services with respect to a Legacy Generation Asset, or (ii) a Legacy Generation Asset is removed from the scope of the O&M Services pursuant to Section 2.3 (*Term*); provided, however, that if the event described in clause (i) or (ii) occurs prior to the first day of Contract Year 6, then the Adjustment Date with respect to such event shall be the first day of Contract Year 6.

1

CONFIDENTIAL

Following an Adjustment Date, the O&M Fixed Fee payable for a given Contract Year shall be the Adjusted O&M Fixed Fee.

The "Adjusted O&M Fixed Fee" shall be calculated in accordance with the following formula:

**Adjusted O&M Fixed Fee = OFF – the aggregate of all O&M Fixed Fee Adjustments for Legacy Generation Assets which are permanently out of service, are being or have been decommissioned, or are indefinitely out of service without an active full remediation plan,**

where:

- *OFF* = The applicable O&M Fixed Fee for a given Contract Year, as set forth in <u>Section I.A.</u> (*O&M Fixed Fee Amounts*) above;

- *O&M Fixed Fee Adjustment* = OFF x AR; and

- *AR* = The applicable ratio corresponding to the percentage of the O&M Fixed Fee allocated to each Legacy Generation Asset which are being or have been decommissioned, as set forth in the tables below:

| Legacy Generation Asset | Applicable Ratio (AR) |
|---|---|
| Aguirre Steam Unit 1 | 11.27% |
| Aguirre Steam Unit 2 | 11.27% |
| Aguirre GT Unit 1 | 0.05% |
| Aguirre GT Unit 2 | 0.53% |
| Aguirre CC 1 – Steam | 2.40% |
| Aguirre CC 1 – Gas | 5.01% |
| Aguirre CC 2 – Steam | 0.05% |
| Aguirre CC 2 – Gas | 0.05% |
| Cambalache Unit 1 | 0.05% |
| Cambalache Unit 2 | 2.07% |
| Cambalache Unit 3 | 2.07% |
| Costa Sur Unit 1 | 0.05% |
| Costa Sur Unit 2 | 0.05% |
| Costa Sur Unit 3 | 0.05% |
| Costa Sur Unit 4 | 0.05% |
| Costa Sur Unit 5 | 10.27% |
| Costa Sur Unit 6 | 10.27% |
| Costa Sur GT Unit 1 | 0.05% |
| Costa Sur GT Unit 2 | 0.05% |
| Mayaguez Unit 1 | 1.38% |
| Mayaguez Unit 2 | 1.38% |
| Mayaguez Unit 3 | 1.38% |

2

CONFIDENTIAL

| | |
|---|---|
| Mayaguez Unit 4 | 1.38% |
| Palo Seco Unit 1 | 2.13% |
| Palo Seco Unit 2 | 0.05% |
| Palo Seco Unit 3 | 5.41% |
| Palo Seco Unit 4 | 5.41% |
| Palo Seco GT Unit 1-1 | 0.53% |
| Palo Seco GT Unit 1-2 | 0.53% |
| Palo Seco GT Unit 2-1 | 0.53% |
| Palo Seco GT Unit 2-2 | 0.53% |
| Palo Seco GT Unit 3-1 | 0.53% |
| Palo Seco GT Unit 3-2 | 0.53% |
| Palo Seco MobilePac 1 | 0.68% |
| Palo Seco MobilePac 2 | 0.68% |
| Palo Seco MobilePac 3 | 0.68% |
| San Juan Unit 1 – Steam | 0.05% |
| San Juan Unit 2 – Steam | 0.05% |
| San Juan Unit 3 – Steam | 0.05% |
| San Juan Unit 4 – Steam | 0.05% |
| San Juan CC 5 – Gas | 4.01% |
| San Juan CC 5 – Steam | 1.50% |
| San Juan CC 6 – Gas | 4.01% |
| San Juan CC 6 – Steam | 1.50% |
| San Juan Unit 7 – Steam | 2.50% |
| San Juan Unit 8 – Steam | 2.50% |
| San Juan Unit 9 - Steam | 0.05% |
| San Juan Unit 10 - Steam | 0.05% |
| Daguao GT Unit 1 | 0.53% |
| Daguao GT Unit 2 | 0.53% |
| Yabucoa GT Unit 1 | 0.53% |
| Yabucoa GT Unit 2 | 0.53% |
| Jobos GT Unit 1 | 0.53% |
| Jobos GT Unit 2 | 0.53% |
| Vega Baja GT Unit 1 | 0.53% |
| Vega Baja GT Unit 2 | 0.53% |
| Total | 100.00% |

**II.    Not used**

**III.    Incentives and Penalties**

**A.    General.**

In each Contract Year, Operator shall be (i) eligible to receive financial incentive compensation in the form of an Incentive Payment or (ii) subject to potential Penalty, in each case, based on Operator's performance in providing the O&M Services and/or the Decommissioning

3

CONFIDENTIAL

Services, as applicable, with respect to the performance categories described in this Section III of Annex II (*Compensation – Incentives and Penalties*); provided that no Incentive Payment shall be paid to, and no Penalty shall be incurred by, Operator during the Mobilization Period or the Demobilization Period. Following any O&M Fixed Fee Adjustment, the maximum Incentive Payment that Operator is entitled to earn for such Contract Year(s) shall be correspondingly subject to Pro Rata reduction.

Upon the occurrence and continuation of any Force Majeure Event (other than a Force Majeure Event that is a *Forced* Outage), Operator and Administrator shall negotiate in good faith adjustments or modifications to the relevant categories of Incentives and Penalties, as applicable, which shall apply during the duration of such Force Majeure Event.

Certain categories of *Incentives* and Penalties include minimum standards of performance that Operator must meet, as set forth in Section III.B of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories*) (each, a "Minimum Performance Threshold"). Failure to meet one or more Minimum Performance Thresholds may trigger a "Minimum Performance Threshold Default" pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

All Incentives and *Penalties* for any Contract Year containing more or less than three hundred and sixty-five (365) calendar days shall be automatically increased or decreased (as applicable) on a Pro Rata basis.

### B.    O&M Services Categories

To incentivize Operator to meet certain targets in performing the O&M Services, Operator shall be evaluated in six (6) categories: (i) Operation Cost Efficiency, (ii) Equivalent Availability Factor (EAF), (iii) Safety Compliance, (iv) Environmental Compliance, (v) Reporting Obligations and (vi) Fuel Savings, as described in this Section III.B of Annex II (*Compensation – Incentives and Penalties – O&M Services Categories*). For each Contract Year, the maximum amount payable by Owner to Operator based on the aggregate sum of (a) the amounts payable to Operator with respect to the following five (5) incentive categories described below, (i) Operation Cost Efficiency, (ii) Equivalent Availability Factor (EAF), (iii) Safety Compliance, (iv) Environmental Compliance and (v) Fuel Savings, for all applicable Legacy Generation Assets *minus* (b) the amount of any Penalties (the sum of (a) and (b), the "Aggregate I&P Amount"), shall be an amount equal to US$100 million (the "Annual Incentive Cap"); provided, however, that to the extent that the Aggregate I&P Amount accrued for any Contract Year exceeds the Annual Incentive Cap, the amount of such accrued excess shall be carried over into subsequent Contract Years and shall be payable by Owner to Operator to the extent that the accrued Aggregate I&P Amount in any subsequent Contract Year is less than the Annual Incentive Cap for such Contract Year.

### 1.    Operation Cost Efficiency

The applicable Operating Budget for each Contract Year shall be the benchmarks for determining Operator's cost efficiency in such Contract Year, subject to adjustments for Force Majeure Events and Owner Fault. Operator shall receive an O&M Incentive Payment based on a

4

CONFIDENTIAL

percentage of the total amount of cost savings achieved by Operator in the delivery of the O&M Services as compared to the approved Operating Budget.

Measurement Parameter: Actual expenditures as a percentage (%) of the approved Operating Budget, where actual savings equal the Operating Budget minus actual expenditures.

| Criteria: | |
|---|---|
| **>95% but <99%** | Operator receives 50% of the actual savings |
| **>90% but ≤95%** | Operator receives 50% of the actual savings |
| **>85% but ≤90%** | Operator receives 50% of the actual savings |
| **≤85%** | Operator receives 50% of the actual savings |

For each Contract Year, the maximum O&M Incentive Payment payable to Operator under the Operation Cost Efficiency category shall be subject to the Annual Incentive Cap, which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

## 2.    Equivalent Availability Factor (EAF)

The overall annual Equivalent Availability Factor (as defined below) targets and Minimum Performance Threshold (Capacity and Heat Rate) value for Baseload Units and for Peaking Units shall be established pursuant to Section 5.22 (*O&M Services – Annual Performance Test*). The Annual Performance Test shall be performed within ninety (90) days from the Service Commencement Date and during the first thirty (30) days of each Contract Year thereafter. The agreed to Annual Performance Test will provide a baseline for Capacity and Heat Rate, which results Operator shall consider when proposing Equivalent Availability Factor targets, including factoring in planned maintenance. Operator shall submit proposed Equivalent Availability Factor targets and Minimum Performance Thresholds to PREB for its review and approval; provided that if PREB does not respond within thirty (30) days following its receipt of such results and proposed targets, PREB shall be deemed to have no objection to such results and proposed targets. Operator shall provide to Administrator a monthly report and an annual report of the Equivalent Availability Factors in accordance with the North American Electric Reliability Corporation' Generation Availability Data System protocols.

To the extent Operator's overall annual Equivalent Availability Factor for a Contract Year exceeds the Equivalent Availability Factor referenced above, Operator shall receive a graduated O&M Incentive Payment, and to the extent it falls below the targets referenced above, Operator shall be subject to an O&M Penalty, in each case, subject to a maximum cap as described below. The Equivalent Availability Factor shall be automatically adjusted for excusable events including Force Majeure Events and Owner Fault.

As used in this Section III of Annex II (*Compensation – Incentives and Penalties*), "Equivalent Availability Factor" shall be defined in accordance with IEEE 762-2006, *IEEE Standard Definitions for Use in Reporting Electric Generating Unit Reliability, Availability, and Productivity* ("IEEE 762-2006") as:

5

CONFIDENTIAL

$$EAF = \frac{(AH\text{-}EPDH\text{-}EUDH)}{PH} \times 100\%$$

where:

- AH = Available Hours
- EPDH= Equivalent Planned Derated Hours
- EUDH = Equivalent Unplanned Derated Hours
- PH = Period Hours or number of hours that the Legacy Generation Asset was in active state

As used in this Section III of Annex II (*Compensation – Incentives and Penalties*), the aforementioned terms have the meanings ascribed to them in IEEE 762-2006.

The actual calculated Equivalent Availability Factor percent for each asset for a Contract Year in a category (Baseload Units and Peaking Units) shall be weighted that Contract Year by the ratio of its Tested Capacity to the total Tested Capacity for the category for that Contract Year to arrive at the overall Equivalent Availability Percent for that category of generation units for purposes of the Incentives and Penalties.

Measurement Parameter: Equivalent Availability Factor for Baseload Units

| Criteria: | |
|---|---|
| >5% above Performance Target | Operator receives an Incentive Payment of US$*15 million* |
| >2.5% but ≤5% above Performance Target | Operator receives an Incentive Payment of US$*10 million* |
| >0% but ≤2.5% above Performance Target | Operator receives an Incentive Payment of US$*5 million* |
| ≤Performance Target | Operator pays a Penalty of US$*5 million* |

Measurement Parameter: Equivalent Availability Factor for Peaking Units

| Criteria: | |
|---|---|
| >10% above Performance Target | Operator receives an Incentive Payment of US$*15 million* |
| >5% but ≤10% above Performance Target | Operator receives an Incentive Payment of US$*10 million* |
| >0% but ≤5% above Performance Target | Operator receives an Incentive Payment of US$*5 million* |
| ≤ Performance Target | Operator pays a Penalty of US$*5 million* |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator with respect to the parameters of the Equivalent Availability Factor category shall be

6

CONFIDENTIAL

subject to the Annual Incentive Cap, which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Equivalent Availability Factor Category: The Minimum Performance Threshold for the annual Equivalent Availability Factor for the applicable Legacy Generation Assets for the Baseload Units and for the Peaking Units shall be established pursuant to Section 5.22 (*O&M Services – Annual Performance Test*), subject to adjustments for Force Majeure Events and Owner Fault. Failure by Operator to achieve either Minimum Performance Threshold in two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 3. Safety Compliance

Operator shall receive an O&M Incentive Payment based on its performance for each Contract Year with respect to the safety compliance targets described below, which, for the avoidance of doubt, shall also include the performance of O&M Services by Operator's subcontractors. If, during any Contract Year, Operator performs below the relevant targets, Operator shall be subject to an O&M Penalty, as described below.

Measurement Parameter: OSHA Lost Time Incidents (LTI)

| Number of LTI Incidents: | |
|---|---|
| 3 or less | Operator receives an Incentive Payment of US$*10,000* |
| Between 3 and 5 | Operator receives an Incentive Payment of US$*5,000* |
| >5 | Operator pays a Penalty of US$*100,000* |

Measurement Parameter: OSHA Recordable Injury or Illness (I&I)

| Number of I&I Incidents: | |
|---|---|
| 0 | Operator receives an Incentive Payment of US$*10,000* |
| Between 1 and 3 | Operator receives an Incentive Payment of US$*5,000* |
| >3 | Operator pays a Penalty of US$*100,000* |

Measurement Parameter: OSHA Fatality or Severe Injury

| Number of Fatalities or Severe Injuries: | |
|---|---|
| 0 | Operator receives an Incentive Payment of US$*10,000* |
| ≥1 | Operator pays a Penalty of US$*100,000* |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator shall be subject to the Annual Incentive Cap and the maximum aggregate O&M Penalty

7

CONFIDENTIAL

that Operator may incur shall be US$100,000, in each case with respect to parameters of the Safety Compliance category described herein, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Safety Compliance Category: The payment of penalties by Operator on any of the safety compliance measurement parameters in two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 4.       Environmental Compliance

Operator shall receive an O&M Incentive Payment based on its performance with respect to the environmental target described below. If, during any Contract Year, Operator performs below the relevant target, Operator shall be subject to an O&M Penalty, as described below.

Measurement Parameter: Violation of Consent Decrees and/or Notice of Violations (NOVs)

| Number of Violations or NOVs: | |
|---|---|
| 0 | Operator receives an Incentive Payment of US$*10,000* |
| >1 | Operator pays a Penalty of US$*25,000* (for each violation or NOV) |

For each Contract Year, the maximum aggregate O&M Incentive Payment payable to Operator shall be US$100,000 and the maximum aggregate O&M Penalty that Operator may incur shall be US$100,000, in each case with respect to parameters of the Environmental Compliance category described herein, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

> Minimum Performance Threshold for Environmental Compliance Category: The payment of an O&M Penalty by Operator under the Environmental Compliance category for two (2) consecutive Contract Years shall trigger a Minimum Performance Threshold Default pursuant to Section 14.1(l) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*).

### 5.       Reporting Obligations

In accordance with Section 5.14(c)(iii) (*Information – Information Access*) and Section 7.1(d) (*Service Fee – Reporting Obligation Charge*), Operator shall be subject to a charge based on its timeliness in responding to a reasonable request for information from Administrator. For every fifteen (15) sequential days during which Operator fails to provide a response to Administrator, Operator shall pay a penalty of US$100,000 (the "Reporting Obligation Charge").

8

CONFIDENTIAL

For each Contract Year, the maximum aggregate Reporting Obligation Charge that Operator may incur shall be US$1 million, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment, and in each case which shall be subject to Pro Rata reduction following any O&M Fixed Fee Adjustment.

### 6.    Fuel Optimization

(a)    Operator shall receive a "Fuel Optimization Payment" of fifty percent (50%) of any Actual Fuel Savings achieved during the relevant Contract Year.

(b)    Operator shall prepare, and shall include in the Incentives and Penalties Report submitted pursuant to Section 7.1(c)(ii) (*Service Fee – Incentives and Penalties*), a detailed report (the "Fuel Optimization Report") (A) demonstrating actual realized savings in Fuel Costs achieved during such Contract Year for each Legacy Generation Asset as a result of any Fuel Cost Savings Initiatives pursued or implemented by Operator ("Actual Fuel Savings"), which shall be calculated pursuant to the Fuel Optimization Plan and based on the applicable assumptions in the then current approved budget (e.g., output, dispatch, Heat Rate, fuel costs, etc.), and be an amount equal to the difference between the budgeted cost and the actual cost of the relevant budget items and (B) setting out Operator's calculation of the Fuel Optimization Payment. The Fuel Optimization Report shall comply with, and all Fuel Cost Savings Initiatives shall be implemented in compliance with, the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(c)    For the purpose of being able to determine Actual Fuel Savings and the corresponding Fuel Optimization Payment for any Contract Year that commences after one or more Fuel Cost Savings Initiatives have been implemented or are otherwise already accounted for in the relevant Budget, the Budgets for such Contract Year(s) shall include an addendum setting forth hypothetical budget allocations for the Fuel Costs that would be incurred in the absence of the Fuel Cost Savings Initiatives (for example (A) the cost of operation on diesel or heavy fuel oil of all Legacy Generation Assets that operated on diesel or heavy fuel oil as of the Effective Date and (B) the cost of transportation, testing and storage based on the fuel sources and transportation and storage methods utilized by Owner as of the Effective Date), and the Actual Fuel Savings shall be calculated by reference to such hypothetical budget allocations. The detailed methodologies for calculating Actual Fuel Savings and the Fuel Optimization Payment pursuant to this Section III.B.6(c) of Annex II (*Compensation – Incentives and Penalties – Fuel Optimization*) shall be included in the Fuel Optimization Plan. If the Parties have not agreed on the foregoing addendum within thirty (30) days of the commencement of any applicable Contract Year, either Party may submit such disagreement for resolution by an Independent Expert for an Expert Technical Determination in accordance with Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*).

### C.    Decommissioning Services Categories

To incentivize Operator to meet certain targets in performing the Decommissioning Services with respect to a Legacy Generation Asset, Operator shall be evaluated in accordance with the Decommissioning Costs Efficiency category, as described in this Section III.C of Annex II (*Compensation – Incentives and Penalties – Decommissioning Services Categories*).

9

CONFIDENTIAL

## 1.    Decommissioning Costs Efficiency

Prior to the commencement of Decommissioning Services for any Legacy Generation Asset, Operator shall propose a Decommissioning Budget and a timeline as part of its proposed Decommissioning Plan, in accordance with Section 16.1 (*Notice and Approval for Retirement of Legacy Generation Assets and Commencement of Decommissioning Services*). Upon completion of such Decommissioning Services, as agreed by Operator, Administrator and PREB:

- If (i) Operator's actual expenditures are consistent with or exceed the estimates included in the applicable Decommissioning Budget and (ii) Operator successfully completes the applicable Decommissioning Services on or before relevant Decommissioning Completion Date, no Incentive Payment shall be applicable.

- If (i) Operator's actual expenditures are below the estimates included in the applicable Decommissioning Budget and (ii) Operator successfully completes the applicable Decommissioning Services on or before relevant Decommissioning Completion Date, Operator shall be eligible to receive a Decommissioning Incentive Payment consisting of a percentage of the actual cost reduction as compared to the estimates included in the applicable Decommissioning Budget (subject to a maximum cap).

- Operator shall use reasonable efforts to perform the Decommissioning Services within the applicable Decommissioning Budget.

Measurement Parameter: Actual expenditures as a percentage (%) of the approved Decommissioning Budget, where actual savings equal the Decommissioning Budget minus actual expenditures.

| Criteria: | |
|---|---|
| **>95% but <99%** | Operator receives 50% of the actual savings |
| **>90% but ≤95%** | Operator receives 50% of the actual savings |
| **>85% but ≤90%** | Operator receives 50% of the actual savings |
| **≤85%** | Operator receives 50% of the actual savings |

For each Contract Year, the aggregate Decommissioning Incentive Payment payable to Operator under the Decommissioning Costs Efficiency category for all applicable Legacy Generation Assets shall be subject to the Annual Incentive Cap.

If the Decommissioning Services with respect to a Legacy Generation Asset are not completed by the applicable Decommissioning Completion Date, then Operator shall be subject to a Decommissioning Penalty consisting of one million dollars ($1,000,000) for each week, or for any portion of a week on a Pro Rata basis, by which the completion of the Decommissioning Services is delayed past the applicable Decommissioning Completion Date, up to a maximum of fifteen million dollars ($15,000,000) in the aggregate across all Legacy Generation Assets and Generation Sites.

10

CONFIDENTIAL

Minimum Performance Threshold: In the event Operator (i) exceeds the costs and expenses included in the applicable Decommissioning Budget and/or (ii) fails to complete the Decommissioning Services before the Decommissioning Completion Date for any two (2) Legacy Generation Assets, Administrator (on behalf of Owner) may, in its sole discretion, engage an independent third party to perform any future Decommissioning Services with respect to any Legacy Generation Assets without either Party incurring, or becoming liable for, the payment of any penalty, premium or termination fee.

11

CONFIDENTIAL

**Annex III**

**Baseline Environmental Study**

[To be provided during Mobilization Period.]

CONFIDENTIAL

**Annex IV**

**[Reserved]**

CONFIDENTIAL

CONFIDENTIAL

## Annex V

## Communications Plan

### 5.1    Communications Guiding Principles

The Operator will ensure that its communications plan covers four key principles.

- Transparent, Open, and Consistent Communications.
  - Operator shall create and sustain an open dialogue with members of the public, stakeholders, government officials and relevant elected leaders and the media.
  - The Operator will share facts, data, and updates in real-time with fact-based communications.

- Teamwork and Collaboration.
  - Operator shall work closely with stakeholders including P3A, PREB, PREPA, T&D Operator, PR Legislature, Central Office for Recovery Reconstruction and Resiliency ("COR3"), Puerto Rico Department of Natural Resources ("PRDRNA") , Federal Emergency Management Agency ("FEMA"), PR Emergency Management Agency ("PREMA", Occupational Safety and Health Administration ("OSHA"),  U.S. Environmental Protection Agency ("EPA") and others to communicate openly and completely regarding status updates, improvements, and challenges facing Legacy Generation Assets operations and decommissioning.

- Building Strong Community Partnerships with a Good Neighbor Program.
  - Operator shall reflect its commitment to serving Puerto Rico's energy needs via its actions and through teamwork to deliver its results and facts to the stakeholders. The Communication Plan shall also include providing opportunities to hear direct feedback from the community which are vital to building trust and strengthening relationships with T&D Operator customers and the general public.

- Local Talent and Local Resources.
  - Operator shall partner with a trusted local public affairs agency for surge support and engage local talent and local resources. This shall include a local, respected, and credible Spanish speaking spokesperson that will always be available and will convey messages in a truthful and complete manner. Local resources should also include contracting local technical, video production, graphic design, and other consultants as needed to support communications requirements.

### 5.2    Communications Team

Operator shall assemble a well-structured, unified corporate affairs department. The corporate affairs department shall handle day-to-day operations, as well as manage crisis situations. This team must be available during normal business hours – and importantly be ready on a 24/7/365 basis during an issue or crisis to provide rapid response communications and services. This will ensure transparent, accurate, and timely communications during normal operations and during crises.

1

CONFIDENTIAL

Members of the corporate affairs team shall frequently and proactively engage with members of the community, media, and local legislators, as well as P3A, PREB, PREPA and T&D Operator and other key stakeholders.

Operator shall ensure that it has a team of five or more full time employees that will also include two executive Vice President positions:

- VP, Communications
  - o Serving as an on-the-record spokesperson for the company growing relationships with reporters, both local and (if necessary) mainland, in Spanish and English. This individual shall oversee the messaging for all public-facing materials and engagements, media relations, digital and social media and employee communications.

- VP, External Affairs
  - o Shall oversee government relations, stakeholder engagement, and community outreach. Additionally, the External Affairs VP and team will oversee the Operator's island-wide Employee Ambassador Program and philanthropic partnerships.

  - o Both individuals will have fluency in Spanish and English and be full-time residents of Puerto Rico. Each position shall hold FEMA NIMs certification and disaster relief training to ensure they are prepared for any potential adverse incidents on the island. These positions will report directly to senior management of Operator to ensure streamlined and real-time communications.

Operator shall be well-positioned in Washington DC to support P3A's and the Operator's federal engagement when necessary. The Operator will engage a national public affairs firm with offices in DC and New York that has strong national media and political relationships and extensive crisis management experience.

Operator will also partner with a trusted local public affairs and advertising agency for surge support and engage local talent and local resources as needed.

## 5.3    Communications Services

Operator needs to develop a system-wide set of standard operating procedures and a communications playbook. It will apply to all possible scenarios and challenges and will have sections that are included in the Generation Emergency Response Plan. The Operator shall develop key metrics that will be shared with management, P3A and other relevant stakeholders on a quarterly basis that will include a) government relations scorecard, b) positive traditional and social media reports, c) corporate reputation surveys and d) annual community and social responsibility reports.

Operator's communications program shall focus on two audiences:

*External*

- LUMA – T&D Operator

CONFIDENTIAL

- PREPA – Generation Owner

- Media (local and international)

- Puerto Rican Government

- Federal Government, including EPA, U.S. Department of Energy ("DOE"), U.S. Department of Justice ("DOJ"), US Congress, OSHA, EPA and others.

- Regulators – PREB, PRDNR, and others.

- Local Community Organizations

- Local Communities around Legacy Generation Assets

*Internal*

- Management and employees

- Labor unions

- System Contractors, Sub-Contractors and Vendors

- Suppliers

**5.4     Key Components of Communications Plan**

The communications plan needs to incorporate the following key components:

1. *Communications Coordination Center*

   Operator shall establish a Communication Coordination Center ("CCC"), which shall serve as the hub for all incoming and outgoing communications. The CCC will monitor the landscape, develop tactics, and execute communications plans daily. The CCC shall handle message development, research, content creation, digital communications, and rapid response. This structure will be particularly effective in the event of an operational crisis or weather emergency, in which the Center could be activated by the Generation Incident Commander to serve as a the "nerve center" to manage rapid response. Operator shall house its communications team – including Operator staff and communications contractors – at or nearby the CCC for accessibility and constant communication. This may include housing, lavatories, connectivity, and food services.

2. *Facts-Based, Strategy-Based, Day-to-Day & Proactive Communications*

   These communications shall focus on day-to-day updates regarding the Legacy Generation plants and associated systems, details on scheduled maintenance, and information regarding operational upgrades and system modifications.

3

CONFIDENTIAL

Operator shall develop appropriate public information campaigns about the company, its mission, and how it will effectively operate Puerto Rico's Legacy Generation plants and systems.

In addition to operational updates, internal components of these communications shall be made to its workforce – such as effectively communicating benefits programs to employees and internal channels.

Communications will be through a series of public-facing, easily digestible materials and services that may include press releases, fact sheets, press conferences, interactive content, and social media-based communications- both in English and Spanish.

3. *Crisis and Emergency Communications*

These communications shall respond to and position Operator in the event of an adverse event – ranging from weather incidents such as a hurricane or earthquake, to an operational, worst-case scenario, such as an explosion, leak, or cybersecurity threat in accordance with the Generation Emergency Response Plan. These communications shall be:

Factual, succinct, and transparent to help educate and inform the public in times of crisis.

Operator's CCC shall be activated in accordance with the Generation Emergency Response Plan to function as a rapid response "nerve center" for all of Operator's incoming and outgoing communications in the event of a crisis.

These communications will also respond to any adverse reputational events and misinformation to ensure that the company is well represented and media and the public have the facts directly from the Operator.

4. *Transitionary Communications*

The intent of these communications will be to announce the decommissioning of Legacy Generation Assets and/or the use of temporary power units during a transition.

Communications must explain the rationale to decommission the asset (operational challenges, lower efficiency, etc.), the use of temporary power units if needed as well as timing.

These communications will also be important for the internal audience, including organized labor, as the decommissioning and commissioning of assets will likely impact certain jobs while creating others.

5. *Individual Generation Units*

In addition to a detailed system-wide road map, the communications team will develop customized communications plans for each individual Legacy Generation Asset division, tailoring it to local dynamics and its unique features and challenges.

   o   San Juan Power Plant Division

4

- o   Costa Sur Power Plant Division

- o   Palo Seco Power Planet Division

- o   Gas and Cambalache Power Plant Division

- o   Aguirre and Combined Power Plant Division

To help facilitate community-based external communications and relations in each division, Operator shall establish an Employee Ambassador Program, in which the Operator will identify and train one or more employees in each division to serve as a representative for the public and local community.

Ambassadors shall coordinate directly with the Operator's External Affairs team, leading local engagement, attending local government meetings and other public-facing events. This role shall also oversee small community forums each month to hear directly from customers and stakeholders.

The Employee Ambassador Program should be used to deliver communications to the community on retirement, maintenance, and other challenges with each of the legacy generation units.

6.  *Employee Communications*

Employee communications is complex, labor intensive and requires complete integration with Human Resources.

Engaging with and constant communication with employees shall be a foundational aspect of this approach. The Operator has an obligation to keep employees informed and to ensure that employees feel part of the new team.

Operator shall create and maintain an internal platform utilizing all available communications channels to ensure streamlined communication with all team members, available in both Spanish and English.

There will also be a channel for employees to directly communicate with management and coworkers. The internal platform should also include all relevant corporate communications and operational-related updates.

7.  *Workforce Communications*

Communications with the workforce, particularly regarding organized labor and contract negotiations, are highly complex and contain both internal and external components. Transparent communications with all parties, including the union, are essential.

All workforce communications shall be crafted in adherence with federal, commonwealth, and local labor regulations, and must highlight the key facts regarding proposed contracts, including economic benefits, healthcare, retirement savings and so forth.

CONFIDENTIAL

Transitionary communications around retiring assets shall also require close coordination with organized labor.

8. ***Stakeholder Communications***

Regular communication with all stakeholders is critical. Everyone involved should receive consistent messaging that aligns with the overall strategy and operational goals.

The Employee Ambassador Program explained above as well as the Good Neighbor Program are both key to local community engagement, including stakeholders. All stakeholders shall be invited to participate in the regularly held roundtables to hear updates directly from the company and provide real-time feedback, ask questions, raise concerns, etc.

Stakeholders shall also receive detailed newsletter updates and frequent communications regarding operational updates, and any investments being made to strengthen legacy assets.

9. ***Customer & General Public Communications***

Operator shall develop a user-friendly digital platform/Operator website that must allow customers and the general public access to real-time information and ensure widespread awareness. Operator shall keep the P3A informed of any and all significant communications prior to being sent or posted.  The platform shall be a "one-stop-shop" to communicate with all key constituencies, including the following:

- o It shall serve as the clearinghouse for all news and updates regarding the Legacy Generation Assets, including updates on maintenance, the retirement schedule, and outages.

- o In the case of an adverse or Generation Emergency event, the CCC shall be equipped as the go-to source for media, stakeholders, and members of the public to get the latest updates on outages, receive Operator's statements, and learn more about what may have caused the incident and its expected impact.

In addition to this platform, Operator shall also utilize both traditional and social media channels to rapidly deploy information to consumers and stakeholders. This includes:

- o Statements to media and public

- o Regular update columns in local news sources

- o Frequent interviews with local radio and tv stations to provide updates on the state of the power generation system, answer questions

- o Engaging regularly on social media, pushing out information via Twitter, Facebook, YouTube, and other platforms, as well as responding to consumer and media inquiries through these channels

6

CONFIDENTIAL

- o Publishing a regular newsletter, either bimonthly or monthly, to provide all the updates in one centralized location, in addition to the digital platform/Operator website

## 5.5    Operator Website

Operator's public website shall be equipped as the go-to source for media, stakeholders, and members of the public to get the latest updates on power plant outages, receive Operator's statements, and learn more about what may have caused the incident and its expected impact.

To help convey key messages and educate both members of the public and stakeholders, Operator must create and publish detailed, yet easily digestible public-facing communications materials. Materials will be developed and modified for day-to-day and proactive, crisis, and transitionary communications. This includes, but must not be limited to:

- Fact Sheets
- Frequently Asked Questions (FAQs)
- Myth v. Fact Sheets
- Informational One Pagers
- Digital Infographics & Share Graphics (for social media, digital advertisements)

For example, when the time comes for a legacy asset to be decommissioned, a brief Fact Sheet or FAQ document could be used to explain why Operator is taking said action and how it could affect or benefit consumers. Alternatively, during a weather-related emergency and in accordance with the Generation Emergency Response Plan, the use of Infographics and Share Graphics could convey key points through social media and other digital channels to quickly and succinctly, inform members of the public and stakeholders.

CONFIDENTIAL

**Annex VI**

**Organizational Conflict of Interest Policy**

1

GENERA PR LLC

"OPERATOR"

Organizational Conflict of Interest Policy

Version 1

January 24, 2023.

# Table of Contents

1.0    Introduction ..................................................................................................................3

2.0    OCI Avoidance Plan and Procedures .........................................................................4

3.0    OCI Identification and Avoidance/Mitigation ..............................................................6

4.0    Additional Considerations .........................................................................................11

5.0    Appendix A ................................................................................................................13

6.0    Appendix B ................................................................................................................14

7.0    Appendix C ................................................................................................................15

8.0    Appendix D ................................................................................................................18

9.0    Appendix E ................................................................................................................26

# 1.0   INTRODUCTION

It is the policy of Genera PR LLC ("Genera" or "Operator") to comply fully with all laws and regulations governing its operations and to conduct its business affairs in a highly ethical manner. Further, it is the policy of Genera to avoid organizational conflicts of interest ("OCIs") in the conduct of its business and to mitigate any such conflicts that might arise to the satisfaction of the Puerto Rico Public- Private Partnerships Authority ("P3" or "Administrator") and the Puerto Rico Central Office for Recovery, Reconstruction and Resiliency ("COR3").  Given this commitment, Genera is sensitive to the possibility that an actual, potential, or apparent OCI could arise, either in connection with, or as a result of, its performance of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (the "O&M Agreement"), specifically in connection with procurement and contract administration activities for Facility Contracts where Genera is acting as the agent of PREPA Genco, LLC ("Owner").  Consistent with our corporate policies and our commitment to ethical business conduct, Genera has developed the following plan to avoid, mitigate, and/or neutralize apparent, potential or actual OCIs for Facility Contracts during its performance of the O&M Agreement.

## 1.1 Purpose & Scope

The purpose of this OCI Policy ("Policy" or "Plan") is to set forth the policies and procedures by which Genera will identify and mitigate potential, apparent and actual OCIs that arise in connection with Genera's performance of the O&M Agreement related to Facility Contracts.  In this Policy, Genera will describe how it will endeavor to: (a) identify and evaluate potential OCIs as early in the procurement process as possible; (b) prevent the existence or appearance of conflicting roles that might bias Genera's judgment; (c) avoid, neutralize, or mitigate significant potential conflicts before contract award; (d) provide unbiased, impartial and objective advice and assistance; (e) prevent the existence of conflicting roles that could result in impaired objectivity; and (f) prevent unfair competition and advantage.

Genera's Policy is intended to ensure compliance with all applicable laws and regulations, including but not limited to Act No. 2 of the Legislative Assembly of Puerto Rico (enacted January 4, 2018) and the applicable provisions of the U.S. Office of Management and Budget Uniform Guidance at 2 C.F.R. Part 200 (the "Uniform Guidance").  It is also intended to ensure compliance with the P3's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts, dated December 19, 2009.  Finally, this Policy is guided by the standards and concepts set forth at Subpart 9.5 of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. Chapter 1.

This Policy shall be incorporated by reference into the Procurement Manual, described at Section 4.2(p) "*Procurement Manual*" of the O&M Agreement.  In addition, capitalized terms in this Policy shall have the meaning set forth in the O&M Agreement, unless otherwise indicated.

## 1.2 Roles and Responsibilities

As stated in the Uniform Guidance, "[o]rganizational conflict of interest means that because of relationships with a parent company, affiliate, or subsidiary organization, [an] entity is unable or appears to be unable to be impartial in conducting a procurement action involving a related organization."  As such, this Policy describes the policies and procedures that Genera will implement for Facility Contracts (1) when it is aware that an

Affiliate is likely to participate as a competitor in a procurement, and (2) when it is required to administer (on behalf of Owner) a Facility Contract in which an Affiliate is the contractor. Genera is committed to conducting procurements and administering contracts in a manner designed to identify actual, potential or apparent conflicts as early as possible. When an actual, potential or apparent OCI is identified, Genera will act to diligently protect the transparency and fairness of the procurement and contract administration processes. As set forth below, this will most often be accomplished through the retention of an independent third party.

NFEnergia LLC, an Affiliate of Genera, currently owns and operates a micro fuel handling facility in San Juan that provides natural gas to Owner pursuant to a Fuel Sale and Purchase Agreement. Moreover, there are other potential procurements for the sale and delivery of Liquified Natural Gas ("LNG") that Affiliates of Genera may decide to pursue. Therefore, on and after the Service Commencement Date, a 3PPO, as designated by the P3 Authority, will be responsible for conducting procurement activities and contract administration activities as described in the Procurement Manual in accordance with the procedures detailed in Appendix D.

The 3PPO will also be required to store such information in physical and electronic locations that are inaccessible to Genera employees and the employees of Genera's Affiliates. These physical and electronic files will be made available for inspection at any time by P3 and COR3 upon their request.

Genera's Chief Compliance Officer ("CCO") will be responsible for administering, monitoring, reporting and ensuring compliance with this Policy, among other responsibilities. The CCO will not directly participate in procurement or contract administration functions but will be aware of, all relevant procurement and contract administration plans and actions. The CCO will provide a quarterly update to P3 and COR3 regarding Genera's compliance with the Policy, to include identifying any violations (with corrective actions taken) and areas for improvement.

## 1.3 Applicability

This OCI Policy shall apply to all Genera employees, officers, agents, and consultants assigned to work under the O&M Agreement, with particular application to the employees within the Procurement & Contracting Group ("P&C Group"). The Policy will become effective on the Service Commencement Date and shall continue to apply for the entire duration of the O&M Agreement as may be updated from time to time in accordance with the Procurement Manual.

## 2.0    OCI AVOIDANCE PLAN AND PROCEDURES

### 2.1 Procedures for reporting of all actual/apparent OCI

All Genera employees, Contractors, and Subcontractors are responsible for reporting actual or apparent OCIs to Genera's CCO.

The report should include the following information:

A. identification number or name of the procurement or contract;
B. a description of the apparent or actual OCI identified;
C. names of Contractors, Subcontractors and employees involved;

D.  any other relevant information related to the OCI;
E.  mitigation measures taken prior to notification; and
F.  date filed and name(s) of the reporting entity.

*See Appendix A for the prescribed format for such reports.*

Once reported, the information will be reviewed by the CCO or designee, logged into the OCI open log form, and referred to the P&C Group for investigation or other action, as appropriate. If an investigation is performed, the P&C Group will determine if there is an apparent or actual OCI. If such an OCI is identified, then Genera will proceed with mitigation steps as appropriate.  The P3 Authority will be notified of the outcome of all investigations.

## 2.2 Monitoring and Compliance

The P&C Group, will be responsible for monitoring compliance with this Plan. The CCO will be responsible for overseeing and providing advice related to compliance with this Plan and engaging Legal and other groups as required.

A log of all reported OCI's will be maintained by the P&C Group.

*The OCI log format is attached as Appendix B.*

## 2.3 Plan Records

The vendor file or bid process documentation, including any required by this Plan, is maintained by the P&C Group whether the procurement is performed by Genera independently or with the assistance of the 3PPO. If an investigation is performed, documentation of the investigation will be maintained by the CCO, with a copy of the investigation report and the final determination provided to the P&C Group.

## 3.0    OCI IDENTIFICATION AND AVOIDANCE/MITIGATION

### 3.1 Identification of OCI

Organizational Conflicts of Interest may arise when, because of other activities or relationships, a person is unable or potentially unable to render impartial assistance or advice under the contract, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has unequal access to information that could result in an unfair competitive advantage.

**Types of OCIs that may arise when Genera conducts procurements on behalf of PREPA include the following:**

**A.  Impaired objectivity**

Impaired objectivity arises where a contractor is unable, or potentially unable, to provide impartial and objective assistance or advice due to other relationships, contacts, or circumstances. This would include circumstances where a contractor's work under one contract could entail it evaluating itself through an assessment of performance under another contract or through an evaluation of proposals.  For example, impaired objectivity might become an issue if Genera was evaluating proposals, and one of those proposals was from Parent Company, and appropriate mitigation techniques were not implemented.

**B.  Unequal access to information**

Unequal access to information occurs when a contractor has access to nonpublic information as part of its performance under another contract and where that information may provide the contractor (or its affiliates) with a competitive advantage in a later competition. For example, if Company A is selected to perform work for Genera and proprietary information from other companies will be provided to Company A in the performance of the Scope of Work for Genera that will provide Company A competitive advantage over its competitors, then an OCI exists, and mitigation actions are required.

**C.  Biased ground rules**

Biased ground rules can arise where a contractor, as part of its performance of work under a contract, has in some sense set the ground rules for another contract. This OCI rule intends to prevent a contractor from influencing requirements or review criteria that provide an unfair advantage to the contractor over potential competitors.

Given Genera's operational requirements related to the development of the statements of work and specifications as PREPA's agent, there is risk of biased ground

rules where Parent Company or an Affiliate intends to or competes for a PREPA contract. Accordingly, mitigation actions discussed below in paragraph 3.2 and throughout this Plan are appropriate to identify, avoid, and/or neutralize any such unfair advantage to Affiliates in the procurement of goods and services for PREPA.

## 3.2 Mitigation of OCIs

### A. Impaired Objectivity

To reduce the risk of impaired objectivity in Genera procurement activities, the following mitigation measures may be implemented by Genera:
1. excluding any "impaired" Contractor or Subcontractor from the procurement;
2. changing the scope of the contract and re-bidding;
3. installing a firewall;
4. transitioning the procurement to the 3PPO;
5. using anonymized identifiers the 3PPO, in its discretion, presents Genera with technical questions during the course of a procurement[1]; and
6. increasing involvement of the 3PPO in oversight.

### B. Unequal access to information

To reduce the risk of unequal access to information in Genera procurement activities, the following mitigation measures will be implemented by Genera:(i) establishing a firewall, security measures, or procedures that effectively limit the flow of "Competitively Sensitive" labeled information between the personnel who have access to such nonpublic information, and the personnel that would benefit from the "Competitively Sensitive" labeled information; and (ii) sharing the information with all competing offerors to avoid or mitigate any potential competitive advantage.

### C. Biased ground rules

To reduce the risk that any procurement could contain biased ground rules in Genera procurement activities, the following mitigation measures will be implemented:

1. Genera will recuse itself from procurements that involve Parent Company or an Affiliate, and instead use a 3PPO established by the P3 Authority. Genera will identify, avoid and/or mitigate actual or potential conflicts of interest concerns and issues as early in the procurement process as possible. If it is known that a Parent Company or an Affiliate, or subsidiary will participate in the competitive bid, Genera will refer the procurement to the 3PPO. Genera

---

[1] All technical questions from the 3PPO and responses from Genera will be made in writing, and placed in the procurement file.

employees will not contact colleagues at affiliated entities to inquire if they would be interested in competing for future award.

2. Genera will exclude any Affiliate or Parent Company from participating as a prime contractor or subcontractor in any procurement process in which the 3PPO was not engaged.

3. When the 3PPO is controlling a procurement, the 3PPO will set the evaluation criteria, and may pose questions to Genera, as appropriate, to inform the 3PPO's decision-making.

4. Any bid protests for PREPA procurements involving allegations of unmitigated biased ground rules will be reviewed by the P3 Authority, consistent with its oversight responsibilities under the O&M Agreement.

   Further, all RFx's will be reviewed by the 3PPO before release to help ensure that there are no biased technical specifications, unless Genera provides a reasonable justification that such measure is inapplicable or inappropriate under the specific circumstances.

   The P3 Authority will periodically review open PREPA solicitations for biased ground rules, consistent with its oversight responsibilities under the O&M Agreement and the Procurement Manual and shall work with Genera to promptly address any issues with as little disruption to the procurement as possible.

D. In addition to the mitigation activities above, Genera will obtain an annual independent audit (by an auditor chosen by Genera and approved by the P3 Authority) of the following:

1. Compliance with this Policy and with the Procurement Manual requirements related to OCI mitigation (as changed from time to time) (e.g., market research, solicitation content, proposals received and evaluations thereof, etc.)

2. Proper management of OCI process (e.g., errors, observations, limitations on competition)

3. The auditor will propose corrective action and/or recommend revisions to processes to address any material issues identified that relate to the OCI Mitigation.

4. A copy of the audit report will be provided to the Executive Director of the P3 Authority, or their designee.

## 3.3 Procedures for identifying, avoiding, or mitigating actual or apparent OCIs *prior to* the initiation of a procurement process

### A. Impaired Objectivity & Biased Ground Rules

Under the O&M Agreement, Genera is responsible for undertaking procurement activities related to the operation of PREPA's Legacy Generation Assets.

To prevent the existence of conflicting roles that might bias Genera's judgment and to prevent any unfair competitive advantage, a 3PPO will be used for all procurements where a Parent Company or Affiliate has formally expressed interest

in participating, for example, via responses to public notices, vendor qualifications, or requests for information. Genera may also use the 3PPO as a mitigation measure whenever deemed appropriate by the CCO.  In accordance with this Plan, the 3PPO will be inserted into the procurement process as early as practicable when needed to mitigate an actual or apparent OCI. In executing this role when needed, the 3PPO will assume control of the procurement and take the actions necessary to mitigate the OCI, as defined in the 3PPO Framework document (Exhibit D hereto). No Affiliate or Parent Company will be allowed to participate as a prime contractor or subcontractor in any procurement process in which the 3PPO was not engaged, if required, as set forth in the 3PPO Framework.

As further provided below and in the 3PPO Framework, the 3PPO will be responsible for, among other matters, independently reviewing and approving the contracting strategy established by Genera and any tender documents prepared by Genera (and other parties as appropriate), including specifications, work statements, and scope, to avoid any unfair competitive advantage to an Affiliate or Parent Company or any bias in favor of an Affiliate or Parent Company. The 3PPO will also be responsible for evaluating bids and issuing an award determination to Genera using anonymous identifiers.  For any actual disputes in which a Parent Company or Affiliate is involved as either a bidder or contractor, the 3PPO will fulfill all duties otherwise performed by Genera as set forth in the Procurement Manual.

Additional actions to mitigate the risk of biased ground rules are provided in section 3.2.C above.

## B. Unequal access to information

To avoid or mitigate the risk of unfair advantage, any of the following mitigation strategies may be considered:

### 1. Firewalls

a. Genera employees are prohibited from sharing any non-public "Competitively Sensitive" labeled information related to PREPA's fuel and Legacy Generation Assets with employees who lack proper authorization, proponents, or Contractors, including those from a Parent Company or Affiliate.  Provided, however, that nothing in this provision or Policy shall preclude executives of Parent Company and/or Affiliate who have managerial responsibility for Genera from accessing Confidential Information needed to perform their roles and legal responsibility except to the extent labeled as Competitively Sensitive and then only until the tender documents (RFx Package) becomes public and unless otherwise authorized;

b. Any employee or entity that may have an OCI based on unequal access to information (including employees from Affiliates) should be under a non-disclosure requirement, firewalled as appropriate, or excluded from the procurement process if the OCI cannot be adequately mitigated.

c. "Seconded Employees" from Affiliates or Parent Company must disclose any actual or apparent OCI and are required to sign Non-Disclosure Agreements, and abide by firewalling procedures, as appropriate.

## 2.  Organizational/Physical/Geographic Separation

Organizational, physical, and/or geographic separation between Genera and an Affiliate or Parent Company will be established to reduce the risk of inadvertent disclosures.  Such separation will include the following considerations:

a. The degree of the organizational, physical, or geographic separation, if any, that already exists between Genera and Affiliates or Parent Company (for example, work areas separate from other business segments and work in a controlled-access facility, precluding access by other contract or proposal teams).
b. The degree to which there is separate management responsibility for the two conflicted groups of employees.
c. The degree to which there are separate accounting/financial systems and controls for the two conflicted groups of employees: and
d. The degree to which there are separate IT systems or controls for document storage/access.

## 3.  Non-Disclosure Agreements ("NDAs")

NDAs will be established in appropriate circumstances to ensure that affected employees understand their obligations with regard to proprietary and competitively sensitive information.  In situations where NDAs may be utilized, Genera and, where appropriate, the 3PPO shall consider:

a. Who will be responsible for determining if NDAs are necessary (normally carried out by CCO and as appropriate, the 3PPO);
b. Who will be responsible for overseeing NDAs (normally carried out by CCO and, as appropriate, the 3PPO);
c. The actual or apparent OCI that requires the NDA, including the specific information that is covered by the terms of the NDA; and
d. Storage and management of executed NDAs (will be kept by Procurement and, as appropriate, the 3PPO as part of the bidding or vendor file).

*The form of NDA is included as Appendix C hereto.*

### 3.4 Procedures for identifying, avoiding, or mitigating actual or apparent OCIs *after* the initiation of a procurement process

In the event an actual or apparent OCI is identified after the procurement process has begun, and a 3PPO is conducting the procurement process, then the 3PPO will conduct an investigation and determine mitigation steps, as appropriate (See Appendix D).

If the procurement process is not being conducted by a 3PPO, then the CCO is responsible for conducting an investigation and determining the appropriate mitigation steps, subject to the P3 Authority's review as set forth in the Procurement Manual. CCO investigations will also be included in a quarterly report to the P3 Authority (see Attachment D, section B, paragraph 25), as part of Genera's reporting requirements under the Procurement Manual.

## 4.0    ADDITIONAL CONSIDERATIONS

### 4.1 Selection and Operation of the 3PPO

P3 Authority will award and oversee the 3PPO contract.  The 3PPO Framework attached as "Exhibit D" describes how the 3PPO will independently perform procurement activities, providing full transparency and objectivity to the process.

### 4.2 Increased Monitoring/Oversight of Conflicted Work by an Independent Party

If a Parent Company or Affiliate is awarded a contract after a 3PPO conducts the procurement process described above (and as further provided in Appendix D), Genera and the 3PPO will perform the management, direction, and monitoring of the contractor during performance of the awarded agreement as set forth in section B.19 of Appendix D. Contract administration duties performed by Genera will be supported by documentation and subject to audit. Genera will provide a quarterly report on significant contract administration issues to the P3 Authority as part of its reporting obligations under the Procurement Manual. (See Attachment D, section B, paragraph 19, subparagraph e.)

### 4.3 Discipline for Noncompliance

Violations of this Plan shall be reported to the individual's immediate manager and to the CCO. Engaging Legal and other groups leaders may be required. Appropriate administrative and/or disciplinary action will be taken for violations, up to and including termination. Additionally, violations may subject an employee to criminal liability under applicable laws.

### 4.4 Emergency

In case of an emergency, the entirety of the Policy or some of its provision may be waived by P3 in accordance with the Emergency procedures set forth in the Procurement Manual.

## 4.5 Request and Approval for Conflict-of-Interest Exceptions

In cases where the OCI or apparent OCI cannot be sufficiently avoided, neutralized, or mitigated, Genera may submit a written request for an exception in accordance with the Procurement Manual.

## 5.0    APPENDIX A
### *Organizational Conflict of Interest Reporting Document*

**Name of person(s) reporting:**

**Date actual or apparent OCI identified:**

**Date Genera notified:**

**Identification No. or name of RFP or Contract:**

Mitigation measures taken prior to notification:

_____

_____

_____

**Description of the Actual or Apparent Organizational Conflict of Interest (OCI):**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Names of Contractors, Subcontractors, Genera, and/or Luma employees involved:**

_____

_____

_____

**Any other relevant information related to the OCI or apparent OCI:**

_____

_____

_____

## 6.0    APPENDIX B

*Open OCI Report Log*

| Date filed | Id # / Name of RFP/ Contract | Status Comments |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

*Reported and Logged OCIs will remain in this list from the time they are identified until their resolution*

## 7.0    APPENDIX C

### CONFIDENTIALITY AGREEMENT

I, _____ **[insert name]**, acknowledge that Genera PR, LLC, a Puerto Rico Limited Liability Company, ("**DISCLOSER**"), acting on behalf of Puerto Rico Electrical Power Authority ("PREPA") has provided me with Confidential Information (as defined below) respecting its businesses, products and undertakings present and future, and hereby acknowledge and agree that:

A.      I am completing this Confidentiality Agreement due to the following actual or apparent conflict of interest:

_____

_____;

and

B.      My employment, consulting agreement, or position as an officer, director of, or ownership interest in or other affiliation with DISCLOSER creates a relationship of confidence and trust between myself and DISCLOSER with respect to all confidential information disclosed to me by, or on behalf of, DISCLOSER or otherwise acquired, created, discovered, developed, learned or made known by, or to, me during the course of my employment or consulting agreement with DISCLOSER; and

C.      "**Confidential Information**" includes, without limitation, information related to the DISCLOSER's procurement of or contract for any good or service, the DISCLOSER's past, present or future need for or evaluation of any good or service, the DISCLOSER's funding, budgets, specifications, requirements, strategies, deliberations, evaluations, judgments, discussions, potential markets, suppliers, vendors or contractors, in each case as related to any past, present or future procurement or contract for any good or service, but does not include information which is: (i) now or in the future publicly available other than through my own actions, provided however that where any part of such information is publicly available but a compilation of information which includes such part is not publicly available then such compilation shall be treated as Confidential Information hereunder; (ii) made available to me from a source which is not prohibited from disclosing such information to me by a legal, contractual or fiduciary obligation; or (iii) as shown by documentary evidence, already in my possession at the time of disclosure to me.

In consideration of the payment of $_____ to me by DISCLOSER, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I hereby acknowledge and agree by the execution of this Confidentiality Agreement (the "**Agreement**") as follows:

## I. Confidentiality

1. Both during the term of my employment or consulting agreement with DISCLOSER and for a twelve-month period after its termination:

   a.  I will keep in strictest confidence and trust all Confidential Information known to me;

   b.  I will not use, divulge, disclose or communicate, either directly or indirectly, in any manner whatsoever, any Confidential Information, or anything relating to it, to any party, including but without limitation to the DISCLOSER's affiliates, without the written consent of the DISCLOSER's Chief Compliance Office ("CCO"); and

   c.  I will use all reasonable and prudent efforts to keep the Confidential Information confidential and to protect and safeguard such information from misuse, loss, theft, publication, disclosure, destruction, or the like.

2. In the event that I am required to disclose Confidential Information, pursuant to any applicable law or regulation, or to any government or governmental department, ministry, board, commission, agency, court, securities commission, or stock exchange having jurisdiction, I shall disclose such information as I am legally required to disclose and shall use all reasonable efforts to obtain confidential treatment for any information so disclosed. In addition, I shall, to the extent permitted by law, promptly provide notice of the required disclosure to the management of DISCLOSER setting out the requirements and circumstances surrounding the required disclosure and any other relevant information.

   Notwithstanding the other provisions of this Agreement, and in compliance with section 1225 of the Disaster Recovery Reform Act of 2018, I acknowledge and agree that no language in this Agreement is intended to prohibit compliance with authorized audits or internal reviews by the Government of Puerto Rico, Federal grant making agencies, or the Comptroller General of the United States.  Consistent with the Procurement Manual, this provision does not restrict or change Genera's existing rights and/or obligations to provide certain governmental entities (i.e., COR3, PREPA, the Federal grant making agency, DHS Office of Inspector General, the Comptroller General of the United States, or their authorized representatives) the right of access to any documents, papers, or other records of Genera which are directly pertinent to a Federal award, in order to make audits, examinations, excerpts and transcripts.

3. Upon request by DISCLOSER, I will promptly deliver to DISCLOSER all documents, notes, drawings, specifications, programs, and data and other materials of any nature that contain Confidential Information and I will in no way retain or take with me any of the foregoing or any reproduction of any of the foregoing or any Confidential Information.

## II. General

1.  I understand and agree that in the event of a breach or a threatened breach by me of any of the provisions of this Agreement, DISCLOSER, in addition to and not in limitation of any other rights, remedies or damages available to it at law or in equity, shall be entitled to an injunction and/or an order of specific performance, in order to prevent or to restrain any such breach or threatened breach by me or any other persons directly or indirectly acting for or on behalf of myself.

2.  This Agreement contains the entire agreement between me and DISCLOSER with respect to the issues addressed herein.  Except in respect of any prior non-disclosure or confidentiality agreement, assignment, or confirmation of assignment of Inventions or Works entered into by me, it supersedes any and all other agreements, either oral or in writing, between me and DISCLOSER with respect to the issues addressed.  DISCLOSER and I both acknowledge that no representations, inducements, promises or agreements, oral or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not embodied in this Agreement.

3.  This Agreement shall be governed by, interpreted, and construed in accordance with the laws of the Commonwealth of Puerto Rico.

4.  This Agreement may not be modified by oral agreement, or course of conduct, but only by an agreement in writing signed by an authorized officer of DISCLOSER and me.

**I FREELY AND VOLUNTARILY ACKNOWLEDGE AND AGREE THAT I HAVE HAD THE OPPORTUNITY TO OBTAIN LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT AND HAVE CAREFULLY READ AND CONSIDERED THE PROVISIONS OF THIS AGREEMENT AND HAVING DONE SO, AGREE THAT THE PROVISIONS OF THIS AGREEMENT ARE FAIR AND REASONABLE AND ARE REASONABLY REQUIRED FOR THE PROTECTION OF DISCLOSER.**

_____                    _____
        Dated                                          Signature


                                           _____
                                           Please Print Name
                                           (In addition, initial each page on the bottom left corner)

ACCEPTED BY AND AGREED TO:

[*DISCLOSER*]

By_____

## 8.0    APPENDIX D

### GENERA OCI MITIGATION PLAN

As provided more fully below, Genera will employ multiple means to timely avoid, mitigate, and/or neutralize actual or apparent Organizational Conflicts of Interest ("OCIs"), including, in appropriate circumstances (as outlined below), the use of a Third-Party Procurement Office (the "3PPO") under the leadership of a third party that has appropriate expertise and independence from Genera.

To ensure independence, the P3 Authority will select the 3PPO with reasonable input from Genera. This document provides the process by which the 3PPO will conduct procurements that involve a Parent Company or Affiliate. Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the O&M Agreement. This Mitigation Plan, as it may be modified or supplemented from time to time, is incorporated into the Procurement Manual as an integral part thereto, but does not change or supersede existing requirements under the Procurement Manual and remains subject thereto.

### 3PPO PROCUREMENT PROCESS FRAMEWORK
### A.  Procurement Process Framework

    a.  Tenders will be based on the projects required to be implemented as part of, among others:

        i.  Procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Facility Contract (including Capital Spare Parts and Spare Parts, but excluding Operator-funded capital improvements that do not involve the installation of equipment that becomes a part of the system at a Legacy Generation Asset;

        ii.  procurement of any new or replacement, or modifications, amendments, renewals and extensions of any Fuel Contracts;

        iii.  projects that may be required by other plans, of, or applicable to, Genera, approved by PREB, as applicable.

    b.  Thus, Genera's role in developing the scope and requirements for tenders, will be based on priorities as established by Genera to execute its obligations under the O&M Agreement, and in accordance with PREB approvals.

    c.  The process to prepare the tender, including without limitation, to determine the scope of work must follow the Procurement Manual, as updated from time to time.

    d.  Except to the extent addressed below, the steps set out in the Procurement Manual shall continue to apply to tenders, as applicable.

## B. Process

### 1. Procurement Strategy

a. When Genera is required to procure services and/or materials on behalf of the Owner, a procurement process as defined in the Genera Procurement Manual will be followed. To initiate the process, Genera will review requirements and determine a procurement strategy including the definition of required timelines for the particular tender documents for review and acceptance by the 3PPO.

b. The procurement strategy will consider how work should be procured (i.e., scope of work, bundling of activities, etc.), type of contract (i.e., lump-sum or other) and what method of procurement should be used (i.e., RFP, etc.).  During the development of this strategy, the potential for OCI will be evaluated, and mitigation measures taken if appropriate.

The nature of the work and potential OCI concerns (Parent Company or Affiliate is more or less likely to be a potential Proposer/Bidder), will help determine which work will require additional mitigation to avoid an OCI. This may include how the Tender Preparation (next step) is developed.  For instance, if a Genera Affiliate will be a Proposer/Bidder on the work, the development of the Tender Preparation (Step 2 below) and Tender Documents (Step 3 below) will be developed by the 3PPO.  If asked by the 3PPO, Genera may provide reasonable input to the 3PPO for the 3PPO's consideration as needed to support the development consistent with Genera's existing contractual obligations.

### 2. Tender Preparation

a. As described in Step 1 above, Genera or the 3PPO will prepare the tender documents that set forth the program and technical requirements for the project based on the planning documents above. Tender documents will include:
   i. Scope of Work
   ii. Standards (which will be Genera Engineering and Construction standards or based on typical industry practices where no Genera standards are available)

The 3PPO will explore the value of creating a set of standard technical specifications for frequently procured goods and services.

### 3. Sourcing Strategy

a. Genera or the 3PPO will prepare the tender documents ("RFx Packages") that set forth the commercial and proposal-related requirements for the project based on the Scope of Work and Standards, including, without limitation:
   i. Commercial requirements (bonding, payment schedules based on milestones, etc.)
   ii. Proposal/bid requirements, schedules, etc.
   iii. Evaluation criteria

b. If the tender documents are prepared by the 3PPO, the 3PPO will set evaluation criteria, but may pose questions to Genera, as appropriate, to inform the 3PPO's decision-making.

   c. After preparation, all RFx Packages will be reviewed and approved by the 3PPO, consistent with the planning documents described above.

4. Request for Interest ("RFI")/Request for Qualifications ("RFQ")

   a. If the tender documents are prepared by the 3PPO,

      i. the 3PPO will issue a combined RFI/RFQ to Genera's pre-qualified Vendors and advertise publicly (i.e., published twice in a general circulation newspaper and posted in Genera's website) to gather a list of companies that may participate in the resulting tender.

      ii. If, upon publication, Genera has any concern about the tender requirements, Genera and the 3PPO will follow the review process below (Section C), and the 3PPO may withdraw, revise, or supplement the RFI/RFQ.

   b. If the tender documents are prepared by Genera,

      i. Genera will issue a combined RFI/RFQ to Genera's pre-qualified Vendors (using Power Advocate or similar) and advertise publicly (i.e., published twice in a general circulation newspaper and posted in Genera's website) to gather a list of companies that may participate in the resulting tender.

   c. The combined RFI/RFQ will:

      i. request the submittal by Proponents/Bidders of specific qualifications in accordance with the nature of the prospective project; provide potential Proponents/Bidders an opportunity to identify ambiguous, unrealistic, and unduly restrictive requirements; and establish how potential Proponents/Bidders will be evaluated (e.g., competency, safety, prior work experience, financial health, capacity, independence, and other relevant factors for the scope of work);

      ii. disclose that, if an Affiliate or Parent Company formally responds to the RFI/RFQ, the procurement will be managed by the 3PPO.
The RFI/RFQ will also explain that if an Affiliate or Parent Company formally responds to the RFI/RFQ, but no Affiliate or Parent Company submits an offer, Genera will manage the evaluation, contract award, and post-award contract administration; and will not disclose proposal information to Affiliates or Parent Company;

      iii. require that Affiliate or Parent Company identify themselves as such on the cover page of their response and that the substantive content of the Affiliate or Parent Company's submittal be separated from the cover page and be secured (security mechanisms to be determined jointly with 3PPO) until further instructions are provided; and

      iv. require any Proponents/Bidders disclose if an Affiliate or Parent Company is part of its bid team (as subcontractor, partner or otherwise).

5. Proposer/Bidder Pre-Qualification

   a. The RFI/RFQ responses will be reviewed and evaluated based on criteria established in the RFI/RFQ.

   b. When an Affiliate or Parent Company responds to an RFI/RFQ, as identified in the cover page of its submittal, the 3PPO will assume control of the review and evaluation process and will be the exclusive party to access the submittals.

   c. In such case, based on the results of its evaluation, the 3PPO will establish a list of pre-qualified Proposers/Bidders.

   d. If no Affiliate or Parent Company responds to the RFI/RFQ, Genera will perform the review and evaluation process and establish a list of pre-qualified Proposers/Bidders.

   e. Only pre-qualified Proponents/Bidders may participate in the resulting tender.

6. Single Source Situations

   a. As part of the process for exceptions to competitive bidding, pursuant to the Procurement Manual, Genera will prepare a justification for single sourcing when required.

   b. If the single sourcing involves an Affiliate or Parent Company, Genera will submit the request to the 3PPO for its review and approval. The 3PPO will provide its evaluation, findings, conclusions and recommendation for approval or rejection to P3A and Genera.

   c. For all single sourcing, approval from P3A will be requested as defined in the Genera Procurement Manual.

   d. If P3A approves the single-source recommendation to an Affiliate or Parent Company, 3PPO will implement the recommendation consistent with the Procurement Manual.

7. Tender Final Review

   a. When the final pre-qualified Proponents/Bidders list includes an Affiliate or Parent Company, the RFx Package will be finalized and approved by the 3PPO (with further consultation with P3A as appropriate) prior to posting.

   b. When the final pre-qualified Proponents/Bidders list does not include an Affiliate or Parent Company, the RFx Package will be finalized and approved by Genera.

8. Tender Posting

   a. The 3PPO or Genera, as appropriate, will issue the RFx Package to pre-qualified Proponents/Bidders.

   b. The tender will notify all eligible Proponents/Bidders when an Affiliate or Parent Company is among the list of pre-qualified bidders. In such circumstances, the tender will also state that where the OCI Policy is available and that any objection to the RFx Package's requirements will be waived unless timely raised in accordance with the RFx Package's requirements.

   The tender will also notify eligible Proponents/Bidders that, if no Affiliate or Parent Company submit an offer, Genera will manage the evaluation, contract award, and post-award contract administration; and will not disclose proposal information to Affiliates or Parent Company.

   c. Genera will require confirmation from all bidders that they intend to propose/bid or not propose/bid on the tender at least 1 week before closure. A proponent/bidder will be ineligible to participate in the tender of it does not confirm its intention to bid at least 1 week before closure.

9. RFx Clarifications

If an Affiliate or Parent Company is among the list of pre-qualified bidders, the 3PPO will receive and respond to any questions and clarification requests from Proponents/Bidders. The 3PPO will coordinate with P3A and Genera, as appropriate, to provide accurate and

responsive answers to clarification requests. Any coordination with Genera regarding questions and clarification requests will be in writing, will use anonymized identifiers to avoid identifying the requesting competitor, and both the 3PPO inquiry and Genera's written response will be placed in the procurement file.

10. Process for Tender Evaluation, Award and Execution <u>without</u> Affiliate or Parent Company's Participation (without 3PPO engagement)

If no Affiliate or Parent Company confirms its intention to bid, then Genera will complete the procurement/bid evaluation and award process without 3PPO involvement and will manage the contracting process through execution and administer the contract as contemplated in the PM.

11. Process for Tender Evaluation and Award <u>with</u> Affiliate or Parent Company's Participation

Upon receipt of confirmation of intention to propose/bid by an Affiliate or Parent Company, Proponents/Bidders will be directed to deliver proposals directly to the 3PPO, and the 3PPO shall comply with the requirements of the Procurement Manual, as applicable, and as complemented by the following process which shall also apply thereto.

12. Review Process

   a. The 3PPO will assign each Proposer/Bidder an anonymized identifier for use in any follow-up technical or commercial questions with Genera. If the 3PPO presents Genera with any technical or commercial questions, the question to Genera and the response from Genera will be documented in the procurement file.

   b. If, upon review, the 3PPO finds that no Affiliate or Parent Company submitted a proposal/bid (despite confirming its intention to do so), then the 3PPO will transfer all bids back to Genera and Genera will complete the evaluation and award process and will manage the contracting process through execution and administer the contract as contemplated in the Procurement Manual, without further reference to this Policy.

13. Commercial Evaluation

Where the tender contemplated a trade-off of cost and non-cost evaluation factors, the 3PPO will conduct and document its commercial evaluation according to the tender rules specified in the RFx Package and the evaluation criteria specified therein (Step 3, Sourcing Strategy).

14. Technical Evaluation

   a. The 3PPO will conduct the technical evaluation according to the tender rules specified in the RFx Package and the evaluation criteria specified in Step 3, Sourcing Strategy. In its review of technical proposals, the 3PPO may consult with Genera as appropriate (using the anonymized identifier if needed) to verify that proposals/bids meet the requirements set forth in the RFx Package and the Sourcing Strategy (e.g., specification interpretation, alternative features, new options, confirmation of capability, etc.). Genera shall have established a Consultation Team to liaise with the 3PPO. The Consultation Team will be required to keep all aspects of said consultation in strict confidence.

b. If the 3PPO presents Genera with any technical or commercial questions, the question to Genera and the response from Genera will be documented in the procurement file.

**15.** Shortlist Presentations

The 3PPO will determine if any proposal/bid submittal is non-responsive, materially deviates from the scope of work or other technical requirements or is non-compliant with the RFx Package requirements and the Sourcing Strategy. The 3PPO may request, coordinate, and attend presentations by Proponents/Bidders and thereafter summarize the evaluation all in order to assist the 3PPO in making an award decision.

**16.** Select Awardee

The 3PPO will identify its recommended awardee, based on the criteria set forth in the Sourcing Strategy.

**17.** Prepare Bid Award Document

The 3PPO will document its evaluation, findings, and conclusions (including the scoring given to each Proponent/bidder, the basis therefor, and any notes regarding variations and potential noncompliance). The 3PPO will transmit its recommendation to P3A along with a summary of the evaluation and the basis for award. P3A will notify Genera of the award along with a summary of the evaluation and the basis for award using the anonymized identifiers.

**18.** Approve Bid Evaluations and Award Authorization

a. If Genera believes the 3PPO's recommendation is inconsistent with applicable law, the O&M Agreement, the terms of the RFx, or the Sourcing Strategy, Genera will advise P3A, and the 3PPO of its concerns within 2 business days of receipt of the notice, which will trigger the Review Process set forth below (Section C).

b. After review, and the close of the 2-day objection period, Genera will provide notice of award.

c. Genera may shorten the award period by, any time within the 2-day objection period, notifying the 3PPO and P3A in writing that it has no concerns with the 3PPO's recommendation.

**19.** Review and Approve Contract

a. If award will be to an Affiliate or Parent Company, the 3PPO will prepare the contract using existing contract templates. If the award will not be to an Affiliate or Parent Company, Genera will prepare the contract using its existing contract templates.

b. If the 3PPO prepared the contract, after negotiation with the contractor, the final recommended contract will be transmitted to P3A by the 3PPO.

c. P3A will provide the final recommended contract to Genera for signature and award.

d. Where award is made to an Affiliate or Parent Company, the post-award contract management, direction, and monitoring of contractor activity, in keeping with the awarded agreement and Genera's obligations under the O&M Agreement, will occur as follows:

1. Activities performed by Genera supported by documentation subject to audit:

     i. Progress reviews;

     ii. Commissioning acceptance;

     iii.    Safety and environmental compliance oversight; and

     iv.    Day-to-day management.

2. Activities performed by Genera only after pre-approval by the 3PPO (all activities must be documented and are subject to audit):

     i. Contractor performance evaluations; and

     ii. Other contract administration responsibilities specifically identified in writing by 3PPO either prior to the signing of the contract, or afterwards. For the avoidance of doubt, it is understood that daily operational coordination on items such as maintenance, nominations, and other similar items impacting the Generation Assets will be handled by LUMA and Genera pursuant to their arrangements and procedures.

3. Activities performed by the 3PPO:

     i. Any activities for which the 3PPO denies Genera's request for pre-approval;

     ii. Review, approve, and administer payments to Affiliates or Parent Company; and

     iii.    Contract changes and circumstances that involve a relief event, supervening event, or change request (technical, schedule, or cost), or other objective determinations with respect to the Affiliate or Parent Company's performance of, or compliance with contract requirements. In the case of a relief event, supervening event, or change request, the procedures in section 21 below will apply. For the avoidance of doubt, it is understood that daily operational coordination on items such as maintenance, nominations, and other similar items impacting the Generation Assets will be handled by LUMA and Genera pursuant to their arrangements and procedures.

e. To mitigate against impaired objectivity by Genera in the performance of any contract awarded to an Affiliate or Parent Company, the 3PPO and Genera will collaborate without limitation in providing a quarterly report, as part of Genera's reporting requirements under the O&M Agreement and Procurement Manual, on the contracted work progress, issues, and risks of all contracts awarded to an Affiliate or Parent Company. The report will specifically identify procurements where OCI mitigation measures have been implemented. This report will also identify any subjective evaluations or oversight of the contractor that should be managed by the 3PPO. The report will be provided to the Executive Director of the P3 Authority, or their designee.

**20.** Changes or Supervening Events

a. In the case of a relief event, supervening event, or change request (i.e., technical, schedule, or cost) where a 3PPO is being utilized to help mitigate real or apparent OCI's:

       i. The contractor will prepare the request for relief or change in accordance with the Procurement Manual and the contract, and provide to Genera and the 3PPO.

      ii. Before any request (including Change Orders) is approved, the 3PPO will review the request and decide whether to accept the request, request further information, or to reject the request. The 3PPO may consult with Genera as the 3PPO deems necessary. The 3PPO will notify Genera of its decision concerning such a request.

      iii. If Genera does not concur with the 3PPO's decision, then Genera and the 3PPO will follow the Review process below (Section C).

b. The contractor will only be entitled to relief or changes that were permitted by the contract and accepted by the 3PPO or determined through the Review Process set forth below.

## C. Review Process

Management of the Review Process described below is a 3PPO responsibility, in all instances where the 3PPO assumes control of the procurement or contract administration activity.

Review Process:

a. If Genera does not concur with the 3PPO's findings and decisions, then Genera will notify the 3PPO in writing the reasons it does not concur.

b. The 3PPO and P3A will review the decision, considering Genera's concerns. The 3PPO and P3A may seek additional information from Genera in the course of their review.

c. Within 15 business days of receiving the notice of nonconcurrence from Genera, the 3PPO will issue the final decision, which will be documented and transmitted to the P3A and Genera. Genera and the 3PPO will implement the decision with due regard for project objectives and schedule.

## 9.0   APPENDIX E

### APPROVAL & REVISION HISTORY

#### 9.1 OCI Policy Revision History

| Revision No. | Nature of Revision | Genera Approval Date | P3A Approval Date |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

CONFIDENTIAL

**Annex VII**

**Mobilization Plan**

Operator shall complete the Mobilization Services in a timely manner and as soon as practical. To achieve an efficient and orderly mobilization of Operator's capabilities and to allow the commencement of the Operation Phase, Operator must pursue the following elements as part of its Mobilization Plan:

- Engage in stakeholder outreach in accordance with the Communications Plan

- Recruit and hire personnel in accordance with the Recruitment and Hiring Plan

- Identify and onboard subcontractors

- Plan and implement information technology systems and tools

- Review applicable permits and compliance obligations

- Evaluate and maintain inventory and coordinate with T&D Operator

- Develop plans/procedures for various aspects of operation (including O&M Plans, Emergency Response Plans, O&M Procedures, Operator Training Programs, among others)

- Identify and complete items listed on the Handover Checklist and report on status every two (2) weeks to the P3A

- Plan for and achieve key milestones

- Develop a Communications Plan that works to create a well-orchestrated and consistent message to Operator's employees regarding expectations

- Develop a fuel savings strategy related to Fuel Contracts, including management of Fuel Contract related decisions during the Mobilization Period

7.1    **Mobilization Process**

Upon commencement of the Mobilization Phase, the Operator's transition teams shall begin working towards completing the critical path activities identified in this Mobilization Plan. Team leaders will be drawn from Operator's pool of experienced managers. A number of these professionals will also be designated to serve as senior leadership for the Operator after the Service Commencement Date and will need to move to Puerto Rico on a permanent basis, to the extent that they are not already residents.

The overall Mobilization Plan has been divided into four primary workstreams.

General Mobilization Management
Operational Takeover
Functional Takeover
Staffing Approach

1

CONFIDENTIAL

These are not distinct workstreams with clear separation between them, but rather they indicate the general focus of activities that will gradually evolve as Operator arrives on site in Puerto Rico and begins their initial Mobilization Services.

### 7.1.5  *Stakeholder Outreach*

*1.  Meet with PREPA Area Leads*

During the first month of the Mobilization Period, functional leads from Operator shall meet with their counterparts within PREPA to discuss and review all existing processes, contracts, and systems. The Operator functional leads, along with Operator's global partners, will then analyze the existing financial management infrastructure by referencing industry norms and practices. The outcome of these analyses will determine what aspects of the existing financial management plan can be retained or extended, and what new infrastructure or systems need to be put in place.

*Meet with officials from applicable unions, including UTIER and UEPI*

Operator shall establish professional relationships with the unions that represent employees to ensure long-term success. Building and maintaining such relationships at all levels of the organization must begin during the early Mobilization Period. Operator should schedule regular and recurring meetings with officials from the unions and the Operator operational management teams early and often to build trust and enhance transparency and communication. Additionally, Operator should hold regular and recurring meetings between site management and site union stewards as part of the initial outreach process and on an ongoing basis.

### 7.1.6  *Personnel & Training*

Operator's recruitment, staffing, and training plan is critical to the success of the Legacy Generation Assets and is vital for generation reliability and ultimately customer satisfaction. To this end, Operator must perform the following:

*1.  Recruit and Screen Existing PREPA Employees*

The Operator shall interview and recruit all Operators and Maintenance Technicians from the existing PREPA workforce to the extent they wish to continue to work in the power plants. Recruitment should focus on these skilled employees and must involve thorough communication of the multi-skilling philosophy and its advantages, trying to recruit and retain as much expertise from the PREPA staff as possible.

*Staffing Philosophy, Goals, and Training and Development*

If the operator recruitment and staffing plan is based on a multi-skilled workforce strategy, the plan is dependent upon training employees to achieve cross-functional skills. Training and employee development is a key building block to the success of this strategy and thus, investment in time and resources will be made to execute the strategy. Plant Training Coordinators ("PTCs") shall be recruited and staffed in each plant organization,

2

CONFIDENTIAL

along with additional training resources staffed on the power Plant Technical Services team. The PTCs should coordinate all the needed training for their respective power plant(s) while the training staff from the technical services team should serve as both instructors and as coordinators of Subcontractors who can offer some of the required training classes.

*Maintenance Philosophy and Working with Puerto Rico-Based Subcontractors for Corrective Maintenance*

Maintenance Technician positions shall be filled in by recruiting existing PREPA technicians and communicating the operations and maintenance philosophies including multi-skilling.

*Positions in Revised Organization*

The operations staffing plan shall include interviewing existing PREPA operations employees primarily (and filling in any voids with hires outside of PREPA) for the following job classifications:

- Leadership positions include Plant Manager, Operations Manager, Maintenance Manager, Operations Team Supervisor, Maintenance Supervisor, Manager of Outage and Projects, Engineering Manager, Technical Support Services Manager

- Plant Operator

- Auxiliary Operator

- Combustion Turbine Technician

- Maintenance Technician

- Contract Resource Coordinator

- Planner

- Engineer

- Project Manager

- Implementation Manager

Additionally, staffing shall be substantially completed prior to Commencement of Operations. The last day of PREPA operations will be simultaneous with shifts of Operator employees to ensure a seamless turnover of duties with a goal of no disruptions in service. During the two weeks prior to commencement of services, overlap of rotating shift workers will take place on multiple occasions to support orientation for selected employees.

### 7.1.7 *Subcontractor Identification & Onboarding*

During the Mobilization Period, representatives from Operator's Supply Chain team shall evaluate existing procedures and systems to evaluate the subcontractor base and to determine opportunities

CONFIDENTIAL

for consolidation and/or cross-over with Operator existing Subcontractors; benchmark pricing and other relevant commercial terms against industry standards to identify potential areas of cost savings; perform in-depth contract review for compliance with existing Operator policies; meet with critical Subcontractors to establish relationships; and ensure they have the correct level of local support for continuity of operations. Various Subcontractors may be used across multiple work streams to assist with the mobilization Period activities.

- *Meet with potential O&M Subcontractors who could perform corrective maintenance activities for the Legacy Generation Assets*

Operator may work with several on-island Subcontractors to perform much of the corrective maintenance at the Legacy Generation Assets. This work must be contracted via the approved Procurement Manual procedures.

### 7.1.8 *Information Technology*

The scope and schedule of Operator's IT group shall be driven by new systems and processes and may represent a degree of change that requires a structured, well-defined multi-year time frame for implementation. The primary critical path activities that determine the schedule for the IT transition program are as follows:

1. *Plan and integrate for implementation a fleet-wide Computerized Maintenance Management System ("CMMS").*

The CMMS will drive and manage disciplined work management processes across all Legacy Generation Assets for preventive and corrective maintenance.

2. *Begin implementation with Operator's IT partners to establish the necessary enterprise-wide workflow IT tools to enable operation, maintenance, inventory control, event reporting and tracking, employee development/training and human performance improvement/safety.*

As part of the IT Mobilization Period, Operator's IT's team, with the support of global partners, must assess PREPA's IT function and environments to understand people, processes, and technologies.

### 7.1.9 *Permit and Compliance Reviews*

Operator shall review permitting and other relevant documentation provided to it, including information regarding the Consent Decree and State Implementation Plan. Based on this information, Operator will prepare an initial compliance matrix which will include permit requirements, timelines, reporting elements, and priorities. As part of the Mobilization Services, Operator shall assess the current level of compliance and structure in place to adhere to the requirements set forth by the Consent Decree and SIP, with focus in key areas such as air compliance, Clean Water Act, SPCC, EPCRA/CERCLA, and general program administration. Any gaps identified will be addressed.

4

CONFIDENTIAL

Operator has an existing compliance management system which may be utilized to manage and track the actions associated with compliance requirements. Staffing requirements shall be identified and aligned with the expectations of the Consent Decree and the SIP and with the expertise needed to ensure proper compliance with all regulatory matters identified. Operator may seek to engage with a third-party specialist to aid in this aspect of the mobilization effort and to assist in training and transitioning the management of compliance matters to the various HSSEQ staff.

### 7.1.10 *Inventory*

Operator shall evaluate existing processes and solutions for materials management, inventory, and warehousing with the goal to develop a streamlined best-in-class solution for the existing operations. Evaluations should consider existing infrastructure suitability, current inventory levels and industry stocking and storage recommendations. This includes identifying necessary consumables, spare parts, Capital Spares and equipment needed for the first 12 months of operation. Further, during the Mobilization Period, an inventory of temporary on-site office space, trailers and storage containers shall be conducted.

Operator shall also have a fuels team in place, with shadowing/overlap with the PREPA fuels office intentionally performed to assure no issues with fuel inventories, orders, or deliveries. The fuel inventory will adequately match a dispatch schedule and long-term dispatch projections provided by the T&D System Operator.

### 7.1.11 *Coordination with T&D System Operator*

Operator shall understand its relationship to the T&D System Operator. Operator shall:

- Participate in any and all system planning meetings with the T&D System Operator during the Mobilization Period to ensure Operator is in proper position to support the T&D System Operator;

- Engage in strategic outreach with the T&D System Operator to identify opportunities for greater efficiencies potentially in fuel for vehicles (by Generation Operator to T&D System Operator), vehicles and equipment usage and to address such opportunities in the Shared Services Agreement, should the parties agree on the value of such;

- Establish a robust outage planning schedule with the T&D System Operator and other relevant organizations; and

- Coordinate with the T&D System Operator and PREPA and any other relevant organization to develop analyses on and registrars of historical expenditures of Legacy Generation Assets.

### 7.1.12 *Review and Evaluate Applicable Plans and Procedures*

As part of its operational take-over plan, Operator shall review and evaluate the existing Emergency Response Plan including disaster recovery, business continuity and any related plans

5

CONFIDENTIAL

for consistency with applicable laws and best management standards and conduct a gap assessment. Where any gaps are identified, Operator shall develop an action plan to address such deficiencies and present its Legacy Generation Emergency Response Plan for review and approval to Administrator and PREB.

Operator shall establish training programs and develop a drill schedule to test the efficacy of the programs and ensure all personnel are informed and prepared to respond to situations described under such plans. Additionally, Operator shall form site or team-level safety teams and train them on the Safety and Hazardous Materials Procedures Manual.

### 7.2    Approach to Interacting with Spanish-Speaking Workforce

The organizational charts in Exhibit 2 of the Proposal include designations for those key personnel that are Spanish speakers.

### 7.3    Handover Checklist

Operator shall maintain and manage the Handover Checklist continually based on the following form but revised as applicable for the unique characteristics of each Legacy Generation Asset. These updates shall include reporting checklist items that have been completed, as well as identify any checklist items that might have emergent issues or problems that need to be escalated for resolution. In addition, if any new emergent items are identified that are not currently known, they must be proposed to be added to the Handover Checklist to be reviewed with Administrator.

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR \|OPERATIONS PHASE\|? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | Staffing completed | | |
| ☐ | Orientation to Genera PR completed (includes detailed role and responsibility training) | | |
| ☐ | Skill assessment completed | | |
| ☐ | Training and development plans created | | |
| ☐ | Training commenced (program in place) | | |
| ☐ | Site/department procedures exist and are in use, including applicable Emergency Response Plans and fuel supply operations and maintenance procedures applicable to the site | | |
| ☐ | New procedures created (if applicable) | | |

6

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR [OPERATIONS PHASE]? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | New personnel trained on site/department procedures | | |
| ☐ | Review of applicable contracts | | |
| ☐ | Existing contracts either remain in place, renewed, or new contracts are entered | | |
| ☐ | Meet with contractor partners and prepare to support operation and maintenance | | |
| ☐ | Work management system in place | | |
| ☐ | Project teams in place, planning items 4+ weeks out | | |
| ☐ | Work plans in place for first 4 weeks | | |
| ☐ | Introductory meeting with Plant Technical Services lead and the Pod Manager supporting the specific plant | | |
| ☐ | Plant Manager and Pod Manager agreed on and formed project teams | | |
| ☐ | Permits reviewed with PREPA functional area leads | | |
| ☐ | Risk assessments reviewed with PREPA functional area leads and updated | | |
| ☐ | Permits reviewed and deconstructed with HSSEQ support | | |
| ☐ | Current compliance status reviewed with HSSEQ support | | |
| ☐ | Permits reviewed with regulators | | |
| ☐ | Established DOA from PREPA to Genera PR and reassign account access where applicable | | |
| ☐ | Filed authorized signatory filings | | |

7

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR [OPERATIONS PHASE]? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | Communication established with LUMA dispatch (agree to initial Agreed Operating Procedures set in the Gridco-Genco Operating Agreement) | | |
| ☐ | Jointly, with LUMA, agree to the requirements and procedures for the Annual Performance Test and heat rate testing for each unit and provide such to PREB for review | | |
| ☐ | Review and agree with LUMA the dispatch schedule for first 4 weeks and ready to support | | |
| ☐ | Fuel inventory adequate for dispatch schedule | | |
| ☐ | Fuel delivery schedule adequate to match long-term dispatch projection | | |
| ☐ | Site/team spare parts/inventory reviewed with PREPA counterpart | | |
| ☐ | Inventory is understood and support continued operation | | |
| | Begin the process for transitioning FCC licences for all radios | | |
| ☐ | Identified all necessary consumables, spare parts and capital spares needed for first 12 months of operation and communicated them to Owner and to PREB | | |
| ☐ | Established communication with potential site-level union officials | | |
| ☐ | Site or team level safety team formed and trained on Safety and Hazardous Materials Procedures Manual | | |
| ☐ | Genera PR and PREPA functional area leaders agreed handover is ready | | |

8

CONFIDENTIAL

7.4    **Key Milestones**

The mobilization process is expected to start immediately on the Effective Date and is expected to continue for 22 weeks. The following Gantt chart or similar document shall provide the key milestones for each scope of work ("week(s)" signifies the number of weeks or the applicable milestone activity displayed).

Within the first week, Operator's functional area leads shall meet with PREPA counterparts in Puerto Rico, consisting of virtual and multi-day, face-to-face meetings. During this time, Operator shall ensure that required insurance coverage is in place; review, revise, and send O&M and fuel procedures to the Administrator and PREB for approval; and update as needed the Safety Hazardous Procedures Manuals for each asset. Additionally, Operator shall begin working with the T&D System Operator, to ensure integration of the applicable Generation Emergency Response Procedures with the System Emergency Response Procedures.

Operator shall then begin recruiting existing PREPA employees, communicate Operator information and philosophies, and establish a recruiting team. Operator must schedule meetings with applicable unions and potential O&M Subcontractors who could perform some of the corrective maintenance activities for the Legacy Generation Assets.

Operator shall commence detailed planning for projects included in the initial work plan. This phase will consist of project and outage teams and determining unit outage requirements and any outage/derate work in coordination with the T&D System Operator.

Operator shall commence planning and integration for implementation of a fleet-wide CMMS, issue RFPs for power plant corrective maintenance and negotiate maintenance service agreements and make offers for positions in the Operator's organization.

Operator shall initiate a targeted training and qualification process on applicable topics and skills, utilizing Subcontractors when necessary.

In the last seven weeks, Operator shall begin implementation with IT Subcontractors to establish the necessary enterprise-wide workflow IT tools to enable operation, maintenance, inventory control, event reporting and tracking, employee development/training, and human performance improvement/safety.

CONFIDENTIAL

| Task | ID | 2022 | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Week 0 | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Week 19 | Week 20 | Week 21 | Week 22 |
| 1- Meet with PREPA Counterparts | 1-A | ■ | | | | | | | | | | | | | | | | | | | | | | |
| | 1-B | | ■ | | | | | | | | | | | | | | | | | | | | | |
| | 1-C | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 1-D | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 1-E | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| 2- Recruitment & Screening of PREPA Existing Employee | 2-A | ■ | ■ | | | | | | | | | | | | | | | | | | | | | |
| | 2-B | | | ■ | | | | | | | | | | | | | | | | | | | | |
| | 2-C | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | |
| 3- Meeting with Union Officers | 3-A | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | | |
| 4- Meet with Potential O&M Subcontractors | 4-A | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | | |
| 5- Commence Detailed Planning | 5-A | | ■ | | | | | | | | | | | | | | | | | | | | | |
| | 5-B | | | | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | |
| | 5-C | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 5-D | | | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ |
| 6- Kick off Planning and Integration | 6-A | | | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| 7- Issue RFPs | 7-A | | | ■ | ■ | | | | ■ | ■ | ■ | | | | | | | | | | | | | |
| 8- Hire Employees | 8-A | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | | | | |
| 9- Assessment of Abilities and Skills | 9-A | | | | | | | | | | | | ■ | ■ | ■ | ■ | | | | | | | | |
| 10- Initiate Targeted Training | 10-A | | | | | | | | | | | | | | | | | | | ■ | ■ | ■ | | |
| 11- Begin Implementation of IT Subcontractors | 11-A | | | | | | | | | | | | | | | | | ■ | ■ | ■ | | | | |
| 12 - Establish recurring meetings with Grid Operator (LUMA) | 12-A | | | | | ■ | | | | | | | | | | | | | | | | | | |
| | 12-B | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ |
| | 12-C | | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ |
| 13 - Update Communication Plan | 13-A | | | | | | | | | | | | | | | | | | | | | ■ | ■ | ■ |
| 14 - Review and Revise as needed the Invoice Review and Approval Process Manual | 14-A | | | | | | | | | | | | | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ |

This time frame will further involve work with the T&D System Operator to revise the two-year major maintenance schedule; an update to the Communications Plan, and revisions of the Invoice Review and Approval Process Manual, as needed and in accordance with the approved SOP's.

In addition, Operator must focus on three additional key items that are important to a successful Mobilization Period, which are:

- Build capacity for outage and project planning teams on site who are prepared to execute various plans;

CONFIDENTIAL

- Plan for and implement a day one acknowledgment, providing information to employees and the public on the mobilization, thanking employees for their work leading up to the mobilization, and celebrating the path forward for the people of Puerto Rico.

11

CONFIDENTIAL

## Annex VIII

## PREPA-Genco-Hydroco Operating Agreement

CONFIDENTIAL

**PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT**

**dated as of
_____, 202[●]**

**THE PUERTO RICO ELECTRIC POWER AUTHORITY**
as Owner of the T&D System,

**[PREPA GENCO, LLC]**
as Owner of the Legacy Generation Assets,

**[PREPA HYDROCO, LLC]**
as Owner of the Hydropower Assets,

**LUMA ENERGY SERVCO, LLC**
as T&D Operator,

**and**

**THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY**
as Administrator

CONFIDENTIAL

## TABLE OF CONTENTS

Page

Article 1 Definitions; Interpretation.................................................................2
Section 1.1    Definitions.................................................................2
Section 1.2    Interpretation; Construction.................................................10

Article 2 Effective Date; Term; AGENT DESIGNATION...................................11
Section 2.1    Effective Date.................................................11
Section 2.2    Term.................................................................11
Section 2.3    Agent Designation.................................................12

Article 3 Budgets and Accounts.................................................12
Section 3.1    Generation Budget Preparation.................................................12
Section 3.2    Generation Budget Amendments.................................................16
Section 3.3    Funding of Accounts and Payment of Expenditures Generally.................16
Section 3.4    Genco O&M Charges.................................................17
Section 3.5    Genco Fuel Costs.................................................19
Section 3.6    Hydropower Costs.................................................20

Article 4 Dispatch; Ownership, Operation And Maintenance Of Interconnection Facilities; Records; Metering; Ancillary Services; Decommissioning; Agreed Operating Procedures.................................................20
Section 4.1    Dispatch.................................................21
Section 4.2    Ownership, Operation and Maintenance of Interconnection Facilities.........21
Section 4.3    Records and Information.................................................21
Section 4.4    Metering.................................................22
Section 4.5    Ancillary Services.................................................22
Section 4.6    Decommissioning.................................................22
Section 4.7    Agreed Operating Procedures.................................................22

Article 5 Indemnification.................................................23
Section 5.1    Indemnification.................................................23

Article 6 Termination.................................................23
Section 6.1    Termination.................................................23

Article 7 Representations and Warranties.................................................23
Section 7.1    Representations and Warranties.................................................23
Section 7.2    Compliance with Applicable Law.................................................24

Article 8 Miscellaneous.................................................24
Section 8.1    Notices.................................................24
Section 8.2    Amendments.................................................25
Section 8.3    Entire Agreement.................................................26
Section 8.4    Assignment and Transfer.................................................26
Section 8.5    Severability.................................................26
Section 8.6    Survival.................................................26

iii

CONFIDENTIAL

Section 8.7      Counterparts ................................................................................27
Section 8.8      Governing Law ............................................................................27
Section 8.9      PREB Actions ..............................................................................27
Section 8.10     FOMB Powers .............................................................................27
Section 8.11     Joinder .........................................................................................27


Annex I   –      Form of Interconnection Agreement
Annex II  –      Form of Agreed Operating Procedures
Annex III –      Form of Joinder Agreement

CONFIDENTIAL

## PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT

This PUERTO RICO PREPA-GENCO-HYDROCO OPERATING AGREEMENT (this "Agreement") is made and entered into as of [●], 2023 by and among: (i) the Puerto Rico Electric Power Authority ("PREPA"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941, as amended, known as the "Puerto Rico Electric Power Authority Act"; (ii) [*PREPA Genco LLC*] ("Genco"), a public limited liability company and governmental instrumentality of the Commonwealth, created under Act No. 164 of the Legislative Assembly of Puerto Rico, enacted on December 16, 2009, as amended, known as the "Puerto Rico General Corporations Act" ("Act 164"); (iii) [*PREPA Hydroco LLC*] ("Hydroco"), a public limited liability company and governmental instrumentality of the Commonwealth, created under Act 164; (iv) LUMA Energy ServCo, LLC, in its capacity as "Operator" pursuant to the T&D O&M Agreement (as defined below) ("T&D Operator"), a limited liability company organized under the laws of the Commonwealth; and (v) the Puerto Rico Public-Private Partnerships Authority ("Administrator" and, together with PREPA, Genco, Hydroco and T&D Operator, the "Parties" and each, a "Party"), a public corporation of the Commonwealth, created under Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009, as amended, known as the "Public-Private Partnership Authority Act" ("Act 29"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1.

## RECITALS

**WHEREAS**, PREPA owns and leases the transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which PREPA has an ownership or leasehold interest (the "T&D System");

**WHEREAS**, PREPA underwent a reorganization pursuant to which PREPA: (a) (i) created Genco, a wholly-owned subsidiary of PREPA; and (ii) transferred to Genco all of its thermal generation plants and the fuel contracts, assets and personnel related thereto (the "Legacy Generation Assets"), including those transferred to Genco pursuant to the Genco Capital Contribution Agreement; (b) (i) created Hydroco, a wholly-owned subsidiary of PREPA; and (ii) transferred to Hydroco all of its hydroelectric generating units, the public irrigation facilities and the assets related thereto (the "Hydropower Assets"), including those transferred to Hydroco pursuant to the Hydroco Capital Contribution Agreement; and (c) transferred out of PREPA to a wholly-owned subsidiary of PREPA certain other assets unrelated to the T&D System, the Legacy Generation Assets or the Hydropower Assets;

**WHEREAS**, as a result of such reorganization and associated transfers, (a) Genco owns the Legacy Generation Assets and (b) Hydroco owns the Hydropower Assets;

**WHEREAS**, PREPA, Administrator and T&D Operator have entered into that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of June 22, 2020 (as amended, modified or supplemented from time to time in accordance with its terms, the "T&D O&M Agreement"), pursuant to which T&D Operator (a) took over the operation and management of the T&D System, including certain administrative, managerial and

1

CONFIDENTIAL

operational services, on June 1, 2021 and (b) assumed the role as T&D System operator, including (i) managing control center operations, including generation scheduling and economic/reliable T&D System dispatch; (ii) balancing the supply and demand of electricity, including reacting to changes in demand in real time, adjusting generation dispatch to be in balance with demand and maintaining the T&D System at safe operating levels in accordance with Prudent Utility Practices (as defined in the T&D O&M Agreement) and the System Operation Principles; (iii) conduct T&D System planning activities; (iv) develop and implement reliability standards appropriate for the conditions in the Commonwealth; and (v) manage a transparent, equitable and open generator interconnection process;

WHEREAS, Genco, Administrator and the Person selected by the partnership committee established by Administrator (as defined below) on July 13, 2020 pursuant to Section 5 of Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018, as amended, known as the "Puerto Rico Electric System Transformation Act" and the provisions of Act 29 ("Genco Operator") expect to enter into that certain Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the ("Generation O&M Agreement"), pursuant to which Genco Operator would take over the operation and maintenance of the Legacy Generation Assets, including certain administrative, managerial and operational services;

WHEREAS, prior to Genco Operator taking over the operation and maintenance of the Legacy Generation Assets pursuant to the Generation O&M Agreement, Genco will continue to be responsible for the operation and maintenance of the Legacy Generation Assets;

WHEREAS, Hydroco will be responsible for the operation and maintenance of the Hydropower Assets; and

WHEREAS, given that the Legacy Generation Assets and the Hydropower Assets have been split from the T&D System such that (a) each of the T&D System, the Legacy Generation Assets and the Hydropower Assets are owned by separate corporate entities and (b) each of the T&D System, the Legacy Generation Assets and the Hydropower Assets are operated and maintained by separate corporate entities, the Parties wish to coordinate certain matters with respect to the Legacy Generation Assets and the Hydropower Assets.

NOW THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

## Article 1

## DEFINITIONS; INTERPRETATION

Section 1.1    Definitions. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"Act 164" has the meaning set forth in the introductory paragraph.

"Act 29" has the meaning set forth in the introductory paragraph.

2

CONFIDENTIAL

"Administrator" has the meaning set forth in the introductory paragraph.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person.

"Agreed Operating Procedures" has the meaning set forth in Section 4.7, and includes any Agreed Operating Procedures entered into on or before the Effective Date between T&D Operator and PREPA, as the case may be, with respect to the Legacy Generation Assets or the Hydropower Assets, respectively, as may be updated or amended from time to time.

"Agreement" has the meaning set forth in the introductory paragraph.

"Ancillary Services" has the meaning set forth in Section 4.5.

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, PROMESA and any order issued by the Title III Court, in each case applicable to the Parties.

"Budget Allocation Meeting" has the meaning set forth in Section 3.1(b)(i).

"Budgets" has the meaning set forth in Section 3.1(b)(i).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq.

"Commonwealth" has the meaning set forth in the introductory paragraph.

"Consent Decree" means the Consent Decree between PREPA and the United States of America (through the United States Department of Justice and the EPA), as entered by the United States District Court for the District of Puerto Rico on March 19, 1999 in Civil Action No. 93-2527(CCC), as modified on September 9, 2004, and as may be further modified in the future, including any successor consent decree thereto.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of a Person (other than an individual), whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to Control another Person (a) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (b) if such Person has the direct or indirect power, whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise, to designate a majority of the board of directors (or equivalent governing body) of such other Person.

3

CONFIDENTIAL

"Dispatch" means the scheduling and control, directly or indirectly, manually or automatically, by T&D Operator of the generation of the Generation Units at each Legacy Generation Asset or Hydropower Asset in order to increase or decrease the electrical energy delivered to the T&D System in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

"Effective Date" has the meaning set forth in Section 2.1.

"Electricity" means the electrical energy, capacity and Ancillary Services available from one or more of the Legacy Generation Assets or one or more of the Hydropower Assets.

"Environmental Law" means (a) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body, and (b) any consent order or decree, settlement agreement or other similar agreement between PREPA, Genco and/or Hydroco and the Puerto Rico Department of Natural and Environmental Resources, EPA, the United States Department of Justice, or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (i) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (ii) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (iii) the storage, treatment, disposal, recycling or transportation of any Hazardous Material or (iv) human health or safety. For the avoidance of doubt, Environmental Law includes the Consent Decree.

"EPA" means the United States Environmental Protection Agency.

"Fiscal Year" means the period from July 1 through June 30 of the following year. Any computation made on the basis of a Fiscal Year shall be adjusted on a Pro Rata basis to take into account any Fiscal Year of less than 365/366 days.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"Fuel Charge Adjustment" means the applicable cost recovery rate provision, as approved by PREB from time to time pursuant to Applicable Law.

"Fuel Costs" means the costs and expenses related to fuel incurred by Genco which PREB approves for recovery from monies collected through the Fuel Charge Adjustment, net of any proceeds received by or on behalf of Genco from the sale of fuel.

"Genco" has the meaning set forth in the introductory paragraph and is subject to Section 1.2(d).

"Genco Accounts Funding Notice" has the meaning set forth in Section 3.3(a).

"Genco Budget" means, for any given Fiscal Year, the budget of (a) the non-fuel expenditures required to operate and maintain the Legacy Generation Assets and to provide the Genco Decommissioning Services for such Fiscal Year, together with the projected budget for the following two (2) Fiscal Years, in each case including monthly budgets of such expenditures and

4

CONFIDENTIAL

cash flows, and (b) any Genco Operator Fees, as such budget may be amended or adjusted from time to time with the approval of PREB; provided that in the event the amounts in clauses (a) and (b) for a given Fiscal Year have not been finalized in accordance with Section 3.1(d)(iii) by July 1 of such Fiscal Year, the applicable approved Genco Budget for the immediately preceding Fiscal Year (as the same may have been amended) shall remain in effect as a default budget until such time as the applicable Genco Budget for such Fiscal Year is so finalized; provided, further, that any such default budget shall be compliant with the then-applicable Rate Order.

"Genco Budget Notice" has the meaning set forth in Section 3.1(d)(ii).

"Genco Capital Contribution Agreement" means [that certain capital contribution agreement entered into on or prior to the Effective Date between PREPA and Genco pursuant to which PREPA transferred to Genco the Legacy Generation Assets].

"Genco Decommissioning Services" means the permitting, demolition, decontamination and dismantling or preparation for conversion, as applicable, of any of the Legacy Generation Assets, for waste disposal and for achievement of end-state conditions within a prescribed time, all of which, including costs, has been approved by PREB.

"Genco Fuel Account" has the meaning set forth in Section 3.5(b)(i).

"Genco Fuel Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Genco Accounts Funding Notice) in any given month, the amount required to replenish the Genco Fuel Account so as to maintain on such day an aggregate funding level in the Genco Fuel Account and the Other Genco Fuel Accounts equal to the sum of the forecasted Fuel Costs as approved by PREB for the subsequent two (2) months (which amount shall be the minimum working capital level that is required for purposes of this Agreement), taking into account all funds on deposit in the Genco Fuel Account and the Other Genco Fuel Accounts as of such day. For the avoidance of doubt, if at any time during the Term the forecasted Fuel Costs as approved by PREB for one (1) or more of the subsequent two (2) months do not exist, then the forecasted Fuel Costs as approved by PREB for the most recent prior one (1) month shall be used.

"Genco Interconnection Facilities" means all assets, equipment and facilities located on Genco's side of each Interconnection Point, installed, operated and maintained by or on behalf of Genco for the purpose of interconnecting each Legacy Generation Asset to the T&D System, as further described in the LGA Interconnection Agreement.

"Genco Operating Account" has the meaning set forth in Section 3.4(b)(i).

"Genco Operating Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Genco Accounts Funding Notice) in any given month, the amount required to replenish the Genco Operating Account so as to maintain on such day an aggregate funding level in the Genco Operating Account, the Other Genco Operating Accounts, the Hydroco Operating Account and the Other Hydroco Operating Accounts equal to the sum of the then-approved Genco Budget and Hydroco Budget for the subsequent two (2) months, taking into account all funds on deposit in the Genco Operating Account, the Other Genco

5

CONFIDENTIAL

Operating Accounts, the Hydroco Operating Account and the Other Hydroco Operating Accounts as of such day.

"Genco Operator" has the meaning set forth in the Recitals and is subject to Section 1.2(d).

"Genco Operator Effective Date" has the meaning set forth in Section 1.2(d).

"Genco Operator Fees" means the maximum amounts for fixed and incentive compensation available to Genco Operator in a given Fiscal Year pursuant to the Generation O&M Agreement.

"Generation Budget" means, for any given Fiscal Year, the combination of the Genco Budget and the Hydroco Budget for such Fiscal Year.

"Generation O&M Agreement" has the meaning set forth in the Recitals.

"Generation Pass-Through Expenditures" means the costs and expenses (without markup for profit) incurred by or on behalf of Genco or Hydroco in the course of providing Electricity, including the costs and expenses incurred under this Agreement.

"Generation Unit" means each of the individual combustion or gas turbine generator units, steam turbine generator units and hydropower or irrigation generator units of each Legacy Generation Asset or each Hydropower Asset.

"Governmental Body" means any U.S. federal, state, Commonwealth, regional, municipal or local legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than PREPA, Genco and Hydroco, and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Hazardous Material" means: (a) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (b) any oil or petroleum product, lead-based paint, per- or polyfluoroalkyl substances or polychlorinated biphenyl; and (c) any other pollutant, contaminant, material, substance or waste that has deleterious or hazardous properties and that is listed, defined or is subject to regulation under any Environmental Law.

"Hydroco" has the meaning set forth in the introductory paragraph.

"Hydroco Account Funding Notice" has the meaning set forth in Section 3.3(b).

"Hydroco Budget" means, for any given Fiscal Year, the budget of the non-fuel expenditures required to operate and maintain the Hydropower Assets and to provide the Hydroco Decommissioning Services for such Fiscal Year, together with the projected budget for the following two (2) Fiscal Years, in each case including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time with the approval of

6

CONFIDENTIAL

PREB; provided that in the event the amounts above for a given Fiscal Year have not been finalized in accordance with Section 3.1(d)(iii) by July 1 of such Fiscal Year, the applicable approved Hydroco Budget for the immediately preceding Fiscal Year (as the same may have been amended in accordance with this Agreement) shall remain in effect as a default budget until such time as the applicable Hydroco Budget for such Fiscal Year is so finalized; provided, further, that any such default budget shall be compliant with the then-applicable Rate Order and to the extent it is not so compliant such default budget shall be reduced so as to be compliant with the then-applicable Rate Order.

"Hydroco Budget Notice" has the meaning set forth in Section 3.1(c)(ii).

"Hydroco Capital Contribution Agreement" means [that certain capital contribution agreement entered into on or prior to the Effective Date between PREPA and Hydroco pursuant to which PREPA transferred to Hydroco the Hydropower Assets].

"Hydroco Decommissioning Services" means the permitting, demolition, decontamination and dismantling or preparation for conversion, as applicable, of any of the Hydropower Assets, for waste disposal and for achievement of end-state conditions within a prescribed time, all of which, including costs, has been approved by PREB.

"Hydroco Interconnection Facilities" means all assets, equipment and facilities located on Hydroco's side of each Interconnection Point, installed, operated and maintained by or on behalf of Hydroco for the purpose of interconnecting each Hydropower Asset to the T&D System, as further described in the Hydropower Interconnection Agreement.

"Hydroco Operating Account" has the meaning set forth in Section 3.6(b)(i).

"Hydroco Operating Account Deposit" means, as of a given day (not more than two (2) Business Days before the date of the applicable Hydroco Account Funding Notice) in any given month, the amount required to replenish the Hydroco Operating Account so as to maintain on such day an aggregate funding level in the Hydroco Operating Account and the Other Hydroco Operating Accounts equal to the then-approved Hydroco Budget for the subsequent two (2) months, taking into account all funds on deposit in the Hydroco Operating Account and the Other Hydroco Operating Accounts as of such day.

"Hydropower Assets" has the meaning set forth in the Recitals.

"Hydropower Cost" has the meaning set forth in Section 3.6(a).

"Hydropower Interconnection Agreement" means that certain interconnection agreement to be entered into on or about the Effective Date between PREPA and Hydroco with respect to the interconnection of the T&D System and the Hydropower Assets substantially and in all material respects in the form of Annex I.

"Initial Generation Budget" means the Generation Budget approved by PREB or certified by the FOMB and effective from July 1, 2023, through June 30, 2024, which Initial Generation Budget is consistent with the applicable Rate Order then in effect.

7

CONFIDENTIAL

"Interconnection Agreements" means the LGA Interconnection Agreement and the Hydropower Interconnection Agreement.

"Interconnection Facilities" means the Genco Interconnection Facilities, the Hydroco Interconnection Facilities and the T&D Interconnection Facilities, as the case may be.

"Interconnection Point" means, (a) with respect to each Legacy Generation Asset, the physical demarcation point between the applicable Genco Interconnection Facilities, on the one hand, and the applicable T&D Interconnection Facilities, on the other hand, where Electricity from such Legacy Generation Asset is delivered or made available to the T&D System, and (b) with respect to each Hydropower Asset, the physical demarcation point between the applicable Hydroco Interconnection Facilities, on the one hand, and the applicable T&D Interconnection Facilities, on the other hand, where Electricity from such Hydropower Asset is delivered or made available to the T&D System. The Interconnection Points are further described in the LGA Interconnection Agreement and the Hydropower Interconnection Agreement.

"Joinder Agreement" has the meaning set forth in Section 8.11.

"Legacy Generation Assets" has the meaning set forth in the Recitals.

"LGA Interconnection Agreement" means that certain interconnection agreement to be entered into on or about the Effective Date between PREPA and Genco with respect to the interconnection of the T&D System and the Legacy Generation Assets substantially and in all material respects in the form of Annex I.

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" has the meaning set forth in Section 5.1(a).

"O&M Charge" has the meaning set forth in Section 3.4(a).

"Other Genco Fuel Accounts" has the meaning set forth in Section 3.5(b)(i).

"Other Genco Operating Accounts" has the meaning set forth in Section 3.4(b)(i).

"Other Hydroco Operating Accounts" has the meaning set forth in Section 3.6(b)(i).

"Other PREPA Budgets" has the meaning set forth in Section 3.1(b)(i).

"Party" or "Parties" has the meaning set forth in the introductory paragraph.

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership,

8

CONFIDENTIAL

limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energía de Puerto Rico*, an independent body created under Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014, as amended, known as the "Puerto Rico Energy Transformation and RELIEF Act".

"PREB Actions" has the meaning set forth in Section 8.9.

"PREPA" has the meaning set forth in the introductory paragraph.

"PREPA Fuel Account" means the fuel account established by PREPA pursuant to Section 7.5(e)(i)(B) of the T&D O&M Agreement.

"PREPA Generation Expenditures Account" means the account established by PREPA pursuant to Section 7.5(e)(i) of the T&D O&M Agreement solely for purposes of funding O&M Charges and Hydropower Costs pursuant to this Agreement.

"Pro Rata" and similar expressions mean an adjustment to a cost, payment or other amount due over a period of time to account for it accruing over only a portion of such period.

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Rate Order" means any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of a Rate Order Modification Request and the subsequent rate review proceeding.

"Rate Order Modification Request" means any application submitted from time to time, or as otherwise required by Applicable Law or ordered by PREB, by T&D Operator to PREB requesting a change in customer rates or charges.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"System Operation Principles" means the operation principles conditionally approved by PREB on June 1, 2021, and available on T&D Operator's website at https://lumapr.com/, as may be amended from time to time in accordance with Applicable Law, including any operation procedures established in connection therewith, as may be amended from time to time.

"T&D Budget" has the meaning set forth in Section 3.1(b)(i).

"T&D Interconnection Facilities" means all assets, equipment and facilities located on PREPA's side of each Interconnection Point, installed, operated and maintained by or on behalf of PREPA for the purpose of interconnecting each Legacy Generation Asset or each Hydropower Asset to the T&D System, as further described in the applicable Interconnection Agreement.

9

CONFIDENTIAL

"T&D O&M Agreement" has the meaning set forth in the Recitals.

"T&D Operator" has the meaning set forth in the introductory paragraph.

"T&D System" has the meaning set forth in the Recitals.

"Term" has the meaning set forth in Section 2.2.

"Title III Case" means PREPA's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

"United States" or "U.S." means the United States of America.

**Section 1.2    Interpretation; Construction.**

(a)    Headings. The table of contents and titles and headings to articles and sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections" and "Annexes" are intended to refer to Articles and Sections of this Agreement and Annexes to this Agreement.

(b)    Annexes. The Annexes referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence will govern: (i) this Agreement, (ii) the System Operation Principles, (iii) the applicable Agreed Operating Procedure, and (iv) the applicable Interconnection Agreement, unless, and then only to the extent that, PREB specifically provides otherwise.

(c)    Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

10

CONFIDENTIAL

(d)    Genco and Genco Operator. Notwithstanding anything to the contrary contained in this Agreement: (i) all references to Genco Operator in Articles 1 through 8 (other than Section 8.11 which shall be effective as of the Effective Date) shall not be effective until the date ("Genco Operator Effective Date") on which (A) Genco Operator and the Parties have executed and delivered the Joinder Agreement pursuant to Section 8.11 and (B) Genco Operator is authorized to begin providing operation, maintenance and related services for the Legacy Generation Assets pursuant to the Generation O&M Agreement; and (ii) where there is a reference in this Agreement to "Genco and Genco Operator" or "Genco or Genco Operator" such reference (other than such reference in Section 2.2) shall be deemed to be a reference only to "Genco Operator" effective as of the Genco Operator Effective Date.

(e)    Days, Months and Years. In this Agreement, (i) all references to days herein are references to calendar days, unless specified as Business Days, (ii) all references to months herein are references to calendar months, unless specified otherwise, and (iii) all references to years herein are references to calendar years, unless specified otherwise.

(f)    Accounting Principles. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

## Article 2
## EFFECTIVE DATE; TERM; AGENT DESIGNATION

**Section 2.1    Effective Date**. This Agreement shall become effective on the date that it is executed by the Parties (the "Effective Date"), by which execution the Parties acknowledge and agree that the following conditions have been satisfied:

(a)    receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to PREPA, Genco, Hydroco and T&D Operator, authorizing the execution, delivery and performance by Administrator of this Agreement and the transactions contemplated hereby;

(b)    receipt by the Parties of approval from PREB, in form and substance reasonably acceptable to Administrator, PREPA, Genco, Hydroco and T&D Operator, approving the form and substance of this Agreement, the Agreed Operating Procedures and the Interconnection Agreements; and

(c)    receipt by the Parties of approval from the relevant Governmental Body(ies), in form and substance reasonably acceptable to Administrator, PREPA, Genco, Hydroco and T&D Operator, approving the reorganization of PREPA, including the formation of Genco and Hydroco.

**Section 2.2    Term**.

(a)    This Agreement shall remain in full force and effect from the Effective Date through the date on which all the Legacy Generation Assets and Hydropower Assets have been decommissioned, unless earlier terminated in accordance with the terms hereof (such period of time, the "Term").

11

CONFIDENTIAL

(b)    If all of the Legacy Generation Assets have been decommissioned and one or more of the Hydropower Assets remains operational, then this Agreement shall continue in effect and the Parties shall amend this Agreement to reflect the removal of Genco and Genco Operator as parties to this Agreement and such other changes as may be necessary and mutually acceptable to the Parties. If all of the Hydropower Assets have been decommissioned and one or more of the Legacy Generation Assets remains operational, then this Agreement shall continue in effect and the Parties shall amend this Agreement to reflect the removal of Hydroco as a party to this Agreement and such other changes as may be necessary and mutually acceptable to the Parties.

(c)    If the T&D O&M Agreement is terminated, then unless T&D Operator assigns all of its rights and obligations under this Agreement to a Person other than PREPA and is relieved of all such obligations and liabilities, PREPA shall assume all of the rights and obligations of T&D Operator under this Agreement and T&D Operator shall be relieved of all such obligations and liabilities. If the Generation O&M Agreement is terminated, then unless Genco Operator assigns all of its rights and obligations under this Agreement to a Person other than Genco and is relieved of all such obligations and liabilities, Genco shall assume all of the rights and obligations of Genco Operator under this Agreement and Genco Operator shall be relieved of all such obligations and liabilities.

**Section 2.3    Agent Designation**. T&D Operator will act as agent for PREPA under this Agreement in accordance with the T&D O&M Agreement. At such time as the Generation O&M Agreement is executed and becomes effective, Genco Operator will act as agent for Genco under this Agreement in accordance with the Generation O&M Agreement. If at any time (a) more than one Person is operating and maintaining the Legacy Generation Assets, or (b) more than one Person is operating and maintaining the Hydropower Assets, then, in each case, the Parties shall amend this Agreement to reflect such changes as may be necessary and mutually acceptable to the Parties.

## Article 3
## BUDGETS AND ACCOUNTS

**Section 3.1    Generation Budget Preparation**.

(a)    Generally.

(i)    If the Effective Date occurs in Fiscal Year 2023, then the Initial Generation Budget shall be used. If the Effective Date occurs after Fiscal Year 2023, then the then-approved Generation Budget shall be used. Thereafter, for any Fiscal Year in which a rate adjustment approved by PREB pursuant to a Rate Order Modification Request enters into effect, the Generation Budget used in connection with obtaining such rate adjustment shall be used.

(ii)    Except as provided in Section 3.1(a)(i), the Generation Budget shall be prepared in accordance with the budget preparation process described in Section 3.1(b), Section 3.1(c) and Section 3.1(d).

12

CONFIDENTIAL

(b)     Budget Allocation Meeting.

(i)     Except as provided in Section 3.1(a)(i), for any Fiscal Year in which there is a single base rate covering each of the T&D System and related assets, the Legacy Generation Assets and the Hydropower Assets, Administrator, T&D Operator, Hydroco, PREPA, Genco and Genco Operator, shall no later than one hundred twenty-five (125) days prior to the commencement of the relevant Fiscal Year meet, to determine the allocation of such base rate and the resulting revenues among the non-generation budgets T&D Operator must prepare pursuant to the T&D O&M Agreement (collectively, the "T&D Budget"), the Genco Budget, the Hydroco Budget and the budgets for PREPA and its subsidiaries other than Genco and Hydroco (the "Other PREPA Budgets" and, together with the Genco Budget, Hydroco Budget and T&D Budget, the "Budgets"), which allocation shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order (such meeting, the "Budget Allocation Meeting"). For the avoidance of doubt, for any Fiscal Year in which there is a Budget Allocation Meeting, T&D Operator, Hydroco, PREPA, Genco and Genco Operator shall prepare and propose Budgets that are consistent with, and based on, the amount of funds allocated to each of the Budgets consistent with the terms of this Section 3.1(b).

(ii)    If, during the Budget Allocation Meeting for a Fiscal Year, T&D Operator, Hydroco, PREPA, Genco and Genco Operator are unable to reach agreement on the allocation of the base rate among the Budgets for such Fiscal Year, then Administrator shall, within five (5) days of the Budget Allocation Meeting, determine the final allocation of the base rate among the Budgets for such Fiscal Year; provided that such determination shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order.

(iii)   If after the Budget Allocation Meeting is held for a Fiscal Year pursuant to this Section 3.1(b) but before the start of such Fiscal Year the load forecast on which the allocation of the base rate was based changes, then Administrator, T&D Operator, Hydroco, PREPA, Genco and Genco Operator shall, as promptly as practicable, meet to determine the allocation of the base rate based on the new load forecasts among the Budgets, which allocation shall be proportionate to, and consistent with, the cost allocation among the Budgets in the applicable Rate Order.

(c)     Hydroco Budget Preparation.

(i)     Except as provided in Section 3.1(a)(i) and subject to the requirements of Section 3.1(b), for any Fiscal Year, Hydroco shall prepare the proposed Hydroco Budget for such Fiscal Year and, no later than one hundred fifteen (115) days prior to the commencement of the relevant Fiscal Year, submit to Genco and Genco Operator the proposed Hydroco Budget for such Fiscal Year. Upon receipt by Genco and the Genco Operator of the proposed Hydroco Budget, Genco and Genco Operator shall, acting reasonably, review the proposed Hydroco Budget to ensure compliance with the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year.

(ii)    If Genco or Genco Operator reasonably believes the proposed Hydroco Budget does not comply with the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year, then Genco and Genco Operator shall notify Administrator,

13

Case 3:26-cv-01423-PAD    Document 2-1    Filed 06/30/26    Page 689 of 768

CONFIDENTIAL

with copy to Hydroco, in writing of such potential non-compliance ("Hydroco Budget Notice"), which potential non-compliance shall be addressed as set forth in Section 3.1(d)(iii).

(d)    Genco Budget Preparation.

(i)    Except as provided in Section 3.1(a)(i) and subject to the requirements of Section 3.1(b), for any Fiscal Year, Genco and Genco Operator shall prepare the proposed Genco Budget for such Fiscal Year, consolidate such proposed Genco Budget with the proposed Hydroco Budget prepared in accordance with Section 3.1(c) and, no later than one hundred five (105) days prior to the commencement of the relevant Fiscal Year, submit to T&D Operator the proposed Generation Budget for such Fiscal Year.

(ii)    No later than ninety (90) days prior to the commencement of the Fiscal Year, T&D Operator shall submit to Administrator (A) the Generation Budget provided by Genco and Genco Operator pursuant to Section 3.1(d)(i) and (B) the T&D Budget, which proposed budgets T&D Operator shall have consolidated prior to their delivery to Administrator pursuant to Section 7.3(a) of the T&D O&M Agreement. If T&D Operator believes the proposed Generation Budget provided by Genco and Genco Operator to T&D Operator for consolidation with the T&D Budget does not comply with: (I) the applicable Rate Order, (II) any PREB-approved directive or requirement applicable to Hydroco, Genco or PREPA, (III) Applicable Law or (IV) the budget allocation of the base rate determined pursuant to Section 3.1(b) for such Fiscal Year, then T&D Operator, acting reasonably, may deliver to Administrator, with copy to Hydroco, Genco and Genco Operator, a written explanation of the potential issues with the proposed Generation Budget ("Genco Budget Notice"), which potential non-compliance shall be addressed as set forth in Section 3.1(d)(iii).

(iii)    Once Administrator has received the proposed Generation Budget and the proposed T&D Budget, Administrator shall review the budgets to ensure compliance with the applicable Rate Order. Within forty-five (45) days following its receipt of such budgets, Administrator shall notify T&D Operator, Hydroco, Genco and Genco Operator whether the proposed budgets are compliant with the applicable Rate Order, and shall request, acting reasonably, any changes or modifications to the proposed budgets to conform the proposed budgets with the applicable Rate Order. In the event that a Hydroco Budget Notice or a Genco Budget Notice was delivered to Administrator, then Genco and Genco Operator, T&D Operator and, if applicable, Hydroco shall, as promptly as practicable, and, in any event, within the thirty (30) day period following receipt by Administrator of the proposed budgets, meet with Administrator and collaborate in good faith to resolve any differences with respect to the proposed budgets to ensure compliance with the applicable Rate Order, provided that if Administrator, Genco and Genco Operator, T&D Operator and, if applicable, Hydroco, collaborating in good faith cannot resolve any such differences with respect to the proposed budgets to ensure compliance with the applicable Rate Order, then any of Genco and Genco Operator, T&D Operator and, if applicable, Hydroco can seek resolution before PREB of any such differences with respect to the proposed budgets. For the avoidance of doubt, unless otherwise directed by PREB, in no event shall T&D Operator, Genco and Genco Operator or Hydroco seek resolution before PREB of any differences with

14

CONFIDENTIAL

respect to the proposed Generation Budget prior to meeting with Administrator as required by Section 3.1(d)(iii).

(e)    PREB Rate Proceedings.

(i)    Notwithstanding anything to the contrary contained in Section 3.1(c) or Section 3.1(d), for any Fiscal Year in which the proposed Generation Budget or the proposed T&D Budget requires a rate adjustment to be approved by PREB, T&D Operator shall have the right, at its sole discretion, to submit the proposed Generation Budget or the proposed T&D Budget for such Fiscal Year, together with a Rate Order Modification Request, directly to PREB rather than to Administrator.

(ii)    If T&D Operator plans to submit to PREB a Rate Order Modification Request which contemplates modifications to the Generation Budget, then T&D Operator shall provide written notice to Genco and Genco Operator at least sixty (60) days prior to the date on which it plans to submit such Rate Order Modification Request and, upon receipt of such notice, Genco and Genco Operator shall cooperate in good faith with T&D Operator and Administrator to prepare a proposed Generation Budget to be included in or otherwise form the basis of such Rate Order Modification Request. Genco and Genco Operator shall provide reasonable further support to T&D Operator through any applicable proceedings arising in connection with the Rate Order Modification Request, including providing any information requested by PREB that is within its possession or control.

(iii)    In the event that the Rate Order Modification Request that T&D Operator plans to submit to PREB pursuant to Section 3.1(e)(ii) contemplates modifications to the Hydroco Budget portion of the Generation Budget, Genco and Genco Operator shall (A) notify Hydroco as soon as practicable upon receipt of notice from T&D Operator of the contemplated Rate Order Modification Request and (B) collaborate with Hydroco in the preparation of the Hydroco Budget portion of the proposed Generation Budget to be included in or otherwise form the basis of such Rate Order Modification Request. Hydroco shall further support T&D Operator (and Genco and Genco Operator in supporting T&D Operator) through any applicable proceedings arising in connection with the Rate Order Modification Request.

(iv)    For the avoidance of doubt, any such Rate Order Modification Request shall be prepared and undertaken in accordance with the relevant requirements set forth under Applicable Law.

(v)    For the avoidance of doubt, nothing in this Agreement shall be construed to prohibit Genco and Genco Operator or Hydroco from soliciting an audience with PREB at any applicable proceedings arising in connection with the Rate Order Modification Request or otherwise in order to advocate for any positions it may have with respect to the Genco Budget or Hydroco Budget portion of the Generation Budget, as applicable. The Parties shall appear before PREB as may be requested by PREB in any proceedings arising in connection with a Rate Order Modification Request.

15

CONFIDENTIAL

**Section 3.2    Generation Budget Amendments**.

(a)    <u>Genco Budget Amendments</u>.

(i)    If in any Fiscal Year, Genco or Genco Operator becomes aware that Genco's expenditures for such Fiscal Year are expected to exceed the Genco Budget for such Fiscal Year, then (A) Genco and Genco Operator shall notify T&D Operator and Administrator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall and (C) as promptly as practicable, Genco and Genco Operator shall prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget and Generation Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(ii)    Notwithstanding anything to the contrary contained in this <u>Section 3.2(a)</u>, in the event that PREB takes any action or issues any order that could result in a change in the portion of rates that relate to the Legacy Generation Assets, then Genco and Genco Operator shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(b)    <u>Hydroco Budget Amendments</u>.

(i)    If in any Fiscal Year, Hydroco becomes aware that Hydroco's expenditures for such Fiscal Year are expected to exceed the Hydroco Budget for such Fiscal Year, then (A) Hydroco shall notify T&D Operator, Administrator, Genco and Genco Operator of the expected shortfall, (B) T&D Operator shall notify PREB of the expected shortfall, (C) as promptly as practicable, Hydroco shall prepare and submit to Genco and Genco Operator, with copy to T&D Operator and Administrator, the proposed amendments to the Hydroco Budget, which amendments must be consistent with the applicable Rate Order, and (D) as promptly as practicable, Genco and Genco Operator shall prepare and Genco and Genco Operator and Hydroco shall submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Genco Budget (which shall be based solely on incorporating the proposed amendments to the Hydroco Budget submitted by Hydroco to Genco and Genco Operator pursuant to <u>Section 3.2(b)(i)(C)</u>), which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

(ii)    Notwithstanding anything to the contrary contained in this <u>Section 3.2(b)</u>, in the event that PREB takes any action or issues any order that could result in a change to the portion of rates that relate to the Hydropower Assets, then Hydroco shall, as promptly as practicable, prepare and submit to PREB, with copy to T&D Operator and Administrator, the proposed amendments to the Hydroco Budget, which amendments must be consistent with the applicable Rate Order and shall require and be subject to approval by PREB.

**Section 3.3    Funding of Accounts and Payment of Expenditures Generally**.

(a)    <u>Genco Accounts</u>. Beginning in the month in which the Effective Date occurs and for each month thereafter, (i) no later than the fifth (5th) Business Day of each month,

16

CONFIDENTIAL

Genco and Genco Operator shall provide T&D Operator with written notice (the "Genco Accounts Funding Notice") of the Genco Operating Account Deposit and the Genco Fuel Account Deposit for the relevant month, together with (A) supporting calculations showing the individual components of the Genco Operating Account Deposit and the Genco Fuel Account Deposit and (B) a certification that the calculation of the Genco Operating Account Deposit and the Genco Fuel Account Deposit is complete and accurate and (ii) no later than the eleventh (11th) Business Day of each month, T&D Operator shall deposit into (A) the Genco Operating Account an amount equal to the Genco Operating Account Deposit for the relevant month and (B) the Genco Fuel Account an amount equal to the Genco Fuel Account Deposit for the relevant month; provided that if, in any given month, Genco or Genco Operator has failed to deliver to T&D Operator the Genco Accounts Funding Notice required by clause (i) of this Section 3.3(a), then T&D Operator shall have no obligation to deposit all or any portion of (1) the Genco Operating Account Deposit into the Genco Operating Account for such month and (2) the Genco Fuel Account Deposit into the Genco Fuel Account for such month. Notwithstanding anything to the contrary contained in this Agreement, (I) in no event shall T&D Operator be required to transfer into: (x) the Genco Operating Account more than the aggregate amount of funds deposited into the PREPA Generation Expenditures Account available for reimbursement of Generation Pass-Through Expenditures under the T&D O&M Agreement and O&M Charges and Hydropower Costs under the then-approved Genco Budget and Hydroco Budget, respectively; and (y) the Genco Fuel Account more than the aggregate amount of funds deposited into the PREPA Fuel Account and available for reimbursement of fuel supply expenses under the T&D O&M Agreement and the forecasted Fuel Costs as approved by PREB, and (II) in no event shall T&D Operator be obligated to make up or fund any underage.

(b)    Hydroco Account. Beginning in the month in which the Effective Date occurs and for each month thereafter, (i) no later than the fourth (4th) Business Day of each month, Hydroco shall provide Genco and Genco Operator with written notice (the "Hydroco Account Funding Notice") of the Hydroco Operating Account Deposit for the relevant month, together with (A) supporting calculations showing the individual components of the Hydroco Operating Account Deposit and (B) a certification that the calculation of the Hydroco Operating Account Deposit is complete and accurate, and (ii) no later than the twelfth (12th) Business Day of each month, Genco and Genco Operator shall deposit into the Hydroco Operating Account an amount equal to the Hydroco Operating Account Deposit for the relevant month; provided that if, in any given month, Hydroco has failed to deliver to Genco and Genco Operator the Hydroco Account Funding Notice required by clause (i) of this Section 3.3(b), then Genco and Genco Operator shall have no obligation to deposit all or any portion of the Hydroco Operating Account Deposit into the Hydroco Operating Account for such month. Notwithstanding anything to the contrary contained in this Agreement, in no event shall Genco and Genco Operator be required to transfer into the Hydroco Operating Account more than the aggregate amount of funds deposited into the Genco Operating Account, and in no event shall Genco or T&D Operator be obligated to make up or fund any underage.

**Section 3.4    Genco O&M Charges**.

(a)    Payment of O&M Charges. Genco shall pay all of its non-fuel costs and expenses, including any Genco Operator Fees payable to the Genco Operator under the Generation O&M Agreement, to the extent the Generation O&M Agreement has been executed, incurred in

17

CONFIDENTIAL

the course of operating and maintaining the Legacy Generation Assets (irrespective of Dispatch or the Electricity delivered or made available by Genco) and performing the Genco Decommissioning Services that are consistent with the then-approved Genco Budget (each such cost or expense, an "O&M Charge").

      (b)     <u>Genco Operating Account</u>.

      (i)     On or prior to the Effective Date, Genco shall establish an operating account relating to the Legacy Generation Assets and the Hydropower Assets (the "<u>Genco Operating Account</u>") into which T&D Operator shall deposit anticipated O&M Charges and Hydropower Costs from time to time in accordance with <u>Section 3.3(a)</u> and this <u>Section 3.4(b)</u> and from which Genco and Genco Operator shall withdraw funds from time to time only to (A) pay O&M Charges, (B) fund one or more operating accounts established by Genco which Genco and Genco Operator shall use only to pay O&M Charges ("<u>Other Genco Operating Accounts</u>"), and/or (C) fund the Hydroco Operating Account in accordance with <u>Section 3.6(b)(ii)</u>.

      (ii)     As of the Effective Date, T&D Operator shall deposit into the Genco Operating Account an amount equal to the anticipated O&M Charges and Hydropower Costs for the following month, based on the then-approved Generation Budget.

      (iii)     Neither Genco nor Genco Operator shall withdraw funds from the Genco Operating Account or the Other Genco Operating Accounts other than for Genco or Genco Operator to pay O&M Charges or, in the case of the Genco Operating Account, to fund the Hydroco Operating Account or one or more of the Other Genco Operating Accounts. Neither Genco nor Genco Operator shall withdraw funds from the Genco Operating Account or the Other Genco Operating Accounts to pay O&M Charges other than for Genco or Genco Operator to pay O&M Charges that are Generation Pass-Through Expenditures.

      (c)     <u>Reporting Requirements</u>.

      (i)     Simultaneous with each withdrawal of funds from the Genco Operating Account or the Other Genco Operating Accounts, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the O&M Charges being paid.

      (ii)     Not later than nine (9) Business Days following the end of each month, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the O&M Charges and Hydropower Costs actually incurred and paid using the funds transferred into the Genco Operating Account or the Other Genco Operating Accounts during the prior month and (B) a written certification that all such O&M Charges are Generation Pass-Through Expenditures.

18

CONFIDENTIAL

**Section 3.5    Genco Fuel Costs**.

(a)    <u>Payment of Fuel Costs</u>. Genco shall pay all of its Fuel Costs.

(b)    <u>Genco Fuel Account</u>.

(i)    On or prior to the Effective Date, Genco shall establish a fuel account (the "<u>Genco Fuel Account</u>") into which T&D Operator shall deposit anticipated Fuel Costs from time to time in accordance with <u>Section 3.3(a)</u> and this <u>Section 3.5(b)</u> and from which Genco or Genco Operator shall withdraw funds from time to time only to (A) pay Fuel Costs and/or (B) fund one or more fuel accounts established by Genco which Genco and Genco Operator shall use only to pay Fuel Costs ("<u>Other Genco Fuel Accounts</u>").

(ii)    As of the Effective Date, T&D Operator shall deposit into the Genco Fuel Account an amount equal to the anticipated Fuel Costs for the following month, based on the forecasted Fuel Costs as approved by PREB, which amount shall be the minimum working capital level contemplated by Section 7.5(e)(ii) of the T&D O&M Agreement.

(iii)    Neither Genco nor Genco Operator shall withdraw funds from the Genco Fuel Account or the Other Genco Fuel Accounts other than for Genco or Genco Operator to pay Fuel Costs or, in the case of the Genco Fuel Account, to fund one or more of the Other Genco Fuel Accounts. Neither Genco nor Genco Operator shall withdraw funds from the Genco Fuel Account or the Other Genco Fuel Accounts to pay Fuel Costs other than for Genco or Genco Operator to pay Fuel Costs that are Generation Pass-Through Expenditures.

(c)    <u>Reporting Requirements</u>.

(i)    Simultaneous with each withdrawal of funds from the Genco Fuel Account or the Other Genco Fuel Accounts, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the Fuel Costs being paid.

(ii)    Not later than nine (9) Business Days following the end of each month, Genco or Genco Operator shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Fuel Costs actually incurred and paid using the funds transferred into the Genco Fuel Account or the Other Genco Fuel Accounts during the prior month and (B) a written certification that all such Fuel Costs are Generation Pass-Through Expenditures.

(iii)    Genco and Genco Operator shall prepare and submit to T&D Operator such information and documents as T&D Operator may reasonably request in order for T&D Operator to comply with PREB rate filing requirements, including pricing information and fuel inventory. Genco and Genco Operator shall provide such documents and information to T&D Operator at such times as such Parties may mutually agree, but in no event later than seven (7) Business Days prior to the time T&D Operator is required to file such documents or information with PREB.

CONFIDENTIAL

**Section 3.6     Hydropower Costs**.

(a)     Payment of Hydropower Costs. Hydroco shall pay all of its non-fuel costs and expenses incurred in the course of operating and maintaining the Hydropower Assets (irrespective of Dispatch or the Electricity delivered or made available by Hydroco) and performing the Hydroco Decommissioning Services that are consistent with the then-approved Hydroco Budget (each such cost or expense, a "Hydropower Cost").

(b)     Hydroco Operating Account.

(i)     On or prior to the Effective Date, Hydroco shall establish an operating account relating to the Hydropower Assets (the "Hydroco Operating Account") into which Genco and Genco Operator shall deposit anticipated Hydropower Costs from time to time in accordance with Section 3.3(b) and this Section 3.6(b) and from which Hydroco shall withdraw funds from time to time only to (A) pay Hydropower Costs and/or (B) fund one or more operating accounts established by Hydroco which Hydroco shall use only to pay Hydropower Costs ("Other Hydroco Operating Accounts").

(ii)     On the day immediately following the Effective Date, Genco and Genco Operator shall deposit into the Hydroco Operating Account an amount equal to the anticipated Hydropower Costs for the following month, based on the then-approved Hydroco Budget.

(iii)     Hydroco shall not withdraw funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts other than to pay Hydropower Costs or, in the case of the Hydroco Operating Account, to fund one or more of the Other Hydroco Operating Accounts. Hydroco shall not withdraw funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts to pay Hydropower Costs unless such Hydropower Costs are Generation Pass-Through Expenditures.

(c)     Reporting Requirements.

(i)     Simultaneous with each withdrawal of funds from the Hydroco Operating Account or the Other Hydroco Operating Accounts, Hydroco shall provide Administrator, with copy to T&D Operator, with written notice of such withdrawal, including a summary of the Hydropower Costs being paid.

(ii)     Not later than eight (8) Business Days following the end of each month, Hydroco shall provide Administrator, with copy to T&D Operator, with (A) a full accounting setting forth in reasonable detail the Hydropower Costs actually incurred and paid using the funds transferred into the Hydroco Operating Account or the Other Hydroco Operating Accounts during the prior month and (B) a written certification that all such Hydropower Costs are Generation Pass-Through Expenditures.

**Article 4**
**DISPATCH; OWNERSHIP, OPERATION AND MAINTENANCE OF**

20

CONFIDENTIAL

## INTERCONNECTION FACILITIES; RECORDS; METERING; ANCILLARY SERVICES; DECOMMISSIONING; AGREED OPERATING PROCEDURES

**Section 4.1    Dispatch**.

(a)    Legacy Generation Assets. T&D Operator is authorized to Dispatch, and Genco and Genco Operator shall comply with T&D Operator's Dispatch of, the Generation Units at the Legacy Generation Assets in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

(b)    Hydropower Assets. T&D Operator is authorized to Dispatch, and Hydroco shall comply with T&D Operator's Dispatch of, the Generation Units at the Hydropower Assets in accordance with the System Operation Principles and the applicable Agreed Operating Procedures.

**Section 4.2    Ownership, Operation and Maintenance of Interconnection Facilities**.

(a)    Genco Interconnection Facilities. Genco shall own and Genco and Genco Operator shall operate and maintain the Genco Interconnection Facilities in accordance with the LGA Interconnection Agreement, the System Operation Principles and the applicable Agreed Operating Procedures. Neither Genco nor Genco Operator shall make any changes to the Genco Interconnection Facilities other than Genco or Genco Operator making changes in accordance with the LGA Interconnection Agreement.

(b)    Hydroco Interconnection Facilities. Hydroco shall own, operate and maintain the Hydroco Interconnection Facilities in accordance with the Hydropower Interconnection Agreement, the System Operation Principles and the applicable Agreed Operating Procedures. Hydroco shall not make any changes to the Hydroco Interconnection Facilities other than in accordance with the Hydropower Interconnection Agreement.

(c)    T&D Interconnection Facilities. PREPA shall own and T&D Operator shall operate and maintain the T&D Interconnection Facilities in accordance with the System Operation Principles and the applicable Interconnection Agreement and Agreed Operating Procedures. PREPA shall not make any changes to the T&D Interconnection Facilities other than in accordance with the applicable Interconnection Agreement.

**Section 4.3    Records and Information**.

(a)    Records. Each Party shall create, maintain and make available for examination by the other Party all records and other data with respect to the operation and maintenance of the Legacy Generation Assets, the Hydropower Assets and the Interconnection Facilities, as the case may be, or as otherwise may be required for the administration and performance of this Agreement, in each case, in accordance with the applicable Agreed Operating Procedures.

(b)    Information. Genco and Genco Operator shall: (i) provide T&D Operator with such information, data and assistance as may be reasonably necessary or appropriate for T&D Operator to perform its obligations (including with respect to any PREB rate or other proceeding

21

CONFIDENTIAL

or requirement) under this Agreement; and (ii) from time to time, as and when requested by T&D Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for T&D Operator to perform its obligations under this Agreement.

**Section 4.4     Metering**.

(a)     <u>Legacy Generation Assets</u>. All Electricity from the Legacy Generation Assets delivered or made available by Genco or Genco Operator at the applicable Interconnection Point shall be measured by meters and metering devices operated, maintained, tested and read in accordance with the LGA Interconnection Agreement and the applicable Agreed Operating Procedures.

(b)     <u>Hydropower Assets</u>. All Electricity from the Hydropower Assets delivered or made available by Hydroco at the applicable Interconnection Point shall be measured by meters and metering devices operated, maintained, tested and read in accordance with the Hydropower Interconnection Agreement and the applicable Agreed Operating Procedures.

**Section 4.5     Ancillary Services**. Genco, Genco Operator and Hydroco shall, in accordance with the System Operation Principles and the applicable Agreed Operating Procedures, provide such ancillary services as T&D Operator may request from time to time pursuant to the applicable Agreed Operating Procedures (the "<u>Ancillary Services</u>").

**Section 4.6     Decommissioning**.

(a)     <u>Legacy Generation Assets</u>. Genco and Genco Operator, shall be responsible for all Genco Decommissioning Services. Genco or Genco Operator shall, in accordance with the System Operation Principles, notify T&D Operator of the expected commencement of any Genco Decommissioning Services.

(b)     <u>Hydropower Assets</u>. Hydroco shall be responsible for all Hydroco Decommissioning Services. Hydroco shall, in accordance with the System Operation Principles, notify T&D Operator of the expected commencement of any Hydroco Decommissioning Services.

**Section 4.7     Agreed Operating Procedures**. Hydroco, T&D Operator, Genco and Genco Operator shall use commercially reasonable efforts to negotiate, finalize and execute individual operating procedures for each Legacy Generation Asset and each Hydropower Asset that is not subject to Agreed Operating Procedures as of the Effective Date substantially and in all material respects in the form of <u>Annex II</u> or otherwise as the applicable Parties may otherwise mutually agree (the "<u>Agreed Operating Procedures</u>") as promptly as practicable and, in any event, within thirty (30) days after the Effective Date.

22

CONFIDENTIAL

**Article 5**
**INDEMNIFICATION**

**Section 5.1    Indemnification**.

(a)    Generally. No Party shall be responsible for any direct or indirect losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties, forfeitures, obligations, deposits, taxes, costs, expenses, or other charges of any kind incurred ("Losses") by another Party in connection with their obligations pursuant to the terms of this Agreement, except to the extent such Losses are a direct result of (i) the gross negligence or willful misconduct of a Party or any of such Party's Affiliates or any of their respective directors, officers, employees, representatives, agents, contractors, subcontractors or suppliers or (ii) any failure to comply with the terms of this Agreement.

(b)    Waiver of Consequential Damages. In no event shall any Party or any Affiliate thereof or any of their respective directors, officers, employees, agents, contractors, subcontractors or suppliers be liable to any other Party or any Affiliate thereof or any of their respective directors, officers, employees, agents, contractors, subcontractors or suppliers for any indirect, consequential, punitive, special, incidental or exemplary losses or damages (including for lost profits or lost business opportunity), whether such liability arises in contract, tort or otherwise.

**Article 6**
**TERMINATION**

**Section 6.1    Termination**.

(a)    Generally. Termination of this Agreement shall occur only upon: (i) expiration of the Term of this Agreement as provided in Section 2.2; or (ii) mutual written agreement of the Parties.

(b)    Discharge of Obligations. Termination of this Agreement shall not discharge any Party from any obligation it owes to the other Parties under this Agreement by reasons of any transaction, loss, cost, damage, expense or liability which shall occur or arise (or the circumstances, events or basis of which shall occur or arise) prior to termination. It is the intent of the Parties hereby that any such obligation owed (whether the same shall be known or unknown at termination or whether the circumstances, events or basis of the same shall be known or unknown at termination) shall survive termination. Any indebtedness by one Party to another Party pursuant to this Agreement shall be considered payable within ninety (90) days of the termination of this Agreement.

**Article 7**
**REPRESENTATIONS AND WARRANTIES**

**Section 7.1    Representations and Warranties**. Each Party represents and warrants to each other Party as of the Effective Date as follows:

(a)    Existence and Powers. Such Party (i) is qualified to do business and is in good standing in the Commonwealth and (ii) has the required corporate power and authority to

23

CONFIDENTIAL

enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)    Due Authorization and Binding Obligation. The execution and delivery of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on its part. This Agreement has been duly and validly executed and delivered by such Party, and (assuming due authorization, execution and delivery by the other Parties) this Agreement constitutes a legal, valid and binding obligation of such Party enforceable against such Party in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    No Conflicts. Neither the execution, delivery or performance of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of such Party; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to such Party; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which such Party is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of such Party.

(d)    No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to such Party in connection with (i) the execution and delivery of this Agreement or (ii) the performance of its obligations hereunder, except as have been duly obtained or made.

(e)    No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by such Party of this Agreement and the consummation of the transactions contemplated hereby.

**Section 7.2    Compliance with Applicable Law**. Each Party agrees that in the performance of its obligations under this Agreement it shall comply with all Applicable Laws.

**Article 8**
**MISCELLANEOUS**

**Section 8.1    Notices**. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address or email

24

CONFIDENTIAL

address set forth below (or at such other address or email address as shall be specified by a Party in a notice given in accordance with this Section 8.1).

If to PREPA:

[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Email: [_____]

If to Genco:

[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Email: [_____]

If to Hydroco:

[_____]
[_____]
Attention: [_____]
Telephone: [_____]
Email: [_____]

If to T&D Operator:

LUMA Energy ServCo, LLC
PO Box 364267
San Juan, PR 00936-4267
Attention: [_____]
Telephone: [_____]
Email: [_____]

If to PREB:

[Puerto Rico Energy Bureau
World Plaza Building

268 Munoz Rivera Avenue
San Juan, Puerto Rico 00918
Attention: Edison Aviles Deliz
Telephone: (787) 523-6262
Email: eavilesdeliz@jrsp.pr.gov]

If to Administrator:

Administrator
PO Box 42001
San Juan, Puerto Rico 00940-2001
Attention: Executive Director – Fermín E. Fontanés Gómez
Telephone: (787) 722-2525 Ext. 15330
Email: Fermin.Fontanes@p3.pr.gov and
Administrator@p3.pr.gov

**Section 8.2    Amendments**. This Agreement may be amended or modified from time to time only by the written agreement of all the Parties. Each such instrument shall be reduced to writing and shall be designated on its face an "Amendment" or an "Addendum" to this Agreement.

25

CONFIDENTIAL

Notwithstanding anything to the contrary contained in this Agreement, the Parties agree that nothing in this Agreement shall (a) be or be deemed to be an amendment to the T&D O&M Agreement or once executed, the Generation O&M Agreement, or (b) result in Genco, Genco Operator or Hydroco being or being deemed to be third-party beneficiaries under the T&D O&M Agreement.

**Section 8.3      Entire Agreement**. This Agreement, together with the Annexes attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Agreement, other than the T&D O&M Agreement and the Generation O&M Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions. The Parties agree that nothing in this Agreement shall amend or modify in any respect (a) the T&D O&M Agreement or the rights and obligations of Administrator, T&D Operator and PREPA thereunder or (b) the Generation O&M Agreement or the rights and obligations of Administrator, Genco Operator and Genco thereunder.

**Section 8.4      Assignment and Transfer**. No Party shall assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB. Any attempt by a Party to assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Administrator and, to the extent required by Applicable Law, PREB, shall be void. If as part of the reorganization of PREPA ownership of the T&D System is assigned by PREPA to a Person, then the Parties shall amend this Agreement to recognize the rights and obligations of such Person under this Agreement and such other changes, in each case, as may be necessary and mutually acceptable to the Parties. This Agreement shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

**Section 8.5      Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 8.6      Survival**. The rights and obligations of the Parties pursuant to this Section 8.6, Section 8.1 and Section 8.8 shall survive the expiration or termination of this Agreement. No expiration or termination of this Agreement shall (a) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (b) preclude any Party from impleading any other Party in any legal proceeding originated by a third party as to any matter occurring during the Term. The rights and obligations of the Parties

26

CONFIDENTIAL

pursuant to Article 5 shall survive the expiration or termination of this Agreement for a period of twelve (12) months following the expiration or termination of this Agreement.

Section 8.7    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

Section 8.8    **Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

Section 8.9    **PREB Actions**. The Parties hereby acknowledge and agree that to the extent PREB (a) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("PREB Actions"), or (b) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of Administrator, unless otherwise provided by Applicable Law.

Section 8.10    **FOMB Powers**. For the avoidance of doubt, nothing in this Agreement shall constitute a limitation on, or waiver by, the FOMB (if then in existence) of any of the FOMB's rights or powers, including those rights or powers relating to the preparation and approval of budgets under PROMESA.

Section 8.11    **Joinder**. On the date that the Generation O&M Agreement is executed, [Genco/Administrator] shall cause Genco Operator to execute and deliver to the Parties the joinder agreement to this Agreement in the form attached hereto as Annex III (the "Joinder Agreement"). Within [three (3) Business Days] following receipt of the Joinder Agreement executed and delivered by Genco Operator, each of the Parties shall execute and deliver to the other Parties the Joinder Agreement. Effective upon the execution and delivery of the Joinder Agreement by Genco Operator and all of the Parties, Genco Operator shall become a "Party" to this Agreement and will have all of the rights and will be subject to all of the obligations of Genco Operator under and in accordance with the terms and conditions of this Agreement.

*[Signature page follows]*

27

CONFIDENTIAL

**IN WITNESS WHEREOF**, PREPA, Genco, Hydroco, T&D Operator and Administrator each has caused this Agreement to be duly executed as of the day and year first above written.

**PREPA**

By: _____

Name: _____

Title: _____

**GENCO**

By: _____

Name: _____

Title: _____

**HYDROCO**

By: _____

Name: _____

Title: _____

**T&D OPERATOR**

By: _____

Name: _____

Title: _____

28

CONFIDENTIAL

**PUERTO RICO PUBLIC-PRIVATE
PARTNERSHIPS AUTHORITY,
solely in its capacity as ADMINISTRATOR**


By: _____


Name: _____


Title: _____

29

CONFIDENTIAL

**Annex I**

**Form of Interconnection Agreement**

**Annex II**

**Form of Agreed Operating Procedure**

**Annex III**

**Form of Joinder Agreement**

[●], [●]

This Joinder Agreement (the "Joinder Agreement") is entered into as of the date first written above by the undersigned (the "Joining Party") in accordance with Section 8.11 of the Puerto Rico PREPA-Genco-Hydroco Operating Agreement, dated as of [●], 2023 (as amended, restated or supplemented from time to time, the "Agreement") among PREPA, Genco, Hydroco, T&D Operator and Administrator. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

1.    Joinder. By executing and delivering this Joinder Agreement, the Joining Party hereby: (i) acknowledges that it has read and understands the terms of the Agreement and has been afforded the opportunity to ask questions concerning the Agreement; (ii) ratifies and agrees to be bound by all of the terms, provisions and conditions contained in the Agreement, as if the Joining Party were an original party thereto; and (iii) makes, as of the date of this Joinder Agreement, all of the representations and warranties set forth in Article 7 (*Representations and Warranties*) of the Agreement (all such representations and warranties being incorporated herein by reference). Upon the execution of this Joinder Agreement by Joining Party and the acceptance of this Joinder Agreement by PREPA, Genco, Hydroco, T&D Operator and Administrator by execution and delivery of the signature page hereto, the Joining Party will become and be treated for all purposes of the Agreement as Genco Operator, and will have all of the rights and be subject to all of the obligations of Genco Operator under the Agreement.

2.    Supplemental Notice Information. The information in this paragraph 2 of the Joinder Agreement shall be deemed to amend and supplement Section 8.1 of the Agreement to add the following notice information for Genco Operator:

If to Genco:          [_____]
                      [_____]
                      Attention: [____]
                      Telephone: [____]
                      Email: [____]

                      with copy to:

Genco Operator:       [_____]
                      [_____]
                      Attention: [____]
                      Telephone: [____]
                      Email: [____]

If to Genco Operator: [_____]
                      [_____]
                      Attention: [____]

Annex III of
32

Telephone: [    ]
Email: [    ]

3.       <u>Counterparts</u>. This Joinder Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Joinder Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Joinder Agreement for all purposes.

4.       <u>Governing Law</u>. This Joinder Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Joinder Agreement and the negotiation, execution or performance of this Joinder Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

*[Signature page follows]*

Annex III of
33

CONFIDENTIAL

**IN WITNESS WHEREOF**, each of the undersigned has caused this Joinder Agreement to be duly executed as of the day and year first above written.

[●], as Genco Operator

By: _____

Name: _____

Title: _____


Accepted: As of the day and year first above written

**PUERTO RICO PUBLIC-PRIVATE
PARTNERSHIPS AUTHORITY,
solely in its capacity as ADMINISTRATOR**

By: _____

Name: _____

Title: _____


**PREPA**

By: _____

Name: _____

Title: _____


**GENCO**

By: _____

Name: _____

Title: _____


**HYDROCO**

By: _____

Name: _____

Annex III of
34

CONFIDENTIAL

Title: _____


**T&D OPERATOR**

By: _____

Name: _____

Title: _____

CONFIDENTIAL

## Annex IX

## Scope of Services

*This Annex IX (Scope of Services) is designed to set forth certain O&M Services in addition to those contained in Article 5 (O&M Services) of the main body of the Agreement, certain of which O&M Services shall also apply to the performance of the Decommissioning Services, Mobilization Services and Demobilization Services. This Annex IX (Scope of Services) is not intended, nor should it be deemed, to be an exclusive list of O&M Services. However, the Agreement, including this Annex IX (Scope of Services), absent subsequent changes agreed to by the Parties, sets forth the entire scope of O&M Services to be provided pursuant to the Agreement, with the exception of the services provided pursuant to the Shared Services Agreement until such time as Operator begins to provide such services. Capitalized terms used but not defined in this Annex IX (Scope of Services) have the respective meanings set forth in the Agreement. All obligations of Operator set forth herein shall be performed in accordance with and are subject to the requirements of the main body of the Agreement.*

I.    Legacy Generation Assets Operation and Maintenance Services.

A.    General. Operator shall be responsible for all management, operation, maintenance, repair and other related services with respect to the Legacy Generation Assets, subject to the terms and conditions of the Agreement, including (1) day-to-day operation and maintenance (including any major maintenance) services, including operation of the Legacy Generation Assets to generate electricity and deliver it into the T&D System; (2) identifying, justifying and managing any required maintenance capital expenditures; (3) providing routine inspections of the Legacy Generation Assets; (4) providing annual operating tests (the Annual Performance Test) of the Legacy Generation Assets in coordination with T&D Operator; (5) establishing appropriate and customary safety work rules and practices; (6) developing an operation and maintenance training program; (7) provisioning, storing and maintaining the inventory of spare and consumable parts, including Capital Spare Parts, for the Legacy Generation Assets; (8) establishing and maintaining a computerized maintenance management system for the Legacy Generation Assets; (9) performing scheduled and emergency maintenance, repair and replacement of equipment, including any balance of plant equipment, painting, and cleaning, among others; (10) managing Planned Outages, Unplanned Outages and Forced Outages and restoration of power supply to the transmission grid; (11) coordinating business continuity and emergency planning and storm restoration and recovery in coordination with T&D Operator; (12) procuring and managing water or auxiliary power supply, as applicable; (13) maintaining and repairing fuel and water systems, including tanks, pumps, filters, and piping, as required; (14) procuring and managing the delivery and quality testing of fuel; (15) liaising with the T&D Operator or any of their assignees or successors regarding dispatch, dispatch planning and related T&D system matters and providing required information; (16) interfacing with and providing reports to regulators including PREB and with environmental compliance agencies such as the EPA, the Puerto Rico Department of Natural and Environmental Resources, the Occupational Safety and Health Administration and others, as may be required; (17) obtaining, complying with and maintaining licenses, permits, consents and the Consent Decree, as necessary; (18) providing periodic reports regarding programmed and non-programmed operations, maintenance, repairs, services and modifications performed and to be performed; (19) preparing for and assisting in, or subcontracting for and

1

CONFIDENTIAL

overseeing, the decommissioning of the relevant plants as outlined in the Integrated Resource Plan (including any future integrated resource plans) in coordination with PREPA/the T&D Operator, Owner and PREB; (20) participating in emergency planning and drills led by the T&D Operator, as needed; (21) conducting emergency planning and drills independent of T&D Operator; (22) assisting with the transition of the plants to third parties or to new uses (synchronous condensers, etc.) to the extent certain of the plants are removed from the O&M Agreement and (23) developing and maintaining a good neighbor program.

B.      Day-to-Day Operation. Operator shall be responsible for the day-to-day safe operation of the Legacy Generation Assets, including start-up, load adjustments, active follow-up of operating parameters and alarms, and shut-down of the plants or units thereof as directed by the T&D Operator and in accordance with Operator's Operations and Maintenance Procedures.

C.      Compliance with PREPA-Genco-Hydroco Operating Agreement. As agent for Owner, Operator shall perform its obligations under the PREPA-Genco-Hydroco Operating Agreement, including the System Operation Principles and the Agreed Operating Procedures included therein, and shall coordinate with T&D Operator, as agent for PREPA, as required thereunder, including by fulfilling the T&D Operator's instructions with regards to generation dispatch and other obligations set forth in the System Operation Principles and the Agreed Operating Procedures, in order to effectively and safely supply the T&D System with requested electric generation and other services.

D.      Engineering Activities. Operator shall be responsible for engineering activities related to the safe operation and reliability of the Legacy Generation Assets, including: (1) analyses related to, and maintenance of records and standards for design and engineering, design standards, construction standards and related information, plant performance, reliability analysis, root cause analysis, equipment ratings and needs assessment; (2) managing an effective environmental, health and safety program; and (3) maintenance of an environmental, health, safety, regulatory compliance program and the documentation thereof.

E.      Maintenance of Technical Documentation. Operator shall be responsible for maintenance of revisions to all drawings, specifications, construction manuals, equipment diagrams and other technical documentation related to the Legacy Generation Assets.

F.      Fuel. Operator shall be responsible for procuring, transporting and managing the delivery and quality testing of Fuel, including natural gas, diesel (number 2 fuel oil) and number 6 fuel oil (including logistics, fuel testing and storage tank management), and approving invoices, as applicable and in accordance with existing and future fuel contract requirements, as an agent for Owner.

G.      Planning, Environmental and Regulatory. Operator shall be responsible for (1) compliance with Environmental Law (including the Consent Decree), including emissions monitoring, recordkeeping, and reporting; (2) maintenance of documentation, timely submission of applications for permits and approvals, and acquisition of permits, approvals, and Easements as required for the Legacy Generation Assets operations; and (3) compliance with applicable regulatory and legislative requirements subject to operating constraints and Prudent Industry Practice. In performing these services and any other services under the Agreement, nothing shall

2

CONFIDENTIAL

require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

H.    Legal Services. Operator shall be responsible for (1) day-to-day legal responsibilities relating to the O&M Services, Decommissioning Services and Demobilization Services, in coordination with Owner and Administrator in accordance with processes set forth in this Annex IX (*Scope of Services*); (2) management of the Existing Litigation and any claims, lawsuits, litigation or similar proceedings arising from and after the Service Commencement Date, (3) collaborating with the T&D Operator to prepare, present, and defend current or future rate cases or other regulatory or legal matters as they relate to the Agreement, as well as preparing, presenting, and defending any non-compliance with local legislative requirements. In performing these services and any other services under this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner. For the avoidance of doubt, the responsibility for tax and securities law related advice as it relates to the Legacy Generation Assets will remain with Owner and Owner will continue to retain its own advisors to provide such services.

I.    Insurance and Claims. Operator shall maintain the appropriate level of insurance as to cover claims that arise after executing the Agreement and following the Service Commencement Date, consistent with Prudent Industry Practices and with the requirements of the Agreement. As part of the Mobilization Plan, Operator shall develop a comprehensive insurance program, to be reviewed and approved by Administrator, which approval shall not be unreasonably withheld, delayed or conditioned. The insurance program shall be provided to PREB for its knowledge. Operator shall be responsible for preparing and submitting insurance claims (including claims that may have arisen prior to the Effective Date and/or the Service Commencement Date) on behalf of Owner as well as keeping Administrator timely informed of such claims processes.

J.    Subcontracting. Operator shall evaluate opportunities for the subcontracting of any specific activities associated with this Annex IX (*Scope of Services*) that shall provide greater efficiencies and value to the operation of the Legacy Generation Assets and seek to implement such activities within budget and regulatory constraints and in accordance with the Agreement.

K.    Good Neighbor. Operator shall conduct community outreach events (e.g., volunteer events, charitable contribution events, etc.) by region on a quarterly basis. All complaints received by PREB that are attributable to the Legacy Generation Assets shall be promptly resolved to PREB's reasonable satisfaction no later than thirty (30) Business Days after Operator receives notification of such complaint from PREB. Operator shall provide Administrator written quarterly reports with respect to any complaints received and Operator's resolution of such complaints.

L.    Other. Operator shall be responsible for other activities necessary, appropriate or advisable to operate and maintain the Legacy Generation Assets in accordance with the Contract Standards, including cooperation, as specified in the Agreement, during Operator's performance of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement, with third parties providing services to Owner with respect to Owner's provision of electric generation services, provided Owner shall impose similar obligations on such third parties to also cooperate with Operator.

3

CONFIDENTIAL

II.    Asset Management and Maintenance Services.

A.    General. Operator shall be responsible for managing and maintaining all assets of the Legacy Generation Assets, including machinery, equipment, structures, improvements and condition assessment of the components of the Legacy Generation Assets, including the following: (1) development and implementation of asset management strategies and risk management and mitigation for combined technical performance, life cycle cost, safety and regulatory compliance; (2) real estate management, including of Easements, leases and agreements; (3) fleet and equipment management; (4) materials and services procurement in accordance with the process required by Applicable Law and inventory management; (5) Legacy Generation Assets security in accordance with Applicable Law and to protect the Legacy Generation Assets from vandalism, terrorism or other acts; (6) business continuity and emergency preparedness and planning; (7) warehousing of on and off-island capital and other spare parts and consumables; (8) fuel procurement, management and testing services; and (9) training and licensing, as applicable, of operators and maintenance technicians.

B.    Inventory Control. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*): (1) maintain an inventory of fuel, equipment, spare parts, capital spare parts, materials and supplies (appropriate for day-to-day operations and Emergencies), and shall maintain and document an inventory control program; (2) purchase, maintain and store inventory in a manner also consistent with the Legacy Generation Assets policies and procedures adopted from time to time by Operator and provided in writing to Owner and Administrator and the Legacy Generation Emergency Response Plan; and (3) complete, on an agreed-upon cycle count basis, a physical inventory and a condition assessment of the equipment, spare parts, materials and supplies.

C.    Necessary Equipment and Systems. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*), determine, acquire, deploy and maintain tools, equipment and Information Systems necessary to perform all O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement.

D.    Information Technology. Operator shall, consistent with the Contract Standards, the Agreement and this Annex IX (*Scope of Services*), be responsible for (1) providing information technology systems maintenance support and improvements in accordance with cybersecurity requirements that support network and day-to-day activities; and (2) developing and maintaining a business continuity plan in the event of natural, man-made or cyber-attack incidents. Operator shall periodically provide Administrator (with copy to PREB) and the T&D Operator managed Energy Control Center the most current versions of the business continuity plan.

III.    Government, Community and Media Relations.

A.    General. Operator shall be responsible for (1) conducting government, community and media relations with respect to the management, operation and maintenance of the Legacy Generation Assets in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement; and (2) staffing public events and presenting

CONFIDENTIAL

workshops, seminars and similar activities during normal business hours, evenings, weekends and holidays.

B.     Communications. It is the Parties' intention that, to enable Operator to effectively communicate with the government officials regarding Legacy Generation Assets matters, Operator shall have direct responsibility for media and other public communications on all matters related to the Legacy Generation Assets, including communications with public officials, regulators and local municipalities and counties regarding storm preparation, management, coordination and response, programs and complaints and related matters. Accordingly, Operator shall determine all communications policies and procedures relating to its provision of O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services under the Agreement in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. Nevertheless, Operator agrees that (1) during Emergency Operating Conditions as defined and described in the Operations and Maintenance Procedures inclusive of major events (e.g., Forced Outages and Declared Emergency or Major Disaster) or (2) if it takes actions in Operator's capacity as Operator, that could be reasonably be expected to have broader impacts on public safety and/or public health, Operator shall endeavor to keep Owner, Administrator and T&D Operator, and, as appropriate, other local, state, and federal government entities, informed and act in consultation with Owner, Administrator and T&D Operator. These communications shall be made in accordance with the Operations and Maintenance Procedures and the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. Furthermore, Operator agrees that during a Declared Emergency or Major Disaster, Operator shall have certain responsibilities under the T&D Operator's incident command system.

C.     Government Relations. Operator shall be responsible for coordinating, conducting and formulating communications with municipal, local, state and federal representatives and organizations relating to operation and maintenance of the Legacy Generation Assets and provision of generation-related services by Operator, including PREB, in accordance with the Communications Plan set forth in Annex V (*Communications Plan*) to the Agreement. For the avoidance of doubt, Operator's responsibilities hereunder shall not include any matters related to PREPA's debt obligations, including any obligations pursuant to federal tax or securities laws.

IV.    Testing, Reports and Records.

A.     Annual Performance Test. Operator shall be responsible for conducting the Annual Performance Test for each Legacy Generation Asset, in coordination with the T&D Operator, Administrator and PREB, in accordance with the PREPA-Genco-Hydroco Operating Agreement. Each Annual Performance Test shall determine the Tested Capacity and Heat Rate for each Legacy Generation Asset for the current Contract Year. Operator shall document the results of such Annual Performance Test in accordance with Section IV.B(c) below, and shall promptly submit such results to Administrator, T&D Operator and PREB.

B.     Other Reports and Records as Requested by Administrator. Operator shall be responsible for (1) preparing a monthly operations report; (2) producing and delivering to Administrator information as Administrator may reasonably request to determine Operator's performance under the Agreement; and (3) developing and maintaining a comprehensive document management program with records storage, retention and destruction guidelines and

5

CONFIDENTIAL

procedures, in accordance with applicable Commonwealth and federal guidelines and regulations, and as otherwise provided for under the Agreement.

V.    Finance and Accounting Services.

A.    General. Operator shall be responsible for all finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the Legacy Generation Assets, including the implementation of the activities set forth in Sections V.A through V.E of this Annex IX (*Scope of Services*). In the exercise of the responsibilities described in this Annex IX Section V (*Scope of Services—Finance and Accounting Services*), Operator may utilize Owner's existing accounting system.

B.    Accounting and Reporting. Operator shall be responsible for accounting and reporting operations including the following activities:

1.    Maintenance of a complete and separate set of financial and accounting records relating to the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services, in accordance with GAAP and other applicable standards (including with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement and other accounting best practices);

2.    Maintenance of a general ledger and all subledgers in accordance with Applicable Law regarding accounts necessary to support the preparation of monthly financial statements and management reports for Operator;

3.    On a monthly basis until the expiration or earlier termination of the Mobilization Period, provision of budget to actuals analyses to explain the month's results with explanations;

4.    Analysis of all accounts within the Operating Budget, Fuel Budget and Decommissioning Budget, on a plant by plant and monthly basis, providing variance analysis of and explanations for both actual period-to-period variances (on a quarterly basis) and budget versus actual variances (on a monthly basis) to the extent reasonably requested by Administrator;

5.    (i) Performance of all accounting and reporting functions necessary to support the Legacy Generation Assets operations; (ii) the maintenance of the fixed assets records in accordance with PREB and other applicable regulatory or accounting requirements and (iii) performance of all reporting and recordkeeping functions necessary in connection with the performance and completion of the Decommissioning Services for the Legacy Generation Assets, including Operator's recommendations to commence Decommissioning Services for a Legacy Generation Asset, if any;

6.    Separate accounting and reporting that may be required from time to time for any federal and Commonwealth grants received by Owner to the extent reasonable prior notice of any such grants obtained is provided to Operator;

7.    Provision of accounting memorandum documenting procedures used in creating journal entries related to the Legacy Generation Assets;

6

CONFIDENTIAL

8.    Accounting for and documenting the costs and revenues resulting from Operator's performance under the Agreement in accordance with GAAP and any other applicable accounting requirements as determined necessary by Administrator (including in accordance with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement, and other accounting best practices, as applicable) in compliance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement;

9.    Reconciliations (including bank account reconciliations), which shall be performed monthly, quarterly or annually based on the risk associated with the account being reconciled, in each case (i) if the month in which the reconciliation is being performed is a quarter-ending month (other than December), by the end of the subsequent month or (ii) if the month in which the reconciliation is being performed is a non-quarter ending month or December, within forty-five (45) days after the end of such month; and

10.    Beginning in the first year of the Agreement, preparation from time to time as requested by PREB, but no less frequently than every three (3) years, of a depreciation study, the goal of which is to determine consolidated annual depreciation accrual rates for preparation of financial statements and factors that relate to the fair and timely recovery of capital invested in the Legacy Generation Assets.

C.    <u>Budgeting and Financial Forecasting</u>. Operator shall be responsible for budgeting and longer-term financial forecasting operations, including the following activities:

1.    Preparing and monthly monitoring of budgets necessary for operating expenses for the services provided by Operator under the Agreement;

2.    Update the Fuel Budget on a quarterly basis to comply with Section 7.3(f) (*O&M Budgets – Quarterly Adjustments to Fuel Budget*) of the main body of the Agreement;

3.    Analyzing monthly and year-to-date budget to actual variances, and explanations thereof and formulating financial projections based on the variance analyses;

4.    Analyzing expenditure projections for the annual or multi-year period beyond the period of actual results;

5.    Preparing and delivering costs budget input data for the annual budgeting processes, the Integrated Resource Plan and Owner's and Administrator's other long-range financial planning processes; and

6.    Risk management operations consistent with enterprise risk management practices covering the potential risks involved in the conduct of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services including the following activities: (i) managing counterparty credit risk, (ii) managing commodity market risk, and (iii) conducting a risk management program.

D.    <u>Auditing</u>. Operator shall be responsible for auditing operations, including the following activities:

7

CONFIDENTIAL

1.      Internal audit function to perform annual risk assessment related to the Legacy Generation Assets for the purpose of developing the appropriate risk-based annual audit plan as well as performing financial, regulatory and third-party contract compliance and operational audits and reviews, including review of the associated internal controls, based on the results of the annual risk assessment and associated annual audit plan;

2.      Provision of all necessary information and assistance to Owner's external auditors in connection with their audit of the financial statements and underlying financial records maintained by Operator related to the services provided under the Agreement; and

3.      Provision of copies of, and reasonable access to, the risk based annual audit plan referenced in Section V.D.1 of this Annex IX (*Scope of Services – Finance and Accounting Services – Auditing*); and the right of Administrator to inspect, during normal business hours and upon reasonable prior notice, internal audit reports and recommendations of Operator and management responses thereto; it being agreed, however, that the foregoing information shall be deemed to be confidential and shall therefore not be used by Owner or Administrator except with respect to any fraudulent conduct or willful misconduct identified in such reports and recommendations.

E.      Other. Any other accounting and finance related activities necessary or advisable to support the operation and maintenance of the Legacy Generation Assets as Administrator may request from time to time, including:

1.      Provision of information and data (both financial and operational) to support Owner's financing activities and the administration of Owner's and its Affiliates' debt service and required disclosure requirements;

2.      Provision of assistance (including provision of information and data (both financial and operational)) to Owner and Administrator in connection with the preparation of reports and other documents to satisfy Owner's reporting requirements including: quarterly and annual (year-end) financial reporting; monthly and annual federal agency reporting requirements; PREB reporting requirements, Budget Reconciliation Act of 2017 and other federal and Commonwealth stimulus or funding program reporting requirements; Department of Energy reporting requirements; and filings relating to the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services in compliance with Applicable Law, and in accordance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement; and

3.      Record keeping in compliance with Applicable Law.

VI.     Emergency Response.

A.      Curtailments and Shutdowns. If the generation of electricity through the Legacy Generation Assets is temporarily reduced, curtailed or shut down for any reason (except to the extent such reduction, curtailment or shut down is directed by T&D Operator pursuant to a T&D or load reduction directive), Operator shall, with due consideration of its responsibility for safety and plant reliability, as promptly as possible, advise Owner, Administrator and T&D Operator (and other Stakeholders as defined in the Legacy Generation Emergency Response Plan) as to the nature, reason and probable duration thereof and the expected effect thereof on the operation of

CONFIDENTIAL

the Legacy Generation Assets. Such notices shall be given as provided in this Annex IX (*Scope of Services*). Any announcement concerning such events made to the public or the media shall be made by Operator in accordance with the provisions of the Legacy Generation Emergency Response Plan and Section III of this Annex IX (*Scope of Services*).

B.    Implementation of the Legacy Generation Emergency Response Plan. Operator shall jointly develop with T&D Operator (in consultation with Administrator and subject to PREB approval), and implement, a Legacy Generation Emergency Response Plan that addresses, disaster recovery and emergency response and restoration, and all necessary emergency response, business continuity, reporting and communication functions relating to the Legacy Generation Assets, and coordinating such plans with any applicable plans of Owner, Administrator, T&D Operator and other service providers for business continuity and disaster recovery, including response, reporting and public communications relating to storms, other unusual weather occurrences and other Emergencies as follows, including the following activities:

1.    (i) Timely reporting to such Governmental Bodies as may be necessary, appropriate or advisable of such emergency conditions including timely regular updates as to the courses of action taken in response thereto or in anticipation thereof and progress made in responding to such emergency conditions and (ii) periodic reporting to Administrator of such emergency conditions as necessary or appropriate to permit Administrator to exercise proper Oversight of Operator's response to emergency conditions;

2.    Weather monitoring and mobilization of Operator or Subcontractor's workforce in connection with anticipated storms and other electric generation emergencies;

3.    Media, fire, police and government coordination (municipal, state and federal);

4.    Facility condition monitoring;

5.    Reporting to Administrator of the condition of each Legacy Generation Asset after a Forced Outage, Declared Emergency or Major Disaster, and the repairs and replacements, if any, needed to restore each such Legacy Generation Assets to pre-emergency conditions;

6.    Repair and replacement of damaged components of the Legacy Generation Assets, including due to Forced Outages or Declared Emergencies or Major Disasters; provided that to the extent the reasonable and documented costs and expenses required to perform such repairs or replacements would result in the Pass-Through Expenditures with respect to O&M Services for any Contract Year to exceed the O&M Budget for such Contract Year, such repairs or replacements shall require Administrator approval;

7.    Employee and public safety activities;

8.    At the request of Administrator, restoration of the Legacy Generation Assets to pre-emergency conditions; and

9

CONFIDENTIAL

9.      Conducting periodic drills, including as required by Applicable Law and in accordance with the PREPA-Genco-Hydroco Operating Agreement.

VII.    Maintenance.

A.      Generally. Operator shall perform all normal and ordinary maintenance (including any major maintenance) of all property constituting the Legacy Generation Assets, including machinery, structures, and electrical system components, keep the Legacy Generation Assets in operational condition and repair, in a neat and orderly condition and in accordance with the Contract Standards. This provision includes the machinery/tools used for the daily operation of the Legacy Generation Assets. Operator shall provide or make provisions for all labor, materials, supplies, equipment, spare parts, consumables and services that are necessary for the normal and ordinary maintenance (including any major maintenance) of the Legacy Generation Assets consistent with Contract Standards and their vehicle/machinery assets and conduct predictive, preventive and corrective maintenance of the Legacy Generation Assets as required by the Contract Standards.

B.      Maintenance Logs. Operator shall keep maintenance logs in accordance with the Contract Standards, which shall be available for review by Administrator.

C.      Safety and Security. Operator shall maintain the Legacy Generation Assets with due regard for employee and public health and safety at least consistent with Contract Standards, including the following:

1.      Establishing and prioritizing workplace safety initiatives, including systematically evaluating all Legacy Generation Assets sites to identify and address any immediate safety issues;

2.      Taking reasonable precautions in the performance of the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services for the health and safety of all persons working at the Legacy Generation Assets, to prevent employee injury, damage, injury or loss to the Legacy Generation Assets and to other Legacy Generation Assets property;

3.      Establishing and enforcing all reasonable safeguards for health and safety and protection, including fencing, posting danger signs and other warnings against hazards and applicable safety laws and regulations;

4.      Giving all notices and complying with all Applicable Law relating to the health and safety of persons or property or their protection from damage, injury or loss;

5.      Designating qualified and responsible employees whose duty shall be the supervision of health and safety, the prevention of fires, accidents spills, explosions and high energy piping failures and the coordination of such activities as shall be necessary with federal and local officials;

CONFIDENTIAL

6.    Designing and implementing cybersecurity measures in accordance with Contract Standards and in the manner specified and subject to the provisions set forth in the main body of the Agreement; and

7.    Developing and maintaining a physical security program in accordance with application regulations/law for the protection of the Legacy Generation Assets critical infrastructure, other assets and persons.

CONFIDENTIAL

## Schedule 1 to Annex IX

### Safety and Hazardous Materials Procedures Manual Outline

**GENERA PR LLC: Outline of Safety HAZMAT Procedures Manual**

- Genera PR Safety and Environmental Commitment
- Assignment of Roles and Responsibilities
- Coordination with Other Service Providers
- Community Awareness and Engagement
- Engagement with Regulatory Agencies
- Regulations and Consensus Standards
  - OSHA
  - NFPA
  - EPA
  - DOT
  - Puerto Rico Territory
  - Local
- Definitions
- Hazard Identification and Management/Mitigation
- Work Permits
- Incident Reporting, Investigation, and Recordkeeping
- Health, Safety, and Environmental Training
- Audits and Inspections
- Hearing Conservation
- Hazard Communication
- Contractor Safety
- Emergency Response and Business Continuity
- Fire Protection, Prevention, and Response / NFPA59A
- Hearing Conservation
- Respiratory Protection
- Electrical and Arc Flash Safety / NFPA70E
- Hazardous Materials
  - List of Materials (including Quantities)
  - Reporting Requirements
  - Storage and Handling
  - Containment / Spill Control
  - Security
  - Fire Protection
  - Transport
  - Accidental Release
    - Emergency Contacts
    - Response
    - Recovery
  - Threats

12

CONFIDENTIAL

- - - Natural Disasters
    - Terrorism
  - Disposal / Waste Characterization / Waste Management
- Lead & Asbestos
- Personal Protective Equipment
- Machinery and Machine Guarding
- Safety Signs & Tags
- Control of Hazardous Energy (lock-out-tag-out)
- Confined Space Entry
- Walking and Working Surfaces
- Working at Heights / Fall Protection
- Powered Industrial Trucks
- Management of Change
- Document Control
- Appendix
  - Forms
  - Checklists
  - Templates
  - Drawings
  - Area Studies

13

CONFIDENTIAL

## Annex X

## Operator Employment Requirements

Prior to commencing employment with Operator (or any affiliate thereof), all prospective employees will be expected to comply with the following requirements:

1) Prospective employees will be required to apply for candidacy in accordance with Operator's applicant processes, including applying to job requisitions within Operator's applicant tracking system and participating in any associated screening/assessment or interview processes.

2) Candidates shall be evaluated for prospective employment with Operator based on their prior experience, education and/or training in conjunction with the requirements for the role as posted in the applicable job description. Candidates may also be asked to participate in associated interview conversations with the Operator's Talent Acquisition team or affiliated 3rd-party HR as part of their selection process.

3) Prospective employees who are selected for employment will be required to undergo a criminal background check, which may also include verifications of education and prior employment and pre-employment drug testing.

4) Prospective employees of Operator will be required to comply with the company's policies regarding vaccination against COVID-19 and will be required to provide proof of COVID vaccination prior to commencement of employment.

5) Prospective employees who are selected for employment will also be required to provide documentary evidence of their authorization to work in Puerto Rico, and their continued employment with Operator will remain contingent upon maintaining such work authorization (in accordance with applicable laws).

6) Prospective employees who are selected for employment will be required to enter into an employment agreement with Operator (or its affiliate). Such agreement will set forth the individual employment terms for such prospective employee, including without limitation, title, employment commencement date, probationary period, location of employment, and compensation details (including base salary, additional discretionary bonus eligibility, etc.). Such employment agreement will also contain other terms and conditions of employment that apply to all Operator employees, including affirmations to comply with all Operator policies and procedures, acknowledgement of "at will" employment relationship, and agreement to comply with Operator's policies regarding providing notice, confidentiality, protective covenants, arbitration, and other miscellaneous terms.

7) Prospective employees who are selected for employment will also be required to complete all associated tax forms and other associated payroll and benefit information to ensure they can commence employment and be paid by Operator in accordance with all applicable laws (including being subject to reporting of income and tax withholding as applicable).

1

CONFIDENTIAL

8)      As part of their onboarding process, prospective employees will also be required to acknowledge receipt of all other Operator policies and procedures, including without limitation, Operator's Code of Conduct and Employee Handbook, anti-bribery & anti-corruption policies, policies regarding the protection of confidential information, insider trading policies, gifts & entertainment policies, social media policies and conflict of interest policies. In addition, their continued employment with Operator will be contingent upon continued adherence to such policies and procedures.

9)      Certain employees of Operator, depending on their role, may also be required to submit to and/or participate in specific training, certification courses, and/or other related processes in compliance with applicable laws or regulations. Such employees will be notified of such requirements, if applicable, as part of Operator's application and candidate selection process. Operator has identified 98 critical plant-level positions; a listing of Operator's current Critical Employee Positions is listed in the table below. The critical position counts shown by plant include:

| Operator's Critical Employee Positions | | |
| --- | --- | --- |
| Site | Headcount | Critical Positions |
| San Juan Plant | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 8 | Control Room Operator |
| | 1 | Work Control Center Supervisor |
| | 2 | Laboratory Workers |
| Total Critical Employee Positions for San Juan Plant | 17 | |
| Palo Seco Plant | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 4 | Control Room Operator |
| | 2 | Work Control Center Supervisor |
| | 1 | Laboratory Workers |
| | 4 | Peaker Operator |
| Total Critical Employee Positions for Palo Seco Plant | 17 | |
| Aguirre Plant | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 8 | Control Room Operator |

2

CONFIDENTIAL

| Operator's Critical Employee Positions | | |
|---|---|---|
| **Site** | **Headcount** | **Critical Positions** |
| | 2 | Work Control Center Supervisor |
| | 4 | Laboratory Workers |
| **Total Critical Employee Positions for Aguirre Plant** | 20 | |
| **Costa Sur Plant** | | |
| | 2 | Electrician /Instrument and Controls Technician |
| | 4 | Shift Supervisor |
| | 4 | Control Room Operator |
| | 2 | Laboratory Workers |
| | 1 | Work Control Center Supervisor |
| **Total Critical Employee Positions for Costa Sur Plant** | 13 | |
| **Cambalache Plant** | | |
| | 2 | Shift Supervisor |
| | 8 | Combustion Turbine Technician |
| | 1 | Work Control Center Supervisor |
| **Total Critical Employee Positions for Cambalache Plant** | 11 | |
| **Mayaguez Plant** | | |
| | 2 | Shift Supervisor |
| | 8 | Combustion Turbine Technician |
| **Total Critical Employee Positions for Mayaguez Plant** | 10 | |
| **Peakers** | | |
| | 2 | Operations Supervisor |
| | 8 | Combustion Turbine Technician |
| **Total Critical Employee Positions for Mayaguez Plant** | 10 | |
| **Grand Total** | 98 | |

3

CONFIDENTIAL

**Schedule 1 to Annex X**

**Owner Employee Interview Plan**

It is expected that the vast majority of plant Operators and Maintenance Technicians will come from the existing Owner workforce. Recruitment will focus on plant skilled employees and will involve the multi-skilling philosophy, trying to recruit and retain as much expertise from the Owner's current staff as possible.

Operator shall offer employment to existing fulltime plant Owner Employees who were employed and in good standing as of June 30, 2022; provided that such employees complete and satisfy customary background checks.

Operator shall give priority in hiring to any other Owner Employee who meets Operator's stated requirements for employment.

Existing employees will not be required to apply on-line. Employees may not be guaranteed a position to remain in their existing role.

Offers of employment shall remain open for a period of thirty (30) Business Days. Any such offer that is accepted within such thirty (30) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

The Operator shall provide a detailed schedule for the interview plan upon Service Commencement.

CONFIDENTIAL

## Annex XI

## Mobilization Hourly Fully Allocated Rates

The amounts of the Mobilization Hourly Fully Allocated Rates are shown in the chart below.

| Employee Category | Hourly Rates (US$) |
|---|---|
| Information & Technology | 430 |
| Human Resources – Systems | 370 |
| Human Resources – Human Capital | 440 |
| Human Resources – FTEs | 405 |
| Contractor Project Management | 420 |
| Finance – Operations | 420 |
| Regulatory | 440 |
| Permitting | 477 |
| Legal | 712 |
| Communications | 375 |

1

CONFIDENTIAL

## Annex XII

## Pass-Through Expenditures

Pass-Through Expenditures shall be the types of reasonable and documented costs and expenses incurred and documented by Operator in the course of providing O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services (without markup for Operator profit) or otherwise performing its obligations hereunder, except to the extent any such reasonable and documented costs and expenses are determined to be Disallowed Costs in the manner set forth in Section 7.7 (*Disallowed Costs*) of the main body of the Agreement. For purposes of the Agreement, including this Annex XII (*Pass-Through Expenditures*), any reference to "incurred under" a Budget, "covered by" a Budget, "included in" a Budget or similar phrases shall include any costs and expenses related to a line item set forth in such Budget and any materials or services procured in connection therewith. For the avoidance of doubt, costs and expenses incurred by Operator prior to the Effective Date shall not be deemed to be Pass-Through Expenditures. Capitalized terms used but not defined in this Annex XII (*Pass-Through Expenditures*) have the respective meanings set forth in the Agreement.

Except as otherwise provided in the Agreement, Pass-Through Expenditures shall include the following items:

1.    wages, salaries, bonuses, employer contributions and premium payments relating to pension, retirement and employee medical plans (including employer contributions for Hired Former Employees of Owner that elect to continue participating in Owner's defined benefit retirement plan), employer contributions and premium payments relating to workmen's compensation, non-occupational disability and other mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime and meal period compensation and associated benefits, severance and other post-employment benefits incurred by Operator in performing the O&M Services, the Decommissioning Services, Mobilization Services and Demobilization Services, excluding any such costs resulting from noncompliance by Operator with wage and hour, discrimination, wrongful dismissal or with any other applicable labor or employment related legislation, as well as the costs of defending such claims if such claims are found to be true by a final non-appealable judgment or administrative determination by a court of competent jurisdiction or other Governmental Body (including costs arising out of or related to additional compensation, damages, penalties, court costs and attorney's fees but excluding, for the avoidance of doubt, any costs incurred by Operator, including defense related costs, which are incurred at the direction or with the consent of Administrator);

2.    costs incurred and documented by Operator in performing the O&M Services, Decommissioning Services, Mobilization Services and Demobilization Services, including costs of all subcontracted and seconded employees, costs and expenses of all goods and services (including all materials, supplies, spare parts, vehicles, equipment rental, other transportation, freight, purchased services, training, Subcontractor costs, employee per diems, administrative costs such as dues, subscriptions, meals, office supplies, postage, rent, utilities and other costs), repair and maintenance costs, and the costs (including fees)

1

CONFIDENTIAL

incurred or payable with respect to banking services and accounts, cash management, leases, equipment rentals, easements, licenses, permits, consents and similar instruments;

3.    costs incurred with respect to professional services, including legal, engineering, accounting, financial, auditing, information technology, telecommunication and other contracted services;

4.    costs incurred with respect to the security of physical assets, information technology, operational technology and processes;

5.    claims, lawsuits, litigations, Losses, fines, penalties, reasonable and documented costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense (including reasonable and documented fees of external counsel; provided that Operator shall not be required to provide documentation that would waive any privilege between Operator and its external counsel), incurred in connection with the performance of the O&M Services and the Decommissioning Services, to the extent such fines, penalties, or other similar payments or charges have not been imposed as a result of Operator's violation of Applicable Law other than circumstances that arise out of violations or circumstances that arose prior to the Effective Date, or are otherwise subject to an indemnity from Owner to Operator under this Agreement;

6.    costs related to Forced Outages, Force Majeure Events and Owner Fault;

7.    costs associated with the Legacy Generation Emergency Response Plan, and the other Services Documentation required under the Agreement;

8.    any Tax related to Owner-owned, leased or licensed assets or revenues, and costs incurred in connection with any tax audits of Owner;

9.    any Commonwealth sales or use taxes (including the additional taxes of Sections 4210.01 and 4210.02 of the Puerto Rico Internal Revenue Code of 2011 (PRIRC)), municipal sales or use taxes, Commonwealth excise taxes, municipal license taxes, municipal excise taxes, and any other Taxes imposed by the Commonwealth, a municipality or any other Governmental Body on Owner or Operator, if Operator is acting on behalf of Owner pursuant to the Agreement, to the extent that Owner becomes subject to the payment of such taxes; provided that any (i) income taxes imposed on Operator by the PRIRC or Act 29, or (ii) other taxes imposed on Operator as a result of the establishment of its operations in the Commonwealth or the continuation thereof (including sales and use taxes and excise taxes on goods or services that are not required to be acquired by Operator on behalf of Owner for the performance of the O&M Services and the Decommissioning Services under the Agreement) shall not be Pass-Through Expenditures;

10.    any municipal construction excise taxes related to construction work performed by Operator in connection with the O&M Services and the Decommissioning Services;

11.    costs to obtain and maintain in effect Required Insurance, including premium, claims and deductible payments;

2

CONFIDENTIAL

12.   costs incurred in connection with Intellectual Property, including licensing of Intellectual Property for use in connection with this Agreement;

13.   costs incurred in connection with data security, including the implementation, operation and maintenance of a cybersecurity program;

14.   costs incurred in connection with Operator's performance serving in the role of the operator of the Legacy Generation Assets, including the services set forth in Section I.C of Annex IX (*Scope of Services*) to the Agreement;

15.   costs of compliance with PREB or other applicable regulatory requirements to which Owner or Operator is subject;

16.   costs incurred in connection with branding and customer and public communications;

17.   costs incurred in connection with Owner's community service programs and community engagement, including the services and resolution of complaints pursuant to Section I.K of Annex IX (*Scope of Services*) to the Agreement;

18.   costs incurred in connection with the administration and performance of the Facility Contracts including as required by Section 5.2 (*Facility Contracts*) in the main body of the Agreement;

19.   Fuel Costs incurred pursuant to approved and executed fuel supply agreements for the Legacy Generation Assets; and,

20.   stipulated penalties under the Consent Decree or any similar arrangement that may be entered into in the future.

3

CONFIDENTIAL

**Annex XIII**

**Insurance Specifications**

I.    Operator shall purchase and maintain, on Owner's behalf, the following insurance coverage for the benefit of Owner from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.    property damage, business interruption coverage and extra expense coverage for the all Legacy Generation Assets covering direct damage from all perils (subject to standard and reasonable exclusions imposed by insurers), which shall, among other things, (i) comply with any requirements resulting from a Legacy Generation Asset's receipt of federal funding and (ii) provide at least US$550 million in coverage or the minimum amount of property insurance required in connection with the Legacy Generation Asset's receipt of federal funding, whichever is greater; provided that coverage shall have no more than a US$2 million per occurrence deductible;

B.    primary and excess general liability insurance of not less than US$75 million per occurrence and in the aggregate with a primary general liability deductible or self-insured retention of no more than US$ 1 million;

C.    cyber insurance with limits of not less than US$20 million, and a deductible or self-insured retention of no more than US$1 million, for first and third-party losses, liabilities, judgments, settlements, lawsuits, regulatory actions, remediation and other costs or damages arising out of or resulting from any Cybersecurity Breach relating to the operation of the Legacy Generation Assets or non-compliance with Applicable Law relating to privacy or data protection, including coverage for breach response costs, PCI-DDS assessments, ransomware and denial of service, property damage and business interruption, and extra expense, as well as third-party claims and investigations arising out cyber incidents, including any negligent or otherwise wrongful acts or omissions by Operator or any employee or agent thereof;

D.    pollution legal liability insurance covering third-party bodily injury, property damage and other losses caused by pollution during the Term with limits of not less than US$5 million per occurrence and US$25 million in aggregate; provided that coverage shall include environmental cleanup, remediation, transportation and disposal;

E.    boiler and machinery insurance with at least US$200 million in limits per accident, with repair and/or replacement included; at least US$10 million in debris removal limits; and at least US$5 million in additional extra expense limits; provided that coverage shall (i) be comprehensive and (ii) cover boilers, pressure vessels, electrical machines including air conditioning, refrigeration equipment, electrical apparatus and electronic data processing equipment including production machines;

F.    commercial auto insurance, providing at least US$10 million in coverage per accident for liability, medical payments, and physical damage;

1

CONFIDENTIAL

G.    crime insurance providing limits of at least US$10 million in coverage per incident and in the aggregate, and covering employee dishonesty, forgery or alteration, dissolution of assets, computer fraud fund transfer, theft of client property, and credit card coverage;

H.    builder's risk/installation floater insurance covering losses arising out of Operator's and or Operator's subcontractors' construction, maintenance or repairs to the infrastructure of any Legacy Generation Asset, including capital expenditures pursuant to the Agreement; provided that limits for such coverage for each project shall be in amounts consistent with market practice and the magnitude of each construction project;

I.    to the extent not duplicative of other insurance coverage obtained in accordance with this Annex XIII (*Insurance Specifications*), protective liability insurance for Owner's contractors with a limit of not less than US$2 million per occurrence, including coverage for bodily injury and/or property damage claims arising out of negligent acts or omissions of independent contractors or subcontractors of Operator;

J.    management liability/Employment Practices Liability ("EPL")/fiduciary liability coverage, initially including at least US$25 million in wrongful acts coverage for Owner and directors and officers of Owner, and US$5 million in fiduciary liability and EPL coverage; the requirement for $25 million in wrongful acts coverage will only be in place until Administrator determines that $65 million in coverage becomes available on commercially reasonable terms; and

K.    business travel accident insurance, providing at least US$150,000 in coverage per accident and at least US$3 million in aggregate limits.

Operator shall be listed as an additional named insured on all aforementioned coverages, and Operator shall provide evidence of coverage through additional insured endorsements on or before the Service Commencement Date. Moreover, all the aforementioned coverages shall apply on a primary and non-contributory basis.

II.    In addition to and separate from the foregoing, Operator shall maintain, on its own behalf, the following insurance coverage from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.    Commonwealth of Puerto Rico's Workmen's Compensation Insurance (as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico), employer's liability insurance and all other employee required insurance; and

B.    fiduciary liability insurance, providing limits not less than US$1 million per claim and in the aggregate; the $1 million limit shall only apply until such time as Operator's plan asset values increase and support a higher coverage amount; Operator shall continue to increase the coverage amount from the $1 million as plan asset values increase until such time as plan asset values support a coverage amount of $5 million; and

C.    professional liability insurance, with limits of not less than US$5 million per occurrence and US$5 million in the aggregate, covering work performed by any architects, engineers, project managers, construction managers or other professional consultants

2

CONFIDENTIAL

pursuant to the Agreement. In addition, any architects, engineers or other consultants engaged by Operator with respect to any construction project undertaken by Operator pursuant to the Agreement shall maintain separate coverage with limits of not less than the completion cost of the construction project undertaken. When any policies purchased pursuant to this paragraph are renewed or replaced, the retroactive date in any new or replacement policy shall coincide with or precede the start of work in connection with the Agreement and any claims-made policy that is not renewed shall have an extended reporting period of at least six years.

CONFIDENTIAL

**Annex XIV**

**Termination Fees**

I.   Operator Termination Fee

| Contract Year | Operator Termination Fee |
|:---:|:---:|
| 1 | US$45,000,000 |
| 2 | US$45,000,000 |
| 3 | US$45,000,000 |
| 4 | US$45,000,000 |
| 5 | US$45,000,000 |
| 6 | US$45,000,000 |
| 7 | US$45,000,000 |
| 8 | US$45,000,000 |
| 9 | US$45,000,000 |
| 10 | US$45,000,000 |

II.  Owner Termination Fee

| Contract Year | Owner Termination Fee |
|:---:|:---:|
| 1 | US$45,000,000 |
| 2 | US$45,000,000 |
| 3 | US$45,000,000 |
| 4 | US$45,000,000 |
| 5 | US$45,000,000 |
| 6 | US$45,000,000 |
| 7 | US$45,000,000 |
| 8 | US$45,000,000 |
| 9 | US$45,000,000 |
| 10 | US$45,000,000 |

1

CONFIDENTIAL

## Annex XV

## Decommissioning Plan

The Decommissioning Services shall include Mobilization, Stabilization, Staffing Support, and Demolition. Plants to be decommissioned will be determined in accordance with the Generation O&M Agreement. PREB will approve the final decommissioning plan proposed by the Operator, as well as the budget and timeline. Post PREB approval the Operator will implement and execute the PREB approved plan.

Preparing for successful decommissioning includes planning for transition of the associated human resources. The PREB approved decommissioning plan will allow for targeted personnel training and communication that will facilitate optimal employment transition opportunities.

Post plan approval decommissioning services will generally consist of:

- Asset Assessment
- Mobilization of resources
- Engagement with local communities and other government agencies, and the media
- Stabilization: Determine which Legacy Generation Assets require stabilization before other activities proceed; identify, negotiate and modify environmental permits as needed for stabilization and as relevant; demolition stages; identify waste remediation activities; negotiate terms with agencies and assign consultant and existing personnel to first-year activities
  o Create a safe work environment at the Legacy Generation Assets
  o Identify key areas around the Legacy Generation Assets, that may need to be placed in a safe shutdown condition
  o Develop HSSEQ management plans for stabilization and monitoring the plans Stabilization may include the beginning of longer-term remediation activities that may extend to demolition and operations

- Staffing Support: Contract for staffing support for HSSEQ activities during the stabilization phase to ensure that adequate resources will be available during Demolition activities
  o The majority of personnel supporting the Decommissioning Services will be Operator's employees and contract personnel.

- Demolition: Develop HSSEQ management plans for activities, monitoring the activities, and following HSSEQ processes activities for safe work
  o Currently Operator understands that the PREB will approve the standards to which decommissioning will be done to.

1

CONFIDENTIAL

**Annex XVI**

**Demobilization Plan**

1      **Development of a Demobilization Plan**

Operator shall develop a Demobilization Plan. The Demobilization Plan shall enable the seamless, safe, and effective transfer of the Legacy Generation Assets to Owner, Administrator, or their successor operator, or custody of a decommissioned Legacy Generation Asset for future use. The Operator's principal objective shall be to complete any demobilization activities in the time frame and on the terms that are most suitable to Owner and Administrator in a way that will achieve an orderly handover or return of the Legacy Generation Assets. The Demobilization Plan shall address:

- Preparation of required reports
- Transition of operating employees
- Transfer of operations and maintenance knowledge
- Coordination for transfer of environmental approvals
- Review of applicable contracts

1.1    *Demobilization Process*

Operator shall formulate an approach to demobilization that will transfer either operation of the Legacy Generation Assets to Owner, Administrator or their successor operator, or the custody of a site that has been decommissioned and is ready for further use consistent with the long-term objectives of Owner and Administrator. The approach and scope of work for the demobilization shall vary depending on the nature of the activity at the assets at the time of demobilization.

1.2    *Required Reports*

Upon receiving the notice of Demobilization, Operator shall arrange for meetings between its management and permitting teams and those for the Owner, Administrator and the successor operator to agree upon and make arrangements to share and transfer any operating procedures and important documentation. The steps shall include familiarizing the successor operator with all of the inventory and related records that are necessary to realize an orderly transition, or a summary of the decommissioned site, particularly including any areas of the property that may be subject to long-term restrictions on use or other similar covenants that run with the land as a result of the remediation aspects of the decommissioning process.

Prior to meetings with Administrator, Owner or any projected successor, Operator shall prepare reports detailing the status of all Generation Assets and Legacy Generation Sites, their condition and all notifications related to the transfer or, or notices required by Governmental Approvals required for the operation of the Legacy Generation Sites.

CONFIDENTIAL

### 1.3    *Transition of Operator Employees*

The Demobilization Plan shall include a process for assisting employees with either transitioning to a new position elsewhere in the workforce or retraining for those employees whose jobs will be eliminated by the Operator demobilization. This plan shall also provide options for qualifying employees to sign on with any successor operator or to receive severance and training upon termination. Specifically, Operator, throughout the term of the O&M Agreement, shall establish an approach to multi-skilling of the workforce in order to maximize the potential for transition to the successor operator, to other power plants, or other industry opportunities. Operator shall work with union representation and adhere to local labor laws throughout the transition process. Operator shall place heavy emphasis on communication, focusing on timing, messaging, and respecting the various elements of the transition process, including, among others, benefits coordination, severance planning, and placement services.

Operator shall have a Labor Relations team as part of a larger demobilization team to focus on reviewing workforce background and facilitating employee transition. Along with the Operations team, the Labor Relations team shall be involved in any needed orientation of employees of the Owner, Administrator or the successor operator with respect to the operation of the equipment to ensure a smooth and efficient handover of responsibilities. This team shall also explore and be knowledgeable about opportunities for re-training of employees who will lose their jobs as a result of the termination and the demobilization.

### 1.4    *Transfer of Operations and Maintenance Know-How*

Operator shall transfer operations and maintenance know-how of the Legacy Generation Sites to any new operator or to Owner. This process shall entail meetings to review and confer about important topics such as maintenance philosophy, the roles and uses of subcontractors in the operation and maintenance of the plants. Operator shall seek to facilitate the continued operation of the Legacy Generation Assets in an orderly manner that minimizes impacts to the efficient operation of the units from the transition. To the extent that the Legacy Generation Assets are no longer in operation and have been decommissioned already, Operator shall assist Owner and Administrator in realizing the maximum value from the sale of any equipment, assets or supplies remaining at the site that are no longer needed for the Legacy Generation Assets. Operator shall be guided by an understanding of the remaining useful lifetime of other Legacy Generation Assets and use such information to determine whether employees, equipment and supplies can be efficiently transitioned to those other sites. The functional area leads from Operator shall review the information with the functional area leads of the successor operator, assigning and completing action items as necessary to assure a smooth and thorough transition.

### 1.5    *Coordinate Transfer of Environmental Approvals*

Functional leads from Operator shall meet with representatives of Administrator, Owner or the designee to identify and review all Governmental Approvals and set out a course of action to transfer the Governmental Approvals to Administrator, Owner, or the designee as the permittee or co-permittee on the permits. This effort shall entail joint meetings with the regulators to discuss the transition. Where the demobilization involves a Legacy Generation Asset for which operation and decommissioning has been completed, Operator shall review with Owner, Administrator or

2

CONFIDENTIAL

their successor operator the nature and extent of any obligations that the remaining permits or regulations require and how to achieve closure under these permits or regulatory programs. Operator may engage a subcontractor and/or legal support team to assist with the process of transferring such responsibilities and all related documentation to the Owner, Administrator or their successor operator.

## 1.6 *Review of Applicable Contracts*

The Operator shall meet with their counterparts from Administrator, Owner or the designee to review the key contracts and discuss their assignment or termination. To the extent that the Administrator, Owner or the designee may want to maintain any of these contracts, then Operator shall work to obtain agreement for the transfer of such contract to the new counterparty. Operator shall work with the Owner, Administrator or successor operator to ensure that the key responsibilities under the transferrable contracts have been identified and will be fulfilled after the transfer as well as an orderly closing out and transferring over of invoicing responsibilities, and transferring of all electronic and paper records. The Operator and all parties involved shall be aware of and work towards a set date for transfer so that all third parties can be aware of the appropriate points of contact moving forward and to ensure that settlement of all outstanding balances has occurred before such date.

## 2 Scope and Estimated Costs

Demobilization costs and durations are dependent upon the size of the site, number of units, technology of the units and the remediation needs of the site. Operator shall submit its estimate for all sites to be demobilized, whether they are smaller sites that may take just a few months to larger sites that may take longer, after taking into account any environmental remediation needed and transfer of any permits.

## 2.1 *Handover and Relocation of Equipment, Vehicles, or Other Materials*

Prior to any handover, Operator shall verify that all equipment has undergone the required inspections and/or maintenance procedures and shall inventory and locate all spare parts existing at the time of demobilization. Operator shall consolidate and prepare the transfer of all documentation for the equipment, including operating manuals (OEM and Operator produced O&M procedures), inspection records, certifications, maintenance history, compliance records, permits, and registrations, among others. Operator shall ensure the smooth transition of any existing warranties, warranty claims, and service agreements to Owner, Administrator or its successor operator. For equipment, vehicles, or other materials existing at a Legacy Generation Asset that was, or was in the process of being decommissioned, Operator shall work with the Owner, Administrator, or successor operator to transfer them for repurposing at other Legacy Generation Assets in order to preserve the best value for the customer, or to work with the Owner, Administrator, or successor operator to arrange for the liquidation of these items in a manner that would help Owner to realize the greatest amount of proceeds from their sale. For situations where such equipment or associated activities are in use at Legacy Generation Assets that remain in operation at the time of demobilization, Operator shall ensure that they are part of the operations to be transferred to Owner, Administrator or its successor operator.

CONFIDENTIAL

## 2.2    *Waste Disposal and Site Remediation*

Operator shall assess all Legacy Generation Assets for signs of contamination during initial inspections to determine the need for stabilization. Where evidence of contamination is found, environmental subcontractors shall be engaged to formally investigate the type and extent of contamination, propose remediation activities and to work with the relevant agencies to execute those activities, resulting in closure of the issues to the extent appropriate for the area remediated. Operator shall make efforts such that many of these activities would at least be underway and, in some cases, completed by the time of demobilization. In the event that these tasks have not been completed by the time of demobilization, the demobilization efforts shall focus on the transfer of these responsibilities to the successor operator. Operator shall ensure that the successor operator is aware of the status and nature of the remediation and the associated requirements so that the successor operator can continue the remediation activities. During the demobilization process, Operator shall take an inventory of existing fuels, liquids, tanks, chemicals and hazardous materials at the site, ensure proper labeling and storage, and coordinate with the successor operator for the safe transfer of all such materials. For any regulated substances that are not part of the materials to be transferred, they shall be reused if possible and, if not, arrangements for their disposal or treatment shall be made at authorized locations. All transfers of fuel and disposal of hazardous material shall be carried out in compliance with applicable federal and Puerto Rico regulations, at a minimum. Management and disposition of asbestos, PCB or other potentially dangerous materials shall be addressed during either the stabilization or the decommissioning phases for any Legacy Generation Assets that are no longer in operation at the time of demobilization.

## 2.3    *Communications and Engagement*

Operator shall use its corporate affairs department to frequently and proactively engage with members of the community, media, and local legislators, as well as PREPA and T&D Operator and other key stakeholders ahead of and during the Demobilization Period.

Operator shall regularly engage with the public regarding its plans for the Legacy Generation Assets and progress of those plans once launched. Operator shall execute this work through a local firm with connections to the affected communities and their leaders.

4

CONFIDENTIAL

**Annex XVII**

**Fuel Contracts**

| Counterparty Name | Products To Be Supplied | Contract Expiration Date | Extension Option |
|---|---|---|---|
| Puma Energy Caribe, LLC | Residual No. 6 Fuel Oil | October 30, 2022 | Yes |
| Novum Energy Trading Inc. | Light Distillate No. 2 Fuel Oil | November 17, 2022 | Yes |
| Naturgy | LNG | September 30, 2032 | Yes |
| NFEnergia LLC | LNG | June 2024 | Yes |

CONFIDENTIAL

## Exhibit A

### Form of Guarantee Agreement

THIS GUARANTEE AGREEMENT (the "Guarantee") is made and entered into as of this [•] day of [•], 20[23] by and among: (i) [•] ("Guarantor"), a [•] organized under the laws of [•]; and (ii) the Puerto Rico Electric Power Authority ("Owner" and, together with Guarantor, the "Parties" and each a "Party"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

### RECITALS

WHEREAS, Owner, the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 and [•] ("Operator"), a [•] organized under the laws of [•], have entered into the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement"), whereby Operator has agreed to provide the O&M Services and the Decommissioning Services for the Legacy Generation Assets in accordance with the terms of the O&M Agreement;

WHEREAS, Guarantor [indirectly] owns [•]% of the equity interests of Operator; and

WHEREAS, Owner and Administrator shall enter into the O&M Agreement only if Guarantor guarantees the performance by Operator of all of Operator's responsibilities and obligations, including amounts payable by, and the covenants and agreements of, Operator under the O&M Agreement, but in all cases subject to the limitations set forth herein, including Section 3.10 (*Limitation on Liability*) (all such obligations and responsibilities, the "Obligations") as set forth in this Guarantee.

NOW THEREFORE, in order to induce the execution and delivery of the O&M Agreement by Owner and Administrator and in consideration thereof, Guarantor agrees as follows:

### ARTICLE 1
### DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**

Capitalized terms used but not defined herein shall have the respective meanings set forth in the O&M Agreement.

**Section 1.2    Interpretation; Construction**

(a)    Headings. Articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Guarantee. Except as otherwise indicated, all references in this Guarantee to "Articles" and "Sections" are intended to refer to Articles and Sections of this Guarantee.

1

CONFIDENTIAL

(b)    Construction. For purposes of this Guarantee: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Guarantee as a whole and not to any particular provision of this Guarantee; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(c)    Days and Time. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Guarantee are to Atlantic Standard Time.

(d)    Accounting Principles. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(e)    Negotiated Agreement. The Parties have participated jointly in the negotiation and drafting of this Guarantee with the benefit of competent legal representation, and the language used in this Guarantee shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Guarantee shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

(f)    Payments. All payments required to be made by Guarantor hereunder shall be made in dollars.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

Section 2.1    **Representations and Warranties of Guarantor**. Guarantor hereby represents and warrants that:

(a)    Existence and Powers. Guarantor is a [•] duly organized, validly existing and in good standing under the laws of [•]. Guarantor has the required corporate power and authority to enter into this Guarantee, carry out its obligations hereunder and consummate the transactions contemplated hereby.

2

CONFIDENTIAL

(b)     Due Authorization and Binding Obligation. The execution and delivery by Guarantor of this Guarantee, the performance by Guarantor of its obligations hereunder and the consummation by Guarantor of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Guarantor. This Agreement has been duly and validly executed and delivered by Guarantor, and (assuming due authorization, execution and delivery by Owner) this Guarantee constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance by Guarantor of this Guarantee, nor the consummation of the transactions contemplated hereby shall: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Guarantor; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Guarantor; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Guarantor is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Guarantor.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Guarantor in connection with (i) the execution and delivery of this Guarantee or (ii) the performance by Guarantor of its payment or other obligations hereunder, except such as have been duly obtained or made.

(e)     No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Guarantor or, to Guarantor's knowledge, threatened against Guarantor, which if determined adversely against Guarantor would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Guarantee or (ii) the performance by Guarantor of its respective obligations hereunder.

(f)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Guarantor of this Guarantee and the transactions contemplated hereby.

(g)     Consent to Agreements. Guarantor is fully aware of the terms and conditions of the O&M Agreement.

(h)     Consideration. The Guarantee is made in furtherance of the purposes for which Guarantor has been organized, and the assumption by Guarantor of its obligations hereunder shall result in a material benefit to Guarantor.

## ARTICLE 3
## GUARANTEE COVENANTS

**Section 3.1     Guarantee to Owner.** Subject to Section 3.10 (*Limitation on Liability*), Guarantor hereby absolutely, presently, irrevocably and unconditionally guarantees to Owner the full and prompt payment and performance when due of the Obligations, including each and all of

3

CONFIDENTIAL

the payments required to be credited or made by Operator under the O&M Agreement to, or for the account of, Owner, as the case may be, when the same shall become due and payable pursuant to this Guarantee. Notwithstanding the unconditional nature of Guarantor's obligations as set forth herein, Guarantor shall have the right to assert the defenses provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*) against claims made under this Guarantee.

**Section 3.2    Right of Owner to Proceed Against Guarantor.**

(a)    Generally. This Guarantee shall constitute a guarantee of payment and performance and not of collection, and Guarantor specifically agrees that in the event of a failure by Operator to pay or perform any Obligation guaranteed hereunder, subject to any notice and cure periods under the O&M Agreement, Owner shall have the right to proceed firstly and directly against Guarantor under this Guarantee and without proceeding against Operator or exhausting any other remedies against Operator which Owner may have.

(b)    No Conditions for Enforcement. Without limiting the foregoing, Guarantor agrees that it shall not be necessary, and that Guarantor shall not be entitled to require, as a condition of enforcing the liability of Guarantor hereunder, that Owner:

(i)    file suit or proceed to obtain a personal judgment against Operator or any other person that may be liable for the Obligations or any part of the Obligations;

(ii)    make any other effort to obtain payment or performance of the Obligations from Operator other than providing Operator with any notice of such payment or performance as may be required by the terms of the O&M Agreement or required to be given to Operator under Applicable Law;

(iii)    foreclose against or seek to realize upon any security for the Obligations; or

(iv)    exercise any other right or remedy to which Owner or Administrator is or may be entitled in connection with the Obligations or any security therefor or any other guarantee thereof, except to the extent that any such exercise of such other right or remedy may be a condition to the Obligations of Operator or to the enforcement of remedies under the O&M Agreement.

(c)    Unexcused Failure; Single Full Performance. Upon any unexcused failure by Operator in the payment or performance of any Obligation and the giving of such notice or demand, if any, to Operator and Guarantor as may be required in connection with such Obligation and this Guarantee, the liability of Guarantor shall be effective and shall immediately be paid or performed. Notwithstanding Owner's right to proceed directly against Guarantor and subject to Section 3.10 (*Limitation on Liability*), Owner (or any successor) shall not be entitled to more than a single full payment from Guarantor or Operator or performance of the Obligations in regard to any breach or non-performance thereof.

4

CONFIDENTIAL

### Section 3.3    Guarantee Absolute and Unconditional.

(a)    Generally. The obligations of Guarantor hereunder are absolute, present, irrevocable and unconditional and shall remain in full force and effect until Operator shall have fully discharged the Obligations in accordance with their respective terms and conditions and, except as provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*), shall not be subject to any counterclaim, set-off, deduction or defense (other than full and strict compliance with, or release, discharge or satisfaction of, such Obligations) based on any claim that Guarantor may have against Operator, Owner, Administrator or any other person. Without limiting the foregoing, the obligations of Guarantor hereunder shall not be released, discharged or in any way modified by reason of any of the following (whether with or without notice to, knowledge by, or further consent of, Guarantor):

(i)    the extension or renewal of this Guarantee or the O&M Agreement up to the specified term of each agreement;

(ii)    any exercise or failure, omission or delay by Owner or Administrator in the exercise of any right, power or remedy conferred on Owner or Administrator, as the case may be, with respect to this Guarantee or the O&M Agreement except to the extent such failure, omission or delay gives rise to an applicable statute of limitations defense with respect to a specific claim;

(iii)    any permitted transfer or assignment of rights or obligations under the O&M Agreement or under any other Transaction Document by any party thereto, or any permitted assignment, conveyance or other transfer of any of their respective interests in the O&M Agreement or in, to or under any of the Transaction Documents;

(iv)    any permitted assignment for the purpose of creating a security interest or mortgage of all or any part of the respective interests of Owner or any other person in any Transaction Document or in any of the Legacy Generation Assets;

(v)    any renewal, amendment, change or modification in respect of any of the Obligations or terms or conditions of any Transaction Document;

(vi)    any failure of title with respect to all or any part of the respective interests of any person in any of the Legacy Generation Assets;

(vii)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, moratorium, arrangement, composition with creditors or readjustment of, or other similar proceedings against or affecting Operator or Guarantor, or any of the property of either of them, or any allegation or contest of the validity of this Guarantee or the O&M Agreement in any such proceeding (it being specifically understood, consented and agreed to that, to the extent permitted by Applicable Law, this Guarantee shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted and as if no rejection, stay, termination, assumption or modification has occurred

5

CONFIDENTIAL

as a result thereof, it being the intent and purpose of this Guarantee that Guarantor shall and does hereby waive all rights and benefits which might accrue to it by reason of any such proceeding);

(viii)    except as permitted by Section 4.1 (*Maintenance Of Corporate Existence*), Section 4.2 (*Guarantor Reports*) or the O&M Agreement, any sale or other transfer by Guarantor or any Affiliate of any of the capital stock or other interest of Guarantor or any Affiliate in Operator now or hereafter owned, directly or indirectly, by Guarantor or any Affiliate, or any change in composition of the interests in Operator;

(ix)    any unexcused failure on the part of Operator for any reason to perform or comply with any agreement with Guarantor;

(x)    the failure on the part of Owner to provide any notice to Guarantor which is not required to be given to Guarantor pursuant to this Guarantee and to Operator as a condition to the enforcement of Obligations pursuant to the O&M Agreement;

(xi)    any failure of any party to the O&M Agreement to mitigate damages resulting from any default by Operator or Guarantor under the O&M Agreement;

(xii)    the merger, consolidation or amalgamation of any party to the O&M Agreement into or with any other person, or any sale, lease, transfer, abandonment or other disposition of any or all of the property of any of the foregoing to any person;

(xiii)    any legal disability or incapacity of Operator or Guarantor with respect to the O&M Agreement; or

(xiv)    the fact that entering into the O&M Agreement by Operator or Guarantor was invalid or in excess of the powers of such party.

(b)    <u>Recovery of Money Due or Owing</u>. Should any money due or owing under this Guarantee not be recoverable from Guarantor due to any of the matters specified in Section 3.3(a) (*Guarantee Absolute and Unconditional - Generally*), then, in any such case, such money, together with all additional sums due hereunder, shall nevertheless be recoverable from Guarantor as though Guarantor were principal obligor in place of Operator pursuant to the terms of the O&M Agreement and not merely a guarantor and shall be paid by Guarantor forthwith subject to the terms of this Guarantee.

(c)    <u>Scope</u>. Notwithstanding anything to the contrary expressed in this Guarantee, nothing in this Guarantee shall be deemed to amend, modify, clarify, expand or reduce Operator's rights, benefits, duties or obligations under the O&M Agreement.

**Section 3.4    Defenses, Set-Offs and Counterclaims**. Notwithstanding any provision contained herein to the contrary, Guarantor shall be entitled to exercise or assert any and all legal or equitable rights or defenses which Operator may have under the O&M Agreement or under Applicable Law (other than bankruptcy or insolvency of Operator and other than any defense which Operator has expressly waived in the O&M Agreement or Guarantor has expressly waived in Section 3.5 (*Waivers by Guarantor*) or elsewhere hereunder), and the obligations of Guarantor

6

CONFIDENTIAL

hereunder are subject to such rights, defenses, counterclaims, set-offs or deductions which Operator is permitted to assert pursuant to the O&M Agreement, if any.

**Section 3.5    Waivers by Guarantor**. Guarantor hereby unconditionally and irrevocably waives:

(a)    notice from Owner of its acceptance of this Guarantee;

(b)    notice of any of the events referred to in Section 3.3 (*Guarantee Absolute and Unconditional*), except to the extent that notice is required to be given as a condition to the Obligations or the enforcement of remedies under the O&M Agreement;

(c)    to the fullest extent lawfully possible, all notices that may be required by statute, rule of law or otherwise to preserve intact any rights against Guarantor, except any notice to Operator required pursuant to the O&M Agreement or Applicable Law as a condition to any Obligation or the enforcement of remedies under the O&M Agreement;

(d)    to the fullest extent lawfully possible, any statute of limitations defense based on a statute of limitations period which may be applicable to guarantors (or parties in similar relationships) which would be shorter than the applicable statute of limitations period for the underlying claim;

(e)    any right to require a proceeding first against Operator;

(f)    any right to require a proceeding first against any person or the security provided by or under the O&M Agreement, except to the extent the O&M Agreement specifically requires a proceeding first against any person (except Operator) or security;

(g)    any requirement that Operator be joined as a party to any proceeding for the enforcement of any term of the O&M Agreement;

(h)    the requirement of, or the notice of, the filing of claims by Owner or Administrator in the event of the receivership or bankruptcy of Operator; and

(i)    all demands upon Operator or any other person and all other formalities the omission of any of which, or delay in performance of which, might, but for the provisions of this Section 3.5 (*Waivers by Guarantor*), by rule of law or otherwise, constitute grounds for relieving or discharging Guarantor in whole or in part from its absolute, present, irrevocable, unconditional and continuing obligations hereunder.

**Section 3.6    Payment of Costs and Expenses**. Guarantor agrees to pay Owner and Administrator on demand all Fees-and-Costs incurred by or on behalf of Owner in successfully enforcing by Legal Proceeding observance of the covenants, agreements and obligations contained in this Guarantee against Guarantor, other than the Fees-and-Costs that Owner or Administrator incurs in performing any of its obligations under the O&M Agreement where such obligations are a condition to performance by Operator of its Obligations.

7

CONFIDENTIAL

**Section 3.7     Subordination of Rights**. Guarantor agrees that any right of subrogation or contribution which it may have against Operator as a result of any payment or performance hereunder is hereby fully subordinated to the rights of Owner and Administrator hereunder and under the O&M Agreement and that Guarantor shall not recover or seek to recover any payment made by it hereunder from Operator until Operator and Guarantor shall have fully and satisfactorily paid or performed and discharged the Obligations giving rise to a claim under this Guarantee.

**Section 3.8     Separate Obligations; Reinstatement.**

(a)     Separate Obligations. The obligations of Guarantor to make any payment or to perform and discharge any other duties, agreements, covenants, undertakings or obligations hereunder shall: (i) to the extent permitted by Applicable Law, constitute separate and independent obligations of Guarantor from its other obligations under this Guarantee; (ii) give rise to separate and independent causes of action against Guarantor; and (iii) apply irrespective of any indulgence granted from time to time by Owner.

(b)     Reinstatement. Guarantor agrees that this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment or performance by or on behalf of Operator is rescinded or must be otherwise restored by Owner, whether as a result of any proceedings in bankruptcy, reorganization or similar proceeding, unless such rescission or restoration is pursuant to the terms of the O&M Agreement or Operator's enforcement of such terms under Applicable Law.

**Section 3.9     Term**. Subject to Section 3.10 (*Limitation of Liability*) this Guarantee shall remain in full force and effect from the date of execution and delivery hereof until all of the Obligations of Operator have been fully paid and performed.

**Section 3.10     Limitation on Liability**. Notwithstanding anything herein or otherwise to the contrary, the aggregate liability of Guarantor under or with respect to this Guarantee with respect to all matters whatsoever or howsoever arising, including where arising from gross negligence and willful misconduct of Operator, any Operator Indemnitee or Guarantor, and regardless of any other rights and remedies that Owner or Administrator may have against Operator under the O&M Agreement, under Applicable Law or otherwise, shall in no event exceed US$45,000,000.00 in respect of the payment and performance by Guarantor of the Obligations, collectively. Without limiting the foregoing, to the fullest extent permitted by law, in no event shall Guarantor be liable, whether in contract, indemnity, tort (including negligence, gross negligence and strict liability) or otherwise, for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages which arise from, relate to or are connected with this Guarantee or the performance of or failure to perform the Obligations except for claims of fraud or intentional misrepresentation.

## ARTICLE 4
GENERAL COVENANTS

**Section 4.1     Maintenance Of Corporate Existence**

(a)     Consolidation, Amalgamation, Merger, Sale or Transfer. Guarantor covenants that during the term of this Guarantee it shall maintain its corporate existence, shall not

8

CONFIDENTIAL

dissolve or otherwise dispose of all or substantially all of its assets and shall not consolidate or amalgamate with or merge into another entity or permit one or more other entities to consolidate or amalgamate with or merge into it unless the successor is Guarantor; provided, however, that Guarantor may consolidate or amalgamate with or merge into another entity, or permit one or more other entities to consolidate or amalgamate with or merge into it, or sell or otherwise transfer to another entity all or substantially all of its assets as an entirety and thereafter dissolve if the successor entity (if other than Guarantor) (i) is acceptable to Owner, acting reasonably, (ii) assumes in writing all the obligations of Guarantor hereunder and (iii) delivers to Owner an opinion of counsel to the effect that its obligations under the Guarantee are legal, valid, binding and enforceable subject to applicable bankruptcy and similar insolvency or moratorium laws.

(b)    Continuance of Obligations. If a consolidation, amalgamation, merger or sale or other transfer is made as permitted by this Section 4.1 (*Maintenance Of Corporate Existence*), the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*) shall continue in full force and effect and no further consolidation, amalgamation, merger or sale or other transfer shall be made except in compliance with the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*). No such consolidation, amalgamation, merger or sale or other transfer shall have the effect of releasing the initial Guarantor from its liability hereunder unless a successor entity has assumed responsibility for this Guarantee in accordance with this Section 4.1 (*Maintenance Of Corporate Existence*).

**Section 4.2    Guarantor Reports**. While this Guarantee is outstanding, Guarantor shall assist Operator in delivering to Administrator the reports required pursuant to Section 8.2 (*Guarantor Reports*) of the O&M Agreement.

**Section 4.3    Assignment**. Except as permitted pursuant to Section 4.1 (*Maintenance Of Corporate Existence*), Guarantor shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Guarantee without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned.

## ARTICLE 5
## MISCELLANEOUS

**Section 5.1    Consent to Jurisdiction**. Any dispute between the Parties arising out of, relating to or in connection with this Guarantee or the existence, interpretation, breach, termination or validity thereof shall be resolved in accordance with the procedures set forth in Article 15 (*Dispute Resolution*) of the O&M Agreement as if it were a Dispute, *mutatis mutandis*; provided that, for the avoidance of doubt, Guarantor hereby irrevocably: (i) agrees that any Legal Proceeding related to this Guarantee or to any rights or relationship between the Parties arising therefrom (other than any negotiation between the Parties in accordance with Section 15.3 (*Negotiation*) of the O&M Agreement) shall be solely and exclusively initiated and maintained in the Commonwealth Court; (ii) consents to the jurisdiction of the Commonwealth Court in any such Legal Proceeding; (iii) waives any objection which it may have to the laying of the jurisdiction of any such Legal Proceeding in the Commonwealth Court; and (iv) waives its right to a trial by jury in any Legal Proceeding in the Commonwealth Court.

CONFIDENTIAL

**Section 5.2    Notices**. All notices or other communications to be delivered in connection with the Guarantee shall be in writing and shall be deemed to have been properly delivered, given and received (i) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (ii) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (iii) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 5.2 (*Notices*)):

If to Owner:                        Puerto Rico Electric Power Authority
                                    [•]
                                    [•]
                                    Attention: [•]
                                    Telephone: [•]
                                    Email: [•]

                                    with a copy to:

                                    Administrator
                                    [•]
                                    [•]
                                    Attention: [•]
                                    Telephone: [•]
                                    Email: [•]

If to Guarantor:                    [•]
                                    [•]
                                    [•]
                                    Attention: [•]
                                    Telephone: [•]
                                    Email: [•]

**Section 5.3    Amendments**. Neither this Guarantee nor any provision hereof may be changed, modified, amended or waived except by written agreement duly executed by the Parties. To the extent required by Applicable Law, any such amendment shall not be effective until approved by the FOMB (if then in existence) and PREB.

**Section 5.4    Entire Agreement**. This Guarantee constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Guarantee. Without limiting the generality of the foregoing, this Guarantee shall completely and fully supersede all other understandings and agreements among the Parties with respect to such

10

CONFIDENTIAL

transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

**Section 5.5    Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 5.6    Waivers**. Either Guarantor or Owner may, at any time, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or (c) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Guarantee shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 5.7    Survival**. The rights and obligations of the Parties pursuant to Section 5.1 (*Consent to Jurisdiction*), Section 5.2 (*Notices*) and Section 5.12 (*Governing Law*) shall survive the expiration or termination of this Guarantee. No expiration or early termination of this Guarantee shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the term of this Guarantee.

**Section 5.8    Severability**. If any term or provision of this Guarantee is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Guarantee so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 5.9    Remedies**

 (a) <u>Cumulative and Non-Exclusive Remedies</u>. Except as otherwise provided in this Guarantee, any and all remedies herein expressly conferred upon a Party shall be deemed

11

CONFIDENTIAL

cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)     Irreparable Damage and Harm. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Guarantee were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Guarantee by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Guarantee or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Guarantee, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

**Section 5.10   Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Guarantee transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Guarantee for all purposes.

**Section 5.11   Office of the Comptroller**. Owner agrees to file this Guarantee with the Comptroller of the Commonwealth promptly after its execution and to provide Guarantor with evidence of its filing within fifteen (15) days following the execution of this Guarantee. The Parties acknowledge and agree that the obligations and considerations under this Guarantee shall not be enforceable until this Guarantee shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 5.12   Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Guarantee and the negotiation, execution or performance of this Guarantee or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 5.13   COMMONWEALTH OBLIGATIONS**. THE OBLIGATIONS OF OWNER UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER.

CONFIDENTIAL

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be duly executed as of the day and year first above written.

**[*GUARANTOR*]**

By: _____
Name:
Title:

Accepted and agreed by:

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____
Name:
Title:

1

CONFIDENTIAL

**Exhibit B**

**Form of Reliance Letter**

_____, 2023

Puerto Rico Thermal Generation Facilities Operation and Maintenance
Agreement dated as of ____, 2023

Ladies and Gentlemen:

In connection with the execution of the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of ____, 2023 by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, and _____ (the "Agreement") we have delivered our legal opinion relating to the impact of the Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Financial Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Agreement or the Bonds or by virtue of this letter.

Very truly yours,

1

CONFIDENTIAL

## Exhibit C

## Form of Sworn Statement

## SWORN STATEMENT

## ACT 2-2018

I, _____, of legal age, single/married, _____ and resident of the _____, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That I hold the position of _____ _____ (hereinafter referred to as the "Company") organized as a _____ under the laws of _____ with the Federal Identification No_____.

3.      That I am authorized to represent the Company and all of its partners and owners for purposes of this affidavit.

4.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfill similar tasks, have been convicted of, nor have they pleaded guilty to, any of the crimes in Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico" or for any of the crimes listed in Puerto Rico Act No. 2-2018, known as the "Anti-Corruption Code for a New Puerto Rico".

5.      No commissions or bonuses have been paid, in cash or in kind, and there is not commitment for the future payment of any such commissions or bonuses to any public official, employee or any former public official that participated in the negotiations and transactions contemplated by the Company's agreement with _____ while working for the Government of Puerto Rico.

6.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfill similar tasks have any conflicts of interest in acting as the Operator of the Legacy Generation Assets.

7.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in _____, this _____ day of _____, 20____.

By:_____
Name:
Title:

Affidavit No. _____

1

**CONFIDENTIAL**

Sworn and subscribed before me by _____, of the personal circumstances stated above, in his/her capacity as _____ of _____; who is personally known to me or whom I have identified pursuant the following form of identification: _____, this ____ day of _____, 20___.

2

CONFIDENTIAL

**Exhibit D**

**Form of Tax Opinion – Effective Date**

_____, 202__

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board for Puerto Rico ("FOMB") with respect to the Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of ___, 2023 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), and [•] ("Operator" and, together with Authority and Administrator, the "Parties"). Pursuant to the terms of the Agreement, Operator shall provide management, operation, maintenance, repair and other related services for the Authority's base-load generation plants and combustion turbine peaking plants (the "Legacy Generation Assets"). The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 2.2(b)(viii) (*Effective Date – Conditions to Execution*) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Facility Contracts in effect as of the date hereof, (iii) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated ____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the Legacy Generation Assets, and (iv) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. Sections 4.4 (*Governmental Approvals and Tax Matters*) and 4.5 (*Conditions Precedent to Service Commencement Date*) of the Agreement contain Service Date Conditions and Commencement Date Government Approvals (collectively, the "Conditions") that must be satisfied or obtained in order for the Service Commencement Date to occur. In rendering the opinion set forth herein, we have assumed that the Conditions are either mere formalities or that the likelihood that the Conditions will not be satisfied or obtained is remote. We have also assumed that the Service Commencement Date will occur on or before *[•]*. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

1

CONFIDENTIAL

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions shall not be treated as resulting in private business use:

2

CONFIDENTIAL

(1)    The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2)    The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider shall not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3)    The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4)    The term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5)    The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6)    The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7)    The service provider must agree that it is not entitled to and shall not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8)    The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider shall not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive

3

CONFIDENTIAL

officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement, we are of the opinion that neither the Agreement nor any provision thereof, nor the performance by each Party to the Agreement of its respective obligations thereunder (including Operator's administration of the Facility Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code. In the event that the Service Commencement Date does not occur on or before [•], this opinion shall be redelivered in final form as of the Service Commencement Date, subject to any necessary adjustments taking into account the later date.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof. We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above. Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the proceeds thereof upon the advice or approval of other counsel.

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.

Sincerely,

Nixon Peabody LLP

4

CONFIDENTIAL

**Exhibit E**

**Form of Commonwealth Certifications**

Operator, for itself and Parent Company (if Operator is a partnership under the Puerto Rico Internal Revenue Code), represents that as of the Effective Date (i) neither it nor Parent Company has any outstanding debts for unemployment insurance, temporary disability (workmen's compensation), or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, income taxes with the Department of Treasury of the Commonwealth or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (ii) it or Parent Company have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

Operator shall deliver to Owner prior to the Effective Date a copy of its Certificate of Incorporation, Certificate of Organization and Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable.

Operator shall also obtain and deliver to Owner, in each case dated no earlier than sixty (60) days prior to the Effective Date, the following:

(i)     a copy of Operator's Merchant's Registration Certificate (Form SC 2918);

(ii)    a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iii)   a certification issued by the Puerto Rico Treasury Department indicating that Operator and Parent Company (if Operator is a Partnership under the Puerto Rico Internal Revenue Code) do not have any debts under any concept, including income tax, with the Commonwealth (Form SC 6096);

(iv)    a Puerto Rico Sales and Use Tax Filing Certification issued by the Puerto Rico Treasury Department reflecting that Operator has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods (Form SC 2942);

(v)     an all concepts debt certification issued by CRIM reflecting that Operator does not owe any taxes to CRIM with respect to real or personal property; and

(vi)    a certification issued by the Puerto Rico Child Support Administration for Operator reflecting that Operator is in compliance with the withholdings required to be made by employers under Applicable Law.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

1

CONFIDENTIAL

## Exhibit F

### Form of Anti-Corruption Certifications

We certify under penalty of nullity that no public servant of Owner shall derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the O&M Services provided is the agreed-upon price that has been negotiated with Owner or its Representatives. The total amount shown on this invoice is true and correct. The O&M Services have been rendered, and no payment has been received.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____.

By:_____
Name:
Title:

1

CONFIDENTIAL

**Exhibit G**

**Form of Acknowledgement of Consent Decree**

Operator represents and acknowledges that (i) transfer of the operations subject to the Consent Decree, which operations include provision of the O&M Services and Decommissioning Services for the relevant Legacy Generation Assets, is conditioned upon agreement by Operator to be subject to the obligations under the Consent Decree and the jurisdiction of the United States District Court for the District of Puerto Rico; (ii) at least thirty (30) days prior to the Effective Date, it has been provided with a complete copy of the Consent Decree (including its appendices and attachments) and (iii) it has the required authority, ability, skills, access to funds, technical support and capacity to meet the requirements of the Consent Decree relating to its obligations under the Puerto Rico Thermal Generation Operation and Maintenance Agreement dated _____ (the "Agreement").

Operator represents, acknowledges and agrees that:

(i)     it shall be subject to the obligations under, and become a signatory to, the Consent Decree;

(ii)     it shall be subject to the jurisdiction of the United States District Court for the District of Puerto Rico in connection with the Consent Decree;

(iii)     to assist Owner in taking all necessary steps to make Operator a signatory to the Consent Decree or to obtain any needed U.S. District Court approval;

(iv)     to provide to each person, firm, corporation, contractor, or subcontractor hired to perform any requirement of the Consent Decree (including its attachments or appendices) a copy of all sections of the Consent Decree (including its attachments and appendices) relevant to the employment of the person, firm, corporation, contractor, or subcontractor;

(v)     to condition all contracts or subcontracts entered into upon performance of the requirement(s) in conformity with the terms of the Consent Decree (including its attachments and appendices); and

(vi)     to require that each such person, firm, corporation, contractor, or subcontractor provide written notice of the Consent Decree to all subcontractors hired to perform any portion of any requirement of the Consent Decree.

By:_____
Name:
Title:

1

CONFIDENTIAL

**Exhibit H**

**Form of Consent to Federal Funding**

[•], 2023

[Name of Government Official]
[Government Official's Position]
[Name of Federal Agency]

**Re:    Consent to Federal Funding**

To whom it may concern,

Reference is made to that certain Puerto Rico Thermal Generation Facilities Operation and Maintenance Agreement dated as of [•] (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement") among (i) [*PREPA Genco LLC*] ("Owner"), a [public limited liability company and governmental instrumentality of the Commonwealth of Puerto Rico, created under Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941], (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29") and (iii) [•] ("Operator"), a [•] organized under the laws of [•]. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the O&M Agreement.

Reference is also made to the faculties and rights vested upon the Administrator by virtue of: (i) Section 10(d) of Act 29, which provides that "the [Administrator], with the assistance of the Partnering Government Entity [(as defined thereunder)] and the [Puerto Rico Fiscal Agency and Financial Advisory Authority], shall oversee the performance and compliance of the Contractor under the Partnership Contract"; (ii) (a) Section 5(b) of Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), which provides that the Administrator "is hereby designated as the sole Governmental Entity authorized to and responsible for (1) implementing the public policy on PREPA Transactions [(as defined thereunder)] conducted in accordance with this Act…" and (b) Section 5(d) of Act 120, which provides that "[u]pon the consummation of any PREPA Transaction, the [Energy] Commission shall assist the [Administrator] in supervising the performance and compliance of the Contractor with the Partnership or Sales Contract, in accordance with Section 10(d) of [Act 29]"; and (iii) Section 6.2(a)(v) (*Rights and Responsibilities of the Administrator* – Generally) of the O&M Agreement, which provides that Administrator shall "exercise Oversight in relation to Operator's performance of its obligations *[thereunder]*, including performance of the O&M Services [(as defined thereunder)]."

Puerto Rico's Legacy Generation Assets (as defined in the O&M Agreement) are owned by Owner, who shall retain the exclusive right to receive amounts from all Federal Funding for the same, and pursuant to the terms of the O&M Agreement, Operator shall provide the O&M Services for the Legacy Generation Assets. Pursuant to Section 5.8(c) (*Federal Funding – Agent* Designation) of the O&M Agreement, Administrator and Owner hereby consent that Operator

1

CONFIDENTIAL

shall act as agent of Owner (and any permitted transferee thereto) in connection with any requests for federal funds for, or actions related to the federal funding of, the Legacy Generation Assets submitted to **[Name of Federal Agency]**.

Sincerely,

PUERTO RICO ELECTRIC POWER
AUTHORITY

PUERTO RICO PUBLIC PRIVATE
PARTNERSHIPS AUTHORITY

_____

_____

Name
Title:

Name
Title:

**PUERTO RICO
ELECTRIC POWER AUTHORITY**

# PREPA

GOVERNMENT OF PUERTO RICO

Mary C. Zapata Acosta
Executive Director

December 19, 2025

Via electronic mail
Josue.Colon@p3.pr.gov

Eng. Josué A. Colón Ortiz
Executive Director
Puerto Rico Public-Private Partnerships Authority
Energy Czar of Puerto Rico
Suite 300, Ave. José de Diego
San Juan, PR 00911

Dear engineer Colón Ortiz:

**Re: Consent for 3PPO Representation and Claims Enforcement under the Fuel Supply and Purchase Agreement (FSPA) with NFEnergía, LLC**

The Puerto Rico Electric Power Authority (PREPA) acknowledges receipt of the letter dated December 18, 2025, in which the Puerto Rico Public-Private Partnerships Authority (P3A) requests PREPA's consent to authorize the Third-Party Procurement Office (3PPO) to administer, execute, and enforce claims related to the Fuel Supply and Purchase Agreement (FSPA) with NFEnergía, LLC (NFE). In addition to the December 18th letter, P3A clarified that the 3PPO already has the mandate of representation for the Natural Gas Sale and Purchase Agreement (NGSPA) and the Energy Exigency Short-Term Natural Gas Sale and Purchase Agreement (the Exigency Agreement). Therefore, no further action by PREPA is required with respect to those agreements.

In response to P3A's request, PREPA hereby consents to the requested authorization with respect to the FSPA, as this agreement was originally executed by PREPA prior to the establishment of the 3PPO and therefore requires PREPA's express consent. PREPA's consent is granted subject to the following conditions, which are intended to ensure transparency, coordination, and the protection of PREPA's contractual interests:

1. **Quarterly Reporting.** The 3PPO shall submit to PREPA quarterly written reports detailing the actions taken, claims pursued, correspondence exchanged, and any material developments related to the enforcement of claims under the agreements.

2. **Notice of Formal Claims.** PREPA shall be copied on any formal claim, notice of default, demand, or similar enforcement action issued to NFE in connection with the agreements.

Consent for 3PPO Representation and Claims Enforcement under the Fuel Supply and Purchase Agreement (FSPA) with NFEnergía, LLC
Page 2

PREPA appreciates the coordination between P3A and the 3PPO on this matter and remains available to collaborate as necessary to safeguard the public interest and PREPA's contractual rights.

Cordially,

Mary C. Zapata Acosta
Executive Director

Lionel Santa Crispín, P3A Legal Counsel, Lionel.Santa@p3.pr.gov
Alexis G. Rivera Medina, PREPA Interim Legal Counsel, Alexis.Rivera@prepa.pr.gov